CLOSED, DISCMAG, JURY, PATENT

# U.S. District Court [LIVE]
## Eastern District of TEXAS LIVE (Marshall)
## CIVIL DOCKET FOR CASE #: 2:06-cv-00507-TJW-CE

Rembrandt Technologies, LP v. Charter Communications, Inc., et al
Assigned to: Judge T. John Ward
Referred to: Magistrate Judge Charles Everingham
Cause: 35:271 Patent Infringement

Date Filed: 11/30/2006
Jury Demand: Plaintiff
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**Rembrandt Technologies, LP**                     represented by   **Max Lalon Tribble, Jr**
Susman Godfrey LLP
1000 Louisiana Street
Ste 5100
Houston, TX 77002-5096
713/651-9366
Fax: 17136546666
Email: mtribble@susmangodfrey.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Wesley Spangler**
Brown McCarroll - Longview
1127 Judson Rd - Ste 220
PO Box 3999
Longview, TX 75606-3999
903-236-9800
Fax: 19032368787
Email: aspangler@mailbmc.com
*ATTORNEY TO BE NOTICED*

**Brooke Ashley-May Taylor**
Susman Godfrey, LLP - Seattle
1201 Third Avenue
Suite 3800
Seattle, WA 98101
206/516-3880
Fax: 206/516-3883
Email: btaylor@susmangodfrey.com
*ATTORNEY TO BE NOTICED*

**Charles Ainsworth**
Parker Bunt & Ainsworth
100 E Ferguson
Suite 1114
Tyler, TX 75702

US
903/531-3535
Fax: 903/533-9687
Email: charley@pbatyler.com
*ATTORNEY TO BE NOTICED*

**Collin Michael Maloney**
Ireland Carroll & Kelley
6101 S Broadway
Suite 500
Tyler, TX 75703
903/561-1600
Fax: 9035811071
Email: fedserv@icklaw.com
*ATTORNEY TO BE NOTICED*

**Edgar G Sargent**
Susman Godfrey, LLP - Seattle
1201 Third Avenue
Suite 3800
Seattle, WA 98101
206/516-3804
Fax: 206/516-3883
Email: esargent@susmangodfrey.com
*ATTORNEY TO BE NOTICED*

**Elizabeth L DeRieux**
Brown McCarroll
1127 Judson Rd - Ste 220
PO Box 3999
Longview, TX 75606-3999
903/236-9800
Fax: 9032368787
Email: ederieux@mailbmc.com
*ATTORNEY TO BE NOTICED*

**Franklin Jones, Jr**
Jones & Jones - Marshall
201 W Houston St
PO Drawer 1249
Marshall, TX 75670
903/938-4395
Fax: 9039383360
Email: maizieh@millerfirm.com
*ATTORNEY TO BE NOTICED*

**James Patrick Kelley**
Ireland Carroll & Kelley
6101 S Broadway
Suite 500

Tyler, TX 75703
903/561-1600
Fax: 9035811071
Email: patkelley@icklaw.com
*ATTORNEY TO BE NOTICED*

**Joseph Samuel Grinstein**
Susman Godfrey - Houston
1000 Louisiana Street
Ste 5100
Houston, TX 77002-5096
713/651-9366
Fax: 7136546666
Email: jgrinstein@susmangodfrey.com
*ATTORNEY TO BE NOTICED*

**Matthew R Berry**
Susman Godfrey, LLP - Seattle
1201 Third Avenue
Suite 3800
Seattle, WA 98101
206/373-7394
Fax: 206/516-3883
Email: mberry@susmangodfrey.com
*ATTORNEY TO BE NOTICED*

**Otis W Carroll, Jr**
Ireland Carroll & Kelley
6101 S Broadway
Suite 500
Tyler, TX 75703
903/561-1600
Fax: 9035811071
Email: Fedserv@icklaw.com
*ATTORNEY TO BE NOTICED*

**Robert Christopher Bunt**
Parker, Bunt & Ainsworth, P.C.
100 East Ferguson, Ste. 1114
Tyler, TX 75702
903/531-3535
Fax: 903/533-9687
Email: rcbunt@pbatyler.com
*ATTORNEY TO BE NOTICED*

**Robert M Parker**
Parker, Bunt & Ainsworth, P.C.
100 E Ferguson
Suite 1114
Tyler, TX 75702

903/531-3535
Fax: 9035339687
Email: rmparker@pbatyler.com
*ATTORNEY TO BE NOTICED*

**Sidney Calvin Capshaw, III**
Brown McCarroll - Longview
1127 Judson Rd - Ste 220
PO Box 3999
Longview, TX 75606-3999
903/236-9800
Fax: 19032368787
Email: ccapshaw@mailbmc.com
*ATTORNEY TO BE NOTICED*

**Tibor L. Nagy**
Susman Godfrey - Houston
1000 Louisiana Street
Ste 5100
Houston, TX 77002-5096
713/653-7850
Fax: 713/654-6102
Email: tnagy@susmangodfrey.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Charter Communications, Inc.**         represented by  **Allen Franklin Gardner**
Potter Minton PC
110 N College
Suite 500
PO Box 359
Tyler, TX 75710-0359
903/597-8311
Email: allengardner@potterminton.com

*ATTORNEY TO BE NOTICED*

**Bradford P Lyerla**
Marshall Gerstein & Borun
233 S Wacker Dr
6300 Sears Tower
Chicago, IL 60606-6357
312/474-6300
Fax: 312/474-0448
Email: blyerla@marshallip.com
*ATTORNEY TO BE NOTICED*

**Charles Edward Juister**

Marshall Gerstein & Borun
233 S Wacker Dr
6300 Sears Tower
Chicago, IL 60606-6357
312/474-6300
Fax: 312/474-0448
Email: cjuister@marshallip.com
*ATTORNEY TO BE NOTICED*

**Gregory E Stanton**
Marshall Gerstein & Borun
233 S Wacker Dr
6300 Sears Tower
Chicago, IL 60606-6357
312/474-6300
Fax: 312/474-0448
Email: gstanton@marshallip.com
*ATTORNEY TO BE NOTICED*

**Jon-Thomas Bloch**
Marshall Gerstein & Borun
233 S Wacker Dr
6300 Sears Tower
Chicago, IL 60606-6357
312/474-6300
Fax: 312/474-0448
Email: jbloch@marshallip.com
*ATTORNEY TO BE NOTICED*

**Kevin D Hogg**
Marshall Gerstein & Borun
233 S Wacker Dr
6300 Sears Tower
Chicago, IL 60606-6357
312/474-6300
Fax: 317/474-0448
Email: khogg@marshallip.com
*ATTORNEY TO BE NOTICED*

**Margaret Lynn Begalle**
Marshall Gerstein & Borun
233 S Wacker Dr
6300 Sears Tower
Chicago, IL 60606-6357
312/474-6300
Fax: 312/474-0448
Email: Mbegalle@marshallip.com
*ATTORNEY TO BE NOTICED*

**Michael Edwin Jones**

Potter Minton PC
110 N College
Suite 500
PO Box 359
Tyler, TX 75710-0359
903/597/8311
Fax: 9035930846
Email: mikejones@potterminton.com
*ATTORNEY TO BE NOTICED*

**Paul Bryan Stephens**
Marshall Gerstein & Borun
233 S Wacker Dr
6300 Sears Tower
Chicago, IL 60606-6357
312/474-6300
Fax: 312/474-0448
Email: pstephens@marshallip.com
*ATTORNEY TO BE NOTICED*

**William Joseph Kramer**
Marshall Gerstein & Borun
233 S Wacker Dr
6300 Sears Tower
Chicago, IL 60606-6357
312/474-6300
Fax: 312/474-0448
Email: wkramer@marshallip.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Charter Communications Operating, LLC**    represented by    **Allen Franklin Gardner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bradford P Lyerla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Charles Edward Juister**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gregory E Stanton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jon-Thomas Bloch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Margaret Lynn Begalle**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Edwin Jones**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Paul Bryan Stephens**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Joseph Kramer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Coxcom, Inc.,**                    represented by   **Allen Franklin Gardner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Leroy M Toliver**
Kilpatrick Stockton
1100 Peachtree St
Suite 2800
Atlanta, GA 30309
404/815-6483
Fax: 404/541-3274
Email: btoliver@kilpatrickstockton.com

*ATTORNEY TO BE NOTICED*

**Michael Edwin Jones**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mitchell G Stockwell**
Kilpatrick Stockton LLP
1100 Peachtree St
Ste 2800
Atlanta, GA 30309-4530
404/815-6214
Fax: 14048156555
Email:
mstockwell@kilpatrickstockton.com
*ATTORNEY TO BE NOTICED*

**Tonya R Deem**
Kilpatrick Stockton LLP NC

1001 W Fourth Street
Winston-Salem, NC 27101
336-607-7485
Fax: 336-607-7500
Email: tdeem@kilpatrickstockton.com
*ATTORNEY TO BE NOTICED*

**Movant**

**Coxcom, Inc.,**

**Counter Claimant**

**Charter Communications, Inc.**

**Counter Claimant**

**Charter Communications Operating,
LLC**

V.

**Counter Defendant**

**Rembrandt Technologies, LP**          represented by  **Tibor L. Nagy**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 11/30/2006 | 1 | COMPLAINT with JURY DEMAND against Charter Communications, Inc., Charter Communications Operating, LLC, Coxcom, Inc., (Filing fee $ 350.) , filed by Rembrandt Technologies, LP. (Attachments: # 1 # 2 # 3 # 4 # 5)(ehs, ) Additional attachment(s) added on 12/1/2006 (ehs, ). (Entered: 12/01/2006) |
| 11/30/2006 | 2 | CORPORATE DISCLOSURE STATEMENT filed by Rembrandt Technologies, LP (ehs, ) (Entered: 12/01/2006) |
| 11/30/2006 |   | E-GOV SEALED SUMMONS Issued as to Charter Communications, Inc., Charter Communications Operating, LLC, Coxcom, Inc.,. (ehs, ) (Entered: 12/01/2006) |
| 11/30/2006 | 3 | Form mailed to Commissioner of Patents and Trademarks. (ehs, ) (Entered: 12/01/2006) |
| 12/01/2006 | 4 | AMENDED COMPLAINT *(First Amended Complaint)* against all defendants, filed by Rembrandt Technologies, LP. (Attachments: # (1) Exhibit A# (2) Exhibit B# (3) Exhibit C# (4) Exhibit D# (5) Exhibit E) (DeRieux, Elizabeth) Additional attachment(s) added on 12/1/2006 (ehs, ). (Entered: 12/01/2006) |
| 12/04/2006 |   | Filing fee: $ 350.00, receipt number 2-1-2128 (ch, ) (Entered: 12/05/2006) |

| 12/07/2006 | 5 | NOTICE of Attorney Appearance by Robert M Parker on behalf of Rembrandt Technologies, LP (Parker, Robert) (Entered: 12/07/2006) |
|---|---|---|
| 12/07/2006 | 6 | NOTICE of Attorney Appearance by Robert Christopher Bunt on behalf of Rembrandt Technologies, LP (Bunt, Robert) (Entered: 12/07/2006) |
| 12/07/2006 | 7 | NOTICE of Attorney Appearance by Charles Ainsworth on behalf of Rembrandt Technologies, LP (Ainsworth, Charles) (Entered: 12/07/2006) |
| 12/12/2006 | 8 | NOTICE of Attorney Appearance by Franklin Jones, Jr on behalf of Rembrandt Technologies, LP (Jones, Franklin) (Entered: 12/12/2006) |
| 12/12/2006 | 9 | E-GOV SEALED SUMMONS Returned Executed by Rembrandt Technologies, LP. Charter Communications, Inc. served on 12/4/2006, answer due 12/26/2006. (ehs, ) (Entered: 12/15/2006) |
| 12/12/2006 | 10 | E-GOV SEALED SUMMONS Returned Executed by Rembrandt Technologies, LP. Charter Communications Operating, LLC served on 12/4/2006, answer due 12/26/2006. (ehs, ) (Entered: 12/15/2006) |
| 12/12/2006 | 11 | E-GOV SEALED SUMMONS Returned Executed by Rembrandt Technologies, LP. Coxcom, Inc., served on 12/4/2006, answer due 12/26/2006. (ehs, ) (Entered: 12/15/2006) |
| 12/21/2006 | 12 | MOTION for Extension of Time to File Answer re 4 Amended Complaint, by Charter Communications, Inc., Charter Communications Operating, LLC. (Attachments: # 1 Text of Proposed Order)(Jones, Michael) (Entered: 12/21/2006) |
| 12/28/2006 | 13 | Consent MOTION for Extension of Time to File Answer re 4 Amended Complaint, by Coxcom, Inc.,. (Attachments: # 1 Text of Proposed Order) (Jones, Michael) (Entered: 12/28/2006) |
| 12/28/2006 | 14 | APPLICATION to Appear Pro Hac Vice by Attorney Margaret Lynn Begalle for Charter Communications, Inc. and Charter Communications Operating, LLC. (ehs, ) (Entered: 12/29/2006) |
| 12/28/2006 | 15 | APPLICATION to Appear Pro Hac Vice by Attorney Jon-Thomas Bloch for Charter Communications, Inc. and Charter Communications Operating, LLC. (ehs, ) (Entered: 12/29/2006) |
| 12/28/2006 | 16 | APPLICATION to Appear Pro Hac Vice by Attorney Charles Edward Juister for Charter Communications, Inc. and Charter Communications Operating, LLC. (ehs, ) (Entered: 12/29/2006) |
| 12/28/2006 | 17 | APPLICATION to Appear Pro Hac Vice by Attorney William Joseph Kramer for Charter Communications, Inc. and Charter Communications Operating, LLC. (ehs, ) (Entered: 12/29/2006) |
| 12/28/2006 | 18 | APPLICATION to Appear Pro Hac Vice by Attorney Bradford P Lyerla for Charter Communications, Inc. and Charter Communications Operating, LLC. (ehs, ) (Entered: 12/29/2006) |
| 12/28/2006 | 19 | APPLICATION to Appear Pro Hac Vice by Attorney Gregory E Stanton for Charter Communications, Inc. and Charter Communications |

| | | |
|---|---|---|
| | | Operating, LLC. (ehs, ) (Entered: 12/29/2006) |
| 12/28/2006 | 20 | APPLICATION to Appear Pro Hac Vice by Attorney Paul Bryan Stephens for Charter Communications, Inc. and Charter Communications Operating, LLC. (ehs, ) (Entered: 12/29/2006) |
| 12/28/2006 | 28 | APPLICATION to Appear Pro Hac Vice by Attorney Kevin D Hogg for Rembrandt Technologies, LP. APPROVED (poa, ) (Entered: 01/04/2007) |
| 12/28/2006 | | Filing fee: $ 25., receipt number 618131 (poa, ) (Entered: 01/04/2007) |
| 12/28/2006 | 29 | APPLICATION to Appear Pro Hac Vice by Attorney Bradford P Lyerla for Charter Communications, Inc. and Charter Communications Operating, LLC.APPROVED (poa, ) (Entered: 01/04/2007) |
| 12/28/2006 | | Filing fee: $ 25., receipt number 618131 (poa, ) (Entered: 01/04/2007) |
| 12/28/2006 | | Filing fee: $ 25., receipt number 618131 (poa, ) (Entered: 01/04/2007) |
| 12/28/2006 | | Pro Hac Vice Filing fee paid by Juister; Fee: $25, receipt number: 618131 (poa, ) (Entered: 01/04/2007) |
| 12/28/2006 | | Pro Hac Vice Filing fee paid by Kramer; Fee: $25, receipt number: 618131 (poa, ) (Entered: 01/04/2007) |
| 12/28/2006 | | Pro Hac Vice Filing fee paid by Begalle; Fee: $25, receipt number: 618131 (poa, ) (Entered: 01/04/2007) |
| 12/28/2006 | 33 | APPLICATION to Appear Pro Hac Vice by Attorney Jon-Thomas Bloch for Charter Communications, Inc. and Charter Communications Operating, LLC. APPROVED (poa, ) (Entered: 01/04/2007) |
| 12/28/2006 | | Pro Hac Vice Filing fee paid by Bloch; Fee: $25, receipt number: 618131 (poa, ) (Entered: 01/04/2007) |
| 12/28/2006 | 34 | APPLICATION to Appear Pro Hac Vice by Attorney Paul Bryan Stephens for Charter Communications, Inc. and Charter Communications Operating, LLC.APPROVED (poa, ) (Entered: 01/04/2007) |
| 12/29/2006 | | Pro Hac Vice Filing fee paid by Margaret Begalle, Jon-Thomas Bloch, Charles Juister, William Kramer, Bradford Lyerla, Gregory Stanton, Paul Stephens; Fee: $175.00, receipt number: 6-1-8131 (ehs, ) (Entered: 12/29/2006) |
| 01/03/2007 | 21 | NOTICE of Attorney Appearance by Matthew R. Berry on behalf of Rembrandt Technologies, LP (Berry, Matthew) (Entered: 01/03/2007) |
| 01/03/2007 | 22 | NOTICE of Attorney Appearance by Brooke Ashley-May Taylor on behalf of Rembrandt Technologies, LP (Taylor, Brooke) (Entered: 01/03/2007) |
| 01/03/2007 | 23 | NOTICE of Attorney Appearance by Joseph Samuel Grinstein on behalf of Rembrandt Technologies, LP (Grinstein, Joseph) (Entered: 01/03/2007) |
| 01/03/2007 | 24 | NOTICE of Attorney Appearance by Sidney Calvin Capshaw, III on |

| | | |
|---|---|---|
| | | behalf of Rembrandt Technologies, LP (Capshaw, Sidney) Modified on 1/4/2007 (mpv, ). (Entered: 01/03/2007) |
| 01/03/2007 | 25 | NOTICE of Attorney Appearance by Andrew Wesley Spangler on behalf of Rembrandt Technologies, LP (Spangler, Andrew) (Entered: 01/03/2007) |
| 01/03/2007 | 26 | ORDER granting 12 Motion for Extension of Time to Answer re 4 Amended Complaint. The time for Defendant Charter to answer, move or otherwise respond is extended to 1/23/07 . Signed by Judge Leonard Davis on 1/3/07. (kjr, ) (Entered: 01/04/2007) |
| 01/03/2007 | 27 | ORDER granting 13 Motion for Extension of Time to Answer re 4 Amended Complaint. The time for Defendant Coxcom Inc. to answer, move or otherwise respond is extended to 1/23/07 . Signed by Judge Leonard Davis on 1/3/07. (kjr, ) (Entered: 01/04/2007) |
| 01/03/2007 | | Answer Due Deadline Updated for Charter Communications, Inc. to 1/23/2007; Charter Communications Operating, LLC to 1/23/2007; Coxcom, Inc., to 1/23/2007. (kjr, ) (Entered: 01/04/2007) |
| 01/04/2007 | 30 | DOCKETED IN ERROR. SEE CORRECT DOCUMENT #16*** APPLICATION to Appear Pro Hac Vice by Attorney Charles Edward Juister for Charter Communications, Inc. and Charter Communications Operating, LLC.APPROVED (poa, ) Modified on 1/4/2007 (Entered: 01/04/2007) |
| 01/04/2007 | 31 | ***DOCKETED IN ERROR. SEE CORRECT DOCUMENT # 17*** APPLICATION to Appear Pro Hac Vice by Attorney William Joseph Kramer for Charter Communications, Inc. and Charter Communications Operating, LLC. APPROVED (poa, ) Modified on 1/4/2007 (ch, ). (Entered: 01/04/2007) |
| 01/04/2007 | 32 | ***DOCKETED IN ERROR. SEE CORRECT DOCUMENT # 14*** APPLICATION to Appear Pro Hac Vice by Attorney Margaret Lynn Begalle for Charter Communications, Inc. and Charter Communications Operating, LLC. APPROVED (poa, ) Modified on 1/5/2007 (ch, ). (Entered: 01/04/2007) |
| 01/11/2007 | 38 | APPLICATION to Appear Pro Hac Vice by Attorney Leroy M Toliver for Coxcom, Inc.. (ch, ) (Entered: 01/16/2007) |
| 01/11/2007 | | Pro Hac Vice Filing fee paid by Toliver; Fee: $25, receipt number: 2-1-2200 (ch, ) (Entered: 01/16/2007) |
| 01/11/2007 | 39 | APPLICATION to Appear Pro Hac Vice by Attorney Mitchell G Stockwell for Coxcom, Inc.. (ch, ) (Entered: 01/16/2007) |
| 01/11/2007 | | Pro Hac Vice Filing fee paid by Stockwell; Fee: $25, receipt number: 2- |

| | | |
|---|---|---|
| | | 1-2201 (ch, ) (Entered: 01/16/2007) |
| 01/12/2007 | 40 | APPLICATION to Appear Pro Hac Vice by Attorney Edgar G Sargent for Rembrandt Technologies, LP. (ch, ) (Entered: 01/19/2007) |
| 01/12/2007 | | Pro Hac Vice Filing fee paid by Sargent; Fee: $25, receipt number: 2-1-2207 (ch, ) (Entered: 01/19/2007) |
| 01/15/2007 | 35 | NOTICE of Attorney Appearance by Otis W Carroll, Jr on behalf of Rembrandt Technologies, LP (Carroll, Otis) (Entered: 01/15/2007) |
| 01/15/2007 | 36 | NOTICE of Attorney Appearance by Collin Michael Maloney on behalf of Rembrandt Technologies, LP (Maloney, Collin) (Entered: 01/15/2007) |
| 01/15/2007 | 37 | NOTICE of Attorney Appearance by James Patrick Kelley on behalf of Rembrandt Technologies, LP (Kelley, James) (Entered: 01/15/2007) |
| 01/22/2007 | 41 | Consent MOTION for Extension of Time to File Answer re 4 Amended Complaint, by Coxcom, Inc.,. (Attachments: # 1 Text of Proposed Order) (Jones, Michael) (Entered: 01/22/2007) |
| 01/23/2007 | 42 | ANSWER to Amended Complaint *and*, COUNTERCLAIM against Rembrandt Technologies, LP by Charter Communications, Inc., Charter Communications Operating, LLC.(Jones, Michael) (Entered: 01/23/2007) |
| 01/23/2007 | 43 | CORPORATE DISCLOSURE STATEMENT filed by Charter Communications, Inc., Charter Communications Operating, LLC identifying Charter Communications, Inc. as Corporate Parent. (Jones, Michael) (Entered: 01/23/2007) |
| 01/23/2007 | 44 | ORDER granting 41 Motion for Extension of Time to Answer. Answer deadline extended to 1/26/07 . Signed by Judge Leonard Davis on 1/23/07. (ehs, ) (Entered: 01/23/2007) |
| 01/26/2007 | 45 | MOTION to Dismiss *for Lack of Subject Matter Jurisdiction, Personal Jurisdiction, or in the Alternative, Transfer, and Brief in Support Thereof* by Coxcom, Inc.,. (Attachments: # 1 Declaration of J. Spalding# 2 Exhibit 1# 3 Exhibit 2# 4 Exhibit 3A-C# 5 Exhibit 3D-E# 6 Exhibit 4# 7 Exhibit 5A-C# 8 Exhibit 6# 9 Exhibit 7# 10 Exhibit 8A-D# 11 Exhibit 9# 12 Exhibit 10A-B# 13 Text of Proposed Order Re: Personal Jurisdiction# 14 Text of Proposed Order Re: Subject Matter Jurisdiction# 15 Text of Proposed Order Re: Transfer to Delaware)(Jones, Michael) (Entered: 01/26/2007) |
| 01/26/2007 | 46 | MOTION to Change Venue/Transfer case *Contained in #45; proposed order attached to #45* by Coxcom, Inc.,. (mpv, ) (Entered: 01/29/2007) |
| 01/29/2007 | 47 | NOTICE of Attorney Appearance by Allen Franklin Gardner on behalf of Charter Communications, Inc., Charter Communications Operating, LLC (Gardner, Allen) (Entered: 01/29/2007) |
| 01/29/2007 | 48 | NOTICE of Attorney Appearance by Allen Franklin Gardner on behalf of Coxcom, Inc., (Gardner, Allen) (Entered: 01/29/2007) |
| 01/31/2007 | 49 | NOTICE of Attorney Appearance by Tibor L. Nagy on behalf of |

|  |  | Rembrandt Technologies, LP (Nagy, Tibor) (Entered: 01/31/2007) |
|---|---|---|
| 02/02/2007 | 50 | MOTION for Extension of Time to File Response/Reply as to 45 MOTION to Dismiss *for Lack of Subject Matter Jurisdiction, Personal Jurisdiction, or in the Alternative, Transfer, and Brief in Support Thereof* by Rembrandt Technologies, LP. (Attachments: # 1 Text of Proposed Order)(Nagy, Tibor) (Entered: 02/02/2007) |
| 02/05/2007 | 51 | ORDER granting 50 Rembrandt Technologies, LP to respond to the motion to dismiss filed by dft CoxCom, Inc is moved from 2/12/07 to 2/23/07. Signed by Judge Leonard Davis on 2/5/07. (djh, ) (Entered: 02/05/2007) |
| 02/05/2007 | 52 | NOTICE by Rembrandt Technologies, LP *Notice of Related Action Currently Pending Before The Honorable T. John Ward* (Nagy, Tibor) (Entered: 02/05/2007) |
| 02/12/2007 | 53 | *Plaintiff's* ANSWER to Counterclaim *of Defendants, Charter Communications, INc., Charter Communications Operating, LLC and Coxcom, Inc.* by Rembrandt Technologies, LP.(Nagy, Tibor) (Entered: 02/12/2007) |
| 02/13/2007 | 54 | ORDER - the court Transfers this case to the Honorable T. John Ward. Signed by Judge Leonard Davis on 2/13/07. (ch, ) (Entered: 02/13/2007) |
| 02/14/2007 | 55 | APPLICATION to Appear Pro Hac Vice by Attorney Tonya R Deem for Coxcom, Inc.(FEE PAID). (ch, ) (Entered: 02/15/2007) |
| 02/23/2007 | 56 | RESPONSE in Opposition re 45 MOTION to Dismiss *for Lack of Subject Matter Jurisdiction, Personal Jurisdiction, or in the Alternative, Transfer, and Brief in Support Thereof TO COXCOM, INC.'S MOTION TO DISMISS* filed by Rembrandt Technologies, LP. (Attachments: # 1 Affidavit of Tibor L. Nagy# 2 Exhibit A# 3 Exhibit B# 4 Exhibit C# 5 Exhibit D# 6 Exhibit E.1# 7 Exhibit E.2# 8 Exhibit F# 9 Exhibit G# 10 Exhibit H# 11 Exhibit I# 12 Exhibit J)(Nagy, Tibor) (Entered: 02/23/2007) |
| 03/05/2007 | 57 | REPLY to Response to Motion re 45 MOTION to Dismiss *for Lack of Subject Matter Jurisdiction, Personal Jurisdiction, or in the Alternative, Transfer, and Brief in Support Thereof* filed by Coxcom, Inc.,. (Attachments: # 1 Exhibit 1# 2 Exhibit 2)(Jones, Michael) (Entered: 03/05/2007) |
| 03/08/2007 | 58 | SUR-REPLY to Reply to Response to Motion re 45 MOTION to Dismiss *for Lack of Subject Matter Jurisdiction, Personal Jurisdiction, or in the Alternative, Transfer, and Brief in Support Thereof* filed by Rembrandt Technologies, LP. (Nagy, Tibor) (Entered: 03/08/2007) |
| 03/09/2007 | 59 | NOTICE by Coxcom, Inc., *of Filing Motion for Transfer and Consolidation of Rembrandt Technologies, LP Patent Litigation Pursuant to 28 U.S.C. 1407* (Attachments: # 1 MDL Motion for Transfer and Consolidation# 2 Motion Ex. A# 3 Motion Ex. B# 4 MDL Memorandum# 5 MDL Exhibit List# 6 MDL Notice of Appearance# 7 |

| | | |
|---|---|---|
| | | MDL Corporate Disclosure# 8 MDL Certificate of Service)(Stockwell, Mitchell) (Entered: 03/09/2007) |
| 03/09/2007 | 60 | Additional Attachments to Main Document: 59 Notice (Other), Notice (Other).. (Attachments: # 1 MDL Ex. 1# 2 MDL Ex. 2# 3 MDL Ex. 3# 4 MDL Ex. 4# 5 MDL Ex. 5# 6 MDL Ex. 6# 7 MDL Ex. 7# 8 MDL Ex. 8# 9 MDL Ex. 9# 10 MDL Ex. 10# 11 MDL Ex. 11# 12 MDL Ex. 12# 13 MDL Ex. 13# 14 MDL Ex. 14# 15 MDL Ex. 15# 16 MDL Ex. 16# 17 MDL Ex. 17# 18 MDL Ex. 18# 19 MDL Ex. 19# 20 MDL Ex. 20# 21 MDL Ex. 21# 22 MDL Ex. 22# 23 MDL Ex. 23# 24 MDL Ex. 24# 25 MDL Ex. 25# 26 MDL Ex. 26# 27 MDL Ex. 27# 28 MDL Ex. 28# 29 MDL Ex. 29# 30 MDL Ex. 30# 31 MDL Ex. 31# 32 MDL Ex. 32# 33 MDL Ex. 33# 34 MDL Ex. 34# 35 MDL Ex. 35# 36 MDL Ex. 36# 37 MDL Ex. 37# 38 MDL Ex. 38# 39 MDL Ex. 39# 40 MDL Ex. 40# 41 MDL Ex. 41# 42 MDL Ex. 42# 43 MDL Ex. 43)(Stockwell, Mitchell) (Entered: 03/09/2007) |
| 03/29/2007 | 61 | NOTICE by Coxcom, Inc., re 45 MOTION to Dismiss *for Lack of Subject Matter Jurisdiction, Personal Jurisdiction, or in the Alternative, Transfer, and Brief in Support Thereof of Supplemental Authority Supporting its Motion to Transfer* (Jones, Michael) (Entered: 03/29/2007) |
| 03/30/2007 | 62 | NOTICE by Rembrandt Technologies, LP *Joint Notice of Conference Regarding Proposed Discovery Order and Docket Control Order* (Attachments: # 1 Exhibit Discovery Order and Docket Control Order) (Taylor, Brooke) (Entered: 03/30/2007) |
| 04/05/2007 | 63 | NOTICE by Rembrandt Technologies, LP re 60 Additional Attachments to Main Document,,,, 59 Notice (Other), Notice (Other) *Notice of Filing Opposition to CoxComs Motion for Transfer and Consolidation* (Attachments: # 1 Exhibit Rembrandts Brief in Opposition to CoxComs Motion For Transfer and Consolidation# 2 Exhibit Exhibit List# 3 Exhibit Opposition Brief Exh 1# 4 Exhibit Opposition Brief Exh 2# 5 Exhibit Opposition Brief Exh 3# 6 Exhibit Opposition Brief Exh 4# 7 Exhibit Opposition Brief Exh 5# 8 Exhibit Opposition Brief Exh 6# 9 Exhibit Opposition Brief Exh 7# 10 Exhibit Opposition Brief Exh 8# 11 Exhibit Opposition Brief Exh 9# 12 Exhibit Opposition Brief Exh 10# 13 Exhibit Exhibit 11# 14 Exhibit Exhibit 12# 15 Exhibit Opposition Brief Exh 13# 16 Exhibit Response to CoxComs Motion for Transfer and Consolidation# 17 Exhibit Reasons Why Oral Argument Should Be Heard# 18 Exhibit Proof of Service)(Taylor, Brooke) (Entered: 04/05/2007) |
| 04/18/2007 | 64 | ORDER - referring case to Magistrate Judge Charles Everingham in accordance with the assignments made by General Order 07-03. The magistrate judge shall conduct pre-trial proceedings pursuant to 28 USC 636. Signed by Judge T. John Ward on 4/18/07. (ch, ) (Entered: 04/18/2007) |
| 04/18/2007 | 65 | NOTICE by Charter Communications, Inc., Charter Communications Operating, LLC, Coxcom, Inc., *Notice of Development* (Attachments: # 1 Notice of Hearing)(Gardner, Allen) (Entered: 04/18/2007) |

| 04/19/2007 | 66 | ORDER- REGARDING THE PROTECTIVE ORDER AND DOCUMENT PRODUCTION. Signed by Judge Charles Everingham on 4/19/07. (ch, ) (Entered: 04/19/2007) |
|---|---|---|
| 04/19/2007 | 67 | DOCKET CONTROL ORDER Respond to Amended Pleadings 11/30/07. Amended Pleadings due by 11/16/2007. Discovery due by 5/14/2008. Joinder of Parties due by 5/3/2007. Claims Construction Hearing set for 2/13/2008 - 2/14/08 9:00 AM before Judge T. John Ward. Motions in limine due by 7/21/2008. Proposed Pretrial Order due by 7/24/2008. Jury Selection set for 8/4/2008 9:00AM before Judge T. John Ward. Pretrial Conference set for 7/24/2008 9:30 AM before Judge T. John Ward. Privilege Logs to be exchanged by parties 6/4/07. All other deadlines are set forth herein. Signed by Judge Charles Everingham on 4/19/07. (ch, ) (Entered: 04/19/2007) |
| 04/24/2007 | 68 | NOTICE by Rembrandt Technologies, LP *Of Proposed Protective Order* (Attachments: # 1 Text of Proposed Order Proposed Protective Order) (Taylor, Brooke) CORRECTED PROPOSED PROTECTIVE ORDER added on 4/25/2007 (mpv, ). Modified on 4/25/2007 (mpv, ). (Entered: 04/24/2007) |
| 04/24/2007 | 69 | NOTICE by Rembrandt Technologies, LP *Re Electronic Production* (Taylor, Brooke) (Entered: 04/24/2007) |
| 04/25/2007 | | NOTICE re 68 Notice (Other) CORRECTED PROPOSED PROTECTIVE ORDER ADDED BY CLERK (mpv, ) (Entered: 04/25/2007) |
| 04/30/2007 | 70 | Minute Entry for proceedings held before Judge Charles Everingham : Scheduling Conference held on 4/30/2007. (Court Reporter Debbie Latham.)(delat, ) (Entered: 04/30/2007) |
| 05/03/2007 | | TRANSCRIPT of Proceedings held on 4/3/07 before Judge Chad Everingham. Court Reporter: Transcriber/Susan Simmons. (lss) (Entered: 05/03/2007) |
| 05/03/2007 | 72 | NOTICE by Charter Communications, Inc., Charter Communications Operating, LLC *of Disclosures* (Gardner, Allen) (Entered: 05/03/2007) |
| 05/04/2007 | 73 | NOTICE of Disclosure by Coxcom, Inc.,, Coxcom, Inc., *Notice of Service of Initial Disclosures* (Stockwell, Mitchell) (Entered: 05/04/2007) |
| 05/04/2007 | 74 | PROTECTIVE ORDER. Signed by Judge Charles Everingham on 5/4/07. (ehs, ) (Entered: 05/04/2007) |
| 05/07/2007 | 75 | NOTICE of Disclosure by Rembrandt Technologies, LP (Berry, Matthew) (Entered: 05/07/2007) |
| 05/23/2007 | 76 | NOTICE of Disclosure by Rembrandt Technologies, LP (Taylor, Brooke) (Entered: 05/23/2007) |
| 06/04/2007 | 77 | Joint MOTION to Amend/Correct *Docket Control Order* by Rembrandt Technologies, LP. (Attachments: # 1 Text of Proposed Order Order Granting Motion to Amend)(Taylor, Brooke) (Entered: 06/04/2007) |

| 06/06/2007 | 78 | ORDER granting 77 Motion to Amend/Correct. Docket Control Order is amended to move date to exchange privilege logs to 7/10/07. Signed by Judge Charles Everingham on 6/5/07. (ch, ) (Entered: 06/06/2007) |
|---|---|---|
| 06/12/2007 | 79 | NOTICE of Disclosure by Rembrandt Technologies, LP *Regarding Compliance with Paragraph 3(b) of the Discovery Order* (Berry, Matthew) (Entered: 06/12/2007) |
| 06/13/2007 | 80 | **PLEASE IGNORE - PLEADING REFILED AS DOC #82**NOTICE of Disclosure by Coxcom, Inc., (Gardner, Allen) Modified on 6/14/2007 (rml, ). (Entered: 06/13/2007) |
| 06/14/2007 | 81 | NOTICE of Disclosure by Charter Communications, Inc., Charter Communications Operating, LLC *P.R. 3-3 and P.R. 3-4* (Gardner, Allen) (Entered: 06/14/2007) |
| 06/14/2007 | 82 | ***REPLACES #80***<br><br>NOTICE of Disclosure by Coxcom, Inc., *P.R. 3-3 and P.R. 3-4* (Gardner, Allen) Modified on 6/14/2007 (mpv, ). (Entered: 06/14/2007) |
| 06/14/2007 |  | ***FILED IN ERROR. PLEASE IGNORE Document # 80, Notice of disclosure. DOCUMENT REFILED AS #82.***<br><br>(rml, ) (Entered: 06/14/2007) |
| 06/21/2007 | 83 | NOTICE by Charter Communications, Inc., Charter Communications Operating, LLC, Coxcom, Inc., *of Multi-District Litigation Developments Pursuant to Local Rule CV-42* (Attachments: # 1 Exhibit A)(Gardner, Allen) (Entered: 06/21/2007) |
| 06/25/2007 | 84 | Interdistrict transfer to the District of Delaware, Wilmington DE. Pursuant to letter Elizabth Dinan was notified. Certified copy of Docket Sheet, Complaint, Transfer Order and letter were mailed to the Federal Blding, Lockbox 18, 844 N. King Street,Wilmington, DE (ch, ) Additional attachment(s) added on 6/28/2007 (ch, ). Modified on 6/28/2007 (ch, ). (Entered: 06/27/2007) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/29/2007 09:21:32 | | |
| **PACER Login:** | ud0037 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:06-cv-00507-TJW-CE |
| **Billable Pages:** | 9 | **Cost:** | 0.72 |

# Exhibit 22

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

REMBRANDT TECHNOLOGIES, LP,                )
                                                    )
        Plaintiff,                   )
                                                      )
        v.                         )     C.A. No. _____
                                                      )
CBS CORPORATION,                           )
                                                     )
        Defendant.                )
                                                     )

## COMPLAINT FOR PATENT INFRINGEMENT
## AND DEMAND FOR JURY TRIAL

Rembrandt Technologies, LP ("Rembrandt"), for its complaint against CBS

Corporation ("CBS" or "Defendant"), alleges as follows:

## PARTIES

1.     Rembrandt is a limited partnership organized under the laws of the State

of New Jersey, having its principal place of business at 401 City Avenue, Suite 815, Bala

Cynwyd, PA 19004.

2.     CBS is a corporation organized under the laws of the State of Delaware,

having its principal place of business at 51 West 52nd Street, 35th Floor, New York, NY 10019.

## JURISDICTION AND VENUE

3.     This is an action arising under the patent laws of the United States, Title

35, United States Code.  This Court has subject matter jurisdiction over this case under 28 U.S.C.

§§ 1331 and 1338(a).

4.      This Court has personal jurisdiction over CBS.  Defendant is incorporated in the State of Delaware, and has conducted and does conduct business within the State of Delaware.  Defendant, directly or through subsidiaries or intermediaries, offers for sale, sells, advertises, and markets products and services that infringe the patent-in-suit, as described more specifically below.  Therefore, because Defendant has committed acts of patent infringement in this district, or is otherwise present or doing business in this district, this Court has personal jurisdiction over Defendant.

5.      Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b), (c), and 1400(b).

## INFRINGEMENT OF U.S. PATENT NO. 5,243,627

6.      Rembrandt realleges and incorporates herein by reference the allegations stated in paragraphs 1-5 of this Complaint.

7.      United States Patent No. 5,243,627 entitled "Signal Point Interleaving Technique" ("the '627 patent") was duly and legally issued by the United States Patent & Trademark Office on September 7, 1993.  A copy of the '627 patent is annexed hereto as Exhibit A.

8.      Rembrandt is the owner of all right, title and interest in the '627 patent, with the right to sue, enforce and recover damages for infringement.

9.      CBS operates television systems and provides television services throughout the United States.

2

10.     Defendant has directly or indirectly infringed the '627 patent, and is continuing to do so, by practicing the inventions claimed therein, and/or by inducing or contributing to the practice by others of the inventions claimed therein, in this judicial district. For example, Defendant has infringed, and continues to infringe, the '627 patent by its transmission, or receipt and retransmission, over its television systems, of digital terrestrial broadcast signals that comply with the ATSC Digital Television Standard.

11.     Rembrandt has been damaged by Defendant's infringement and will suffer additional and irreparable damage unless this Court enjoins Defendant from continuing its infringement under 35 U.S.C. § 283.

12.     Upon information and belief, such infringement has been, and will continue to be, willful and deliberate, entitling Rembrandt to increased damages under 35 U.S.C. § 284 and making this an exceptional case entitling Rembrandt to an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

## PRAYER FOR RELIEF

WHEREFORE, Rembrandt respectfully requests the following relief:

(1)     the entry of judgment in favor of Rembrandt, and against Defendant, that Defendant has infringed the '627 patent;

(2)     a permanent injunction enjoining and restraining Defendant and its officers, agents, servants, employees, affiliates, divisions, units and subsidiaries, and those in association therewith, from further acts of infringement of the '627 patent;

(3)     an award of damages;

(4)     an award of increased damages pursuant to 35 U.S.C. § 284;

3

(5)     an award of all costs and expenses of this action, including reasonable attorneys' fees, pre-judgment interest, and post-judgment interest; and

(6)     such other and further relief, at law and in equity, as the Court deems just and proper.

## JURY DEMAND

Rembrandt hereby respectfully requests a jury trial on all issues so triable.


ASHBY & GEDDES


Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Plaintiff*

*Of Counsel:*

John F. Sweeney
Joseph A. DeGirolamo
Michael O. Cummings
MORGAN & FINNEGAN, LLP
3 World Financial Center
New York, NY 10281-2101
Telephone: (212) 415-8700
jsweeney@morganfinnegan.com
jdegirolamo@ morganfinnegan.com
mcummings@morganfinnegan.com

Dated:  December 1, 2006
175613.1

4

# EXHIBIT A

# United States Patent [19]

## Betts et al.

US005243627A

[11] Patent Number: 5,243,627

[45] Date of Patent: Sep. 7, 1993

[54] SIGNAL POINT INTERLEAVING TECHNIQUE

[75] Inventors: William L. Betts, St. Petersburg; Edward S. Zuranski, Largo, both of Fla.

[73] Assignee: AT&T Bell Laboratories, Murray Hill, N.J.

[21] Appl. No.: 748,594

[22] Filed: Aug. 22, 1991

[51] Int. Cl.5 .......................................... H04L 5/12
[52] U.S. Cl. .............................. 375/39; 375/60; 375/99; 371/43
[58] Field of Search ................... 375/39, 58, 60, 99; 371/43, 37.5, 2.1, 45; 341/81

[56] References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,988,677 | 10/1976 | Fletcher et al. | 371/45 X |
| 4,677,624 | 6/1987 | Betts et al. | 375/39 |
| 4,945,549 | 7/1990 | Simon et al. | 375/53 |
| 5,029,185 | 7/1991 | Wei | 375/39 X |

Primary Examiner—Curtis Kuntz
Assistant Examiner—Tesfaldet Bocure
Attorney, Agent, or Firm—Ronald D. Slusky; Gerard A. deBlasi

[57] ABSTRACT

Viterbi decoder performance in a data communication system using 2N-dimensional channel symbols N>1 can be further enhanced by an interleaving technique which uses a distributed trellis encoder in combination with a signal point interleaver.

24 Claims, 4 Drawing Sheets



## FIG. 1

PRIOR ART



## FIG. 2



Case 2:06-cv-00507-TJW-CE    Document 60-23    Filed 03/09/2007    Page 9 of 18

**U.S. Patent**        Sep. 7, 1993        Sheet 2 of 4        **5,243,627**



*FIG. 3*

Case 2:06-cv-00507-TJW-CE    Document 60-23    Filed 03/09/2007    Page 10 of 18



FIG. 4

### FIG. 5

|  |  | 4D SYMBOL | | 4D SYMBOL | | 4D SYMBOL | | 4D SYMBOL | | 4D SYMBOL | | 4D SYMBOL | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I | NOT INTERLEAVED ONE TRELLIS STAGE | $x_0^\alpha$ | $x_1^\alpha$ | $x_2^\alpha$ | $x_3^\alpha$ | $x_4^\alpha$ | $x_5^\alpha$ | $x_6^\alpha$ | $x_7^\alpha$ | $x_8^\alpha$ | $x_9^\alpha$ | $x_{10}^\alpha$ | ... |
| II | NOT INTERLEAVED THREE TRELLIS STAGES | $x_0^\alpha$ | $x_1^\alpha$ | $x_2^\beta$ | $x_3^\beta$ | $x_4^\gamma$ | $x_5^\gamma$ | $x_6^\alpha$ | $x_7^\alpha$ | $x_8^\beta$ | $x_9^\beta$ | $x_{10}^\gamma$ | ... |
| III | INTERLEAVED ONE TRELLIS STAGE | $x_0^\alpha$ | $x_{-1}^\alpha$ | $x_2^\alpha$ | $x_1^\alpha$ | $x_4^\alpha$ | $x_3^\alpha$ | $x_6^\alpha$ | $x_5^\alpha$ | $x_8^\alpha$ | $x_7^\alpha$ | $x_{10}^\alpha$ | ... |
| IV | INTERLEAVED TWO TRELLIS STAGES | $x_0^\alpha$ | $x_{-1}^\beta$ | $x_2^\beta$ | $x_1^\alpha$ | $x_4^\alpha$ | $x_3^\beta$ | $x_6^\beta$ | $x_5^\alpha$ | $x_8^\alpha$ | $x_7^\beta$ | $x_{10}^\beta$ | ... |
| V | INTERLEAVED THREE TRELLIS STAGES | $x_0^\alpha$ | $x_{-1}^\gamma$ | $x_2^\beta$ | $x_1^\alpha$ | $x_4^\gamma$ | $x_3^\beta$ | $x_6^\alpha$ | $x_5^\gamma$ | $x_8^\beta$ | $x_7^\alpha$ | $x_{10}^\gamma$ | ... |

### FIG. 6



### FIG. 7



5,243,627

1

## SIGNAL POINT INTERLEAVING TECHNIQUE

### BACKGROUND OF THE INVENTION

The present invention relates to the transmission of digital data over band-limited channels.

Over the years, the requirements of modern-day digital data transmission over band-limited channels—such as voiceband telephone channels—have resulted in a push for higher and higher bit rates. This push has led to the development and introduction of such innovations as adaptive equalization, multi-dimensional signal constellations, echo cancellation (for two-wire applications), and trellis coding. Today, the data rates achieved using these and other techniques are beginning to approach the theoretical limits of the channel.

It has been found that various channel impairments, whose effects on the achievable bit rate were relatively minor compared to, say, additive white Gaussian noise and linear distortion, have now become of greater concern. These include such impairments as nonlinear distortion and residual (i.e., uncompensated-for) phase jitter. Such impairments are particularly irksome in systems which use trellis coding. Indeed, it has been found that the theoretical improvement in Gaussian noise immunity promised by at least some trellis codes is not realized in real-world applications where these impairments are manifest. The principal reason this is so appears to be that the noise components introduced into the received signal samples are such as to worsen the effectiveness of the Viterbi decoder used in the receiver to recover the transmitted data.

U.S. Pat. No. 4,677,625, issued Jun. 30, 1987 to Betts et al., teaches a method and arrangement in which, through the use of a distributed trellis encoder/Viterbi decoder, the effects of many of these impairments can be reduced. The invention in the Betts et al patent recognizes that a part of the reason that the performance of the Viterbi decoder is degraded by these impairments is the fact that the noise components of channel symbols which closely follow one another in the transmission channel are highly correlated for many types of impairments. And it is that correlation which worsens the effect that these impairments have on the Viterbi decoder. Among the impairments whose noise is correlated in this way are impulse noise, phase "hits" and gain "hits." All of these typically extend over a number of adjacent channel symbols in the channel, and thus all result in channel symbol noise components which are highly correlated. The well-known noise enhancement characteristics of linear equalizers also induce correlated noise in adjacent channel symbols, as does uncompensated-for phase jitter. Also, the occurrence of one of the relatively high power points of the signal constellation can, in pulse code modulation (PCM) systems, for example, give rise to noise on adjacent channel symbols which, again, is correlated.

The Betts et al patent addresses this issue by distributing the outgoing data to a plurality of trellis encoders in round-robin fashion and interleaving the trellis encoder outputs on the transmission channel. In the receiver, the stream of received interleaved channel symbols is correspondingly distributed to a plurality of trellis decoders. Since the successive pairs of channel symbols applied to a particular trellis decoder are separated from one another as they traverse the channel, the correlation of the noise components of these channel symbol

2

pairs is reduced from what it would have otherwise been.

### SUMMARY OF THE INVENTION

In accordance with the present invention, it has been realized that Viterbi decoder performance in a data communication system using 2N-dimensional channel symbols can be further enhanced by an interleaving technique which uses, in combination, a) the aforementioned distributed trellis encoder/Viterbi decoder technique and b) a signal point interleaving technique which causes the constituent signal points of the channel symbols to be non-adjacent as they traverse the channel.

In preferred embodiments of the invention, the interleaving is carried out in such a way that every $N^{th}$ signal point in the signal point stream traversing the channel is the $N^{th}$ signal point of a respective one of the channel symbols. This criterion enhances the accuracy with which the phase tracking loop in the receiver performs its function.

Also in preferred embodiments, we have found that the use of three parallel trellis encoders in conjunction with a signal point interleaving regime in which the signal points of each channel symbol are separated from one another by three signaling intervals (bauds) provides an optimum or near-optimum tradeoff between signal point/channel symbol separation and the decoding delay that is caused by the interleaving.

### BRIEF DESCRIPTION OF THE DRAWING

In the drawing,

FIG. 1 is a block diagram of the transmitter section of a prior art modem;

FIG. 2 is shows a signal constellation used by the transmitter of FIG. 1;

FIG. 3 is a block diagram of the transmitter section of a modem employing four-dimensional channel symbols and embodying the principles of the invention;

FIG. 4 is a block diagram of the receiver section of a modem embodying the principles of the invention which processes the received four-dimensional channel symbols generated by the transmitter of FIG. 3;

FIG. 5 is a signal point timing/sequencing chart helpful in explaining the principles of the present invention;

FIG. 6 is a signal point interleaver which can be used in the transmitter of FIG. 3 to interleave the signal points of eight-dimensional channel symbols; and

FIG. 7 is a signal point deinterleaver which can be used in the receiver of FIG. 4 to deinterleave the signal points of eight-dimensional channel symbols.

### DETAILED DESCRIPTION

FIG. 1 depicts the transmitter section of a prior art modem employing a 2N-dimensional signaling scheme, $N \geq 1$. The modem receives input information in the form of a serial bit stream from data terminal equipment (DTE) 111—illustratively a host computer. That bit stream is then scrambled, or randomized, by randomizer 113 whose output bits are provided in serial form to serial-to-parallel (S/P) converter 115.

Serial-to-parallel converter 115, in turn, provides, during each of a succession of symbol intervals (comprised of N baud intervals), some predetermined number of parallel bits on lead 109 and some number of parallel bits on lead 108. (It will be appreciated that whenever bits are provided in parallel in the modem, separate leads are required to carry each of the bits.) The bits on lead 109 are applied to trellis encoder 119a,

5,243,627

3

and are referred to as the "trellis bits." The bits on lead 108 are applied to modulus converter 116, and are referred to as the "uncoded bits."

To better understand how trellis encoder 119α and modulus converter 116 work, reference is made to FIG. 2, which shows the two-dimensional signal constellation that forms the basis of the 2N-dimensional signaling scheme illustratively used by the modem. This constellation is comprised of 32 signal points, which are divided into four subsets, A through D, each comprised of eight signal points. The eight points of subset A are explicitly labeled as $A_0$ through $A_7$. It may be noted that subsets C, B and D can be arrived at by clockwise rotation of subset A by 90, 180 and 270 degrees, respectively. (Conventional differential encoding circuitry within trellis encoder 119α exploits this symmetry.) For reference, a single signal point of each of those subsets is also shown on FIG. 2.

Consider, first, the case of N=1, i.e., a two-dimensional signaling scheme. In this case, one trellis bit on lead 109 would be expanded to two bits by trellis encoder 119α on lead 121. The four possible values of those three bits 00, 01, 10, and 11 identify subsets A, B, C and D, respectively. The successive 2-bit words on lead 121 are expressed as $\alpha_n$, n=0,1,2..., where n is an index that advances at the baud rate. At the same time, three parallel bits would be provided on lead 108. These are converted by modulus converter 116 into an index having a value within the range (decimal) 0 to 7. The index value, represented in binary form on lead 117, selects a particular signal point from the subset identified on lead 121. Thus if lead 121 carries the two bits 00 while lead 117 carries the three bits 001, then signal point $A_1$ of the FIG. 2 constellation has been selected. The words on leads 117 and 121 are applied to QAM encoder 124 which generates, on lead 125, values representing the I (in-phase) and Q (quadrature-phase) components of signal point $A_1$. The signal point generated on lead 125 in the $n^{th}$ baud interval is denoted $X_n^α$, which is passed on to modulator 128 to generate a passband line signal which is applied to the communication channel. The superscript, α, indicates that the trellis encoder that was used to identify the subset for any particular signal point was trellis encoder 119α. That is, of course, a trivial notation as far as FIG. 1 goes inasmuch as trellis encoder 119α is the only trellis encoder in the modem. However, it is useful to introduce this notation because more than one trellis encoder stage is used in preferred embodiments of modems incorporating the principles of the present invention as shown in later FIGS.

In the case of N>1, the operation is similar. Now, however, the words on lead 109 are used by trellis encoder 119α to sequentially identify on lead 121N subsets, while the words on lead 108 are used to generate N corresponding index values on lead 117. The N signal points identified in this way are the component signal points of a 2N-dimensional channel symbol, the first such symbol being comprised of the signal points $X_0^α$, ... $X_{(N-1)}^α$. For example, a modem in which the transmitter of FIG. 1 could be used may be a 14,400 bit per second modem using four-dimensional coding (i.e., N=2) and a baud rate of 3200. In this case, nine bits from S/P converter 115 are used for each four-dimensional symbol. Specifically, three parallel bits on lead 109 are expanded into four bits on lead 121 to identify a pair of subsets while six bits on lead 108 are used to select particular signal points from those two subsets.

4

Those two signal points are thereupon communicated over the channel by QAM encoder 124 and modulator 128 as described above.

Note that, implementationally, the 2N-dimensional channel symbol is generated by having the trellis encoder identify, interdependently, N subsets of the two-dimensional constellation of FIG. 2, then select a two-dimensional signal point from each of the subsets thus identified. The concatenation of the N two-dimensional signal points thus selected is the desired 2N-dimensional channel symbol. This process, however, can be understood as involving the direct selection of a 2N-dimensional channel symbol. Viewed in this context, the set of all possible combinations of N of the two-dimensional subsets identified by N successive trellis encoder outputs can be understood to be a set of 2N-dimensional subsets of a 2N-dimensional constellation, the latter being comprised of all possible combinations of N of the signal points of the two-dimensional constellation. A succession of N outputs from the trellis encoder identifies a particular one of the 2N-dimensional subsets and a succession of N outputs from the modulus converter selects a particular 2N-dimensional signal point from the identified 2N-dimensional subset.

Modulus converter 116 is illustratively of the type disclosed in co-pending, commonly-assigned U.S. patent application Ser. No. 588,658 filed Sep. 26, 1990 and allowed on May 21, 1991, hereby incorporated by reference. Modulus converter 116 provides the modem with the ability to support data transmission at various different bit rates. Assume, for example, that the rate at which bits are provided by DTE 111 decreases. The serial-to-parallel converter will continue to provide its outputs on leads 108 and 109 at the same baud rate as before. However, the upper limit of the range of index values that are provided by modulus converter 116 on lead 117 will be reduced, so that, effectively, each of the four subsets A through D, instead of having eight signal points, will have some smaller number. Conversely if the rate at which bits are provided by DTE 111 should increase over that originally assumed, the upper limit of the range of index values, and thus the number of parallel bits, that appear on lead 117 will be increased beyond eight and the constellation itself will be expanded to accommodate the larger number of signal points thus being selected. As an alternative to using a modulus converter, fractional bit rates can be supported using, for example, the technique disclosed in L. Wei, "Trellis-Coded Modulation with Multidimensional Constellations," *IEEE Trans. on Communication Theory*, Vol. IT-33, No. 4, July 1987, pp. 483–501.

Turning now to FIG. 3, the transmitter portion of a modem embodying the principles of the invention is shown. This embodiment illustratively uses the aforementioned four-dimensional, i.e., N=2, signaling scheme. Many of the components are similar to those shown in FIG. 1. Thus, in particular, the transmitter of FIG. 3—which receives its input information in the form of a stream of input bits from DTE 311—includes randomizer 313, which supplies its output, on lead 314, to S/P converter 315. The latter outputs uncoded bits to modulus converter 316. The transmitter further includes four-dimensional QAM encoder 324 and modulator 328. The trellis bits, on lead 309, are provided not to a standard single trellis encoder, but to a distributed trellis encoder comprised of three trellis encoder stages: trellis encoder stage 319α, trellis encoder stage 319β, and trellis encoder stage 319γ.

5,243,627

Such a distributed trellis encoder, which is described in the aforementioned Betts et al patent, generates a plurality of streams of trellis encoded channel symbols in response to respective portions of the input information. Specifically, a three-bit word on lead 309 is supplied to trellis encoder stage $319\alpha$. The next three-bit word on lead 309 is supplied to trellis encoder stage $319\beta$. The next three-bit word is supplied to trellis encoder stage $319\gamma$, and then back to trellis encoder stage $319\alpha$. This distribution of the trellis bits to the various trellis encoder stages is performed by switching circuit 331 operating under the control of symbol clock 325. The initial data word outputs of the trellis encoders are subset identifiers $\alpha_0$ and $\alpha_1$ for encoder stage $319\alpha$, $\beta_2$ and $\beta_3$ for encoder stage $319\beta$, and $\gamma_4$ and $\gamma_5$ for encoder stage $319\gamma$, followed by $\alpha_6$ and $\alpha_7$ for encoder stage $319\alpha$, and so forth. These are supplied to four-dimensional QAM encoder 324 by switching circuit 337—also operating under the control of symbol clock 325—on lead 338 through a one-symbol delay 364 and lead 363, in order to compensate for a one-symbol delay caused by modulus converter 316. Thus, the stream of subset identifiers on lead 338 is $\alpha_0$, $\alpha_1$, $\beta_2$, $\beta_3$, $\gamma_4$, $\gamma_5$, $\alpha_6$ . . . . Using the notation introduced above, then, the output of encoder 324 on lead 325 is the stream of signal points $X_0{}^\alpha$, $X_1{}^\alpha$, $X_2{}^\beta$, $X_3{}^\beta$, $X_4{}^\gamma$, $X_5{}^\gamma$, $X_6{}^\alpha$ . . . , which is comprised of three interleaved streams of trellis encoded channel symbols, these streams being $X_0{}^\alpha$, $X_1{}^\alpha$, $X_6{}^\alpha$, $X_7{}^\alpha$, $X_{12}{}^\alpha$ . . . ; $X_2{}^\beta$, $X_3{}^\beta$, $X_8{}^\beta$, $X_9{}^\beta$, $X_{14}{}^\beta$ . . . ; and $X_4{}^\gamma$, $X_5{}^\gamma$, $X_{10}{}^\gamma$, $X_{11}{}^\gamma$, $X_{16}{}^\gamma$ . . . . These, in turn, are supplied, in accordance with the invention, to signal point interleaver 341 which applies alternate ones of the signal points applied thereto to lead 3412—which signal points appear immediately at the interleaver output on lead 342—and to one-symbol ($Z^{-1}$) delay element 3411, which appear on lead 342 after being delayed therein by one symbol interval. The resulting interleaved stream of trellis encoded signal points is $X_0{}^\alpha$, $X_{-1}{}^\gamma$, $X_2{}^\beta$, $X_1{}^\alpha$, $X_4{}^\gamma$, $X_3{}^\beta$, $X_6{}^\alpha$, $X_5{}^\gamma$, $X_8{}^\beta$, $X_7{}^\alpha$, $X_{10}{}^\gamma$, $X_9{}^\beta$ . . . (the signal point $X_{-1}{}^\gamma$ being, of course, the signal point applied to interleaver 341 just ahead of signal point $X_0{}^\alpha$).

A discussion and explanation of how the interleaving just described is advantageous is set forth hereinbelow. In order to fully set the stage for that explanation, however, it will be first useful to consider the receiver section of a modem which receives the interleaved signal point stream.

Thus referring to FIG. 4, the line signal transmitted by the transmitter of FIG. 3 is received from the channel and applied to demodulator/equalizer 455 which, in conventional fashion—including an input from phase tracking loop 457—generates a stream of outputs on lead 456 representing the demodulator/equalizer's best approximation of the values of the I and Q components of the signal points of the transmitted interleaved signal point stream. These outputs are referred to herein as the "received signal points." (Due to distortion and other channel impairments that the demodulator/equalizer is not able to compensate for, the I and Q components of the received signal points, instead of having exact integer values, can have any value. Thus a transmitted signal point having coordinates (3, —5) may be output by the demodulator/equalizer as the received signal point (2.945, —5.001).) The stream of received signal points on lead 456 is denoted $\bar{X}_0{}^\alpha$, $\bar{X}_{-1}{}^\gamma$, $\bar{X}_2{}^\beta$, $\bar{X}_1{}^\alpha$, $\bar{X}_4{}^\gamma$, $\bar{X}_3{}^\beta$, $\bar{X}_6{}^\alpha$, $\bar{X}_5{}^\gamma$, $\bar{X}_8{}^\beta$, $\bar{X}_7{}^\alpha$, $\bar{X}_{10}{}^\gamma$, $\bar{X}_9{}^\beta$ . . . .

The successive received signal points are deinterleaved in signal point deinterleaver 441, which provides the opposite function to interleaver 341 in the transmitter. The output of deinterleaver 441 on lead 442 is thus $\bar{X}_0{}^\alpha$, $\bar{X}_1{}^\alpha$, $\bar{X}_2{}^\beta$, $\bar{X}_3{}^\beta$, $\bar{X}_4{}^\gamma$, $\bar{X}_5{}^\gamma$, $\bar{X}_6{}^\alpha$, . . . , etc. (Although not explicitly shown in the drawing, the same well-known techniques used in modems of this general kind to identify within the stream of received signal points the boundaries between successive symbols is used to synchronize the operation of signal point deinterleaver 441 to ensure that received signal points $\bar{X}_0{}^\alpha$, $\bar{X}_2{}^\beta$, $\bar{X}_4{}^\gamma$ . . . are applied to delay element 4411 while received signal points $\bar{X}_1{}^\alpha$, $\bar{X}_3{}^\beta$, $\bar{X}_5{}^\gamma$ . . . are applied to lead 4412.)

The received signal points on lead 442 are then distributed by switching circuit 431 under the control of symbol clock 425 to a distributed Viterbi decoder comprised of 4D Viterbi decoder stages $419\alpha$, $419\beta$ and $419\gamma$. Specifically, received signal points $\bar{X}_0{}^\alpha$ and $\bar{X}_1{}^\alpha$ are applied to decoder stage $419\alpha$; received signal points $\bar{X}_2{}^\beta$ and $\bar{X}_3{}^\beta$ are applied to decoder stage $419\beta$; and received signal points $\bar{X}_4{}^\gamma$ and $\bar{X}_5{}^\gamma$ are applied to decoder stage $419\gamma$. The outputs of the three decoder stages are then combined into a serial stream on lead 438 by switching circuit 437, also operating under the control of symbol clock 425. Those outputs, representing decisions as to the values of the transmitted signal points, are denoted $\hat{X}_0$, $\hat{X}_1$, $\hat{X}_2$, $\hat{X}_3$, $\hat{X}_4$, $\hat{X}_5$, $\hat{X}_6$ . . . ., the $\alpha$, $\beta$ and $\gamma$ superscripts no longer being needed.

In conventional fashion, the bits that represent each of the decisions on lead 438 can be divided into bits that represent a) the trellis bits that appeared on transmitter lead 309 and b) the index values that appeared on transmitter lead 317. Those two groups of bits are provided in the receiver on leads 461 and 462, respectively. The latter group of bits are deconverted by modulus deconverter 416 (also disclosed in the aforementioned '658 patent application) back to uncoded bit values on lead 414. The operation of the modulus deconverter imparts a one-symbol delay to the bits on lead 414. Accordingly, the bits on lead 461 are caused to be delayed by one symbol by delay element 464. The resulting combined bits on lead 415 thus represent the stream of bits that appeared at the output of randomizer 313 in the transmitter. These are derandomized in the receiver by derandomizer 413 and the resulting derandomized bit stream is applied to DTE 411 which may be, for example, a computer terminal.

Referring to FIG. 5, one can see the improvement that is achieved by the present invention.

Line I shows the stream of output signal points generated and launched into the channel using one stage of trellis encoding and no signal point interleaving. This is, of course, the prior art arrangement shown in FIG. 1. Line II shows the effect of providing a three-stage distributed trellis encoder but still no signal point interleaving. This is the arrangement shown in the aforementioned Betts et al patent. Note that the signal points of each channel symbol operated on by a particular trellis encoder stage are adjacent in the output signal point stream. For example, the second signal point of the symbol $X_0{}^\alpha$ $X_1{}^\alpha$—namely signal point $X_1{}^\alpha$—is separated by five baud intervals from the first (closer) signal point of the symbol $X_6{}^\alpha$ $X_7{}^\alpha$—namely signal point $X_6{}^\alpha$. As noted earlier, such separation is advantageous because the channel symbols which are processed one after the other in a particular Viterbi decoder stage have noise components which are not highly correlated.

Note, however, that the individual signal points of each channel symbol, e.g., $X_0{}^\alpha$ and $X_1{}^\alpha$, are adjacent to

5,243,627

7

one another as they pass through the channel; and since all the signal points of a channel symbol must be processed serially in the same Viterbi decoder stage, this means that the Viterbi decoder must process adjacent signal points that have highly correlated noise components.

It is to this end that signal point interleaver 341 is included within the transmitter in accordance with the invention. Firstly, it may be noted from Line III that using the signal point interleaver without the distributed trellis encoder—an arrangement not depicted in the drawing—will, advantageously, cause the signal points from the same channel symbol to be non-adjacent. Moreover, there is further advantage in that a pair of channel symbols processed serially by Viterbi decoder stage 419α traverses the channel separated by five baud intervals rather than three, thereby providing greater decorrelation of the noise components thereof. Compare, for example, the span of baud intervals occupied by signal points $X_0{}^\alpha$ and $X_1{}^\alpha$, $X_2{}^\alpha$ and $X_3{}^\alpha$ in Line I and the span of baud intervals occupied by the same signal points in Line III. Disadvantageously, however, the use of a single trellis encoding stage brings back the problem that the distributed trellis encoder solves, as described above. Thus, for example, although signal points $X_0{}^\alpha$ and $X_1{}^\alpha$, which are from the same channel symbol, are separated from one another when traversing the channel, we find that, disadvantageously, signal points $X_2{}^\alpha$ and $X_1{}^\alpha$, which are signal points from two different channel symbols which will be processed serially by the Viterbi decoder, traverse the channel adjacent to one another.

Line IV shows that using the signal point interleaver with a two-stage trellis encoder—also an arrangement not depicted in the drawing—provides some improvement. Firstly, it may be noted that, as in Line III, signal points from the same channel symbol remain separated by three baud intervals. Additionally, pairs of channel symbols processed sequentially by a given Viterbi decoder stage—such as the channel symbols comprised of signal points $X_0{}^\alpha$ and $X_1{}^\alpha$, $X_4{}^\alpha$ and $X_5{}^\alpha$—are still non-adjacent and, indeed, are now separated by seven baud intervals, which is even greater than the separation of five baud intervals provided in Line III. Moreover, certain signal points that traverse the channel adjacent to one another and which are from channel symbols which would have been decoded sequentially in the one-trellis-encoding-stage case are, in the two-trellis-encoding-stage case of Line IV, processed by different Viterbi decoding stages. Signal points $X_2{}^\beta$ and $X_1{}^\alpha$ are such a pair of signal points. Note, however, that, disadvantageously, signal points $X_1{}^\alpha$ and $X_4{}^\alpha$ traverse the channel serially, and are from channel symbols which are serially processed by the "α" Viterbi decoder stage.

Referring, however, to Line V, which depicts the stream of signal points output by the transmitter of FIG. 3, it will be seen that, in accordance with the invention, there is still a non-adjacency—indeed, a separation of at least three baud intervals—between a) the signal points which belong to any particular channel symbol (and so which, therefore, are processed serially by a particular Viterbi decoder stage) and b) the signal points which belong to channel symbols which are processed serially by a Viterbi decoder stage. Thus, for example, signal points $X_1{}^\alpha$ and $X_4{}^\alpha$ are now processed by different Viterbi decoder stages. Moreover, pairs of channel symbols processed sequentially by a given Viterbi decoder stage—such as the channel symbols comprised of

8

signal points $X_0{}^\alpha$ and $X_1{}^\alpha$, $X_6{}^\alpha$ and $X_7{}^\alpha$—are now separated by none baud intervals.

Using more than three trellis encoder stages in the distributed trellis encoder and/or a signal point interleaver that separates signal points from the same channel symbol by more than three baud intervals would provide even greater separation and could, therefore, potentially provide even greater improvement in Viterbi decoding. However, such improvement comes at a price—that price being increased decoding delay—particularly as the number of trellis encoders is increased beyond three. An engineering trade-off can be made, as suits any particular application.

Moreover, it is desirable for the signal point interleaver to provide a sequence in which every $N^{th}$ signal point in the interleaved signal point stream is the $N^{th}$ signal point of a channel symbol. (The reason this is desirable is described in detail hereinbelow.) In the case of an N=2, four-dimensional signaling scheme, this means that every second, that is "every other," signal point in the interleaved stream is the second signal point of the channel symbol from which it comes. In the case of an N=4, eight-dimensional signaling scheme, this means that every fourth signal point in the interleaved stream is the fourth signal point of the channel symbol from which it comes. Indeed, this criterion is in fact satisfied in the embodiment of FIG. 3. Note that each one of signal points $X_0{}^\alpha$, $X_2{}^\beta$, $X_4{}^\gamma$, $X_6{}^\alpha$, . . . , which appear as every other signal point in the interleaved stream, is the second signal point of one of the four-dimensional channel symbols. Note that not all rearrangements of the signal points will, in fact, satisfy this criterion, such as, if the two signal points of a channel symbol are separated by two, rather than three, baud intervals.

Satisfying the above criterion is advantageous because it enhances the accuracy with which phase tracking loop 487 performs its function. This is so because the arrival of an $N^{th}$ signal point of a given symbol means that all the signal points comprising that channel symbol have arrived. This, in turn, makes it possible to form a decision as to the identity of that channel symbol by using the minimum accumulated path metric in the Viterbi decoder stages. (Those decisions are fed back to the tracking loop by decoder stages 419α, 419β 419γ on leads 494, 495 and 496, respectively, via switching circuit 456.) Without having received all of the signal points of a channel symbol, one cannot take advantage of the accumulated path metric information but, rather, must rely on the so-called raw sliced values, which is less accurate. By having every $N^{th}$ signal point in the interleaved stream be the $N^{th}$ signal point of a channel symbol, we are guaranteed that the time between adjacent such path metric "decisions" supplied to the phase tracking loop is, advantageously, never more than N baud intervals.

The foregoing merely illustrates the principles of the invention. Thus although the illustrative embodiment utilizes a four-dimensional signaling scheme, the invention can be used with signaling schemes of any dimensionality. In the general, 2N-dimensional, case each stage of the distributed trellis encoder would provide N two-dimensional subset identifiers to switching circuit 337 before the latter moves on to the next stage. And, of course, each stage of the distributed Viterbi decoder would receive N successive received signal points. The distributed trellis encoder and distributed Viterbi decoder can, however, continue to include three trellis

encoders and still maintain, independent of the value of N, a separation of three baud intervals in the channel between signal points that are from channel symbols that are adjacent in the trellis encoder. If a greater separation of such signal points is desired, more stages can be added to the distributed trellis encoder/Viterbi decoder, just as was noted above for the four-dimensional case. However, when dealing with 2N-dimensional signaling where N>2, it is necessary to add additional delay elements to the signal point interleaver/deinterleaver in order to maintain a three-baud-interval separation among the signal points from any given channel symbol.

Consider, for example, the case of N=4, i.e., an eight-dimensional case. Looking again at FIG. 3, the three (8D) stages of the distributed trellis encoder would generate the three streams of subset identifiers $\alpha_0 \alpha_1 \alpha_2 \alpha_3 \alpha_{12} \ldots$, $\beta_4 \beta_5 \beta_6 \beta_7 \beta_{16} \ldots$, and $\gamma_8 \gamma_9 \gamma_{10} \gamma_{11} \gamma_{20} \ldots$, respectively. This would lead to the following stream of signal points of eight-dimensional encoded channel symbols at the output of the QAM encoder on lead 325: $X_0{}^\alpha X_1{}^\alpha X_2{}^\alpha X_3{}^\alpha X_4{}^\beta X_5{}^\beta X_6{}^\beta X_7{}^\beta X_8{}^\gamma X_9{}^\gamma X_{10}{}^\gamma X_{11}{}^\gamma X_{12}{}^\alpha \ldots$. Signal point interleaving could be carried out by substituting signal point interleaver 641 of FIG. 6 for interleaver 341. Interleaver 641, in addition to direct connection 6414, includes one-, two-, and three-symbol delay elements 6413, 6412 and 6411, respectively.

The signal points on lead 325, after passing through interleaver 641, would appear on lead 342 in the following order: $X_0{}^\alpha X_{-3}{}^\gamma X_{-6}{}^\beta X_{-9}{}^\alpha X_4{}^\beta X_1{}^\alpha X_{-2}{}^\gamma X_{-5}{}^\beta X_8{}^\gamma X_5{}^\beta X_2{}^\alpha X_{-1}{}^\gamma X_{12}{}^\alpha X_9{}^\gamma X_6{}^\beta X_3{}^\alpha X_{16}{}^\beta X_{13}{}^\alpha X_{10}{}^\gamma X_7{}^\beta \ldots$ where signal points with negative subscripts are, of course, signal points that arrived before signal point $X_0{}^\alpha$ and were already stored in the delay elements 6411, 6412 and 6413. Examination of this signal point stream will reveal that there is either a three- or five-baud separation between signal points of channel symbols that are processed sequentially by the same trellis encoder stage, e.g., $X_3{}^\alpha$ and $X_{12}{}^\alpha$; that adjacent signal points of any one channel symbol, e.g., $X_0{}^\alpha$ and $X_1{}^\alpha$, are separated by five baud intervals; and that the four signal points comprising any particular one channel symbol are separated by fifteen baud intervals.

FIG. 7 shows the structure of a deinterleaver 741 that could be used in the receiver of FIG. 4 in place of deinterleaver 441 in order to restore the signal points of the eight-dimensional channel symbols to their original order. This structure, which is the inverse of interleaver 641, includes delay stages 7411, 7412 and 7413, as well as direct connection 7414.

It will be appreciated that, although various components of the modem transmitter and receiver are disclosed herein for pedagogic clarity as discrete functional elements and indeed—in the case of the various switching circuits—as mechanical elements, those skilled in the art will recognize that the function of any one or more of those elements could be implemented with any appropriate available technology, including one or more appropriately programmed processors, digital signal processing (DSP) chips, etc. For example, multiple trellis encoders and decoders can be realized using a single program routine which, through the mechanism of indirect addressing of multiple arrays within memory, serves to provide the function of each of the multiple devices.

It will thus be appreciated that those skilled in the art will be able to devise numerous arrangements which,

although not explicitly shown or described herein, embody the principles of the invention and are within its spirit and scope.

We claim:

1. Apparatus for forming a stream of trellis encoded signal points in response to input information, said apparatus comprising

means for generating a plurality of streams of trellis encoded channel symbols in response to respective portions of said input information, each of said channel symbols being comprised of a plurality of signal points, and

means for interleaving the signal points of said generated channel symbols to form said stream of trellis encoded signal points, said interleaving being carried out in such a way that the signal points of each channel symbol are non-adjacent in said stream of trellis encoded signal points and such that the signal points of adjacent symbols in any one of said channel symbol streams are non-adjacent in said stream of trellis encoded channel symbols.

2. The apparatus of claim 1 wherein said means for generating generates three of said streams of trellis encoded channel symbols, and wherein said means for interleaving causes there to be interleaved between each of the signal points of each channel symbol at least two signal points from other channel symbols of said streams of trellis encoded channel symbols.

3. The apparatus of claim 1 wherein said channel symbols are 2N-dimensional channel symbols, N>1, and wherein said means for interleaving causes every $N^{th}$ signal point in said interleaved signal point stream to be the $N^{th}$ signal point of a respective one of said channel symbols.

4. The apparatus of claim 2 wherein said channel symbols are 2N-dimensional channel symbols, N>1, and wherein said means for interleaving causes every $N^{th}$ signal point in said interleaved signal point stream to be the $N^{th}$ signal point of a respective one of said channel symbols.

5. A modem comprising

means for receiving a stream of input bits,

means for dividing said stream of input bits into a stream of uncoded bits and a plurality of streams of trellis bits,

means for independently trellis encoding each of said plurality of streams of trellis bits to generate respective streams of data words each identifying one of a plurality of predetermined subsets of the channel symbols of a predetermined 2N-dimensional constellation, N being an integer greater than unity, each of said channel symbols being comprised of a plurality of signal points,

means for selecting an individual channel symbol from each identified subset in response to said stream of uncoded bits to form a stream of channel symbols, and

means for generating a stream of output signal points, said signal point stream being comprised of the signal points of the selected channel symbols, the signal points of said signal point stream being sequenced in such a way that signal points that are either a) part of the same channel symbol, or b) part of channel symbols that are adjacent to one another in said channel symbol stream, are separated in said output stream by at least one other signal point.

6. The apparatus of claim 5 wherein said trellis encoding means includes a plurality of trellis encoder stage

5,243,627

| 11 | 12 |

means for trellis encoding respective ones of said streams of trellis bits.

7. The apparatus of claim 5 wherein said means for selecting includes means for modulus converting said stream of uncoded bits.

8. The apparatus of claim 5 wherein said channel symbols are 2N-dimensional channel symbols, $N>1$, and wherein said means for generating causes every $N^{th}$ signal point in said stream of output signal points to be the $N^{th}$ signal point of a respective one of said channel symbols.

9. Receiver apparatus for recovering information from a received stream of trellis encoded signal points, said signal points having been transmitted to said receiver apparatus by transmitter apparatus which generates said signal points by generating a plurality of streams of trellis encoded channel symbols in response to respective portions of said information, each of said channel symbols being comprised of a plurality of signal points, and by interleaving the signal points of said generated channel symbols to form said stream of trellis encoded signal points, said interleaving being carried out in such a way that the signal points of each channel symbol are non-adjacent in said stream of trellis encoded signal points and such that the signal points of adjacent symbols in any one of said channel symbol streams are non-adjacent in said stream of trellis encoded signal points,

said receiver apparatus comprising

means for deinterleaving the interleaved signal points to recover said plurality of streams of trellis encoded channel symbols, and

a distributed Viterbi decoder for recovering said information from the deinterleaved signal points.

10. The apparatus of claim 9 further comprising

a phase tracking loop, and

means for adapting the operation of said phase tracking loop in response to minimum accumulated path metrics in said distributed Viterbi decoder.

11. A method for forming a stream of trellis encoded signal points in response to input information, said method comprising the steps of

generating a plurality of streams of trellis encoded channel symbols in response to respective portions of said input information, each of said channel symbols being comprised of a plurality of signal points, and

interleaving the signal points of said generated channel symbols to form said stream of trellis encoded signal points, said interleaving being carried out in such a way that the signal points of each channel symbol are non-adjacent in said stream of trellis encoded signal points and such that the signal points of adjacent symbols in any one of said channel symbol streams are non-adjacent in said stream of trellis encoded signal points.

12. The method of claim 11 wherein said generating step generates three of said streams of trellis encoded channel symbols, and wherein said interleaving step causes there to be interleaved between each of the signal points of each channel symbol at least two signal points from other channel symbols of said streams of trellis encoded channel symbols.

13. The method of claim 11 wherein said channel symbols are 2N-dimensional channel symbols, $N>1$, and wherein said interleaving step causes every $N^{th}$ signal point in said interleaved signal point stream to be

the $N^{th}$ signal point of a respective one of said channel symbols.

14. The method of claim 12 wherein said channel symbols are 2N-dimensional channel symbols, $N>1$, and wherein said interleaving step causes every $N^{th}$ signal point in said interleaved signal point stream to be the $N^{th}$ signal point of a respective one of said channel symbols.

15. A method for use in a modem, said method comprising the steps of

receiving a stream of input bits,

dividing said stream of input bits into a stream of uncoded bits and a plurality of streams of trellis bits,

independently trellis encoding each of said plurality of streams of trellis bits to generate respective streams of data words each identifying one of a plurality of predetermined subsets of the channel symbols of a predetermined 2N-dimensional constellation, N being an integer greater than unity, each of said channel symbols being comprised of a plurality of signal points,

selecting an individual channel symbol from each identified subset in response to said stream of uncoded bits to form a stream of channel symbols, and

generating a stream of output signal points, said signal point stream being comprised of the signal points of the selected channel symbols, the signal points of said signal point stream being sequenced in such a way that signal points that are either a) part of the same channel symbol, or b) part of channel symbols that are adjacent to one another in said channel symbol stream, are separated in said output stream by at least one other signal point.

16. The method of claim 15 wherein in said trellis encoding step a plurality of trellis encoder stages trellis encode respective ones of said streams of trellis bits.

17. The method of claim 15 wherein said selecting step includes the step of modulus converting said stream of uncoded bits.

18. The method of claim 15 wherein said channel symbols are 2N-dimensional channel symbols, $N>1$, and wherein said generating step causes every $N^{th}$ signal point in said stream of output signal points to be the $N^{th}$ signal point of a respective one of said channel symbols.

19. A method for use in a receiver to recover information from a received stream of trellis encoded signal points, said signal points having been transmitted to said receiver apparatus by a method which includes the steps of

generating a plurality of streams of trellis encoded channel symbols in response to respective portions of said information, each of said channel symbols being comprised of a plurality of signal points, and

interleaving the signal points of said generated channel symbols to form said stream of trellis encoded signal points, said interleaving being carried out in such a way that the signal points of each channel symbol are non-adjacent in said stream of trellis encoded signal points and such that the signal points of adjacent symbols in any one of said channel symbol streams are non-adjacent in said stream of trellis encoded signal points,

said method comprising the steps of

deinterleaving the interleaved signal points to recover said plurality of streams of trellis encoded channel symbols, and

5,243,627

13

using a distributed Viterbi decoder to recover said information from the deinterleaved signal points.

20. The method of claim 19 wherein said receiver includes a phase tracking loop and wherein said method comprises the further step of adapting the operation of said phase tracking loop in response to minimum accumulated path metrics in said distributed Viterbi decoder.

21. Data communication apparatus comprising

means for receiving input information,

means for generating a plurality of streams of trellis encoded channel symbols in response to respective portions of said input information, each of said channel symbols being comprised of a plurality of signal points,

means for interleaving the signal points of said generated channel symbols to form a stream of trellis encoded signal points, said interleaving being carried out in such a way that the signal points of each channel symbol are non-adjacent in said stream of trellis encoded signal points and such that the signal points of adjacent symbols in any one of said channel symbol streams are non-adjacent in said stream of trellis encoded signal points,

means for applying the stream of trellis encoded signal points to a transmission channel,

14

means for receiving the stream of trellis encoded signal points from the channel,

means for deinterleaving the interleaved signal points to recover said plurality of streams of trellis encoded channel symbols, and

a distributed Viterbi decoder for recovering said information from the deinterleaved signal points.

22. The apparatus of claim 21 wherein said means for generating generates three of said streams of trellis encoded channel symbols, and wherein said means for interleaving causes there to be interleaved between each of the signal points of each channel symbol at least two signal points from other channel symbols of said streams of trellis encoded channel symbols.

23. The apparatus of claim 21 wherein said channel symbols are 2N-dimensional channel symbols, $N > 1$, and wherein said means for interleaving causes every $N^{th}$ signal point in said interleaved signal point stream to be the $N^{th}$ signal point of a respective one of said channel symbols.

24. The apparatus of claim 22 wherein said channel symbols are 2N-dimensional channel symbols, $N > 1$, and wherein said means for interleaving causes every $N^{th}$ signal point in said interleaved signal point stream to be the $N^{th}$ signal point of a respective one of said channel symbols.

* * * * *

# Exhibit 23

US2000 5490191.1

# U.S. District Court
## District of Delaware (Wilmington)
## CIVIL DOCKET FOR CASE #: 1:06-cv-00727-GMS

Rembrandt Technologies LP v. CBS Corporation
Assigned to: Honorable Gregory M. Sleet
Related Case: 1:06-cv-00635-GMS
Cause: 35:271 Patent Infringement

Date Filed: 12/01/2006
Jury Demand: Both
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**Rembrandt Technologies LP**                represented by **Steven J. Balick**
Ashby & Geddes
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
Email: sbalick@ashby-geddes.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lauren E. Maguire**
Ashby & Geddes
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
Email: lmaguire@ashby-geddes.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**CBS Corporation**                represented by **Jack B. Blumenfeld**
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
Email: jbbefiling@mnat.com
*LEAD ATTORNEY*

**Counter Claimant**

**CBS Corporation**                represented by **Jack B. Blumenfeld**
(See above for address)
*LEAD ATTORNEY*

V.

**Counter Defendant**

**Rembrandt Technologies LP**                    represented by  **Steven J. Balick**
                                                                 (See above for address)
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Lauren E. Maguire**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/01/2006 | 1 | COMPLAINT filed with Jury Demand against CBS Corporation - Magistrate Consent Notice to Pltf. ( Filing fee $ 350, receipt number 145541.) - filed by Rembrandt Technologies LP. (Attachments: # 1 Civil Cover Sheet # 2 Acknowledgement of Consent Form)(ead) (Entered: 12/04/2006) |
| 12/01/2006 |  | Summons Issued as to CBS Corporation on 12/1/2006. (ead) (Entered: 12/04/2006) |
| 12/01/2006 | 2 | Notice of Availability of a U.S. Magistrate Judge to Exercise Jurisdiction (ead) (Entered: 12/04/2006) |
| 12/04/2006 | 3 | Report to the Commissioner of Patents and Trademarks for Patent Number 5,243,627; (ead) (Entered: 12/04/2006) |
| 12/04/2006 | 4 | SUMMONS Returned Executed by Rembrandt Technologies LP. CBS Corporation served on 12/4/2006, answer due 12/27/2006. (Maguire, Lauren) (Entered: 12/04/2006) |
| 12/06/2006 | 5 | Disclosure Statement pursuant to Rule 7.1 filed by Rembrandt Technologies LP. (Maguire, Lauren) (Entered: 12/06/2006) |
| 12/11/2006 | 6 | MOTION for Pro Hac Vice Appearance of Attorney John F. Sweeney, Joseph A. DeGirolamo, and Michael O. Cummings - filed by Rembrandt Technologies LP. (Maguire, Lauren) (Entered: 12/11/2006) |
| 12/13/2006 |  | Case assigned to Judge Gregory M. Sleet. Please include the initials of the Judge (GMS) after the case number on all documents filed. (rjb) (Entered: 12/13/2006) |
| 12/14/2006 | 7 | NOTICE of Change of Address by Steven J. Balick (Balick, Steven) (Entered: 12/14/2006) |
| 12/22/2006 | 8 | Joint STIPULATION TO EXTEND TIME to answer complaint to January 26, 2007 - filed by Rembrandt Technologies LP, CBS Corporation. (Blumenfeld, Jack) (Entered: 12/22/2006) |
| 12/28/2006 |  | SO ORDERED, re 8 Joint STIPULATION TO EXTEND TIME to answer complaint to January 26, 2007 filed by Rembrandt Technologies LP, CBS Corporation. Signed by Judge Gregory M. Sleet on 12/28/06. (mmm) (Entered: 12/28/2006) |
| 12/28/2006 |  | Set/Reset Answer Deadlines: CBS Corporation answer due 1/26/2007. (mmm) (Entered: |

| | | |
|---|---|---|
| | | 12/28/2006) |
| 01/24/2007 | 9 | MOTION for Pro Hac Vice Appearance of Attorney Timothy E. DeMasi, Matthew D. Powers, Edward R. Reines, Anne M. Cappella and Sonal N. Mehta - filed by CBS Corporation. (Blumenfeld, Jack) (Entered: 01/24/2007) |
| 01/25/2007 | | SO ORDERED, re 9 MOTION for Pro Hac Vice Appearance of Attorney Timothy E. DeMasi, Matthew D. Powers, Edward R. Reines, Anne M. Cappella and Sonal N. Mehta filed by CBS Corporation. Ordered by Judge Gregory M. Sleet on 1/25/2007. (asw) (Entered: 01/25/2007) |
| 01/25/2007 | | SO ORDERED, re 6 MOTION for Pro Hac Vice Appearance of Attorney John F. Sweeney, Joseph A. DeGirolamo, and Michael O. Cummings filed by Rembrandt Technologies LP. Ordered by Judge Gregory M. Sleet on 1/25/2007. (asw) (Entered: 01/25/2007) |
| 01/26/2007 | 10 | ANSWER to Complaint with Jury Demand, COUNTERCLAIM *and Affirmative Defenses* against Rembrandt Technologies LP by CBS Corporation.(Blumenfeld, Jack) (Entered: 01/26/2007) |
| 01/26/2007 | 11 | Disclosure Statement pursuant to Rule 7.1 filed by CBS Corporation. (Blumenfeld, Jack) (Entered: 01/26/2007) |
| 02/15/2007 | 12 | ANSWER to Counterclaim by Rembrandt Technologies LP. (Attachments: # 1 Exhibit A# 2 Exhibit B)(Balick, Steven) (Entered: 02/15/2007) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/02/2007 09:32:34 | | | |
| **PACER Login:** | ps0067 | **Client Code:** | 331049 |
| **Description:** | Docket Report | **Search Criteria:** | 1:06-cv-00727-GMS Start date: 1/1/1970 End date: 3/2/2007 |
| **Billable Pages:** | 2 | **Cost:** | 0.16 |

# Exhibit 24

US2000 5490191.1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

REMBRANDT TECHNOLOGIES, LP,     )
                                                                       )
         Plaintiff,                              )
                                                                       )
           v.                                     )       C. A. No. _____
                                                                           )
NBC UNIVERSAL, INC.,                     )
                                                                       )
         Defendant.                          )
                                                                         )

## COMPLAINT FOR PATENT INFRINGEMENT
## AND DEMAND FOR JURY TRIAL

Rembrandt Technologies, LP ("Rembrandt"), for its complaint against NBC

Universal, Inc. ("NBC" or "Defendant"), alleges as follows:

### PARTIES

1.      Rembrandt is a limited partnership organized under the laws of the State

of New Jersey, having its principal place of business at 401 City Avenue, Suite 815, Bala

Cynwyd, PA 19004.

2.      NBC is a corporation organized under the laws of the State of Delaware,

having its principal place of business at 30 Rockefeller Plaza, New York, NY 10019.

### JURISDICTION AND VENUE

3.      This is an action arising under the patent laws of the United States, Title

35, United States Code. This Court has subject matter jurisdiction over this case under 28 U.S.C.

§§ 1331 and 1338(a).

4. This Court has personal jurisdiction over NBC. Defendant is incorporated in the State of Delaware, and has conducted and does conduct business within the State of Delaware. Defendant, directly or through subsidiaries or intermediaries, offers for sale, sells, advertises, and markets products and services that infringe the patent-in-suit, as described more specifically below. Therefore, because Defendant has committed acts of patent infringement in this district, or is otherwise present or doing business in this district, this Court has personal jurisdiction over Defendant.

5. Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b), (c), and 1400(b).

## INFRINGEMENT OF U.S. PATENT NO. 5,243,627

6. Rembrandt realleges and incorporates herein by reference the allegations stated in paragraphs 1-5 of this Complaint.

7. United States Patent No. 5,243,627 entitled "Signal Point Interleaving Technique" ("the '627 patent") was duly and legally issued by the United States Patent & Trademark Office on September 7, 1993. A copy of the '627 patent is annexed hereto as Exhibit A.

8. Rembrandt is the owner of all right, title and interest in the '627 patent, with the right to sue, enforce and recover damages for infringement.

9. NBC operates television systems and provides television services throughout the United States.

2

10.     Defendant has directly or indirectly infringed the '627 patent, and is continuing to do so, by practicing the inventions claimed therein, and/or by inducing or contributing to the practice by others of the inventions claimed therein, in this judicial district. For example, Defendant has infringed, and continues to infringe, the '627 patent by its transmission, or receipt and retransmission, over its television systems, of digital terrestrial broadcast signals that comply with the ATSC Digital Television Standard.

11.     Rembrandt has been damaged by Defendant's infringement and will suffer additional and irreparable damage unless this Court enjoins Defendant from continuing its infringement under 35 U.S.C. § 283.

12.     Upon information and belief, such infringement has been, and will continue to be, willful and deliberate, entitling Rembrandt to increased damages under 35 U.S.C. § 284 and making this an exceptional case entitling Rembrandt to an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

**PRAYER FOR RELIEF**

WHEREFORE, Rembrandt respectfully requests the following relief:

(1)     the entry of judgment in favor of Rembrandt, and against Defendant, that Defendant has infringed the '627 patent;

(2)     a permanent injunction enjoining and restraining Defendant and its officers, agents, servants, employees, affiliates, divisions, units and subsidiaries, and those in association therewith, from further acts of infringement of the '627 patent;

(3)     an award of damages;

3

(4)     an award of increased damages pursuant to 35 U.S.C. § 284;

(5)     an award of all costs and expenses of this action, including reasonable attorneys' fees, pre-judgment interest, and post-judgment interest; and

(6)     such other and further relief, at law and in equity, as the Court deems just and proper.

## JURY DEMAND

Rembrandt hereby respectfully requests a jury trial on all issues so triable.

ASHBY & GEDDES

*[signature]*

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Plaintiff*

*Of Counsel:*

John F. Sweeney
Joseph A. DeGirolamo
Michael O. Cummings
MORGAN & FINNEGAN, LLP
3 World Financial Center
New York, NY 10281-2101
Telephone: (212) 415-8700
jsweeney@morganfinnegan.com
jdegirolamo@morganfinnegan.com
mcummings@morganfinnegan.com

Dated: December 1, 2006
175611.1

4

# EXHIBIT A

# United States Patent [19]

**Betts et al.**

[11]  **Patent Number:**    **5,243,627**

[45]  **Date of Patent:**    **Sep. 7, 1993**

[54]  **SIGNAL POINT INTERLEAVING TECHNIQUE**

[75]  Inventors:  William L. Betts, St. Petersburg;
Edward S. Zuranski, Largo, both of
Fla.

[73]  Assignee:  AT&T Bell Laboratories, Murray
Hill, N.J.

[21]  Appl. No.:  748,594

[22]  Filed:  Aug. 22, 1991

[51]  Int. Cl.5 ........................................ H04L 5/12
[52]  U.S. Cl. ........................ 375/39; 375/60;
375/99; 371/43
[58]  Field of Search .................... 375/39, 58, 60, 99;
371/43, 37.5, 2.1, 45; 341/81

[56]  **References Cited**

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,988,677 | 10/1976 | Fletcher et al. | 371/45 X |
| 4,677,624 | 6/1987 | Betts et al. | 375/39 |
| 4,945,549 | 7/1990 | Simon et al. | 375/53 |
| 5,029,185 | 7/1991 | Wei | 375/39 X |

*Primary Examiner*—Curtis Kuntz
*Assistant Examiner*—Tesfaldet Bocure
*Attorney, Agent, or Firm*—Ronald D. Slusky; Gerard A.
deBlasi

[57]  **ABSTRACT**

Viterbi decoder performance in a data communication
system using 2N-dimensional channel symbols N>1
can be further enhanced by an interleaving technique
which uses a distributed trellis encoder in combination
with a signal point interleaver.

**24 Claims, 4 Drawing Sheets**





Case 1:07-cv-00464-2006cv-00507-TJW-CE    Document 62-2007    Filed 08/09/2007    Page 8 of 1

### FIG. 1
PRIOR ART



### FIG. 2



Case 2:06-cv-00507-TJW-CE    Document 60-25    Filed 03/09/2007    Page 9 of 18

U.S. Patent        Sep. 7, 1993        Sheet 2 of 4        5,243,627



FIG. 3

Case 2:06-cv-00507-TJW-CE    Document 60-25    Filed 03/09/2007    Page 10 of 18



FIG. 4

Case 1:07-cv-00464-2005cv-00507-TUNW-C4    Doke 06/28/2257    Filed 03/06/2007    Page 11 of

*FIG. 5*

| | | 4D SYMBOL | 4D SYMBOL | 4D SYMBOL | 4D SYMBOL | 4D SYMBOL | 4D SYMBOL |
|---|---|---|---|---|---|---|---|
| I | NOT INTERLEAVED ONE TRELLIS STAGE | $x_0^\alpha\ x_1^\alpha$ | $x_2^\alpha\ x_3^\alpha$ | $x_4^\alpha\ x_5^\alpha$ | $x_6^\alpha\ x_7^\alpha$ | $x_8^\alpha\ x_9^\alpha$ | $x_{10}^\alpha\ \cdots$ |
| II | NOT INTERLEAVED THREE TRELLIS STAGES | $x_0^\alpha\ x_1^\alpha$ | $x_2^\beta\ x_3^\beta$ | $x_4^\gamma\ x_5^\gamma$ | $x_6^\alpha\ x_7^\alpha$ | $x_8^\beta\ x_9^\beta$ | $x_{10}^\gamma\ \cdots$ |
| III | INTERLEAVED ONE TRELLIS STAGE | $x_0^\alpha\ x_{-1}^\alpha$ | $x_2^\alpha\ x_1^\alpha$ | $x_4^\alpha\ x_3^\alpha$ | $x_6^\alpha\ x_5^\alpha$ | $x_8^\alpha\ x_7^\alpha$ | $x_{10}^\alpha\ \cdots$ |
| IV | INTERLEAVED TWO TRELLIS STAGES | $x_0^\alpha\ x_{-1}^\beta$ | $x_2^\beta\ x_1^\alpha$ | $x_4^\alpha\ x_3^\beta$ | $x_6^\beta\ x_5^\alpha$ | $x_8^\alpha\ x_7^\beta$ | $x_{10}^\beta\ \cdots$ |
| V | INTERLEAVED THREE TRELLIS STAGES | $x_0^\alpha\ x_{-1}^\gamma$ | $x_2^\beta\ x_1^\alpha$ | $x_4^\gamma\ x_3^\beta$ | $x_6^\alpha\ x_5^\gamma$ | $x_8^\beta\ x_7^\alpha$ | $x_{10}^\gamma\ \cdots$ |

*FIG. 6*



*FIG. 7*



1

5,243,627

2

# SIGNAL POINT INTERLEAVING TECHNIQUE

## BACKGROUND OF THE INVENTION

The present invention relates to the transmission of digital data over band-limited channels.

Over the years, the requirements of modern-day digital data transmission over band-limited channels—such as voiceband telephone channels—have resulted in a push for higher and higher bit rates. This push has led to the development and introduction of such innovations as adaptive equalization, multi-dimensional signal constellations, echo cancellation (for two-wire applications), and trellis coding. Today, the data rates achieved using these and other techniques are beginning to approach the theoretical limits of the channel.

It has been found that various channel impairments, whose effects on the achievable bit rate were relatively minor compared to, say, additive white Gaussian noise and linear distortion, have now become of greater concern. These include such impairments as nonlinear distortion and residual (i.e., uncompensated-for) phase jitter. Such impairments are particularly irksome in systems which use trellis coding. Indeed, it has been found that the theoretical improvement in Gaussian noise immunity promised by at least some trellis codes is not realized in real-world applications where these impairments are manifest. The principal reason this is so appears to be that the noise components introduced into the received signal samples are such as to worsen the effectiveness of the Viterbi decoder used in the receiver to recover the transmitted data.

U.S. Pat. No. 4,677,625, issued Jun. 30, 1987 to Betts et al, teaches a method and arrangement in which, through the use of a distributed trellis encoder/Viterbi decoder, the effects of many of these channel impairments can be reduced. The invention in the Betts et al patent recognizes that a part of the reason that the performance of the Viterbi decoder is degraded by these impairments is the fact that the noise components of channel symbols which closely follow one another in the transmission channel are highly correlated for many types of impairments. And it is that correlation which worsens the effect that these impairments have on the Viterbi decoder. Among the impairments whose noise is correlated in this way are impulse noise, phase "hits" and gain "hits." All of these typically extend over a number of adjacent channel symbols in the channel, and thus all result in channel symbol noise components which are highly correlated. The well-known noise enhancement characteristics of linear equalizers also induce correlated noise in adjacent channel symbols, as does uncompensated-for phase jitter. Also, the occurrence of one of the relatively high power points of the signal constellation can, in pulse code modulation (PCM) systems, for example, give rise to noise on adjacent channel symbols which, again, is correlated.

The Betts et al patent addresses this issue by distributing the outgoing data to a plurality of trellis encoders in round-robin fashion and interleaving the trellis encoder outputs on the transmission channel. In the receiver, the stream of received channel symbols is correspondingly distributed to a plurality of trellis decoders. Since the successive pairs of channel symbols applied to a particular trellis decoder are separated from one another as they traverse the channel, the correlation of the noise components of these channel symbol pairs is reduced from what it would have otherwise been.

## SUMMARY OF THE INVENTION

In accordance with the present invention, it has been realized that the Viterbi decoder performance in a data communication system using 2N-dimensional channel symbols can be further enhanced by an interleaving technique which uses, in combination, a) the aforementioned distributed trellis encoder/Viterbi decoder technique and b) a signal point interleaving technique which causes the constituent signal points of the channel symbols to be non-adjacent as they traverse the channel.

In preferred embodiments of the invention, the interleaving is carried out in such a way that every $N^{th}$ signal point in the signal point stream traversing the channel is the $N^{th}$ signal point of a respective one of the channel symbols. This criterion enhances the accuracy with which the phase tracking loop in the receiver performs its function.

Also in preferred embodiments, we have found that the use of three parallel trellis encoders in conjunction with a signal point interleaving regime in which the signal points of each channel symbol are separated from one another by three signaling intervals (bauds) provides an optimum or near-optimum tradeoff between signal point/channel symbol separation and the decoding delay that is caused by the interleaving.

## BRIEF DESCRIPTION OF THE DRAWING

In the drawing,

FIG. 1 is a block diagram of the transmitter section of a prior art modem;

FIG. 2 is shows a signal constellation used by the transmitter of FIG. 1;

FIG. 3 is a block diagram of the transmitter section of a modem employing four-dimensional channel symbols and embodying the principles of the invention;

FIG. 4 is a block diagram of the receiver section of a modem embodying the principles of the invention which processes the received four-dimensional channel symbols generated by the transmitter of FIG. 3;

FIG. 5 is a signal point timing/sequencing chart helpful in explaining the principles of the present invention;

FIG. 6 is a signal point interleaver which can be used in the transmitter of FIG. 3 to interleave the signal points of eight-dimensional channel symbols; and

FIG. 7 is a signal point deinterleaver which can be used in the receiver of FIG. 4 to deinterleave the signal points of eight-dimensional channel symbols.

## DETAILED DESCRIPTION

FIG. 1 depicts the transmitter section of a prior art modem employing a 2N-dimensional signaling scheme, N≧1. The modem receives input information in the form of a serial bit stream from data terminal equipment (DTE) 111—illustratively a host computer. That bit stream is then scrambled, or randomized, by randomizer 113 whose output bits are provided in serial form to serial-to-parallel (S/P) converter 115.

Serial-to-parallel converter 115, in turn, provides, during each of a succession of symbol intervals (comprised of N baud intervals), some predetermined number of parallel bits on lead 109 and some number of parallel bits on lead 108. (It will be appreciated that whenever bits are provided in parallel in the modem, separate leads are required to carry each of the bits.) The bits on lead 109 are applied to trellis encoder 119a,

5,243,627

**3**

and are referred to as the "trellis bits." The bits on lead 108 are applied to modulus converter 116, and are referred to as the "uncoded bits."

To better understand how trellis encoder 119α and modulus converter 116 work, reference is made to FIG. 2, which shows the two-dimensional signal constellation that forms the basis of the 2N-dimensional signaling scheme illustratively used by the modem. This constellation is comprised of 32 signal points, which are divided into four subsets, A through D, each comprised of eight signal points. The eight points of subset A are explicitly labeled as $A_0$ through $A_7$. It may be noted that subsets C, B and D can be arrived at by clockwise rotation of subset A by 90, 180 and 270 degrees, respectively. (Conventional differential encoding circuitry within trellis encoder 119α exploits this symmetry.) For reference, a single signal point of each of those subsets is also shown on FIG. 2.

Consider, first, the case of N=1, i.e., a two-dimensional signaling scheme. In this case, one trellis bit on lead 109 would be expanded to two bits by trellis encoder 119α on lead 121. The four possible values of those three bits 00, 01, 10, and 11 identify subsets A, B, C and D, respectively. The successive 2-bit words on lead 121 are represented as $\alpha_n$, n=0,1,2 . . . , where n is an index that advances at the baud rate. At the same time, three parallel bits would be provided on lead 108. These are converted by modulus converter 116 into an index having a value within the range (decimal) 0 to 7. The index value, represented in binary form on lead 117, selects a particular signal point from the subset identified on lead 121. Thus if lead 121 carries the two bits 00 while lead 117 carries the three bits 001, then signal point $A_1$ of the FIG. 2 constellation has been selected. The words on leads 117 and 121 are applied to QAM encoder 124 which generates, on lead 125, values representing the I (in-phase) and Q (quadrature-phase) components of signal point $A_1$. The signal point generated on lead 125 in the $n^{th}$ baud interval is denoted $X_n{}^\alpha$, which is passed on to modulator 128 to generate a passband line signal which is applied to the communication channel. The superscript, α, indicates that the trellis encoder that was used to identify the subset for any particular signal point was trellis encoder 119α. That is, of course, a trivial notation as far as FIG. 1 goes inasmuch as trellis encoder 119α is the only trellis encoder in the modem. However, it is useful to introduce this notation because more than one trellis encoder stage is used in preferred embodiments of modems incorporating the principles of the present invention as shown in later FIGS.

In the case of N>1, the operation is similar. Now, however, the words on lead 109 are used by trellis encoder 119α to sequentially identify on lead 121N subsets, while the words on lead 108 are used to generate N corresponding index values on lead 117. The N signal points identified in this way are the component signal points of a 2N-dimensional channel symbol, the first such symbol being comprised of the signal points $X_0{}^\alpha$. . . $X_{(N-1)}{}^\alpha$. For example, a modem in which the transmitter of FIG. 1 could be used may be a 14,400 bit per second modem using four-dimensional coding (i.e., N=2) and a baud rate of 3200. In this case, nine bits from S/P converter 115 are used for each four-dimensional symbol. Specifically, three parallel bits on lead 109 are expanded into four bits on lead 121 to identify a pair of subsets while six bits on lead 108 are used to select particular signal points from those two subsets.

**4**

Those two signal points are thereupon communicated over the channel by QAM encoder 124 and modulator 128 as described above.

Note that, implementationally, the 2N-dimensional channel symbol is generated by having the trellis encoder identify, interdependently, N subsets of the two-dimensional constellation of FIG. 2, then select a two-dimensional constellation signal point from each of the subsets thus identified. The concatenation of the N two-dimensional signal points thus selected is the desired 2N-dimensional channel symbol. This process, however, can be understood as involving the direct selection of a 2N-dimensional channel symbol. Viewed in this context, the set of all possible combinations of N of the two-dimensional subsets identified by N successive trellis encoder outputs can be understood to be a set of 2N-dimensional subsets of a 2N-dimensional constellation, the latter being comprised of all possible combinations of N of the signal points of the two-dimensional constellation. A succession of N outputs from the trellis encoder identifies a particular one of the 2N-dimensional subsets and a succession of N outputs from the modulus converter selects a particular 2N-dimensional signal point from the identified 2N-dimensional subset.

Modulus converter 116 is illustratively of the type disclosed in co-pending, commonly-assigned U.S. patent application Ser. No. 588,658 filed Sep. 26, 1990 and allowed on May 21, 1991, hereby incorporated by reference. Modulus converter 116 provides the modem with the ability to support data transmission at various different bit rates. Assume, for example, that the rate at which bits are provided by DTE 111 decreases. The serial-to-parallel converter will continue to provide its outputs on leads 108 and 109 at the same baud rate as before. However, the upper limit of the range of index values that are provided by modulus converter 116 on lead 117 will be reduced, so that, effectively, each of the four subsets A through D, instead of having eight signal points, will have some smaller number. Conversely if the rate at which bits are provided by DTE 111 should increase over that originally assumed, the upper limit of the range of index values, and thus the number of parallel bits, that appear on lead 117 will be increased beyond eight and the constellation itself will be expanded to accommodate the larger number of signal points thus being selected. As an alternative to using a modulus converter, fractional bit rates can be supported using, for example, the technique disclosed in L. Wei, "Trellis-Coded Modulation with Multidimensional Constellations," *IEEE Trans. on Communication Theory*, Vol. IT-33, No. 4, July 1987, pp. 483–501.

Turning now to FIG. 3, the transmitter portion of a modem embodying the principles of the invention is shown. This embodiment illustratively uses the aforementioned four-dimensional, i.e., N=2, signaling scheme. Many of the components are similar to those shown in FIG. 1. Thus, in particular, the transmitter of FIG. 3—which receives its input information in the form of a stream of input bits from DTE 311—includes randomizer 313, which supplies its output, on lead 314, to S/P converter 315. The latter outputs uncoded bits to modulus converter 316. The transmitter further includes four-dimensional QAM encoder 324 and modulator 328. The trellis bits, on lead 309, are provided not to a standard single trellis encoder, but to a distributed trellis encoder comprised of three trellis encoder stages: trellis encoder stage 319α, trellis encoder stage 319β, and trellis encoder stage 319γ.

5,243,627

5

Such a distributed trellis encoder, which is described in the aforementioned Betts et al patent, generates a plurality of streams of trellis encoded channel symbols in response to respective portions of the input information. Specifically, a three-bit word on lead 309 is supplied to trellis encoder stage 319$\alpha$. The next three-bit word on lead 309 is supplied to trellis encoder stage 319$\beta$. The next three-bit word is supplied to trellis encoder stage 319$\gamma$, and then back to trellis encoder stage 319$\alpha$. This distribution of the trellis bits to the various trellis encoder stages is performed by switching circuit 331 operating under the control of symbol clock 325. The initial data word outputs of the trellis encoders are subset identifiers $\alpha_0$ and $\alpha_1$ for encoder stage 319$\alpha$, $\beta_2$ and $\beta_3$ for encoder stage 319$\beta$, and $\gamma_4$ and $\gamma_5$ for encoder stage 319$\gamma$, followed by $\alpha_6$ and $\alpha_7$ for encoder stage 319$\alpha$, and so forth. These are supplied to four-dimensional QAM encoder 324 by switching circuit 337—also operating under the control of symbol clock 325—on lead 338 through a one-symbol delay 364 and lead 363, in order to compensate for a one-symbol delay caused by modulus converter 316. Thus, the stream of subset identifiers on lead 338 is $\alpha_0$, $\alpha_1$, $\beta_2$, $\beta_3$, $\gamma_4$, $\alpha_6$ . . . . Using the notation introduced above, then, the output of encoder 324 on lead 325 is the stream of signal points $X_0{}^\alpha$, $X_1{}^\alpha$, $X_2{}^\beta$, $X_3{}^\beta$, $X_4{}^\gamma$, $X_5{}^\gamma$, $X_6{}^\alpha$ . . . , which is comprised of three interleaved streams of trellis encoded channel symbols, these streams being $X_0{}^\alpha$, $X_1{}^\alpha$, $X_6{}^\alpha$, $X_7{}^\alpha$, $X_{12}{}^\alpha$ . . . ; $X_2{}^\beta$, $X_3{}^\beta$, $X_8{}^\beta$, $X_9{}^\beta$, $X_{14}{}^\beta$ . . . ; and $X_4{}^\gamma$, $X_5{}^\gamma$, $X_{10}{}^\gamma$, $X_{11}{}^\gamma$, $X_{16}{}^\gamma$ . . . . These, in turn, are supplied, in accordance with the invention, to signal point interleaver 341 which applies alternate ones of the signal points applied thereto to lead 3412—which signal points appear immediately at the interleaver output on lead 342—and to one-symbol ($Z^{-1}$) delay element 3411, which appear on lead 342 after being delayed therein by one symbol interval. The resulting interleaved stream of trellis encoded signal points is $X_0{}^\alpha$, $X_{-1}{}^\gamma$, $X_2{}^\beta$, $X_1{}^\alpha$, $X_4{}^\gamma$, $X_3{}^\beta$, $X_6{}^\alpha$, $X_5{}^\gamma$, $X_8{}^\beta$, $X_7{}^\alpha$, $X_{10}{}^\gamma$, $X_9{}^\beta$ . . . (the signal point $X_{-1}{}^\gamma$ being, of course, the signal point applied to interleaver 341 just ahead of signal point $X_0{}^\alpha$).

A discussion and explanation of how the interleaving just described is advantageous is set forth hereinbelow. In order to fully set the stage for that explanation, however, it will be first useful to consider the receiver section of a modem which receives the interleaved signal point stream.

Thus referring to FIG. 4, the line signal transmitted by the transmitter of FIG. 3 is received from the channel and applied to demodulator/equalizer 455 which, in conventional fashion—including an input from phase tracking loop 457—generates a stream of outputs on lead 456 representing the demodulator/equalizer's best approximation of the values of the I and Q components of the signal points of the transmitted interleaved signal point stream. These outputs are referred to herein as the "received signal points". (Due to distortion and other channel impairments that the demodulator/equalizer is not able to compensate for, the I and Q components of the received signal points, instead of having exact integer values, can have any value. Thus a transmitted signal point having coordinates (3, −5) may be output by the demodulator/equalizer as the received signal point (2.945, −5.001).) The stream of received signal points on lead 456 is denoted $\overline{X}_0{}^\alpha$, $\overline{X}_{-1}{}^\gamma$, $\overline{X}_2{}^\beta$, $\overline{X}_1{}^\alpha$, $\overline{X}_4{}^\gamma$, $\overline{X}_3{}^\beta$, $\overline{X}_6{}^\alpha$, $\overline{X}_5{}^\gamma$, $\overline{X}_8{}^\beta$, $\overline{X}_7{}^\alpha$, $\overline{X}_{10}{}^\gamma$, $\overline{X}_9{}^\beta$ . . . .

The successive received signal points are deinterleaved in signal point deinterleaver 441, which provides

6

the opposite function to interleaver 341 in the transmitter. The output of deinterleaver 441 on lead 442 is thus $\overline{X}_0{}^\alpha$, $\overline{X}_1{}^\alpha$, $\overline{X}_2{}^\beta$, $\overline{X}_3{}^\beta$, $\overline{X}_4{}^\gamma$, $\overline{X}_5{}^\gamma$, $\overline{X}_6{}^\alpha$, . . . , etc. (Although not explicitly shown in the drawing, the same well-known techniques used in modems of this general kind to identify within the stream of received signal points the boundaries between successive symbols is used to synchronize the operation of signal point deinterleaver 441 to ensure that received signal points $\overline{X}_0{}^\alpha$, $\overline{X}_2{}^\beta$, $\overline{X}_4{}^\gamma$ . . . are applied to delay element 4411 while received signal points $\overline{X}_1{}^\alpha$, $\overline{X}_3{}^\beta$, $\overline{X}_5{}^\gamma$ . . . are applied to lead 4412.)

The received signal points on lead 442 are then distributed by switching circuit 431 under the control of symbol clock 425 to a distributed Viterbi decoder comprised of 4D Viterbi decoder stages 419$\alpha$, 419$\beta$ and 419$\gamma$. Specifically, received signal points $\overline{X}_0{}^\alpha$ and $\overline{X}_1{}^\alpha$ are applied to decoder stage 419$\alpha$; received signal points $\overline{X}_2{}^\beta$ and $\overline{X}_3{}^\beta$ are applied to decoder stage 419$\beta$; and received signal points $\overline{X}_4{}^\gamma$ and $\overline{X}_5{}^\gamma$ are applied to decoder stage 419$\gamma$. The outputs of the three decoder stages are then combined into a serial stream on lead 438 by switching circuit 437, also operating under the control of symbol clock 425. Those outputs, representing decisions as to the values of the transmitted signal points, are denoted $\hat{X}_0$, $\hat{X}_1$, $\hat{X}_2$, $\hat{X}_3$, $\hat{X}_4$, $\hat{X}_5$, $\hat{X}_6$ . . . , the $\alpha$, $\beta$ and $\gamma$ superscripts no longer being needed.

In conventional fashion, the bits that represent each of the decisions on lead 438 can be divided into bits that represent a) the trellis bits that appeared on transmitter lead 309 and b) the index values that appeared on transmitter lead 317. Those two groups of bits are provided in the receiver on leads 461 and 462, respectively. The latter group of bits are deconverted by modulus deconverter 416 (also disclosed in the aforementioned '658 patent application) back to uncoded bit values on lead 414. The operation of the modulus deconverter imparts a one-symbol delay to the bits on lead 414. Accordingly, the bits on lead 461 are caused to be delayed by one symbol by delay element 464. The resulting combined bits on lead 415 thus represent the stream of bits that appeared at the output of randomizer 313 in the transmitter. These are derandomized in the receiver by derandomizer 413 and the resulting derandomized bit stream is applied to DTE 411 which may be, for example, a computer terminal.

Referring to FIG. 5, one can see the improvement that is achieved by the present invention.

Line I shows the stream of output signal points generated and launched into the channel using one stage of trellis encoding and no signal point interleaving. This is, of course, the prior art arrangement shown in FIG. 1. Line II shows the effect of providing a three-stage distributed trellis encoder but still no signal point interleaving. This is the arrangement shown in the aforementioned Betts et al patent. Note that the signal points of each channel symbol operated on by a particular trellis encoder stage are adjacent in the output signal point stream. For example, the second signal point of the symbol $X_0{}^\alpha$, $X_1{}^\alpha$—namely signal point $X_1{}^\alpha$—is separated by five baud intervals from the first (closer) signal point of the symbol $X_6{}^\alpha$, $X_7{}^\alpha$—namely signal point $X_6{}^\alpha$. As noted earlier, such separation is advantageous because the channel symbols which are processed one after the other in a particular Viterbi decoder stage have noise components which are not highly correlated.

Note, however, that the individual signal points of each channel symbol, e.g., $X_0{}^\alpha$ and $X_1{}^\alpha$, are adjacent to

5,243,627

7

one another as they pass through the channel; and since all the signal points of a channel symbol must be processed serially in the same Viterbi decoder stage, this means that the Viterbi decoder must process adjacent signal points that have highly correlated noise components.

It is to this end that signal point interleaver 341 is included within the transmitter in accordance with the invention. Firstly, it may be noted from Line III that using the signal point interleaver without the distributed trellis encoder—an arrangement not depicted in the drawing—will, advantageously, cause the signal points from the same channel symbol to be non-adjacent. Moreover, there is further advantage in that a pair of channel symbols processed serially by Viterbi decoder stage $419\alpha$ traverses the channel separated by five baud intervals rather than three, thereby providing greater decorrelation of the noise components thereof. Compare, for example, the span of baud intervals occupied by signal points $X_0{}^\alpha$ and $X_1{}^\alpha$, $X_2{}^\alpha$ and $X_3{}^\alpha$ in Line I and the span of baud intervals occupied by the same signal points in Line III. Disadvantageously, however, the use of a single trellis encoding stage brings back the problem that the distributed trellis encoder solves, as described above. Thus, for example, although signal points $X_0{}^\alpha$ and $X_1{}^\alpha$, which are from the same channel symbol, are separated from one another when traversing the channel, we find that, disadvantageously, signal points $X_2{}^\alpha$ and $X_1{}^\alpha$, which are signal points from two different channel symbols which will be processed serially by the Viterbi decoder, traverse the channel adjacent to one another.

Line IV shows that using the signal point interleaver with a two-stage trellis encoder—also an arrangement not depicted in the drawing—provides some improvement. Firstly, it may be noted that, as in Line III, signal points from the same channel symbol remain separated by three baud intervals. Additionally, pairs of channel symbols processed sequentially by a given Viterbi decoder stage—such as the channel symbols comprised of signal points $X_0{}^\alpha$ and $X_1{}^\alpha$, $X_4{}^\alpha$ and $X_5{}^\alpha$—are still non-adjacent and, indeed, are now separated by seven baud intervals, which is even greater than the separation of five baud intervals provided in Line III. Moreover, certain signal points that traverse the channel adjacent to one another and which are from channel symbols which would have been decoded sequentially in the one-trellis-encoding-stage case are, in the two-trellis-encoding-stage case of Line IV, processed by different Viterbi decoding stages. Signal points $X_2{}^\beta$ and $X_1{}^\alpha$ are such a pair of signal points. Note, however, that, disadvantageously, signal points $X_1{}^\alpha$ and $X_4{}^\alpha$ traverse the channel serially, and are from channel symbols which are serially processed by the "α" Viterbi decoder stage.

Referring, however, to Line V, which depicts the stream of signal points output by the transmitter of FIG. 3, it will be seen that, in accordance with the invention, there is still a non-adjacency—indeed, a separation of at least three baud intervals—between a) the signal points which belong to any particular channel symbol (and which, therefore, are processed serially by a particular Viterbi decoder stage) and b) the signal points which belong to channel symbols which are processed serially by a Viterbi decoder stage. Thus, for example, signal points $X_1{}^\alpha$ and $X_4{}^\gamma$ are now processed by different Viterbi decoder stages. Moreover, pairs of channel symbols processed sequentially by a given Viterbi decoder stage—such as the channel symbols comprised of

8

signal points $X_0{}^\alpha$ and $X_1{}^\alpha$, $X_6{}^\alpha$ and $X_7{}^\alpha$—are now separated by none baud intervals.

Using more than three trellis encoder stages in the distributed trellis encoder and/or a signal point interleaver that separates signal points from the same channel symbol by more than three baud intervals would provide even greater separation and could, therefore, potentially provide even greater improvement in Viterbi decoding. However, such improvement comes at a price—that price being increased decoding delay—particularly as the number of trellis encoders is increased beyond three. An engineering trade-off can be made, as suits any particular application.

Moreover, it is desirable for the signal point interleaver to provide a sequence in which every $N^{th}$ signal point in the interleaved signal point stream is the $N^{th}$ signal point of a channel symbol. (The reason this is desirable is described in detail hereinbelow.) In the case of an $N=2$, four-dimensional signaling scheme, this means that every second, that is "every other," signal point in the interleaved stream is the second signal point of the channel symbol from which it comes. In the case of an $N=4$, eight-dimensional signaling scheme, this means that every fourth signal point in the interleaved stream is the fourth signal point of the channel symbol from which it comes. Indeed, this criterion is in fact satisfied in the embodiment of FIG. 3. Note that each one of signal points $X_0{}^\alpha$, $X_2{}^\beta$, $X_4{}^\gamma$, $X_6{}^\alpha$, . . . , which appear as every other signal point in the interleaved stream, is the second signal point of one of the four-dimensional channel symbols. Note that not all rearrangements of the signal points will, in fact, satisfy this criterion, such as, if the two signal points of a channel symbol are separated by two, rather than three, baud intervals.

Satisfying the above criterion is advantageous because it enhances the accuracy with which phase tracking loop 487 performs its function. This is so because the arrival of an $N^{th}$ signal point of a given symbol means that all the signal points comprising that channel symbol have arrived. This, in turn, makes it possible to form a decision as to the identity of that channel symbol by using the minimum accumulated path metric in the Viterbi decoder stages. (Those decisions are fed back to the tracking loop by decoder stages $419\alpha$, $419\beta$ $419\gamma$ on leads 494, 495 and 496, respectively, via switching circuit 456.) Without having received all of the signal points of a channel symbol, one cannot take advantage of the accumulated path metric information but, rather, must rely on the so-called raw sliced values, which is less accurate. By having every $N^{th}$ signal point in the interleaved stream be the $N^{th}$ signal point of a channel symbol, we are guaranteed that the time between adjacent such path metric "decisions" supplied to the phase tracking loop is, advantageously, never more than N baud intervals.

The foregoing merely illustrates the principles of the invention. Thus although the illustrative embodiment utilizes a four-dimensional signaling scheme, the invention can be used with signaling schemes of any dimensionality. In the general, 2N-dimensional, case each stage of the distributed trellis encoder would provide N two-dimensional subset identifiers to switching circuit 337 before the latter moves on to the next stage. And, of course, each stage of the distributed Viterbi decoder would receive N successive received signal points. The distributed trellis encoder and distributed Viterbi decoder can, however, continue to include three trellis

5,243,627

9

encoders and still maintain, independent of the value of N, a separation of three baud intervals in the channel between signal points that are from channel symbols that are adjacent in the trellis encoder. If a greater separation of such signal points is desired, more stages can be added to the distributed trellis encoder/Viterbi decoder, just as was noted above for the four-dimensional case. However, when dealing with 2N-dimensional signaling where N>2, it is necessary to add additional delay elements to the signal point interleaver/deinterleaver in order to maintain a three-baud-interval separation among the signal points from any given channel symbol.

Consider, for example, the case of N=4, i.e., an eight-dimensional case. Looking again at FIG. 3, the three (8D) stages of the distributed trellis encoder would generate the three streams of subset identifiers $\alpha_0 \alpha_1 \alpha_2 \alpha_3 \alpha_{12} \ldots$, $\beta_4 \beta_5 \beta_6 \beta_7 \beta_{16} \ldots$, and $\gamma_8 \gamma_9 \gamma_{10} \gamma_{11} \gamma_{20} \ldots$, respectively. This would lead to the following stream of signal points of eight-dimensional trellis encoded channel symbols at the output of the QAM encoder on lead 325: $X_0^a X_1^a X_2^a X_3^a X_4^\beta X_5^\beta X_6^\beta X_7^\beta X_8^\gamma X_9^\gamma X_{10}^\gamma X_{11}^\gamma X_{12}^a \ldots$. Signal point interleaving could be carried out by substituting signal point interleaver 641 of FIG. 6 for interleaver 341. Interleaver 641, in addition to direct connection 6414, includes one-, two-, and three-symbol delay elements 6413, 6412 and 6411, respectively.

The signal points on lead 325, after passing through interleaver 641, would appear on lead 342 in the following order: $X_0^a X_{-3}^\gamma X_{-6}^\beta X_{-9}^a X_4^\beta X_1^a X_{-2}^\gamma X_{-5}^\beta X_8^\gamma X_5^\beta X_2^a X_{-1}^\gamma X_{12}^a X_9^\gamma X_6^\beta X_3^a X_{16}^\beta X_{13}^a X_{10}^\gamma X_7^\beta \ldots$ where signal points with negative subscripts are, of course, signal points that arrived before signal point $X_0^a$ and were already stored in the delay elements 6411, 6412 and 6413. Examination of this signal point stream will reveal that there is either a three- or five-baud separation between signal points of channel symbols that are processed sequentially by the same trellis encoder stage, e.g., $X_3^a$ and $X_{12}^a$; that adjacent signal points of any one channel symbol, e.g., $X_0^a$ and $X_1^a$, are separated by five baud intervals; and that the four signal points comprising any particular one channel symbol are separated by fifteen baud intervals.

FIG. 7 shows the structure of a deinterleaver 741 that could be used in the receiver of FIG. 4 in place of deinterleaver 441 in order to restore the signal points of the eight-dimensional channel symbols to their original order. This structure, which is the inverse of interleaver 641, includes delay stages 7411, 7412 and 7413, as well as direct connection 7414.

It will be appreciated that, although various components of the modem transmitter and receiver are disclosed herein for pedagogic clarity as discrete functional elements and indeed—in the case of the various switching circuits—as mechanical elements, those skilled in the art will recognize that the function of any one or more of those elements could be implemented with any appropriate available technology, including one or more appropriately programmed processors, digital signal processing (DSP) chips, etc. For example, multiple trellis encoders and decoders can be realized using a single program routine which, through the mechanism of indirect addressing of multiple arrays within memory, serves to provide the function of each of the multiple devices.

It will thus be appreciated that those skilled in the art will be able to devise numerous arrangements which,

10

although not explicitly shown or described herein, embody the principles of the invention and are within its spirit and scope.

We claim:

1. Apparatus for forming a stream of trellis encoded signal points in response to input information, said apparatus comprising

means for generating a plurality of streams of trellis encoded channel symbols in response to respective portions of said input information, each of said channel symbols being comprised of a plurality of signal points, and

means for interleaving the signal points of said generated channel symbols to form said stream of trellis encoded signal points, said interleaving being carried out in such a way that the signal points of each channel symbol are non-adjacent in said stream of trellis encoded signal points and such that the signal points of adjacent symbols in any one of said channel symbol streams are non-adjacent in said stream of trellis encoded signal points.

2. The apparatus of claim 1 wherein said means for generating generates three of said streams of trellis encoded channel symbols, and wherein said means for interleaving causes there to be interleaved between each of the signal points of each channel symbol at least two signal points from other channel symbols of said streams of trellis encoded channel symbols.

3. The apparatus of claim 1 wherein said channel symbols are 2N-dimensional channel symbols, N>1, and wherein said means for interleaving causes every $N^{th}$ signal point in said interleaved signal point stream to be the $N^{th}$ signal point of a respective one of said channel symbols.

4. The apparatus of claim 2 wherein said channel symbols are 2N-dimensional channel symbols, N>1, and wherein said means for interleaving causes every $N^{th}$ signal point in said interleaved signal point stream to be the $N^{th}$ signal point of a respective one of said channel symbols.

5. A modem comprising

means for receiving a stream of input bits,

means for dividing said stream of input bits into a stream of uncoded bits and a plurality of streams of trellis bits,

means for independently trellis encoding each of said plurality of streams of trellis bits to generate respective streams of data words each identifying one of a plurality of predetermined subsets of the channel symbols of a predetermined 2N-dimensional constellation, N being an integer greater than unity, each of said channel symbols being comprised of a plurality of signal points,

means for selecting an individual channel symbol from each identified subset in response to said stream of uncoded bits to form a stream of channel symbols, and

means for generating a stream of output signal points, said signal point stream being comprised of the signal points of the selected channel symbols, the signal points of said signal point stream being sequenced in such a way that signal points that are either a) part of the same channel symbol, or b) part of channel symbols that are adjacent to one another in said channel symbol stream, are separated in said output stream by at least one other signal point.

6. The apparatus of claim 5 wherein said trellis encoding means includes a plurality of trellis encoder stage

5,243,627

11

means for trellis encoding respective ones of said streams of trellis bits.

7. The apparatus of claim 5 wherein said means for selecting includes means for modulus converting said stream of uncoded bits.

8. The apparatus of claim 5 wherein said channel symbols are 2N-dimensional channel symbols, N>1, and wherein said means for generating causes every N[th] signal point in said stream of output signal points to be the N[th] signal point of a respective one of said channel symbols.

9. Receiver apparatus for recovering information from a received stream of trellis encoded signal points, said signal points having been transmitted to said receiver apparatus by transmitter apparatus which generates said signal points by generating a plurality of streams of trellis encoded channel symbols in response to respective portions of said information, each of said channel symbols being comprised of a plurality of signal points, and by interleaving the signal points of said generated channel symbols to form said stream of trellis encoded signal points, said interleaving being carried out in such a way that the signal points of each channel symbol are non-adjacent in said stream of trellis encoded signal points and such that the signal points of adjacent symbols in any one of said channel symbol streams are non-adjacent in said stream of trellis encoded signal points,

said receiver apparatus comprising

means for deinterleaving the interleaved signal points to recover said plurality of streams of trellis encoded channel symbols, and

a distributed Viterbi decoder for recovering said information from the deinterleaved signal points.

10. The apparatus of claim 9 further comprising a phase tracking loop, and

means for adapting the operation of said phase tracking loop in response to minimum accumulated path metrics in said distributed Viterbi decoder.

11. A method for forming a stream of trellis encoded signal points in response to input information, said method comprising the steps of

generating a plurality of streams of trellis encoded channel symbols in response to respective portions of said input information, each of said channel symbols being comprised of a plurality of signal points, and

interleaving the signal points of said generated channel symbols to form said stream of trellis encoded signal points, said interleaving being carried out in such a way that the signal points of each channel symbol are non-adjacent in said stream of trellis encoded signal points and such that the signal points of adjacent symbols in any one of said channel symbol stream are non-adjacent in said stream of trellis encoded signal points.

12. The method of claim 11 wherein said generating step generates three of said streams of trellis encoded channel symbols, and wherein said interleaving step causes there to be interleaved between each of the signal points of each channel symbol at least two signal points from other channel symbols of said streams of trellis encoded channel symbols.

13. The method of claim 11 wherein said channel symbols are 2N-dimensional channel symbols, N>1, and wherein said interleaving step causes every N[th] signal point in said interleaved signal point stream to be

12

the N[th] signal point of a respective one of said channel symbols.

14. The method of claim 12 wherein said channel symbols are 2N-dimensional channel symbols, N>1, and wherein said interleaving step causes every N[th] signal point in said interleaved signal point stream to be the N[th] signal point of a respective one of said channel symbols.

15. A method for use in a modem, said method comprising the steps of

receiving a stream of input bits,

dividing said stream of input bits into a stream of uncoded bits and a plurality of streams of trellis bits,

independently trellis encoding each of said plurality of streams of trellis bits to generate respective streams of data words each identifying one of a plurality of predetermined subsets of the channel symbols of a predetermined 2N-dimensional constellation, N being an integer greater than unity, each of said channel symbols being comprised of a plurality of signal points,

selecting an individual channel symbol from each identified subset in response to said stream of uncoded bits to form a stream of channel symbols, and

generating a stream of output signal points, said signal point stream being comprised of the signal points of the selected channel symbols, the signal points of said signal point stream being sequenced in such a way that signal points that are either a) part of the same channel symbol, or b) part of channel symbols that are adjacent to one another in said channel symbol stream, are separated in said output stream by at least one other signal point.

16. The method of claim 15 wherein in said trellis encoding step a plurality of trellis encoder stages trellis encode respective ones of said streams of trellis bits.

17. The method of claim 15 wherein said selecting step includes the step of modulus converting said stream of uncoded bits.

18. The method of claim 15 wherein said channel symbols are 2N-dimensional channel symbols, N>1, and wherein said generating step causes every N[th] signal point in said stream of output signal points to be the N[th] signal point of a respective one of said channel symbols.

19. A method for use in a receiver to recover information from a received stream of trellis encoded signal points, said signal points having been transmitted to said receiver apparatus by a method which includes the steps of

generating a plurality of streams of trellis encoded channel symbols in response to respective portions of said information, each of said channel symbols being comprised of a plurality of signal points, and interleaving the signal points of said generated channel symbols to form said stream of trellis encoded signal points, said interleaving being carried out in such a way that the signal points of each channel symbol are non-adjacent in said stream of trellis encoded signal points and such that the signal points of adjacent symbols in any one of said channel symbol streams are non-adjacent in said stream of trellis encoded signal points,

said method comprising the steps of

deinterleaving the interleaved signal points to recover said plurality of streams of trellis encoded channel symbols, and

5,243,627

**13**

using a distributed Viterbi decoder to recover said information from the deinterleaved signal points.

20. The method of claim 19 wherein said receiver includes a phase tracking loop and wherein said method comprises the further step of adapting the operation of said phase tracking loop in response to minimum accumulated path metrics in said distributed Viterbi decoder.

21. Data communication apparatus comprising
    means for receiving input information,
    means for generating a plurality of streams of trellis encoded channel symbols in response to respective portions of said input information, each of said channel symbols being comprised of a plurality of signal points,
    means for interleaving the signal points of said generated channel symbols to form a stream of trellis encoded signal points, said interleaving being carried out in such a way that the signal points of each channel symbol are non-adjacent in said stream of trellis encoded signal points and such that the signal points of adjacent symbols in any one of said channel symbol streams are non-adjacent in said stream of trellis encoded signal points,
    means for applying the stream of trellis encoded signal points to a transmission channel,

**14**

means for receiving the stream of trellis encoded signal points from the channel,
means for deinterleaving the interleaved signal points to recover said plurality of streams of trellis encoded channel symbols, and
a distributed Viterbi decoder for recovering said information from the deinterleaved signal points.

22. The apparatus of claim 21 wherein said means for generating generates three of said streams of trellis encoded channel symbols, and wherein said means for interleaving causes there to be interleaved between each of the signal points of each channel symbol at least two signal points from other channel symbols of said streams of trellis encoded channel symbols.

23. The apparatus of claim 21 wherein said channel symbols are 2N-dimensional channel symbols, $N > 1$, and wherein said means for interleaving causes every $N^{th}$ signal point in said interleaved signal point stream to be the $N^{th}$ signal point of a respective one of said channel symbols.

24. The apparatus of claim 22 wherein said channel symbols are 2N-dimensional channel symbols, $N > 1$, and wherein said means for interleaving causes every $N^{th}$ signal point in said interleaved signal point stream to be the $N^{th}$ signal point of a respective one of said channel symbols.

* * * * *

# Exhibit 25

US2000 5490191.1

# U.S. District Court
## District of Delaware (Wilmington)
### CIVIL DOCKET FOR CASE #: 1:06-cv-00729-GMS

| | |
|---|---|
| Rembrandt Technologies LP v. NBC Universal Inc. | Date Filed: 12/01/2006 |
| Assigned to: Honorable Gregory M. Sleet | Jury Demand: Plaintiff |
| Related Case: 1:06-cv-00635-GMS | Nature of Suit: 830 Patent |
| Cause: 35:271 Patent Infringement | Jurisdiction: Federal Question |

**Plaintiff**

**Rembrandt Technologies LP**                    represented by **Steven J. Balick**
Ashby & Geddes
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
Email: sbalick@ashby-geddes.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lauren E. Maguire**
Ashby & Geddes
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
Email: lmaguire@ashby-geddes.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**NBC Universal Inc.**                    represented by **Jack B. Blumenfeld**
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
Email: jbbefiling@mnat.com
*LEAD ATTORNEY*

**Counter Claimant**

**NBC Universal Inc.**                    represented by **Jack B. Blumenfeld**
(See above for address)
*LEAD ATTORNEY*

V.

**Counter Defendant**

**Rembrandt Technologies LP**
      represented by **Steven J. Balick**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lauren E. Maguire**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/01/2006 | 1 | COMPLAINT filed with Jury Demand against NBC Universal Inc. - Magistrate Consent Notice to Pltf. ( Filing fee $ 350, receipt number 145541.) - filed by Rembrandt Technologies LP. (Attachments: # 1 Civil Cover Sheet # 2 Acknowledgement of Consent Form)(ead) (Entered: 12/04/2006) |
| 12/01/2006 | | Summons Issued as to NBC Universal Inc. on 12/1/2006. (ead) (Entered: 12/04/2006) |
| 12/01/2006 | 2 | Notice of Availability of a U.S. Magistrate Judge to Exercise Jurisdiction (ead) (Entered: 12/04/2006) |
| 12/04/2006 | 3 | Report to the Commissioner of Patents and Trademarks for Patent Number 5,243,627; (ead) (Entered: 12/04/2006) |
| 12/04/2006 | 4 | SUMMONS Returned Executed by Rembrandt Technologies LP. NBC Universal Inc. served on 12/4/2006, answer due 12/27/2006. (Maguire, Lauren) (Entered: 12/04/2006) |
| 12/06/2006 | 5 | Disclosure Statement pursuant to Rule 7.1 filed by Rembrandt Technologies LP. (Maguire, Lauren) (Entered: 12/06/2006) |
| 12/11/2006 | 6 | MOTION for Pro Hac Vice Appearance of Attorney John F. Sweeney, Joseph A. DeGirolamo, and Michael O. Cummings - filed by Rembrandt Technologies LP. (Maguire, Lauren) (Entered: 12/11/2006) |
| 12/13/2006 | | Case assigned to Judge Gregory M. Sleet. Please include the initials of the Judge (GMS) after the case number on all documents filed. (rjb) (Entered: 12/13/2006) |
| 12/14/2006 | 7 | NOTICE of Change of Address by Steven J. Balick (Balick, Steven) (Entered: 12/14/2006) |
| 12/22/2006 | 8 | Joint STIPULATION TO EXTEND TIME to answer complaint to January 26, 2007 - filed by Rembrandt Technologies LP, NBC Universal Inc.. (Blumenfeld, Jack) (Entered: 12/22/2006) |
| 12/28/2006 | | SO ORDERED, re 8 Joint STIPULATION TO EXTEND TIME to answer complaint to January 26, 2007 filed by NBC Universal Inc., Rembrandt Technologies LP. Signed by Judge Gregory M. Sleet on 12/28/06. (mmm) (Entered: 12/28/2006) |
| 12/28/2006 | | Set/Reset Answer Deadlines: NBC Universal Inc. answer due 1/26/2007. (mmm) |

| | | |
|---|---|---|
| | | (Entered: 12/28/2006) |
| 01/24/2007 | 9 | MOTION for Pro Hac Vice Appearance of Attorney Timothy E. DeMasi, Matthew D. Powers, Edward R. Reines, Anne M. Cappella and Sonal N. Mehta - filed by NBC Universal Inc.. (Blumenfeld, Jack) (Entered: 01/24/2007) |
| 01/25/2007 | | SO ORDERED, re 9 MOTION for Pro Hac Vice Appearance of Attorney Timothy E. DeMasi, Matthew D. Powers, Edward R. Reines, Anne M. Cappella and Sonal N. Mehta filed by NBC Universal Inc.. Ordered by Judge Gregory M. Sleet on 1/25/2007. (asw) (Entered: 01/25/2007) |
| 01/25/2007 | | SO ORDERED, re 6 MOTION for Pro Hac Vice Appearance of Attorney John F. Sweeney, Joseph A. DeGirolamo, and Michael O. Cummings filed by Rembrandt Technologies LP. Ordered by Judge Gregory M. Sleet on 1/25/2007. (asw) (Entered: 01/25/2007) |
| 01/26/2007 | 10 | ANSWER to Complaint with Jury Demand, COUNTERCLAIM *and Affirmative Defenses* against Rembrandt Technologies LP by NBC Universal Inc..(Blumenfeld, Jack) (Entered: 01/26/2007) |
| 01/26/2007 | 11 | Disclosure Statement pursuant to Rule 7.1 filed by NBC Universal Inc.. (Blumenfeld, Jack) (Entered: 01/26/2007) |
| 02/15/2007 | 12 | ANSWER to Counterclaim by Rembrandt Technologies LP. (Attachments: # 1 Exhibit A# 2 Exhibit B)(Balick, Steven) (Entered: 02/15/2007) |

<table>
<tr><td colspan="5" align="center"><strong>PACER Service Center</strong></td></tr>
<tr><td colspan="5" align="center"><strong>Transaction Receipt</strong></td></tr>
<tr><td colspan="5" align="center">03/02/2007 09:34:03</td></tr>
<tr><td><strong>PACER Login:</strong></td><td>ps0067</td><td><strong>Client Code:</strong></td><td colspan="2">331049</td></tr>
<tr><td><strong>Description:</strong></td><td>Docket Report</td><td><strong>Search Criteria:</strong></td><td colspan="2">1:06-cv-00729-GMS Start date: 1/1/1970 End date: 3/2/2007</td></tr>
<tr><td><strong>Billable Pages:</strong></td><td>2</td><td><strong>Cost:</strong></td><td colspan="2">0.16</td></tr>
</table>

# Exhibit 26

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

REMBRANDT TECHNOLOGIES, LP,　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiff,　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　v.　　　　　　　　　　　)　　　C.A. No. _____
　　　　　　　　　　　　　　　　　　)
ABC, INC.,　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　Defendant.　　　　　　　)
　　　　　　　　　　　　　　　　　　)

## COMPLAINT FOR PATENT INFRINGEMENT
## AND DEMAND FOR JURY TRIAL

Rembrandt Technologies, LP ("Rembrandt"), for its complaint against ABC, Inc. ("ABC" or "Defendant""), alleges as follows:

## PARTIES

1.　　　Rembrandt is a limited partnership organized under the laws of the State of New Jersey, having its principal place of business at 401 City Avenue, Suite 815, Bala Cynwyd, PA 19004.

2.　　　ABC is a corporation organized under the laws of the State of New York, having its principal place of business at 77 W. 66th Street, New York, NY 10023-6201.

## JURISDICTION AND VENUE

3.　　　This is an action arising under the patent laws of the United States, Title 35, United States Code. This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1338(a).

4.  This Court has personal jurisdiction over ABC. Defendant has conducted and does conduct business within the State of Delaware. Defendant, directly or through subsidiaries or intermediaries, offers for sale, sells, advertises, and markets products and services that infringe the patent-in-suit, as described more specifically below. Therefore, because Defendant has committed acts of patent infringement in this district, or is otherwise present or doing business in this district, this Court has personal jurisdiction over Defendant.

5.  Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b), (c), and 1400(b).

## INFRINGEMENT OF U.S. PATENT NO. 5,243,627

6.  Rembrandt realleges and incorporates herein by reference the allegations stated in paragraphs 1-5 of this Complaint.

7.  United States Patent No. 5,243,627 entitled "Signal Point Interleaving Technique" ("the '627 patent") was duly and legally issued by the United States Patent & Trademark Office on September 7, 1993. A copy of the '627 patent is annexed hereto as Exhibit A.

8.  Rembrandt is the owner of all right, title and interest in the '627 patent, with the right to sue, enforce and recover damages for infringement.

9.  ABC operates television systems and provides television services throughout the United States.

10. Defendant has directly or indirectly infringed the '627 patent, and is continuing to do so, by practicing the inventions claimed therein, and/or by inducing or

2

contributing to the practice by others of the inventions claimed therein, in this judicial district. For example, Defendant has infringed, and continues to infringe, the '627 patent by its transmission, or receipt and retransmission, over its television systems, of digital terrestrial broadcast signals that comply with the ATSC Digital Television Standard.

11.     Rembrandt has been damaged by Defendant's infringement and will suffer additional and irreparable damage unless this Court enjoins Defendant from continuing its infringement under 35 U.S.C. § 283.

12.     Upon information and belief, such infringement has been, and will continue to be, willful and deliberate, entitling Rembrandt to increased damages under 35 U.S.C. § 284 and making this an exceptional case entitling Rembrandt to an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.


**PRAYER FOR RELIEF**

WHEREFORE, Rembrandt respectfully requests the following relief:

(1)     the entry of judgment in favor of Rembrandt, and against Defendant, that Defendant has infringed the '627 patent;

(2)     a permanent injunction enjoining and restraining Defendant and its officers, agents, servants, employees, affiliates, divisions, units and subsidiaries, and those in association therewith, from further acts of infringement of the '627 patent;

(3)     an award of damages;

(4)     an award of increased damages pursuant to 35 U.S.C. § 284;

3

(5)  an award of all costs and expenses of this action, including reasonable attorneys' fees, pre-judgment interest, and post-judgment interest; and

(6)  such other and further relief, at law and in equity, as the Court deems just and proper.

## JURY DEMAND

Rembrandt hereby respectfully requests a jury trial on all issues so triable.

ASHBY & GEDDES

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Plaintiff*

*Of Counsel:*

John F. Sweeney
Joseph A. DeGirolamo
Michael O. Cummings
MORGAN & FINNEGAN, LLP
3 World Financial Center
New York, NY 10281-2101
Telephone: (212) 415-8700
Fax: (212) 415-8701
jsweeney@morganfinnegan.com
jdegirolamo@morganfinnegan.com
mcummings@morganfinnegan.com

Dated:  December 1, 2006
175612.1

# EXHIBIT A

# United States Patent [19]

## Betts et al.

[11] Patent Number: 5,243,627

[45] Date of Patent: Sep. 7, 1993

[54] SIGNAL POINT INTERLEAVING TECHNIQUE

[75] Inventors: William L. Betts, St. Petersburg; Edward S. Zuranski, Largo, both of Fla.

[73] Assignee: AT&T Bell Laboratories, Murray Hill, N.J.

[21] Appl. No.: 748,594

[22] Filed: Aug. 22, 1991

[51] Int. Cl.⁵ ........................................ H04L 5/12
[52] U.S. Cl. ............................ 375/39; 375/60; 375/99; 371/43
[58] Field of Search .............. 375/39, 58, 60, 99; 371/43, 37.5, 2.1, 45; 341/81

[56] References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,988,677 | 10/1976 | Fletcher et al. | 371/45 X |
| 4,677,624 | 6/1987 | Betts et al. | 375/39 |
| 4,945,549 | 7/1990 | Simon et al. | 375/53 |
| 5,029,185 | 7/1991 | Wei | 375/39 X |

Primary Examiner—Curtis Kuntz
Assistant Examiner—Tesfaldet Bocure
Attorney, Agent, or Firm—Ronald D. Slusky; Gerard A. deBlasi

[57] ABSTRACT

Viterbi decoder performance in a data communication system using 2N-dimensional channel symbols N>1 can be further enhanced by an interleaving technique which uses a distributed trellis encoder in combination with a signal point interleaver.

24 Claims, 4 Drawing Sheets





*FIG. 1*

PRIOR ART



*FIG. 2*



Case 2:06-cv-00507-TJW-CE    Document 60-27    Filed 03/09/2007    Page 9 of 18

U.S. Patent          Sep. 7, 1993          Sheet 2 of 4          5,243,627



FIG. 3

Case 1:07-cv-00404-GMS    Document 91-6    Filed 06/28/2007    Page 10 of 18

Case 2:06-cv-00507-TJW-CE    Document 60-27    Filed 03/09/2007    Page 10 of 18



FIG. 4

## FIG. 5

| | | 4D SYMBOL | 4D SYMBOL | 4D SYMBOL | 4D SYMBOL | 4D SYMBOL | 4D SYMBOL |
|---|---|---|---|---|---|---|---|
| I | NOT INTERLEAVED ONE TRELLIS STAGE | $x_0^\alpha$ $x_1^\alpha$ | $x_2^\alpha$ $x_3^\alpha$ | $x_4^\alpha$ $x_5^\alpha$ | $x_6^\alpha$ $x_7^\alpha$ | $x_8^\alpha$ $x_9^\alpha$ | $x_{10}^\alpha$ ··· |
| II | NOT INTERLEAVED THREE TRELLIS STAGES | $x_0^\alpha$ $x_1^\alpha$ | $x_2^\beta$ $x_3^\beta$ | $x_4^\gamma$ $x_5^\gamma$ | $x_6^\alpha$ $x_7^\alpha$ | $x_8^\beta$ $x_9^\beta$ | $x_{10}^\gamma$ ··· |
| III | INTERLEAVED ONE TRELLIS STAGE | $x_0^\alpha$ $x_{-1}^\alpha$ | $x_2^\alpha$ $x_1^\alpha$ | $x_4^\alpha$ $x_3^\alpha$ | $x_6^\alpha$ $x_5^\alpha$ | $x_8^\alpha$ $x_7^\alpha$ | $x_{10}^\alpha$ ··· |
| IV | INTERLEAVED TWO TRELLIS STAGES | $x_0^\alpha$ $x_{-1}^\beta$ | $x_2^\beta$ $x_1^\alpha$ | $x_4^\alpha$ $x_3^\beta$ | $x_6^\beta$ $x_5^\alpha$ | $x_8^\alpha$ $x_7^\beta$ | $x_{10}^\beta$ ··· |
| V | INTERLEAVED THREE TRELLIS STAGES | $x_0^\alpha$ $x_{-1}^\gamma$ | $x_2^\beta$ $x_1^\alpha$ | $x_4^\gamma$ $x_3^\beta$ | $x_6^\alpha$ $x_5^\gamma$ | $x_8^\beta$ $x_7^\alpha$ | $x_{10}^\gamma$ ··· |

## FIG. 6



## FIG. 7



5,243,627

| 1 | 2 |

## SIGNAL POINT INTERLEAVING TECHNIQUE

### BACKGROUND OF THE INVENTION

The present invention relates to the transmission of digital data over band-limited channels.

Over the years, the requirements of modern-day digital data transmission over band-limited channels—such as voiceband telephone channels—have resulted in a push for higher and higher bit rates. This push has led to the development and introduction of such innovations as adaptive equalization, multi-dimensional signal constellations, echo cancellation (for two-wire applications), and trellis coding. Today, the data rates achieved using these and other techniques are beginning to approach the theoretical limits of the channel.

It has been found that various channel impairments, whose effects on the achievable bit rate were relatively minor compared to, say, additive white Gaussian noise and linear distortion, have now become of greater concern. These include such impairments as nonlinear distortion and residual (i.e., uncompensated-for) phase jitter. Such impairments are particularly irksome in systems which use trellis coding. Indeed, it has been found that the theoretical improvement in Gaussian noise immunity promised by at least some trellis codes is not realized in real-world applications where these impairments are manifest. The principal reason this is so appears to be that the noise components introduced into the received signal samples are such as to worsen the effectiveness of the Viterbi decoder used in the receiver to recover the transmitted data.

U.S. Pat. No. 4,677,625, issued Jun. 30, 1987 to Betts et al, teaches a method and arrangement in which, through the use of a distributed trellis encoder/Viterbi decoder, the effects of many of these impairments can be reduced. The invention in the Betts et al patent recognizes that a part of the reason that the performance of the Viterbi decoder is degraded by these impairments is the fact that the noise components of channel symbols which closely follow one another in the transmission channel are highly correlated for many types of impairments. And it is that correlation which worsens the effect that these impairments have on the Viterbi decoder. Among the impairments whose noise is correlated in this way are impulse noise, phase "hits" and gain "hits." All of these typically extend over a number of adjacent channel symbols in the channel, and thus all result in channel symbol noise components which are highly correlated. The well-known noise enhancement characteristics of linear equalizers also induce correlated noise in adjacent channel symbols, as does uncompensated-for phase jitter. Also, the occurrence of one of the relatively high power points of the signal constellation can, in pulse code modulation (PCM) systems, for example, give rise to noise on adjacent channel symbols which, again, is correlated.

The Betts et al patent addresses this issue by distributing the outgoing data to a plurality of trellis encoders in round-robin fashion and interleaving the trellis encoder outputs on the transmission channel. In the receiver, the stream of received interleaved channel symbols is correspondingly distributed to a plurality of trellis decoders. Since the successive pairs of channel symbols applied to a particular trellis decoder are separated from one another as they traverse the channel, the correlation of the noise components of these channel symbol pairs is reduced from what it would have otherwise been.

### SUMMARY OF THE INVENTION

In accordance with the present invention, it has been realized that the Viterbi decoder performance in a data communication system using 2N-dimensional channel symbols can be further enhanced by an interleaving technique which uses, in combination, a) the aforementioned distributed trellis encoder/Viterbi decoder technique and b) a signal point interleaving technique which causes the constituent signal points of the channel symbols to be non-adjacent as they traverse the channel.

In preferred embodiments of the invention, the interleaving is carried out in such a way that every $N^{th}$ signal point in the signal point stream traversing the channel is the $N^{th}$ signal point of a respective one of the channel symbols. This criterion enhances the accuracy with which the phase tracking loop in the receiver performs its function.

Also in preferred embodiments, we have found that the use of three parallel trellis encoders in conjunction with a signal point interleaving regime in which the signal points of each channel symbol are separated from one another by three signaling intervals (bauds) provides an optimum or near-optimum tradeoff between signal point/channel symbol separation and the decoding delay that is caused by the interleaving.

### BRIEF DESCRIPTION OF THE DRAWING

In the drawing,

FIG. 1 is a block diagram of the transmitter section of a prior art modem;

FIG. 2 is shows a signal constellation used by the transmitter of FIG. 1;

FIG. 3 is a block diagram of the transmitter section of a modem employing four-dimensional channel symbols and embodying the principles of the invention;

FIG. 4 is a block diagram of the receiver section of a modem embodying the principles of the invention which processes the received four-dimensional channel symbols generated by the transmitter of FIG. 3;

FIG. 5 is a signal point timing/sequencing chart helpful in explaining the principles of the present invention;

FIG. 6 is a signal point interleaver which can be used in the transmitter of FIG. 3 to interleave the signal points of eight-dimensional channel symbols; and

FIG. 7 is a signal point deinterleaver which can be used in the receiver of FIG. 4 to deinterleave the signal points of eight-dimensional channel symbols.

### DETAILED DESCRIPTION

FIG. 1 depicts the transmitter section of a prior art modem employing a 2N-dimensional signaling scheme, $N \geq 1$. The modem receives input information in the form of a serial bit stream from data terminal equipment (DTE) 111—illustratively a host computer. That bit stream is then scrambled, or randomized, by randomizer 113 whose output bits are provided in serial form to serial-to-parallel (S/P) converter 115.

Serial-to-parallel converter 115, in turn, provides, during each of a succession of symbol intervals (comprised of N baud intervals), some predetermined number of parallel bits on lead 109 and some number of parallel bits on lead 108. (It will be appreciated that whenever bits are provided in parallel in the modem, separate leads are required to carry each of the bits.) The bits on lead 109 are applied to trellis encoder 119a,

3

and are referred to as the "trellis bits." The bits on lead 108 are applied to modulus converter 116, and are referred to as the "uncoded bits."

To better understand how trellis encoder 119α and modulus converter 116 work, reference is made to FIG. 2, which shows the two-dimensional signal constellation that forms the basis of the 2N-dimensional signaling scheme illustratively used by the modem. This constellation is comprised of 32 signal points, which are divided into four subsets, A through D, each comprised of eight signal points. The eight points of subset A are explicitly labeled as $A_0$ through $A_7$. It may be noted that subsets C, B and D can be arrived at by clockwise rotation of subset A by 90, 180 and 270 degrees, respectively. (Conventional differential encoding circuitry within trellis encoder 119α exploits this symmetry.) For reference, a single signal point of each of those subsets is also shown on FIG. 2.

Consider, first, the case of N=1, i.e., a two-dimensional signaling scheme. In this case, one trellis bit on lead 109 would be expanded to two bits by trellis encoder 119α on lead 121. The four possible values of those three bits 00, 01, 10, and 11 identify subsets A, B, C and D, respectively. The successive 2-bit words on lead 121 are represented as $a_n$, n=0,1,2..., where n is an index that advances at the baud rate. At the same time, three parallel bits would be provided on lead 108. These are converted by modulus converter 116 into an index having a value within the range (decimal) 0 to 7. The index value, represented in binary form on lead 117, selects a particular signal point from the subset identified on lead 121. Thus if lead 121 carries the two bits 00 while lead 117 carries the three bits 001, then signal point $A_1$ of the FIG. 2 constellation has been selected. The words on leads 117 and 121 are applied to QAM encoder 124 which generates, on lead 125, values representing the I (in-phase) and Q (quadrature-phase) components of signal point $A_1$. The signal point generated on lead 128 in the $n^{th}$ baud interval is denoted $X_n a_n$, which is passed on to modulator 128 to generate a passband line signal which is applied to the communication channel. The superscript, α, indicates that the trellis encoder that was used to identify the subset for any particular signal point was trellis encoder 119α. That is, of course, a trivial notation as far as FIG. 1 goes inasmuch as trellis encoder 119α is the only trellis encoder in the modem. However, it is useful to introduce this notation because more than one trellis encoder stage is used in preferred embodiments of modems incorporating the principles of the present invention as shown in later FIGS.

In the case of N>1, the operation is similar. Now, however, the words on lead 109 are used by trellis encoder 119α to sequentially identify on lead 121N subsets, while the words on lead 108 are used to generate N corresponding index values on lead 117. The N signal points identified in this way are the component signal points of a 2N-dimensional channel symbol, the first such symbol being comprised of the signal points $X_0 a$, ... $X_{(N-1)} a$. For example, a modem in which the transmitter of FIG. 1 could be used may be a 14,400 bit per second modem using four-dimensional coding (i.e., N=2) and a baud rate of 3200. In this case, nine bits from S/P converter 115 are used for each four-dimensional symbol. Specifically, three parallel bits on lead 109 are expanded into four bits on lead 121 to identify a pair of subsets while six bits on lead 108 are used to select particular signal points from those two subsets.

4

Those two signal points are thereupon communicated over the channel by QAM encoder 124 and modulator 128 as described above.

Note that, implementationally, the 2N-dimensional channel symbol is generated by having the trellis encoder identify, interdependently, N subsets of the two-dimensional constellation of FIG. 2, then select a two-dimensional signal point from each of the subsets thus identified. The concatenation of the N two-dimensional signal points thus selected is the desired 2N-dimensional channel symbol. This process, however, can be understood as involving the direct selection of a 2N-dimensional channel symbol. Viewed in this context, the set of all possible combinations of N of the two-dimensional subsets identified by N successive trellis encoder outputs can be understood to be a set of 2N-dimensional subsets of a 2N-dimensional constellation, the latter being comprised of all possible combinations of N of the signal points of the two-dimensional constellation. A succession of N outputs from the trellis encoder identifies a particular one of the 2N-dimensional subsets and a succession of N outputs from the modulus converter selects a particular 2N-dimensional signal point from the identified 2N-dimensional subset.

Modulus converter 116 is illustratively of the type disclosed in co-pending, commonly-assigned U.S. patent application Ser. No. 588,658 filed Sep. 26, 1990 and allowed on May 21, 1991, hereby incorporated by reference. Modulus converter 116 provides the modem with the ability to support data transmission at various different bit rates. Assume, for example, that the rate at which bits are provided by DTE 111 decreases. The serial-to-parallel converter will continue to provide its outputs on leads 108 and 109 at the same baud rate as before. However, the upper limit of the range of index values that are provided by modulus converter 116 on lead 117 will be reduced, so that, effectively, each of the four subsets A through D, instead of having eight signal points, will have some smaller number. Conversely if the rate at which bits are provided by DTE 111 should increase over that originally assumed, the upper limit of the range of index values, and thus the number of parallel bits, that appear on lead 117 will be increased beyond eight and the constellation itself will be expanded to accommodate the larger number of signal points thus being selected. As an alternative to using a modulus converter, fractional bit rates can be supported using, for example, the technique disclosed in L. Wei, "Trellis-Coded Modulation with Multidimensional Constellations," *IEEE Trans. on Communication Theory*, Vol. IT-33, No. 4, July 1987, pp. 483–501.

Turning now to FIG. 3, the transmitter portion of a modem embodying the principles of the invention is shown. This embodiment illustratively uses the aforementioned four-dimensional, i.e., N=2, signaling scheme. Many of the components are similar to those shown in FIG. 1. Thus, in particular, the transmitter of FIG. 3—which receives its input information in the form of a stream of input bits from DTE 311—includes randomizer 313, which supplies its output, on lead 314, to S/P converter 315. The latter outputs uncoded bits to modulus converter 316. The transmitter further includes four-dimensional QAM encoder 324 and modulator 328. The trellis bits, on lead 309, are provided not to a standard single trellis encoder, but to a distributed trellis encoder comprised of three trellis encoder stages: trellis encoder stage 319α, trellis encoder stage 319β, and trellis encoder stage 319γ.

**5**

Such a distributed trellis encoder, which is described in the aforementioned Betts et al patent, generates a plurality of streams of trellis encoded channel symbols in response to respective portions of the input information. Specifically, a three-bit word on lead 309 is supplied to trellis encoder stage 319$\alpha$. The next three-bit word on lead 309 is supplied to trellis encoder stage 319$\beta$. The next three-bit word is supplied to trellis encoder stage 319$\gamma$, and then back to trellis encoder stage 319$\alpha$. This distribution of the trellis bits to the various trellis encoder stages is performed by switching circuit 331 operating under the control of symbol clock 325. The initial data word outputs of the trellis encoders are subset identifiers $\alpha_0$ and $\alpha_1$ for encoder stage 319$\alpha$, $\beta_2$ and $\beta_3$ for encoder stage 319$\beta$, and $\gamma_4$ and $\gamma_5$ for encoder stage 319$\gamma$, followed by $\alpha_6$ and $\alpha_7$ for encoder stage 319$\alpha$, and so forth. These are supplied to four-dimensional QAM encoder 324 by switching circuit 337—also operating under the control of symbol clock 325—on lead 338 through a one-symbol delay 364 and lead 363, in order to compensate for a one-symbol delay caused by modulus converter 316. Thus, the stream of subset identifiers on lead 338 is $\alpha_0$, $\alpha_1$, $\beta_2$, $\beta_3$, $\gamma_4$, $\gamma_5$, $\alpha_6$ . . . . Using the notation introduced above, then, the output of encoder 324 on lead 325 is the stream of signal points $X_0{}^\alpha$, $X_1{}^\alpha$, $X_2{}^\beta$, $X_3{}^\beta$, $X_4{}^\gamma$, $X_5{}^\gamma$, $X_6{}^\alpha$ . . . , which is comprised of three interleaved streams of trellis encoded channel symbols, these streams being $X_0{}^\alpha$, $X_1{}^\alpha$, $X_6{}^\alpha$, $X_7{}^\alpha$, $X_{12}{}^\alpha$ . . . ; $X_2{}^\beta$, $X_3{}^\beta$, $X_8{}^\beta$, $X_9{}^\beta$, $X_{14}{}^\beta$ . . . ; and $X_4{}^\gamma$, $X_5{}^\gamma$, $X_{10}{}^\gamma$, $X_{11}{}^\gamma$, $X_{16}{}^\gamma$ . . . . These, in turn, are supplied, in accordance with the invention, to signal point interleaver 341 which applies alternate ones of the signal points applied thereto to lead 3412—which signal points appear immediately at the interleaver output on lead 342—and to one-symbol ($Z^{-1}$) delay element 3411, which appear on lead 342 after being delayed therein by one symbol interval. The resulting interleaved stream of trellis encoded signal points is $X_0{}^\alpha$, $X_{-1}{}^\gamma$, $X_2{}^\beta$, $X_1{}^\alpha$, $X_4{}^\gamma$, $X_3{}^\beta$, $X_6{}^\alpha$, $X_5{}^\gamma$, $X_8{}^\beta$, $X_7{}^\alpha$, $X_{10}{}^\gamma$, $X_9{}^\beta$ . . . (the signal point $X_{-1}{}^\gamma$ being, of course, the signal point applied to interleaver 341 just ahead of signal point $X_0{}^\alpha$).

A discussion and explanation of how the interleaving just described is advantageous is set forth hereinbelow. In order to fully set the stage for that explanation, however, it will be first useful to consider the receiver section of a modem which receives the interleaved signal point stream.

Thus referring to FIG. 4, the line signal transmitted by the transmitter of FIG. 3 is received from the channel and applied to demodulator/equalizer 455 which, in conventional fashion—including an input from phase tracking loop 457—generates a stream of outputs on lead 456 representing the demodulator/equalizer's best approximation of the values of the I and Q components of the signal points of the transmitted interleaved signal point stream. These outputs are referred to herein as the "received signal points". (Due to distortion and other channel impairments that the demodulator/equalizer is not able to compensate for, the I and Q components of the received signal points, instead of having exact integer values, can have any value. Thus a transmitted signal point having coordinates (3, $-5$) may be output by the demodulator/equalizer as the received signal point (2.945, $-5.001$).) The stream of received signal points on lead 456 is denoted $\overline{X}_0{}^\alpha$, $\overline{X}_{-1}{}^\gamma$, $\overline{X}_2{}^\beta$, $\overline{X}_1{}^\alpha$, $\overline{X}_4{}^\gamma$, $\overline{X}_3{}^\beta$, $\overline{X}_6{}^\alpha$, $\overline{X}_5{}^\gamma$, $\overline{X}_8{}^\beta$, $\overline{X}_7{}^\alpha$, $\overline{X}_{10}{}^\gamma$, $\overline{X}_9{}^\beta$ . . . .

The successive received signal points are deinterleaved in signal point deinterleaver 441, which provides

**6**

the opposite function to interleaver 341 in the transmitter. The output of deinterleaver 441 on lead 442 is thus $\overline{X}_0{}^\alpha$, $\overline{X}_1{}^\alpha$, $\overline{X}_2{}^\beta$, $\overline{X}_3{}^\beta$, $\overline{X}_4{}^\gamma$, $\overline{X}_5{}^\gamma$, $\overline{X}_6{}^\alpha$, . . . , etc. (Although not explicitly shown in the drawing, the same well-known techniques used in modems of this general kind the boundaries between successive symbols is used to synchronize the operation of signal point deinterleaver 441 to ensure that received signal points $\overline{X}_0{}^\alpha$, $\overline{X}_2{}^\beta$, $\overline{X}_4{}^\gamma$ . . . are applied to delay element 4411 while received signal points $\overline{X}_1{}^\alpha$, $\overline{X}_3{}^\beta$, $\overline{X}_5{}^\gamma$ . . . are applied to lead 4412.)

The received signal points on lead 442 are then distributed by switching circuit 431 under the control of symbol clock 425 to a distributed Viterbi decoder comprised of 4D Viterbi decoder stages 419$\alpha$, 419$\beta$ and 419$\gamma$. Specifically, received signal points $\overline{X}_0{}^\alpha$ and $\overline{X}_1{}^\alpha$ are applied to decoder stage 419$\alpha$; received signal points $\overline{X}_2{}^\beta$ and $\overline{X}_3{}^\beta$ are applied to decoder stage 419$\beta$; and received signal points $\overline{X}_4{}^\gamma$ and $\overline{X}_5{}^\gamma$ are applied to decoder stage 419$\gamma$. The outputs of the three decoder stages are then combined into a serial stream on lead 438 by switching circuit 437, also operating under the control of symbol clock 425. Those outputs, representing decisions as to the values of the transmitted signal points, are denoted $\hat{X}_0$, $\hat{X}_1$, $\hat{X}_2$, $\hat{X}_3$, $\hat{X}_4$, $\hat{X}_5$, $\hat{X}_6$ . . . , the $\alpha$, $\beta$ and $\gamma$ superscripts no longer being needed.

In conventional fashion, the bits that represent each of the decisions on lead 438 can be divided into bits that represent a) the trellis bits that appeared on transmitter lead 309 and b) the index values that appeared on transmitter lead 317. Those two groups of bits are provided in the receiver on leads 461 and 462, respectively. The latter group of bits are deconverted by modulus deconverter 416 (also disclosed in the aforementioned '659 patent application) back to uncoded bit values on lead 414. The operation of the modulus deconverter imparts a one-symbol delay to the bits on lead 414. Accordingly, the bits on lead 461 are caused to be delayed by one symbol by delay element 464. The resulting combined bits on lead 415 thus represent the stream of bits that appeared at the output of randomizer 313 in the transmitter. These are derandomized in the receiver by derandomizer 413 and the resulting derandomized bit stream is applied to DTE 411 which may be, for example, a computer terminal.

Referring to FIG. 5, one can see the improvement that is achieved by the present invention.

Line I shows the stream of output signal points generated and launched into the channel using one stage of trellis encoding and no signal point interleaving. This is, of course, the prior art arrangement shown in FIG. 1. Line II shows the effect of providing a three-stage distributed trellis encoder but still no signal point interleaving. This is the arrangement shown in the aforementioned Betts et al patent. Note that the signal points of each channel symbol operated on by a particular trellis encoder stage are adjacent in the output signal point stream. For example, the second signal point of the symbol $X_0{}^\alpha$ $X_1{}^\alpha$—namely signal point $X_1{}^\alpha$—is separated by five baud intervals from the first (closer) signal point of the symbol $X_6{}^\alpha$ $X_7{}^\alpha$—namely signal point $X_6{}^\alpha$. As noted earlier, such separation is advantageous because the channel symbols which are processed one after the other in a particular Viterbi decoder stage have noise components which are not highly correlated.

Note, however, that the individual signal points of each channel symbol, e.g., $X_0{}^\alpha$ and $X_1{}^\alpha$, are adjacent to

5,243,627

one another as they pass through the channel; and since all the signal points of a channel symbol must be processed serially in the same Viterbi decoder stage, this means that the Viterbi decoder must process adjacent signal points that have highly correlated noise components.

It is to this end that signal point interleaver 341 is included within the transmitter in accordance with the invention. Firstly, it may be noted from Line III that using the signal point interleaver without the distributed trellis encoder—an arrangement not depicted in the drawing—will, advantageously, cause the signal points from the same channel symbol to be non-adjacent. Moreover, there is further advantage in that a pair of channel symbols processed serially by Viterbi decoder stage 419$\alpha$ traverses the channel separated by five baud intervals rather than three, thereby providing further decorrelation of the noise components thereof. Compare, for example, the span of baud intervals occupied by signal points $X_0{}^\alpha$ and $X_1{}^\alpha$, $X_2{}^\alpha$ and $X_3{}^\alpha$ in Line I and the span of baud intervals occupied by the same signal points in Line III. Disadvantageously, however, the use of a single trellis encoding stage brings back the problem that the distributed trellis encoder solves, as described above. Thus, for example, although signal points $X_0{}^\alpha$ and $X_1{}^\alpha$, which are from the same channel symbol, are separated from one another when traversing the channel, we find that, disadvantageously, signal points $X_2{}^\alpha$ and $X_1{}^\alpha$, which are signal points from two different channel symbols which will be processed serially by the Viterbi decoder, traverse the channel adjacent to one another.

Line IV shows that using the signal point interleaver with a two-stage trellis encoder—also an arrangement not depicted in the drawing—provides some improvement. Firstly, it may be noted that, as in Line III, signal points from the same channel symbol remain separated by three baud intervals. Additionally, pairs of channel symbols processed sequentially by a given Viterbi decoder stage—such as the channel symbols comprised of signal points $X_0{}^\alpha$ and $X_1{}^\alpha$, $X_4{}^\alpha$ and $X_5{}^\alpha$—are still non-adjacent and, indeed, are now separated by seven baud intervals, which is even greater than the separation of five baud intervals provided in Line III. Moreover, certain signal points that traverse the channel adjacent to one another and which are from channel symbols which would have been decoded sequentially in the one-trellis-encoding-stage case are, in the two-trellis-encoding-stage case of Line IV, processed by different Viterbi decoding stages. Signal points $X_2{}^\beta$ and $X_1{}^\alpha$ are now such a pair of signal points. Note, however, that, disadvantageously, signal points $X_1{}^\alpha$ and $X_4{}^\alpha$ traverse the channel serially, and are from channel symbols which are serially processed by the "$\alpha$" Viterbi decoder stage.

Referring, however, to Line V, which depicts the stream of signal points output by the transmitter of FIG. 3, it will be seen that, in accordance with the invention, there is still a non-adjacency—indeed, a separation of at least three baud intervals—between a) the signal points which belong to any particular channel symbol (and which, therefore, are processed serially by a particular Viterbi decoder stage) and b) the signal points which belong to channel symbols which are processed serially by a Viterbi decoder stage. Thus, for example, signal points $X_1{}^\alpha$ and $X_4{}^\gamma$ are now processed by different Viterbi decoder stages. Moreover, pairs of channel symbols processed sequentially by a given Viterbi decoder stage—such as the channel symbols comprised of

signal points $X_0{}^\alpha$ and $X_1{}^\alpha$, $X_6{}^\alpha$ and $X_7{}^\alpha$—are now separated by none baud intervals.

Using more than three trellis encoder stages in the distributed trellis encoder and/or a signal point interleaver that separates signal points from the same channel symbol by more than three baud intervals would provide even greater separation and could, therefore, potentially provide even greater improvement in Viterbi decoding. However, such improvement comes at a price—that price being increased decoding delay—particularly as the number of trellis encoders is increased beyond three. An engineering trade-off can be made, as suits any particular application.

Moreover, it is desirable for the signal point interleaver to provide a sequence in which every $N^{th}$ signal point in the interleaved signal point stream is the $N^{th}$ signal point of a channel symbol. (The reason this is desirable is described in detail hereinbelow.) In the case of an $N=2$, four-dimensional signaling scheme, this means that every second, that is "every other," signal point in the interleaved stream is the second signal point of the channel symbol from which it comes. In the case of an $N=4$, eight-dimensional signaling scheme, this means that every fourth signal point in the interleaved stream is the fourth signal point of the channel symbol from which it comes. Indeed, this criterion is in fact satisfied in the embodiment of FIG. 3. Note that each one of signal points $X_0{}^\alpha$, $X_2{}^\beta$, $X_4{}^\gamma$, $X_6{}^\alpha$, . . . , which appear as every other signal point in the interleaved stream, is the second signal point of one of the four-dimensional channel symbols. Note that not all rearrangements of the signal points will, in fact, satisfy this criterion, such as, if the two signal points of a channel symbol are separated by two, rather than three, baud intervals.

Satisfying the above criterion is advantageous because it enhances the accuracy with which phase tracking loop 457 performs its function. This is so because the arrival of an $N^{th}$ signal point of a given symbol means that all the signal points comprising that channel symbol have arrived. This, in turn, makes it possible to form a decision as to the identity of that channel symbol by using the minimum accumulated path metric in the Viterbi decoder stages. (Those decisions are fed back to the tracking loop by decoder stages 419$\alpha$, 419$\beta$ 419$\gamma$ on leads 494, 495 and 496, respectively, via switching circuit 456.) Without having received all of the signal points of a channel symbol, one cannot take advantage of the accumulated path metric information but, rather, must rely on the so-called raw sliced values, which is less accurate. By having every $N^{th}$ signal point in the interleaved stream be the $N^{th}$ signal point of a channel symbol, we are guaranteed that the time between adjacent such path metric "decisions" supplied to the phase tracking loop is, advantageously, never more than N baud intervals.

The foregoing merely illustrates the principles of the invention. Thus although the illustrative embodiment utilizes a four-dimensional signaling scheme, the invention can be used with signaling schemes of any dimensionality. In the general, 2N-dimensional, case each stage of the distributed trellis encoder would provide N two-dimensional subset identifiers to switching circuit 337 before the latter moves on to the next stage. And, of course, each stage of the distributed Viterbi decoder would receive N successive received signal points. The distributed trellis encoder and distributed Viterbi decoder can, however, continue to include three trellis

9

encoders and still maintain, independent of the value of N, a separation of three baud intervals in the channel between signal points that are from channel symbols that are adjacent in the trellis encoder. If a greater separation of such signal points is desired, more stages can be added to the distributed trellis encoder/Viterbi decoder, just as was noted above for the four-dimensional case. However, when dealing with 2N-dimensional signaling where N>2, it is necessary to add additional delay elements to the signal point interleaver/deinterleaver in order to maintain a three-baud-interval separation among the signal points from any given channel symbol.

Consider, for example, the case of N=4, i.e., an eight-dimensional case. Looking again at FIG. 3, the three (8D) stages of the distributed trellis encoder would generate the three streams of subset identifiers $\alpha_0 \alpha_1 \alpha_2 \alpha_3 \alpha_{12} \ldots$, $\beta_4 \beta_5 \beta_6 \beta_7 \beta_{16} \ldots$, and $\gamma_8 \gamma_9 \gamma_{10} \gamma_{11} \gamma_{20} \ldots$, respectively. This would lead to the following stream of signal points of eight-dimensional trellis encoded channel symbols at the output of the QAM encoder on lead 325: $X_0^\alpha X_1^\alpha X_2^\alpha X_3^\alpha X_4^\beta X_5^\beta X_6^\beta X_7^\beta X_8^\gamma X_9^\gamma X_{10}^\gamma X_{11}^\gamma X_{12}^\alpha \ldots$. Signal point interleaving could be carried out by substituting signal point interleaver 641 of FIG. 6 for interleaver 341. Interleaver 641, in addition to direct connection 6414, includes one-, two-, and three-symbol delay elements 6413, 6412 and 6411, respectively.

The signal points on lead 325, after passing through interleaver 641, would appear on lead 342 in the following order: $X_0^\alpha X_{-3}^\gamma X_{-6}^\beta X_{-9}^\alpha X_4^\beta X_1^\alpha X_{-2}^\gamma X_{-5}^\beta X_8^\gamma X_5^\beta X_2^\alpha X_{-1}^\gamma X_{12}^\alpha X_9^\gamma X_6^\beta X_3^\alpha X_{16}^\beta X_{13}^\alpha X_{10}^\gamma X_7^\beta \ldots$ where signal points with negative subscripts are, of course, signal points that arrived before signal point $X_0^\alpha$ and were already stored in the delay elements 6411, 6412 and 6413. Examination of this signal point stream will reveal that there is either a three- or five-baud separation between signal points of channel symbols that are processed sequentially by the same trellis encoder stage, e.g., $X_3^\alpha$ and $X_{12}^\alpha$; that adjacent signal points of any one channel symbol, e.g., $X_0^\alpha$ and $X_1^\alpha$, are separated by five baud intervals; and that the four signal points comprising any particular one channel symbol are separated by fifteen baud intervals.

FIG. 7 shows the structure of a deinterleaver 741 that could be used in the receiver of FIG. 4 in place of deinterleaver 441 in order to restore the signal points of the eight-dimensional channel symbols to their original order. This structure, which is the inverse of interleaver 641, includes delay stages 7411, 7412 and 7413, as well as direct connection 7414.

It will be appreciated that, although various components of the modem transmitter and receiver are disclosed herein for pedagogic clarity as discrete functional elements and indeed—in the case of the various switching circuits—as mechanical elements, those skilled in the art will recognize that the function of any one or more of those elements could be implemented with any appropriate available technology, including one or more appropriately programmed processors, digital signal processing (DSP) chips, etc. For example, multiple trellis encoders and decoders can be realized using a single program routine which, through the mechanism of indirect addressing of multiple arrays within memory, serves to provide the function of each of the multiple devices.

It will thus be appreciated that those skilled in the art will be able to devise numerous arrangements which,

10

although not explicitly shown or described herein, embody the principles of the invention and are within its spirit and scope.

We claim:

1. Apparatus for forming a stream of trellis encoded signal points in response to input information, said apparatus comprising

    means for generating a plurality of streams of trellis encoded channel symbols in response to respective portions of said input information, each of said channel symbols being comprised of a plurality of signal points, and

    means for interleaving the signal points of said generated channel symbols to form said stream of trellis encoded signal points, said interleaving being carried out in such a way that the signal points of each channel symbol are non-adjacent in said stream of trellis encoded signal points and such that the signal points of adjacent symbols in any one of said channel symbol streams are non-adjacent in said stream of trellis encoded signal points.

2. The apparatus of claim 1 wherein said means for generating generates three of said streams of trellis encoded channel symbols, and wherein said means for interleaving causes there to be interleaved between each of the signal points of each channel symbol at least two signal points from other channel symbols of said streams of trellis encoded channel symbols.

3. The apparatus of claim 1 wherein said channel symbols are 2N-dimensional channel symbols, N>1, and wherein said means for interleaving causes every $N^{th}$ signal point in said interleaved signal point stream to be the $N^{th}$ signal point of a respective one of said channel symbols.

4. The apparatus of claim 2 wherein said channel symbols are 2N-dimensional channel symbols, N>1, and wherein said means for interleaving causes every $N^{th}$ signal point in said interleaved signal point stream to be the $N^{th}$ signal point of a respective one of said channel symbols.

5. A modem comprising

    means for receiving a stream of input bits,

    means for dividing said stream of input bits into a stream of uncoded bits and a plurality of streams of trellis bits,

    means for independently trellis encoding each of said plurality of streams of trellis bits to generate respective streams of data words each identifying one of a plurality of predetermined subsets of the channel symbols of a predetermined 2N-dimensional constellation, N being an integer greater than unity, each of said channel symbols being comprised of a plurality of signal points,

    means for selecting an individual channel symbol from each identified subset in response to said stream of uncoded bits to form a stream of channel symbols, and

    means for generating a stream of output signal points, said signal point stream being comprised of the signal points of the selected channel symbols, the signal points of said signal point stream being sequenced in such a way that signal points that are either a) part of the same channel symbol, or b) part of channel symbols that are adjacent to one another in said channel symbol streams, are separated in said output stream by at least one other signal point.

6. The apparatus of claim 5 wherein said trellis encoding means includes a plurality of trellis encoder stage

5,243,627

11

means for trellis encoding respective ones of said streams of trellis bits.

7. The apparatus of claim 5 wherein said means for selecting includes means for modulus converting said stream of uncoded bits.

8. The apparatus of claim 5 wherein said channel symbols are 2N-dimensional channel symbols, $N>1$, and wherein said means for generating causes every $N^{th}$ signal point in said stream of output signal points to be the $N^{th}$ signal point of a respective one of said channel symbols.

9. Receiver apparatus for recovering information from a received stream of trellis encoded signal points, said signal points having been transmitted to said receiver apparatus by transmitter apparatus which generates said signal points by generating a plurality of streams of trellis encoded channel symbols in response to respective portions of said information, each of said channel symbols being comprised of a plurality of signal points, and by interleaving the signal points of said generated channel symbols to form said stream of trellis encoded signal points, said interleaving being carried out in such a way that the signal points of each channel symbol are non-adjacent in said stream of trellis encoded signal points and such that the signal points of adjacent symbols in any one of said channel symbol streams are non-adjacent in said stream of trellis encoded signal points,

said receiver apparatus comprising

means for deinterleaving the interleaved signal points to recover said plurality of streams of trellis encoded channel symbols, and

a distributed Viterbi decoder for recovering said information from the deinterleaved signal points.

10. The apparatus of claim 9 further comprising

a phase tracking loop, and

means for adapting the operation of said phase tracking loop in response to minimum accumulated path metrics in said distributed Viterbi decoder.

11. A method for forming a stream of trellis encoded signal points in response to input information, said method comprising the steps of

generating a plurality of streams of trellis encoded channel symbols in response to respective portions of said input information, each of said channel symbols being comprised of a plurality of signal points, and

interleaving the signal points of said generated channel symbols to form said stream of trellis encoded signal points, said interleaving being carried out in such a way that the signal points of each channel symbol are non-adjacent in said stream of trellis encoded signal points and such that the signal points of adjacent symbols in any one of said channel symbol streams are non-adjacent in said stream of trellis encoded signal points.

12. The method of claim 11 wherein said generating step generates three of said streams of trellis encoded channel symbols, and wherein said interleaving step causes there to be interleaved between each of the signal points of each channel symbol at least two signal points from other channel symbols of said streams of trellis encoded channel symbols.

13. The method of claim 11 wherein said channel symbols are 2N-dimensional channel symbols, $N>1$, and wherein said interleaving step causes every $N^{th}$ signal point in said interleaved signal point stream to be

12

the $N^{th}$ signal point of a respective one of said channel symbols.

14. The method of claim 12 wherein said channel symbols are 2N-dimensional channel symbols, $N>1$, and wherein said interleaving step causes every $N^{th}$ signal point in said interleaved signal point stream to be the $N^{th}$ signal point of a respective one of said channel symbols.

15. A method for use in a modem, said method comprising the steps of

receiving a stream of input bits,

dividing said stream of input bits into a stream of uncoded bits and a plurality of streams of trellis bits,

independently trellis encoding each of said plurality of streams of trellis bits to generate respective streams of data words each identifying one of a plurality of predetermined subsets of the channel symbols of a predetermined 2N-dimensional constellation, N being an integer greater than unity, each of said channel symbols being comprised of a plurality of signal points,

selecting an individual channel symbol from each identified subset in response to said stream of uncoded bits to form a stream of channel symbols, and

generating a stream of output signal points, said signal point stream being comprised of the signal points of the selected channel symbols, the signal points of said signal point stream being sequenced in such a way that signal points that are either a) part of the same channel symbol, or b) part of channel symbols that are adjacent to one another in said channel symbol stream, are separated in said output stream by at least one other signal point.

16. The method of claim 15 wherein in said trellis encoding step a plurality of trellis encoder stages trellis encode respective ones of said streams of trellis bits.

17. The method of claim 15 wherein said selecting step includes the step of modulus converting said stream of uncoded bits.

18. The method of claim 15 wherein said channel symbols are 2N-dimensional channel symbols, $N>1$, and wherein said generating step causes every $N^{th}$ signal point in said stream of output signal points to be the $N^{th}$ signal point of a respective one of said channel symbols.

19. A method for use in a receiver to recover information from a received stream of trellis encoded signal points, said signal points having been transmitted to said receiver apparatus by a method which includes the steps of

generating a plurality of streams of trellis encoded channel symbols in response to respective portions of said information, each of said channel symbols being comprised of a plurality of signal points, and

interleaving the signal points of said generated channel symbols to form said stream of trellis encoded signal points, said interleaving being carried out in such a way that the signal points of each channel symbol are non-adjacent in said stream of trellis encoded signal points and such that the signal points of adjacent symbols in any one of said channel symbol streams are non-adjacent in said stream of trellis encoded signal points,

said method comprising the steps of

deinterleaving the interleaved signal points to recover said plurality of streams of trellis encoded channel symbols, and

5,243,627

13

using a distributed Viterbi decoder to recover said information from the deinterleaved signal points.

20. The method of claim 19 wherein said receiver includes a phase tracking loop and wherein said method comprises the further step of adapting the operation of said phase tracking loop in response to minimum accumulated path metrics in said distributed Viterbi decoder.

21. Data communication apparatus comprising

means for receiving input information,

means for generating a plurality of streams of trellis encoded channel symbols in response to respective portions of said input information, each of said channel symbols being comprised of a plurality of signal points,

means for interleaving the signal points of said generated channel symbols to form a stream of trellis encoded signal points, said interleaving being carried out in such a way that the signal points of each channel symbol are non-adjacent in said stream of trellis encoded signal points and such that the signal points of adjacent symbols in any one of said channel symbol streams are non-adjacent in said stream of trellis encoded signal points,

means for applying the stream of trellis encoded signal points to a transmission channel,

14

means for receiving the stream of trellis encoded signal points from the channel,

means for deinterleaving the interleaved signal points to recover said plurality of streams of trellis encoded channel symbols, and

a distributed Viterbi decoder for recovering said information from the deinterleaved signal points.

22. The apparatus of claim 21 wherein said means for generating generates three of said streams of trellis encoded channel symbols, and wherein said means for interleaving causes there to be interleaved between each of the signal points of each channel symbol at least two signal points from other channel symbols of said streams of trellis encoded channel symbols.

23. The apparatus of claim 21 wherein said channel symbols are 2N-dimensional channel symbols, $N > 1$, and wherein said means for interleaving causes every $N^{th}$ signal point in said interleaved signal point stream to be the $N^{th}$ signal point of a respective one of said channel symbols.

24. The apparatus of claim 22 wherein said channel symbols are 2N-dimensional channel symbols, $N > 1$, and wherein said means for interleaving causes every $N^{th}$ signal point in said interleaved signal point stream to be the $N^{th}$ signal point of a respective one of said channel symbols.

* * * * *

# Exhibit 27

US2000 5490191.1

PATENT

## U.S. District Court
### District of Delaware (Wilmington)
### CIVIL DOCKET FOR CASE #: 1:06-cv-00730-GMS

Rembrandt Technologies LP v. ABC Inc.                    Date Filed: 12/01/2006
Assigned to: Honorable Gregory M. Sleet            Jury Demand: Both
Related Case: 1:06-cv-00635-GMS                      Nature of Suit: 830 Patent
Cause: 35:271 Patent Infringement                     Jurisdiction: Federal Question

**Plaintiff**

**Rembrandt Technologies LP**              represented by  **Steven J. Balick**
                                                            Ashby & Geddes
                                                            500 Delaware Avenue, 8th Floor
                                                            P.O. Box 1150
                                                            Wilmington, DE 19899
                                                            (302) 654-1888
                                                            Email: sbalick@ashby-geddes.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Lauren E. Maguire**
                                                            Ashby & Geddes
                                                            500 Delaware Avenue, 8th Floor
                                                            P.O. Box 1150
                                                            Wilmington, DE 19899
                                                            (302) 654-1888
                                                            Email: lmaguire@ashby-geddes.com
                                                            *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**ABC Inc.**                                represented by  **Jack B. Blumenfeld**
                                                            Morris, Nichols, Arsht & Tunnell LLP
                                                            1201 North Market Street
                                                            P.O. Box 1347
                                                            Wilmington, DE 19899
                                                            (302) 658-9200
                                                            Email: jbbefiling@mnat.com
                                                            *LEAD ATTORNEY*

**Counter Claimant**

**ABC Inc.**                                represented by  **Jack B. Blumenfeld**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*

V.

**Counter Defendant**

**Rembrandt Technologies LP**                    represented by **Steven J. Balick**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lauren E. Maguire**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/01/2006 | 1 | COMPLAINT filed with Jury Demand against ABC Inc. - Magistrate Consent Notice to Pltf. ( Filing fee $ 350, receipt number 145541.) - filed by Rembrandt Technologies LP. (Attachments: # 1 Civil Cover Sheet # 2 Acknowledgement of Consent Form)(ead) (Entered: 12/04/2006) |
| 12/01/2006 | | Summons Issued as to ABC Inc. on 12/1/2006. (ead) (Entered: 12/04/2006) |
| 12/01/2006 | 2 | Notice of Availability of a U.S. Magistrate Judge to Exercise Jurisdiction (ead) (Entered: 12/04/2006) |
| 12/04/2006 | 3 | Report to the Commissioner of Patents and Trademarks for Patent Number 5,243,627; (ead) (Entered: 12/04/2006) |
| 12/05/2006 | 4 | Return of Service Executed by Rembrandt Technologies LP. ABC Inc. served on 12/4/2006, answer due 12/27/2006. (Balick, Steven) (Entered: 12/05/2006) |
| 12/06/2006 | 5 | Disclosure Statement pursuant to Rule 7.1 filed by Rembrandt Technologies LP. (Maguire, Lauren) (Entered: 12/06/2006) |
| 12/11/2006 | 6 | MOTION for Pro Hac Vice Appearance of Attorney John F. Sweeney, Joseph A. DeGirolamo, and Michael O. Cummings - filed by Rembrandt Technologies LP. (Maguire, Lauren) (Entered: 12/11/2006) |
| 12/13/2006 | | Case assigned to Judge Gregory M. Sleet. Please include the initials of the Judge (GMS) after the case number on all documents filed. (rjb) (Entered: 12/13/2006) |
| 12/14/2006 | 7 | NOTICE of Change of Address by Steven J. Balick (Balick, Steven) (Entered: 12/14/2006) |
| 12/22/2006 | 8 | Joint STIPULATION TO EXTEND TIME to answer complaint to January 26, 2007 - filed by Rembrandt Technologies LP, ABC Inc.. (Blumenfeld, Jack) (Entered: 12/22/2006) |
| 12/28/2006 | | SO ORDERED, re 8 Joint STIPULATION TO EXTEND TIME to answer complaint to January 26, 2007 filed by ABC Inc., Rembrandt Technologies LP. Signed by Judge Gregory M. Sleet on 12/28/06. (mmm) (Entered: 12/28/2006) |
| 12/28/2006 | | Set/Reset Answer Deadlines: ABC Inc. answer due 1/26/2007. (mmm) (Entered: |

| | | 12/28/2006) |
|---|---|---|
| 01/24/2007 | 9 | MOTION for Pro Hac Vice Appearance of Attorney Timothy E. DeMasi, Matthew D. Powers, Edward R. Reines, Anne M. Cappella and Sonal N. Mehta - filed by ABC Inc.. (Blumenfeld, Jack) (Entered: 01/24/2007) |
| 01/25/2007 | | SO ORDERED, re 9 MOTION for Pro Hac Vice Appearance of Attorney Timothy E. DeMasi, Matthew D. Powers, Edward R. Reines, Anne M. Cappella and Sonal N. Mehta filed by ABC Inc. Ordered by Judge Gregory M. Sleet on 1/25/2007. (asw) (Entered: 01/25/2007) |
| 01/25/2007 | | SO ORDERED, re 6 MOTION for Pro Hac Vice Appearance of Attorney John F. Sweeney, Joseph A. DeGirolamo, and Michael O. Cummings filed by Rembrandt Technologies LP. Ordered by Judge Gregory M. Sleet on 1/25/2007. (asw) (Entered: 01/25/2007) |
| 01/26/2007 | 10 | ANSWER to Complaint with Jury Demand, COUNTERCLAIM *and Affirmative Defenses* against Rembrandt Technologies LP by ABC Inc..(Blumenfeld, Jack) (Entered: 01/26/2007) |
| 01/26/2007 | 11 | Disclosure Statement pursuant to Rule 7.1 filed by ABC Inc. identifying The Walt Disney Corporation as Corporate Parent. (Blumenfeld, Jack) (Entered: 01/26/2007) |
| 02/15/2007 | 12 | ANSWER to Counterclaim by Rembrandt Technologies LP. (Attachments: # 1 Exhibit A# 2 Exhibit B)(Balick, Steven) (Entered: 02/15/2007) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/02/2007 09:35:02 | | |
| **PACER Login:** | ps0067 | **Client Code:** | 331049 |
| **Description:** | Docket Report | **Search Criteria:** | 1:06-cv-00730-GMS Start date: 1/1/1970 End date: 3/2/2007 |
| **Billable Pages:** | 2 | **Cost:** | 0.16 |

# Exhibit 28

US2000 5490191.1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

REMBRANDT TECHNOLOGIES, LP,    )
    )
    Plaintiff,    )
    )
    v.    )    C.A. No. _____
    )
FOX ENTERTAINMENT GROUP, INC., and    )
FOX BROADCASTING COMPANY,    )
    )
    Defendants.    )

## COMPLAINT FOR PATENT INFRINGEMENT
## AND DEMAND FOR JURY TRIAL

Rembrandt Technologies, LP ("Rembrandt"), for its complaint against Fox

Entertainment Group, Inc. ("Fox Entertainment") and Fox Broadcasting Company ("Fox

Broadcasting") (sometimes jointly referred to herein as "FOX" or "Defendants"), alleges as

follows:

## PARTIES

1.    Rembrandt is a limited partnership organized under the laws of the State

of New Jersey, having its principal place of business at 401 City Avenue, Suite 815, Bala

Cynwyd, PA 19004.

2.    Fox Entertainment is a corporation organized under the laws of the State

of Delaware, having its principal place of business at 10201 W. Pico Blvd, Los Angeles, CA

90035-2606.

3.    Fox Broadcasting is a subsidiary of Fox Entertainment and is a corporation organized under the laws of the State of Delaware, having its principal place of business at 10201 W. Pico Blvd, Los Angeles, CA 90035-2606.

## JURISDICTION AND VENUE

4.    This is an action arising under the patent laws of the United States, Title 35, United States Code.  This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1338(a).

5.    This Court has personal jurisdiction over FOX.  Defendants are incorporated in the State of Delaware, and have conducted and do conduct business within the State of Delaware.  Defendants, directly or through subsidiaries or intermediaries, offer for sale, sell, advertise, and market products and services that infringe the patent-in-suit, as described more specifically below.  Therefore, because Defendants have committed acts of patent infringement in this district, or are otherwise present or doing business in this district, this Court has personal jurisdiction over Defendants.

6.    Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b), (c), and 1400(b).

## INFRINGEMENT OF U.S. PATENT NO. 5,243,627

7.    Rembrandt realleges and incorporates herein by reference the allegations stated in paragraphs 1-6 of this Complaint.

8.     United States Patent No. 5,243,627 entitled "Signal Point Interleaving Technique" ("the '627 patent") was duly and legally issued by the United States Patent & Trademark Office on September 7, 1993.  A copy of the '627 patent is annexed hereto as Exhibit A.

9.     Rembrandt is the owner of all right, title and interest in the '627 patent, with the right to sue, enforce and recover damages for infringement.

10.     FOX operates television systems and provides television services throughout the United States.

11.     Defendants have directly or indirectly infringed the '627 patent, and are continuing to do so, by practicing the inventions claimed therein, and/or by inducing or contributing to the practice by others of the inventions claimed therein, in this judicial district. For example, Defendants have infringed, and continue to infringe, the '627 patent by their transmission, or receipt and retransmission, over their television systems, of digital terrestrial broadcast signals that comply with the ATSC Digital Television Standard.

12.     Rembrandt has been damaged by Defendants' infringement and will suffer additional and irreparable damage unless this Court enjoins Defendants from continuing their infringement under 35 U.S.C. § 283.

13.     Upon information and belief, such infringement has been, and will continue to be, willful and deliberate, entitling Rembrandt to increased damages under 35 U.S.C. § 284 and making this an exceptional case entitling Rembrandt to an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

3

**PRAYER FOR RELIEF**

WHEREFORE, Rembrandt respectfully requests the following relief:

(1)   the entry of judgment in favor of Rembrandt, and against Defendants, that Defendants have infringed the '627 patent;

(2)   a permanent injunction enjoining and restraining Defendants and their officers, agents, servants, employees, affiliates, divisions, units and subsidiaries, and those in association therewith, from further acts of infringement of the '627 patent;

(3)   an award of damages;

(4)   an award of increased damages pursuant to 35 U.S.C. § 284;

(5)   an award of all costs and expenses of this action, including reasonable attorneys' fees, pre-judgment interest, and post-judgment interest; and

(6)   such other and further relief, at law and in equity, as the Court deems just and proper.

**JURY DEMAND**

Rembrandt hereby respectfully requests a jury trial on all issues so triable.

ASHBY & GEDDES

*Steven J. Balick*

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Plaintiff*

4

*Of Counsel:*

John F. Sweeney
Joseph A. DeGirolamo
Michael O. Cummings
MORGAN & FINNEGAN, LLP
3 World Financial Center
New York, NY 10281-2101
Telephone: (212) 415-8700
Fax: (212) 415-8701
jsweeney@morganfinnegan.com
jdegirolamo@morganfinnegan.com
mcummings@morganfinnegan.com

Dated:  December 1, 2006
175610.1

Case 2:06-cv-00507-TJW-CE     Document 60-29     Filed 03/09/2007     Page 7 of 19

# EXHIBIT A

US005243627A

# United States Patent [19]

## Betts et al.

[11] Patent Number: **5,243,627**

[45] Date of Patent: **Sep. 7, 1993**

[54] **SIGNAL POINT INTERLEAVING TECHNIQUE**

[75] Inventors: **William L. Betts**, St. Petersburg; **Edward S. Zuranski**, Largo, both of Fla.

[73] Assignee: **AT&T Bell Laboratories**, Murray Hill, N.J.

[21] Appl. No.: **748,594**

[22] Filed: **Aug. 22, 1991**

[51] Int. Cl.⁵ .................................. H04L 5/12
[52] U.S. Cl. ........................... 375/39; 375/60; 375/99; 371/43
[58] Field of Search ............... 375/39, 58, 60, 99; 371/43, 37.5, 2.1, 45; 341/81

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 3,988,677 | 10/1976 | Fletcher et al. | 371/45 X |
| 4,677,624 | 6/1987 | Betts et al. | 375/39 |
| 4,945,549 | 7/1990 | Simon et al. | 375/53 |
| 5,029,185 | 7/1991 | Wei | 375/39 X |

*Primary Examiner*—Curtis Kuntz
*Assistant Examiner*—Tesfaldet Bocure
*Attorney, Agent, or Firm*—Ronald D. Slusky; Gerard A. deBlasi

[57] **ABSTRACT**

Viterbi decoder performance in a data communication system using 2N-dimensional channel symbols N>1 can be further enhanced by an interleaving technique which uses a distributed trellis encoder in combination with a signal point interleaver.

**24 Claims, 4 Drawing Sheets**





## FIG. 1
PRIOR ART



## FIG. 2



Case 1:07-cv-00404-GMS    Document 91-8    Filed 06/28/2007    Page 10 of 19

Case 2:06-cv-00507-TJW-CE    Document 60-29    Filed 03/09/2007    Page 10 of 19



FIG. 3

Case 1:07-cv-00404-GMS    Document 91-8    Filed 06/28/2007    Page 11 of 19

Case 2:06-cv-00507-TJW-CE    Document 60-29    Filed 03/09/2007    Page 11 of 19



FIG. 4

## FIG. 5

|   |   | 4D SYMBOL | 4D SYMBOL | 4D SYMBOL | 4D SYMBOL | 4D SYMBOL | 4D SYMBOL |
|---|---|---|---|---|---|---|---|

I — NOT INTERLEAVED ONE TRELLIS STAGE
$$X_0^\alpha \; X_1^\alpha \; X_2^\alpha \; X_3^\alpha \; X_4^\alpha \; X_5^\alpha \; X_6^\alpha \; X_7^\alpha \; X_8^\alpha \; X_9^\alpha \; X_{10}^\alpha \;\cdots$$

II — NOT INTERLEAVED THREE TRELLIS STAGES
$$X_0^\alpha \; X_1^\alpha \; X_2^\beta \; X_3^\gamma \; X_4^\gamma \; X_5^\gamma \; X_6^\alpha \; X_7^\alpha \; X_8^\beta \; X_9^\beta \; X_{10}^\gamma \;\cdots$$

III — INTERLEAVED ONE TRELLIS STAGE
$$X_0^\alpha \; X_{-1}^\alpha \; X_2^\alpha \; X_1^\alpha \; X_4^\alpha \; X_3^\alpha \; X_6^\alpha \; X_5^\alpha \; X_8^\alpha \; X_7^\alpha \; X_{10}^\alpha \;\cdots$$

IV — INTERLEAVED TWO TRELLIS STAGES
$$X_0^\alpha \; X_{-1}^\beta \; X_2^\beta \; X_1^\alpha \; X_4^\alpha \; X_3^\beta \; X_6^\beta \; X_5^\alpha \; X_8^\alpha \; X_7^\beta \; X_{10}^\beta \;\cdots$$

V — INTERLEAVED THREE TRELLIS STAGES
$$X_0^\alpha \; X_{-1}^\gamma \; X_2^\beta \; X_1^\alpha \; X_4^\gamma \; X_3^\beta \; X_6^\alpha \; X_5^\gamma \; X_8^\beta \; X_7^\alpha \; X_{10}^\gamma \;\cdots$$

## FIG. 6



## FIG. 7



5,243,627

| 1 | 2 |

SIGNAL POINT INTERLEAVING TECHNIQUE

## BACKGROUND OF THE INVENTION

The present invention relates to the transmission of digital data over band-limited channels.

Over the years, the requirements of modern-day digital data transmission over band-limited channels—such as voiceband telephone channels—have resulted in a push for higher and higher bit rates. This push has led to the development and introduction of such innovations as adaptive equalization, multi-dimensional signal constellations, echo cancellation (for two-wire applications), and trellis coding. Today, the data rates achieved using these and other techniques are beginning to approach the theoretical limits of the channel.

It has been found that various channel impairments, whose effects on the achievable bit rate were relatively minor compared to, say, additive white Gaussian noise and linear distortion, have now become of greater concern. These include such impairments as nonlinear distortion and residual (i.e., uncompensated-for) phase jitter. Such impairments are particularly irksome in systems which use trellis coding. Indeed, it has been found that the theoretical improvement in Gaussian noise immunity promised by at least some trellis codes is not realized in real-world applications where these impairments are manifest. The principal reason this is so appears to be that the noise components introduced into the received signal samples are such as to worsen the effectiveness of the Viterbi decoder used in the receiver to recover the transmitted data.

U.S. Pat. No. 4,677,625, issued Jun. 30, 1987 to Betts et al, teaches a method and arrangement in which, through the use of a distributed trellis encoder/Viterbi decoder, the effects of many of these impairments can be reduced. The invention in the Betts et al patent recognizes that a part of the reason that the performance of the Viterbi decoder is degraded by these impairments is the fact that the noise components of channel symbols which closely follow one another in the transmission channel are highly correlated for many types of impairments. And it is that correlation which worsens the effect that these impairments have on the Viterbi decoder. Among the impairments whose noise is correlated in this way are impulse noise, phase "hits" and gain "hits." All of these typically extend over a number of adjacent channel symbols in the channel, and thus all result in channel symbol noise components which are highly correlated. The well-known noise enhancement characteristics of linear equalizers also induce correlated noise in adjacent channel symbols, as does uncompensated-for phase jitter. Also, the occurrence of one of the relatively high power points of the signal constellation can, in pulse code modulation (PCM) systems, for example, give rise to noise on adjacent channel symbols which, again, is correlated.

The Betts et al patent addresses this issue by distributing the outgoing data to a plurality of trellis encoders in round-robin fashion and interleaving the trellis encoder outputs on the transmission channel. In the receiver, the stream of received interleaved channel symbols is correspondingly distributed to a plurality of trellis decoders. Since the successive pairs of channel symbols are applied to a particular trellis decoder are separated from one another as they traverse the channel, the correlation of the noise components of these channel symbol pairs is reduced from what it would have otherwise been.

## SUMMARY OF THE INVENTION

In accordance with the present invention, it has been realized that the Viterbi decoder performance in a data communication system using 2N-dimensional channel symbols can be further enhanced by an interleaving technique which uses, in combination, a) the aforementioned distributed trellis encoder/Viterbi decoder technique and b) a signal point interleaving technique which causes the constituent signal points of the channel symbols to be non-adjacent as they traverse the channel.

In preferred embodiments of the invention, the interleaving is carried out in such a way that every $N^{th}$ signal point in the signal point stream traversing the channel is the $N^{th}$ signal point of a respective one of the channel symbols. This criterion enhances the accuracy with which the phase tracking loop in the receiver performs its function.

Also in preferred embodiments, we have found that the use of three parallel trellis encoders in conjunction with a signal point interleaving regime in which the signal points of each channel symbol are separated from one another by three signaling intervals (bauds) provides an optimum or near-optimum tradeoff between signal point/channel symbol separation and the decoding delay that is caused by the interleaving.

## BRIEF DESCRIPTION OF THE DRAWING

In the drawing,

FIG. 1 is a block diagram of the transmitter section of a prior art modem;

FIG. 2 is shows a signal constellation used by the transmitter of FIG. 1;

FIG. 3 is a block diagram of the transmitter section of a modem employing four-dimensional channel symbols and embodying the principles of the invention;

FIG. 4 is a block diagram of the receiver section of a modem embodying the principles of the invention which processes the received four-dimensional channel symbols generated by the transmitter of FIG. 3;

FIG. 5 is a signal point timing/sequencing chart helpful in explaining the principles of the present invention;

FIG. 6 is a signal point interleaver which can be used in the transmitter of FIG. 3 to interleave the signal points of eight-dimensional channel symbols; and

FIG. 7 is a signal point deinterleaver which can be used in the receiver of FIG. 4 to deinterleave the signal points of eight-dimensional channel symbols.

## DETAILED DESCRIPTION

FIG. 1 depicts the transmitter section of a prior art modem employing a 2N-dimensional signaling scheme, $N \geq 1$. The modem receives input information in the form of a serial bit stream from data terminal equipment (DTE) 111—illustratively a host computer. That bit stream is then scrambled, or randomized, by randomizer 113 whose output bits are provided in serial form to serial-to-parallel (S/P) converter 115.

Serial-to-parallel converter 115, in turn, provides, during each of a succession of signal intervals (comprised of N baud intervals), some predetermined number of parallel bits on lead 109 and some number of parallel bits on lead 108. (It will be appreciated that whenever bits are provided in parallel in the modem, separate leads are required to carry each of the bits.) The bits on lead 109 are applied to trellis encoder 119a,

5,243,627

3

and are referred to as the "trellis bits." The bits on lead 108 are applied to modulus converter 116, and are referred to as the "uncoded bits."

To better understand how trellis encoder 119α and modulus converter 116 work, reference is made to FIG. 2, which shows the two-dimensional signal constellation that forms the basis of the 2N-dimensional signaling scheme illustratively used by the modem. This constellation is comprised of 32 signal points, which are divided into four subsets, A through D, each comprised of eight signal points. The eight points of subset A are explicitly labeled as A₀ through A. It may be noted that subsets C, B and D can be arrived at by clockwise rotation of subset A by 90, 180 and 270 degrees, respectively. (Conventional differential encoding circuitry within trellis encoder 119α exploits this symmetry.) For reference, a single signal point of each of those subsets is also shown on FIG. 2.

Consider, first, the case of N=1, i.e., a two-dimensional signaling scheme. In this case, one trellis bit on lead 109 would be expanded to two bits by trellis encoder 119α on lead 121. The four possible values of those two bits 00, 01, 10, and 11 identify subsets A, B, C and D, respectively. The successive 2-bit words on lead 121 are represented as αₙ, n=0,1,2..., where n is an index that advances at the baud rate. At the same time, three parallel bits would be provided on lead 108. These are converted by modulus converter 116 into an index having a value within the range (decimal) 0 to 7. The index value, represented in binary form on lead 117, selects a particular signal point from the subset identified on lead 121. Thus if lead 121 carries the two bits 00 while lead 117 carries the three bits 001, then signal point A₁ of the FIG. 2 constellation has been selected. The words on leads 117 and 121 are applied to QAM encoder 124 which generates, on lead 125, values representing the I (in-phase) and Q (quadrature-phase) components of signal point A₁. The signal point generated on lead 128 in the nᵗʰ baud interval is denoted Xₙαₙ, which is passed on to modulator 128 to generate a passband line signal which is applied to the communication channel. The superscript, α, indicates that the trellis encoder that was used to identify the subset for any particular signal point was trellis encoder 119α. That is, of course, a trivial notation as far as FIG. 1 goes inasmuch as trellis encoder 119α is the only trellis encoder in the modem. However, it is useful to introduce this notation because more than one trellis encoder stage is used in preferred embodiments of modems incorporating the principles of the present invention as shown in later FIGS.

In the case of N>1, the operation is similar. Now, however, the words on lead 109 are used by trellis encoder 119α to sequentially identify on lead 121N subsets, while the words on lead 108 are used to generate N corresponding index values on lead 117. The N signal points identified in this way are the component signal points of a 2N-dimensional channel symbol, the first such symbol being comprised of the signal points Xₒα ... X₍ₙ₋₁₎α. For example, a modem in which the transmitter of FIG. 1 could be used may be a 14,400 bit per second modem using four-dimensional coding (i.e., N=2) and a baud rate of 3200. In this case, nine bits from S/P converter 115 are used for each four-dimensional symbol. Specifically, three parallel bits on lead 109 are expanded into four bits on lead 121 to identify a pair of subsets while six bits on lead 108 are used to select particular signal points from those two subsets.

4

Those two signal points are thereupon communicated over the channel by QAM encoder 124 and modulator 128 as described above.

Note that, implementationally, the 2N-dimensional channel symbol is generated by having the trellis encoder identify, interdependently, N subsets of the two-dimensional constellation of FIG. 2, then select a two-dimensional signal point from each of the subsets thus identified. The concatenation of the N two-dimensional signal points thus selected is the desired 2N-dimensional channel symbol. This process, however, can be understood as involving the direct selection of a 2N-dimensional channel symbol. Viewed in this context, the set of all possible combinations of N of the two-dimensional subsets identified by N successive trellis encoder outputs can be understood to be a set of 2N-dimensional subsets of a 2N-dimensional constellation, the latter being comprised of all possible combinations of N of the signal points of the two-dimensional constellation. A succession of N outputs from the trellis encoder identifies a particular one of the 2N-dimensional subsets and a succession of N outputs from the modulus converter selects a particular 2N-dimensional signal point from the identified 2N-dimensional subset.

Modulus converter 116 is illustratively of the type disclosed in our co-pending, commonly-assigned U.S. patent application Ser. No. 588,658 filed Sep. 26, 1990 and allowed on May 21, 1991, hereby incorporated by reference. Modulus converter 116 provides the modem with the ability to support data transmission at various different bit rates. Assume, for example, that the rate at which bits are provided by DTE 111 decreases. The serial-to-parallel converter will continue to provide its outputs on leads 108 and 109 at the same baud rate as before. However, the upper limit of the range of index values that are provided by modulus converter 116 on lead 117 will be reduced, so that, effectively, each of the four subsets A through D, instead of having eight signal points, will have some smaller number. Conversely if the rate at which bits are provided by DTE 111 should increase over that originally assumed, the upper limit of the range of index values, and thus the number of parallel bits, that appear on lead 117 will be increased beyond eight and the constellation itself will be expanded to accommodate the larger number of signal points thus being selected. As an alternative to using a modulus converter, fractional bit rates can be supported using, for example, the technique disclosed in L. Wei, "Trellis-Coded Modulation with Multidimensional Constellations," IEEE Trans. on Communication Theory, Vol. IT-33, No. 4, July 1987, pp. 483–501.

Turning now to FIG. 3, the transmitter portion of a modem embodying the principles of the invention is shown. This embodiment illustratively uses the aforementioned four-dimensional, i.e., N=2, signaling scheme. Many of the components are similar to those shown in FIG. 1. Thus, in particular, the transmitter of FIG. 3—which receives its input information in the form of a stream of input bits from DTE 311—includes randomizer 313, which supplies its output, on lead 314, to S/P converter 315. The latter outputs uncoded bits to modulus converter 316. The transmitter further includes four-dimensional QAM encoder 324 and modulator 328. The trellis bits, on lead 309, are provided not to a standard single trellis encoder, but to a distributed trellis encoder comprised of three trellis encoder stages: trellis encoder stage 319α, trellis encoder stage 319β, and trellis encoder stage 319γ.

5

Such a distributed trellis encoder, which is described in the aforementioned Betts et al patent, generates a plurality of streams of trellis encoded channel symbols in response to respective portions of the input information. Specifically, a three-bit word on lead 309 is supplied to trellis encoder stage 319α. The next three-bit word on lead 309 is supplied to trellis encoder stage 319β. The next three-bit word is supplied to trellis encoder stage 319γ, and then back to trellis encoder stage 319α. This distribution of the trellis bits to the various trellis encoder stages is performed by switching circuit 331 operating under the control of symbol clock 325. The initial data word outputs of the trellis encoders are subset identifiers α₀ and α₁ for encoder stage 319α, β₂ and β₃ for encoder stage 319β, and γ₄ and γ₅ for encoder stage 319γ, followed by α₆ and α₇ for encoder stage 319α, and so forth. These are supplied to four-dimensional QAM encoder 324 by switching circuit 337—also operating under the control of symbol clock 325—on lead 338 through a one-symbol delay 364 and lead 363, in order to compensate for a one-symbol delay caused by modulus converter 316. Thus, the stream of subset identifiers on lead 338 is α₀, α₁, β₂, β₃, γ₄, γ₅, α₆ . . . . Using the notation introduced above, then, the output of encoder 324 on lead 325 is the stream of signal points $X_0^α$, $X_1^α$, $X_2^β$, $X_3^β$, $X_4^γ$, $X_5^γ$, $X_6^α$ . . . , which is comprised of three interleaved streams of trellis encoded channel symbols, these streams being $X_0^α$, $X_1^α$, $X_6^α$, $X_7^α$, $X_{12}^α$ . . . ; $X_2^β$, $X_3^β$, $X_8^β$, $X_9^β$, $X_{14}^β$ . . . ; and $X_4^γ$, $X_5^γ$, $X_{10}^γ$, $X_{11}^γ$, $X_{16}^γ$ . . . . These, in turn, are supplied, in accordance with the invention, to signal point interleaver 341 which applies alternate ones of the signal points applied thereto to lead 3412—which signal points appear immediately at the interleaver output on lead 342—and to one-symbol (Z⁻¹) delay element 3411, which appear on lead 342 after being delayed therein by one symbol interval. The resulting interleaved stream of trellis encoded signal points is $X_0^α$, $X_{-1}^γ$, $X_2^β$, $X_1^α$, $X_4^γ$, $X_3^β$, $X_6^α$, $X_5^γ$, $X_8^β$, $X_7^α$, $X_{10}^γ$, $X_9^β$ . . . (the signal point $X_{-1}^γ$ being, of course, the signal point applied to interleaver 341 just ahead of signal point $X_0^α$).

A discussion and explanation of how the interleaving just described is advantageous is set forth hereinbelow. In order to fully set the stage for that explanation, however, it will be first useful to consider the receiver section of a modem which receives the interleaved signal point stream.

Thus referring to FIG. 4, the line signal transmitted by the transmitter of FIG. 3 is received from the channel and applied to demodulator/equalizer 455 which, in conventional fashion—including an input from phase tracking loop 457—generates a stream of outputs on lead 456 representing the demodulator/equalizer's best approximation of the values of the I and Q components of the signal points of the transmitted interleaved signal point stream. These outputs are referred to herein as the "received signal points." (Due to distortion and other channel impairments that the demodulator/equalizer is not able to compensate for, the I and Q components of the received signal points, instead of having excal integer values, can have any value. Thus a transmitted signal point having coordinates (3, −5) may be output by the demodulator/equalizer as the received signal point (2.945, −5.001).) The stream of received signal points on lead 456 is denoted $\overline{X}_0^α$, $\overline{X}_{-1}^γ$, $\overline{X}_2^β$, $\overline{X}_1^α$, $\overline{X}_4^γ$, $\overline{X}_3^β$, $\overline{X}_6^α$, $\overline{X}_5^γ$, $\overline{X}_8^β$, $\overline{X}_7^α$, $\overline{X}_{10}^γ$, $\overline{X}_9^β$ . . . .

The successive received signal points are deinterleaved in signal point deinterleaver 441, which provides

6

the opposite function to interleaver 341 in the transmitter. The output of deinterleaver 441 on lead 442 is thus $\overline{X}_0^α$, $\overline{X}_1^α$, $\overline{X}_2^β$, $\overline{X}_3^β$, $\overline{X}_4^γ$, $\overline{X}_5^γ$, $\overline{X}_6^α$, . . . , etc. (Although not explicitly shown in the drawing, the same well-known techniques used in modems of this general kind to identify within the stream of received signal points the boundaries between successive symbols is used to synchronize the operation of signal point deinterleaver 441 to ensure that received signal points $\overline{X}_0^α$, $\overline{X}_2^β$, $\overline{X}_4^γ$ . . . are applied to delay element 4411 while received signal points $\overline{X}_1^α$, $\overline{X}_3^β$, $\overline{X}_5^γ$ . . . are applied to lead 4412.)

The received signal points on lead 442 are then distributed by switching circuit 431 under the control of symbol clock 425 to a distributed Viterbi decoder comprised of 4D Viterbi decoder stages 419α, 419β and 419γ. Specifically, received signal points $\overline{X}_0^α$ and $\overline{X}_1^α$ are applied to decoder stage 419α; received signal points $\overline{X}_2^β$ and $\overline{X}_3^β$ are applied to decoder stage 419β; and received signal points $\overline{X}_4^γ$ and $\overline{X}_5^γ$ are applied to decoder stage 419γ. The outputs of the three decoder stages are then combined into a serial stream on lead 438 by switching circuit 437, also operating under the control of symbol clock 425. Those outputs, representing decisions as to the values of the transmitted signal points, are denoted $\hat{X}_0$, $\hat{X}_1$, $\hat{X}_2$, $\hat{X}_3$, $\hat{X}_4$, $\hat{X}_5$, $\hat{X}_6$ . . . , the α, β and γ superscripts no longer being needed.

In conventional fashion, the bits that represent each of the decisions on lead 438 can be divided into bits that represent a) the trellis bits that appeared on transmitter lead 309 and b) the index values that appeared on transmitter lead 317. Those two groups of bits are provided in the receiver on leads 461 and 462, respectively. The latter group of bits are deconverted by modulus deconverter 416 (also disclosed in the aforementioned '658 patent application) back to uncoded bit values on lead 414. The operation of the modulus deconverter imparts a one-symbol delay to the bits on lead 414. Accordingly, the bits on lead 461 are caused to be delayed by one symbol by delay element 464. The resulting combined bits on lead 415 thus represent the stream of bits that appeared at the output of randomizer 313 in the transmitter. These are derandomized in the receiver by derandomizer 413 and the resulting derandomized bit stream is applied to DTE 411 which may be, for example, a computer terminal.

Referring to FIG. 5, one can see the improvement that is achieved by the present invention.

Line I shows the stream of output signal points generated and launched into the channel using one stage of trellis encoding and no signal point interleaving. This is, of course, the prior art arrangement shown in FIG. 1. Line II shows the effect of providing a three-stage distributed trellis encoder but still no signal point interleaving. This is the arrangement shown in the aforementioned Betts et al patent. Note that the signal points of each channel symbol operated on by a particular trellis encoder stage are adjacent in the output signal point stream. For example, the second signal point of the symbol $X_0^α$—$X_1^α$—namely signal point $X_1^α$—is separated by five beat intervals from the first (closer) signal point of the symbol $X_6^α$—$X_7^α$—namely signal point $X_6^α$. As noted earlier, such separation is advantageous because the channel symbols which are processed one after the other in a particular Viterbi decoder stage have noise components which are not highly correlated.

Note, however, that the individual signal points of each channel symbol, e.g., $X_0^α$ and $X_1^α$, are adjacent to

7

one another as they pass through the channel; and since all the signal points of a channel symbol must be processed serially in the same Viterbi decoder stage, this means that the Viterbi decoder must process adjacent signal points that have highly correlated noise components.

It is to this end that signal point interleaver 341 is included within the transmitter in accordance with the invention. As may be noted from Line III that using the signal point interleaver without the distributed trellis encoder—an arrangement not depicted in the drawing—will, advantageously, cause the signal points from the same channel symbol to be non-adjacent. Moreover, there is further advantage in that a pair of channel symbols processed serially by Viterbi decoder stage $419\alpha$ traverses the channel separated by five baud intervals rather than three, thereby providing greater decorrelation of the noise components thereof. Compare, for example, the span of baud intervals occupied by signal points $X_0{}^\alpha$ and $X_1{}^\alpha$, $X_2{}^\alpha$ and $X_3{}^\alpha$ in Line I and the span of baud intervals occupied by the same signal points in Line III. Disadvantageously, however, the use of a single trellis encoding stage brings back the problem that the distributed trellis encoder solves, as described above. Thus, for example, although signal points $X_0{}^\alpha$ and $X_1{}^\alpha$, which are from the same channel symbol, are separated from one another when traversing the channel, we find that, disadvantageously, signal points $X_2{}^\alpha$ and $X_1{}^\alpha$, which are signal points from two different channel symbols which will be processed serially by the Viterbi decoder, traverse the channel adjacent to one another.

Line IV shows that using the signal point interleaver with a two-stage trellis encoder—also an arrangement not depicted in the drawing—provides some improvement. As may be noted that, as in Line III, signal points from the same channel symbol remain separated by three baud intervals. Additionally, pairs of channel symbols processed sequentially by a given Viterbi decoder stage—such as the channel symbols comprised of signal points $X_0{}^\alpha$ and $X_1{}^\alpha$, $X_4{}^\alpha$ and $X_5{}^\alpha$—are still non-adjacent and, indeed, are now separated by seven baud intervals, which is even greater than the separation of five baud intervals provided in Line III. Moreover, certain signal points that traverse the channel adjacent to one another and which are from channel symbols which would have been decoded sequentially in the one-trellis-encoding-stage case are, in the two-trellis-encoding-stage case of Line IV, processed by different Viterbi decoding stages. Signal points $X_2{}^\beta$ and $X_1{}^\alpha$ are now such a pair of signal points. Note, however, that, disadvantageously, signal points $X_1{}^\alpha$ and $X_4{}^\alpha$ traverse the channel serially, and are from channel symbols which are serially processed by the "α" Viterbi decoder stage.

Referring, however, to Line V, which depicts the stream of signal points output by the transmitter of FIG. 3, it will be seen that, in accordance with the invention, there is still a non-adjacency—indeed, a separation of at least three baud intervals—between a) the signal points which belong to any particular channel symbol (and which, therefore, are processed serially by a particular Viterbi decoder stage) and b) the signal points which belong to channel symbols which are processed serially by a Viterbi decoder stage. Thus, for example, signal points $X_1{}^\alpha$ and $X_4{}^\gamma$ are now processed by different Viterbi decoder stages. Moreover, pairs of channel symbols processed sequentially by a given Viterbi decoder stage—such as the channel symbols comprised of

8

signal points $X_0{}^\alpha$ and $X_1{}^\alpha$, $X_6{}^\alpha$ and $X_7{}^\alpha$—are now separated by none baud intervals.

Using more than three trellis encoder stages in the distributed trellis encoder and/or a signal point interleaver that separates signal points from the same channel symbol by more than three baud intervals would provide even greater separation and could, therefore, potentially provide even greater improvement in Viterbi decoding. However, such improvement comes at a price—that price being increased decoding delay—particularly as the number of trellis encoders is increased beyond three. An engineering trade-off can be made, as suits any particular application.

Moreover, it is desirable for the signal point interleaver to provide a sequence in which every $N^{th}$ signal point in the interleaved signal point stream is the $N^{th}$ signal point of a channel symbol. (The reason this is desirable is described in detail hereinbelow.) In the case of an $N=2$, four-dimensional signaling scheme, this means that every second, that is "every other," signal point in the interleaved stream is the second signal point of the channel symbol from which it comes. In the case of an $N=4$, eight-dimensional signaling scheme, this means that every fourth signal point in the interleaved stream is the fourth signal point of the channel symbol from which it comes. Indeed, this criterion is in fact satisfied in the embodiment of FIG. 3. Note that each one of signal points $X_0{}^\alpha$, $X_2{}^\beta$, $X_4{}^\gamma$, $X_6{}^\alpha$, . . . , which appear as every other signal point in the interleaved stream, is the second signal point of one of the four-dimensional channel symbols. Note that not all rearrangements of the signal points will, in fact, satisfy this criterion, such as, if the two signal points of a channel symbol are separated by two, rather than three, baud intervals.

Satisfying the above criterion is advantageous because it enhances the accuracy with which phase tracking loop 457 performs its function. This is so because the arrival of an $N^{th}$ signal point of a given symbol means that all the signal points comprising that channel symbol have arrived. This, in turn, makes it possible to form a decision as to the identity of that channel symbol by using the minimum accumulated path metric in the Viterbi decoder stages. (Those decisions are fed back to the tracking loop by decoder stages $419\alpha$, $419\beta$ $419\gamma$ on leads 494, 495 and 496, respectively, via switching circuit 456.) Without having received all of the signal points of a channel symbol, one cannot take advantage of the accumulated path metric information but, rather, must rely on the so-called raw sliced values, which is less accurate. By having every $N^{th}$ signal point in the interleaved stream be the $N^{th}$ signal point of a channel symbol, we are guaranteed that the time between adjacent such path metric "decisions" supplied to the phase tracking loop is, advantageously, never more than N baud intervals.

The foregoing merely illustrates the principles of the invention. Thus although the illustrative embodiment utilizes a four-dimensional signaling scheme, the invention can be used with signaling schemes of any dimensionality. In the general, 2N-dimensional, case each stage of the distributed trellis encoder would provide N two-dimensional subset identifiers to switching circuit 337 before the latter moves on to the next stage. And, of course, each stage of the distributed Viterbi decoder would receive N successive received signal points. The distributed trellis encoder and distributed Viterbi decoder can, however, continue to include three trellis

5,243,627

9

encoders and still maintain, independent of the value of N, a separation of three baud intervals in the channel between signal points that are from channel symbols that are adjacent in the trellis encoder. If a greater separation of such signal points is desired, more stages can be added to the distributed trellis encoder/Viterbi decoder, just as was noted above for the four-dimensional case. However, when dealing with 2N-dimensional signaling where N>2, it is necessary to add additional delay elements to the signal point interleaver/deinterleaver in order to maintain a three-baud-interval separation among the signal points from any given channel symbol.

Consider, for example, the case of N=4, i.e., an eight-dimensional case. Looking again at FIG. 3, the three (8D) stages of the distributed trellis encoder would generate the three streams of subset identifiers $\alpha_0 \alpha_1 \alpha_2 \alpha_3 \alpha_{12} \ldots$, $\beta_4 \beta_5 \beta_6 \beta_7 \beta_{16} \ldots$, and $\gamma_8 \gamma_9 \gamma_{10} \gamma_{11} \gamma_{20} \ldots$, respectively. This would lead to the following stream of signal points of eight-dimensional trellis encoded channel symbols at the output of the QAM encoder on lead 325: $X_0{}^\alpha X_1{}^\alpha X_2{}^\alpha X_3{}^\alpha X_4{}^\beta X_5{}^\beta X_6{}^\beta X_7{}^\beta X_8{}^\gamma X_9{}^\gamma X_{10}{}^\gamma X_{11}{}^\gamma X_{12}{}^\alpha \ldots$ Signal point interleaving could be carried out by substituting signal point interleaver 641 of FIG. 6 for interleaver 341. Interleaver 641, in addition to direct connection 6414, includes one-, two-, and three-symbol delay elements 6413, 6412 and 6411, respectively.

The signal points on lead 325, after passing through interleaver 641, would appear on lead 342 in the following order: $X_0{}^\alpha X_{-3}{}^\gamma X_{-6}{}^\beta X_{-9}{}^\alpha X_4{}^\beta X_1{}^\alpha X_{-2}{}^\gamma X_{-5}{}^\beta X_8{}^\gamma X_5{}^\beta X_2{}^\alpha X_{-1}{}^\gamma X_{12}{}^\alpha X_9{}^\gamma X_6{}^\beta X_3{}^\alpha X_{16}{}^\beta X_{13}{}^\alpha X_{10}{}^\gamma X_7{}^\beta \ldots$ where signal points with negative subscripts are, of course, signal points that arrived before signal point $X_0{}^\alpha$ and were already stored in the delay elements 6411, 6412 and 6413. Examination of this signal point stream will reveal that there is either a three- or five-baud separation between signal points of channel symbols that are processed sequentially by the same trellis encoder stage, e.g., $X_3{}^\alpha$ and $X_{12}{}^\alpha$; that adjacent signal points of any one channel symbol, e.g., $X_0{}^\alpha$ and $X_1{}^\alpha$, are separated by five baud intervals; and that the four signal points comprising any particular one channel symbol are separated by fifteen baud intervals.

FIG. 7 shows the structure of a deinterleaver 741 that could be used in the receiver of FIG. 4 in place of deinterleaver 441 in order to restore the signal points of the eight-dimensional channel symbols to their original order. This structure, which is the inverse of interleaver 641, includes delay stages 7411, 7412 and 7413, as well as direct connection 7414.

It will be appreciated that, although various components of the modem transmitter and receiver are disclosed herein for pedagogic clarity as discrete functional elements and indeed—in the case of the various switching circuits—as mechanical elements, those skilled in the art will recognize that the function of any one or more of those elements could be implemented with any appropriate available technology, including one or more appropriately programmed processors, digital signal processing (DSP) chips, etc. For example, multiple trellis encoders and decoders can be realized using a single program routine which, through the mechanism of indirect addressing of multiple arrays within memory, serves to provide the function of each of the multiple devices.

It will thus be appreciated that those skilled in the art will be able to devise numerous arrangements which,

10

although not explicitly shown or described herein, embody the principles of the invention and are within its spirit and scope.

We claim:

1. Apparatus for forming a stream of trellis encoded signal points in response to input information, said apparatus comprising

   means for generating a plurality of streams of trellis encoded channel symbols in response to respective portions of said input information, each of said channel symbols being comprised of a plurality of signal points, and

   means for interleaving the signal points of said generated channel symbols to form said stream of trellis encoded signal points, said interleaving being carried out in such a way that the signal points of each channel symbol are non-adjacent in said stream of trellis encoded signal points and such that the signal points of adjacent symbols in any one of said channel symbol streams are non-adjacent in said stream of trellis encoded signal points.

2. The apparatus of claim 1 wherein said means for generating generates three of said streams of trellis encoded channel symbols, and wherein said means for interleaving causes there to be interleaved between each of the signal points of each channel symbol at least two signal points from other channel symbols of said streams of trellis encoded channel symbols.

3. The apparatus of claim 1 wherein said channel symbols are 2N-dimensional channel symbols, N>1, and wherein said means for interleaving causes every $N^{th}$ signal point in said interleaved signal point stream to be the $N^{th}$ signal point of a respective one of said channel symbols.

4. The apparatus of claim 2 wherein said channel symbols are 2N-dimensional channel symbols, N>1, and wherein said means for interleaving causes every $N^{th}$ signal point in said interleaved signal point stream to be the $N^{th}$ signal point of a respective one of said channel symbols.

5. A modem comprising

   means for receiving a stream of input bits,

   means for dividing said stream of input bits into a stream of uncoded bits and a plurality of streams of trellis bits,

   means for independently trellis encoding each of said plurality of streams of trellis bits to generate respective streams of data words each identifying one of a plurality of predetermined subsets of the channel symbols of a predetermined 2N-dimensional constellation, N being an integer greater than unity, each of said channel symbols being comprised of a plurality of signal points,

   means for selecting an individual channel symbol from each identified subset in response to said stream of uncoded bits to form a stream of channel symbols, and

   means for generating a stream of output signal points, said signal point stream being comprised of the signal points of the channel symbols, the signal points of said signal point stream being sequenced in such a way that signal points that are either a) part of the same channel symbol, or b) part of channel symbols that are adjacent to one another in said channel symbol stream, are separated in said output stream by at least one other signal point.

6. The apparatus of claim 5 wherein said trellis encoding means includes a plurality of trellis encoder stage

5,243,627

11

means for trellis encoding respective ones of said streams of trellis bits.

7. The apparatus of claim 5 wherein said means for selecting includes means for modulus converting said stream of uncoded bits.

8. The apparatus of claim 5 wherein said channel symbols are 2N-dimensional channel symbols, $N>1$, and wherein said means for generating causes every $N^{th}$ signal point in said stream of output signal points to be the $N^{th}$ signal point of a respective one of said channel symbols.

9. Receiver apparatus for recovering information from a received stream of trellis encoded signal points, said signal points having been transmitted to said receiver apparatus by transmitter apparatus which generates said signal points by generating a plurality of streams of trellis encoded channel symbols in response to respective portions of said information, each of said channel symbols being comprised of a plurality of signal points, and by interleaving the signal points of said generated channel symbols to form said stream of trellis encoded signal points, said interleaving being carried out in such a way that the signal points of each channel symbol are non-adjacent in said stream of trellis encoded signal points and such that the signal points of adjacent symbols in any one of said channel symbol streams are non-adjacent in said stream of trellis encoded signal points,

said receiver apparatus comprising

means for deinterleaving the interleaved signal points to recover said plurality of streams of trellis encoded channel symbols, and

a distributed Viterbi decoder for recovering said information from the deinterleaved signal points.

10. The apparatus of claim 9 further comprising a phase tracking loop, and

means for adapting the operation of said phase tracking loop in response to minimum accumulated path metrics in said distributed Viterbi decoder.

11. A method for forming a stream of trellis encoded signal points in response to input information, said method comprising the steps of

generating a plurality of streams of trellis encoded channel symbols in response to respective portions of said input information, each of said channel symbols being comprised of a plurality of signal points, and

interleaving the signal points of said generated channel symbols to form said stream of trellis encoded signal points, said interleaving being carried out in such a way that the signal points of each channel symbol are non-adjacent in said stream of trellis encoded signal points and such that the signal points of adjacent symbols in any one of said channel symbol streams are non-adjacent in said stream of trellis encoded signal points.

12. The method of claim 11 wherein said generating step generates three of said streams of trellis encoded channel symbols, and wherein said interleaving step causes there to be interleaved between each of the signal points of each channel symbol at least two signal points from other channel symbols of said streams of trellis encoded channel symbols.

13. The method of claim 11 wherein said channel symbols are 2N-dimensional channel symbols, $N>1$, and wherein said interleaving step causes every $N^{th}$ signal point in said interleaved signal point stream to be

12

the $N^{th}$ signal point of a respective one of said channel symbols.

14. The method of claim 12 wherein said channel symbols are 2N-dimensional channel symbols, $N>1$, and wherein said interleaving step causes every $N^{th}$ signal point in said interleaved signal point stream to be the $N^{th}$ signal point of a respective one of said channel symbols.

15. A method for use in a modem, said method comprising the steps of

receiving a stream of input bits,

dividing said stream of input bits into a stream of uncoded bits and a plurality of streams of trellis bits,

independently trellis encoding each of said plurality of streams of trellis bits to generate respective streams of data words each identifying one of a plurality of predetermined subsets of the channel symbols of a predetermined 2N-dimensional constellation, N being an integer greater than unity, each of said channel symbols being comprised of a plurality of signal points,

selecting an individual channel symbol from each identified subset in response to said stream of uncoded bits to form a stream of channel symbols, and

generating a stream of output signal points, said signal point stream being comprised of the signal points of the selected channel symbols, the signal points of said signal point stream being sequenced in such a way that signal points that are either a) part of the same channel symbol, or b) part of channel symbols that are adjacent to one another in said channel symbol stream, are separated in said output signal point stream by at least one other signal point.

16. The method of claim 15 wherein said trellis encoding step a plurality of trellis encoder stages trellis encode respective ones of said streams of trellis bits.

17. The method of claim 15 wherein said selecting step includes the step of modulus converting said stream of uncoded bits.

18. The method of claim 15 wherein said channel symbols are 2N-dimensional channel symbols, $N>1$, and wherein said generating step causes every $N^{th}$ signal point in said stream of output signal points to be the $N^{th}$ signal point of a respective one of said channel symbols.

19. A method for use in a receiver to recover information from a received stream of trellis encoded signal points, said signal points having been transmitted to said receiver apparatus by a method which includes the steps of

generating a plurality of streams of trellis encoded channel symbols in response to respective portions of said information, each of said channel symbols being comprised of a plurality of signal points, and

interleaving the signal points of said generated channel symbols to form said stream of trellis encoded signal points, said interleaving being carried out in such a way that the signal points of each channel symbol are non-adjacent in said stream of trellis encoded signal points and such that the signal points of adjacent symbols in any one of said channel symbol streams are non-adjacent in said stream of trellis encoded signal points,

said method comprising the steps of

deinterleaving the interleaved signal points to recover said plurality of streams of trellis encoded channel symbols, and

5,243,627

13

using a distributed Viterbi decoder to recover said information from the deinterleaved signal points.

20. The method of claim 19 wherein said receiver includes a phase tracking loop and wherein said method comprises the further step of adapting the operation of said phase tracking loop in response to minimum accumulated path metrics in said distributed Viterbi decoder.

21. Data communication apparatus comprising
means for receiving input information,
means for generating a plurality of streams of trellis encoded channel symbols in response to respective portions of said input information, each of said channel symbols being comprised of a plurality of signal points,
means for interleaving the signal points of said generated channel symbols to form a stream of trellis encoded signal points, said interleaving being carried out in such a way that the signal points of each channel symbol are non-adjacent in said stream of trellis encoded signal points and such that the signal points of adjacent symbols in any one of said channel symbol streams are non-adjacent in said stream of trellis encoded signal points,
means for applying the stream of trellis encoded signal points to a transmission channel,

14

means for receiving the stream of trellis encoded signal points from the channel,
means for deinterleaving the interleaved signal points to recover said plurality of streams of trellis encoded channel symbols, and
a distributed Viterbi decoder for recovering said information from the deinterleaved signal points.

22. The apparatus of claim 21 wherein said means for generating generates three of said streams of trellis encoded channel symbols, and wherein said means for interleaving causes there to be interleaved between each of the signal points of each channel symbol at least two signal points from other channel symbols of said streams of trellis encoded channel symbols.

23. The apparatus of claim 21 wherein said channel symbols are 2N-dimensional channel symbols, $N>1$, and wherein said means for interleaving causes every $N^{th}$ signal point in said interleaved signal point stream to be the $N^{th}$ signal point of a respective one of said channel symbols.

24. The apparatus of claim 22 wherein said channel symbols are 2N-dimensional channel symbols, $N>1$, and wherein said means for interleaving causes every $N^{th}$ signal point in said interleaved signal point stream to be the $N^{th}$ signal point of a respective one of said channel symbols.

* * * * *

# Exhibit 29

US2000 5490191.1

# U.S. District Court
## District of Delaware (Wilmington)
## CIVIL DOCKET FOR CASE #: 1:06-cv-00731-GMS

| | |
|---|---|
| Rembrandt Technologies LP v. Fox Entertainment Group Inc. et al | Date Filed: 12/01/2006 |
| Assigned to: Honorable Gregory M. Sleet | Jury Demand: Both |
| Related Case: 1:06-cv-00635-GMS | Nature of Suit: 830 Patent |
| Cause: 35:271 Patent Infringement | Jurisdiction: Federal Question |

**Plaintiff**

| | | |
|---|---|---|
| **Rembrandt Technologies LP** | represented by | **Steven J. Balick**<br>Ashby & Geddes<br>500 Delaware Avenue, 8th Floor<br>P.O. Box 1150<br>Wilmington, DE 19899<br>(302) 654-1888<br>Email: sbalick@ashby-geddes.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Lauren E. Maguire**<br>Ashby & Geddes<br>500 Delaware Avenue, 8th Floor<br>P.O. Box 1150<br>Wilmington, DE 19899<br>(302) 654-1888<br>Email: lmaguire@ashby-geddes.com<br>*ATTORNEY TO BE NOTICED* |

V.

**Defendant**

| | | |
|---|---|---|
| **Fox Entertainment Group Inc.** | represented by | **Richard L. Horwitz**<br>Potter Anderson & Corroon, LLP<br>1313 N. Market St., Hercules Plaza, 6th Flr.<br>P.O. Box 951<br>Wilmington, DE 19899-0951<br>(302) 984-6000<br>Email: rhorwitz@potteranderson.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **David Ellis Moore**<br>Potter Anderson & Corroon, LLP<br>1313 N. Market St., Hercules Plaza, 6th Flr.<br>P.O. Box 951 |

Wilmington, DE 19899-0951
(302) 984-6000
Email: dmoore@potteranderson.com
*ATTORNEY TO BE NOTICED*

**William L. Anthony**
Pro Hac Vice
Email: wanthony@orrick.com
*ATTORNEY TO BE NOTICED*

**William W. Oxley**
Pro Hac Vice
Email: woxley@orrick.com
*ATTORNEY TO BE NOTICED*

<u>Defendant</u>

**Fox Broadcasting Company**                    represented by  **Richard L. Horwitz**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Ellis Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William L. Anthony**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William W. Oxley**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Counter Claimant</u>

**Fox Entertainment Group Inc.**                represented by  **Richard L. Horwitz**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Ellis Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William L. Anthony**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William W. Oxley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Fox Broadcasting Company**                  represented by **Richard L. Horwitz**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **David Ellis Moore**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

                                                **William L. Anthony**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

                                                **William W. Oxley**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Rembrandt Technologies LP**                  represented by **Steven J. Balick**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Lauren E. Maguire**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 12/01/2006 | 1 | COMPLAINT filed with Jury Demand against Fox Entertainment Group Inc., Fox Broadcasting Company - Magistrate Consent Notice to Pltf. ( Filing fee $ 350, receipt number 145541.) - filed by Rembrandt Technologies LP. (Attachments: # 1 Civil Cover Sheet # 2 Acknowledgement of Consent Form)(ead) (Entered: 12/04/2006) |
| 12/01/2006 |   | Summons Issued as to Fox Entertainment Group Inc. on 12/1/2006; Fox Broadcasting Company on 12/1/2006. (ead) (Entered: 12/04/2006) |
| 12/01/2006 | 2 | Notice of Availability of a U.S. Magistrate Judge to Exercise Jurisdiction (ead) (Entered: 12/04/2006) |
| 12/04/2006 | 3 | Report to the Commissioner of Patents and Trademarks for Patent Number 5,243,627; (ead) (Entered: 12/04/2006) |
| 12/04/2006 | 4 | SUMMONS Returned Executed by Rembrandt Technologies LP. Fox Entertainment Group Inc. served on 12/4/2006, answer due 12/27/2006. (Maguire, Lauren) (Entered: 12/04/2006) |

| 12/04/2006 | 5 | SUMMONS Returned Executed by Rembrandt Technologies LP. Fox Broadcasting Company served on 12/4/2006, answer due 12/27/2006. (Maguire, Lauren) (Entered: 12/04/2006) |
|---|---|---|
| 12/06/2006 | 6 | Disclosure Statement pursuant to Rule 7.1 filed by Rembrandt Technologies LP. (Maguire, Lauren) (Entered: 12/06/2006) |
| 12/11/2006 | 7 | MOTION for Pro Hac Vice Appearance of Attorney John F. Sweeney, Joseph A. DeGirolamo, and Michael O. Cummings - filed by Rembrandt Technologies LP. (Maguire, Lauren) (Entered: 12/11/2006) |
| 12/13/2006 | | Case assigned to Judge Gregory M. Sleet. Please include the initials of the Judge (GMS) after the case number on all documents filed. (rjb) (Entered: 12/13/2006) |
| 12/14/2006 | 8 | NOTICE of Change of Address by Steven J. Balick (Balick, Steven) (Entered: 12/14/2006) |
| 12/22/2006 | 9 | STIPULATION TO EXTEND TIME to answer or otherwise respond to the complaint to January 26, 2007 - filed by Fox Entertainment Group Inc., Fox Broadcasting Company. (Horwitz, Richard) (Entered: 12/22/2006) |
| 12/28/2006 | | SO ORDERED, re 9 STIPULATION TO EXTEND TIME to answer or otherwise respond to the complaint to January 26, 2007 filed by Fox Entertainment Group Inc., Fox Broadcasting Company. Signed by Judge Gregory M. Sleet on 12/28/06. (mmm) (Entered: 12/28/2006) |
| 12/28/2006 | | Set/Reset Answer Deadlines: Fox Entertainment Group Inc. answer due 1/26/2007; Fox Broadcasting Company answer due 1/26/2007. (mmm) (Entered: 12/28/2006) |
| 01/17/2007 | 10 | MOTION for Pro Hac Vice Appearance of Attorney William W. Oxley, William L. Anthony, Jr., and Fabio E. Marino of Orrick, Herrington, & Sutcliffe LLP - filed by Fox Entertainment Group Inc., Fox Broadcasting Company. (Moore, David) (Entered: 01/17/2007) |
| 01/18/2007 | | SO ORDERED, re 10 MOTION for Pro Hac Vice Appearance of Attorney William W. Oxley, William L. Anthony, Jr., and Fabio E. Marino of Orrick, Herrington, & Sutcliffe LLP filed by Fox Entertainment Group Inc., Fox Broadcasting Company. Ordered by Judge Gregory M. Sleet on 1/18/2007. (asw) (Entered: 01/18/2007) |
| 01/18/2007 | | SO ORDERED, re 7 MOTION for Pro Hac Vice Appearance of Attorney John F. Sweeney, Joseph A. DeGirolamo, and Michael O. Cummings filed by Rembrandt Technologies LP. Ordered by Judge Gregory M. Sleet on 1/18/2007. (asw) (Entered: 01/18/2007) |
| 01/26/2007 | 11 | Disclosure Statement pursuant to Rule 7.1 filed by Fox Entertainment Group Inc., Fox Broadcasting Company. (Horwitz, Richard) (Entered: 01/26/2007) |
| 01/26/2007 | 12 | ANSWER to Complaint with Jury Demand, First COUNTERCLAIM *For Declaratory Relief* against Rembrandt Technologies LP by Fox Entertainment Group Inc., Fox Broadcasting Company.(Horwitz, Richard) (Entered: 01/26/2007) |
| 02/15/2007 | 13 | ANSWER to Counterclaim by Rembrandt Technologies LP.(Balick, Steven) (Entered: 02/15/2007) |

Case 2:06-cv-00731-GMS    Document 96-30    Filed 06/28/2007    Page 6 of 6

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/02/2007 09:35:53 | | | |
| **PACER Login:** | ps0067 | **Client Code:** | 331049 |
| **Description:** | Docket Report | **Search Criteria:** | 1:06-cv-00731-GMS Start date: 1/1/1970 End date: 3/2/2007 |
| **Billable Pages:** | 3 | **Cost:** | 0.24 |

# Exhibit 30

Vineet Bhatia (VB 9964)
SUSMAN GODFREY L.L.P.
590 Madison Ave., 8th Floor
New York, NY 10022
Main Telephone: (212) 336-8330

James L. Garrity, Jr. (JG 8389)
Marc B. Hankin (MH 7001)
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York  10022
Telephone:  (212) 848-4000
Facsimile:  (212) 848-7179

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: Adelphia Communications Corporation, et al. | ) ) ) | Chapter 11 |
| | ) | Case No. 02-41729 (REG) |
| Debtors | ) | Jointly Administered |
| _____ | ) ) | |
| Rembrandt Technologies, LP | ) ) | |
| *Plaintiff/Counter-defendants* | ) ) | Adversary Proceeding |
| | ) | No. 06-01739 (REG) |
| v. | ) ) | |
| Adelphia Communications Corporation; | ) | |
| Century-TCI California, LP; | ) | |
| Century-TCI California Communications, LP; | ) | ____ Civ. _____ ( ) |
| Century-TCI Distribution Company, LLC; | ) | |
| Century-TCI Holdings, LLC; | ) | |
| Parnassos, LP; | ) | |
| Parnassos Communications, LP; | ) | |
| Parnassos Distribution Company I, LLC; | ) | |
| Parnassos Distribution Company II, LLC; | ) | |
| Parnassos Holdings, LLC; | ) | |
| Western NY Cablevision, LP | ) ) | |
| *Defendants/Counterclaimants* | ) | |

**REMBRANDT TECHNOLOGIES, LP'S MOTION**
**TO WITHDRAW THE REFERENCE TO THE BANKRUPTCY COURT**

Plaintiff and Counter-defendant Rembrandt Technologies, LP ("Rembrandt") file this

Motion to Withdraw the Reference to the Bankruptcy Court pursuant to 28 U.S.C. § 157(d), Fed.

R. Bankr. P. 5011 and Local Rule 5011-1. For the reasons set forth in the accompanying

Memorandum of Law in Support of Rembrandt Technologies, LP's Motion to Withdraw the

Reference, and the Declaration of Marc B. Hankin in Support of Rembrandt Technologies, LP's

Motion to Withdraw the Reference, the Court should withdraw the reference of the above-

captioned adversary proceeding (the "Adversary Proceeding") to the Bankruptcy Court.

WHEREFORE, Rembrandt respectfully requests that this Court withdraw the reference

of the Adversary Proceeding to the Bankruptcy Court.

Dated: January 10, 2007

SUSMAN GODFREY L.L.P.


By: /s/ Vineet Bhatia
    Vineet Bhatia (VB 9964)
    590 Madison Ave., 8th Floor
    New York, NY 10022
    Main Telephone: (212) 336-8330


SHEARMAN & STERLING LLP

    James L. Garrity, Jr. (JG 8389)
    Marc B. Hankin (MH 7001)
    599 Lexington Avenue
    New York, NY 10022
    Main Telephone: (212) 848-4000
    Main Fax: (212) 848-7179

    *Attorneys for Plaintiff /Counter-defendant*
    *Rembrandt Technologies, LP*

## CERTFICATE OF SERVICE

I, Marc B. Hankin, do hereby certify that on January 10, 2007, a true and correct copy of (i) Rembrandt Technologies, LP's Motion for Withdrawal of the Reference to the Bankruptcy Court (the "Motion"), (ii) Memorandum of Law in Support of the Motion, and (iii) Declaration of Marc B. Hankin in Support of the Motion, each dated January 10, 2007, was served by electronic mail and first class mail on:

Thomas Meloro
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019-6099

Attorneys for Defendants/Counterclaimants
Adelphia Communications Corp. et al.


/s/ Marc B. Hankin
Marc B. Hankin

Dated: January 10, 2007


SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
Facsimile: (212) 848-7179

*Co-counsel to Plaintiff / Counter-defendant*
*Rembrandt Technologies, LP*

Case 2:05-cv-00637-FCD-KJM   Document 160-32   Filed 05/28/2007   Page 1 of 3

# Exhibit 31

# U.S. District Court
## United States District Court for the Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:07-cv-00214-WHP

In Re: Adelphia Communication Corp.
Assigned to: Judge William H. Pauley, III
Case in other court: USBC-SDNY, 06-01739A
Cause: 28:157 Motion to Withdraw Reference

Date Filed: 01/11/2007
Jury Demand: None
Nature of Suit: 423 Bankruptcy Withdrawl
Jurisdiction: Federal Question

**In Re**

**Adelphia Communication Corp.**

**Debtor**

**Adelphia Communication Corp.**

**Plaintiff**

**Rembrandt Technologies, LP**                     represented by   **Vineet Bhatia**
Susman Godfrey LLP
590 Madison Ave., 8th Floor
New York, NY 10022
212-336-8330
Email: vbhatia@susmangodfrey.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Adelphia Communications Corp.**                  represented by   **Thomas J. Meloro, Jr.,**
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
212-728-8000
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 01/11/2007 | 1 | MOTION TO WITHDRAW THE BANKRUPTCY REFERENCE. Bankruptcy Court Case Numbers: 06-1739A.Document filed by Rembrandt Technologies, LP.(bkar, ) (Entered: 01/11/2007) |
| 01/11/2007 | 2 | MEMORANDUM OF LAW in Support re: 1 MOTION TO WITHDRAW THE BANKRUPTCY REFERENCE. Bankruptcy Court Case Numbers: 06-1739A. Document filed by Rembrandt Technologies, LP. (bkar, ) (Entered: 01/11/2007) |

| 01/11/2007 | 3 | DECLARATION of Marc B. Hankin in Support re: 1 MOTION TO WITHDRAW THE BANKRUPTCY REFERENCE. Bankruptcy Court Case Numbers: 06-1739A. Document filed by Rembrandt Technologies, LP. (Attachments: # 1 Exhibit A - Part I# 2 Exhibit A - Part II# 3 Exhibit B - Part I# 4 Exhibit B - Part II# 5 Exhibit C# 6 Exhibit D# 7 Exhibit E)(bkar, ) (Entered: 01/11/2007) |
| 01/11/2007 | | Magistrate Judge Douglas F. Eaton is so designated. (bkar, ) (Entered: 01/11/2007) |
| 01/11/2007 | | Case Designated ECF. (bkar, ) (Entered: 01/11/2007) |
| 01/11/2007 | 4 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Rembrandt Technologies, LP.(Roll, William) (Entered: 01/11/2007) |
| 03/02/2007 | 5 | MEMORANDUM OF LAW in Opposition re: 1 MOTION TO WITHDRAW THE BANKRUPTCY REFERENCE. Bankruptcy Court Case Numbers: 06-1739A.. Document filed by Adelphia Communications Corp.. (Attachments: # 1 Certificate of Service)(Netzer, Roger) (Entered: 03/02/2007) |
| 03/02/2007 | 6 | DECLARATION of Eilish M. Cahalan in Opposition re: 1 MOTION TO WITHDRAW THE BANKRUPTCY REFERENCE. Bankruptcy Court Case Numbers: 06-1739A.. Document filed by Adelphia Communications Corp.. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E# 6 Exhibit F# 7 Certificate of Service)(Netzer, Roger) (Entered: 03/02/2007) |

| **PACER Service Center** | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 03/08/2007 10:42:43 | | |
| **PACER Login:** | ps0067 | **Client Code:** | 331049 |
| **Description:** | Docket Report | **Search Criteria:** | 1:07-cv-00214-WHP |
| **Billable Pages:** | 1 | **Cost:** | 0.08 |

# Exhibit 32

US2000 5490191.1

HIGHLY CONFIDENTIAL

## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Rembrandt Technologies LP | ) |
|     *Plaintiff* | ) |
| | ) |
| v. | ) |
| | )    Case No. 02-41729 (REG) |
| Adelphia Communications Corporation; | ) |
| Century-TCI California, LP; | ) |
| Century-TCI California Communications, LP; | ) |
| Century-TCI Distribution Company, LLC; | ) |
| Century-TCI Holdings, LLC; | ) |
| Parnassos, LP; | ) |
| Parnassos Communications, LP; | ) |
| Parnassos Distribution Company I, LLC; | ) |
| Parnassos Distribution Company II, LLC; | ) |
| Parnassos Holdings, LLC; | ) |
| Western NY Cablevision, LP | ) |
|     *Defendants* | ) |

## PRELIMINARY EXPERT REPORT OF KEVIN C. ALMEROTH

1.    The following sets forth my preliminary expert report regarding infringement of U.S. Patent Nos. 5,710,761, 5,778,234, 6,131,159, and 6,950,444 B1. This preliminary report includes my qualifications, opinions, and the bases for my opinions in addition to my personal experience. Also included is a list of the material I considered in preparing this preliminary report, and the compensation I received for my work in this matter.

2.    This is a preliminary export report and is based on a limited set of information and sources. As of the date of this report, I have not received any technical documents from Adelphia that have assisted in my infringement evaluation. Therefore, the opinions contained in this report are subject to change based upon the receipt and consideration of additional information.

**Qualifications**

3.      I am a professor in the Department of Computer Science at the University of California, Santa Barbara (UCSB). I have been a professor at the University since 1997. A copy of my curriculum vitae is attached to this preliminary report as Exhibit A

4.      I received a Doctor of Philosophy degree in computer science from the Georgia Institute of Technology in Atlanta, Georgia in 1997. Prior to that, I earned a Bachelor of Science and a Master of Science Degree, also in computer science, from the same university in 1992 and 1994, respectively.

5.      Since 1992 I have been conducting research into the delivery of multimedia over cable systems. In particular, how to aggregate requests for movies at a cable head-end and then how to satisfy a multitude of requests using one audio/video stream broadcast to multiple simultaneous receivers. In the courses I teach, the class spends significant time covering all aspects of the Internet including the physical and data link layers of the Open System Interconnect (OSI) protocol stack. These are the layers that deal with signal modulation, error control, and data transmission. Furthermore, in these courses I also teach the DOCSIS standard, DSL, and other standardized protocols for communicating across a variety of physical media including cable systems, telephone lines, wireless, and high-speed Local Area Networks (LANs).

6.      As an important component of my research program, I am involved in the development of academic research into available technology in the market place. As a result, I am actively involved in the Internet Engineering Task Force (IETF).

7.      My involvement in the research community extends to leadership positions for several journals and conferences. I am the chair of the Steering Committee for the ACM Network and System Support for Digital Audio and Video (NOSSDAV) workshop; on the Editorial Board of IEEE/ACM Transactions on Networking, IEEE Network, ACM Computers in Entertainment, and ACM Computer Communications Review; have co-chaired a number of conferences and workshops including the IEEE International Conference on Network Protocols (ICNP), IFIP/IEEE International Conference on Management of Multimedia Networks and Services (MMNS), the International Workshop On Wireless Network Measurement (WiNMee), ACM Sigcomm Workshop on Challenged Networks (CHANTS), the Network Group Communication (NGC) workshop, and the Global Internet Symposium; and have been on the program committee of numerous conferences. I am a member of the Association of Computing Machinery (ACM) and a senior member of the Institute of Electrical and Electronics Engineers (IEEE).

8.      Additional details about my employment history and fields of expertise are further described in my curriculum vitae attached as Exhibit A to this declaration.

**Publications**

9.      I am an author or co-author of more than 125 technical papers, published software systems, IETF Internet Drafts and IETF Request for Comments (RFCs). A list of these publications is included in my curriculum vitae attached as Exhibit A to this declaration.

**Consultation Fee**

10.    My fee for legal consultation in this case is my usual and customary rate of $400.00/hour.  My compensation is not conditioned on the outcome of this case.

**Testimony and Deposition in Other Recent Legal Actions**

11.    I have provided assistance as an expert in the following cases: *ACTV v. Disney* (00-CV-9622 SDNY); *Toddlerwatch.com v. Motorola* (01-12187-REK Mass); *Bond Holders of @Home v. AT&T* (02-5442-CRB NDCA); *Alacritech v. Microsoft* (04-03284-JSW NDCA); and *Two-Way Media v. AOL* (C-04-089 SDTX).  In *ACTV v. Disney*, I prepared an expert report for Disney, had my testimony taken in a deposition, and testified at a Markman Hearing in October 2001.  In *Toddlerwatch.com v. Motorola*, I prepared an expert report for Motorola in February 2003.  In *Bond Holders of @Home v. AT&T*, I commented on claim construction issues in September 2003 for the Bond Holders of @Home.  In *Alacritech v Microsoft*, I wrote two expert reports for Alacritech and gave a tutorial to the court in 2005.  In *Two-Way Media v. AOL*, my expertise was used by Two-Way Media to prepare two tutorials for the court in 2006.

**Patent Materials Reviewed**

12.    I reviewed the following documents:

a.  Rembrandt Technologies LP v. Adelphia Communications Corporation, "COMPLAINT FOR POST-PETITION PATENT INFRINGEMENT," September 13, 2006.

b.  U.S. Patent No. 5,710,761 and its file history.

c.   U.S. Patent No. 5,778,234 and its file history.

d.   U.S. Patent No. 6,131,159 and its file history.

e.   U.S. Patent No. 6,950,444 B1 and its file history.

f.   "Data-Over-Cable Service Interface Specifications (DOCSIS 1.1): Radio
     Frequency Interface Specification," SP-RFIv1.1-I10-030730, Cable
     Television Laboratories, Inc., July 2003.

g.   "Data-Over-Cable Service Interface Specifications (DOCSIS 2.0): Radio
     Frequency Interface Specification," SP-RFIv2.0-I04-030730, Cable
     Television Laboratories, Inc., July 2003.

h.   DerEngel, "Hacking the Cable Modem: What Cable Companies Don't Want
     You to Know," No Starch Press, San Francisco, CA, September 2006.

i.   "Adelphia | High Speed Internet: Recommended Modems,"
     http://www.adelphia.com/high_speed_internet/modems.cfm, November 2006.

j.   "Motorola – Connected Home Solutions: SURFBoard® SB4200 External
     Cable Modem," http://broadband.motorola.com/noflash/sb4200.html,
     November 2006.

k.   "Motorola: SB4200 Cable Modem,"
     http://broadband.motorola.com/modem/SB4200.pdf, November 2006.

l.   "Motorola: SURFBoard SB5100/SB5101 – Whirlpool.net.au,"
     http://whirlpool.net.au/index.cfm?a=h_view&model_id=179, November 2006.

m.   "Motorola: SURFBoard® SB5100 Cable Modem,"
     http://broadband.motorola.com/catalog/product_documents/SB5100-data-
     sheet.pdf, November 2006.

n. "Motorola: SB5101 Cable Modem Specification Sheet," http://broadband.motorola.com/catalog/product_documents/533176-001--a-SB5101-7-2006.pdf, November 2006.

o. "Broadcom: BCM3345 Product Brief," http://www.tranzistoare.ro/datasheets2/15/155898_1.pdf, November 2006.

### Exhibits To This Declaration

13.     Below is a list of the Exhibits to this declaration:

a.  Exhibit A – Curriculum vitae of Dr. Kevin C. Almeroth.

### The DOCSIS Standard

14.     DOCSIS is the Data Over Cable Service Interface Specification.  It "defines interface requirements for cable modems involved in high-speed data distribution over cable television system networks."[1]  DOCSIS is *the* standard to follow for cable network operators and cable modem manufactures.  The rapid proliferation of Internet connectivity through cable networks would not have been possible without the DOCSIS standard and the adherence of vendors to its specification.

15.     The DOCSIS standardization effort is a project of, "Cable Television Laboratories, Inc. (CableLabs®), a nonprofit research and development consortium, dedicated to helping its cable operator members integrate new cable telecommunications technologies into their business objectives."[2]

---

[1] http://www.cablemodem.com/
[2] http://www.cablemodem.com/

16.     DOCSIS was first developed in 1997 by Multimedia Cable Network System (MCNS) Partners to provide a standard for the burgeoning cable broadband market. A standard was needed in order to ensure that the variety of manufactures of cable modems would all produce a device that could accurately communicate with the rest of the equipment in the cable network.

17.     The DOCSIS standard has evolved over time with the 1.0 version of the standard having been released in March 1997, Version 1.1 released in April 1999, Version 2.0 released in January 2002, and the latest, Version 3.0, released in August 2006.

18.     Once DOCSIS was approved as a standard, CableLabs initiated a certification program to identify and label DOCSIS-compliant cable modems. Such cable modems could then be used in high-speed Internet cable networks running the DOCSIS protocol.

### Adelphia High-Speed Internet Cable System

19.     Adelphia operated numerous high-speed Internet cable networks, almost all of which were DOCSIS compatible, from the equipment in the network head-end (called the Cable Modem Termination System (CMTS)), to the cable modems recommended for customer use.[3]

---

[3] http://www.adelphia.com/high_speed_internet/modems.cfm

### DOCSIS and Adelphia Infringement of the Rembrandt Patents

20.     The DOCSIS 1.1 standard infringes on two of the Rembrandt patents:
Nos. 5,778,234 and 6,131,159.

21.     The DOCSIS 2.0 standard infringes on four of the Rembrandt patents:
Nos. 5,710,761, 5,778,234, 6,131,159, and 6,950,444 B1.

22.     Because Adelphia has operated numerous high-speed Internet cable
networks that utilize the DOCSIS 1.1 and DOCSIS 2.0 standards, Adelphia has infringed
on the four Rembrandt patents.

23.     Furthermore, I tested my hypothesis of Adelphia DOCSIS infringement by
examining the operation of a modem recommended by Adelphia for use in their high-
speed Internet cable system.  I focused on determining whether Motorola's SURFboard
line of cable modems, a brand and model of cable modems recommended by Adelphia
for use by its customers[4], infringed the Rembrandt patent No. 6,131,159.  My conclusion
is that this line of Motorola cable modems infringes not only directly, but also as an
obvious result of complying with the DOCSIS standard.  Based on my investigation to
date and my knowledge about the similarities of other Adelphia-recommended cable
modems, I further believe that other DOCSIS-compliant cable modems used in the
Adelphia high-speed Internet cable network infringe not only patent No. 6,131,159, but
the other three Rembrandt patents as well.

---

[4]   http://www.adelphia.com/high_speed_internet/modems.cfm

24.     The specific analyses of the claims of the four Rembrandt patents are detailed in the four claim charts for the four Rembrandt patents, respectively.  These charts describe how DOCSIS, and by connection Adelphia, infringes.  For patent Nos. 6,131,159 and 5,778,234, both DOCSIS 1.1 and DOCSIS 2.0 infringe.  For all four patents, DOCSIS 2.0 infringes.  And for the additional step of tracing infringement for one of the patents, the 6,131,159 claim chart shows that the line of Motorola SURFBoard modems infringe patent No. 6,131,159.

25.     Patent Nos. 6,131,159 and 5,778,234 describe two ways of remotely updating the "firmware" on a cable modem, either in a one-stage process or in a multi-stage process.  A remote software update procedure is critical for a cable network provider to be able to quickly and efficiently update customer cable modems without incurring the expense of  individually updating each customer's cable modem at their home.  While DOCSIS 1.1 and DOCSIS 2.0 describe a remote software update procedure, some of the specific details are left to the cable modem vendor, in particular, whether the update software occurs in one or more stages.  It is my opinion that however many stages a cable modem vendor uses to update the software, the procedure is covered by either patent No. 6,131,159 or patent No. 5,778,234.  Again, I have taken the additional step of confirming that one of the Adelphia recommended cable modems performs this remote software update in one stage, thus infringing on patent No. 6,131,159.

26.     Patent No. 5,710,761 describes the selection of an "error control negotiation sequence" based on a parameter of the physical layer or based on the data rate.  DOCSIS 2.0 exactly describes the selection of a sequence and then the negotiation

of the error control scheme and its parameters in Section 8.3.3 of the specification. Selecting and following a specific error control negotiation sequence is a critical step in identifying the right error control parameters to use. Given that customers can have widely varying error patterns requiring different types of error control, the ability to quickly negotiate the right scheme and settings is important to maximizing the date rate to each customer.

27.    Patent No. 6,950,444 B1 describes various enhancements to the transmission of the initial bits of a DOCSIS frame, called the preamble. The goal of these enhancements is to, "significantly increase the probability that the decoder will decode the preamble symbols error free."[5] Furthermore, additional information can be included in the preamble bits, for example, link control information, e.g., a specific pattern of bits indicating a particular symbol mapping. DOCSIS 2.0 describes both how the physical layer modulation can be different for the preamble and how the preamble bits can be used to convey link control information. These enhancements are described in several subsections in Section 6.2 of the DOCSIS 2.0 specification. The ability to ensure that the preamble is easy to decode is important for ensuring that both a customer's cable modem and the provider's CMTS are able to accurately receive and decode a transmitted frame of data.

28.    As part of my analysis, I took the first of several additional steps to demonstrate that not only was the Adelphia high-speed Internet cable system DOCSIS compliant and therefore infringing on the Rembrandt patents, but also that specific

---

[5] Abstract of Patent No. 6,950,444 B1

equipment in use in the Adelphia high-speed Internet cable system, was also infringing. Specifically, modems in the line of Motorola SURFBoard modems infringe each of the claim elements for several of the claims of patent No. 6,131,159. The logic for this conclusion was based on the hardware configuration of these modems, the DOCSIS-compliant chip used in each, and the DerEngel reference describing the architecture, boot procedure, and firmware update process for SURFBoard modems.

29. The opinions given in this report are based on my investigations to date. I reserve the right to alter or expand upon my opinions upon further investigation or discovery of additional information.

30. I have personal knowledge of the matters set forth in this declaration and could and would so testify if I were called as a witness. I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Dated: November 13, 2006

*Kevin C. Almeroth*

Kevin C. Almeroth

# Exhibit 33

US2000 5490191 1

## IN THE UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In Re: Adelphia Communications Corporation, et al. | ) ) ) | Chapter 11 Case No. 02-41729 (REG) |
| Debtors | ) ) ) | Jointly Administered |
| Rembrandt Technologies LP | ) ) | Adversary Proceeding |
| *Plaintiff* | ) ) | No. _____ |
| v. | ) ) | |
| Adelphia Communications Corporation; Century-TCI California, LP; Century-TCI California Communications, LP; Century-TCI Distribution Company, LLC; Century-TCI Holdings, LLC; Parnassos, LP; Parnassos Communications, LP; Parnassos Distribution Company I, LLC; Parnassos Distribution Company II, LLC; Parnassos Holdings, LLC; Western NY Cablevision, LP | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| *Defendants* | ) | |

## COMPLAINT FOR POST-PETITION PATENT INFRINGEMENT

Plaintiff Rembrandt Technologies, LP files this complaint for post-petition infringement of United States Patent Nos. 5,710,761; 5,778,234; 6,131,159 and 6,950,444 under 35 U.S.C. § 271. All acts of infringement alleged herein relate solely to acts by the Defendants that occurred after the applicable petition dates set forth herein and before July 31, 2006.

### PARTIES

1.  Plaintiff Rembrandt Technologies, LP ("Rembrandt") is a limited partnership organized under the laws of the state of New Jersey with its principal place of business at 401 City Avenue, Suite 815, Bala Cynwyd, Pennsylvania 19004.

1

2. Defendant Adelphia Communications Corporation ("ACC") is a corporation organized under the laws of the State of Delaware. On June 25, 2002, ACC filed a petition in bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Southern District of New York in a case captioned *In re Adelphia Communications Corporation*, Case No. 02-41729 (REG). That case remains pending in the bankruptcy court. ACC's principal place of business on the Petition Date was located in Coudersport, Pennsylvania, and is currently located in Greenwood Village, Colorado. ACC was one of the leading cable and telecommunications companies in the United States. Since seeking bankruptcy protection on June 25, 2002, ACC continued to provide cable internet and television services to consumers throughout the United States until the sale of substantially all of its assets on July 31, 2006.

3. Defendant Century-TCI California, LP is a partnership organized under the laws of the State of Delaware. Century-TCI California, LP is an affiliate of ACC. On June 25, 2002, Century-TCI California, LP filed a petition in bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Southern District of New York. Century-TCI California, LP's bankruptcy proceedings are jointly administered with *In re Adelphia Communications Corporation*, Case No. 02-41729 (REG).

4. Defendant Century-TCI California Communications, LP is a partnership organized under the laws of the State of Delaware. Century-TCI California Communications, LP is an affiliate of ACC. On June 25, 2002, Century-TCI California Communications, LP filed a petition in bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Southern District of New York. Century-TCI California Communications, LP's bankruptcy proceedings are jointly administered with *In re Adelphia Communications Corporation*, Case No. 02-41729 (REG).

2

5.      Defendant Century-TCI Distribution Company, LLC is a limited liability company organized under the laws of the State of Delaware. Century-TCI Distribution Company, LLC is an affiliate of ACC. On October 6, 2005, Century-TCI Distribution Company, LLC filed a petition in bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Southern District of New York. Century-TCI Distribution Company, LLC's bankruptcy proceedings are jointly administered with *In re Adelphia Communications Corporation*, Case No. 02-41729 (REG).

6.      Defendant Century-TCI Holdings, LLC is a corporation organized under the laws of the State of Delaware. Century-TCI Holdings, LLC is an affiliate of ACC. On June 25, 2002, Century-TCI Holdings, LLC filed a petition in bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Southern District of New York. Century-TCI Holdings, LLC's bankruptcy proceedings are jointly administered with *In re Adelphia Communications Corporation*, Case No. 02-41729 (REG).

7.      Defendant Parnassos Communications, LP is a partnership organized under the laws of the State of Delaware. Parnassos Communications, LP is an affiliate of ACC. On June 25, 2002, Parnassos Communications, LP filed a petition in bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Southern District of New York. Parnassos Communications, LP's bankruptcy proceedings are jointly administered with *In re Adelphia Communications Corporation*, Case No. 02-41729 (REG).

8.      Defendant Parnassos Distribution Company I, LLC is a limited liability company organized under the laws of the State of Delaware. Parnassos Distribution Company I, LLC is an affiliate of ACC. On October 6, 2005, Parnassos Distribution Company I, LLC filed a petition in bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Southern District of

3

New York. Parnassos Distribution Company I, LLC's bankruptcy proceedings are jointly administered with *In re Adelphia Communications Corporation*, Case No. 02-41729 (REG).

9.    Defendant Parnassos Distribution Company II, LLC is a limited liability company organized under the laws of the State of Delaware. Parnassos Distribution Company II, LLC is an affiliate of ACC. On October 6, 2005, Parnassos Distribution Company II, LLC filed a petition in bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Southern District of New York. Parnassos Distribution Company II, LLC's bankruptcy proceedings are jointly administered with *In re Adelphia Communications Corporation*, Case No. 02-41729 (REG).

10.    Defendant Parnassos Holdings, LLC is a corporation organized under the laws of the State of Delaware. Parnassos Holdings, LLC is an affiliate of ACC. On June 25, 2002, Parnassos Holdings, LLC filed a petition in bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Southern District of New York. Parnassos Holdings, LLC's bankruptcy proceedings are jointly administered with *In re Adelphia Communications Corporation*, Case No. 02-41729 (REG).

11.    Defendant Parnassos, LP is a partnership organized under the laws of the State of Delaware. Parnassos, LP is an affiliate of ACC. On June 25, 2002, Parnassos, LP filed a petition in bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Southern District of New York. Parnassos, LP's bankruptcy proceedings are jointly administered with *In re Adelphia Communications Corporation*, Case No. 02-41729 (REG).

12.    Defendant Western NY Cablevision, LP is a partnership organized under the laws of the State of Delaware. Western NY Cablevision, LP is an affiliate of ACC. On June 25, 2002, Western NY Cablevision, LP filed a petition in bankruptcy under Chapter 11 in the United

4

States Bankruptcy Court for the Southern District of New York. Western NY Cablevision, LP's bankruptcy proceedings are jointly administered with *In re Adelphia Communications Corporation*, Case No. 02-41729 (REG).

13. On information and belief, Defendants are liable for the infringement of Rembrandt's patents as alleged herein. Rembrandt makes these allegations with regard to particular Defendants based on a review of publicly available information. Other affiliates of ACC may also be liable for infringement of these patents. Rembrandt intends to amend this pleading to add other ACC affiliates who have infringed Rembrandt's patents or, if appropriate, to dismiss Defendants who are shown not to have engaged in any infringing activity.

## JURISDICTION AND VENUE

14. This is an action for patent infringement arising under the law of the United States relating to patents, including, *inter alia*, 35 U.S.C. §§ 271, 281, 284 and 285. This court has jurisdiction over such federal question claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

15. For the avoidance of doubt and for the sake of clarity, Plaintiffs hereby explicitly state that all acts of infringement alleged herein relate solely to actions taken by Defendants *after* their filing for bankruptcy in this district on June 25, 2002 or October 6, 2005, as applicable, and *before* the acquisition by Time Warner Cable and Comcast on July 31, 2006 (such period for each Defendant, the "Post-Petition Period"). Plaintiffs hereby explicitly state and affirm that they are not seeking relief for any actions of Defendants that occurred prior to the filing of ACC's bankruptcy petition. ACC continued to operate its cable internet and television businesses after June 25, 2002 and prior to its acquisition. In doing so, as alleged in greater detail below, ACC engaged in post-petition acts of infringement that have damaged Rembrandt.

It is solely based on these post-petition actions, and for relief under the United States patent laws, that Rembrandt brings this action.

16.     This Court has personal jurisdiction over the Defendants because one or more events giving rise to the causes of action herein occurred in this district and because the Defendants have submitted to the jurisdiction of this Court.

17.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and 1409(a).

**COUNT I: INFRINGEMENT OF U.S. PATENT NO. 5,710,761**

18.     Rembrandt refers to and incorporates herein the allegations of Paragraphs 1-17 above.

19.     Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 5,710,761, entitled "Error Control Negotiation Based on Modulation" ("the '761 patent."). A true copy of the '761 patent is attached as Exhibit A.

20.     The '761 patent was duly and legally issued by the United States Patent and Trademark Office on January 20, 1998, after full and fair examination.

21.     During the Post-Petition Period, the Defendants have directly or indirectly infringed the '761 patent by practicing or causing others to practice, by inducement or contributorily, the inventions claimed in the '761 patent, in this district and otherwise within the United States. For example, Defendants infringed the '761 patent by providing high-speed cable modem internet products and services to subscribers.

22.     Rembrandt suffered substantial damages due to the Defendants' infringement. Furthermore, upon information and belief, such infringement was willful, making this an

exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

## COUNT II: INFRINGEMENT OF U.S. PATENT NO. 5,778,234

23.     Rembrandt refers to and incorporates herein the allegations of Paragraphs 1-17 above.

24.     Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 5,778,234, entitled "Method for Downloading Programs" ("the '234 patent."). A true copy of the '234 patent is attached as Exhibit B.

25.     The '234 patent was duly and legally issued by the United States Patent and Trademark Office on July 7, 1998, after full and fair examination.

26.     During the Post-Petition Period, the Defendants have directly or indirectly infringed the '234 patent by practicing or causing others to practice, by inducement or contributorily, the inventions claimed in the '234 patent, in this district and otherwise within the United States. For example, the Defendants infringed the '234 patent by providing high-speed cable modem internet products and services to subscribers.

27.     Rembrandt suffered substantial damages due to the Defendants' infringement. Furthermore, upon information and belief, such infringement was willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

## COUNT III: INFRINGEMENT OF U.S. PATENT NO. 6,131,159

28.     Rembrandt refers to and incorporates herein the allegations of Paragraphs 1-17 above.

7

29.    Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 6,131,159, entitled "System for Downloading Programs" ("the '159 patent."). A true copy of the '159 patent is attached as Exhibit C.

30.    The '159 patent was duly and legally issued by the United States Patent and Trademark Office on October 10, 2000, after full and fair examination.

31.    During the Post-Petition Period, the Defendants have directly or indirectly infringed the '159 patent by practicing or causing others to practice, by inducement or contributorily, the inventions claimed in the '159 patent, in this district and otherwise within the United States. For example, the Defendants infringed the '159 patent by providing high-speed cable modem internet products and services to subscribers.

32.    Rembrandt suffered substantial damages due to the Defendants' infringement. Furthermore, upon information and belief, such infringement was willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

## COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 6,950,444

33.    Rembrandt refers to and incorporates herein the allegations of Paragraphs 1-17 above.

34.    Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 6,950,444, entitled "System and Method for a Robust Preamble and Transmission Delimiting in a Switched-Carrier Transceiver" ("the '444 patent."). A true copy of the '444 patent is attached as Exhibit D.

35.     The '444 patent was duly and legally issued by the United States Patent and Trademark Office on September 27, 2005, after full and fair examination.

36.     During the Post-Petition Period, Defendants directly or indirectly infringed the '444 patent by practicing or causing others to practice, by inducement or contributorily, the inventions claimed in the '444 patent, in this district and otherwise within the United States. For example, the Defendants infringed the '444 patent by providing high-speed cable modem internet products and services to subscribers.

37.     Rembrandt suffered substantial damages due to the Defendants' infringement. Furthermore, upon information and belief, such infringement was willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

## **PRAYER FOR RELIEF**

WHEREFORE, Rembrandt prays that it have judgment from the District Court against the Defendants for the following:

(1) An order that the Defendants have infringed the patents-in-suit;

(2) An award of damages for said infringement;

(4) An award of increased damages pursuant to 35 U.S.C. § 284;

(5) An award of all costs of this action, including attorneys' fees and interest; and

(6) Such other and further relief, at law or in equity, to which Rembrandt is justly entitled.

Dated: September 13, 2006.          **SUSMAN GODFREY L.L.P.**

By: /s/ Vineet Bhatia
     VINEET BHATIA (VB 9964)

     MAX L. TRIBBLE, JR.
     Texas Bar 20213950 (*application pending*)

     EDGAR SARGENT
     Washington Bar 28283 (*application pending*)

     BROOKE A.M. TAYLOR
     Washington Bar 33190 (*application pending*)

     TIBOR L. NAGY
     Texas Bar 24041562 (*application pending*)

     SUSMAN GODFREY L.L.P.
     590 Madison Ave., 8th Floor
     New York, NY 10022
     Main Telephone: (212) 336-8330
     Main Fax: (212) 336-8340
     Email: vbhatia@susmangodfrey.com
     Email: mtribble@susmangodfrey.com
     Email: esargent@susmangodfrey.com
     Email: btaylor@susmangodfrey.com
     Email: tnagy@susmangodfrey.com

**Exhibit A**



US005710761A

## United States Patent [19]

### Scott

[11] **Patent Number:** **5,710,761**

[45] **Date of Patent:** **Jan. 20, 1998**

[54] **ERROR CONTROL NEGOTIATION BASED ON MODULATION**

[75] Inventor: **Robert Earl Scott**, Indian Rocks Beach, Fla.

[73] Assignee: **Paradyne Corporation**, Largo, Fla.

[21] Appl. No.: **458,048**

[22] Filed: **May 31, 1995**

[51] Int. Cl.$^6$ .................................................. **H04L 1/00**

[52] U.S. Cl. ...................... **370/252**; 375/222; 379/93.08

[58] Field of Search ............................ 370/252, 465, 370/466, 467, 469; 375/222; 379/93

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,715,044 | 12/1987 | Gartner | 375/8 |
| 5,384,780 | 1/1995 | Lomp et al. | 375/222 |
| 5,430,793 | 7/1995 | Ueltzen et al. | 375/222 |
| 5,481,696 | 1/1996 | Lomp et al. | 395/500 |

| | | | |
|---|---|---|---|
| 5,550,881 | 8/1996 | Sridhar et al. | 375/222 |
| 5,636,037 | 6/1997 | Saitoh | 375/222 |

*Primary Examiner*—Melvin Marcelo

*Attorney, Agent, or Firm*—Thomas, Kayden, Horstemeyer & Risley

[57] **ABSTRACT**

A modem dynamically selects the type of error-control negotiation sequence as a function of a negotiated parameter of the physical layer. In one embodiment of the invention, a modem selects between error-control negotiation sequences as a function of the type of modulation negotiated in the physical layer. In particular, the modem has at least two type of error-control negotiation sequences to select from: "LAPM or Disconnect," and "LAPM, MNP or Buffer." When the modem negotiates a V.32 or higher modulation, the modem uses the "LAPM or Disconnect" error control negotiation sequence. However, when the modem negotiates a V.22 bis or lower modulation, the modem uses the "LAPM, MNP or Buffer" error control sequence.

**16 Claims, 1 Drawing Sheet**



*FIG. 1*



*FIG. 2*



5,710,761

1

# ERROR CONTROL NEGOTIATION BASED ON MODULATION

## BACKGROUND OF THE INVENTION

The present invention relates to data communications equipment, e.g., modems, and, more particularly, to the error control negotiation phase of establishing a data connection.

In establishing a data connection between two modems, the modems perform a "handshaking" sequence to negotiate various parameters about the data connection, e.g., the type of modulation (which relates to line speed), and the type of error control protocol. The type of modulation is representative of the "physical" layer of a data connection, while the type of error control protocol is representative of the "link" layer of the data connection. The negotiation of the physical layer is always negotiated before the link layer.

The types of error control protocols used today are: "Link Access Protocol Modem" (LAPM), "Microcom Networking Protocol" (MNP), or "Buffer" (which in reality is no error control). Typically, in negotiating the type of error control protocol a modem tries each type of error control protocol in turn. In particular, the modem uses a negotiation sequence defined herein as "LAPM, MNP, or Buffer." In this negotiation sequence, the modem attempts to connect with the far-end modem for several seconds, e.g., 2 seconds, using an "LAPM" protocol like International Telecommunication Union (ITU) standard V.42. If the far-end modem does not appropriately respond, the modem then tries to connect with the far-end modem for several seconds, e.g., 6 seconds, using the "MNP" protocol. If this too is unsuccessful, the modem then falls back to a non-error control mode, i.e., the "Buffer" mode of operation. This type of negotiation sequence typically allows a modem to connect to the widest range of industry-available modems.

Unfortunately with higher modulation speeds available, like those in ITU standards V.34 and, to a lesser degree, V.32bis, the above error control negotiation sequence can present a problem. In particular, as noted above, the negotiation of the line speed (modulation) occurs before the negotiation of the type of error control. In order to determine the appropriate line speed, a modem uses a technique called "line probing." Unfortunately, the accuracy of current line probing techniques is not perfect. As a result, a modem may erroneously connect at too high a line speed. In other words, even though the line speed was successfully negotiated, the error rate at that line speed is high. This affects the time it takes to perform the subsequent error control negotiation. In particular, with an increase in the error rate, the LAPM type of error control may not be negotiated within the 2 seconds, mentioned above. Further, in severe cases, the time delay in negotiating the error control protocol will be so long that neither LAPM nor MNP is negotiated, causing the modem to fallback to buffer mode. The latter presents a problem, since users typically want V.42 error control and V.42bis data compression for their data calls, however in buffer mode neither V.42 error control nor V.42bis data compression are available.

One way to solve the above-mentioned problem is to have a different negotiation sequence for error control negotiation—"LAPM or Disconnect" for example. With this negotiation setting, the modem tries for an extended length of time, e.g., 30 seconds, to negotiate a LAPM data connection. Even if the modem has trouble at the start of the call, LAPM may still be negotiated because of the longer time delay. However, this negotiation sequence presents a problem when connecting to modems that do not support

2

LAPM, i.e., MNP-only or non-error-control modems. In order to connect to MNP-only or non-error-control modems, the user must switch the modem back to using the "LAPM, MNP, or Buffer" error control negotiation sequence, described above. Typically, the user switches between error control negotiation sequences via an respective AT command. This is not user-friendly. In today's marketplace, the configuration of the modem itself, e.g., what type of error control negotiation sequence to use, should be transparent to the user.

## SUMMARY OF THE INVENTION

However, I have realized a solution that solves all of the above problems and is user-friendly. I have observed that almost every high-speed modem (V.34, V.32bis, V.32) has a LAPM mode, and that the LAPM mode is enabled. Further, only the low-speed modems (V.22bis or below) are MNP-only or non-error control. And, finally, the modulation (physical layer) is always negotiated before the error control protocol (link layer). Therefore, and in accordance with the invention, a modem dynamically selects the type of link layer negotiation sequence as a function of a negotiated parameter of the physical layer.

In one embodiment of the invention, a modem selects between error control negotiation sequences as a function of the type of modulation negotiated in the physical layer. In particular, the modem has at least two type of error control negotiation sequences to select from: "LAPM or Disconnect," and "LAPM, MNP or Buffer." When the modem negotiates a V.32 or higher modulation, the modem uses the "LAPM or Disconnect" error control negotiation sequence. However, when the modem negotiates a V.22bis or lower modulation, the modem uses the "LAPM, MNP or Buffer" error control sequence.

In another embodiment of the invention, a modem uses the data rate negotiated at the physical layer, rather than the modulation, to select the type of error control sequence. For example, if the modem connects at 2400 bits per second (bps) or below, the modem uses the "LAPM, MNP or Buffer" error control sequence. However, if the modem connects at a rate higher than 2400 bps, the modem uses the "LAPM or Disconnect" error control negotiation sequence. It should be noted that even though V.34 supports 2400 bps, I have observed that this data rate is unlikely to be used, i.e., a data rate of 2400 bps or less can be used to infer there is no high-speed modem in the data connection.

The above-described inventive concept provides a number of advantages. The user does not have to administer the modem to select a particular type of error control negotiation sequence via an AT command or other type of strap setting. Further, a modem incorporating the inventive concept still maintains compatibility with a large part of the currently installed-base of modems. Finally, this approach allows a high-speed modem to connect at the highest feasible rate and still negotiate the use of the LAPM protocol.

## BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 is a block diagram of a data communications equipment embodying the principles of the invention; and

FIG. 2 is a flow diagram of an illustrative method embodying the principles of the invention for use in the modem of FIG. 1.

## DETAILED DESCRIPTION

FIG. 1 shows an illustrative high-level block diagram of a modem embodying the principles of the invention. As

5,710,761

3

shown, modem 100 couples to a communications channel (not shown) via line 133, which is, e.g., a local loop that couples modem 100 to a local central office (not shown). Modem 100 is also coupled to respective data terminal equipment (DTE) 10 via line 11. Other than the inventive concept, the components of modem 100 are well-known and will not be described in detail. Modem 100 includes DTE interface 105, microprocessor-based central processing unit (CPU) 110, memory 120 and digital signal processing circuitry (DSP) 130. Since FIG. 1 is a high-level block diagram, other parts of modem 100 not important to the inventive concept are assumed to be included within these representative components. For example, DSP 130 is representative of not only a digital signal processing chip, but also includes the "data access arrangement" (DAA) circuitry that couples any transmitted and received data signals to, and from, line 133. Further, although shown as single lines in FIG. 1, lines 11, 106, 111,109, and 133, are representative of a plurality of signals as known in the art to interconnect the various components. For example, line 11 is representative of any one of a number of ways for coupling data communications equipment to data terminal equipment, e.g., a serial interface like that specified in Electronic Industry Association (EIA) standard RS-232.

As known in the art, CPU 110 provides a controlling function for modem 100, e.g., CPU 110 controls, via line 109, DSP 130 for establishing, maintaining, and disconnecting, from a data connection to a far-end modem (not shown), via line 109. In performing this controlling function, CPU 110 operates on, or executes, program data stored in memory 120 via line 111, which is representative of control, address, and data signals (not shown).

In accordance with the inventive concept, modem 100 dynamically selects the type of error control negotiation sequence as a function of the type of physical layer negotiated. Turning now to FIG. 2, an illustrative method embodying the principles of the invention will be described. The steps shown in FIG. 2 are illustratively stored in memory 120 as program data as represented by blocks 305, block 310, block 315, etc., of FIG. 1, respectively. For the purposes of this description, it is assumed that modem 100 has already initiated a data call to a far-end modem (not shown) and a handshaking sequence has begun. As known in the art, CPU 110 first negotiates with the far-end modem the physical layer of the data connection, as shown in step 305. (It should be realized that since this is a negotiation process, whether modem 100 is the originating, or answering, modem is irrelevant to the inventive concept). During the physical layer negotiation, modem 100 negotiates the type of modulation, e.g., V.22, V.22bis, V.32, V.32bis, and V.34 industry standards. After negotiation of the physical layer, CPU 110 evaluates a negotiated parameter of the physical layer in step 310. In particular, CPU 110 compares a value of the negotiated parameter to a predefined value. If the value of the negotiated parameter is greater than or equal to the predefined value, CPU 110 uses an "LAPM or Disconnect" error control negotiation sequence in step 315 as part of the link layer negotiation. The software instructions for executing the "LAPM or Disconnect" error control negotiation sequence are illustratively stored in memory 120 at location 121. With this negotiation setting, modem 100 tries for an extended length of time to negotiate a LAPM link layer on the data connection. If a LAPM link layer cannot be negotiated, modem 100 disconnects.

On the other hand, if the value of the negotiated parameter is less than the predefined value, CPU 110 uses an "LAPM, MNP or Buffer" error control negotiation sequence in step

4

320 as part of the link layer negotiation. The software instructions for executing the "LAPM, MNP, or Buffer" error control negotiation sequence are illustratively stored in memory 120 at location 122. As described earlier, in this negotiation sequence modem 100 attempts to connect with the far-end modem for several seconds using an "LAPM" protocol like International Telecommunication Union (ITU) standard V.42. If the far-end modem does not appropriately respond, modem 100 then tries to connect with the far-end modem for several seconds using the "MNP" protocol. If this too is unsuccessful, modem 100 then falls back to a non-error control mode, i.e., the "Buffer" mode of operation.

In one embodiment of the invention, the negotiated parameter from the physical layer is the type of modulation negotiated in the physical layer. In particular, when modem 100 negotiates a V.32 or higher modulation, modem 100 performs step 315, described above. However, when modem 100 negotiates a V.22bis or lower modulation, modem 100 performs step 320, described above.

In another embodiment of the invention, the negotiated parameter from the physical layer is the negotiated data rate. For example, if modem 100 connects below 4800 bps, modem 100 performs step 320, described above. However, when modem 100 connects at a rate equal to or higher than 4800 bps, modem 100 performs step 315, described above. It should be noted that even though high-speed modulations, like V.34, support rates below 4800, I have observed that these data rates are unlikely to be used. As a result, a data rate less than 4800 bps can be used to infer there is no high-speed modem in the data connection.

The above-described inventive concept provides a number of advantages. The user does not have to administer the modem to select a particular type of error control negotiation sequence for use during the link layer negotiation. Further, a modem incorporating the inventive concept still maintains compatibility with a large part of the currently installed-base of modems. Finally, this approach allows a high-speed modem to connect at the highest feasible rate and still negotiate the use of the LAPM protocol.

The foregoing merely illustrates the principles of the invention and it will thus be appreciated that those skilled in the art will be able to devise numerous alternative arrangements which, although not explicitly described herein, embody the principles of the invention and are within its spirit and scope.

For example, although the invention is illustrated herein as being implemented with discrete functional building blocks, e.g. a memory, CPU, etc., the functions of any one or more of those building blocks can be carried out using one or more appropriate integrated circuits, e.g., a microprocessor that includes memory.

In addition, although described in the context of a modem external to the data terminal equipment, the inventive concept applies to any other forms of coupling a modem to data terminal equipment, e.g., a modem that is internal to a personal computer or a modem that is part of a mobile phone transceiver. Finally, the selection of a link layer negotiation sequence can be a function of other data rates, types of modulations, and/or other parameters of the physical layer.

What is claimed:

1. A method for use in data communications equipment, the method comprising the steps of:

negotiating a physical layer of a data connection with a far-end data communications equipment to determine a set of parameters for the physical layer of the data connection with the far-end data communications equipment; and

5,710,761

5

selecting one of a number of error control negotiation sequences as a function of a value of at least one parameter from the set of parameters for the physical layer.

2. The method of claim 1, further including the step of negotiating error control of the data connection with the far-end data communications equipment in accordance with the selected one of the number of error control negotiation sequences.

3. The method of claim 1, wherein the at least one parameter is the type of modulation negotiated with the far-end data communications equipment.

4. The method of claim 3, wherein the number of error control negotiation sequences include a Link Access Protocol Modem, Microcom Networking Protocol, or Buffer sequence and a Link Access Protocol Modem or Disconnect sequence.

5. The method of claim 4, wherein the Link Access Protocol Modem, Microcom Networking Protocol, or Buffer sequence is selected when the type of modulation negotiated is less than V.32, and wherein the Link Access Protocol Modem or Disconnect sequence is selected when the type of modulation negotiated is greater than or equal to V.32.

6. The method of claim 1, wherein the at least one parameter is the data rate negotiated with the far-end data communications equipment.

7. The method of claim 6, wherein the number of error control negotiation sequences include a Link Access Protocol Modem, Microcom Networking Protocol, or Buffer sequence and a Link Access Protocol Modem or Disconnect sequence.

8. The method of claim 7, wherein the Link Access Protocol Modem, Microcom Networking Protocol, or Buffer sequence is selected when the data rate is less than 4800 bits per second, and wherein the Link Access Protocol Modem or Disconnect sequence is selected when the data rate is greater than or equal to 4800 bits per second.

9. Data communications apparatus comprising:

a memory that stores a number of error control negotiation sequences; and

processor circuitry that negotiates a physical layer of a data connection with a far-end data communications equipment to determine a set of parameters for the

6

physical layer of the data connection with the far-end data communications equipment, and selects from memory one of a number of error control negotiation sequences as a function of a value of at least one parameter from the set of parameters for the physical layer.

10. The apparatus of claim 9, wherein the processor negotiates error control of the data connection with the far-end data communications equipment in accordance with the selected one of the number of error control negotiation sequences.

11. The apparatus of claim 9, wherein the at least one parameter is the type of modulation negotiated with the far-end data communications equipment.

12. The apparatus of claim 11, wherein the number of error control negotiation sequences include a Link Access Protocol Modem, Microcom Networking Protocol, or Buffer sequence and a Link Access Protocol Modem or Disconnect sequence.

13. The apparatus of claim 12, wherein the processor selects the Link Access Protocol Modem, Microcom Networking Protocol, or Buffer sequence when the type of modulation negotiated is less than V.32, and wherein the processor selects the Link Access Protocol Modem or Disconnect sequence when the type of modulation negotiated is greater than or equal to V.32.

14. The apparatus of claim 9, wherein the at least one parameter is data rate negotiated with the far-end data communications equipment.

15. The apparatus of claim 9, wherein the number of error control negotiation sequences include a Link Access Protocol Modem, Microcom Networking Protocol, or Buffer sequence and a Link Access Protocol Modem or Disconnect sequence.

16. The apparatus of claim 15, wherein the processor selects the Link Access Protocol Modem, Microcom Networking Protocol, or Buffer sequence when the data rate is less than 4800 bits per second, and wherein the processor selects the Link Access Protocol Modem or Disconnect sequence when the data rate is greater than or equal to 4800 bits per second.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

**PATENT NO.** : 5,710,761

**DATED** : January 20, 1998

**INVENTOR(S)** : Scott

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Title page of the patent, second column, six lines under the heading "ABSTRACT", change "type" to --types--.

Column 2, line 27, after "at least two" change "type" to --types--.

Column 4, line 22, change "4800" (in bold) to --4800-- (in regular font).

Column 4, line 49, after "can be" delete "carded" and insert therefor --carried--.

Signed and Sealed this

Twenty-sixth Day of May, 1998

*Attest:*

*Bruce Lehman*

**BRUCE LEHMAN**

*Attesting Officer*        *Commissioner of Patents and Trademarks*

**Exhibit B**



US005778234A

## United States Patent [19]

Hecht et al.

[11] Patent Number: 5,778,234

[45] Date of Patent: Jul. 7, 1998

[54] **METHOD FOR DOWNLOADING PROGRAMS**

[75] Inventors: **Gideon Hecht**, Seminole; **Kurt Ervin Holmquist**, Largo; **Donald C. Snoll**, Clearwater, all of Fla.

[73] Assignee: **Paradyne Corporation**, Largo, Fla.

[21] Appl. No.: **899,834**

[22] Filed: **Jul. 24, 1997**

### Related U.S. Application Data

[62] Division of Ser. No. 880,257, May 8, 1992.

[51] Int. Cl.$^6$ .................................................. G06F 9/44
[52] U.S. Cl. .................................... 395/712; 395/652
[58] Field of Search .............................. 395/712, 651, 395/652

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,430,704 | 2/1984 | Page et al. | 364/200 |
| 4,459,662 | 7/1984 | Skelton et al. | 364/200 |
| 4,626,986 | 12/1986 | Mori | 364/200 |
| 4,663,707 | 5/1987 | Dawson | 364/200 |
| 4,720,812 | 1/1988 | Kao et al. | 364/900 |
| 4,724,521 | 2/1988 | Carron et al. | 364/200 |
| 4,954,941 | 9/1990 | Redman | 395/712 |
| 5,053,990 | 10/1991 | Kriefels et al. | 364/900 |
| 5,136,711 | 8/1992 | Hugard et al. | 395/700 |
| 5,210,854 | 5/1993 | Beaverton et al. | 395/500 |
| 5,257,380 | 10/1993 | Lang | 395/700 |

| | | | |
|---|---|---|---|
| 5,280,627 | 1/1994 | Flaherty et al. | 395/700 |
| 5,355,498 | 10/1994 | Provino et al. | 395/700 |
| 5,361,365 | 11/1994 | Hirano et al. | 395/775 |
| 5,367,686 | 11/1994 | Fisher et al. | 395/700 |
| 5,367,688 | 11/1994 | Croll | 395/700 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| A0205692 | 6/1985 | European Pat. Off. | G06F 9/44 |
| 0500973A1 | 2/1991 | European Pat. Off. | G06F 9/445 |
| 0524719A2 | 5/1992 | European Pat. Off. | G06F 9/44 |
| 2227584 | 8/1990 | United Kingdom | G06F 12/12 |

#### OTHER PUBLICATIONS

*Electronic Engineering*, vol. 64, No. 783. "SGS–Thomson Block Erase Flash in 16 Bit RISC Controller", Mar. 1992, Woolrich, London GB, p. 83.

*IBM Technical Disclosure Bulletin*, vol. 34, No. 3, Aug. 1991, Armonk, NY, US pp. 286–289.

Primary Examiner—Emanuel Todd Voeltz
Assistant Examiner—Kakali Chaki
Attorney, Agent, or Firm—Thomas, Kayden, Horstemeyer & Risley LLP

[57] **ABSTRACT**

A modified version of the operating communication program of a stored program controlled apparatus is downloaded by first downloading a segment of the new package of programs which contains the essential portion of the new programs. Control of the apparatus is then transferred to the new program segment. Thereafter, utilizing the downloaded essential portion of the new package of programs, the remainder of the new package of programs is downloaded.

**8 Claims, 1 Drawing Sheet**



FIG. 1



FIG. 2



FIG. 3



5,778,234

## 1

### METHOD FOR DOWNLOADING PROGRAMS

This application is a division of U.S. patent application having Ser. No. 07/880,257 of Hecht.et al., filed May 8,1992.

### BACKGROUND OF THE INVENTION

This invention relates to stored program controlled apparatus and, in particular, to apparatus with a capability for remote updating of its entire set of programs.

Stored program controlled apparatus can conveniently be divided into two types; one where the stored programs are completely unalterable under normal operating circumstances, and the other where the stored programs are alterable, at least at times, during normal operation. In apparatus of the first type, the program is often executed automatically and the user does not even know that the controlled apparatus is "stored program controlled". This is typically the case in equipment that is designed for people who are not knowledgeable in computers and for whom the equipment is just a tool of the trade. "Point of sale" terminals, such as check-out terminals at a supermarket, are a good example. Modems are another example. People who use this equipment desire fail-safe operation and they do not want to be bothered with loading programs, fixing program bugs, installing updated versions of software, etc.

One approach to programming such equipment is to imprint the program into read-only-memory integrated circuits and physically install the circuits into the equipment. The problem with this approach is that updated versions of the program require the creation of new sets of read-only memories and new installations.

When a communication link is present, "downloading" the programs to the equipment from a remote processor, through the communication link, forms another approach for programming the equipment. It has been known in the art for some time that it is feasible to download limited types of control information from a remote processor. It is also known to download entire machine language application programs. Often such equipment does not include writable non-volatile store, such as a hard disk, so the programs are stored in battery protected read/write memories.

This is an unattractive solution because it leaves a substantial portion of program memory to be at risk. To mitigate this problem, U.S. Pat. No. 4,724,521, suggests storing within read-only memories of the local equipment a number of general purpose routines which comprise instructions to be executed by the central processing unit to accomplish a particular program task. These, in effect, form a set of macro-instructions. The downloaded machine language program utilizes these macro-instructions to the extent possible, and thereby achieves flexibility without the need to download substantial amounts of program code.

In all of the known approaches, however, there is a program portion in the local equipment that is resident in a read-only memory, and its contents is not changed. That resident portion contains "boot-up" segments and program segments that are necessary to maintain the communication between the remote processor and the local equipment (so that the process of downloading the programs can continue). This set of programs is the "essential programs" (EP) set. This set of programs should, of course, be a non-volatile store because there is always a possibility of power loss.

The fact that the EP set is needed to maintain communications presents a problem when the EP set itself needs to be

## 2

modified or updated. Indeed, that is often the case with modems, where essentially the sole function of the modem software is to support communication.

### SUMMARY OF THE INVENTION

The problem of downloading a modified version of the operating communication program, and the problem of effectively updating the entire set of programs in a stored program controlled apparatus, such as a modem, is solved with a downloadable start address specification means and, optionally, with an EEPROM memory. The start address specification means stores information that is downloaded through the communication link, and that information is used in defining the address from where the communication link programs are initiated.

In accordance with the method of this invention, downloading comprises what may be considered two communication segments. In the first segment the essential portion of the new package (EP set) of programs is downloaded to some chosen location in the local apparatus and the downloadable start address specification means is loaded with the appropriate new start address. Utilizing the most recently downloaded EP set of the new communication package, the second segment downloads the remainder of the new package.

### BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 presents a block diagram of an arrangement for carrying out this invention;

FIG. 2 is a flow diagram of a downloading process in accordance with this invention; and

FIG. 3 is a flow diagram of an augmented downloading process in accordance with this invention.

### DETAILED DESCRIPTION

A modem's primary function is to enable communications between a customer's digital equipment and a remote apparatus over a transmission medium. In a modem with a stored programmed controlled architecture this communication is effected with a set of programs, which includes call establishment programs, link layer protocols with flow control and error recovery functions, and programs that handle and store the communicated data, as well as the modulation and demodulation programs used by the modem. These programs occupy a significant portion of the modem's program memory. In accordance with this invention, all programs—including the EP set of programs that carry out the elemental communications—are downloadable. That is, the apparatus employing the principles of this invention does not need to have a non-volatile "boot-up" read-only-memory. All programs (including the boot-up programs) can be stored in a single memory arrangement which, for some applications, can consist of just two memory devices.

FIG. 1 depicts one structure that, in conformance with the principles of this invention, enables the downloading of programs to the modem's program memory. FIG. 1 includes a processor element 10 with a port for receiving signals from, and sending signals to, line 12. Processor 10 is also responsive to line 11 data from program memory 20, and it supplies address and data to memory 20 via bus 13 and bus 14, respectively. In a conventional processor structure, bus 14 is connected to an address port of memory 20. In FIG. 1, address modifier 30 is interposed between processor 10 and program memory 20, with bus 15 supplying the address information to memory 20. Modifier 30 is responsive to

5,778,234

register 40, which is loaded with bus 13 data when the register is enabled by bus 16. Modifier 30 is a modulo M adder, where M is the size of memory 20. A typical stored program controlled modem also includes a read/write data memory, means for interfacing with the transmission medium, means for interfacing with the local digital equipment, and perhaps other data and control ports. For purposes of this invention, however, these other elements are irrelevant, so they are not included in the drawing.

It should be understood that line 12 in the FIG. 1 architecture effectively offers a "remote execution" capability to processor 10, in that the programs which are executed by processor 10 are affected by data supplied by line 12. For example, data supplied by line 12 can effect branching to programs that are normally dormant. One such normally dormant program is a program that downloads information to the program memory. It should also be understood, and noted, that although this invention is described in connection with modems, its principles are applicable to all stored program apparatus. In particular, the principles of this invention are applicable to all situations where it is desirable to download an entire set of new programs, including the EP set. For example, this invention is useful in PCs, "point of sale" terminals, etc.

The operation of the FIG. 1 apparatus is quite simple. The processes carried out by the FIG. 1 apparatus are effected by executing a sequence of instructions that the processor receives from program memory 20 via bus 11. In turn, processor 10 determines which instructions are delivered to it by controlling the addresses applied to memory 20 (typically by controlling a "program counter" within processor 10, which is not shown in the FIG.). The primary difference between a conventional microprocessor arrangement and the FIG. 1 arrangement is that the addresses supplied on bus 14 are not the actual addresses that are applied to program memory 20, because of the interposed circuit 30. One might call these addresses "virtual addresses", which are translated into the real addresses by the additive constant applied by register 40 to modifier circuit 30.

The exact structure and organization of the programs executed by the FIG. 1 arrangement is not really relevant to this invention, but it is to be understood that a protocol exists for sending information out on line 12 and for receiving information from line 12. This protocol provides a mechanism for intelligent communication with processor 10, which includes, for example, knowing when the received data is commands or data, and whether to store the received data in memory 20 or elsewhere.

The programs that can be executed by the FIG. 1 arrangement reside throughout memory 20, but the set of programs that is essential to the maintenance of communication with line 12 (the EP set) may, advantageously, occupy a contiguous segment of memory 20 addresses in the range 0 to N. Within that range of addresses there is a subroutine for installing a new EP set

In accordance with the principles of this invention, the entire set of programs contained in memory 20 can be over-written with a new set of programs (in a process initiated by the apparatus itself or by the party connected to the apparatus via line 12) by following the procedure outlined in FIG. 2. In step 50 of FIG. 2, a command is received on line 12 to branch to the subroutine in the EP set that installs new EP sets (that command may simply be a data word that is installed in a particular read/write memory location). After supplying the branch instruction, the new EP

set of programs are downloaded via line 12. Optionally, an offset address that is the starting address of the new EP set (the address corresponding to 0 in the existing EP set) is also downloaded. Alternatively, the offset address may be predefined, in which case it does not need to be supplied by line 12. In any event, the offset address is greater than N and less than M−N. It may be noted that N must be less than M/2, because two EP sets must temporarily coexist in memory 20.

After the new EP set is installed in memory locations X through X+N, where X is the offset address (X=M/2, for example), memory locations that serve as software-defined registers in the new EP set are populated with data that is found in the corresponding software-defined addresses in the active EP set. Thereafter, according to step 51, register 40 is loaded with the offset address.

The immediate effect of loading the offset address into register 40 is to transfer control to the newly installed EP set. That means that the program in the new EP set to which control is transferred, must be at a predetermined logic point so that the communication can continue seamlessly. This minor requirement can be easily accommodated by proper planning of the new EP set. Once operation proceeds under control of the new EP set of programs, according to FIG. 2, step 52 conditions processor 10 to account for the offset present in register 40 and loads the remainder of programs destined for memory 20 in addresses higher than X+N (modulo M).

It is obviously important to protect the offset address loaded into memory 20 from loss. At the very least, that means that memory 20 must be non-volatile. Memory 20 must also be relatively fast because it directly affects the processing speed that can be attained with the FIG. 1 arrangement. Currently, we use an electrically bulk erasable, programmable, read-only memory (FLASH EEPROM) to form memory 20. This memory must be erased in bulk before new information can be written in it. To install a new EP in such a memory, it is recalled that the EP set must occupy less than half of memory 20, and that makes it convenient to construct memory 20 from at least two distinct chips (distinct in the sense of being able to erase one and not the other). Each segment of the downloading process begins with a bulk erasure of one of the memory 20 halves.

To summarize the downloading process of this invention.

1. Bulk erase the that half of memory 20 which does NOT contain the EP set of programs;

2. download a new EP set of programs to the erased half of memory 20;

3. download the offset address to pass control to the new EP set of programs;

4. bulk erase the other half of memory 20;

5. download the remainder of programs into memory 20.

If register 40 is to contain the offset address for a substantial time after downloading is accomplished, then its contents must be protected in a manner set unlike that of memory 20. Of course, register 40 can manufactured together with memory 20 and be an EEPROM. However, that is not absolutely necessary, and manufacturing costs could benefit if register 40 were constructed as part of the read/write memory or as part of processor 10.

Register 40 may be a volatile memory if the downloading process is carried out as depicted in FIG. 3. Specifically, by including a copy subroutine in the EP set of programs, the downloading process can be modified to the following (assuming the EP set is in the first half of memory 20):

1. Bulk erase the second half of memory 20;

5,778,234

2. download a new EP set of programs to the second half of memory 20;

4. download the offset address to pass control to the new EP set of programs;

5. bulk erase the first half of memory 20;

6. copy the contents of the second half of memory 20 into the first half of memory 20;

7. reset the offset address to 0; and

8. download the remainder of programs into memory 20. Admittedly, during the copy sequence (which may also be a "move" sequence) the arrangement is vulnerable to power failures. Since the time of copying or moving is very small, this is a very unlikely event. Still, to protect against this unlikely event, the power source can be designed to have sufficient reserve to complete the copy operation, or to protect the starting address. A capacitor at the output of the power supply may supply the necessary power reserve.

In the arrangement described above where memory 20 consists of two FLASH EEPROM chips, register 40 needs to have only one bit of memory, and modifier circuit 30 can be merely an Exclusive OR gate which, with the aid of the one bit memory of register 40, selects the bank of memory that is active.

We claim:

1. A method for installing a new set of communication programs $P_{new}$ into a stored program controlled apparatus that includes a communication port and a memory by transmitting said set of programs $P_{new}$ to said apparatus via said port, with the aid of a set of communications programs $P_{old}$ already resident in said memory, where said set of programs $P_{old}$ contains a subset of programs $EP_{old}$ that occupy less than half of the memory and said set of programs $P_{new}$ also contains a subset of programs $EP_{new}$ that, when installed, occupy less than half of the memory, comprising the steps of:

installing the $EP_{new}$ programs in a first area of said memory that contains programs other than the $EP_{old}$ programs, thereby overwriting at least a portion of one program in said $P_{old}$ set of programs;

altering operation of said apparatus to execute the $EP_{new}$ programs instead of the $EP_{old}$ programs; and

installing the remaining programs of said $P_{new}$ set of programs in a second area of said memory, said second area constituting memory locations not occupied by the $EP_{new}$ programs.

2. The method of claim 1 further comprising

a step of moving, interposed between said step of altering operation of the apparatus and said step of installing the remaining programs, that installs said $EP_{new}$ programs into memory locations starting at a location that corresponds to a starting location of the $EP_{old}$ programs, and

a second step of altering operation of said apparatus to execute the $EP_{new}$ programs in the installed locations by said step of moving.

wherein said installing the remaining programs of said $P_{new}$ set of programs stores the programs in memory locations not occupied with the $EP_{new}$ programs installed by said step of moving.

3. The method of claim 1, further comprising the steps of:

erasing said first area of said memory, said erasing step to be performed prior to said step of installing the $EP_{new}$ programs into said first area of said memory; and

erasing said second area of said memory, said erasing step to be performed after said step of altering operation of the apparatus and prior to said step of installing the remaining programs of said $P_{new}$ set of programs.

4. The method of claim 1, wherein said step of altering operation of said apparatus to execute said $EP_{new}$ programs is accomplished by installing an offset address to pass control of said apparatus to said $EP_{new}$ programs.

5. A method for installing a new set of communication programs $P_{new}$ into a stored program controlled apparatus that includes a communication port and a memory by transmitting said set of programs $P_{new}$ to said apparatus via said port, with the aid of a set of communications programs $P_{old}$ already resident in said memory, where said set of programs $P_{old}$ contains a subset of programs $EP_{old}$ that occupy less than half of the memory and said set of programs $P_{new}$ also contains a subset of programs $EP_{new}$ that, when installed, occupy less than half of the memory, comprising the steps of:

installing the $EP_{new}$ programs in a first area of said memory that contains programs other than the $EP_{old}$ programs, thereby overwriting at least a portion of one program in said $P_{old}$ set of programs;

altering operation of said apparatus to execute the $EP_{new}$ programs instead of the $EP_{old}$ programs;

moving the $EP_{new}$ programs from said first area of memory to a second area of said memory; and

installing the remaining programs of said $P_{new}$ set of programs in said first area of memory.

6. The method of claim 5, further comprising the step of:

erasing said first area of said memory, said erasing step to be performed prior to said step of installing the $EP_{new}$ programs into said first area of said memory.

7. The method of claim 5, wherein said moving step further comprises the steps of:

copying the $EP_{new}$ programs from said first area of memory to said second area of memory; and

erasing said first area of memory.

8. The method of claim 5, wherein said step of altering operation of said apparatus to execute said $EP_{new}$ programs is accomplished by installing an offset address to pass control of said apparatus to said $EP_{new}$ programs.

* * * * *

## UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    : 5,778,234
DATED         : July 7, 1998
INVENTOR(S)   : Hecht, *et al.*

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In column 4, line 45, delete "that".

In column 5, line 48, insert ":" after "comprising".

In column 6, line 1, insert "step of" after the first appearance of "said" and before "installing".

Signed and Sealed this

Seventeenth Day of November, 1998

*Attest:*

*Bruce Lehman*

BRUCE LEHMAN

*Attesting Officer*            *Commissioner of Patents and Trademarks*

# Exhibit C



US006131159A

# United States Patent [19]

## Hecht et al.

[11] **Patent Number:** **6,131,159**

[45] **Date of Patent:** **Oct. 10, 2000**

[54] **SYSTEM FOR DOWNLOADING PROGRAMS**

[75] Inventors: **Gideon Hecht**, Seminole; **Kurt Ervin Holmquist**, Largo; **Donald C. Snoll**, Clearwater, all of Fla.

[73] Assignee: **Paradyne Corporation**, Largo, Fla.

[21] Appl. No.: **07/880,257**

[22] Filed: **May 8, 1992**

[51] Int. Cl.[7] ..................................... G06F 9/445
[52] U.S. Cl. ......................... 713/1; 713/100; 711/1
[58] Field of Search ......................... 395/700, 651,
395/652, 653, 712; 364/DIG. 1, DIG. 2;
713/1, 2, 100; 711/114, 1, 145, 202–206;
710/23, 104

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,430,704 | 2/1984 | Page et al. ..................... 395/700 |
| 4,459,662 | 7/1984 | Skelton et al. ................. 364/200 |
| 4,626,986 | 12/1986 | Mori ........................... 395/700 |
| 4,654,783 | 3/1987 | Veres et al. ................... 713/2 |
| 4,663,707 | 5/1987 | Dawson . |
| 4,720,812 | 1/1988 | Kao et al. ..................... 364/900 |
| 4,724,521 | 2/1988 | Carron et al. .................. 395/700 |
| 5,053,990 | 10/1991 | Kreifels et al. ................ 364/900 |
| 5,126,808 | 6/1992 | Montalvo et al. ............... 357/23.5 |
| 5,136,711 | 8/1992 | Hugard et al. .................. 395/652 |
| 5,142,623 | 8/1992 | Staab et al. ................... 709/200 |
| 5,210,854 | 5/1993 | Beaverton et al. ............... 395/500 |
| 5,257,380 | 10/1993 | Lang ........................... 395/700 |
| 5,268,928 | 12/1993 | Herh et al. .................... 375/222 |
| 5,280,627 | 1/1994 | Flaherty et al. ................ 395/700 |
| 5,297,258 | 3/1994 | Hale et al. .................... 711/114 |
| 5,321,840 | 6/1994 | Ahlin et al. ................... 395/712 |
| 5,355,498 | 10/1994 | Provino et al. ................. 395/700 |
| 5,361,365 | 11/1994 | Hirano et al. .................. 395/775 |
| 5,367,686 | 11/1994 | Fisher et al. .................. 395/700 |
| 5,367,688 | 11/1994 | Croll .......................... 395/700 |

| | | |
|---|---|---|
| 5,572,572 | 11/1996 | Kawan et al. ................ 379/90.01 |
| 5,579,522 | 11/1996 | Christeson et al. ........... 713/2 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2015305 | 12/1990 | Canada ................... G06F 12/14 |
| 0 205 692 | 6/1985 | European Pat. Off. ........ G06F 9/44 |
| 0 500 973 A1 | 2/1991 | European Pat. Off. ........ G06F 9/445 |
| 0 524 719 A2 | 5/1992 | European Pat. Off. ........ G06F 9/44 |
| 2 227 584 | 8/1990 | United Kingdom ......... G06F 12/12 |

### OTHER PUBLICATIONS

Electronic Engineering, vol. 64, No. 783, "SGS–Thomson Block Erase Flash in 16 Bit RISC Controller", Mar. 1992, Woolrich, London, GB, p. 83.

IBM Technical Disclosure Bulletin, vol. 34, No. 3, Aug. 1991, Armonk, NY, US, pp. 286–289.

*Primary Examiner*—Thomas C. Lee
*Assistant Examiner*—Rijue Mai
*Attorney, Agent, or Firm*—Thomas, Kayden, Horstemeyer & Risley LLP

[57] **ABSTRACT**

A modified version of the operating communication program of a stored program controlled apparatus is installed with the aid of a downloadable program means, optionally realized with an EEPROM memory. The start address specification means stores information that is downloaded through a communication port in the apparatus, and that information is used in defining the address from where the communication programs are initiated. In accordance with the method of this invention, downloading of the entire new set of programs is effected by first downloading a segment of the essential portion of the new package of programs. Control is then transferred to the new segment by downloading appropriate information into the start address specification means. Thereafter, utilizing the downloaded essential portion of the new package of programs, the remainder of the new package is downloaded.

**21 Claims, 1 Drawing Sheet**



*FIG. 1*



*FIG. 2*



*FIG. 3*



6,131,159

## 1
### SYSTEM FOR DOWNLOADING PROGRAMS

### BACKGROUND OF THE INVENTION

This invention relates to stored program controlled apparatus and, in particular, to apparatus with a capability for remote updating of its entire set of programs.

Stored program controlled apparatus can conveniently be divided into two types; one where the stored programs are completely unalterable under normal operating circumstances, and the other where the stored programs are alterable, at least at times, during normal operation. In apparatus of the first type, the program is often executed automatically and the user does not even know that the controlled apparatus is "stored program controlled". This is typically the case in equipment that is designed for people who are not knowledgeable in computers and for whom the equipment is just a tool of the trade. "Point of sale" terminals, such as check-out terminals at a supermarket, are a good example. Modems are another example. People who use this equipment desire fail-safe operation and they do not want to be bothered with loading programs, fixing program bugs, installing updated versions of software, etc.

One approach to programming such equipment is to imprint the program into read-only-memory integrated circuits and physically install the circuits into the equipment. The problem with this approach is that updated versions of the program require the creation of new sets of read-only memories and new installations.

When a communication link is present, "downloading" the programs to the equipment from a remote processor, through the communication link, forms another approach for programming the equipment. It has been known in the art for some time that it is feasible to download limited types of control information from a remote processor. It is also known to download entire machine language application programs. Often such equipment does not include writable non-volatile store, such as a hard disk, so the programs are stored in battery protected read/write memories. This is an unattractive solution because it leaves a substantial portion of program memory to be at risk. To mitigate this problem, U.S. Pat. No. 4,724,521, suggests storing within read-only memories of the local equipment a number of general purpose routines which comprise instructions to be executed by the central processing unit to accomplish a particular program task. These, in effect, form a set of macroinstructions. The downloaded machine language program utilizes these macro-instructions to the extent possible, and thereby achieves flexibility without the need to download substantial amounts of program code.

In all of the known approaches, however, there is a program portion in the local equipment that is resident in a read-only memory, and its contents are not changed. That resident portion contains "boot-up" segments and program segments that are necessary to maintain the communication between the remote processor and the local equipment (so that the process of downloading the programs can continue). This set of programs is the "essential programs" (EP) set. This set of programs should, of course, be a non-volatile store because there is always a possibility of power loss.

The fact that the EP set is needed to maintain communications presents a problem when the EP set itself needs to be modified or updated. Indeed, that is often the case with modems, where essentially the sole function of the modem software is to support communication.

### SUMMARY OF THE INVENTION

The problem of downloading a modified version of the operating communication program, and the problem of

## 2
effectively updating the entire set of programs in a stored program controlled apparatus, such as a modem, is solved with a downloadable start address specification means and, optionally, with an EEPROM memory. The start address specification means stores information that is downloaded through the communication link, and that information is used in defining the address from where the communication link programs are initiated.

In accordance with the method of this invention, downloading comprises what may be considered two communication segments. In the first segment the essential portion of the new package (EP set) of programs is downloaded to some chosen location in the local apparatus and the downloadable start address specification means is loaded with the appropriate new start address. Utilizing the most recently downloaded EP set of the new communication package, the second segment downloads the remainder of the new package.

### BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 presents a block diagram of an arrangement for carrying out this invention;

FIG. 2 is a flow diagram of a downloading process in accordance with this invention; and

FIG. 3 is a flow diagram of an augmented downloading process in accordance with this invention.

### DETAILED DESCRIPTION

A modem's primary function is to enable communications between a customer's digital equipment and a remote apparatus over a transmission medium. In a modem with a stored programmed controlled architecture this communication is effected with a set of programs, which includes call establishment programs, link layer protocols with flow control and error recovery functions, and programs that handle and store the communicated data, as well as the modulation and demodulation programs used by the modem. These programs occupy a significant portion of the modem's program memory. In accordance with this invention, all programs—including the EP set of programs that carry out the elemental communications—are downloadable. That is, the apparatus employing the principles of this invention does not need to have a non-volatile "boot-up" read-only-memory. All programs (including the boot-up programs) can be stored in a single memory arrangement which, for some applications, can consist of just two memory blocks.

FIG. 1 depicts one structure that, in conformance with the principles of this invention, enables the downloading of programs to the modem's program memory. FIG. 1 includes a processor element 10 with a port for receiving signals from, and sending signals to, line 12. Processor 10 is also responsive to line 11 data from program memory 20, and it supplies address and data to memory 20 via bus 13 and bus 14, respectively. In a conventional processor structure, bus 14 is connected to an address port of memory 20. In FIG. 1, address modifier 30 is interposed between processor 10 and program memory 20, with bus 15 supplying the address information to memory 20. Modifier 30 is responsive to register 40, which is loaded with bus 13 data when the register is enabled by bus 16. Modifier 30 is a modulo M adder, where M is the size of memory 20. A typical stored program controlled modem also includes a read/write data memory, means for interfacing with the transmission medium, means for interfacing with the local digital equipment, and perhaps other data and control ports. For purposes of this invention, however, these other elements are irrelevant, so they are not included in the drawing.

3

It should be understood that line 12 in the FIG. 1 architecture effectively offers a "remote execution" capability to processor 10, in that the programs which are executed by processor 10 are affected by data supplied by line 12. For example, data supplied by line 12 can effect branching to programs that are normally dormant. One such normally dormant program is a program that downloads information to the program memory. It should also be understood, and noted, that although this invention is described in connection with modems, its principles are applicable to all stored program apparatus. In particular, the principles of this invention are applicable to all situations where it is desirable to download an entire set of new programs, including the EP set. For example, this invention is useful in PCs, "point of sale" terminals, etc.

The operation of the FIG. 1 apparatus is quite simple. The processes carried out by the FIG. 1 apparatus are effected by executing a sequence of instructions that the processor receives from program memory 20 via bus 11. In turn, processor 10 determines which instructions are delivered to it by controlling the addresses applied to memory 20 (typically by controlling a "program counter" within processor 10, which is not shown in the FIG.). The primary difference between a conventional microprocessor arrangement and the FIG. 1 arrangement is that the addresses supplied on bus 14 are not the actual addresses that are applied to program memory 20, because of the interposed circuit 30. One might call these addresses "virtual addresses", which are translated into the real addresses by the additive constant applied by register 40 to modifier circuit 30.

The exact structure and organization of the programs executed by the FIG. 1 arrangement is not really relevant to this invention, but it is to be understood that a protocol exists for sending information out on line 12 and for receiving information from line 12. This protocol provides a mechanism for intelligent communication with processor 10, which includes, for example, knowing when the received data is commands or data, and whether to store the received data in memory 20 or elsewhere.

The programs that can be executed by the FIG. 1 arrangement reside throughout memory 20, but the set of programs that is essential to the maintenance of communication with line 12 (the EP set) may, advantageously, occupy a contiguous segment of memory 20 addresses in the range 0 to N. Within that range of addresses there is a subroutine for installing a new EP set.

In accordance with the principles of this invention, the entire set of programs contained in memory 20 can be over-written with a new set of programs (in a process initiated by the apparatus itself or by the party connected to the apparatus via line 12) by following the procedure outlined in FIG. 2. In step 50 of FIG. 2, a command is received on line 12 to branch to the subroutine in the EP set that installs new EP sets (that command may simply be a data word that is installed in a particular read/write memory location). After supplying the branch instruction, the new EP set of programs are downloaded via line 12. Optionally, an offset address that is the starting address of the new EP set (the address corresponding to 0 in the existing EP set) is also downloaded. Alternatively, the offset address may be predefined, in which case it does not need to be supplied by line 12. In any event, the offset address is greater than N and less than M–N. It may be noted that N must be less than M/2, because two EP sets must temporarily coexist in memory 20.

After the new EP set is installed in memory locations X through X+N, where X is the offset address (X=M/2, for example), memory locations that serve as software-defined registers in the new EP set are populated with data that is

4

found in the corresponding software-defined addresses in the active EP set. Thereafter, according to step 51, register 40 is loaded with the offset address.

The immediate effect of loading the offset address into register 40 is to transfer control to the newly installed EP set. That means that the program in the new EP set to which control is transferred, must be at a predetermined logic point so that the communication can continue seamlessly. This minor requirement can be easily accommodated by proper planning of the new EP set. Once operation proceeds under control of the new EP set of programs, according to FIG. 2, step 52 conditions processor 10 to account for the offset present in register 40 and loads the remainder of programs destined for memory 20 in addresses higher than X+N (modulo M).

It is obviously important to protect the information loaded into memory 20 from loss. At the very least, that means that memory 20 must be non-volatile. Currently, we use an electrically bulk erasable, programmable, read-only memory (FLASH EEPROM) to form memory 20. This memory must be erased in bulk before new information can be written in it. To install a new EP in such a memory, it is recalled that the EP set must occupy less than half of memory 20, and that makes it convenient to construct memory 20 from at least two distinct erasable memory blocks (distinct in the sense of being able to erase one and not the other). Each segment of the downloading process begins with a bulk erasure of one of the memory 20 halves.

To summarize the downloading process of this invention,

1. Bulk erase the that half of memory 20 which does NOT contain the EP set of programs;
2. download a new EP set of programs to the erased half of memory 20;
3. download the offset address to pass control to the new EP set of programs;
4. bulk erase the other half of memory 20;
5. download the remainder of programs into memory 20.

If register 40 is to contain the offset address for a substantial time after downloading is accomplished, then its contents must be protected in a manner not unlike that of memory 20. Of course, register 40 can manufactured together with memory 20 and be an EEPROM. However, that is not absolutely necessary, and manufacturing costs could benefit if register 40 were constructed as part of the read/write memory or as part of processor 10.

Register 40 may be a volatile memory if the downloading process is carried out as depicted in FIG. 3. Specifically, by including a copy operation in the EP set of programs, the downloading process can be modified to the following (assuming the EP set is in the first half of memory 20):

1. Bulk erase the second half of memory 20;
2. download a new EP set of programs to the second half of memory 20;
3. download the offset address to pass control to the new EP set of programs;
4. bulk erase the first half of memory 20;
5. copy the contents of the second half of memory 20 into the first half of memory 20;
6. reset the offset address to 0; and
7. download the remainder of programs into memory 20.

Admittedly, during the copy sequence (which may also be a "move" sequence) the arrangement is vulnerable to power failures. Since the time of copying or moving is very small, this is a very unlikely event. Still, to protect against this unlikely event, the power source can be designed to have sufficient reserve to complete the copy operation, or to protect the starting address. A capacitor at the output of the power supply may supply the necessary power reserve.

5

In the arrangement described above where memory **20** consists of two FLASH EEPROM chips, register **40** needs to have only one bit of memory, and modifier circuit **30** can be merely an Exclusive OR gate which, with the aid of the one bit memory of register **40**, selects the bank of memory that is active.

What is claimed is:

1. A system comprising:

(a) a processor;

(b) a memory, and a set of programs stored in said memory that are executed when the system needs to be initialized, said memory being of a type which may be completely updated in its entirety but which is not volatile, said memory being the only program memory in said system; and

(c) alterable storage means for holding a displacement multi-bit memory address that is used to point to the starting address accessed by the processor when initializing.

2. The system of claim 1 wherein said memory is an EEPROM memory.

3. The system of claim 1 wherein said memory consists of 2-FLASH EEPROM devices.

4. The system of claim 1 wherein said alterable storage means is an EEPROM memory.

5. The system of claim 1 further comprising translation means interposed between said alterable storage means and said memory, wherein said alterable storage means holds an address that translates between addresses directed to the memory via said translation means and addresses actually applied to the memory by said translation means.

6. A system comprising:

(a) a processor;

(b) a memory coupled to said processor, said memory being the only program memory in the system, said memory being completely updatable in its entirety but non-volatile, there being a set of programs stored in said memory that are executed when the system needs to be initialized; and

(c) alterable memory means for storing a multi-bit memory address that controls the starting address accessed by the processor when initializing.

7. The system of claim 6 further comprising means for receiving a trigger signal at a telecommunications input port of the system to begin execution of said programs.

8. A system comprising:

(a) a processor;

(b) a memory and a communications port coupled to said processor, said communications port being adapted to communicate with devices which are external to said system, said memory being completely updatable in its entirety but non-volatile;

(c) a program module in said memory that, when activated by said processor, effects communication with said port; and

(d) operationally alterable means for setting the starting address of said program, which address is supplied to said system via said communication port.

9. The system of claim 8 wherein:

(a) said memory contains a first set of programs and a second set of programs;

(b) said memory is at least twice the size of the size of the first set of programs; and

6

(c) said operationally alterable means sets the starting position of the program executed by said processor in connection with communication with said port at a second specified location that is M removed from the first location, M being half the size of said memory.

10. A system comprising:

(a) a processor;

(b) a communication port coupled to said processor, said communication port being adapted to communicate with devices which are external to said system;

(c) a memory coupled to said processor, said memory being non-volatile and capable of being completely updated in its entirety, said memory containing programs, including a set of programs that are executed when the system needs to be initialized and a program for controlling communication through said communication port; and

(d) means for activating said program for controlling communication and receiving information through said communication port to modify the programs in said memory, said information including the program for controlling communication through said communication port and a command that is executed by said processor effectively when it is received.

11. The system of claim 10 wherein the communication port is a telecommunication port.

12. The system of claim 10 wherein the communication port is a telecommunication port and the programs execute the functions of a modem.

13. The system of claim 10 where the communication port receives commands to be executed by the processor and data to be stored in the memory.

14. The system of claim 10 wherein said means for receiving includes means for altering the program according to the information obtained by the means for receiving.

15. The system of claim 10 wherein said means for receiving modifies the programs by altering a portion of the memory contents pursuant to data received via said communication port.

16. The system of claim 10 wherein said means for receiving modifies the programs by replacing them with program data received via said communication port.

17. The system of claim 10 where the means for altering alters all of the programs in the system in a single communication session with said communication port.

18. A system comprising:

(a) a processor;

(b) a memory coupled to said processor, said memory being of a type, which is completely updatable in its entirety but non-volatile;

(c) a set of program means stored in said memory that are activated when said system needs to be updated wit a new set of programs, and

(d) alterable storage means for holding an offset memory address that is used to point to a starting address accessed by said processor when initializing.

19. The system of claim 18 wherein said memory is an EEPROM memory.

20. The system of claim 18 wherein said memory consists of 2 FLASH EEPROM devices.

21. The system of claim 18 wherein said alterable storage means is an EEPROM memory.

* * * * *

## UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO. : 6,131,159
DATED : October 10, 2000
INVENTOR(S) : Hecht, et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 4, line 40, insert "be" between "can" and "manufactured".

Column 6, line 49, delete "," after "type".

Column 6, line 52, change "wit" to --with--.

Signed and Sealed this

Twenty-fourth Day of April, 2001

*Attest:*

*Nicholas P. Godici*

NICHOLAS P. GODICI

*Attesting Officer*   *Acting Director of the United States Patent and Trademark Office*

**Exhibit D**

(12) **United States Patent**
Holmquist et al.

(10) Patent No.: **US 6,950,444 B1**
(45) Date of Patent: **Sep. 27, 2005**

US006950444B1

(54) **SYSTEM AND METHOD FOR A ROBUST PREAMBLE AND TRANSMISSION DELIMITING IN A SWITCHED-CARRIER TRANSCEIVER**

(75) Inventors: **Kurt Holmquist**, Largo, FL (US); **Joseph Chapman**, Seminole, FL (US)

(73) Assignee: **Paradyne Corporation**, Largo, FL (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 812 days.

(21) Appl. No.: 09/637,185

(22) Filed: **Aug. 11, 2000**

**Related U.S. Application Data**

(60) Provisional application No. 60/150,436, filed on Aug. 24, 1999.

(51) Int. Cl.[7] .............................................. H04L 12/56
(52) U.S. Cl. ...................................... 370/476; 370/477
(58) Field of Search ........................... 370/476, 471, 370/472, 474, 477, 389

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,278,689 A | * | 1/1994 | Gitlin et al. | ................. 359/137 |
| 5,305,384 A | * | 4/1994 | Ashby et al. | ................. 380/29 |
| 5,535,199 A | * | 7/1996 | Amri et al. | |
| 5,822,373 A | * | 10/1998 | Addy | ................. 375/259 |
| 6,252,865 B1 | | 6/2001 | Walton et al. | ................. 370/335 |
| 6,353,635 B1 | * | 3/2002 | Montague et al. | ..... 375/240.26 |
| 6,651,210 B1 | * | 11/2003 | Trott et al. | ................. 714/758 |

* cited by examiner

*Primary Examiner*—Kenneth Vanderpuye
(74) *Attorney, Agent, or Firm*—Thomas, Kayden, Horstemeyer & Risley LLP

(57) **ABSTRACT**

A method and system for robust delimiting of transmitted messages in switched-carrier operation in which a preamble precedes each communication message with the preamble comprising symbols transmitted at a rate lower than that of the following data. The lower rate symbols of the preamble significantly increase the probability that the decoder will decode the preamble symbols error free. Communication line control information can be included in the robust preamble, thereby ensuring that line control information is reliably transferred over the communication channel. The first symbol of the preamble can be transmitted at the lower symbol rate and at an increased power level, thereby clearly and reliably delimiting the beginning of a transmission. The end of the communication message can be reliably delimited by sending the first symbol containing only bits from a next cell of information at a lower symbol rate and including an extra bit in that symbol. The extra bit can be set to indicate to a receiver whether the last cell of information has just begun.

**55 Claims, 10 Drawing Sheets**





FIG. 1



FIG. 2A

FIG. 2B



**FIG. 3A**



FIG. 3B



**FIG. 4A**

Case 2:07-cv-00404-CMS-E   Document 16-34   Filed 06/29/2007   Page 40 of 56



FIG. 4B



FIG. 5

FIG. 6



FIG. 7



FIG. 8



FIG. 9

US 6,950,444 B1

1

# SYSTEM AND METHOD FOR A ROBUST PREAMBLE AND TRANSMISSION DELIMITING IN A SWITCHED-CARRIER TRANSCEIVER

## CROSS-REFERENCE TO RELATED APPLICATIONS

This document claims priority to, and the benefit of, the filing date of Provisional Application Ser. No. 60/150,436 entitled "A TECHNIQUE FOR ROBUST SIGNAL DELIMITING AND ENCODING OF CRITICAL LINK CONTROL SIGNALS APPLIED TO TRANSMISSION OF ATM CELLS OVER A DSL USING ADAPTIVE TIME DOMAIN DUPLEX (ATDD)," filed on Aug. 24, 1999, which is hereby incorporated by reference.

## TECHNICAL FIELD

The present invention relates generally to communications systems, and more particularly, to a system and method for a robust preamble and transmission delimiting in a switched-carrier transceiver.

## BACKGROUND OF THE INVENTION

Data communication typically occurs as the transfer of information from one communication device to another. This is typically accomplished by the use of a modem located at each communication endpoint. In the past, the term modem denoted a piece of communication apparatus that performed a modulation and demodulation function, hence the term "modem". Today, the term modem is typically used to denote any piece of communication apparatus that enables the transfer of data and voice information from one location to another. For example, modem communication systems use many different technologies to perform the transfer of information from one location to another. Digital subscriber line (DSL) technology is one vehicle for such transfer of information. DSL technology uses the widely available subscriber loop, the copper wire pair that extends from a telephone company central office to a residential location, over which communication services, including the exchange of voice and data, may be provisioned. DSL devices can be referred to as modems, or, more accurately, transceivers, which connect the telephone company central office to the user, or remote location typically, referred to as the customer premises. DSL communication devices utilize different types of modulation schemes and achieve widely varying communication rates. However, even the slowest DSL communications devices achieve data rates far in excess of conventional point-to-point modems.

DSL transceivers can be used to provision a variety of communication services using, for example, asynchronous transfer mode (ATM). ATM defines a communication protocol in which 53 octet (byte) cells are used to carry information over the DSL communication channel. The first five octets of the ATM cell are typically used for overhead and the remaining 48 octets are used to carry payload data. When using a switched-carrier transmission methodology, a control transceiver may be connected via the DSL to one or more remote transceivers. In such a communication scheme, the transmission is commonly referred to as "half-duplex," which is defined as two way electronic communication that takes place in only one direction at a time. With only a single remote transceiver on a line, switched-carrier transmission may instead be employed in full-duplex mode (i.e., allowing transmission in both directions simultaneously). In this case, full-duplex operation is typically enabled by employing

2

either echo cancellation or frequency division multiplexing. Hybrid techniques are possible such as one in which there are multiple remote transceivers and communication takes place between the control transceiver and only one remote transceiver in full-duplex fashion. As it relates to the present invention, the common characteristic of these communication techniques is the use of a switched-carrier modulation in which transmitters are deliberately silent for some interval between signal transmissions. For simplicity, the following discussions assume the simplest case of using switch carrier modulation with a half-duplex (also sometimes referred to as "time domain duplex") line usage discipline.

Before the transmission of ATM cells, a preamble containing channel, transmission, address and administrative information may be transmitted by the transceiver. The application of this preamble is sometimes referred to as "framing" the data to be transmitted. Due to the switched-carrier nature of the transmission, silence precedes this preamble and it is of course important for all symbols in this preamble to be received error free. It is also desirable to have the ability to precisely delimit the beginning and end of a transmission to within one transmitted symbol interval. Robustly delimiting the beginning of a message enables a receiving transceiver to reliably begin immediately decoding the message at the correct symbol. Likewise, robustly delimiting the end of a message enables a receiving transceiver to reliably decode the entire message through the final symbol and then stopping so as to prevent data loss and to prevent the inclusion of any false data. Furthermore, by communicating the end of message indicator to a receiving transceiver prior to the actual end of the message, line turnaround time (i.e., idle time on the line between transmissions) can be reduced, thereby increasing the effective use of the available line bandwidth.

Because the most efficient signal constellation encoding cannot allocate signal space to silence, it is impractical to reliably discriminate silence from a signal when analyzing only a single symbol encoding an arbitrary data value.

To improve message delimiting, existing techniques use special marker symbols whose symbol indices are greater than those used to encode data. At N bits per symbol (bps) data is encoded using symbol indices 0 through $2^N-1$. The special symbols use indices $2^N$ and above. While these special marker symbols are useful for marking the beginning and end of a transmission, their placement at the outer edges of a constellation raises the peak signal, thus increasing the peak to average ratio (PAR) across all data rates by as much as 4 dB. Unfortunately, discrimination of special symbols has the same error threshold as does decoding of data.

Thus, it would be desirable to have a robust manner in which to detect the beginning and end of a transmission so that line bandwidth can be most efficiently allocated. Furthermore, it would be desirable to robustly transmit a message preamble including control information thereby greatly improving the probability that the preamble is received error free.

## SUMMARY OF THE INVENTION

The present invention provides an improved system and method for robustly delimiting a message transmission in switched-carrier communication systems. The invention provides a method and system for transmission of a message preamble in which transmission of the preamble is more robust than the data. In this manner, the beginning and end of a transmission can be robustly delimited and channel control information can be reliably conveyed to a receiving transceiver.

US 6,950,444 B1

| 3 | 4 |

The system of the present invention uses a novel header application, which enables the transport of ATM, or any other data, efficiently and economically over a communications channel, such as a DSL communications channel.

Briefly described, in architecture, the system for robust transmission delimiting comprises a communication message including a preamble including a plurality of bits representing communication link control information, and an encoder configured to encode the preamble bits into a plurality of symbol indices. The symbol indices are encoded at a lower bit per symbol rate relative to the maximum rate capable of being supported over a communication channel.

In another aspect, the invention is a system for delimiting the end of a transmission. The system takes a communication message segmented into a plurality of fixed size units, each fixed size unit including a plurality of bits, and includes an encoder configured to encode the plurality of bits into a plurality of symbol indices at a first data rate. The encoder is also configured to encode the first symbol index containing only bits from each fixed size unit at a data rate lower than that of the first data rate.

The present invention can also be viewed as a method for robust transmission delimiting comprising the steps of applying a preamble to a communication message, the preamble including a plurality of bits representing communication link control information, and encoding the preamble bits into a plurality of symbol indices. The symbol indices are encoded at a lower bit per symbol rate relative to the maximum rate capable of being transmitted over a communication channel.

In another aspect, the invention is a method for delimiting the end of a transmission comprising the steps of segmenting a communication message into a plurality of fixed size units, each unit including a plurality of bits, encoding a plurality of the bits in the cells into a plurality of symbol indices, the symbol indices being encoded at a first rate, and encoding the first symbol index containing only bits from each fixed size unit at a rate lower than that of the first rate.

## BRIEF DESCRIPTION OF THE DRAWINGS

The invention can be better understood with reference to the following drawings. The components in the drawings are not necessarily to scale, emphasis instead being placed upon clearly illustrating the principles of the present invention. Moreover, in the drawings, like reference numerals designate corresponding parts throughout the several views.

FIG. 1 is a schematic view illustrating a switched-carrier half-duplex communication environment, in which DSL transceivers containing the present invention reside;

FIB 2A is an illustration of the time-domain duplex communication methodology employed by the DSL transceivers of FIG. 1;

FIG. 2B is a schematic view illustrating, in further detail, a communication message of FIG. 2A;

FIG. 3A is a schematic view illustrating the bit to symbol relationship of the communication message of FIG. 2B;

FIG. 3B is a schematic view illustrating, in further detail, the preamble of FIG. 3A;

FIG. 4A is a graphical illustration representing a two (2) bit per symbol signal space constellation and the increased energy symbol of FIG. 3B;

FIG. 4B is a graphical illustration showing an exemplar grouping of constellation points representing different bit per symbol rates in accordance with an aspect of the invention;

FIG. 5 is a schematic view illustrating the communication message of FIG. 3A, and a technique for scrambling that further improves reliable transmission of the message preamble;

FIG. 6 is a schematic view illustrating the communication message of FIG. 3A and the reduced line turn around delay made possible by an aspect of the invention;

FIG. 7 is a block diagram illustrating the control DSL transceiver of FIG. 1;

FIG. 8 is a block diagram illustrating the encoder of FIG. 7; and

FIG. 9 is a block diagram illustrating the decoder of FIG. 7.

## DETAILED DESCRIPTION OF THE INVENTION

Although, described with particular reference to the transmission of ATM cells over a DSL communication channel, the system and method for a robust preamble and transmission delimiting can be implemented to transmit all forms of data in any switched-carrier transmission system in which it is desirable to send a robust preamble and to robustly delimit the beginning and end of each communication message.

Furthermore, the system and method for a robust preamble and transmission delimiting can be implemented in software, hardware, or a combination thereof. In a preferred embodiment(s), selected portions of the system and method for a robust preamble and transmission delimiting are implemented in hardware and software. The hardware portion of the invention can be implemented using specialized hardware logic. The software portion can be stored in a memory and be executed by a suitable instruction execution system (microprocessor). The hardware implementation of the system and method for a robust preamble and transmission delimiting can include any or a combination of the following technologies, which are all well known in the art: an discrete logic circuit(s) having logic gates for implementing logic functions upon data signals, an application specific integrated circuit having appropriate logic gates, a programmable gate array(s) (PGA), a field programmable gate array (FPGA), etc

Furthermore, the robust preamble and transmission delimiting software, which comprises an ordered listing of executable instructions for implementing logical functions, can be embodied in any computer-readable medium. Moreover, use by or in connection with an instruction execution system, apparatus, or device, such as a computer-based system, processor-containing system, or other system that can fetch the instructions from the instruction execution system, apparatus, or device and execute the instructions.

In the context of this document, a "computer-readable medium" can be any means that can contain, store, communicate, propagate, or transport the program for use by or in connection with the instruction execution system, apparatus, or device. The computer readable medium can be, for example but not limited to, an electronic, magnetic, optical, electromagnetic, infrared, or semiconductor system, apparatus, device, or propagation medium. More specific examples (a non-exhaustive list) of the computer-readable medium would include the following: a electrical connection (electronic) having one or more wires, a portable computer diskette (magnetic), a random access memory (RAM), a read-only memory (ROM), an erasable programmable read-only memory (EPROM or Flash memory) (magnetic), an optical fiber (optical), and a portable compact disc read-only memory (CDROM) (optical). Note that the computer-

5

readable medium could even be paper or another suitable medium upon which the program is printed. As the program can be electronically captured, via for instance optical scanning of the paper or other medium, then compiled, interpreted or otherwise processed in a suitable manner if necessary, and then stored in a computer memory.

Turning now to the drawings, FIG. 1 is a schematic view illustrating a switched-carrier half-duplex communication environment 1, in which DSL transceivers containing the present invention reside. Although the invention will be described below in a half-duplex communication environment, the DSL transceivers containing the invention may be used in a switched-carrier full-duplex environment as well. In such a case, full-duplex operation may be enabled using technologies such as echo cancellation or frequency division multiplexing. Communication environment 11, includes central office 12 connected via communication channel 16 to customer premises 21. Communication channel 16 can be any physical medium over which communications signals can be exchanged, and in the preferred embodiment, is the copper wire pair that extends from a telephone company central office to an end-user location, such as a home or office. Central office 12 includes DSL transceiver 100 connected to communication channel 16. DSL transceiver 100 processes data via connection 14. DSL transceiver 100 exchanges data via connection 14 with any data terminal equipment (DTE), such as a computer or data terminal.

Customer premises 21 includes one or more DSL transceivers 150 connected via internal infrastructure wiring 18 to communication channel 16. The infrastructure wiring 18 can be, for example but not limited to, the telephone wiring within a private residence or within an office. DSL transceivers 150 can be connected to a variety of telecommunication devices located at customer premises 21. For example, DSL transceiver 150 connects via connection 22 to a personal computer 26. Although additional DSL transceivers can be located at customer premises 21, an exemplar one of which is indicated using reference numeral 155, the aspects of the invention to be discussed below are also applicable if only one DSL transceiver 150 is located at customer premises 21. In the example given in FIG. 1, DSL transceiver 155 connects to computer 28 via connection 29.

The DSL transceiver 100 located at central office 12 is considered a "control device" and the DSL transceiver 150 located at customer premises 21 is considered a "remote device." This is so because the control DSL transceiver 100 controls the communication sessions by periodically polling each remote DSL transceiver 150 to determine whether the remote device has information to transmit. Regardless of the number of DSL transceivers located at customer premises 21, the method of communication between DSL transceiver 100 located at central office 12 and DSL transceiver 150 located at customer premises 21 is half-duplex in nature, sometimes referred to as adaptive time-domain duplex, or data driven half-duplex, unless the above-mentioned technologies such as echo cancellation or frequency division multiplexing allow full-duplex operation between the control transceiver 100 and one remote transceiver 150. This means that during any time period only one DSL transceiver may transmit at any time. In the situation in which there are multiple DSL transceivers located at customer premises 21, the DSL transceiver 100 located at central office 12 periodically polls each DSL transceiver located at customer premises 21 at an appropriate time to determine whether any of the remotely located DSL transceivers have any information to transmit to central office 12. If only one DSL

6

transceiver 150 is located at customer premises 21, the communication method may be half-duplex in nature or conventional full-duplex techniques may be used (e.g., using either frequency division multiplexing or echo cancellation).

FIG. 2A is a schematic view illustrating the time-domain duplex communication methodology between a control DSL transceiver 100 and a remote DSL transceiver 150. When a control DSL transceiver 100 desires to send a message to a remote DSL transceiver 150 the control DSL transceiver 100 sends a communication message 31 including a preamble and any information that is to be transmitted. There are times when the communication message may include only a preamble. After the transmission of communication message 31, the remote DSL transceiver to which communication message 31 is addressed (in this example remote DSL transceiver 150) responds with communication message 32. After the remote DSL transceiver 150 completes the transmission of communication message 32, the control DSL transceiver 100 is now free to send another communication message 34 to either the same remote DSL transceiver 150 or, if present, a different remote DSL transceiver, such as DSL transceiver 155 (remote "n") of FIG. 1. As illustrated in FIG. 2A, remote DSL transceiver "n" responds with communication message 36. In this manner, the communication methodology between control DSL transceiver 100 and all remote DSL transceivers 150, 155 . . . n, is switched-carrier and time-domain duplexed.

FIG. 2B is a schematic view illustrating, in further detail, the communication message 31 of FIG. 2A. Communication message 31 begins with preamble 40 followed by optional administrative header 42. In accordance with an aspect of the invention, all communication messages, regardless of the content, begin with preamble 40. Administrative header 42 is optional and can be used to send information that is neither part of the preamble 40 or of any data to follow. For example, the administrative header 42 could convey a description of noise level conditions at one end so the other end may opt to increase or reduce the power level of its transmission as necessary. Likewise, the administrative header 42 sent by a remote transceiver could contain information regarding the amount of payload information that the remote transceiver is ready to transmit and its relative priorities so that the control transceiver could alter the amount of time that this remote transceiver is given to transmit its data (relative to any other transceivers connected to the line). When the payload data comprises ATM cells, the control transceiver could use messages conveyed by the administrative header 42 to direct remote devices to activate or deactivate various ATM virtual circuits.

If data is included in communication message 31, one or more ATM cells follow the optional administrative header 42. Although illustrated using three ATM cells, 44, 45 and 46, there are situations in which no ATM cells, or for that matter, no information of any kind, follows preamble 40. In the case in which information does follow preamble 40, and for purposes of illustration only, ATM cells 44, 45 and 46 are each standard 53 octet ATM cells. For example, ATM cell 44 includes 5 octet ATM header 47 and 48 octets of ATM data 48. ATM cells 45 and 46 are identical in structure to ATM cell 44. ATM cells 44, 45 and 46 adhere to the conventional ATM cell structure as defined in standardized ATM literature. It should be noted that optional administrative header 42 does not follow the standard ATM cell format and that administrative header 42 can be any number of octets in length. As known to those having ordinary skill in the art, an octet comprises 8 bits of information. Although described with particular reference to the transportation of ATM cells

7

over a DSL communication channel, the principles of the invention are applicable to all fixed length communication messages.

FIG. 3A is a schematic view illustrating the bit to symbol relationship of the communication message 31 of FIG. 2B. In accordance with an aspect of the invention, preamble 40 is placed at the beginning of every transmission (i.e., each communication message 31). Preamble 40 is followed by optional administrative header 42, which is then followed, if there is data to transmit, by one or more 53 octet ATM cell 44 and 45. Although illustrated using only two ATM cells, any number of ATM cells may follow preamble 40 and, if included, optional administrative header 42. The ATM cells are a stream of data information represented as a series of bits that are placed into each ATM cell.

The preamble 40 is also a series of bits, which are encoded into a number of communication symbols. Symbols are the representation of the bits to be transmitted, and are represented as signal points in a signal space constellation (to be described below with respect to FIGS. 4A and 4B). In accordance with one aspect of the invention, each of the bits in preamble 40 are encoded into symbols, an exemplar one of which is illustrated using reference numeral 55, at the lowest available bit rate that can be transmitted over the communication channel 16. For purposes of illustration only, the symbols that encode the bits in the preamble 40 shown in FIG. 3A are encoded at a rate of two (2) bits per symbol. However, any number of bits per symbol lower than that of the normally transmitted data rate can be used so long as the symbol rate allows a receiving device to more reliably decode those symbols. For example, if the normal data rate is five (5) bits per symbol, then a symbol rate of two (2) bits per symbol has a significantly (approximately 9 dB) higher noise margin than the five (5) bit per symbol data rate, thereby allowing the symbols that are encoded at the lower rate of two (2) bits per symbol to be very robustly and reliably decoded by a receiving device. In this manner, the preamble 40, which is sent at the beginning of every communication message 31, can be made sufficiently robust so that the chance that it will always be received error free is greatly increased. Although very robust, there are still situations in which the symbols into which the preamble bits are encoded can be corrupted. However, in accordance with another aspect of the invention, because the preamble 40 is sent at the beginning of every communication message 31, even if the preamble 40 is corrupted, only data following that preamble may be affected, i.e., lost due to corruption, if certain bits of the preamble are corrupted.

In accordance with another aspect of the invention, the first symbol 55 representing the first bits in the preamble 40 can be sent using an increased power level, thereby clearly and robustly delimiting the beginning of the communication message 31. The effect of this increased power level symbol 55 will be explained in greater detail below with respect to FIGS. 4A and 4B.

Still referring to FIG. 3A, if an administrative header 42 is present in communication message 31, then the bits that are contained in administrative header 42 will be encoded at a symbol rate of "N" bits per symbol, where N is the normal data rate. The normal data rate can be any data rate, for example, but not limited to, a value between 2 and 12 (inclusive) bits per symbol. For purposes of illustration, and for simplicity of explanation, the normal symbol rate can be five bits per symbol. This is represented by the group of symbols 56 into which all the bits of administrative header 42 and a portion of the bits of header 47 of ATM cell 44 are encoded.

8

In accordance with another aspect of the invention, the first symbol used to encode bits from a particular cell that contains bits only from that cell will be encoded at a data rate lower than that of the standard data rate used for all other bits of each cell. For example, symbol 57 is the first symbol that contains bits only from ATM cell 44. The last symbol 65 of symbol group 56 contains bits from both administrative header 42 and ATM cell 44. Likewise, symbol 60 is the first symbol containing only bits from ATM cell 45. In accordance with this aspect of the invention, the symbols 57 and 60 will be encoded at a data rate that is two (2) bits per symbol lower than that of the preceding symbol (represented by N−2 where N is the number of bits per symbol used for encoding all other bits of the administrative header and ATM cells.) In this manner, because of the fixed length 53 octet ATM cells, by simple bit counting, the receiver will always know the first symbol encoding bits from a cell that contains only bits from this cell, and therefore has the special encoding described herein. These N−2 bits of the cell data are grouped for transmission and an additional bit (bit 54 for cell 44 or bit 61 for cell 45) is added for a total of N−1 bits encoded into symbol 57 or 60, respectively. This group of N−1 bits, represented by symbol 57 or 60, is encoded into a symbol and scaled for transmission with the scaling normally applied when encoding at N−1 bits per symbol. The extra bit 54 or 61 indicates whether or not the cell just started (ATM cell 44 or 45, respectively) is the last cell of the transmission. The extra bit 61 in symbol 60 is set to logic one to indicate that ATM cell 45 is the last cell of the transmission so that the receiver will know at the beginning of the receipt of ATM cell 45 that ATM cell 45 is the last cell in the transmission. For the same reason, bit 54 in symbol 57 set to zero so that the receiver will know that at least one more cell follows cell 44.

If N=2, then no bits are taken from the cell to encode the next symbol (since N−2=0). Since N−1=1, the next symbol contains just one bit, which is the last cell indicator. This effectively inserts an entire extra symbol in each cell. Nevertheless, the same encoding/decoding logic for this special symbol applies for any value of N≧2.

Once the receiver knows that a particular cell is the last cell in the message, by simple counting it can readily identify the symbol that contains the last bits of the last cell. This is represented in FIG. 3A as symbol 51 or optionally symbol 53. Since the number of bits remaining to be transmitted in the last symbol (M) can be less than N, a modified encoding technique is preferable for this symbol. One option is to add one or more padding bits (P) 52 so that M+P=N. Another option is to encode the last group of bits at M bits per symbol as represented by symbol 53. This has the advantage of increased robustness for the transmission of these bits.

For simplicity, the following discussion does not address this second technique. Having recognized the last symbol of the transmission, the receiver does not attempt to demodulate and decode the signal on the line following this symbol since the transmitting station must now be sending silence.

It should be noted that although described as being encoded at N−1 bits per symbol, the symbols 57 and 60 containing the additional last cell indicator bit can be encoded at any symbol rate lower than that of the standard transmission rate (N bits per symbol). For example, if N is five (5), the specially encoded symbols could also be encoded at N−2 or three (3) bits per symbol so that they contain two (2) bits of cell data plus the last cell indicator bit. In this manner, the receiver can clearly and reliably decode the symbol 60, thereby providing a robust and reliable end of message delimiter.

9

In accordance with this aspect of the invention, and to be described in further detail with respect to FIG. 3B, it is also desirable to have the ability to indicate that a message contains only an administrative header 42. In order to accomplish this, the first symbol containing data from the administrative header 42 can also be encoded using the higher noise margin N-1 bit per symbol encoding technique described above. For example, the first N-2 bits of the administrative header 42 can be combined with a last cell bit (such as bit 61 of symbol 60) and be encoded at the N-1 bit per symbol rate. This can provide the extra bit to indicate whether or not one or more ATM cells follow administrative header 42. An alternative technique is to simply include a bit in the preamble 40 that indicates whether an administrative header 40 follows the preamble 42. For simplicity, it has been assumed that this alternative technique is used with respect to FIG. 3A and in the following discussion.

Because each ATM cell is the smallest unit of a payload of ATM cells, and because all ATM cells have the same length, the first symbol of each cell that carries only bits of that cell can readily be identified. Because these bits are transmitted using the specially encoded symbol carrying two fewer bits than normal (as described above), the length of each cell is effectively increased by two bits. In some cases this can result in one extra symbol being needed to transmit the cell. In other cases an additional cell is not needed because the spare bits are available anyway (and would have ended up as the padding bits (P) 52 in FIG. 3A). Because the cells may be transmitted contiguously as a bit stream, the addition of one extra symbol may provide sufficient extra bits to cover the opening symbol of multiple following cells. For example, at eight (8) bits per symbol, in one (1) extra symbol is needed to cover the end of frame signaling overhead to transmit up to four (4) cells.

FIG. 3B is a schematic view illustrating, in further detail, the exemplar preamble 40 of FIG. 3A. The bit stream of preamble 40 comprises four (4) bits 62 that include information regarding the transmit rate (in bits per symbol) used to encode data following preamble 40 (the data comprising the optional administrative header and optional ATM cells), four (4) bits 63 include information regarding the rate (also in bits per symbol) that the receiver is capable of receiving, two (2) bits 64 that identify the address of a remote DSL transceiver if the control DSL transceiver is transmitting (if a remote DSL transceiver is transmitting, then these two (2) bits 64 can represent the address of that remote DSL transceiver) and two (2) bits 66, which can be used to communicate the format of the message to follow. For example, the two (2) bits 66 can be used to advise a receiving device whether an administrative header 42 follows the preamble 40, whether ATM cells follow the preamble, whether both follow or whether only the preamble is being transmitted. The four (4) bits provided by symbols 55 and 67 and by symbols 68 and 69 can each encode as many as sixteen data encoding rates.

As mentioned above, the preamble 40 is sent at the beginning of each transmission. The twelve (12) bits that comprise the preamble 40 are encoded into symbols 55, 67, 68, 69, 70 and 71 in accordance with that described above. In accordance with an aspect of the invention, all of the symbols in preamble, 40 are encoded at a low bit per symbol rate. In this example, all of the symbols are encoded at a rate of two (2) bits per symbol, however, any other low bit per symbol rate can be used with similar results. The low bit per symbol rate ensures a high signal-to-noise ratio for these symbols, thereby significantly decreasing the probability that these preamble symbols will be corrupted by noise on

10

the communication channel. The payload data (administrative header and ATM cells) would typically be encoded at N bits per symbol only if transmission at this N bit per symbol rate has an acceptably low rate of errors (based on line length, signal strength, noise, distortion and other impairments that may be present). Otherwise, data transmission efficiency would suffer. Therefore, encoding the preamble at less than N bits per symbol allows a corresponding improvement in the reliability of transmitting this information such that it is highly unlikely to be corrupted. Since very few bits are needed to convey the information carried in the preamble, a very low rate can be used without seriously reducing the overall transmission efficiency.

In accordance with another aspect of the invention, the first symbol 55 is encoded at a rate of two (2) bits per symbol and has its energy increased to a point at which noise on the communication channel is unlikely to cause a receiver to erroneously interpret the first symbol 55 as silence. Likewise the increased energy makes it unlikely that noise on the communication channel will cause the receiver to erroneously interpret an interval of the silence that precedes each message as the starting symbol of a message. It has been found that an energy increase of 3dB is sufficient. This aspect of the invention will be described in greater detail below with respect to FIGS. 4A and 4B. In this manner, the beginning of each transmission can be clearly and robustly delimited. The remainder of the symbols 67, 68, 69, 70 and 71 that represent the bits in preamble 40 are all encoded at two (2) bits per symbol, but do not have their energy increased.

The four (4) transmit rate bits 62 inform a receiving DSL transceiver of the transmit rate of the information to follow the preamble 40. Sending this information in every message has significant benefits. It provides the transmitting transceiver the option of changing the encoding rate for the payload from one message to the next. Messages containing information that has been determined to be of high priority can be transmitted using a lower number of bits per symbol to improve the chances of its being received without errors. If the communications system intermittently has a reduced throughput demand, the transceivers may instantly reduce their data rates to improve robustness without adversely affecting real throughput. Finally, if a severe noise condition (such as an impulse caused by plain old telephone service (POTS) ringing signals on a subscriber line 16) happens to corrupt one or both of the symbols 55 and 67 that encode the transmit rate, only the payload data in this message will be improperly decoded. The receiver's memory of a corrupted rate value lasts only until the next transmission begins. This allows the transmit rate to potentially be changed for every message while at the same time avoiding the complexities of providing fail-safe communication of the rate, such as through use of an automatic repeat request (ARQ) protocol, that would be needed if the rate is sent only when it is changed.

The receive rate bits 63 allow the transmitting device to communicate to the receiving device the maximum receive rate at which the transmitting device can receive. Inherently included in these receive rate bits 63 are commands that instruct the opposite device to either increase or decrease its transmit rate. This allows the responding transceiver to instantly modify the rate it uses for its next transmission to accommodate changes in the signal quality that have been detected at the opposite end of the line.

In accordance with an aspect of the invention, the address bits 64 need only be used when the control DSL transceiver

US 6,950,444 B1

11

100 is communicating with a plurality of remote DSL transceivers in what is commonly referred to as "multi-point" mode. When communicating in "multi-point," mode the address bits 64 include either the address of the remote DSL transceiver 150 that is to transmit next (if the transmission is sent by the control DSL transceiver 100) or the address of the responding remote DSL transceiver 150 (if the transmission is sent by the remote DSL transceiver 150). Sending these bits 64 at the lower bit rate of the preamble reduces the likelihood of a remote transceiver 150 not responding or of the incorrect remote transceiver 150 responding to a message from the control transceiver 100. Frequent occurrence of either of these two types of errors could adversely affect the overall data transmission efficiency of the line.

The format bits 66 indicate whether the optional administrative header 42 is being sent, whether one or more ATM cells are being sent, or whether both or neither are being sent. As described previously, the receiver uses this information in conjunction with the transmit rate from bits 62 to identify the special symbols at the start of each ATM cell and to determine the symbol that is the last in the message. Robust transmission of this information at the start of each message allows the transmitter to dynamically modify the message format as needed from one message to the next. Should one of the format bits be corrupted by an abnormally severe noise event, the "damage" is restricted to the current message only. To operate reliably, the receiver could have a "back up" method of recognizing the end of a message such as through detecting loss of signal energy for an extended duration.

FIG. 4A is a graphical illustration representing a two (2) bit per symbol space constellation and the increased energy symbol of FIG. 3B. The constellation points labeled "c" represent the points in a standard 2 bit per symbol constellation. For each constellation point "c" transmitted, the effect of noise can make the point appear to a receiver to have been moved with respect to where it was when it was transmitted. The dashed circle 76 surrounding constellation point 79 represents the space within which noise may move the point and still have the point reliably decoded by the receiver. The point 79 appears in a different place at the decoder due to noise induced in the communications channel 16. Each of the points "c" have a space about which they can move and still be reliably decoded by the receiver.

The circle 77 encloses the area surrounding the origin of the in-phase-(horizontal) and quadrature (vertical) axes of FIG. 4A about which an interval of silence (no constellation point) can be moved by the same additive noise that can affect signal points. This additive noise could cause the silence to be interpreted by the decoder as one of the constellation points in a two (2) bit per symbol constellation due to the overlap of the decoding discrimination threshold circles 76 and 77. As shown, the circle 76 and the circle 77 have sufficient overlap in region 73 so that silence can easily be interpreted as one of the signal points "c". Conversely, one of the signal points "c" could also be interpreted by the decoder as silence.

For efficient operation, it is desirable that the beginning and end of each transmission be robustly and precisely identified (to within one (1) symbol interval). The beginning and end of each transmission are preceded and followed by silence on the line. Because the most efficient constellation encoding cannot allocate signal space to silence, it is impractical to reliably discriminate silence from signal when analyzing only a single symbol. In other words, it would be undesirable for silence that occurs before a message or after

12

a message to be interpreted as a constellation point "c", and it would be undesirable for a constellation point "c" to be interpreted as silence. As mentioned above, this is possible due to the effect of noise altering the position of the constellation signal points "c" or the position of silence.

In accordance with an aspect of the invention, the first symbol (symbol 55 of FIG. 3B) in the preamble 40 is transmitted with increased energy, thereby increasing the probability that it will be reliably detected by the decoder of the receiving device. In this manner, the beginning of each transmission is clearly and robustly delimited. The signal point "b" in FIG. 4A is an exemplar one of four (4) two (2) bit per symbol constellation points that are transmitted at an increased energy level. While other increases may provide useful, a 3 dB increase is typically sufficient and does not increase the ratio of peak power to average power (PAR) of the transmitted signal. As illustrated, the signal point "b" is enclosed by dotted circle 78, within which the point "b" may move due to noise on the communication channel 16 and still be reliably decoded by the receiver. As shown, there is no overlap between circle 78 and circle 77. Accordingly, by boosting the energy of the first symbol (symbol 55 of FIG. 3B) transmitted in a communication message (31 of FIG. 3A), there is a significantly higher probability that the boosted symbol will be reliably decoded and not be mistaken for silence. Nor will silence be mistaken for this boosted energy first symbol. Preferably, the receiver places the threshold to discriminate signal from noise at one unit from the origin as shown by circle 77 in FIG. 4A.

FIG. 4B is a graphical illustration showing an exemplar grouping of constellation points representing different bit per symbol rates in accordance with an aspect of the invention. For example purposes only, assuming that normal data is encoded at five (5) bits per symbol, the black constellation points, an exemplar of one of which is illustrated using reference numeral 81, represent data encoded at five (5) bits per symbol. In accordance with an aspect of the invention, all the symbols in the preamble 40 are encoded at a rate of two (2) bits per symbol and are illustrated by the four (4) constellation points labeled "c" in FIG. 4B. These two (2) bit per symbol constellation points provide a higher signal-to-noise ratio (high margin) than do the normal data encoded at five (5) bits per symbol. This increased margin increases the probability that the receiver will reliably decode all the symbols in the preamble.

In accordance with another aspect of the invention, the four constellation points labeled "b" in FIG. 4B represent the first symbol (symbol 55 of FIGS. 3A and 3B), which energy is boosted by 3 dB. In this manner, the constellation points "b" representing the boosted symbol 55 of FIG. 3A and 3B will robustly and reliably communicate the beginning of a transmission. Circle 82 represents the maximum signal level of any symbols as the number of bits per symbol becomes arbitrarily large, but the average power of the transmitted signal is the same as it is for either the five (5) bits per symbol (81) or the two (2) bits per symbol (points "c") constellations shown. Therefore, as illustrated by circle 82, the instantaneous power required by the boosted symbol points "b" is not any higher than that used to send the normal data at any bits per symbol value. In this manner, the boosted symbol represented by constellation points "b" can be used to reliably indicate the start of a message without requiring a higher transmit level capability than that needed for normal data transmission. The non-boosted two (2) bit per symbol constellation points indicated as "c" (having a significantly higher signal-to-noise ratio than that of the normal five (5) bit per symbol data) are used to transmit all symbols of the preamble after the first symbol.

US 6,950,444 B1

13

FIG. 5 is a schematic view illustrating the communication message 31 of FIG. 3A and another aspect of the invention. Typically, it is desirable to scramble all the data bits in a communications message using a self-synchronizing scrambler so that all points in the signal constellation can be used. Unfortunately, the self-synchronizing capability of the scrambler carries the inherent disadvantage of error propagation and extension. A single bit in error in the received data stream is typically transformed by the self-synchronizing descrambling process into at least 3 erroneous bits that are separated by several bits that are not in error.

Typically, in switched-carrier operation, the scrambler setting (state) at the end of one transmission is preserved and used to begin scrambling the next message. (This enables full randomization of the encoding process so as to make full use of the available channel bandwidth.) Similarly, in a receiving device, when descrambling, the state of the descrambler that exists at the end of the previously received message is used to begin the descrambling process for the next received message. This means that the last state of the scrambler saved after scrambling the data portion of the message would then be used to begin scrambling the preamble bits of the next message.

Unfortunately, using this technique with the robust preamble 40 of the invention can lead to error propagation from the data portion of the communication message to the preamble 40. Allowing errors, which are more likely due to the larger number of bits per symbol, in the payload data to corrupt the data in the preamble due to the inherent error extension of the descrambling process significantly reduces the robustness of the preamble 40. In accordance with another aspect of the invention, a first scrambler can be used to scramble the information contained in the preamble 40 and a second scrambler can be used to scramble the data (i.e., the information in the ATM cells 44, 45, etc.).

As shown in FIG. 5, line 87 indicates that a first scrambler is used to scramble the preamble 40 of communication message 31 and also used to scramble the preamble of communication message 86. Similarly, line 88 indicates that a second scrambler is used to scramble the data portion of communication message 31 and the data portion of communication message 86. The message to message randomizing desirable for full usage of the available channel bandwidth can be maintained if the setting of the preamble scrambler (to be described with respect to FIG. 8) at the end of one preamble is used to begin the scrambling of the preamble of the next communication message 86. Because errors in the preamble are considered unlikely to occur, and because the bits received at the end of a previous preamble define the descrambler state used to descramble the next preamble, error extension from one message preamble into the preamble is also much less likely than in the single scrambler case.

An alternative to this that avoids the use of two scramblers is to save the state of the preamble scrambler after scrambling the preamble as the state to use to begin scrambling of the next preamble. This cab be done instead of the conventional approach of using the state of the scrambler at the end of the message. This technique can also prevent errors at the end of one message from corrupting the preamble of the next transmission.

FIG. 6 is a schematic view illustrating the communication message 31 and the reduced line turn around delay made possible by an aspect of the invention. In time-domain duplex operation any periods during which no transceiver is transmitting represent loss of available bandwidth. To make

14

most efficient usage of a communication line, it is desirable to minimize these periods. Some intervals of silence necessarily occur between transmissions because the transition from silence to the first symbol of the preamble is the manner in which the beginning of the next transmission is delimited. The process by which a transceiver makes the transition from receiving to transmitting is referred to as "line turn-around" and the time required may determine the minimum amount of silence that can occur between messages. Various aspects of the design and implementation of a time-domain duplex transceiver may result in increased delays in the line turn-around process. For example, transmitter filters and receiver equalizers have inherent delays. The analog-to-digital and digital-to-analog conversion process as well as the process of transferring digital samples between the signal processor and converters may have some inherent delays. If the signal processing is implemented in firmware there may be delays between the arrival of received signal samples and the time the processing can be performed. All of these factors may extend the line turn-around time to the point that transmission efficiency is significantly reduced.

As described above with respect to FIG. 3A, communication message 31 includes a specially encoded symbol 60 transmitted at a lower bit per symbol rate than that of the normal data encoding rate. The symbol encodes an additional bit 61 that indicates whether or not the ATM cell is the last cell in the communication message 31. If it is indicated to the receiver at the beginning of the last ATM cell 46 that the ATM cell 46 is the last cell in the communication message, (instead of waiting to the end of the ATM cell 46) line turn around delay can be reduced. As illustrated, if a receiving device must wait until the end of the last message to learn that the message is complete, there will be a delay "d" between the time that the communication message 31 is received and the time at which the transmission of communication message 91a can begin. By having advance notification that the communication message is about to be complete, a remote DSL transceiver 150 can begin transmission of the next message before reception of the current message has been completed. By knowing the delay contributed by the factors such as those mentioned previously, the transceiver can begin the transmission process, indicated by communication message 91b, so as to reduce delay "d" as much as possible, potentially reducing it to the minimum value needed for the receiver to reliably detect the transition-from silence to signal at the beginning of the next message.

FIG. 7 is a block diagram illustrating the control DSL transceiver 100 of FIG. 1. Although, described with respect to control DSL transceiver 100, the following description is equally applicable to a remote DSL transceiver 150. Control DSL transceiver 100 includes microprocessor 101, memory 102, transmitter 115 and receiver 120 in communication via logical interface 108. A bi-directional stream of ATM cells from a DTE is communicated via line 14 to the control DSL transceiver 100. Memory 102 includes end of transmission delimiting software 106 and robust preamble software 104. This software resides in memory 102 and executes in microprocessor 101 in order to achieve and perform the benefits of the present invention. Transmitter 115 communicates with line interface 109 via connection 112 in order to gain access to communication channel 16. Information received on communication channel 16 is processed by line interface 109 and sent via connection 111 to receiver 120. Transmitter 115 includes, among other elements that are known to those having ordinary skill in the art, encoder 200 and modulator 117. Similarly, receiver 120 includes, among

**15**

other elements that have been omitted for clarity, decoder 300 and demodulator 118.

FIG. 8 is a block diagram illustrating the encoder 200 of FIG. 7. The transmit sequencer 236 commands the multiplexer 214 via connection 242 to select the first two (2) bits of the four (4) bits (62 of FIG. 3B) that define the current transmit rate from transmit rate element 206, via connection 212. This symbol is then forwarded to preamble scrambler 217, via connection 216 for scrambling, and is then forwarded via connection 218 to two (2) bit per symbol preamble encoder 219. This encoded symbol is then forwarded via connection 226 to gain increase element 227 where its energy is increased by approximately 3 dB and is then sent via connection 228 to multiplexer 224 and over connection 254 to modulator 117.

The next two (2) bits of the transmit rate (62 of FIG. 3B) are then scrambled and encoded in the same way. Next, the transmit sequencer 236 commands the multiplexer 214 via connection 242 to select the four (4) bits representing the requested received rate from receive rate element 204, which bits are forwarded to multiplexer 214 via connection 211. These four (4) bits are then forwarded to preamble scrambler 217 where they are scrambled, and then forwarded via connection 218 to two (2) bit per symbol preamble encoder 219 where they are encoded into a pair of symbols. These encoded symbols, are forwarded directly via connection 226 to multiplexer 224 and then forwarded via connection 254 to modulator 117.

If there are multiple remote DSL transceivers 150 and 155, then the transmit sequencer 236 commands the multiplexer 214 via connection 242 to select the two (2) bits representing the remote address from remote address element 202, which bits are then forwarded via connection 209 to multiplexer 214. These two (2) bits are then forwarded via connection 216 to preamble scrambler 217, which scrambles the bits and forwards them via connection 218 to the two (2) bit per symbol preamble encoder 219. The two (2) bit per symbol preamble encoder 219 encodes the bits and transfers the encoded symbol via connection 226 through multiplexer 224 and then via connection 254 to modulator 117.

Transmit sequencer 236 senses if an administrative header 42 and/or ATM cells 44, 45, 46 are available for transmission via connections 232 and 234, respectively, and uses this information to prepare the message format indicator which is loaded by the transmit sequencer 236 via connection 207. The transmit sequencer 236 commands the multiplexer 214 via connection 242 to select the two (2) bits representing the message format from element 201, which bits are then forwarded via connection 208 to multiplexer 214. These two (2) bits are then forwarded via connection 216 to preamble scrambler 217, which scrambles the bits and forwards them via connection 218 to the two (2) bit per symbol preamble encoder 219. The two (2) bit per symbol preamble encoder 219 encodes the bits and transfers the encoded symbol via connection 226 through multiplexer 224 and then via connection 254 to modulator 117.

Next, transmission of either the administrative header 42 or the ATM cell payload begins by transmit sequencer 236 sending a command via connection 235 to multiplexer 241 to select either the administrative header 42 via element 229 or payload data via element 231. These bits are supplied through multiplexer 241 via connections 239 and 238 and are then forwarded via connection 244 to payload scrambler 246. Payload scrambler 246 scrambles the bits and forwards them via connection 248 to N bit per symbol data encoder 249 and N−1 bit per symbol data encoder 251. As mentioned

**16**

above with respect to FIG. 5, payload scrambler 246 may use as its initial state either the state that exists at the end of scrambling the preamble (supplied via connection 247) or the state that exists after completion of scrambling the payload portion of the previous message. As mentioned above with respect to FIG. 3A, all the data bits are encoded at an N bit per symbol data rate by data encoder 249 and forwarded via connection 257 to multiplexer 224 until the first symbol containing only bits from a new ATM cell is detected. This symbol is encoded at a rate of N−1 bits per symbol by N−1 bit per symbol data encoder 251 and forwarded via connection 256 to multiplexer 224. The index for this symbol as delivered to payload scrambler 246 is formed by selecting the first N−2 bits of the first octet of the cell and adding an additional bit (i.e., bit 54 or 61 of FIG. 3A) representing the state of the last cell signal 237 as selected via multiplexer 241. When instructed by transmit sequencer 236 via connection 252, the multiplexer 224 selects the symbols from either N bit per symbol data encoder 249 or from N−1 bit per symbol data encoder 251 and forwards these symbols via connection 254 to modulator 117.

Transmit sequencer 236 uses the payload bits per symbol value N received via connection 212 to determine the number of symbols to encode for each cell and to determine which symbol is to be encoded at the N−1 bits per symbol rate and contain the last cell indicator bit. After completing transmission of the message, transmit sequencer 236 commands multiplexer 224 via connection 252 to select silence 221 via connection 222 as the input to the modulator 117.

FIG. 9 is a block diagram illustrating the decoder 300 of FIG. 7. A received transmission stream is received in demodulator 118, where it is demodulated in accordance with techniques known those having ordinary skill in the art. The first symbol is forwarded via connection 301 to gain reduction element 302. Gain reduction element 302 reduces the gain of the first symbol and supplies that reduced energy symbol via connection 304 to multiplexer 306. Receive sequencer 328 sends a signal to multiplexer 306 via connection 354 instructing multiplexer 306 to select that reduced gain symbol and transfer it via connection 307 to two (2) bit per symbol preamble decoder 308. The decoded bits from the first symbol are then sent via connection 309 to preamble descrambler 311. Preamble descrambler 311 descrambles the first bits in the transmission and forwards them via connection 312 to the multiplexer 314. When instructed by receive sequencer 328 via connection 332, the multiplexer 314 forwards these bits via connection 324 to transmit rate element 236.

The following preamble symbols are all forwarded via connection 301 directly to multiplexer 306, which forwards these symbols via connection 307 for decoding by two (2) bit per symbol preamble decoder 308. The decoded bits are forwarded via connection 309 to preamble descrambler 311 as mentioned above. These bits are then forwarded in order via connections 324, 321, 318 and 316 to transmit rate element 326, receive rate element 322, remote address element 319 and message format element 317, respectively.

Next, the administrative header symbols and ATM cell data symbols that have been encoded at N bits per symbol are forwarded via connection 301 to N bit per symbol data decoder 337 and the ATM cell data symbols that have been encoded at N−1 bits per symbol are forwarded via connection 301 to N−1 bit per symbol data decoder 339. These symbols are decoded and the decoded bits are transferred via connections 338 and 341 to multiplexer 342. Similarly, as mentioned above with respect to FIG. 8, receive sequencer

17

328 insures that the symbols encoded at the rate of N−1 bits per symbol are forwarded via connection 301 to N−1 bit per symbol data decoder 339, which forwards the decoded bits via connection 341 to multiplexer 342. As shown, the value of N, which is the bits per symbol value used for the N bits per symbol, or N−1 bits per symbol decoding is controlled by the just received transmit rate bits that have been stored in transmit rate element 326.

At the appropriate time, receive sequencer 328 commands the multiplexer 342 via connection 347 to forward the bits via connection 344 to payload descrambler 336. In accordance with an aspect of the invention, the preamble descrambler 311 operates only on the preamble bits and the payload descrambler 336 operates only on the payload bits. As mentioned above with respect to FIG. 5, the payload descrambler may use as its initial state either the state of the preamble descrambler at the end of descrambling the preamble as supplied via connection 334 or the state of the payload descrambler at the end of descrambling the payload bits of the previous message. The descrambled payload bits are then forwarded via connection 346 to multiplexer 349. When ordered by receive sequencer 328 via connection 351, the multiplexer 349 forwards the administrative header bits via connection 351 and the payload data bits via connection 352. These bits are then forwarded via logical interface 108 to microprocessor 101 for processing (FIG. 7). Receive sequencer 328 determines the presence or absence of the administrative header and ATM cells via the just received message format bits that have been stored in element 317 and provided to receive sequencer 328 via connection 327. When the bits for each symbol containing the last message bit are available at multiplexer 349, receive sequencer 328 directs the N−2 bits of payload data to the payload data element 356 via connection 352 and receives the last cell bit via connection 329. Receive sequencer 328 uses the current bits per symbol value for payload data received via connection 324 to determine the beginning and end of each cell. Based on the message format and the value of the last cell indicator bit, receive sequencer 328 determines when the last symbol of the message has been decoded and instructs demodulator 118 (FIG. 7) to stop delivering demodulated symbols.

In an alternative embodiment, the special encoding of the last cell as described above in FIG. 3A can be omitted and an "eye pattern closure test" can be used to detect the end of the message. In such a situation where it is acceptable to lose the advanced notification of the end of the transmission, beneficial alternative uses for the special encoding of the first bits of each cell are possible. For example, this special encoding as described above with respect to FIG. 3A wherein N−2 bits are encoded for the first full bytes of each cell, can be used to indicate whether or not the ATM cell header (e.g., ATM header 47 of FIG. 2B) is present. This can be useful in the situation in which a string of ATM cells have exactly the same header. This can happen, for example, for ATM adaptation layer 5 (AAL5) cells that carry data from a single protocol data unit (PDU) if no other cells have been interleaved. The single extra bit (bit 61 of FIG. 3A) provided by the encoding described above with respect to FIG. 3A, can be used to indicate whether or not the following cell contains a header. If the bit 61 indicates that there is no header, the receiver copies the last header received ahead of the payload octets of this next cell before forwarding it to the ATM layer. Advantageously, this reduces the approximate 10 percent overhead imposed by the five (5) octet header (47 of FIG. 2B).

It should be emphasized that the above-described embodiments of the present invention, particularly any "preferred"

18

embodiments, are merely possible examples of implementations, merely set forth for a clear understanding of the principles of the invention. Many variations and modifications may be made to the above-described embodiment(s) of the invention without departing substantially from the spirit and principles of the invention. For example, the robust preamble and transmission delimiting system and method are applicable to all switched-carrier transmission methodologies in which it is desirable to reliably convey channel establishment information and reliably delimit the beginning and end of each communication message. All such modifications and variations are intended to be included herein within the scope of the present invention.

Therefore, having thus described the invention, at least the following is claimed:

1. A system for robust transmission delimiting, comprising:

a communication message including a preamble, the preamble operating to frame the message and to delimit the message from silence, the preamble including a plurality of bits representing communication link control information; and

an encoder configured to encode the preamble bits into a plurality of symbol indices, the symbol indices encoded at a lower bit per symbol rate relative to the maximum rate capable of being supported over a communication channel.

2. A system for robust transmission delimiting, comprising:

a communication message including a preamble, the preamble including a plurality of bits representing communication link control information; and

an encoder configured to encode the preamble bits into a plurality of symbol indices, the symbol indices encoded at a lower bit per symbol rate relative to the maximum rate capable of being supported over a communication channel,

wherein the preamble includes information that defines a rate at which data following the preamble has been encoded for transmission.

3. The system as defined in claim 2, further comprising a gain boost element configured to increase the energy of the first symbol index to reliably indicate the beginning of the communication message.

4. The system as defined in claim 2, wherein the preamble includes information defining a maximum rate at which a first transceiver that is sending the preamble is able to receive transmissions from a second transceiver that is receiving the preamble.

5. The system as defined in claim 2, wherein the preamble indicates whether a data portion follows the preamble and, if so, the format and type of data that follows the preamble.

6. The system as defined in claim 2, wherein the preamble indicates whether administrative information follows the preamble.

7. The system as defined in claim 5, further comprising:

a first scrambler configured to scramble the preamble; and

a second scrambler configured to scramble the data,

wherein a state of the scrambler used to scramble the bits that comprise the preamble is the state that existed when scrambling of a previous preamble was completed.

8. The system as defined in claim 5, wherein the data portion of the communication message comprises fixed size units, the fixed size units comprising a plurality of bits and

**19**

wherein the bits are encoded into symbol indices such that, for each of the fixed size units, one symbol index is encoded differently from the other symbols.

9. The system as defined in claim 8, wherein the differently encoded symbol index further comprises an extra bit that indicates whether the fixed size unit from which the other bits of the differently encoded symbol indices are obtained is the last one transmitted in a message.

10. The system as defined in claim 8, wherein the differently encoded symbol index is encoded at a data rate lower than that of the other symbols carrying message data.

11. A system for delimiting the end of a transmission, comprising:

    a communication message segmented into a plurality of fixed size units, each fixed size unit including a plurality of bits; and

    an encoder configured to encode the plurality of bits into a plurality of symbol indices at a first data rate, the encoder also configured to encode at a second rate when producing the first symbol index in the plurality of symbol indices that contains only bits from each fixed size unit, where the second rate is lower than the first rate.

12. A method for robust transmission delimiting, the method comprising the steps of:

    applying a preamble to a communication message, the preamble operating to frame the message and to delimit the message from silence, the preamble including a plurality of bits representing communication link control information; and

    encoding the preamble bits into a plurality of symbol indices, the symbol indices encoded at a lower bit per symbol rate relative to the maximum rate capable of being transmitted over a communication channel.

13. A method for robust transmission delimiting, the method comprising the steps of:

    applying a preamble to a communication message, the preamble including a plurality of bits representing communication link control information;

    encoding the preamble bits into a plurality of symbol indices, the symbol indices encoded at a lower bit per symbol rate relative to the maximum rate capable of being transmitted over a communication channel; and

    including information in the preamble defining a rate at which data following the preamble has been encoded for transmission.

14. The method as defined in claim 13, further comprising the step of increasing the energy of the first symbol index to reliably indicate the beginning of the communication message.

15. The method as defined in claim 13, further comprising the step of including information in the preamble defining a maximum rate at which a transceiver that is sending the preamble is able to receive transmissions from a transceiver that is receiving the preamble.

16. The method as defined in claim 13, further comprising the step of using the preamble to indicate whether a data portion follows the preamble and, if so, the format and type of data that follows the preamble.

17. The method as defined in claim 13, further comprising the step of using the preamble to indicate whether administrative information follows the preamble.

18. The method as defined in claim 16, further comprising the steps of:

    scrambling the preamble using a first scrambler;

    scrambling the data using a second scrambler; and

**20**

scrambling the bits in the preamble using the state of the scrambler that existed when scrambling of the previous preamble was complete.

19. The method as defined in claim 16, wherein the data portion of the communication message comprises fixed size units, the fixed size units comprising a plurality of bits, and wherein the bits that comprise each of the fixed size units are encoded into symbol indices such that for each of the fixed size units, one symbol index is encoded differently from the other symbols.

20. The method as defined in claim 19, further comprising the step of including in said differently encoded symbol index an extra bit that indicates whether the fixed size unit from which the other bits of said differently encoded symbol indices are obtained is the last one transmitted in a message.

21. The method as defined in claim 19, further comprising the step of encoding the differently encoded symbol index at a data rate lower than that of the other symbols carrying message data.

22. A method for delimiting the end of a transmission, the method comprising the steps of:

    segmenting a communication message into a plurality of units, each unit including a plurality of bits and having a fixed size;

    encoding a plurality of the bits in the plurality of units into a plurality of symbol indices, the symbol indices being encoded at a first rate; and

    encoding one symbol index of the plurality of symbol indices at a rate lower than the first rate, the one symbol index containing bits from only one of the plurality of units.

23. A system for robust transmission delimiting, comprising:

    means for applying a preamble to a communication message, the preamble operating to frame the message and to delimit the message from silence, the preamble including a plurality of bits representing communication link control information; and

    means for encoding the preamble bits into a plurality of symbol indices, the symbol indices encoded at a lower bit per symbol rate relative to the maximum rate capable of being transmitted over a communication channel.

24. The system as defined in claim 23, further comprising means for increasing the energy of the first symbol index to reliably indicate the beginning of the communication message.

25. A system for robust transmission delimiting, comprising:

    means for applying a preamble to a communication message, the preamble including a plurality of bits representing communication link control information;

    means for encoding the preamble bits into a plurality of symbol indices, the symbol indices encoded at a lower bit per symbol rate relative to the maximum rate capable of being transmitted over a communication channel; and

    means for including information in the preamble defining a rate at which data following the preamble has been encoded for transmission.

26. The system as defined in claim 25, further comprising means for including information in the preamble defining a maximum rate at which a transceiver that is sending the preamble is able to receive transmissions from a transceiver that is receiving the preamble.

27. The system as defined in claim 25, further comprising means for using the preamble to indicate whether a data

US 6,950,444 B1

21

portion follows the preamble and, if so, the format and type of data that follows the preamble.

28. The system as defined in claim 25, further comprising means for using the preamble to indicate whether administrative information follows the preamble.

29. The system as defined in claim 27, further comprising:

means for scrambling the preamble using a first scrambler;

means for scrambling the data using a second scrambler; and

means for scrambling the bits in the preamble using the state of the scrambler that existed when scrambling of the previous preamble was complete.

30. The system as defined in claim 27, wherein the data portion of the communication message comprises fixed size units, the fixed size units comprising a plurality of bits; and

means for encoding the bits that comprise each of the fixed size units into symbol indices such that for each of the fixed size units, one symbol index is encoded differently from the other symbols.

31. The system as defined in claim 30, further comprising means for including in said differently encoded symbol index an extra bit that indicates whether the fixed size unit from which the other bits of said differently encoded symbol indices are obtained is the last one transmitted in a message.

32. The system as defined in claim 30, further comprising means for encoding the differently encoded symbol index at a data rate lower than that of the other symbols carrying message data.

33. A system for delimiting the end of a transmission, comprising:

means for segmenting a communication message into a plurality of fixed size units, each unit including a plurality of bits;

means for encoding a plurality of the bits in the units into a plurality of symbol indices, the symbol indices being encoded at a first rate; and

means for encoding at a second rate when producing the first symbol index in the plurality of symbol indices that contains only bits from each fixed size unit, where the second rate is lower than the first rate.

34. A computer readable medium having a program for robust transmission delimiting, the program comprising logic for performing the steps of:

applying a preamble to a communication message, the preamble operating to frame the message and to delimit the message from silence, the preamble including a plurality of bits representing communication link control information; and

encoding the preamble bits into a plurality of symbol indices, the symbol indices encoded at a lower bit per symbol rate relative to the maximum rate capable of being transmitted over a communication channel.

35. The program as defined in claim 34, further comprising logic for performing the step of increasing the energy of the first symbol index to reliably indicate the beginning of the communication message.

36. A computer readable medium having a program for robust transmission delimiting, the program comprising logic for performing the steps of:

applying a preamble to a communication message, the preamble including a plurality of bits representing communication link control information;

encoding the preamble bits into a plurality of symbol indices, the symbol indices encoded at a lower bit per

22

symbol rate relative to the maximum rate capable of being transmitted over a communication channel; and

including information in the preamble defining a rate at which data following the preamble has been encoded for transmission.

37. The program as defined in claim 36, further comprising logic for performing the step of including information in the preamble defining a maximum rate at which a transceiver that is sending the preamble is able to receive transmissions from a transceiver that is receiving the preamble.

38. The program as defined in claim 36, further comprising logic for performing the step of using the preamble to indicate whether a data portion follows the preamble and, if so, the format and type of data that follows the preamble.

39. The program as defined in claim 36, further comprising logic for performing the step of using the preamble to indicate whether administrative information follows the preamble.

40. The program as defined in claim 38, further comprising logic for performing the steps of:

scrambling the preamble using a first scrambler;

scrambling the data using a second scrambler; and

scrambling the bits in the preamble using the state of the scrambler that existed when scrambling of the previous preamble was complete.

41. The program as defined in claim 38, wherein the data portion of the communication message comprises fixed size units, the fixed size units comprising a plurality of bits; and

wherein the bits that comprise each of the fixed size units are encoded into symbol indices such that for each of the fixed size units, one symbol index is encoded differently from the other symbols.

42. The program as defined in claim 41, further comprising logic for performing the step of including in said differently encoded symbol index an extra bit that indicates whether the fixed size unit from which the other bits of said differently encoded symbol indices are obtained is the last one transmitted in a message.

43. The program as defined in claim 41, further comprising logic for performing the step of encoding the differently encoded symbol index at a data rate lower than that of the other symbols carrying message data.

44. A computer readable medium having a program for delimiting the end of a transmission, the program comprising logic to perform the steps of:

segmenting a communication message into a plurality of fixed size units, each unit including a plurality of bits;

encoding a plurality of the bits in the fixed sized units into a plurality of symbol indices, the symbol indices being encoded at a first rate; and

encoding at a second rate when producing the first symbol index in the plurality of symbol indices that contains only bits from each fixed size unit, where the second rate is lower than the first rate.

45. A method for delimiting the end of a transmission, the method comprising the steps of:

segmenting a communication message into a plurality of fixed size units, each unit including a plurality of bits;

encoding the first N bits in a unit into a first symbol index, the first symbol index being encoded at a first rate, N being less than the fixed size; and

encoding the remaining bits in the plurality of units into a plurality of symbol indices at a rate greater than the first rate.

US 6,950,444 B1

23

46. The system as defined in claim 11, further comprising a gain boost element configured to increase the energy of the first symbol index to reliably indicate the beginning of the communication message.

47. The system as defined in claim 11, wherein the preamble indicates whether a data portion follows the preamble and, if so, the format and type of data that follows the preamble.

48. The method as defined in claim 22, further comprising the step of increasing the energy of the first symbol index to reliably indicate the beginning of the communication message.

49. The method as defined in claim 22, further comprising the step of using the preamble to indicate whether a data portion follows the preamble and, if so, the format and type of data that follows the preamble.

50. The system as defined in claims 33, further comprising means for increasing the energy of the first symbol index to reliably indicate the beginning of the communication message.

51. The system as defined in claim 33, further comprising means for using the preamble to indicate whether a data

24

portion follows the preamble and, if so, the format and type of data that follows the preamble.

52. The program as defined in claim 44, further comprising logic for performing the step of increasing the energy of the first symbol index to reliably indicate the beginning of the communication message.

53. The program as defined in claim 44, further comprising logic for performing the step of using the preamble to indicate whether a data portion follows the preamble and, if so, the format and type of data that follows the preamble.

54. The method as defined in claim 45, further comprising the step of increasing the energy of the first symbol index to reliably indicate the beginning of the communication message.

55. The method as defined in claim 45, further comprising the step of using the preamble to indicate whether a data portion follows the preamble and, if so, the format and type of data that follows the preamble.

* * * * *

# Exhibit 34

Case 1:07-cv-00894-BMC   Document 16-35   Filed 06/29/2007   Page 2 of 9

# U.S. Bankruptcy Court
## Southern District of New York (Manhattan)
## Adversary Proceeding #: 06-01739-reg

*Assigned to:* Judge Robert E. Gerber

*Related BK Case:* 02-41729
*Related BK Title:* Adelphia Communications Corporation
*Related BK Chapter:* 11
*Demand:*
*Nature[s] of Suit:* 498 Other Action

*Date Filed:* 09/13/06

**Plaintiff**
-----------------------

**Rembrandt Technologies LP**

represented by **Brooke A.M. Taylor**
1201 Third Avenue
Suite 3800
Seattle, WA 98101
206-516-3804
Email: Btaylor@susmangodfrey.com
*LEAD ATTORNEY*

**Edgar G. Sargent**
1201 Third Avenue
3800
Seattle, WA 98101
206-516-3804
Email: Esargent@susmangodfrey.com
*LEAD ATTORNEY*

**James L. Garrity, Jr.**
Shearman & Sterling, LLP
599 Lexington Avenue
New York, NY 10022
(212) 848-4879
Fax : (646) 848-4879
Email: jgarrity@shearman.com

**Joseph S. Grinstein**
Susman Godfrey LLP
1000 Louisiana Street
Houston, TX 77002
713-651-9366
Email: jgrinstein@susmangodfrey.com
*LEAD ATTORNEY*

**Matthew R. Berry**
1201 Third Avenue
Suite 3800

Seattle, WA 98101
206-373-7394
Email: mberry@susmangodfrey.com
*LEAD ATTORNEY*

**Tibor L. Nagy**
590 Madison Avenue
8th Floor
New York, NY 10022
212-336-8330
Email: Tnagy@susmangodfrey.com
*LEAD ATTORNEY*

V.

**Defendant**
----------------------

**Adelphia Communications Corporation**                 represented by    **Adelphia Communications Corporation**
1 North Main Street                                                        PRO SE
Coudersport, PA 16915
Tax id: 23-2417713

**Century-TCI California Communications,**              represented by
**LP**                                                                     **Century-TCI California Communications,**
c/o Adelphia Communications Corporation                                    **LP**
1 North Main Street                                                        PRO SE
Coudersport, PA 16915
Tax id: 25-1858964

**Century-TCI Distribution Company, LLC**              represented by
c/o Adelphia Communications Corporation                                    **Century-TCI Distribution Company, LLC**
5619 DTC Parkway                                                           PRO SE
Greenwood Village, CO 80111
Tax id: 42-1680410

**Century-TCI Holdings, LLC**                          represented by    **Century-TCI Holdings, LLC**
c/o Adelphia Communications Corporation                                    PRO SE
1 North Main Street
Coudersport, PA 16915

**Parnassos, L.P.**                                    represented by    **Parnassos, L.P.**
                                                                           PRO SE

**Parnassos Communications, LP**                       represented by
c/o Adelphia Communications Corporation                                    **Parnassos Communications, LP**
1 North Main Street                                                        PRO SE
Coudersport, PA 16915
Tax id: 25-1828176

**Parnassos Distribution Company I, LLC**              represented by
c/o Adelphia Communications Corporation                                    **Parnassos Distribution Company I, LLC**
5619 DTC Parkway                                                           PRO SE
Greenwood Village, CO 80111
Tax id: 42-1680413

**Parnassos Distribution II, LLC**
c/o Adelphia Communications Corporation
5619 DTC Parkway
Greenwood Village, CO 80111
Tax id: 42-1680415

represented by   **Parnassos Distribution II, LLC**
PRO SE

**Parnassos Holdings, LLC**
c/o Adelphia Communications Corporation
1 North Main Street
Coudersport, PA 16915
Tax id: 25-1828178

represented by   **Parnassos Holdings, LLC**
PRO SE

**Western NY Cablevision, LP**
c/o Adelphia Communications Corporation
1 North Main Street
Coudersport, PA 16915
Tax id: 25-1804166

represented by   **Western NY Cablevision, LP**
PRO SE

**Counter-Claimant**
------------------------

**Adelphia Communications Corporation**
1 North Main Street
Coudersport, PA 16915
Tax id: 23-2417713

represented by **Shelley C. Chapman**
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019-6099
(212) 728-8268
Fax : (212) 728-8111
Email: maosbny@willkie.com

**Century-TCI California Communications, LP**
c/o Adelphia Communications Corporation
1 North Main Street
Coudersport, PA 16915
Tax id: 25-1858964

represented by   **Shelley C. Chapman**
(See above for address)

**Century-TCI Distribution Company, LLC**
c/o Adelphia Communications Corporation
5619 DTC Parkway
Greenwood Village, CO 80111
Tax id: 42-1680410

represented by   **Shelley C. Chapman**
(See above for address)

**Century-TCI Holdings, LLC**
c/o Adelphia Communications Corporation
1 North Main Street
Coudersport, PA 16915

represented by   **Shelley C. Chapman**
(See above for address)

**Parnassos Communications, LP**
c/o Adelphia Communications Corporation
1 North Main Street
Coudersport, PA 16915
Tax id: 25-1828176

represented by   **Shelley C. Chapman**
(See above for address)

**Parnassos Distribution Company I, LLC**
c/o Adelphia Communications Corporation
5619 DTC Parkway

represented by   **Shelley C. Chapman**
(See above for address)

Greenwood Village, CO 80111
Tax id: 42-1680413

**Parnassos Distribution II, LLC**                    represented by
c/o Adelphia Communications Corporation
5619 DTC Parkway                                              **Shelley C. Chapman**
Greenwood Village, CO 80111                                   (See above for address)
Tax id: 42-1680415

**Parnassos Holdings, LLC**                          represented by
c/o Adelphia Communications Corporation
1 North Main Street                                          **Shelley C. Chapman**
Coudersport, PA 16915                                        (See above for address)
Tax id: 25-1828178

**Parnassos, L.P.**                                 represented by **Shelley C. Chapman**
                                                                 (See above for address)

**Western NY Cablevision, LP**                      represented by
c/o Adelphia Communications Corporation
1 North Main Street                                          **Shelley C. Chapman**
Coudersport, PA 16915                                        (See above for address)
Tax id: 25-1804166

V.


**Counter-Defendant**
------------------------
**Rembrandt Technologies LP**                       represented by **James L. Garrity, Jr.**
                                                                 (See above for address)

| Filing Date | # | Docket Text |
|---|---|---|
| 09/13/2006 | 1 | Adversary case 06-01739. Complaint against Adelphia Communications Corporation, Century-TCI California Communications, LP, Century-TCI Distribution Company, LLC, Century-TCI Holdings, LLC, Parnassos, L.P., Parnassos Communications, LP, Parnassos Distribution Company I, LLC, Parnassos Distribution II, LLC, Parnassos Holdings, LLC, Western NY Cablevision, LP *Complaint for Post-Petition Patent Infringement* (Pursuant to Section 498 (Other Action)) Filed by Rembrandt Technologies LP, Adelphia Communications Corporation. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D) (Garrity, James) (Entered: 09/13/2006) |
| 09/13/2006 |   | Receipt of Complaint(06-01739-reg) [cmp,cmp] ( 250.00) Filing Fee. Receipt number 3908896. Fee amount 250.00. (U.S. Treasury) (Entered: 09/13/2006) |
| 09/13/2006 | 2 | Summons with Notice of Pre-Trial Conference issued by Clerk's Office with Pre-Trial Conference set for 11/14/2006 at 09:45 AM at Courtroom 621 (REG), Answer due by 10/13/2006, (Leggett, Venice) (Entered: 09/13/2006) |
| 10/02/2006 | 3 | Application for Pro Hac Vice Admission filed by Tibor L. Nagy on behalf of |

| | | Rembrandt Technologies LP. Filing fee collected, receipt #170300. (Su, Kevin) (Entered: 10/02/2006) |
|---|---|---|
| 10/02/2006 | 4 | Application for Pro Hac Vice Admission filed by Brooke A.M. Taylor on behalf of Rembrandt Technologies LP. Filing fee collected, receipt #170301. (Su, Kevin) (Entered: 10/02/2006) |
| 10/02/2006 | 5 | Application for Pro Hac Vice Admission filed by Edgar G. Sargent on behalf of Rembrandt Technologies LP. Filing fee collected, receipt #170302. (Su, Kevin) (Entered: 10/02/2006) |
| 10/03/2006 | 6 | Order Granting Application for Pro Hac Vice re: Tibor L. Nagy (Related Doc # 3) signed on 10/3/2006. (Blum, Helene) (Entered: 10/03/2006) |
| 10/03/2006 | 7 | Order Granting Application for Pro Hac Vice Brooke A.M. Taylor (Related Doc # 4) signed on 10/3/2006. (Blum, Helene) (Entered: 10/03/2006) |
| 10/03/2006 | 8 | Order Granting Application for Pro Hac Vice re: Edgar G. Sargent (Related Doc # 5) signed on 10/3/2006. (Blum, Helene) (Entered: 10/03/2006) |
| 10/10/2006 | 9 | Affidavit of Service *of Summons and Complaint on Century-TCI Distribution Company, LLC;* filed by Brooke A.M. Taylor on behalf of Rembrandt Technologies LP. (Lee, Lisa) (Entered: 10/11/2006) |
| 10/10/2006 | 10 | Affidavit of Service *of Summons and Complaint on Parnassos Distribution Company I, LLC;* filed by Brooke A.M. Taylor on behalf of Rembrandt Technologies LP. (Lee, Lisa) (Entered: 10/11/2006) |
| 10/10/2006 | 11 | Affidavit of Service *of Summons and Complaint on Parnassos Distribution Company II, LLC;* filed by Brooke A.M. Taylor on behalf of Rembrandt Technologies LP. (Lee, Lisa) (Entered: 10/11/2006) |
| 10/10/2006 | 12 | Affidavit of Service *of Summons and Complaint on Parnassos Holding, LLC;* filed by Brooke A.M. Taylor on behalf of Rembrandt Technologies LP. (Lee, Lisa) (Entered: 10/11/2006) |
| 10/10/2006 | 13 | Affidavit of Service *of Summons and Complaint on Century-TCI Holdings, LLC;* filed by Brooke A.M. Taylor on behalf of Rembrandt Technologies LP. (Lee, Lisa) (Entered: 10/11/2006) |
| 10/10/2006 | 14 | Affidavit of Service *of Summons and Complaint on Century-TCI California Communications, L.P.;* filed by Brooke A.M. Taylor on behalf of Rembrandt Technologies LP. (Lee, Lisa) (Entered: 10/11/2006) |
| 10/10/2006 | 15 | Affidavit of Service *of Summons and Complaint on Parnassos, L.P.;* filed by Brooke A.M. Taylor on behalf of Rembrandt Technologies LP. (Lee, Lisa) (Entered: 10/11/2006) |

| 10/10/2006 | 16 | Affidavit of Service *of Summons and Complaint on Parnassos Communications, L.P.;* filed by Brooke A.M. Taylor on behalf of Rembrandt Technologies LP. (Lee, Lisa) (Entered: 10/11/2006) |
| 10/10/2006 | 17 | Affidavit of Service *of Summons and Complaint on Western NY Cablevision, LP;* filed by Brooke A.M. Taylor on behalf of Rembrandt Technologies LP. (Lee, Lisa) (Entered: 10/11/2006) |
| 10/10/2006 | 18 | Affidavit of Service *of Summons and Complaint on Adelphia Communications Corporation;* filed by Brooke A.M. Taylor on behalf of Rembrandt Technologies LP. (Lee, Lisa) (Entered: 10/11/2006) |
| 10/17/2006 | 19 | So Ordered Stipulation signed on 10/17/2006 Between All Parties Extending Defendants' Time to Answer. (Blum, Helene) (Entered: 10/17/2006) |
| 10/26/2006 | 20 | So Ordered Stipulation signed on 10/26/2006 Extending Time for Defendants to Answer. (Blum, Helene) (Entered: 10/26/2006) |
| 11/08/2006 | 23 | Application for Pro Hac Vice Admission filed by Matthew R. Berry on behalf of Rembrandt Technologies LP. $25.00, Receipt Number 170843 (Porter, Minnie) Modified on 11/28/2006 (Porter, Minnie). (Entered: 11/17/2006) |
| 11/13/2006 | 21 | Application for Pro Hac Vice Admission filed by Joseph S. Grinstein on behalf of Rembrandt Technologies LP. Filing fee collected, receipt #170705. (Su, Kevin) (Entered: 11/13/2006) |
| 11/13/2006 | 22 | Order Granting Application for Pro Hac Vice re: Joseph S. Grinstein (Related Doc # 21) signed on 11/13/2006. (Blum, Helene) (Entered: 11/13/2006) |
| 11/20/2006 | 24 | So Ordered Agreed Protective Order signed on 11/20/2006 Between All Parties. (Blum, Helene) (Entered: 11/20/2006) |
| 11/20/2006 | 25 | So Ordered Stipulation signed on 11/20/2006 Between All Parties re: Discovery Schedule. (Blum, Helene) (Entered: 11/20/2006) |
| 11/20/2006 | 29 | Transcript *of Hearing Held on November 14, 2006 at 9:39 AM, Re: Pretrial Conference* (related document(s)2) filed by Rand Transcript Service, Inc.. (Braithwaite, Kenishia) (Entered: 12/05/2006) |
| 11/21/2006 | 26 | Order Granting Application for Pro Hac Vice re: Matthew R. Berry (Related Doc # 23) signed on 11/20/2006. (Blum, Helene) (Entered: 11/21/2006) |
| 11/27/2006 | 27 | Answer to Complaint (Related Doc # 1), Counterclaim against Rembrandt Technologies LP filed by Shelley C. Chapman on behalf of Adelphia Communications Corporation, Century-TCI California Communications, LP, Century-TCI Distribution Company, LLC, Century-TCI Holdings, LLC, Parnassos Communications, LP, Parnassos Distribution Company I, LLC, Parnassos |

| | | Distribution II, LLC, Parnassos Holdings, LLC, Parnassos, L.P., Western NY Cablevision, LP. (Attachments: # 1 Certificate of Service)(Chapman, Shelley) (Entered: 11/27/2006) |
|---|---|---|
| 11/28/2006 | 28 | So Ordered Stipulation signed on 11/28/2006 Between All Parties re: Second Protective Order. (Blum, Helene) (Entered: 11/28/2006) |
| 12/15/2006 | 30 | Response /Plaintiff's Reply to Defendants' Answer and Counterclaims (related document(s)27) filed by James L. Garrity Jr. on behalf of Rembrandt Technologies LP. (Garrity, James) (Entered: 12/15/2006) |
| 01/10/2007 | 31 | Motion to Withdraw the Reference /Rembrandt Technologies. LP's Motion to Withdraw the Reference to the Bankruptcy Court filed by James L. Garrity Jr. on behalf of Rembrandt Technologies LP. (Garrity, James) (Entered: 01/10/2007) |
| 01/10/2007 | | Receipt of Motion to Withdraw the Reference (fee)(06-01739-reg) [motion,205] ( 150.00) Filing Fee. Receipt number 4069827. Fee amount 150.00. (U.S. Treasury) (Entered: 01/10/2007) |
| 01/10/2007 | 32 | Memorandum of Law in Support of Rembrandt Technologies. LP's Motion to Withdraw the Reference to the Bankruptcy Court (related document(s)31) filed by James L. Garrity Jr. on behalf of Rembrandt Technologies LP. (Garrity, James) (Entered: 01/10/2007) |
| 01/10/2007 | 33 | Declaration of Marc B. Hankin is Support of Rembrandt Technologies. LP's Motion to Withdraw the Reference to the Bankruptcy Court (related document(s)31) filed by James L. Garrity Jr. on behalf of Rembrandt Technologies LP. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E) (Garrity, James) (Entered: 01/10/2007) |
| 01/11/2007 | 34 | Civil Cover Sheet from U.S. District Court, Case Number: 0700214 Judge William H. Pauley (related document(s)31) filed by Clerk's Office of the U.S. Bankruptcy Court. (Rouzeau, Anatin) (Entered: 01/11/2007) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 03/02/2007 11:35:51 | | | |
| PACER Login: | ps0067 | Client Code: | 331049 |
| Description: | Docket Report | Search Criteria: | 06-01739-reg Fil or Ent: filed From: 9/13/2006 To: 3/2/2007 Doc From: 0 Doc To: 99999999 Format: HTML |

https://ecf.nysb.uscourts.gov/cgi-bin/DktRpt.pl?218746394240333-L_889_0-1    3/2/2007

Case 2.07-cv-00804-PMSE - Document 160-35   Filed 06/28/2007   Page 9 of 99

| Billable Pages: | 4 | Cost: | 0.32 | |

# Exhibit 35

A CERTIFIED TRUE COPY

FEB 1 6 2005

ATTEST
FOR THE JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

FEB 1 6 2005

FILED
CLERK'S OFFICE

*RELEASED FOR PUBLICATION*

*DOCKET NO. 1660*

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

## IN RE PHARMASTEM THERAPEUTICS, INC., PATENT LITIGATION

**BEFORE WM. TERRELL HODGES, CHAIRMAN, JOHN F. KEENAN, D. LOWELL JENSEN, J. FREDERICK MOTZ, ROBERT L. MILLER, JR., KATHRYN H. VRATIL AND DAVID R. HANSEN, JUDGES OF THE PANEL**

### TRANSFER ORDER

This litigation currently consists of the six actions listed on the attached Schedule A and pending in six districts as follows: one action each in the Central and Northern Districts of California, the District of Delaware, the Middle District of Florida, the District of Massachusetts, and the Eastern District of Pennsylvania.[1] The six actions all arise from efforts by PharmaStem Therapeutics, Inc. (Pharma) to enforce patents relating to the collection and storage of a newborn's umbilical cord blood and/or placenta for future therapeutic uses. The five actions pending outside the District of Delaware are patent infringement actions brought by Pharma, and the Delaware action is an unfair competition action brought against Pharma that is predicated in large part upon Pharma's allegedly illicit patent enforcement efforts. Now before the Panel is a motion, pursuant to 28 U.S.C. § 1407, brought by four cord blood collection companies and fifteen health care providers or facilities which are defendants in the various patent infringement actions (three of the four cord blood collection company movants are also the plaintiffs in the District of Delaware unfair competition action). Opposed to transfer are Pharma and two additional third-party defendants named in various actions: i) Pharma's chief executive (sued in the Northern District of California, the Middle District of Florida, and the Eastern District of Pennsylvania actions); and ii) Pharma licensee Stembanc, Inc., which is sued as a third-party defendant in the Northern District of California action. If the Panel orders centralization over two of these three parties' objections, then i) Pharma would favor centralization of the MDL-1660 actions in, in order of preference, the Northern District of California, the Central District of California, any other of the three districts where it has sued for patent infringement, or, lastly, the District of Delaware (but with assignment to a judge other than the judge to whom the constituent Delaware action is now assigned); and ii)

---

[1] The Section 1407 motion as filed before the Panel included an additional action pending in the District of Delaware, *PharmaStem Therapeutics, Inc. v. ViaCell, Inc., et al.*, C.A. No. 1:02-148. Trial has occurred in this action and an appeal from the judgment entered in the action has been taken to the United States Court of Appeals for the Federal Circuit. Accordingly, the question of Section 1407 transfer for coordinated or consolidated pretrial proceedings with respect to this action is now moot. Should subsequent developments result in the return of the action for additional pretrial proceedings to the Delaware district (the court selected as the transferee district for this docket), the action may be considered as a potential tag-along action in accordance with Panel and local court rules. *See* Rule 7.5, R.P.J.P.M.L., 199 F.R.D. 425, 436 (2001).

- 2 -

Stembanc expressly requests that the Panel sever and simultaneously remand to the Northern District of California the claims asserted against it in the Northern District of California action (if this request is denied, then Stembanc would support selection of the Northern District of California or the Northern District of Ohio as transferee district).

On the basis of the papers filed and hearing session held, the Panel finds that the actions in this litigation involve common questions of fact and that centralization in the District of Delaware will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. At issue in each of the patent infringement actions brought by Pharma are Pharma patents that relate to compositions and methods for the preservation of stem cells derived from human umbilical cord blood. The sixth MDL-1660 action presents claims arising from allegations of patent misuse of the same patents and also raises issues similar to those that have been filed in counterclaims in several of the other MDL-1660 actions. All actions can thus be expected to share factual and legal questions concerning such matters as the technology underlying the patents, prior art, claim construction and issues of infringement involving the patents. Centralization under Section 1407 is necessary in order to eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel and the judiciary.

Parties opposing the motion before the Panel have argued, inter alia, that Section 1407 transfer should be denied because i) transfer would retard the progress of an earlier patent infringement action brought by Pharma in the District of Delaware (*supra*, note 1) that had been pending since 2002, had been the subject of one trial (whose verdicts were partially set aside pursuant to post-trial motions), and is now on appeal; ii) alternatives to 1407 transfer were available to address any common discovery matters and to prevent inconsistent pretrial rulings; and/or iii) transfer would be unduly burdensome or otherwise prejudicial. We are not persuaded by these contentions. While we applaud every cooperative effort undertaken by parties to any litigation, we observe that transfer under Section 1407 has the benefit of placing all actions in this docket before a single judge who can structure pretrial proceedings to consider all parties' legitimate discovery needs while ensuring that common parties and witnesses are not subjected to discovery demands which duplicate activity that has already occurred or is occurring in other actions. Furthermore, by choosing to centralize this litigation in the District of Delaware and to assign it to the judge before whom Pharma's 2002 Delaware infringement action was brought, we will be placing these actions before a transferee judge i) who is already familiar with many of the technological and legal issues posed by these actions, and ii) who will have the flexibility to structure any pretrial proceedings in the six current MDL-1660 actions with any pretrial proceedings that may later present themselves in the 2002 Delaware action (upon resolution of pending appeals), so that any common matters may be addressed jointly while still ensuring that any matters unique to the 2002 action or the six centralized MDL-1660 actions may proceed on their own separate tracks.

In seeking severance and remand of the third-party claims asserted against it, Stembanc argues that the uniqueness and/or simplicity of those claims renders their inclusion in MDL-1660 unnecessary or inadvisable. We are not persuaded by these contentions on the basis of the record now before us. As Section 1407 proceedings evolve in the transferee district, Stembanc may at some point wish to renew its arguments and to approach the transferee judge for a suggestion of remand. We note that whenever the transferee judge deems remand of any claims or actions appropriate, procedures are

- 3 -

available whereby this may be accomplished with a minimum of delay.  *See* Rule 7.6, R.P.J.P.M.L., 199 F.R.D. at 436-38.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. §1407, the actions listed on the attached Schedule A and pending outside the District of Delaware are transferred to the District of Delaware and, with the consent of that court, assigned to the Honorable Gregory M. Sleet for coordinated or consolidated pretrial proceedings with the action pending in that district and listed on Schedule A.

FOR THE PANEL:

Wm. Terrell Hodges
Chairman

# SCHEDULE A

MDL-1660 -- In re PharmaStem Therapeutics, Inc., Patent Litigation

### Central District of California

*PharmaStem Therapeutics v. CureSource, Inc., et al.*, C.A. No. 8:04-921

### Northern District of California

*PharmaStem Therapeutics, Inc. v. Cord Blood Registry, Inc., et al.*, C.A. No. 3:04-3072

### District of Delaware

*ViaCell, Inc., et al. v. PharmaStem Therapeutics, Inc.*, C.A. No. 1:04-1335 *GMS*

### Middle District of Florida

*PharmaStem Therapeutics, Inc. v. Cryo-Cell International, Inc., et al.*,
   C.A. No. 8:04-1740

### District of Massachusetts

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc., et al.*, C.A. No. 1:04-11673

### Eastern District of Pennsylvania

*PharmaStem Therapeutics, Inc. v. CorCell, Inc., et al.*, C.A. No. 2:04-3561

# Exhibit 36

## Table C.
## U.S. District Courts—Civil Cases Commenced, Terminated, and Pending During the 12-Month Periods Ending March 31, 2005 and 2006

| Circuit | Filings | | | Terminations | | | Pending | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2005 | 2006 | Percent Change[1] | 2005 | 2006 | Percent Change[1] | 2005[2] | 2006 | Percent Change[1] |
| TOTAL | 278,712 | 244,068 | -12.4 | 260,980 | 281,220 | 7.8 | 283,209 | 246,057 | -13.1 |
| DC | 2,559 | 2,566 | 0.3 | 2,532 | 2,598 | 2.6 | 3,308 | 3,276 | -1.0 |
| 1ST | 6,750 | 6,139 | -9.1 | 6,707 | 6,539 | -2.5 | 7,453 | 7,053 | -5.4 |
| ME | 521 | 448 | -14.0 | 500 | 509 | 1.8 | 354 | 293 | -17.2 |
| MA | 3,306 | 3,213 | -2.8 | 3,490 | 3,316 | -5.0 | 3,926 | 3,823 | -2.6 |
| NH | 504 | 490 | -2.8 | 541 | 550 | 1.7 | 470 | 410 | -12.8 |
| RI | 828 | 580 | -30.0 | 618 | 540 | -12.6 | 775 | 815 | 5.2 |
| PR | 1,591 | 1,408 | -11.5 | 1,558 | 1,624 | 4.2 | 1,928 | 1,712 | -11.2 |
| 2ND | 24,020 | 22,422 | -6.7 | 22,354 | 22,080 | -1.2 | 31,830 | 32,172 | 1.1 |
| CT | 2,336 | 2,020 | -13.5 | 2,536 | 2,208 | -12.9 | 2,905 | 2,717 | -6.5 |
| NY,N | 1,601 | 1,687 | 5.4 | 1,619 | 1,511 | -6.7 | 2,535 | 2,711 | 6.9 |
| NY,E | 6,279 | 6,126 | -2.4 | 6,583 | 6,203 | -5.8 | 7,542 | 7,465 | -1.0 |
| NY,S | 11,676 | 10,520 | -9.9 | 9,591 | 10,156 | 5.9 | 15,918 | 16,282 | 2.3 |
| NY,W | 1,749 | 1,720 | -1.7 | 1,654 | 1,654 | 0.0 | 2,602 | 2,668 | 2.5 |
| VT | 379 | 349 | -7.9 | 371 | 348 | -6.2 | 328 | 329 | 0.3 |
| 3RD | 32,835 | 27,444 | -16.4 | 27,777 | 29,653 | 6.8 | 24,515 | 22,306 | -9.0 |
| DE | 1,628 | 1,067 | -34.5 | 1,424 | 1,367 | -4.0 | 1,733 | 1,433 | -17.3 |
| NJ | 6,853 | 6,103 | -11.0 | 6,618 | 6,478 | -2.1 | 6,187 | 5,812 | -6.1 |
| PA,E | 18,219 | 14,439 | -20.8 | 13,817 | 15,604 | 12.9 | 10,635 | 9,470 | -11.0 |
| PA,M | 2,909 | 2,819 | -3.1 | 2,813 | 2,957 | 5.1 | 2,172 | 2,034 | -6.4 |
| PA,W | 2,846 | 2,633 | -7.5 | 2,881 | 2,959 | 2.7 | 2,742 | 2,416 | -11.9 |
| VI | 380 | 383 | 0.8 | 224 | 288 | 28.6 | 1,046 | 1,141 | 9.1 |
| 4TH | 39,503 | 18,241 | -53.8 | 22,670 | 38,280 | 68.9 | 34,475 | 14,436 | -58.1 |
| MD | 4,166 | 3,532 | -15.2 | 4,418 | 3,652 | -17.3 | 3,062 | 2,942 | -3.9 |
| NC,E | 1,515 | 1,317 | -13.1 | 1,374 | 1,398 | 1.7 | 1,472 | 1,391 | -5.5 |
| NC,M | 1,220 | 1,201 | -1.6 | 1,217 | 1,277 | 4.9 | 1,088 | 1,012 | -7.0 |
| NC,W | 1,151 | 1,004 | -12.8 | 1,122 | 1,082 | -3.6 | 1,134 | 1,056 | -6.9 |
| SC | 23,508 | 3,768 | -84.0 | 5,276 | 23,072 | 337.3 | 22,504 | 3,200 | -85.8 |
| VA,E | 4,555 | 3,950 | -13.3 | 4,606 | 4,149 | -9.9 | 2,224 | 2,025 | -9.0 |
| VA,W | 1,419 | 1,382 | -2.6 | 1,621 | 1,498 | -7.6 | 909 | 793 | -12.8 |
| WV,N | 652 | 643 | -1.4 | 644 | 609 | -5.4 | 686 | 720 | 5.0 |
| WV,S | 1,317 | 1,444 | 9.6 | 2,392 | 1,543 | -35.5 | 1,396 | 1,297 | -7.1 |

## Table C. (March 31, 2006—Continued)

| Circuit | Filings | | | Terminations | | | Pending | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2005 | 2006 | Percent Change[1] | 2005 | 2006 | Percent Change[1] | 2005[2] | 2006 | Percent Change[1] |
| **5TH** | **29,852** | **34,622** | **16.0** | **32,074** | **31,296** | **-2.4** | **33,227** | **36,553** | **10.0** |
| LA,E | 3,441 | 7,302 | 112.2 | 3,195 | 2,675 | -16.3 | 3,411 | 8,038 | 135.6 |
| LA,M | 1,001 | 1,504 | 50.2 | 1,047 | 1,510 | 44.2 | 8,799 | 8,793 | -0.1 |
| LA,W | 2,576 | 2,351 | -8.7 | 2,723 | 2,579 | -5.3 | 2,610 | 2,282 | -9.1 |
| MS,N | 1,353 | 1,182 | -12.6 | 1,368 | 1,170 | -14.5 | 1,494 | 1,506 | 0.8 |
| MS,S | 2,687 | 4,398 | 63.7 | 4,058 | 4,445 | 9.5 | 2,848 | 2,801 | -1.7 |
| TX,N | 5,014 | 4,577 | -8.7 | 5,620 | 4,761 | -15.3 | 3,581 | 3,397 | -5.1 |
| TX,E | 3,006 | 2,971 | -1.2 | 3,149 | 3,072 | -2.5 | 2,499 | 2,398 | -4.1 |
| TX,S | 7,296 | 6,912 | -5.3 | 7,590 | 7,424 | -2.2 | 5,392 | 4,880 | -9.5 |
| TX,W | 3,478 | 3,425 | -1.5 | 3,324 | 3,660 | 10.1 | 2,693 | 2,458 | -8.7 |
| **6TH** | **24,236** | **22,556** | **-6.9** | **26,350** | **37,672** | **43.0** | **39,599** | **24,483** | **-38.2** |
| KY,E | 2,297 | 2,188 | -4.8 | 2,376 | 2,327 | -2.1 | 1,787 | 1,648 | -7.8 |
| KY,W | 1,410 | 1,510 | 7.1 | 1,550 | 1,506 | -2.8 | 1,382 | 1,386 | 0.3 |
| MI,E | 5,151 | 5,642 | 9.5 | 4,916 | 20,101 | 308.9 | 19,397 | 4,938 | -74.6 |
| MI,W | 1,660 | 1,537 | -7.4 | 1,731 | 1,561 | -9.8 | 1,245 | 1,221 | -1.9 |
| OH,N | 6,392 | 5,176 | -19.0 | 8,521 | 4,805 | -43.6 | 7,757 | 8,128 | 4.8 |
| OH,S | 2,683 | 2,402 | -10.5 | 2,623 | 2,753 | 5.0 | 3,231 | 2,880 | -10.9 |
| TN,E | 1,669 | 1,334 | -20.1 | 1,690 | 1,661 | -1.7 | 1,817 | 1,490 | -18.0 |
| TN,M | 1,477 | 1,446 | -2.1 | 1,678 | 1,646 | -1.9 | 1,423 | 1,223 | -14.1 |
| TN,W | 1,497 | 1,321 | -11.8 | 1,265 | 1,312 | 3.7 | 1,560 | 1,569 | 0.6 |
| **7TH** | **17,965** | **16,811** | **-6.4** | **19,614** | **17,044** | **-13.1** | **14,940** | **14,707** | **-1.6** |
| IL,N | 8,305 | 7,608 | -8.4 | 9,376 | 7,739 | -17.5 | 6,785 | 6,654 | -1.9 |
| IL,C | 1,180 | 1,076 | -8.8 | 1,172 | 1,093 | -6.8 | 992 | 975 | -1.7 |
| IL,S | 1,282 | 1,254 | -2.2 | 1,336 | 1,185 | -11.3 | 1,243 | 1,312 | 5.6 |
| IN,N | 1,922 | 1,885 | -1.9 | 2,041 | 1,941 | -4.9 | 1,676 | 1,620 | -3.4 |
| IN,S | 2,955 | 2,802 | -5.2 | 3,265 | 2,938 | -10.0 | 2,619 | 2,483 | -5.2 |
| WI,E | 1,351 | 1,428 | 5.7 | 1,427 | 1,358 | -4.8 | 1,344 | 1,414 | 5.2 |
| WI,W | 970 | 758 | -21.9 | 997 | 790 | -20.8 | 281 | 249 | -11.4 |
| **8TH** | **17,309** | **15,982** | **-7.7** | **16,734** | **16,189** | **-3.3** | **18,646** | **18,439** | **-1.1** |
| AR,E | 3,704 | 2,954 | -20.3 | 2,422 | 2,508 | 3.6 | 3,515 | 3,961 | 12.7 |
| AR,W | 1,055 | 753 | -28.6 | 1,185 | 991 | -16.4 | 900 | 662 | -26.5 |
| IA,N | 677 | 569 | -16.0 | 634 | 598 | -5.7 | 599 | 570 | -4.9 |
| IA,S | 954 | 868 | -9.0 | 1,023 | 1,001 | -2.2 | 973 | 840 | -13.7 |
| MN | 4,440 | 3,676 | -17.2 | 4,865 | 4,122 | -15.3 | 7,288 | 6,842 | -6.1 |
| MO,E | 2,327 | 2,810 | 20.8 | 2,318 | 2,598 | 12.1 | 1,960 | 2,172 | 10.8 |
| MO,W | 2,420 | 2,597 | 7.3 | 2,382 | 2,682 | 12.6 | 1,923 | 1,838 | -4.4 |
| NE | 1,007 | 1,109 | 10.1 | 1,182 | 990 | -16.3 | 809 | 928 | 14.7 |
| ND | 323 | 230 | -28.8 | 290 | 239 | -17.6 | 249 | 240 | -3.6 |
| SD | 402 | 416 | 3.5 | 433 | 460 | 6.2 | 430 | 386 | -10.2 |

## Table C. (March 31, 2006—Continued)

| Circuit | Filings | | | Terminations | | | Pending | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2005 | 2006 | Percent Change[1] | 2005 | 2006 | Percent Change[1] | 2005[2] | 2006 | Percent Change[1] |
| **9TH** | **43,661** | **41,030** | **-6.0** | **42,920** | **40,977** | **-4.5** | **41,732** | **41,785** | **0.1** |
| AK | 361 | 367 | 1.7 | 393 | 338 | -14.0 | 373 | 402 | 7.8 |
| AZ | 4,295 | 5,006 | 16.6 | 3,531 | 4,343 | 23.0 | 4,292 | 4,955 | 15.4 |
| CA,N | 5,705 | 6,624 | 16.1 | 5,815 | 5,997 | 3.1 | 6,051 | 6,678 | 10.4 |
| CA,E | 4,404 | 4,197 | -4.7 | 4,398 | 3,897 | -11.4 | 5,465 | 5,765 | 5.5 |
| CA,C | 14,070 | 11,585 | -17.7 | 13,766 | 12,530 | -9.0 | 11,594 | 10,649 | -8.2 |
| CA,S | 2,794 | 2,646 | -5.3 | 2,928 | 2,668 | -8.9 | 2,017 | 1,995 | -1.1 |
| HI | 761 | 785 | 3.2 | 792 | 767 | -3.2 | 755 | 773 | 2.4 |
| ID | 642 | 567 | -11.7 | 650 | 582 | -10.5 | 692 | 677 | -2.2 |
| MT | 711 | 630 | -11.4 | 665 | 591 | -11.1 | 836 | 875 | 4.7 |
| NV | 2,678 | 2,232 | -16.7 | 2,581 | 2,149 | -16.7 | 2,464 | 2,547 | 3.4 |
| OR | 2,533 | 2,572 | 1.5 | 2,445 | 2,611 | 6.8 | 2,457 | 2,418 | -1.6 |
| WA,E | 910 | 736 | -19.1 | 985 | 777 | -21.1 | 635 | 594 | -6.5 |
| WA,W | 3,712 | 2,997 | -19.3 | 3,877 | 3,613 | -6.8 | 3,968 | 3,352 | -15.5 |
| GUAM | 50 | 39 | -22.0 | 57 | 80 | 40.4 | 81 | 40 | -50.6 |
| NMI | 35 | 47 | 34.3 | 37 | 34 | -8.1 | 52 | 65 | 25.0 |
| **10TH** | **11,053** | **10,089** | **-8.7** | **11,717** | **10,812** | **-7.7** | **9,847** | **9,124** | **-7.4** |
| CO | 2,748 | 2,766 | 0.7 | 2,995 | 2,887 | -3.6 | 2,281 | 2,160 | -5.3 |
| KS | 1,774 | 1,537 | -13.4 | 1,930 | 1,598 | -17.2 | 1,535 | 1,474 | -4.0 |
| NM | 1,489 | 1,300 | -12.7 | 1,607 | 1,439 | -10.5 | 1,353 | 1,214 | -10.3 |
| OK,N | 904 | 779 | -13.8 | 956 | 929 | -2.8 | 1,036 | 886 | -14.5 |
| OK,E | 597 | 541 | -9.4 | 622 | 567 | -8.9 | 530 | 504 | -4.9 |
| OK,W | 1,812 | 1,576 | -13.0 | 1,783 | 1,713 | -3.9 | 1,294 | 1,157 | -10.6 |
| UT | 1,350 | 1,275 | -5.6 | 1,440 | 1,346 | -6.5 | 1,449 | 1,378 | -4.9 |
| WY | 379 | 315 | -16.9 | 384 | 333 | -13.3 | 369 | 351 | -4.9 |
| **11TH** | **28,969** | **26,166** | **-9.7** | **29,531** | **28,080** | **-4.9** | **23,637** | **21,723** | **-8.1** |
| AL,N | 3,699 | 2,766 | -25.2 | 3,912 | 3,186 | -18.6 | 2,965 | 2,545 | -14.2 |
| AL,M | 1,271 | 1,274 | 0.2 | 1,334 | 1,244 | -6.8 | 1,227 | 1,257 | 2.4 |
| AL,S | 874 | 772 | -11.7 | 892 | 778 | -12.8 | 712 | 706 | -0.9 |
| FL,N | 1,903 | 1,498 | -21.3 | 1,781 | 1,540 | -13.5 | 1,305 | 1,263 | -3.2 |
| FL,M | 7,420 | 6,692 | -9.8 | 7,295 | 6,796 | -6.9 | 5,352 | 5,248 | -2.0 |
| FL,S | 6,877 | 6,829 | -0.7 | 7,181 | 7,528 | 4.8 | 6,397 | 5,698 | -10.9 |
| GA,N | 4,540 | 3,984 | -12.3 | 4,875 | 4,615 | -5.3 | 3,681 | 3,050 | -17.2 |
| GA,M | 1,198 | 1,194 | -0.3 | 1,221 | 1,168 | -4.4 | 1,034 | 1,060 | 2.5 |
| GA,S | 1,187 | 1,157 | -2.5 | 1,040 | 1,225 | 17.8 | 964 | 896 | -7.1 |

NOTE: PENDING CASES EXCLUDE ASBESTOS CASES TRANSFERRED TO PA.E UNDER ORDER 875 OF THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION.
[1] PERCENT CHANGE NOT COMPUTED WHEN FEWER THAN 10 CASES REPORTED FOR THE PREVIOUS PERIOD.
[2] REVISED.

38

Case 2:07-cv-00574-TCMC-DML Document 16-28 Filed 06/29/2007 Page 1 of 22

# Exhibit 37

US2000 5490191.1

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | Numerical Standing | |
|---|---|---|---|---|---|---|---|---|---|---|
| **DELAWARE** | | | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | Filings* | | 1,077 | 1,190 | 1,797 | 1,362 | 2,028 | 1,004 | | |
| | Terminations | | 1,419 | 1,448 | 1,516 | 1,507 | 1,478 | 1,020 | | |
| | Pending | | 1,501 | 1,853 | 2,085 | 1,836 | 1,999 | 1,477 | | |
| | % Change in Total Filings | Over Last Year | | -9.5 | | | | | 74 | 6 |
| | | Over Earlier Years | | | -40.1 | -20.9 | -46.9 | 7.3 | 34 | 3 |
| | Number of Judgeships | | 4 | 4 | 4 | 4 | 4 | 4 | | |
| | Vacant Judgeship Months** | | .0 | .0 | .0 | 1.9 | 3.1 | .0 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 270 | 298 | 449 | 340 | 507 | 251 | 82 | 5 |
| | | Civil | 233 | 264 | 414 | 306 | 462 | 233 | 73 | 5 |
| | | Criminal Felony | 30 | 28 | 29 | 25 | 38 | 18 | 88 | 5 |
| | | Supervised Release Hearings** | 7 | 6 | 6 | 9 | 7 | - | 87 | 4 |
| | Pending Cases | | 375 | 463 | 521 | 459 | 500 | 369 | 48 | 5 |
| | Weighted Filings** | | 367 | 422 | 534 | 424 | 516 | 379 | 71 | 4 |
| | Terminations | | 355 | 362 | 379 | 377 | 370 | 255 | 69 | 4 |
| | Trials Completed | | 15 | 20 | 19 | 23 | 18 | 16 | 65 | 3 |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 9.3 | 9.4 | 9.1 | 8.3 | 9.8 | 8.0 | 56 | 2 |
| | | Civil** | 16.8 | 10.9 | 14.0 | 11.2 | 8.2 | 12.6 | 91 | 5 |
| | From Filing to Trial** (Civil Only) | | 26.0 | 23.5 | 26.0 | 24.0 | 22.5 | 21.0 | 49 | 3 |
| OTHER | Civil Cases Over 3 Years Old** | Number | 142 | 156 | 65 | 66 | 99 | 77 | | |
| | | Percentage | 10.6 | 9.1 | 3.4 | 3.9 | 5.4 | 5.5 | 76 | 5 |
| | Average Number of Felony Defendants Filed Per Case | | 1.2 | 1.2 | 1.2 | 1.3 | 1.1 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 39.60 | 39.82 | 38.50 | 34.98 | 33.84 | 32.68 | | |
| | | Percent Not Selected or Challenged | 24.1 | 22.8 | 20.9 | 24.0 | 24.4 | 19.9 | | |

| 2006 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 930 | 32 | 6 | 233 | 12 | 6 | 20 | 76 | 52 | 160 | 132 | 51 | 150 |
| Criminal* | 117 | - | 26 | 14 | 29 | 20 | - | 2 | 5 | 10 | 2 | - | 9 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See "Explanation of Selected Terms."

# Exhibit 38

US2000 5490191.1

| Search Result List | | | | | | | |
|---|---|---|---|---|---|---|---|
| Court | Docket Number | Description | Participant | Filed | Date Retrieved | Active or Closed | Identification |
| U.S. District - Delaware | 1:00cv1020 | Pegasus Development, et al v. Directv Inc, et al | - | 12/04/2000 | 02/26/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:00cv432 | TI Group Automotive v. VDO North America, et al | - | 04/25/2000 | 01/25/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:01cv51 | Fisher-Price Inc, et al v. Safety 1ST Inc, et al | - | 01/26/2001 | 12/29/2006 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:02cv1694 | Becton Dickinson Co, et al v. Tyco Healthcare | - | 12/23/2002 | 03/01/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:03cv896 | Martek Biosciences v. Nutrinova Inc, et al | - | 09/23/2003 | 12/29/2006 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:03cv927 | Leapfrog Enterprises v. Fisher-Price Inc, et al | - | 10/03/2003 | 02/26/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:04cv1230 | Applera Corporation, et al v. Thermo Electron Corp | - | 09/03/2004 | 02/15/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:04cv1505 | Thermo Finnigan LLC v. Applera Corporation | - | 12/08/2004 | 01/10/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:04cv874 | Telcordia Tech Inc v. Alcatel SA, et al | - | 07/16/2004 | 03/01/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:04cv875 | Telcordia Tech Inc v. Lucent Technologies | - | 07/16/2004 | 03/01/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:04cv876 | Telcordia Tech Inc v. Cisco Systems Inc | - | 07/16/2004 | 03/01/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:05cv110 | Thermo Finnigan LLC v. Applera Corporation et al | - | 02/23/2005 | 02/15/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:05cv149 | Aladdin Knowledge Systems Ltd v. Feitian Technologies Co Ltd Et A | - | 03/11/2005 | 12/30/2006 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:05cv152 | Pharmastem Therapeutics Inc v. Aszlerbaum et al | - | 05/12/2005 | 12/30/2006 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:05cv153 | Pharmastem Therapeutics Inc v. Cord Blood Registry Inc et al | - | 03/31/2005 | 12/30/2006 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:05cv154 | Pharmastem Therapeutics Inc v. Cryo-Cell International Inc Et A | - | 03/25/2005 | 03/01/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:05cv155 | Pharmastem Therapeutics Inc v. Viacell Inc et al | - | 05/06/2005 | 12/30/2006 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:05cv156 | Pharmastem Therapeutics Inc v. Corcell, Inc et al | - | 03/28/2005 | 03/01/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:05cv197 | Smith Kline & French Laboratories Limited et al v. Teva Pharmaceuticals USA Inc | - | 04/06/2005 | 02/28/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:05cv349 | Talecris Biotherapeutics Inc v. Baxter International Inc Et A | - | 06/01/2005 | 02/26/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:05cv422 | Energy Transportation Group Inc v. Sonic Innovations Inc Et A | - | 06/23/2005 | 12/30/2006 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:05cv434 | Dyson Technology Limited et al v. Maytag Corporation | - | 06/27/2005 | 08/03/2006 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:05cv486 | Textron Innovations Inc v. Toro Company | - | 07/12/2005 | 11/29/2006 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:05cv586 | Biovail Laboratories International SRL v. Andrx Pharmaceuticals LLC Et A | - | 08/10/2005 | 02/28/2007 | Active | NOS : (830) Patent |

| U.S. District - Delaware | 1:05cv590 | Abbott Diabetes Care Inc v. Dexcom Inc | - | 08/11/2005 | 02/28/2007 | Active | NOS : (830) Patent |
|---|---|---|---|---|---|---|---|
| U.S. District - Delaware | 1:05cv636 | Black & Decker Inc et al v. Stanley Works | - | 08/30/2005 | 10/13/2006 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:05cv658 | Merck & Co Inc v. Watson Laboratories Inc | - | 09/07/2005 | 01/08/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:05cv701 | Synopsys Inc v. Magma Design Automation | - | 09/26/2005 | 03/01/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:05cv730 | Biovail Laboratories International SRL v. Andrx Pharmaceuticals LLC Et A | - | 10/14/2005 | 03/01/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:05cv842 | UD Technology Corporation v. Phenomenex Inc et al | - | 12/05/2005 | 12/06/2006 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:06cv187 | Automotive Technologies International Inc v. American Honda Motor Company et al | - | 03/17/2006 | 03/01/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:06cv230 | Merck & Co Inc v. Apotex Inc | - | 04/07/2006 | 03/01/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:06cv251 | US Philips Corporation v. Eastman Kodak Company | - | 04/18/2006 | 09/24/2006 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:06cv286 | Aventis Pharmaceuticals Inc et al v. Barr Laboratories Inc | - | 05/02/2006 | 03/01/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:06cv297 | Rohm and Haas Electronic Materials LLC v. Honeywell Electronic Materials Inc Et A | - | 05/05/2006 | 03/01/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:06cv346 | Analog Devices Inc v. Linear Technology Corp | - | 05/25/2006 | 07/03/2006 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:06cv369 | Finjan Software Ltd v. Secure Computing Corporation et al | - | 06/05/2006 | 07/11/2006 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:06cv386 | Black & Decker Inc et al v. Techtronics Industries Co Ltd Et A | - | 06/14/2006 | 09/28/2006 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:06cv391 | Automotive Technologies International Inc v. Hyundai Motor America Et A | - | 06/16/2006 | 03/01/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:06cv417 | Colgate-Palmolive Company v. Ranir LLC | - | 06/30/2006 | 08/08/2006 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:06cv438 | Elan Pharma International Limited v. Abraxis Bioscience Inc | - | 07/19/2006 | 03/01/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:06cv476 | Linear Technology Corporation v. Monolithic Power Systems Inc | - | 08/03/2006 | 08/29/2006 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:06cv514 | Abbott Diabetes Care Inc v. Dexcom Inc | - | 08/17/2006 | 03/01/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:06cv54 | Illinois Tool Works Inc v. Frito-Lay North America Inc | - | 01/27/2006 | 12/30/2006 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:06cv543 | Ronald A Katz Technology Licensing, LP v. Reliant Energy Inc Et A | - | 09/01/2006 | 03/01/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:06cv544 | Ronald A Katz Technology Licensing LP v. TD Banknorth Inc et al | - | 09/01/2006 | 03/01/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:06cv545 | Ronald A Katz Technology Licensing, LP v. Ahold USA Inc et al | - | 09/01/2006 | 03/01/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:06cv546 | Ronald A Katz Technology Licensing, LP v. Time Warner Cable | - | 09/01/2006 | 03/01/2007 | Active | NOS : (830) Patent |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | Inc Et A | | | | | |
| U.S. District - Delaware | 1:06cv547 | Ronald A Katz Technology Licensing, LP v. American International Group, Inc Et A | - | 09/01/2006 | 03/01/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:06cv558 | Glaxo Group Ltd v. Spectrum Pharmaceuticals Inc | - | 09/08/2006 | 02/28/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:06cv620 | Biovail Laboratories International SRL v. Andrx Pharmaceuticals LLC Et A | - | 10/04/2006 | 02/22/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:06cv633 | Transmeta Corporation v. Intel Corporation | - | 10/11/2006 | 03/01/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:06cv635 | Rembrandt Technologies LP v. Cablevision Systems Corporation Et A | - | 10/13/2006 | 03/01/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:06cv636 | Aventis Pharma SA v. Baxter Healthcare Corp | - | 10/16/2006 | 03/01/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:06cv721 | Coxcom Inc v. Rembrandt Technologies LP | - | 11/30/2006 | 02/28/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:06cv727 | Rembrandt Technologies LP v. CBS Corporation | - | 12/01/2006 | 02/28/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:06cv729 | Rembrandt Technologies LP v. NBC Universal Inc | - | 12/01/2006 | 02/28/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:06cv730 | Rembrandt Technologies LP v. ABC Inc | - | 12/01/2006 | 02/28/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:06cv731 | Rembrandt Technologies LP v. Fox Entertainment Group Inc Et A | - | 12/01/2006 | 03/01/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:06cv764 | Nesscap Co Ltd v. Maxwell Technologies Inc | - | 12/14/2006 | 01/21/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:06cv775 | CVS Corporation v. Ronald A Katz Technology Licensing LP | - | 12/19/2006 | 03/01/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:07cv17 | Keurig Incorporated v. Kraft Foods Global Inc et al | - | 01/10/2007 | 02/28/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:07cv35 | Nesscap Co Ltd et al v. Maxwell Technologies Inc | - | 01/18/2007 | 02/22/2007 | Active | NOS : (830) Patent |
| U.S. District - Delaware | 1:07cv79 | Sandata Technologies Inc v. First Data Government Solutions Inc | - | 02/12/2007 | 03/01/2007 | Active | NOS : (830) Patent |

**Search Title**   Untitled Search 3/1/2007 (1)
**Client Matter Code** 331049 9444

## U.S. District Courts (Civil)

**Courts**   United States District Courts (Civil) - Delaware

**Judges**   sleet

**Nature Of Suit**   Patent (830)

**Status**   Active

**Charbonneau, Lynn**

| | |
|---|---|
| **From:** | Deem, Tonya |
| **Sent:** | Tuesday, March 06, 2007 2:52 PM |
| **To:** | Joswick, E.J. |
| **Cc:** | Stockwell, Mitch; Charbonneau, Lynn; Ludlam, Taylor |
| **Subject:** | RE: District of Delaware |

Thank you!

We will need to file in each of the 6 actions pending in Delaware a notice of filing (which will include the MDL motion and supporting papers). We will need you to sign the notices. Alternatively, if you are registered for e-filing in Delaware, we can just use your id and password and take care of everything from here. Lynn is handling the logistics of the filing so she can give you the details.

Tonya

---

**From:** Joswick, E.J.
**Sent:** Tuesday, March 06, 2007 2:46 PM
**To:** Deem, Tonya
**Cc:** Agelakopoulos, Athanasios; Stockwell, Mitch
**Subject:** RE: District of Delaware

I am a member and admitted to practice in the District Court. How can I help?

---

**From:** Deem, Tonya
**Sent:** Tuesday, March 06, 2007 2:31 PM
**To:** Agelakopoulos, Athanasios; Joswick, E.J.
**Cc:** Stockwell, Mitch
**Subject:** District of Delaware

I understand from PeopleSearch that you all are members of the Delaware Bar and admitted to practice before the District of Delaware. We hope to file a motion for transfer and consolidation with the Multi-District Litigation panel this week. Under the MDL rules, we must file the motion and supporting papers with the MDL panel and in each court in which a proposed transfer action is pending. Our motion includes the transfer of 6 actions pending in the District of Delaware. While we have a client in one of these actions, our local counsel has a conflict such that he prefers not to handle the filing (in our case and in the other 5 cases). In lieu of finding new local counsel, we are hoping that one of you could help us with this filing. In this regard, please let me know if you are a member of the bar, admitted to practice before the District court and willing to help.

Thanks,
Tonya



KILPATRICK
STOCKTON LLP
Attorneys at Law

Tonya R. Deem
Kilpatrick Stockton LLP
1001 West Fourth Street
Winston-Salem, NC 27101-2400
t 336 607 7485
f 336 734 2653

Confidentiality Notice:
This communication constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 U.S.C. Section 2510, and its disclosure is strictly limited to the recipient intended by the sender of this message. This transmission, and any attachments, may contain confidential attorney-client privileged information and attorney work product. If you are not the intended recipient, any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. Please contact us immediately by return e-mail or at 336 607 7300, and destroy the original transmission and its attachments without reading or saving in any manner.

3/6/2007

# Charbonneau, Lynn

**From:** Joswick, E.J.
**Sent:** Tuesday, March 06, 2007 2:55 PM
**To:** Deem, Tonya
**Cc:** Stockwell, Mitch; Charbonneau, Lynn; Ludlam, Taylor
**Subject:** RE: District of Delaware

I am not registered for e-filing. My bar number is 4271.

> **From:** Deem, Tonya
> **Sent:** Tuesday, March 06, 2007 2:52 PM
> **To:** Joswick, E.J.
> **Cc:** Stockwell, Mitch; Charbonneau, Lynn; Ludlam, Taylor
> **Subject:** RE: District of Delaware
>
> Thank you!
>
> We will need to file in each of the 6 actions pending in Delaware a notice of filing (which will include the MDL motion and supporting papers). We will need you to sign the notices. Alternatively, if you are registered for e-filing in Delaware, we can just use your id and password and take care of everything from here. Lynn is handling the logistics of the filing so she can give you the details.
>
> Tonya
>
> > **From:** Joswick, E.J.
> > **Sent:** Tuesday, March 06, 2007 2:46 PM
> > **To:** Deem, Tonya
> > **Cc:** Agelakopoulos, Athanasios; Stockwell, Mitch
> > **Subject:** RE: District of Delaware
> >
> > I am a member and admitted to practice in the District Court. How can I help?
> >
> > > **From:** Deem, Tonya
> > > **Sent:** Tuesday, March 06, 2007 2:31 PM
> > > **To:** Agelakopoulos, Athanasios; Joswick, E.J.
> > > **Cc:** Stockwell, Mitch
> > > **Subject:** District of Delaware
> > >
> > > I understand from PeopleSearch that you all are members of the Delaware Bar and admitted to practice before the District of Delaware. We hope to file a motion for transfer and consolidation with the Multi-District Litigation panel this week. Under the MDL rules, we must file the motion and supporting papers with the MDL panel and in each court in which a proposed transfer action is pending. Our motion includes the transfer of 6 actions pending in the District of Delaware. While we have a client in one of these actions, our local counsel has a conflict such that he prefers not to handle the filing (in our case and in the

3/6/2007

other 5 cases). In lieu of finding new local counsel, we are hoping that one of you could help us with this filing. In this regard, please let me know if you are a member of the bar, admitted to practice before the District court and willing to help.

Thanks,
Tonya


 KILPATRICK
STOCKTON LLP

Attorneys at Law

Tonya R. Deem
Kilpatrick Stockton LLP
1001 West Fourth Street
Winston-Salem, NC 27101-2400
t 336 607 7485
f 336 734 2653

Confidentiality Notice:
This communication constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 U.S.C. Section 2510, and its disclosure is strictly limited to the recipient intended by the sender of this message. This transmission, and any attachments, may contain confidential attorney-client privileged information and attorney work product. If you are not the intended recipient, any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. Please contact us immediately by return e-mail or at 336 607 7300, and destroy the original transmission and its attachments without reading or saving in any manner.

Case 2:07-cv-00574-MSE   Document 16-10   Filed 06/29/2007   Page 1 of 2

# Exhibit 39

US2000 5490191.1

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **TEXAS EASTERN** | | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | Numerical Standing | |
| | | | | | | | | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | Filings* | 3,658 | 3,583 | 3,860 | 4,072 | 3,610 | 3,452 | | |
| | Terminations | 3,623 | 3,538 | 4,243 | 3,487 | 4,458 | 4,819 | | |
| | Pending | 3,079 | 3,035 | 2,983 | 3,358 | 2,825 | 3,706 | | |
| | % Change in Total Filings — Over Last Year | | 2.1 | | | | | 14 | 2 |
| | % Change in Total Filings — Over Earlier Years | | | -5.2 | -10.2 | 1.3 | 6.0 | 41 | 5 |
| | Number of Judgeships | 8 | 8 | 8 | 8 | 7 | 7 | | |
| | Vacant Judgeship Months** | .0 | .0 | 9.1 | 4.2 | 19.3 | 10.0 | | |
| ACTIONS PER JUDGESHIP | FILINGS — Total | 457 | 448 | 483 | 509 | 515 | 493 | 38 | 6 |
| | FILINGS — Civil | 375 | 376 | 411 | 431 | 444 | 427 | 27 | 5 |
| | FILINGS — Criminal Felony | 82 | 72 | 71 | 77 | 70 | 66 | 36 | 3 |
| | FILINGS — Supervised Release Hearings** | 0 | 0 | 1 | 1 | 1 | - | - | - |
| | Pending Cases | 385 | 379 | 373 | 420 | 404 | 529 | 45 | 6 |
| | Weighted Filings** | 550 | 511 | 518 | 529 | 492 | 492 | 13 | 3 |
| | Terminations | 453 | 442 | 530 | 436 | 637 | 688 | 45 | 7 |
| | Trials Completed | 21 | 21 | 21 | 26 | 22 | 22 | 39 | 6 |
| MEDIAN TIMES (months) | From Filing to Disposition — Criminal Felony | 9.2 | 8.3 | 8.4 | 7.5 | 8.9 | 8.0 | 52 | 7 |
| | From Filing to Disposition — Civil** | 9.0 | 10.3 | 6.5 | 10.9 | 15.0 | 30.9 | 39 | 5 |
| | From Filing to Trial** (Civil Only) | 17.7 | 15.9 | 15.4 | 17.0 | 14.0 | 15.9 | 12 | 2 |
| OTHER | Civil Cases Over 3 Years Old** — Number | 80 | 64 | 47 | 41 | 58 | 881 | | |
| | Civil Cases Over 3 Years Old** — Percentage | 3.2 | 2.6 | 1.9 | 1.4 | 2.4 | 26.1 | 18 | 2 |
| | Average Number of Felony Defendants Filed Per Case | 1.6 | 1.7 | 1.7 | 1.7 | 1.4 | 1.7 | | |
| | Jurors — Avg. Present for Jury Selection | 36.89 | 34.27 | 33.92 | 32.49 | 32.40 | 32.25 | | |
| | Jurors — Percent Not Selected or Challenged | 30.1 | 30.2 | 32.5 | 33.5 | 33.3 | 35.6 | | |

### 2006 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE

| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Civil | 3001 | 156 | 318 | 1276 | 27 | 27 | 94 | 282 | 217 | 253 | 227 | 2 | 122 |
| Criminal* | 650 | 10 | 188 | 79 | 195 | 66 | 14 | 22 | 16 | 24 | 12 | 11 | 13 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See "Explanation of Selected Terms."

# Exhibit 40

# BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| In re: | ) |
| | ) |
| Rembrandt Technologies, LP Patent | )  MDL Docket No. |
| Litigation | ) |
| | ) |

## DECLARATION OF BRIAN L. FERRALL

Mitchell G. Stockwell
Taylor Higgins Ludlam
KILPATRICK STOCKTON LLP
1100 Peachtree Street, N.E., Suite 2800
Atlanta, GA 30309
Telephone: (404) 815-6500
Facsimile: (404) 815-6555

Tonya R. Deem
KILPATRICK STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC 27101-2400
Telephone: (336) 607-7300
Facsimile: (336) 607-7500

**Attorneys For:  CoxCom, Inc.**

## DECLARATION OF BRIAN L. FERRALL

I, Brian L. Ferrall, declare as follows:

      1.     My name is Brian L. Ferrall. I am a partner at Keker & Van Nest, LLP and am over the age of 18 years, and am otherwise competent to make this declaration, which is given for use in the above-referenced matter. The statements made in this Declaration are within my own personal knowledge.

      2.     I am attorney of record for defendants Comcast Corporation, Comcast Cable Communications, LLC and Comcast of Plano, LP (collectively, "Comcast") each of whom are defendants in the *Rembrandt Technologies, LP v. Comcast Corporation, et. al.;* Civil Action No. 2:05-CV-433, action currently pending in the United States District Court for the Eastern District of Texas.

      3.     On September 7, 2006, I was served with the attached Amended Subpoena Testificandum and Duce Tecum directed to Arris Group, Inc. ("Arris"). Arris is a supplier of DOCSIS-compliant cable modems for Comcast and other cable service providers. The attached subpoena is a true and correct copy of the subpoena served upon me on September 7, 2006.

      4.     Rembrandt has served similar subpoenas, seeking identical information, on over forty (40) third party vendors, each of whom are suppliers or manufacturers of the accused DOCSIS-compliant devices at issue.

US2000 9827043.1

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated:  March __7__, 2007

Brian L. Ferrall

US2000 9827043.1

# Exhibit 41

US2000 5490191.1

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| In re: ) | |
| ) | |
| Rembrandt Technologies, LP Patent ) | MDL Docket No. |
| Litigation ) | |
| ) | |

**DECLARATION OF BRIAN L. FERRALL**

Mitchell G. Stockwell
Taylor Higgins Ludlam
KILPATRICK STOCKTON LLP
1100 Peachtree Street, N.E., Suite 2800
Atlanta, GA  30309
Telephone:  (404) 815-6500
Facsimile:  (404) 815-6555

Tonya R. Deem
KILPATRICK STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC  27101-2400
Telephone:  (336) 607-7300
Facsimile:  (336) 607-7500

**Attorneys For:  CoxCom, Inc.**

## DECLARATION OF BRIAN L. FERRALL

I, Brian L. Ferrall, declare as follows:

1.     My name is Brian L. Ferrall.  I am a partner at Keker & Van Nest, LLP and am over the age of 18 years, and am otherwise competent to make this declaration, which is given for use in the above-referenced matter.  The statements made in this Declaration are within my own personal knowledge.

2.     I am attorney of record for defendants Comcast Corporation, Comcast Cable Communications, LLC and Comcast of Plano, LP (collectively, "Comcast") each of whom are defendants in the *Rembrandt Technologies, LP v. Comcast Corporation, et. al.;* Civil Action No. 2:05-CV-433, action currently pending in the United States District Court for the Eastern District of Texas.

3.     On September 7, 2006, I was served with the attached Amended Subpoena Testificandum and Duce Tecum directed to Arris Group, Inc. ("Arris").  Arris is a supplier of DOCSIS-compliant cable modems for Comcast and other cable service providers.  The attached subpoena is a true and correct copy of the subpoena served upon me on September 7, 2006.

4.     Rembrandt has served similar subpoenas, seeking identical information, on over forty (40) third party vendors, each of whom are suppliers or manufacturers of the accused DOCSIS-compliant devices at issue.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: March __7__, 2007

_____
Brian L. Ferrall

# Exhibit 42

**R**

REMBRANDT

401 City Avenue, Suite 900
Bala Cynwyd, PA 19004
Tel: 610-822-0100
Fax: 610-822-0323
www.RembrandtIP.com

February 14, 2007

Marcus Delgado, Senior Counsel
Cox Communications, Inc.
1400 Lake Hearn Drive
Atlanta, Georgia 30319
Tel: 404-843-5000

Dear Mr. Delgado:

Rembrandt Technologies, LP ("Rembrandt") presently owns full rights, title and interest in U.S. Patent No.5,243,627 ("the 627 patent").

In January 1995, AT&T IPM wrote the enclosed letter to Mr. Robert Hopkins, the Executive Director of the Advanced Television Systems Committee ("ATSC") which stated, *inter alia*, that "we will license our patents which relate to the ATSC Standard for HDTV ("ATSC standard"), to the extent such patents are directed toward and are essential to the implementation of the Standard." It is our belief that AT&T Corp. was the owner of the '627, that AT&T IPM was an affiliate of AT&T Corp. at the time of the letter, and that the '627 patent is directed toward and essential to the implementation of the Standard.

The letter also stated that "[s]uch licenses will be granted under reasonable terms and conditions on a non-discriminatory, non-exclusive basis. Such reasonable terms and conditions would include a reasonable royalty and a grant of licenses to us." The letter concluded by stating, "[i]f you, or any member of your organization, have any questions concerning the licensing of our patents related to this standard, please contact Mr. David S. Nelson at 908-508-5392." Our present information is that Cox Communications did not respond.

Notwithstanding that Rembrandt does not believe it is obligated to do so, Rembrandt is prepared to license, on a non-discriminatory basis, the '627 for a license fee of one-half percent (0.5%) of all revenues derived from use of the ATSC standard for digital broadcast over a cable network by your company as an MSO licensee.

Patent Infringement Solutions 

As you know, there presently is scheduled a meeting between Cox and Rembrandt Technologies representatives to discuss the possibility of settling the litigation between Rembrandt Technologies and Cox involving four patents, one of which is the '627 patent. That meeting is scheduled for Monday, February 26, 2007, starting at 10AM, at the offices of Rembrandt IP Management, LLC, located at 401 City Avenue, Suite 900, Bala Cynwyd, PA 19004. Given the unsettled law after the Supreme Court's recent decision in the eBay case regarding the consequences of such discussions, it is our intention at the meeting solely to discuss a possible license to the '627 patent.

If you are interested in discussing a license solely to the '627 patent, we continue to be ready to meet.

Sincerely,

John J. Garland
Executive Vice-President

Attachment



James E. Lamar
President

January 12, 1995

AT&T IPM Corp.
2333 Ponce de Leon Blvd.
Coral Gables, Florida 33134

Mr. Robert Hopkins
Executive Director
Advanced Television Systems Committee
1760 K Street NW
Suite 800
Washington DC 20006

Dear Mr. Hopkins:

Responding to your letter of August 16 to Mr. Robert Rast of General Instrument Corporation as the representative for the Grand Alliance, we will license our patents which relate to the ATSC Standard for HDTV, to the extent that the claims of such patents are directed toward and are essential to the implementation of the Standard. Such licenses will be granted under reasonable terms and conditions on a non-discriminatory, non-exclusive basis. Such reasonable terms and conditions would include a reasonable royalty and a grant of licenses to us.

If you, or any member of your organization, have any questions concerning the licensing of our patents related to this standard, please contact Mr. David S. Nelson at 908-580-5392.

Very truly yours,

James E. Lamar

Copy to:
R. L. Cerbone
G. D. Green
M. R. Greene
D. S. Nelson

# Exhibit 43

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------------------------x
                                                          :
Rembrandt Technologies, LP,                               :
                                                          :
                              Plaintiff,                  :
                                                          :
                 - against -                              :
                                                          :
Adelphia Communications Corporation;                      :
Century-TCI California, LP;                               :
Century-TCI California Communications, LP;                :     Case No. 1:07-cv-00214 (WHP)
Century-TCI Distribution Company, LLC;                    :
Century-TCI Holdings, LLC;                                :
Parnassos, LP;                                            :
Parnassos Communications, LP;                             :
Parnassos Distribution Company I, LLC;                    :
Parnassos Distribution Company II, LLC;                   :
Parnassos Holdings, LLC; and                              :
Western NY Cablevision, LP,                               :
                                                          :
                              Defendants.                 :
                                                          :
----------------------------------------------------------x
```

## DECLARATION OF EILISH M. CAHALAN IN SUPPORT OF DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION TO <u>WITHDRAW THE REFERENCE TO BANKRUPTCY COURT</u>

I, Eilish M. Cahalan, declare under penalty of perjury, as follows:

1.      I am an associate in the law firm of Willkie Farr & Gallagher LLP,

attorneys of record for reorganized Debtors Adelphia Communications Corporation;

Century-TCI California, LP; Century-TCI California Communications, LP; Century-TCI

Distribution Company, LLC; Century-TCI Holdings, LLC; Parnassos, LP; Parnassos

Communications, LP; Parnassos Distribution Company I, LLC; Parnassos Distribution

Company II, LLC; Parnassos Holdings, LLC; and Western NY Cablevision, LP (collectively, "Defendants").

2.      I submit this declaration in support of Defendants' Memorandum In Opposition To Plaintiff's Motion To Withdraw The Reference To Bankruptcy Court.

3.      Attached as Exhibit A is a true and accurate copy of an October 16, 2006 letter from Brooke A.M. Taylor to Roger Netzer.

4.      Attached as Exhibit B is a true and accurate copy of Rembrandt's First Request for the Production of Documents In the Adversary Proceeding, dated October 20, 2006.

5.      Attached as Exhibit C is a true and accurate copy of the November 14, 2006 hearing transcript.

6.      Attached as Exhibit D is a true and accurate copy of a November 15, 2006 stipulation and proposed order.

7.      Attached as Exhibit E is a true and accurate copy of the November 22, 2006 Objection of Rembrandt Technologies, LP to Confirmation of the Fifth Amended Joint Chapter 11 Plan for Adelphia Communications Corporation and Certain of its Affiliated Debtors.

8.      Attached as Exhibit F is a true and accurate copy of the December 13, 2006 Stipulated Order Establishing Separate Reserve for Rembrandt Technologies, LP Administrative Claim.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2[th] day of March 2007 at New York, New York.


 /s/ Eilish M. Cahalan

Eilish M. Cahalan

**Exhibit C**

```
1                 UNITED STATES BANKRUPTCY COURT
                  SOUTHERN DISTRICT OF NEW YORK
2                                        .
   IN RE:                                .  Case No. 02-41729
3                                        .
   ADELPHIA COMMUNICATIONS,              .  New York, New York
4                                        .  Tuesday, November 14, 2006
                            Debtors.     .  9:39 a.m.
5  . . . . . . . . . . . . . . .
   REMBRANDT TECHNOLOGIES, LP,           .
6                                        .
                           Plaintiff,    .
7                                        .
           v.                            .  Adv. Proc. No. 06-1739
8                                        .
   ADELPHIA COMMUNICATIONS,              .
9                                        .
                           Defendant.    .
10 . . . . . . . . . . . . . . .

11             TRANSCRIPT OF PRETRIAL CONFERENCE
            BEFORE THE HONORABLE ROBERT E. GERBER
12             UNITED STATES BANKRUPTCY JUDGE

13 APPEARANCES:
   For the Plaintiff:          James L. Garrity, Jr., Esq.
14                             SHEARMAN & STERLING, LLP
                               599 Lexington Avenue
15                             New York, New York 10022-6069
                               (212) 848-4000
16
                               Joseph S. Grinstein, Esq.
17                             Tibor L. Nagy, Esq.
                               SUSMAN GODFREY, LLP
18                             590 Madison Avenue, 8th Floor
                               New York, New York  10022-8521
19                             (212) 336-8332
   (Appearances continued)
20
   Audio Operator:            Electronically Recorded
21                            by Court Personnel

22 Transcription Company:     Rand Transcript Service, Inc.
                              311 Cheyenne Road
23                            Lafayette, New Jersey  07848
                              (973) 383-6977
24
   Proceedings recorded by electronic sound recording,
25 transcript produced by transcription service.
```

```
1
    APPEARANCES:   (Continued)
2

3
    For the Defendant:           Shelley Chapman, Esq.
4                                Roger Netzer, Esq.
                                 Thomas Meloro, Esq.
5                                WILLKIE, FARR & GALLAGHER, LLP
                                 787 Seventh Avenue
6                                New York, New York  10014
                                 (212) 728-8000
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                    I N D E X

2                                              Page

ARGUMENT

3       By Mr. Grinstein                        5
        By Mr. Garrity                       15,22

4       By Mr. Netzer                          16
        By Ms. Chapman                         18

5       By Mr. Meloro                          23
        Court Decision - reserved              30

6

PRETRIAL CONFERENCE/SCHEDULING                 31

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Proceedings commence at 9:39 a.m.)

2            THE COURT:  Okay.  We're here on a pretrial

3    conference, what I believe is the first pretrial conference

4    in this adversary.  I -- Mr. Garrity, I know you and I know

5    some of the folks at the other counsel table.  I don't know

6    everybody.  Do you want to make some introductions?

7            MR. GARRITY:  I'd be happy to, Your Honor.  Good

8    morning.  Jim Garrity from Shearman & Sterling.  Your Honor,

9    we are co-counsel principally for bankruptcy purposes of

10   Rembrandt Technologies, LP, the plaintiff in this adversary

11   proceeding.

12           At counsel table with me are Joseph Grinstein and

13   Tibor Nagy.  Mr. Grinstein and Mr. Nagy are with the Susman

14   Godfrey firm and they are co-counsel in this matter and when

15   we get to, if Your Honor will allow us a moment or two to

16   talk about the complaint and the matters at issue, I will

17   turn the floor over to them, if that's all right with you.

18           THE COURT:  Okay.  Ms. Chapman, I know you and Mr.

19   Netzer.  And in between you is?

20           MS. CHAPMAN:  Good morning, Your Honor.  In between

21   us is our partner Tom Meloro, who is a patent specialist and

22   who will be addressing the merits, if, as, and when we get to

23   that today.

24           THE COURT:  Okay.  I think it would be constructive

25   if we spent just a couple of minutes for you folks to tell me

1   the underlying issues.  It's my impression, very

2   impressionistically, that this is a case for -- an action for

3   alleged post-petition patent infringement.  I don't know if

4   I'm fully correct or not.

5              Mr. Grinstein or Mr. Nagy, you want to give me a

6   more detailed discussion of what it's about?

7              MR. GRINSTEIN:  Yes, Your Honor.  Joseph Grinstein

8   for plaintiff Rembrandt.

9              Just as an administrative matter, my pro hac

10  admission is pending, but has not been acted on, so --

11             THE COURT:  Okay.  Certainly you can speak today and

12  I have no doubt that it will be granted.  Go ahead.

13             MR. GRINSTEIN:  Thank you, Your Honor.

14             This is a patent infringement case, as you

15  mentioned.  The complaint was filed in September.  It relates

16  solely to post-petition alleged infringement by the debtors.

17  By agreement the debtors have not yet answered the complaint.

18  Their answer will be due in a few weeks.

19             THE COURT:  Pause, please, Mr. Grinstein.

20             A patent with respect to what kind of a product or

21  technology?

22             MR. GRINSTEIN:  There are four patents that are

23  asserted in this case.  They relate to the debtors' cable

24  modem services.  More specifically, there is a standard by

25  which the entire industry performs cable modem services.

1   That standard is called "DOCSIS," d-o-c-s-I-s.  It stands for

2   "data over cable system interface specification."  It's a lot

3   of words.

4           That is a standard that all of the cable companies

5   got together in the late 1990s and formed as a way of making

6   sure that each person's or each company's cable modems were

7   compatible with each other; in other words, an industry

8   standard designed to insure efficiency, reliability,

9   compatibility.

10          The allegation in this case by Rembrandt, the

11  plaintiff, is that the DOCSIS standard infringes four of

12  Rembrandt's patents and, by extension, any cable modem

13  services that the debtors performed that were compliant with

14  the DOCSIS standard, which would have been all of them, by

15  implication therefore also infringed the patents.

16          THE COURT:  Now pause, please.

17          If the DOCSIS system is uniformly used across the

18  industry, so by way of example I could, you know, go out to a

19  J&R Music World and get a cable modem there and use it on a

20  Time Warner system or a Comcast system, was there anything

21  that Adelphia did unique to the industry or do you have this

22  claim going out against all of the cable companies in the

23  United States?

24          MR. GRINSTEIN:  We're making this claim against

25  other cable companies:  Time Warner, Comcast.  I'm not sure

1   if every cable company was yet got to, but we are making this

2   claim against other cable companies.

3          The allegation is that Adelphia, by the fact that

4   it's standardized to this industry-wide standard, the

5   industry-wide standard infringes our patents.  So as long as

6   Adelphia was compliant with the standard, and there's no

7   reason to believe that they weren't compliant with the

8   standard or else their cable modem system would not have

9   worked, they're alleged to have infringed.

10         THE COURT:  Now, did I hear you right that you have

11  similar actions pending against other major cable companies?

12         MR. GRINSTEIN:  We do, Your Honor.

13         THE COURT:  And where are they pending?

14         MR. GRINSTEIN:  I believe we have action pending in

15  the eastern district of Texas and I think Delaware as well.

16  Not so sure about -- eastern district of Texas is at least

17  one of them.

18         THE COURT:  And they're all being prosecuted

19  individually?

20         MR. GRINSTEIN:  Yes, Your Honor.

21         THE COURT:  Go on.

22         MR. GRINSTEIN:  There are four patents at issue in

23  this case.  The patents were originally developed by a

24  subsidiary of AT&T/Bell Labs known as Paradyne Corporation.

25  Paradyne was one of the leaders and sort of at the forefront

1  of modem technology back in the 1990s.  A lot of what we see

2  today out in the modem marketplace was due to Paradyne's

3  work.  Rembrandt, the client who is at issue -- who is here

4  today, acquired those patents from Paradyne and is now

5  serving them in this particular case.

6       There are four patents.  They relate specifically to

7  three areas of technology, three distinct methods of

8  infringement.  The first two patents are somewhat related.

9  They're the 159 patent and the 234 patent.  Both of those

10 patents we allege are infringed by the DOCSIS standards that

11 relate to the manner by which cable modems download and

12 update new program content.

13      From time to time a cable modem needs to update its

14 operating system, get updated, get upgrades.

15      THE COURT:  You talking about updating the firmware

16 inside the modem as compared and contrasted to the

17 programming content that the modem sucks off the internet?

18      MR. GRINSTEIN:  Right.  It's the operating systems.

19 You can call it the firmware in the modem.  That's being

20 updated through this download process.  And those patents

21 relate to the DOCSIS standard about how that downloading is

22 to occur.  Those are the 159 and 234 patents.  That's the

23 first area of infringement that we've alleged.

24      The second area of infringement that we've alleged

25 relates to the 761 patent, and that is a patent that covers

1   the manner by which cable modems communicate error control

2   correction mechanisms.  One of the more important things that

3   a cable modem does when it's doing data transmission is

4   control for errors.

5            THE COURT:  Well, any modem, cable or otherwise,

6   right?

7            MR. GRINSTEIN:  Certainly, Your Honor.  And the

8   DOCSIS standard sets out a particular method by which cable

9   modem services are supposed to obtain this error control

10  correction mechanism.  The 761 patent, we allege, covers that

11  DOCSIS standard.

12           The third distinct patent is the 444 patent.  The

13  444 patent covers a particular aspect of data transmission by

14  cable modems.  Specifically, it's very important when you're

15  --

16           THE COURT:  Could you repeat that, please, Mr.

17  Grinstein?

18           MR. GRINSTEIN:  Yes.  It's the 444 patent, and it

19  covers a DOCSIS standard that governs data transmission by

20  modems.  More specifically, when you're doing data

21  transmission in a modem, data is transmitted in blocks and

22  chunks.  And it's very important that you delimit the

23  beginning and the end of a particular block of data.

24           The 444 patent relates to the DOCSIS standard for

25  delimiting the beginning and the end of a particular data

1  transmission, and that's particularly critical to exploiting

2  the extent of a potential bandwidth on the system.

3        So those are the three patents -- actually four

4  patents, but they're related to three areas of technology.

5  We've alleged that DOCSIS infringes those patents and, by

6  implication, the defendant's products that -- products and

7  services, I should say, that utilize DOCSIS.

8        Where do we stand right now, Your Honor?  We -- as I

9  mentioned, we filed the adversary complaint in September.

10  The defendants have not yet answered the complaint.  By

11  agreement, we've extended that answer date for some time.

12        The parties have engaged in some informal discovery

13  relating to the upcoming confirmation hearing.  That informal

14  discovery has been aimed at communicating to the defendants

15  what the aspects of our claim is, what the merits of our

16  claim are.  In connection with that informal discovery, there

17  has been a mutual document exchange by both parties.  We have

18  produced documents relating to these patents, relating to our

19  allegations.  They've produced documents back to us.  We have

20  some issues with the extent to which all the documents have

21  been produced to us, but I don't think now is the time or

22  place to discuss those.

23        We've also engaged in some expert discovery.

24  Rembrandt has provided to defendants an expert report from a

25  computer scientist expert who has analyzed the patents,

1  analyzed the DOCSIS standard, and has opined that the DOCSIS

2  standard infringes these four patents.  We provided that to

3  the debtors.

4        We've also provided an expert report from an expert

5  economist who has analyzed the revenues that these cable

6  modem services have generated for the debtors and has stated

7  a damages claim that he alleges -- he opines is the

8  appropriate damages remedy in this particular case.

9        THE COURT:  What kind of damages you looking for?

10       MR. GRINSTEIN:  We have alleged that, because of

11 this alleged infringement, in a hypothetical negotiation, the

12 defendants would have paid to us between a four and five-

13 percent royalty on cable modem services.  I think that ranges

14 -- ends up ranging from between ninety to $115 million.

15       I should say that we've filed the claim seeking $130

16 million as our administrative claim.  Since we've done some

17 more refined analysis, after having engaged in a little bit

18 of discovery and having talked back and forth with the

19 defendants, we've now since refined that claim to the outside

20 of the claim is I believe $115 million.  Ninety-two to one

21 fifteen.  Excuse me.

22       THE COURT:  Okay.  Now, I take it against the

23 Adelphia alleged infringers, at least, you're not looking for

24 injunctive relief?

25       MR. GRINSTEIN:  We are not looking for injunctive

1    relief, Your Honor.  And I should say --

2            THE COURT:  You're looking for injunctive relief

3    against the other defendants in your other lawsuits?

4            MR. GRINSTEIN:  No, Your Honor.

5            I should also mention that we are continuing to

6    investigate infringement.  There may well be other aspects of

7    the debtors' products that infringe our patents.  We're

8    continuing to investigate that.  The stuff that we've stated

9    now is very preliminary in nature, so there may be other

10   services that the debtors do that we reserve our right to

11   allegations infringement against.

12           I stand somewhat corrected.  My colleague reminds me

13   we are looking for injunctive relief in other venues, for

14   example, against Time Warner.  If your question related to

15   any possible connection between Adelphia and anyone else

16   where there's injunctive relief, in the eastern district of

17   Texas we are looking for injunctive relief, but not in this

18   action.

19           THE COURT:  Where is that, in Plano?

20           MR. GRINSTEIN:  Excuse me?

21           THE COURT:  In Plano, Texas?

22           MR. GRINSTEIN:  No, the case is pending in Marshall,

23   Texas.

24           THE COURT:  Marshall?

25           MR. GRINSTEIN:  Marshall before Judge Ward.

1      THE COURT:  All right.  Now, do you have a view or

2  position on the advantages or disadvantages of coordinating

3  this litigation with the actions in the other jurisdictions

4  where similar or identical issues are being raised?

5      MR. GRINSTEIN:  I have not discussed that with the

6  other side.  I think if, you know, Your Honor wanted to

7  coordinate with Judge Ward and reach some sort of mutual

8  claim construction with Judge Ward on one of the aspects of

9  the patent cases to go through a procedure known as a

10  "Markman procedure" where the Court construes the claims of

11  patent.  That claim construction probably would be applicable

12  both to Time Warner and to Adelphia to a certain extent, so I

13  think it might be a good idea for you to coordinate with the

14  eastern district of Texas with respect to issues like that.

15  Frankly, we have not discussed that with the other side.

16      THE COURT:  Another option that's not infrequently

17  done in MDL litigation is to coordinate pretrial proceedings,

18  discovery and the like, and then to send the action back to

19  the district in which the underlying claim is pending.  Have

20  you thought about that?  Do you have a view on the

21  desirability or undesirability of that?

22      MR. GRINSTEIN:  I think that would be desirable,

23  Your Honor.  Candidly, the eastern district of Texas is a

24  very sophisticated patent venue.  I won't say most of the

25  patent cases that are getting filed today are filed in that

1   district, but a large percentage of them, so that district

2   has a lot of experience with patent matters.

3          Not to suggest that Your Honor doesn't, but if Your

4   Honor wanted to coordinate more closely with the eastern

5   district and sort of follow along on pretrial matters with

6   that district in the Time Warner case, I think that probably

7   would be advantageous to everyone involved.  The eastern

8   district has a very standardized and a very well-worn set of

9   pretrial patent procedures.  It's called the "local patent

10  rules" of that district.

11         THE COURT:  Is this the same court that was the

12  subject of The Wall Street Journal article --

13         MR. GRINSTEIN:  New York Times.

14         THE COURT:  -- about a lot of patent litigation

15  winding up in one particular district?

16         MR. GRINSTEIN:  Yes, Your Honor.  It was a New York

17  Times article.

18         THE COURT:  Oh, New York Times.  Okay.  All right.

19         Now, Mr. Grinstein, would either you or Mr. Garrity

20  comment on your perceived views as to the affect or non-

21  affect on pending reorganization matters in this court and

22  whether we can simply deal with this by creating a

23  satisfactory reserve or whether this involves more stuff and,

24  of course, what need I have to get this case decided under

25  any particular time frame?

1       MR. GARRITY:  Your Honor, Jim Garrity.

2       We have no objection to the establishment of a

3  reserve.  When we filed the complaint, we suggested that to

4  our adversary.  That then led to, understandably so, requests

5  for discovery and information about our claim, which we've

6  been happy to provide.  We don't want to stand in the way of

7  confirmation, Your Honor.  We'd like some money set aside to

8  address our claim once -- to pay the claim once the claim is

9  resolved on the merits, however that may be done, whenever

10 that may be done.

11      It's basically, Your Honor, from our perspective,

12 that simple.  We thought there might be an estimation

13 proceeding instituted, but we understand there won't be.  So,

14 Your Honor, we certainly will support any interim type of

15 solution that leaves us with assurance that once our claim is

16 finally allowed, as we believe it will be, that there will be

17 sufficient funds to pay it, as any other administrative

18 expense claim would have to be paid in the context of a

19 Chapter 11 case.  So I think that's the short answer, Your

20 Honor.

21      THE COURT:  All right.  Let me get the Adelphia

22 perspective.  Mr. Netzer?

23      MR. NETZER:  Very briefly, Your Honor, we're going

24 in reverse order here because, as I'm sure Your Honor

25 suspects, I'm not a patent lawyer, Mr. Meloro is.

1    But with respect to Your Honor's questions about

2    injunctive relief and also with respect to what, if anything,

3    needs to be done in the short term, what we haven't -- first,

4    both gentlemen were correct in saying there has been some

5    cooperative discovery.  That doesn't mean we have had all of

6    our questions answered, Your Honor, and here's a big one that

7    we asked right off the bat.

8         We've been sued for patent infringement during the

9    entire filing period, presumably, therefore, to the extent we

10   were infringing, we were infringing before.  That's more than

11   four years ago, Your Honor.

12        So we posed the question when we got the letter in

13   September of 2006, just months before confirmation hearing,

14   what was the date on which Rembrandt became aware of those

15   products and services, as well as the date on which Rembrandt

16   first had reason to believe that the products allegedly

17   infringed the patents in suit, and the reasons why Rembrandt

18   waited until September 13, 2006 to file its claims.  We have

19   had no answer to that question in discovery, Your Honor, and

20   I think it is a pertinent one.

21        As to the need for an estimation proceeding, what we

22   have said is that we are not -- still not yet in a position

23   to evaluate their claim for reserve of $130 million.  I think

24   that nothing proves that we were not in a position to

25   evaluate that than the fact that yesterday we learned that

1    Rembrandt hadn't evaluated it because it is no longer what

2    they're demanding.  And if we hadn't gotten the expert report

3    yesterday, we wouldn't know even that.

4           So I just wanted to give the context, Your Honor,

5    because, frankly, it's one troubling to us and pertinent, I

6    think, why it is that on the eve of confirmation, this came

7    up for the first time.  It's not as though Rembrandt is an

8    operating company.  All they do is buy patents and sue

9    people.  So --

10          THE COURT:  Wait.  Rembrandt was not the developer

11   of this technology?

12          MR. NETZER:  No, Your Honor.  I've learned an

13   interesting term that I hadn't heard before.  It's called

14   "patent trolls."  These are people --

15          THE COURT:  Patent what?

16          MR. NETZER:  Patent trolls.  Like in the Lord of the

17   Rings, trolls, t-r-o-l-l-s.

18          THE COURT:  Well, unfortunately, my boy isn't old

19   enough to read that stuff yet.  You mean t-r-o-l-l-s?

20          MR. NETZER:  Like under the bridge with the billy

21   goats, trolls.  They're people who don't actually develop

22   patents or technology, but just buy it up and don't have

23   operations, they just sue people.  I know Your Honor has

24   nothing in -- there's nothing in the Court's experience to

25   compare with people who just acquire interests in

1    litigations.

2        (Laughter.)

3            MR. NETZER:  But that is --

4            THE COURT:  Well, that's a very alien concept to me,

5    Mr. Netzer.

6            MR. NETZER:  That's why I thought I should

7    elaborate.

8            Your Honor, that's just by way of background.  I

9    leave to Mr. Meloro and Ms. Chapman the finer details of the

10   patent and the bankruptcy issues.

11           THE COURT:  Who's next for the Adelphia side?

12           MS. CHAPMAN:  Your Honor, Shelley Chapman from

13   Willkie Farr for Adelphia.

14           To just continue with what Mr. Netzer was saying,

15   the -- as Your Honor knows, the sale of the assets closed at

16   the end of July.  That's the end of the infringement period

17   that has been alleged because as of that moment we were no

18   longer an operating company and the assets moved to our

19   purchasers.

20           Notwithstanding that, this claim did not come in

21   until the occurrence of the administrative bar date in the JV

22   plan, so not to beat a dead horse, but there has been a lot

23   of waiting here and we find ourselves now, less than a month

24   before the commencement of the confirmation hearing, having

25   to deal with this allegedly 130-million-dollar claim.

1    Mr. Netzer is right.  As I understand it from Mr.

2  Meloro, we just received this expert report.  We'd like an

3  opportunity to analyze it and I think it would be our

4  intention to respond with an offer as to an appropriate

5  reserve, of course, believing and maintaining when we get to

6  that, that there is no infringement.

7    But as Your Honor knows in other reserve situations,

8  we have taken the approach of trying to come to a consensual

9  resolution without burdening the Court with a trial or even a

10  mini-trial on the merits.  We do have a time constraint here.

11  We have to deal with this in a way that does not stand in the

12  way of confirmation and that's what we're setting about doing

13  now.

14    What I would suggest is that -- and Mr. Meloro can

15  talk about timing -- is that we go that next round.  Maybe

16  there will be an agreement, maybe there won't.  If there

17  won't, we may, in fact, have to be back here for some sort of

18  a proceeding to estimate the claim.  We are --

19    THE COURT:  No, there -- I think I dealt with this

20  in the ABIZ decision, which I ultimately published a couple

21  years after I issued it.

22    MS. CHAPMAN:  Yes, Your Honor.

23    THE COURT:  My memory of that holding, and I'm a

24  little stale on it, is that it's pretty clear that I have the

25  ability to estimate, for purposes of establishing reserves,

1  even putting aside the issue of my ability to estimate for

2  allowance for all purposes.

3          MS. CHAPMAN:  That's correct, Your Honor.  We have

4  actually reviewed the decision recently in this context and

5  in the ABIZ case there was a slight nuance there because

6  there was a feasibility issue in the ABIZ case, so with that

7  caveat, yes.

8          In that case, Your Honor applied 502(c) and you

9  estimated the Adelphia claim against the ABIZ debtors for

10 reserve purposes, but not ultimate allowance purposes.  I

11 think in that case they ended up being one and the same, but

12 those facts I think are not applicable here.

13         So we know Your Honor is familiar with that

14 procedure.  That's like the procedure that we would go down.

15 We have not, frankly, thought through what the proceeding

16 here might look like, but given what's coming up with

17 confirmation, it would be our position that it would have to

18 be a fairly summary proceeding in nature.

19         I also have heard -- I view this as estimation and

20 reserve and I've heard the word "confirmation" used and I'd

21 be interested to hear whether, if a satisfactory reserve is

22 established, there are, nonetheless, confirmation issues or

23 whether we're done, because from our perspective, we'd like

24 to deal with Rembrandt, frankly, put it aside or have the

25 patent lawyers continue a pace to deal with it on the merits,

1   but we've got a plan to confirm and that's -- we don't want

2   to take our eye off that ball.

3        THE COURT:  As you properly observed, in ABIZ, if

4   the required reserve were too high, the ABIZ plan wouldn't

5   have been feasible.  I assume that in this case the plan,

6   whatever else people have complained about it, is feasible

7   under all scenarios and the only issue is how much has to be

8   held aside before stakeholders can get their recoveries.  Am

9   I correct?

10       MS. CHAPMAN:  That's exactly right, Your Honor.

11  There's a nuance, though, because a question might be asked,

12  given that we are feasible, that we do have the cash, why not

13  just do this, what's the down side.  We felt that it was --

14  would be inappropriate and inconsistent with our fiduciary

15  duty to simply agree to a number written on a piece of paper,

16  which was $130 million.  And, in fact, were you to set aside

17  that much money in cash, you would affect the mix of plan

18  consideration that goes to the subsidiary creditors, putting

19  aside how you would affect the parent company creditors.

20       It's not large.  I mean, in the case of this

21  magnitude, even $130 million isn't that large, but I think

22  even a one-or-two-percentage shift in the plan consideration

23  from the cash pot to the stock pot is of concern to us and,

24  therefore, we felt it was necessary to really look at this

25  very closely.

1      THE COURT: Okay. Mr. Garrity, to what extent do

2   you see any confirmation issues, other than the need to fix

3   the size of the reserve?

4      MR. GARRITY: Your Honor, from our perspective, if

5   we get an acceptable reserve, we don't believe, from our

6   perspective, that there is a confirmation issue. We

7   respectfully differ. We think there is a significant

8   confirmation issue if there isn't a reserve, but we don't

9   have to even investigate that in the event that there is a

10  reserve.

11     And I will tell you, Your Honor, we have said from

12  the beginning that we are prepared to estimate this. At the

13  outset of our discussions we were thinking about and

14  discussing in concept -- and understood, nobody made a

15  commitment, Your Honor -- we're going to estimate. We were

16  then told, no, we're not going to estimate. And now we're

17  being told we will estimate.

18     Your Honor, we would just like -- the perfect world

19  would be to agree upon a number, Your Honor, and we're happy,

20  willing, and hopefully able, to sit down and try to work that

21  out with the debtor. Again, the last thing we want to do is

22  to be a fly in the ointment for this confirmation hearing.

23     Now, if we can't do that, most respectfully, Your

24  Honor, we would expect that there would be -- if there's

25  going to be an estimation hearing, let's decide that that's

1    what's going to happen, let's agree on a process and

2    procedure for doing it so that Your Honor can manage his

3    calendar for what may be, you know -- we're not close enough

4    to know, Your Honor, whether this is going to be protracted

5    or controversial, as far as the rest of the confirmation

6    goes.

7          We'd like to set some time out, subject to Your

8    Honor's calendar, and an agreement to move forward if that's

9    what they want to do.  But, Your Honor, as of last week,

10   that's not what they wanted to do.

11         So having said that, if we're able to work that out,

12   there is no confirmation issue.

13         THE COURT:  All right.  Anybody else want to be

14   heard on anything?  Mr. Meloro?  Did I pronounce your name

15   correctly?

16         MR. MELORO:  Yes.  Thank you, Your Honor.

17         I just wanted to -- since Mr. Grinstein spoke a

18   little bit about the patents, I thought it might be useful if

19   we shared a few thoughts that we had.

20         The plaintiff in the case, as you know, is an outfit

21   called Rembrandt Technologies.  These patents were purchased

22   in the early part of 2005 by Rembrandt.  The allegations of

23   infringement relate to cable modem technology.

24         The patents were purchased from a company called

25   Paradyne.  As best as we can tell, Paradyne had nothing to do

1   with cable modems.  As best we can tell, Paradyne had nothing

2   to do with the DOCSIS standards.  The DOCSIS standards were

3   put together by the leaders in the industry.  They apparently

4   all sat around a table, they attended meetings, they shared

5   ideas, and they came up with the standards on which all cable

6   modems -- essentially all cable modems operate.

7          As best we can tell, Paradyne never showed up at

8   those meetings.  They never came and said we have some useful

9   technology.  They never said we're a leader in this field.

10         Now maybe, while the leaders in the field were

11  adopting the standards, Paradyne was sitting there typing

12  Shakespeare and issuing patents exactly on those standards.

13  If they did, they never showed up, as best we can tell, to

14  come to the DOCSIS folks and say you're using our patents.

15  They never went to the cable operators, as best we can tell,

16  and said you're using our patents.  Never offered a license,

17  never threatened to sue anybody; they just did nothing, as

18  best we can tell.

19         Now, we've asked for -- we couldn't find any record

20  of communications with Adelphia from Paradyne or Rembrandt.

21  We asked for that; we haven't gotten anything.  We haven't

22  seen evidence that there was any extensive campaign to

23  license folks.

24         So what did Paradyne decide to do?  They were in the

25  modem business, they just weren't in the cable modem

1  business.  They decided to just sell their patents.  They

2  didn't want them anymore.  So they went out and they found

3  Rembrandt.

4         THE COURT:  Pause, Mr. Meloro.  Was Paradyne the

5  original filer of the patents with the patent office or are

6  you suggesting that Paradyne, like your allegation as to

7  Rembrandt, was kind of the patent equivalent to a claims

8  trader?

9         MR. MELORO:  Paradyne was an operating company.  At

10  one point it was a part of AT&T.  I believe that it was a

11  separate company that was bought by AT&T and then sold by

12  AT&T and became and independent company again.  We don't have

13  research-and-development records from Paradyne, but my

14  assumption is they were doing work in laboratories to develop

15  products, they just weren't doing work to develop cable

16  modems.  They were other products.

17         Paradyne eventually decided they had no need for the

18  patents and it found Rembrandt.  Rembrandt basically is a

19  pool of money and four lawyers, from what we can see from

20  their website.  They bought the patents, they bought a

21  seventy-three-percent interest in the patents for $1 million.

22  That's what Rembrandt paid for a pool of patents.

23         Early part of 2005 was the major transaction, as far

24  as we can tell, and when Rembrandt bought those patents, it

25  didn't contact Adelphia, as far as I know.  The infringement,

1   even the post-petition infringement, had been going on for

2   some time, if there's any infringement here.  And it's

3   interesting because a bunch of lawsuits were filed in Texas

4   against Comcast, Time Warner, Charter Communications, Cox,

5   Sharpe.  There may be others, but not for infringement of

6   these four patents.  The suits filed in Texas were for

7   infringement of four completely different patents that had

8   been bought by Rembrandt from Paradyne.

9           Supposedly those four patents are the four which

10  cover the DOCSIS standard.  A tactical choice was made not to

11  sue Adelphia at that point.  Why?  I don't know, but those

12  operators were sued under four different patents.

13          We got to what I understand is the last day for

14  filing administrative claims in this proceeding and on that

15  day Adelphia was sued for infringement of these four patents.

16  For some other tactical reason on that same day, Time Warner

17  and Time Warner alone was sued for infringement of these four

18  patents in Texas.

19          Mr. Grinstein I think said he wasn't sure if they

20  had yet gotten to every cable company.  They've gotten to

21  them all, but not on these patents.  We specifically asked

22  that question in one of our conference calls, is there anyone

23  other than Time Warner that has been sued, and we were told

24  no.

25          Now, the DOCSIS standard supposedly is the basis for

1   infringement, but the DOCSIS standard was developed without

2   any reference to anybody at Paradyne, as best we can tell at

3   this early stage.

4         Mr. Grinstein referred to three different

5   technologies that are involved with these patents.  The first

6   -- I don't know if I have them in exactly the same order.

7   The first that I have in my notes is the 761, which relates

8   to --

9         THE COURT:  Error correction?

10        MR. MELORO:  -- error correction.  Exactly.  This

11  patent has nothing to do with cable modems.  It was filed in

12  the era of dial-up modems and it was filed with reference to

13  the specific problems that you face with dial-up modems.  You

14  know, in those old days, you'd hear the call going through on

15  the dial-up modem and you'd hear these series of beeps and

16  sounds and then you'd have to wait, and you'd wait and you'd

17  wait and you'd hope that it would go through and sometimes it

18  wouldn't go through.  That was the problem that the 761 was

19  trying to solve.  It was trying to solve these slow,

20  cumbersome hookups from the old dial-up modems.

21        Cable modems operate on a completely different

22  principle.  The hookup is completely different.  The DOCSIS

23  standard doesn't use the protocols, doesn't use the

24  negotiation, doesn't use the sequence that's specified in

25  that patent.

1    There were two other patents, 159 and 234, that Your

2  Honor correctly characterized as relating to updating the

3  firmware.  And this relates to having some firmware remotely

4  in the cable modem and pushing some updates to the software

5  through the system.

6    Quite simply, there is absolutely nothing -- and

7  this patent is specific not to remotely updating the

8  software, but doing it in a very special way.  There's prior

9  art which relates to remotely updating software.  These

10  weren't the first folks to have the idea that you might want

11  to push software updates through communication systems.

12    And essentially, they got the patent by saying we

13  have a very narrow idea of how you can do it in what they

14  thought was an efficient way.  DOCSIS standard doesn't

15  require, and as best we can tell, nobody uses the firmware

16  update method that's in this patent.  You can update firmware

17  using DOCSIS-compliant modems, you just don't use what's in

18  this patent.  Paradyne never said anybody did.  Quite

19  frankly, Rembrandt didn't until quite recently.

20    The last patent is the 444 patent and the 444 patent

21  relates to the actual data that gets transmitted through the

22  system.  And there's a preamble that goes on the data.  If

23  you want to send some command from your computer back to the

24  internet, when it goes through your cable modem, they tack on

25  a header, essentially, a preamble.  And the patent relates --

1       THE COURT:  Ahead of the block of data?

2       MR. MELORO:  Exactly.  And there's also something on

3   the tail end as well, but the patent really relates to what's

4   on that preamble on the front end before what they call the

5   "payload" comes through with the data that's being

6   transmitted.

7       And the patent relates to two aspects of that

8   preamble.  One is how you encode the information to make the

9   transmission more efficient, and the second is what

10  information is in that preamble.

11      Now, this patent, I have to say, we have progressed.

12  This was the last of the patents that were filed by Paradyne

13  and it was filed originally in 1999, so this was not a dial-

14  up modem patent, but it also wasn't a cable modem patent, it

15  was a DSL patent.  DSL is what you get from Verizon as

16  opposed to what you get from your cable company; faster than

17  dial-up but completely different technology.

18      And in fact, what was specified in the patent is a

19  preamble that's used for DSL technology.  The information

20  that goes in there is not information that goes into a DOCSIS

21  preamble.  We're still at an early stage, we're moving at

22  lightening pace by the standards of most complex infringement

23  cases, we're still learning a lot, but the technology that's

24  in these patents -- if you assume they're worth anything,

25  even if you assume they're worth the million dollars that

1   they paid for them, it's just simply not the technology

2   that's used in cable modems.

3            THE COURT:  Okay.  Obviously, I'm not going to be

4   making any judgments onto the merits either for estimation

5   purposes or more extensive purposes today.  I think we simply

6   need to develop a game plan for dealing with the triaging of

7   our priorities in terms of getting things done.

8            Subject to your right to be heard, it seems to me

9   that I should set a period of time, not particularly lengthy,

10  but a period of time for you folks to agree upon a consensual

11  reserve, if one can be achieved.

12           I must say, hearing the seemingly dramatic

13  differences in views as to the merits, I have a sense that

14  Adelphia might well come to the view that the reserve should

15  be very modest.  And if that's true, you may have to agree to

16  disagree on that.

17           And although the reserve would only be for purposes

18  of reserve and not for the purpose of ultimate liability, I

19  don't know if Rembrandt is going to care about the cosmetic

20  or other implications of a reserve that's so small that seems

21  to suggest that at least somebody thinks its claims aren't

22  worth a whole lot.

23           I want to get your views on my tentative,

24  nevertheless, that I should give you folks a period of time

25  to see if you can reach a consensual reserve, and then what

1   we need to do, if you agree to disagree, and what we need to

2   do if I have to have an estimation proceeding, it seems to me

3   that since -- and again, this is subject to your rights to be

4   heard, but it seems to me that if Adelphia has the

5   wherewithal to post a reserve at any place along the spectrum

6   of the amount demanded by Rembrandt, we're still not talking

7   about feasibility; and that if you've got to pay your admin

8   claims or reserve for them on the effective date, we may be

9   shooting for the effective date of the plan, rather than the

10  confirmation hearing, but I want both sides to comment on

11  that, so whichever side wants to be heard first.  Ms.

12  Chapman?

13          MS. CHAPMAN:  Your Honor, I think the outside date

14  is the effective date of the plan, however, I think if we

15  have to agree to disagree, I wouldn't want to put the

16  occurrence of the effective date at any risk, would want it

17  to occur as soon as possible after confirmation; and

18  therefore, I would like to be more aggressive on behalf of

19  the debtors with respect to the timetable and perhaps have

20  Your Honor allocate -- the parties have not discussed what a

21  proceeding would look like.  I don't think that we would be

22  looking at more than a day at the most.  I know these are

23  extremely complex issues that I don't purport to begin to

24  understand, but we have parameters that we have to operate

25  under here.

 1          So I think that the more prudent course for the

 2   debtors to insure that if we do get through confirmation

 3   successfully, as I hope and anticipate we will, that this

 4   will not be hanging out there.  So I'd rather that we be

 5   prepared to proceed sooner rather than later.

 6          I have to defer to Mr. Meloro as to timing since we

 7   just got the expert report and I don't know how quickly our

 8   team will be in a position to respond to the new damage range

 9   that we just became aware of, but I'd rather keep the focus

10   on confirmation and prior to the end of confirmation, rather

11   than have it slip until sometime before the effective date.

12   But the effective date, you're correct, that's the drop-dead

13   date by which all reserves have to be set.

14          THE COURT:  Now, with that said, we have a pretty

15   full December on matters wholly apart from this patent

16   controversy.  How much time, Ms. Chapman, Mr. Meloro, do you

17   folks think you need to have the dialogue with Rembrandt as

18   to the consensual reserve, if a consensual number can be

19   reached?

20          MR. MELORO:  Your Honor, we had discussed, before we

21   got the expert reports yesterday, a schedule for exchanging

22   contentions and under that schedule, we would respond to the

23   contentions we got yesterday by a week from tomorrow, the day

24   before Thanksgiving.  Things have changed dramatically in

25   terms of what they're saying, but we would still hope to keep

1  to that schedule to work with our experts, to understand what

2  they've said, to see where we agree or disagree, and it would

3  seem to me that we would be in a position starting right

4  after Thanksgiving to have a dialogue with them, once we had

5  digested it and responded to what they've said.

6          THE COURT:  Mr. Garrity or Mr. Grinstein?

7          MR. GARRITY:  Your Honor, from the perspective of if

8  there's going to be an estimation, I guess from our

9  perspective, certainly the effective date, from our

10 perspective, would be the outside.  We don't -- the way the

11 plan is drafted, Your Honor, administrative claims are going

12 to be filed -- potentially filed forty days after the

13 effective date, so we've got a real question as to how that's

14 going to work.

15         But again, from our perspective in dealing with our

16 claim, if we can get an agreed reserve, of course we want to

17 do that, and if we have to estimate it in the context of the

18 confirmation hearing, you know, so be it.  And, you know, we

19 will try to work out an agreement with regard to the evidence

20 and how to put the evidence in, et cetera.  I suppose we

21 could use your earlier work in the case you mentioned

22 earlier.  Forgive me, Your Honor, I can't remember the name.

23         THE COURT:  It's <u>Adelphia Business Solutions</u>.  It's

24 nickname is <u>ABIZ</u>.

25         MR. GARRITY:  Right.  So let me defer to Mr.

1  Grinstein with regard to the issues on the merit claim.

2          MR. GRINSTEIN:  I understand Your Honor doesn't want

3  to get into a debate about the merits, so I'll put aside --

4          THE COURT:  I assume that everything I heard from

5  Mr. Meloro you essentially disagree with.

6          MR. GRINSTEIN:  That's correct, Your Honor.  And I

7  don't think now is the time or the place to state that.

8          I will say --

9          THE COURT:  With one exception, Mr. Grinstein.  Do

10  you quarrel with their assertion that you guys didn't develop

11  the technology and that you acquired it and that, therefore,

12  to the extent that the real developers of the technology have

13  information relevant to this controversy, we're going to have

14  to get that from them as third-party witnesses?

15          MR. GRINSTEIN:  I think, as I mentioned in my

16  opening presentation, absolutely we acquired these patents

17  from Paradyne.  Paradyne is the one who filed for those

18  patents and developed them.  We acquired them subsequent to

19  that.

20          As far as the location of documents, in the course

21  of our dealings with Paradyne to acquire these patents,

22  Paradyne provided us a lot of due diligence from its own

23  files about those patents and that information we've already

24  provided to the other side.  There is some degree of

25  information which I imagine Paradyne didn't provide to us,

1 and in that situation, we're trying to work cooperatively

2 with Paradyne to get that information from them to give to

3 the other side.  There might possibly be some third-party

4 discovery.  I'm sure, to protect itself, the defendants will

5 want to engage in that, but there will be some sort of

6 process of acquiring third-party discovery, some of which

7 they've already got; I'm sure there's some more they need to

8 get.

9         As regard to the hearing that we're talking about,

10 though, I will mention that the parties have negotiated a

11 stipulation that governs the exchange of information relating

12 to the claim, which was intended to be a stipulation that

13 governs the exchange of information, were we to get to some

14 sort of contested hearing in a few weeks about what to

15 reserve for the claim.

16         Pursuant to that stipulation, we were, yesterday, to

17 provide an expert opinion to them relating to damages and

18 relating to infringement.  They were to have provided to us

19 an expert opinion where they stated forth their opinions that

20 the patents were somehow invalid.  We provided those expert

21 opinions to them, they did not provide to us.

22         I assume we are still going forward on the basis of

23 that stipulation and that stipulation will govern the manner

24 by which we'll put discovery or put evidence in at the

25 hearing; which is to say, I would hope by having not provided

1   their invalidity report to us yesterday, they're not going to

2   take some position that they can provide one at some future

3   date and then put in invalidity evidence at the hearing in an

4   effort to suggest to Your Honor that the patents are invalid

5   and, therefore, a reserve of zero is appropriate.

6          THE COURT:  Well, I'm not a patent lawyer, never

7   was, but it seems to me that some of the points that Mr.

8   Meloro was making could seemingly be related to contentions

9   that part or all of your patents are invalid.

10         MR. GRINSTEIN:  And we had an agreement, Your Honor,

11  that they were to provide an expert opinion on that yesterday

12  and they did not.  They may well think that they don't need

13  an expert opinion or whatnot, but I just want to make clear

14  that we have an agreement on how to proceed forward and how

15  to exchange discovery and that agreement is aimed towards

16  putting forth a presentation at the time of the hearing, the

17  estimation hearing for the time of the claim.  It's not

18  related to the adversary, really.  We weren't gauging all of

19  this discovery right now focused on this estimation

20  proceeding.  They haven't even answered the adversary yet, so

21  there has been no formal adversary discovery.

22         And so, to the extent that we are not able to reach

23  consensus with respect to the amount of the claim, I just

24  thought it important to point out to you, Your Honor, that we

25  have reached consensus on how to proceed forward in discovery

1   towards the estimation hearing and, you know, Rembrandt

2   intends to live by that particular arrangement.

3        THE COURT:  Okay.  Mr. Meloro?

4        MR. MELORO:  Yes, we do have an agreement with

5   counsel on the exchange of expert reports.  We chose not to

6   submit an invalidity expert report.  We don't intend to

7   present that evidence if there's a hearing some day.

8        THE COURT:  You say you do or you don't?

9        MR. MELORO:  We do not.  Our contention, our main

10  contention, and the contention we're going to put through

11  experts, is that we don't use the technology, we don't

12  infringe on the patents.

13       THE COURT:  So assuming the patents are fully valid,

14  you still don't owe them anything?

15       MR. MELORO:  Correct.  Now, there is one avenue of

16  invalidity that we don't think we need an expert report on

17  and we don't -- and we haven't submitted an expert report on

18  and it relates to some documents that are in their files that

19  we believe creates at least a strong inference that there is

20  a problem with this product having been released by Paradyne

21  too early.  And it results in invalidity not on the basis of

22  the work of others, but on the basis of Paradyne's own

23  behavior and actions.

24       We don't think we need an expert report on that, we

25  don't intend to offer expert testimony on that.  We've asked

1    counsel for additional documents and information on this

2    issue.  We haven't gotten any yet, so we're not quite sure

3    what, if anything, we're going to do with regard to that

4    issue if there is a hearing some day, but we do intend to

5    stay within the confines of our agreement that if you have a

6    hearing and you're going to offer expert testimony, it's

7    going to be by virtue of the subjects identified in the

8    expert reports.

9         THE COURT:  Okay.  Now, clarify one thing for me,

10   and I need to get an answer on this from Mr. Grinstein as

11   well.  Is the deal that you folks made on exchanges of

12   informal discovery and expert reports and the like, was that

13   intended to do double duty for the merits and any estimation

14   proceeding or was it for only one or the other?

15        MR. MELORO:  It was only as a preliminary matter for

16   an estimation or whatever bankruptcy-related proceeding might

17   need to occur.  It was not intended to be for the merits of

18   the case as a whole.  I think we both envision a subsequent

19   full discovery period with expert reports following on later

20   on.

21        THE COURT:  Okay.  Mr. Netzer was rising.  I don't

22   know if he wanted to talk to you or me.

23        MR. NETZER:  To you, Your Honor.

24        Just also to say that in addition -- not that this

25   is unrelated to estimation.  We needed, of course, to

1   evaluate their demand for a reserve and requested the

2   information for that purpose.  The only other refinement I'd

3   offer to what's said is while, yes, there is an agreement

4   about discovery, I think that -- and I'm not sure if you

5   meant to imply this, Mr. Grinstein, that that is not

6   necessarily the exclusive discovery that any party can take

7   between now and -- at any time.

8        THE COURT:  Okay.  Mr. Grinstein, do you agree or

9   disagree with what we just heard from Mr. Meloro and Mr.

10  Netzer?

11       MR. GRINSTEIN:  Well, with respect to Mr. Meloro, I

12  agree that the expert reports that we're putting forth right

13  now are not intended to do double duty.  Typically you do

14  expert discovery long after fact discovery has concluded and

15  there really has been no fact discovery, so these are

16  preliminary reports.

17       I will -- I think Mr. Meloro will agree that we've

18  exchanged a lot of documents which won't need to be re-

19  exchanged, of course.

20       As far as what Mr. Netzer indicated, I think our

21  agreement was pretty clear about what scope of discovery

22  we're agreeing to for purposes of the hearing.  I certainly

23  don't think we've, you know, limited ourselves with respect

24  to the adversary proceeding, but there is a scope of

25  discovery we've agreed to with respect to the hearing; for

1   example, we've said that no party will take deposition of

2   parties or non-parties, and so I would imagine that does

3   preclude a pretty large chunk of potential discovery between

4   now and the hearing.

5           THE COURT:  Okay.  How was the agreement papered, by

6   a letter agreement or a stip, and a stip that was going to be

7   so ordered or was just between the parties or what?

8           MR. GRINSTEIN:  We've negotiated a stipulation and

9   agreed to its terms and we were intending to file it as soon

10  as we can get signatures on it.  I think we're all in

11  agreement on that stipulation.

12          THE COURT:  Okay.  Anything else, anybody?

13          All right.  Well, here's what we're going to do.  I

14  share your view that the full litigation of the adversary and

15  the merits of the underlying controversy will need to play

16  out in due course and what we need to do now is keep our eye

17  on the ball of what we need to do in the short range.

18          I haven't heard any objection to Ms. Chapman's

19  proposal that we do a stop, look, and listen around

20  Thanksgiving for the purpose of seeing whether there's a

21  consensual agreement as to the size of an appropriate

22  reserve, but I don't know whether I'm being unduly

23  pessimistic, but I think we need to make arrangements for

24  what happens if there isn't an agreement.

25          And for that reason, then, we have to figure out

1  when we're going to be doing this and whether it's your

2  expectation that you guys are going to try all of this before

3  Christmas and then you're just going to look to me to work

4  over Christmas and over the Christmas holiday to give you the

5  answers you want.

6      By my understanding, and I'm going to need help from

7  the Adelphia folks on this, we have now reserved Thursday the

8  7th, Friday the 8th, and Thursday the 14th and Friday the

9  15th for all of the Adelphia confirmation issues that I knew

10  about back at the time, which did not include this one; that

11  I also have a day reserved for some kind of Adelphia purposes

12  on Tuesday the 12th; and that I now have an open day on

13  Monday the 11th, which was going to be used as an emergency

14  contingency day.

15      With all of that said, I don't know, given the most

16  recent update on the acrimony in the Adelphia case as to the

17  extent to which even that is going to be enough, and I want

18  to give you from Adelphia, if you can provide them, as to

19  when and how I should try to schedule this.

20      MS. CHAPMAN:  Your Honor, if I'm understanding

21  correctly, based on what is happening with the confirmation

22  you now assume that you're going to be having confirmation

23  proceedings on the 11th, the 12th, the 14th and the 15th?

24      THE COURT:  Well, the 7th, the 8th, the 14th and

25  15th.  The 12th is what we call an "Adelphia day," which you

1   can use in some fashion; and the 11th has not been given to

2   anybody else because I was afraid that even that isn't --

3   what I've already reserved isn't enough.  Or reserved not in

4   the sense of reserves like we're talking about here today,

5   but saved for use for Adelphia needs.

6           I do have to tell you that I have another ninety or

7   a hundred Chapter 11 cases.

8           MS. CHAPMAN:  Yes, we tend to forget that, Your

9   Honor, but I am aware of that.

10          I guess the only suggestion that I could make is

11  that we be given time on the 11th and, at the risk of putting

12  undue pressure on the patent attorneys, if there were any

13  time prior to the 7th and the 8th, I believe that once we get

14  into the thick of confirmation, that's going to have to

15  assume a priority and we don't want to put Your Honor in a

16  position to have to be laboring over a patent liability

17  and/or damages opinion in the midst of that.

18          THE COURT:  Well, time out, Ms. Chapman.  If you

19  guys are looking for anything other than an estimation

20  decision before the effective date of a plan, assuming it's

21  otherwise confirmed, I think that would be unrealistic as

22  well.

23          MS. CHAPMAN:  I'm sorry, Your Honor.  I didn't

24  understand what you just said.

25          THE COURT:  The most that we're going to be talking

1   about between now and the effective date of any plan,

2   assuming, especially in the absence of people who have

3   different views of the world than you and the Creditors'

4   Committee, that the plan is confirmed, the most we're going

5   to have is a determination of the reserve --

6           MS. CHAPMAN:  Yes, Your Honor.

7           THE COURT:  -- before the effective date.

8           MS. CHAPMAN:  Yes.

9           THE COURT:  Okay.

10          MS. CHAPMAN:  That's all that we are contemplating.

11  That's all that we believe is necessary in order to move

12  forward.

13          THE COURT:  All right, then.

14          MR. GARRITY:  Your Honor, pardon me.

15          THE COURT:  Yes, Mr. Garrity?

16          MR. GARRITY:  I apologize for interrupting you.

17  Just a question.  On the reserve, Your Honor -- are you

18  contemplating the fixing of a reserve for the Rembrandt

19  claim, not a larger reserve for all administrative claims?  I

20  had understood it to be the former, the Rembrandt claim.

21          THE COURT:  I did as well.  It's my understanding

22  that the only reserves that I'm going to need to set in this

23  case are those where the reserves would be sufficiently

24  material so it has an effect upon creditor distributions and

25  that most of them have been consensually resolved and maybe

1   there will be a few that I will have to do similar

2   proceedings on, but I haven't been told of any such yet.

3         MR. GARRITY:  Thank you, Your Honor.

4         THE COURT:  Ms. Chapman, am I right in that

5   understanding?

6         MS. CHAPMAN:  Well, Your Honor, this is a unique

7   situation.  When we've been here before you on reserves, they

8   have been unsecured claims in different classes in the

9   capital structure.  This is an administrative claim.

10        THE COURT:  All pre-petition unsecured claims.

11        MS. CHAPMAN:  Correct.  That's right, Your Honor.

12  So this is an administrative claim.  It's a horse of a

13  different color and if I hear Mr. Garrity correctly, what I

14  think they're asking for is their very own reserve with their

15  name on it, not a piece of a reserve that builds up generally

16  to a reserve for all admin claims similarly situated.  I

17  believe that's what they're asking for.

18        MR. GARRITY:  Your Honor, that's exactly what we're

19  asking for, and the reason we need it, Your Honor, is because

20  in their plan there is an ability for people to file

21  administrative priority claims after the effective date.

22        Now, if we don't know that there are funds available

23  to pay us, then we don't know that the plan is going to be

24  feasible.  And most respectfully, I don't know how anybody

25  could find that it's feasible.

1          But in any event, Your Honor, that's what we want.

2    That's what we contemplate, that's what we would ask for, and

3    once we got it, that would most likely obviate and deal with

4    whatever confirmation issue we had.

5          THE COURT:  All right.  Here's what you're going to

6    do.

7          I'm going to give you Monday the 11th -- no, strike

8    that -- Tuesday the 12th for a hearing on the estimation for

9    purposes of reserves, if that is necessary; and the 11th,

10   which was empty and which was going to be used as an Adelphia

11   day will be used for confirmation continuation so we have a

12   three-day consecutive period of proceedings on the

13   confirmation hearing.

14         Then we'll have a two-day break, during which, on

15   the 12th I'm going to deal with the issues in this matter and

16   on the 13th I'm going to deal with all my other cases, and

17   then we'll resume -- or as many of my other cases as I can

18   squeeze into the 13th, and then on the 14th and 15th we'll be

19   back to Adelphia confirmation.

20         So you folks are going to have, if you can't agree,

21   a hearing that will run on the 12th.  Usual case management

22   order procedures are going to prevail, specifically taking

23   all direct, by affidavit or declaration, and only cross and

24   subsequent testimony going in live, getting documents to me

25   in advance so that I can review them in advance, but to the

1   extent that people have evidentiary objections to anything

2   that will be going in by paper, you're letting me know in

3   advance so that I can at least read them with the

4   understanding that there is an evidentiary issue.

5           And I will deal with procedural matters and/or

6   motions in limine and/or evidentiary objections to the extent

7   already known at some date before the 12th, like perhaps the

8   4th or the 5th of December.

9           Thanksgiving is the 23rd and the 24th.  I'd like you

10  to let me know by Wednesday the 29th as to whether or not you

11  have a consensual agreement on the size of the reserve

12  because I'm going to need the time if you do.  And if you

13  don't, I'm going to have to figure out whether the amount of

14  time I've allocated is sufficient.

15          And I think that's about as far as we can get today.

16  Are there open issues, Mr. Garrity?

17          MR. GARRITY:  Just a question, Your Honor.  As far

18  as communicating with the Court on the 29th, just by letter?

19  Is that sufficient?

20          THE COURT:  Letter copied to your opponent.

21          MR. GARRITY:  Of course.

22          THE COURT:  If it's a deal, I assume you can do

23  something that you vetted in advance.

24          MR. GARRITY:  Yes.

25          THE COURT:  If it's not, one way or another just

1   tell me.

2          MR. GARRITY:  Thank you.

3          THE COURT:  Oh, one other thing.  To what extent

4   does this involve anything that is commercially proprietary

5   or sensitive?  Can I hold all these hearings in the clear?  I

6   assume if you're talking about a patent, by definition a

7   patent is a public document, it's not a trade secret.  And

8   Adelphia isn't in the business anymore, so Adelphia doesn't

9   care.  Am I correct?

10          MR. MELORO:  We don't see any reason why this can't

11   be held in open court, Your Honor.

12          THE COURT:  Mr. Garrity?

13          MR. GARRITY:  We agree, Your Honor, it can be held

14   in open court.

15          THE COURT:  Okay.  Okay.  All right.  Anything else,

16   anybody?  All right.  Thank you, folks.  Have a good day.

17      (Proceedings concluded at 10:43 a.m.)

18                          *****

19

20

21

22

23

24

25

```
 1                              CERTIFICATION

 2          I certify that the foregoing is a correct transcript

 3     from the electronic sound recording of the proceedings in the

 4     above-entitled matter to the best of my knowledge and

 5     ability.

 6

 7

 8

 9                                            November 15, 2006

10     Lisa Luciano, AAERT Cert. No. 327
       Certified Court Transcriptionist
11     For Rand Transcript Service, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```