IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

REMBRANDT TECHNOLOGIES, L.P.

               Plaintiff,

v.

CHARTER COMMUNICATIONS, INC.,
CHARTER COMMUNICATIONS
OPERATING, LLC, and COXCOM, INC.,

               Defendants.

CASE NO. 2:06-CV-507 [LED]

## DEFENDANT COXCOM, INC.'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION, PERSONAL JURISDICTION, OR IN THE ALTERNATIVE, TRANSFER, AND BRIEF IN SUPPORT THEREOF

Defendant CoxCom, Inc. ("Defendant" or "CoxCom") moves pursuant to Rules 12(b)(1) and 12(b)(2) of the Federal Rules of Civil Procedure to dismiss Plaintiff Rembrandt Technologies, L.P.'s ("Plaintiff" or "Rembrandt") claims against it on the grounds that this Court lacks subject matter jurisdiction and personal jurisdiction.  In the alternative, CoxCom moves to transfer this action to the United States District Court for the District of Delaware where there is already an action pending involving the same parties and same issues.

## I.      INTRODUCTION

The "first-to-file" rule instructs a district court to decline jurisdiction over an action when an action involving the same parties and same issues is already pending in another district.[1] *West Gulf Mar. Ass'n. v. ILA Deep Sea Local 24*, 751 F.2d 721 (5th Cir. 1985); *Mann Mfg., Inc. v.*

---

[1] Other parties in similar cases have filed similar motions to dismiss in other jurisdictions under Rule 12(b)(6) of the Federal Rules of Civil Procedure, rather than 12(b)(1).  However, *West Gulf Mar. Assoc. v. ILA Deep Sea Local 24*, 751 F.2d 721 (5th Cir. 1985), suggests that Rule 12(b)(1) is the appropriate rule.  *Id.* at 730 (noting that "the court with 'prior jurisdiction over the common subject matter' should resolve all issues presented in related actions.").  Therefore, CoxCom has filed the current motion under Rule 12(b)(1) and acknowledges that other rules may be equally applicable.

1

*Hortex*, 439 F.2d 403, 408 (5ᵗʰ Cir. 1971). Such is the case here. On November 30, 2006, *before* Rembrandt filed this action, CoxCom filed a declaratory judgment action against Rembrandt in the United States District Court for the District of Delaware, seeking a declaration of non-infringement and invalidity of U.S. Patent No. 5,008,903 (the "'903 Patent") (the "Delaware Action"). The instant action involves the very same issues. Namely, whether CoxCom's activities of providing high-speed internet services infringe the '903 Patent. As the parties and issues involved in this second-filed case are the same as those in the first-filed Delaware Action, pursuant to the first-to-file rule, this Court must decline jurisdiction and either dismiss this action or transfer it to the United States District Court for the District of Delaware where it may be consolidated with the first-filed Delaware Action.

As a second and independent basis for dismissal, the exercise of personal jurisdiction over CoxCom does not comport with federal due process. CoxCom, a Delaware corporation with its principal place of business in Atlanta, Georgia, does not do business in Texas such that it would be subject to this Court's general personal jurisdiction. Moreover, CoxCom does not own or operate any cable systems or provide high-speed internet services in Texas such that it would be subject to this Court's specific personal jurisdiction. In fact, CoxCom's only contact with Texas is a point of presence ("POP") node consisting of servers and routing equipment which is located in leased space in Dallas and which is unrelated to the accused methods and systems at issue in this case. Indeed, in another patent litigation matter pending in this judicial district, Judge Clark recently held that CoxCom did not have the minimum contacts with Texas sufficient to support the exercise of personal jurisdiction. *USA Video Tech. Corp. v. Time Warner Cable, Inc., et al*; civil action number 2:06-CV-239-RHC.[2] Defendant CoxCom respectfully requests

---

[2] A true and correct copy of Judge Clark's order is attached hereto as Exhibit 1.

US2000 9720059.5 C8490-331049

that this Court similarly find that CoxCom has insufficient contacts with Texas to support jurisdiction and dismiss Plaintiff's Complaint as to Defendant CoxCom.

## II.    STATEMENT OF FACTS

CoxCom filed the Delaware Action against Rembrandt at 4:33 p.m. EST on November 30, 2006,[3] seeking a declaration that its activities in providing high speed internet access do not infringe the '903 Patent.  Four hours later, at 7:41 p.m. Central, Rembrandt filed the instant action, asserting that CoxCom's activities in providing high speed cable modem internet products and services to subscribers infringe U.S. Patent No. 5,710,761 (the "'761 Patent"), No. 5,778,234 (the "'234 Patent"), No. 6,131,159 (the "'159 Patent"), and No. 6,950,444 (the "'444 Patent").  (Compl. ¶¶ 11, 16, 21, and 26.)  The next day, acknowledging that the '761 Patent, '234 Patent, '159 Patent, '444 Patent and '903 Patent are related patents and alleging that the activity accused with respect to the '761 Patent, '234 Patent, '159 Patent and '444 Patent is the same activity accused with respect to the '903 Patent, Rembrandt amended its Complaint to include a claim for infringement of the '903 Patent (the '761 Patent, '234 Patent, '159 Patent, '444 Patent and '903 Patent are collectively referred to as the "Patents in Suit").[4]  (First Am. Compl. ¶¶ 8-12.)

CoxCom, a cable service provider that offers various cable services to subscribers, including high speed internet access, is a Delaware corporation with its principal place of business in Atlanta, Georgia.  (Decl. of John Spalding in Supp. of Def. CoxCom, Inc.'s Mot. to Dismiss Pursuant to Rules 12(b)(1) and 12(b)(2) ¶¶ 2, 4 [hereinafter Spalding Decl.].)  CoxCom has no presence in Texas.  CoxCom is not registered to do business in Texas and does not have any employees, does not maintain any place of business or office, and does not keep any

---

[3]  A true and correct copy of CoxCom's declaratory judgment complaint is attached hereto as Exhibit 2.
[4]  A true and correct copy of each of the Patents in Suit is attached hereto as Exhibits 3A-3E.

corporate books or records in Texas. (*Id.* ¶¶ 3, 6.) CoxCom does not own or operate any cable systems in Texas and does not provide any high speed internet services in Texas or to residents of Texas, and does not derive any revenues from Texas. (*Id.* ¶ 4.) In fact, CoxCom's only contact with Texas is an internet Point of Presence (POP) node consisting of servers and routing equipment located in leased space in Dallas.[5] (*Id.* ¶ 5.) The node carries internet protocol traffic and is not related to the accused methods and systems. (*Id.*)

CoxCom's parent company, Cox Communications, Inc. ("Cox Communications"), recently was named a defendant in an action filed by USA Video Technology Corporation ("USA Video") and pending before Judge Clark of the Eastern District of Texas, Marshall Division (civil action number 2:06-CV-239-RHC). Cox Communications moved to dismiss the action as to it on the grounds that the court lacked personal jurisdiction. USA Video opposed the motion and moved to amend its complaint to add CoxCom as an additional defendant. CoxCom opposed the motion to amend on the grounds that the court lacked general and specific personal jurisdiction. After granting plaintiff jurisdictional discovery, Judge Clark issued an order finding that the court lacked personal jurisdiction over both Cox Communications and CoxCom, ordering that the claims asserted against Cox Communications be severed, transferring the claims to the United States District Court for the District of Delaware, and denying USA Video's motion to amend to add CoxCom. *See* Exhibit 1.

In stark contrast to CoxCom, Rembrandt, a New Jersey limited partnership with its principal place of business in Bala Cynwyd, Pennsylvania, is a non-practicing entity ("NPE")—a firm that invests in patents but does not practice them. (First Am. Compl. ¶ 1.) As such,

---

[5] With the exception of the POP node, all assets of CoxCom that were located in Texas were sold to Cox Southwest Holdings, L.P. ("Cox Southwest") on or about December 31, 2003 (*Id.* ¶ 7.) Thereafter, with the sole exception of a cable television franchise located in Henderson, Texas, Cox Southwest sold all of its assets to Cebridge Acquisition, L.P. ("Cebridge"). (*Id.*) Cox Southwest is an entity separate from CoxCom and maintains its own corporate formalities, including books, records, boards and corporate structure. (*Id.* ¶ 8.)

4

Rembrandt invests in patents for the purpose of litigating infringement royalties and licenses. According to its website, Rembrandt "shoulders the legal, financial, and business risks associated with pursuing patent pirates and provides the capital and expertise required to litigate complex patent infringements."[6] http://www.rembrandtfund.com/about.html. In short, Rembrandt is an entity that has filed several lawsuits against many cable service providers, including CoxCom, alleging infringement of the Patents in Suit and other patents related to cable and internet services.[7] With respect to geography, Rembrandt is amenable to suit in multiple venues, including the District of Delaware—located in Wilmington, Delaware approximately 30 miles from Rembrandt's headquarters in Bala Cynwyd, Pennsylvania. *See* Exhibit 6 attached hereto. In fact, Rembrandt has filed in Delaware patent infringement actions involving the same patents and accused activity (providing high speed internet access) that are at issue in this action.[8]

In light of the facts that CoxCom is a Delaware corporation and Rembrandt is conveniently located to the United States District Court for the District of Delaware and is amenable to suit there, CoxCom elected to file its declaratory judgment action in Delaware.

---

[6] To pursue such patent infringement litigation, Rembrandt maintains a "staff of in-house professionals and outside consultants" that "includes scientists, inventors, financial analysts, lawyers, and researchers who are expert at identifying the validity and market value of patents and Intellectual Property (IP), and securing revenue for these inventors and companies as well as Rembrandt's investors." *Id.* Rembrandt claims to have raised $150 million "to acquire patents and litigate patent infringement." *Id.* Attached hereto as Exhibit 4 is a true and correct copy of excerpts from Rembrandt's Web site.

[7] On June 1, 2006, Rembrandt filed a complaint in the Eastern District of Texas against Charter Communications, Inc., Charter Communications Operating, LLC, Cox Communications, Inc., CoxCom, Inc., Cox Enterprises, Inc., Cablevision Systems Corporation and CSC Holdings, Inc. (case no. 2:06-CV-223-TJW), alleging infringement of U.S. Patent Nos. 5,243,627; 5,852,631; 5,719,858; and 4,937,819 by operating digital cable systems in which they provide cable television, high speed internet, and Voice over IP services to their subscribers. On the same day and in the same court, Rembrandt filed a separate suit against Time Warner Cable, Inc. (case No. 2:06-CV-0224-TJW), alleging infringement of the same patents. On September 13, 2006, Rembrandt filed a second suit in this Court against Time Warner (case no. 2:06-CV-369-TJW), alleging infringement of the Patents in Suit by providing high speed cable modem internet products and services to subscribers. True and correct copies of the complaints are attached hereto as Exhibits 5A-5C.

[8] On October 13, 2006, Rembrandt filed an action against Cablevision Systems Corporation, *et al.* (case no. 1:06-0CV-00635-GMS), asserting the same patents that are at issue in this action, as well as one additional patent. A true and correct copy of this complaint is attached hereto as Exhibit 7. Rembrandt has also brought other patent infringement suits in Delaware against CBS (case no. 1:06-00727), ABC (case no. 1:06-00730), NBC (case no. 1:06-00729) and Fox (case no. 1:06-00731) for infringement of U.S Patent No. 5,243,627; true and correct copies of each complaint are attached hereto as Exhibits 8A-8D.

5

### III.    LEGAL AUTHORITY AND ARGUMENT

**A.    This Second-Filed Action Should be Dismissed or Transferred to the United States District Court for the District of Delaware.**

      1.    <u>The First-to-File Rule Avoids Duplicative Litigation.</u>

The United States Court of Appeals for the Fifth Circuit and this Court recognize the "firs-to-file" rule.  The first-to-file rule is a generally recognized doctrine of federal judicial comity which instructs a district court to decline jurisdiction over an action when a complaint involving the same parties and same issues has already been filed in another district.  *West Gulf Mar. Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 729 (5th Cir. 1985); *Mann Mfg., Inc. v. Hortex, Inc.*, 439 F.2d 403, 408 (5th Cir. 1971).  "The concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result."  *Id.* (citations omitted).

In the context of patent litigation, the first-to-file rule is rigidly followed, and the United States Court of Appeals for the Federal Circuit, which is the controlling circuit in patent cases, strongly favors the first-filed action.  *See Elecs for Imaging, Inc. v. Coyle*, 394 F.3d 1341, 1348 (Fed. Cir. 2005); *Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931, 938 (Fed. Cir. 1993) ("There must . . . be sound reason that would make it unjust or inefficient to continue the first-filed action"; otherwise, the first-filed suit should proceed to judgment).  Thus, patent cases are adjudicated in the forum where jurisdiction first attaches.  *See Daimler-Chrysler Corp. v. Gen. Motors Corp.*, 133 F. Supp. 2d 1041, 1043 n.2 (N.D. Ohio 2001) ("The Federal Circuit has . . . held that the first to file rule will be applied more rigorously in patent cases . . . ."); *Guthy-Renker Fitness, L.L.C. v. Icon Health & Fitness*, 179 F.R.D. 264, 269 (C.D. Cal. 1998) ([a]pplication especially important in patent cases, "where the risk of conflicting determinations as to the patent's validity and enforceability [is] clear.").

US2000 9720059.5 C8490-331049

The Fifth Circuit and district courts within the Fifth Circuit similarly have given substantial deference to the court where the first action was filed in patent infringement disputes. *See, e.g., Mann Mfg., Inc.*, 439 F.2d at 408 (remanding and ordering the district court in the second-filed infringement case to either dismiss or transfer the matter to the court hearing the first-filed declaratory judgment case); *Texas Instruments, Inc. v. Micron Semiconductor, Inc.*, 815 F. Supp. 994, 1000 (E.D. Tex. 1993) (denying reconsideration of an order transferring an infringement action to the forum where the first-filed declaratory judgment action was filed).

CoxCom opted—as was its prerogative—to initiate its action against Rembrandt in Delaware. It was CoxCom's right to elect the Delaware forum to assert its rights to a declaration of noninfringement, it did so prior to commencement of this action, and its election should not be disturbed.

2. Because the Two Cases Involve Substantially Overlapping Issues, the Court Must Dismiss or, in the Alternative, Transfer the Second-Filed Action.

In determining whether to apply the "first-to-file" rule, the courts must resolve two questions: (a) whether the pending actions are duplicative or involve substantially similar issues such that one court should decide the subject matter of both actions, and (b) which of the two courts should take the case. *Cal. Sec. Co-Op, Inc. v. Multimedia Cablevision, Inc.*, 897 F. Supp. 316, 317 (E.D. Tex. 1995). The court presiding over the second-filed action may make an initial determination of whether there is a likelihood of substantial overlap of the issues warranting deference to the first-filed action. *See Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997). However, once that determination is made, the second court **must** dismiss, transfer or stay the proceedings, and leave for the court presiding over the first action to decide whether or not the first-to-file rule applies. *See Mann Mfg., Inc.*, 439 F.2d at 407-08 ("Once the likelihood of a substantial overlap between the two suits ha[s] been demonstrated, it [is] was no

7

longer up to the [second-filed court] to resolve the question of whether both should be allowed to proceed."); *Texas Instruments*, 815 F. Supp. at 999 ("This [c]ourt simply may not, consistent with the principles of comity and conservation of judicial resources, usurp the first-filed court's role."). The Fifth Circuit considers it an abuse of discretion for a district court in a second-filed case to refuse to dismiss, stay, or transfer the matter to the court handling the first-filed case once substantial overlap is determined to exist. *See Sutter Corp. v. P & P Indus., Inc.*, 125 F.3d 914, 950 (5th Cir. 1997), declined to follow on other grounds by *Bill Harbert Const. Co., a Div. of Bill Harbert Intern., Inc. v. Cortez Byrd Chips, Inc.*, 169 F.3d 693; *Save Power Ltd.*, 121 F.3d at 952.

In the context of patent litigation, "substantial overlap" is met where there is an infringement action and a declaratory judgment action based on the same patents, because "they involve the exact same determination, just sought through different procedural vehicles." *Tape & Techs. Inc. v. Davlyn Mfg. Co.*, No. Civ. A. SA04CA-1150-XR, 2005 WL 1072169, at *3 (W.D. Tex. May 6, 2005); *see also Genentec, Inc. v. Eli Lilly and Co.,* 998 F.2d 931, 937-38 (Fed. Cir. 1993) (noting that the first-to-file rule applies in the declaratory judgment context); *Watershed Software Group, LLC v. Camping Cos.*, No. Civ. A. 02-2546, 2002 WL 31528464, at *4 (E.D. La. Nov. 8, 2002) (holding that substantial overlap existed between an action seeking a declaration of rights and an action seeking monetary damages for violation of the same rights); *800-FLOWERS, Inc. v. Intercontinental Florist, Inc.*, 860 F. Supp. 128 , 132 (S.D.N.Y. 1994). Notably, identical litigation is not required, only "substantial" overlap between the issues. *Save Power Ltd.*, 121 F.3d at 950. There may be substantial overlap between the cases even if one case involves additional claims and additional parties. *Cal. Sec. Co-Op, Inc.*, 897 F. Supp. at 318

8

(holding that the addition of claims and parties that were not included in the first-filed action did not change the subject matter of the cases—which was the same in both cases).

The parties in the first-filed Delaware action and in the instant action are the same[9] and the issues substantially overlap.  CoxCom filed the Delaware Action seeking a ruling that its high-speed internet and cable modem services do not infringe the '903 Patent.  The '903 Patent is at issue in this action, as well as the other Patents in Suit, each of which Rembrandt alleges is infringed by the same accused activity—CoxCom's high-speed cable and internet services.   In fact, acknowledging that the Patents in Suit are related, when Rembrandt amended its Complaint to specifically assert the '903 Patent, it did not allege any additional accused infringing activity or network components.  (*Compare* Compl; First Am. Compl.) Therefore, the Delaware Action and this second-filed action are merely different procedural vehicles to determine the same issues—whether CoxCom's activities are infringing.   Because the Delaware Action was filed first, involves the same parties and substantially overlapping issues, this Court must decline jurisdiction and either dismiss this action as to CoxCom or transfer it to the District of Delaware where it may be consolidated with the first-filed Delaware Action.

**B.     This Exercise of Personal Jurisdiction over CoxCom Violates Federal Due Process and, Thus, Provides a Second and Independent Basis for Dismissal.**

While CoxCom historically provided internet service in Texas, several years ago and before Rembrandt bought the rights to the Patents in Suit,[10] CoxCom made a strategic business decision to exit from Texas.  (Spalding Decl. ¶ 4.)  As a result, CoxCom does no business in Texas, owns no assets in Texas, keeps no records in Texas, has no employees in Texas, and does

---

[9]  There are additional defendants in this action, but they are not related to, or required for, Rembrandt's patent infringement claims against CoxCom.

[10]  Rembrandt became the assignee of the '903 Patent on July 31, 2006; the '234 Patent on March 30, 2005; the '159 Patent on March 30, 2005; the '444 Patent on July 31, 2006; and the '761 Patent on March 30, 2005.  A true and correct copy of each chain of assignments is attached hereto as Exhibit 9.  (These assignments may be accessed from the United States Patent and Trademark office Web site – http://assignments.uspto.gov, follow "Patent Assignment" hyperlink, and enter the desired patent number in the search field.)

9

not own or operate any cable systems or provide any high speed internet services in Texas.  (*Id.* ¶¶ 3-4, 6.)  Accordingly, the exercise of personal jurisdiction over CoxCom would violate federal due process.

### 1.   Legal Standard

Personal jurisdiction in patent infringement cases is governed by Federal Circuit law, with guidance on due process principles supplied by the Supreme Court and other federal circuits.  *Pennington Seed, Inc. v. Produce Exch.*, No. 299, 457 F.3d 1334, 1343-44 (Fed. Cir. 2006).  Determining whether personal jurisdiction exists over a non-resident defendant involves two inquiries:  whether personal jurisdiction exists under the forum's long-arm statute and, if so, whether the exercise of personal jurisdiction comports with due process.  *Trintec Indus., Inc. v. Pedre Promotional Prods., Inc.*, 395 F.3d 1275, 1279 (Fed. Cir. 2005).  If the forum's long-arm statute is coextensive with the limits of due process, "the two inquiries collapse into a single inquiry:  whether jurisdiction comports with due process."  *Dainippon Screen Mfg. Co. v. CFMT, Inc.*, 142 F.3d 1266, 1270 (Fed. Cir. 1998).  While Federal Circuit precedent controls the due process analysis, the law of the forum governs the interpretation of the forum's long-arm statute.  *HollyAnne Corp. v. TFT, Inc.*, 199 F.3d 1304, 1307 (Fed. Cir. 1999).[11]  The Texas Long Arm Statute has been construed to be coextensive with constitutional due process requirements.  *See Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 214 (5th Cir. 2000); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 17.04.

Due process concerns mandate that a court may only exercise personal jurisdiction over a non-resident defendant where that defendant "has certain minimum contacts with the forum such

---

[11]  *3D Sys., Inc. v. Aarotech Labs., Inc.*, 160 F.3d 1373, 1377 (Fed. Cir. 1998) ("While we defer to the interpretation of a state's long-arm statute given by that state's highest court, particularly whether or not the statute is intended to reach the limit of federal due process, when analyzing personal jurisdiction for purposes of compliance with federal due process, Federal Circuit law, rather than regional circuit law, applies.") (internal citations omitted).

10

that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984) (internal citations and alterations omitted). This is because the defendant has a liberty interest in not being subject to the judgments of a forum with which it has no meaningful minimum "contacts, ties, or relations" and, out of fairness, defendants should not be "haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72, 475 (1985) (internal quotations omitted). Personal jurisdiction may be either general or specific. *See Helicopteros*, 466 U.S. at 414 n.9.

In reviewing a motion to dismiss, a court must assume the truth of all factual allegations made in the complaint and construe all inferences from them in the light most favorable to the plaintiff. *Elecs for Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1349 (Fed. Cir. 2003), *cert denied*, 540 U.S. 1111 (2004); *United States v. Smithfield Foods, Inc.*, 332 F. Supp. 2d 55, 59 (D.D.C. 2004). At the same time, however, jurisdiction may not be invoked solely on "bare allegations or conclusory statements." *Id.* at 60. When personal jurisdiction is challenged, the plaintiff must "allege specific facts connecting [the] defendant with the forum." *Id.*

2.    CoxCom Does Not Have Sufficient "Substantial and Continuous" Contacts With Texas to Justify the Exercise of General Jurisdiction.

In determining whether a defendant has "continuous and systematic" contacts with the forum, in accordance with federal due process, a court will consider factors such as whether the defendant maintains an office in the forum, has been licensed to conduct business in the forum, has employees or agents in the forum, uses bank accounts in the forum, or markets or sells products in the forum. *See, e.g., Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984) (holding there was no general jurisdiction where defendant did not have a place of business in the forum, was not licensed to do business in the forum and its only contacts

11

consisted of sending an officer to the forum for a contract-negotiation session, accepting checks drawn on a bank in the forum, purchasing products and services from the forum, and sending personnel to the forum for training).  None of these factors are present in this case.

CoxCom is a Delaware corporation that is not registered or qualified to do business in Texas because it does no business in Texas.  (Spalding Decl. ¶¶ 3, 4.)  CoxCom does not own or operate any cable systems in Texas and does not provide any television, internet or telephone services in Texas, and, therefore, does not derive revenues from any Texas transactions, activities, or connections.  (*Id.* ¶ 4. )  CoxCom does not maintain any place of business, maintain any office, or keep any corporate books or records in Texas.  (*Id.* ¶ 3.)  CoxCom does not direct any activities to the residents of Texas.  Finally, in another patent infringement action involving video on demand services, Judge Clark recently found that CoxCom had insufficient contacts with Texas to justify the exercise of general or specific personal jurisdiction.  Exhibit 1 at 1.

3.   <u>The Exercise of Specific Jurisdiction Over CoxCom Would Not Comport With Due Process Given That CoxCom Has No Contacts with Texas Related to Plaintiff's Claims.</u>

The Federal Circuit has developed a three-prong test to determine whether the exercise of specific jurisdiction over a nonresident comports with due process:

(a)   whether the defendant purposefully directed its activities at the residents of the forum;

(b)   whether the claim arises out of or is related to those activities, and

(c)   whether assertion of personal jurisdiction is reasonable and fair.

*Akro Corp. v. Luker*, 45 F.3d 1541, 1545-46 (Fed. Cir. 1995); *HollyAnne Corp. v. TFT, Inc.*, 199 F.3d 1304, 1307-08 (Fed. Cir. 1999).  The plaintiff must prove all three prongs to establish jurisdiction.  *Akro*, 45 F.3d at 1545.

As stated above, CoxCom is not purposefully directing activities at the residents of Texas and, in fact, made a strategic business decision to exit from the state.  (Spalding Decl. ¶ 4.)  As a

12

result, CoxCom does not offer or otherwise provide in Texas the high speed internet services alleged to infringe the Patents in Suit. (*Id.* ¶ 4.) In fact, CoxCom's sole contact with Texas is an internet node that carries internet traffic for CoxCom's cable systems, which are located outside of Texas. (*Id.* ¶ 5.) The internet node is not related to the DOCSIS communications that occur between a cable modem and the cable modem termination system in the head-end (*id.*), which are the methods and systems at issue in this litigation (*see* First Am. Compl. ¶¶ 9, 11, 14, 16, 19, 21, 24, 26 (describing the Patents in Suit)). The purpose of the node, which is implemented by computer servers in leased space in Dallas, is to connect with CoxCom's national internet backbone to carry traffic from and to its cable systems that are located in several (non-Texas) metro areas throughout the country. Interconnecting national or international networks through assets in Texas does not support personal jurisdiction. *See Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 717-18 (5th Cir. 1999) (holding that leasing [telephone] lines in Texas "for the purpose of connecting two points in Mexico . . . [did] not constitute doing business in Texas"); *Applewhite v. Metro Aviation, Inc.*, 875 F.2d 491, 717-18 (5th Cir. 1989) (holding interconnections, even though crossing the border into a forum, are insufficient to confer jurisdiction under the Due Process Clause). The purchase of the computer servers used by the POP node or the purchase of related services (such as the space occupied by the servers) also do not establish personal jurisdiction. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) ("[m]ere purchases, even if occurring at regular intervals, are not enough to warrant a [S]tate's assertion of . . . jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions"); *Shaffer v. Heitner*, 433 U.S. 186, 213 (1977) (ownership of property in forum state unrelated to claim did not support jurisdiction).

13

Even if the Court were to find that CoxCom is subject to personal jurisdiction in Texas (which CoxCom denies), the exercise of such jurisdiction would be both unreasonable and unfair.  *See HollyAnne Corp. v. TFT, Inc.*, 199 F.3d 1304 (Fed. Cir. 1999); *Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.* 148 F.3d 1355 (Fed. Cir. 1998); *Colida v. LG Elecs., Inc.*, 77 Fed. Appx. 523, 526 (Fed. Cir. 2003).

In evaluating the reasonableness of personal jurisdiction, courts consider several factors including, *inter alia*, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, and the interstate judicial system's interest in obtaining the most efficient resolution of controversies.  *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).  Generally speaking, Texas' "interest[s] [are] preventing patent infringement within its borders and in protecting the patent rights of its citizens. . . [and] . . . furthering commerce and scientific development, especially within its technology sector, which is promoted by patent laws." *Marshall Packaging Co., LLC v. Nestle Waters N. Am., Inc.*, No. 6:05CV295, 2006 WL 871015, at *5 (E.D. Tex. Mar. 24, 2006).  However, unlike the plaintiff in *Marshall Packaging* (which was a Texas corporation doing business in Texas), Rembrandt is organized under the laws of New Jersey and with a principal place of business in Pennsylvania.  Rembrandt has not attempted to practice, develop, or otherwise advance the technology covered by its patents in Texas.  Therefore, exercising jurisdiction over CoxCom will do nothing to protect the patent rights of Texas citizens or to further commerce and scientific development in Texas.  Finally, since CoxCom is not doing business in Texas, exercising jurisdiction over CoxCom does nothing to prevent patent infringement within Texas.  Simply, Texas has no interest in Rembrandt's claims against CoxCom.

14

When considering the plaintiff's interest in obtaining convenient and effective relief, courts examine "the convenience and effectiveness of relief from the plaintiff's perspective, as generally the first party to file suit chooses the forum." *Breckenridge Pharm., Inc. v. Metabolite Labs, Inc.*, 444 F.3d 1356, 1367-68 (Fed. Cir. 2006). However, when the plaintiff's and state's interest in litigating in a particular form is particularly attenuated, as in this case, the court should not exercise personal jurisdiction over a non-resident defendant. *See Colida*, 77 Fed. Appx. at 526. Here, Rembrandt was *not* the first party to file suit or choose a forum—CoxCom was, and it filed suit in Delaware. Moreover, the United States District Court for the District of Delaware, located in Wilmington, Delaware, is approximately 30 miles from Rembrandt's headquarters. *See* Exhibit 6. Presumably, much more convenient than Texas. Furthermore, Rembrandt has already expressed its desire and willingness to litigate in Delaware, having filed multiple patent litigation matters there, including matters involving the same patents at issue in this case. *See supra* note 6.

When considering the interstate judicial system's interest in obtaining the most efficient resolution of controversies, courts compare the alternative forums and may consider the case load of the courts as well as their familiarity with the type of litigation. *Amoco Egypt Oil Co., v. Leonis Navigation Co.*, 1 F.3d 848, 852 (9th Cir. 1993); *Breckenridge Pharm., Inc.*, 444 F.3d at 1368. In that regard, according to the Statistical Tables for the Federal Judiciary, in 2005, there were 1,190 total filings in the District of Delaware for four judges, or 298 cases per judge; and 3,583 filings in the Eastern District of Texas for eight judges, or 448 cases per judge. Judicial Caseload Profile Reports for the District of Delaware and the Eastern District of Texas, http://www.uscourts.gov/fcmstat/index.html. In the "other" category, which includes patent litigation matters, 13 cases were filed in the District of Delaware and 110 in the Eastern District

of Texas.  U.S. District Courts—Civil Cases Commenced, by Nature of Suit and District, During the 12-Month Period Ending June 30, 2005, http://www.uscourts.gov/stats/june05/index.html.[12] The lighter case load of the Delaware court suggests that this case may be resolved just as efficiently in Delaware.  Further, the time for disposition of the cases is almost identical—10.9 months in Delaware versus 10.3 months in the Eastern District of Texas.  *Id.*  Therefore, the statistics do not substantially favor Texas, and just as sound a resolution can be had in Delaware.

CoxCom does not have systematic and continuous contacts with the State of Texas sufficient for this Court to exercise general personal jurisdiction over it.  It ceased any business and operations in Texas in 2003, making any contacts non-existent.  In addition, there are no minimum contacts with Texas to support specific jurisdiction with respect to the Patents in Suit.  CoxCom has no activities, employees, operations, or assets in Texas that are directed to the technology of the Patents in Suit.  The only asset, the POP node, supports internet backbone traffic and *not* any cable modem or high-speed internet traffic of Texas subscribers because there are none.  However, if this Court should find sufficient minimum contacts to support personal jurisdiction, it should find that the assertion of such jurisdiction is both unfair and unreasonable based on the above factors.  Rembrandt has no business or contacts with Texas, other than filing suit here, and does not practice or otherwise make use of its patents.  CoxCom is no longer located, here, and Delaware can provide as just and efficient a resolution to the matter as this Court.

## V.    CONCLUSION

For the reasons stated above, CoxCom respectfully requests that this Court decline jurisdiction and either dismiss this action or transfer it to the District Court for the District of Delaware.

---

[12]  The Judicial Caseload Reports are attached hereto as Exhibit 10A-10B.

16

This the 26th day of January 2007.

/s/ Michael E. Jones
Mitchell G. Stockwell
Lead Attorney
Georgia Bar No. 682912
KILPATRICK STOCKTON LLP
1100 Peachtree St NE
Suite 2800
Atlanta GA  30309-4530
Telephone:  404-815-6214
Facsimile:   404-815-6555
MStockwell@KilpatrickStockton.com

Michael E. Jones
State Bar No. 10929400
mikejones@potterminton.com
Allen F. Gardner
State Bar No. 24043679
allengardner@potterminton.com
POTTER MINTON
A Professional Corporation
110 N. College, Suite 500 (75702)
PO Box 359
Tyler, Texas  75710
Telephone:  903-597-8311
Facsimile:  903-593-0846

**Attorneys for CoxCom, Inc.**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) and contemporaneously served upon all counsel who have consented to electronic service on this the 26th day of January 2007.  Other counsel shall be served by first class mail on this same date.

/s/ Michael E. Jones
Michael E. Jones

17

US2000 9720059.5 C8490-331049

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

REMBRANDT TECHNOLOGIES, LP,

               Plaintiff,

    v.

CHARTER COMMUNICATIONS, INC.,         CASE NO. 2:06-CV-507 [LED]
CHARTER COMMUNICATIONS
OPERATING, LLC. and COXCOM, INC.,

               Defendants.

## DECLARATION OF JOHN SPALDING IN SUPPORT OF DEFENDANT COXCOM, INC.'S MOTION TO DISMISS PURSUANT TO RULES 12(B)(1) AND 12(b)(2)

    1.     I, John Spalding, am a Vice President of CoxCom, Inc. ("CoxCom"). My responsibilities include oversight of government affairs matters.

    2.     CoxCom is incorporated in Delaware and maintains its principal place of business in Atlanta, Georgia. CoxCom is a subsidiary/affiliate of Cox Communications, Inc.

    3.     CoxCom is not registered to do business in Texas. CoxCom does not maintain any place of business, maintain any office, or keep any corporate books or records in Texas.

    4.     CoxCom is an operational entity which owns and operates cable systems. While CoxCom historically provided services to residents in Texas, in 2003 CoxCom made a business decision to transfer the assets it owned in Texas, to no longer offer services to residents of Texas and to no longer do business in Texas. As a result, CoxCom does not currently own or operate any cable systems in Texas and does not provide any cable

television, internet, or telephone services in Texas. CoxCom does not provide goods or services to any customers in Texas, and does not receive revenues from Texas.

5.   CoxCom's only contact with Texas is an internet backbone node. This Point of Presence (POP) node consists of servers and routing equipment located in leased space in Dallas. The node carries internet protocol traffic for the company's national network. The POP node does not relate to the DOCSIS communications that occur between a cable modem and the cable modem termination system (CMTS) in the headend.

6.   CoxCom has no employees based in Texas. All CoxCom engineers and service technicians for the POP node are located outside of Texas.

7.   With the exception of the POP node, all assets of CoxCom that were located in Texas were assigned to Cox Southwest Holdings, L.P. ("Cox Southwest") on or about December 31, 2003/January 1, 2004. Thereafter, with the sole exception of a cable television franchise located in Henderson, Texas, Cox Southwest sold all of its Texas assets to Cebridge Acquisition, L.P. ("Cebridge"). In connection with the sale to Cebridge, Cox Southwest sold all of the physical assets associated with the Henderson cable television system and attempted to immediately transfer the franchise itself. However, the City of Henderson refused to consent to the transfer of the franchise and, as a result, Cox Southwest was prohibited from immediately transferring the franchise. The Henderson franchise expires on or about March 25, 2007. After that date, Cox Southwest will have no assets in Texas.

2

8.    Cox Southwest is an entity separate from CoxCom and maintains its own corporate formalities, including books, records, boards and corporate structure.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this the 26th day of January 2007.


John Spalding

US2000 9628124.5 C8490-331049

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| USA VIDEO TECHNOLOGY CORPORATION, | § § § | |
| *Plaintiff,* | § § | Civil Action No. 2:06-CV-239 |
| v. | § § | JUDGE RON CLARK |
| TIME WARNER CABLE, INC.; COX COMMUNICATIONS, INC.; CHARTER COMMUNICATIONS, INC.; COMCAST CABLE COMMUNICATIONS, LLC; COMCAST OF RICHARDSON, LP; COMCAST OF PLANO, LP; COMCAST OF DALLAS, LP, | § § § § § § § § | |
| *Defendants.* | § | |

**ORDER ON DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL
JURISDICTION AND PLAINTIFF'S MOTION TO AMEND**

Defendant Cox Communications, Inc. ("Cox") filed a Motion to Dismiss for Lack of

Personal Jurisdiction or, in the Alternative, to Transfer Venue to the District of Delaware [Doc. #

32]. In response, Plaintiff argued that it needed limited discovery on the issue of personal

jurisdiction. Plaintiff also filed a Motion for Leave to Amend [Doc. # 42] to join a subsidiary of

Cox, CoxCom, Inc. ("CoxCom"), and asked for discovery on the relationship between Cox and

CoxCom.

This court allowed limited discovery on these issues. *See* Order on Defendant's Motion

to Dismiss for Lack of Personal Jurisdiction [Doc. # 53]. Both parties have submitted

supplemental briefing on these motions. Based on the evidence presented, Cox and CoxCom

lack sufficient contacts with Texas for this court to exercise jurisdiction over them. Normally,

1

when the court lacks personal jurisdiction over a party, the court can dismiss the party or transfer

to a court which has personal jurisdiction.  Cox requests that this case be transferred to Delaware.

The court will sever Plaintiff's claims against Cox and grant Cox's request to transfer to

the District of Delaware.  The court also finds that the joinder of CoxCom is not warranted.

## I. Background

Plaintiff USA Video Technology ("USVO") alleges that the Defendants infringe Claim 1

of U.S. Patent No. 5,130,792 (the ` 792 patent).  The ` 792 patent teaches a method for

communicating video programs to remote locations over selected commercial telephone

networks.  This "video-on-demand" process allows a customer to obtain a video program

whenever a customer requests it.

Cox maintains that Plaintiff has sued the wrong company because Cox does not provide

"video-on-demand" services and Cox does not own or operate a cable system in Texas.  Cox also

states that its affiliate CoxCom does not sell or market any products in Texas.  After suit was

filed here, CoxCom filed a declaratory judgment action in Delaware against USVO.  Cox itself

has not joined in the action in Delaware.

## II. Law and Analysis

**A. Personal Jurisdiction over Cox**

<u>1. Standard of Review for Personal Jurisdiction</u>

Because this a patent case, this court applies the law of the Federal Circuit, rather than

that of regional circuits, to determine whether personal jurisdiction exists.  *Electronics For*

*Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1348 (Fed. Cir. 2003).  There are two types of personal

jurisdiction – specific and general.  *Id.* at 1349.  Under general jurisdiction, the exercise of

2

jurisdiction is proper where the defendant has continuous and systematic contacts with the forum

state, even if those contacts are not related to the cause of action. *Id.* at 1349. However, these

contacts must be "so substantial and of such a nature as to justify suit against [the defendant] on

causes of action arising from dealings entirely different from those activities." *International*

*Shoe Co. v. Washington*, 326 U.S. 310, 318, 66 S.Ct. 154, 159 (1945).

Determining whether specific personal jurisdiction over a nonresident defendant is proper

entails two inquiries: (1) whether the long-arm statute of the forum state confers personal

jurisdiction over the defendant; and (2) whether the exercise of such jurisdiction by the forum

state is consistent with due process. *Id* at 1349.[1] Texas' long arm statute has been interpreted to

extend to the limits of due process. *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex. 1990).

Therefore, the question is whether Defendant's contacts with the State are sufficient to satisfy

due process. *Electronics For Imaging, Inc.*, 340 F.3d at 1350.

Whether due process is satisfied requires the court to consider whether Defendant has

certain "minimum contacts" with the forum state, and whether the exercise of jurisdiction would

offend traditional notions of fair play and substantial justice. *Electronics For Imaging, Inc.*, 340

F.3d at 1350. In making this determination, the Federal Circuit has stated that three factors must

be considered: (1) whether the defendant purposefully directed its activities at the residents of the

forum state, (2) whether the claim arises out of or relates to those activities, and (3) whether

assertion of personal jurisdiction is reasonable and fair. *Id.* The first two factors correspond with

---

[1]The Federal Circuit has stated "the question of which Due Process Clause controls the
personal jurisdiction inquiry becomes purely academic because this court, though professing
reliance on the Fifth Amendment, applies the Fourteenth Amendment state-contacts test of
*International Shoe*." *Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355,
1358 n.*. (Fed. Cir. 1998).

3

the "minium contacts" analysis and the third factor corresponds with the traditional notions of fair play and substantial justice. *Id.* Plaintiff bears the initial burden to prove a prima facie case that Defendant has minimum contacts with the forum state. *Id.* Defendant bears the burden to show that the exercise of jurisdiction would violate the traditional notations of fair play and substantial justice. *Id.*

### 2. Cox's Contacts

In this court's prior order allowing Plaintiff discovery on the issue of personal jurisdiction, the court pointed out that Plaintiff had failed to show the nature and extent of Cox's contacts with Texas. After limited discovery, Plaintiff still has not presented any evidence which suggests that Cox has continuous and systematic contacts with Texas (for general jurisdiction), or that Cox marketed or sold any of the accused services or products in Texas (for specific jurisdiction). In fact, Plaintiff admits that Cox appears to have no ties to Texas.

Plaintiff suggests that the contacts of Cox's affiliates may be attributed to Cox for the purposes of establishing minimum contacts with Texas. Contacts may be attributed when a parent company totally dominates and controls its subsidiary, operating the subsidiary as its business conduit or agent. *See U.S. v. Jon-T Chemicals, Inc.*, 768 F.2d 686, 691 (5th Cir. 1985).[2] Even assuming that one of Cox's affiliates has sufficient contacts with Texas to establish a basis for jurisdiction, Plaintiff has not argued, or come forward with any evidence to show, that Cox totally dominates and controls any of its subsidiaries or affiliates. Plaintiff has not suggested that any additional discovery is needed. The court will grant Cox's request to transfer.

---

[2]In analyzing whether the contacts of an affiliate are imputed to another entity, the Federal Circuit follows the law of other courts of appeals. *Insituform Techs., Inc. v. CAT Contracting, Inc.*, 385 F.3d 1380, 1380 (Fed. Cir. 2004).

## C. Joinder of CoxCom

### 1. Standard of Review for Joinder

Under Fed. R. Civ. P. 21, "[p]arties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just." In applying Rule 21, the court is governed by the liberal amendment standards of Rule 15(a). *See McLellan v. Miss. Power & Light*, 526 F.2d 870, 873 (5th Cir. 1976).[3]  Under Rule 15(a), the court should grant leave "freely" and there is a strong bias in favor of granting leave to amend. *Lyn-Lea Travel Corp. v. American Airlines, Inc.*, 283 F.3d 282, 286 (5th Cir. 2002).  A district court may consider various factors in determining whether to allow leave to amend. *Little v. Liquid Air Corp.*, 952 F.2d 841, 846 (5th Cir. 1992).  These factors include undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by an amendment previously allowed, undue prejudice to the other party, and futility of the amendment. *Jacobsen v. Osborne*, 133 F.3d 315, 318 (5th Cir. 1998).  Denial may be based upon futility alone. *Id.* at 320.

### 2. Futility of Joinder

Cox argues that joinder of CoxCom is futile because the evidence before the court shows that this court cannot exercise personal jurisdiction over CoxCom.

#### a. General Jurisdiction

Plaintiff states that CoxCom has continuous and systematic general business contacts

––––––––

[3]The Federal Circuit has stated that a decision on whether to grant or deny a motion for leave to join a party is governed by the law of the regional circuit. *See Insituform Technologies, Inc. v. CAT Contracting, Inc.*, 385 F.3d 1360, 1372 (Fed. Cir. 2004).

with Texas because CoxCom owns and operates a Point of Presence ("POP") in Dallas, Texas. This POP is a transport backbone node for a national IP network and is located in leased office space in Dallas. The POP consists of a network of circuits and equipment for connecting internet protocol traffic traveling across the nation to and from CoxCom's systems located outside of Texas. It is undisputed that the node operates only to carry internet protocol traffic through Texas, not to any Texas residents. In fact, there is no evidence to suggest that CoxCom does any business in Texas at all.

While the Federal Circuit has not directly addressed this issue, the Fifth Circuit has stated that interconnections, even though crossing the border into a forum, are insufficient by themselves to confer general jurisdiction. *See Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 718 (5th Cir. 1999). The court finds this reasoning persuasive. The POP only operates to transfer digitized packets of information as part of a national network, and is not directly related to any business activity in Texas. This is not the type of activity which is so substantial and of such a nature to justify the exercise of general jurisdiction. *See International Shoe*, 326 U.S. at 318, 66 S.Ct. at 159.

Moreover, there are no permanent employees in Dallas, and CoxCom employees only occasionally service the equipment in Dallas. These occasional visits by employees are insufficient to establish a basis for general jurisdiction. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-18, 104 S.Ct. 1868, 1872-74 (1984). Additionally, the mere renting or ownership of property in a forum is not enough to confer jurisdiction when that property is not used to conduct business in the forum. *See Shaffer v. Heitner*, 433 U.S. 186, 212, 97 S.Ct. 2569, 2584 (1977). Plaintiff has not argued, and there is no evidence to suggest, that the

6

property in Dallas (i.e. servers and routers) was used to conduct business in Texas.  On the record before it, the court finds that the POP is insufficient to establish a basis for general jurisdiction.

> b. *Specific Jurisdiction*

To establish specific jurisdiction, there must be some evidence that the claims arise out of or relate to the contacts with Texas. *Electronics For Imaging, Inc.*, 340 F.3d at 1350.  Plaintiff has accused Defendants' "video on demand" cable television services as infringing on the ` 792 patent.   It is undisputed that CoxCom no longer offers "video on demand" services in Texas, and that the POP is not part of CoxCom's cable television services.  Therefore, the alleged contact with Texas, internet traffic passing through a POP, cannot be related to Plaintiff's claims of offering "video on demand" services to Texas residents.  The court concludes that there is no basis for specific jurisdiction over CoxCom.

Plaintiff has not asked for any additional discovery or suggested that any other contacts with Texas exist. Because the evidence before the court shows that this court lacks personal jurisdiction over CoxCom, the court concludes that joinder would be futile and is not warranted. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584, 119 S.Ct. 1563, 1570 (1999)(personal jurisdiction is an essential element of the jurisdiction of a district court "without which the court is powerless to proceed to an adjudication.").

### III. Conclusion

After discovery, Plaintiff failed to come forward with any evidence to show that this court could exercise jurisdiction over Cox Communications, Inc.  The evidence before the court also shows that the joinder of CoxCom, Inc. would be futile because CoxCom, Inc. does not have sufficient contacts with Texas such that this court can exercise jurisdiction over it.

IT IS THEREFORE ORDERED that Defendant Cox Communications, Inc.'s Motion to

Dismiss for Lack of Personal Jurisdiction or, in the Alternative, to Transfer Venue to the District

of Delaware [**Doc. # 32**] is **GRANTED IN PART**.  USA Video Technology's claims against

Cox Communications, Inc. are **SEVERED** and **TRANSFERRED** to the United States District

Court for the District of Delaware.  The Clerk shall send a copy of this Order to the Clerk of the

United States District Court for the District of Delaware

IT IS FURTHER ORDERED that Plaintiff's Motion for Leave to Amend [**Doc. # 42**] is

**DENIED**.

So **ORDERED** and **SIGNED** this 1   day of **November, 2006.**

Ron Clark, United States District Judge

8

# EXHIBIT 2



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

COXCOM, INC.                          )
                                      )
            Plaintiff,                )
                                      )
      v.                              )      C.A. No. ___ 08 ___ 7 2 1
                                      )
REMBRANDT TECHNOLOGIES, L.P.          )
                                      )
            Defendant.                )

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, CoxCom, Inc. ("CoxCom"), files this complaint for declaratory judgment relief

against Defendant, Rembrandt Technologies, L.P. ("Rembrandt"), and avers as follows:

## PARTIES

1.      Plaintiff CoxCom is a corporation organized under the laws of the State of

Delaware with its principal place of business at 1400 Lake Hearn Dr., Atlanta, GA 30319.

2.      On information and belief, Rembrandt is a corporation organized under the laws

of the State of New Jersey with its principal place of business at 401 City Avenue, Suite 185,

Bala Cynwyd, PA 19004.

## JURISDICTION AND VENUE

3.      This action is for declaratory relief of non-infringement, invalidity and/or

unenforceability of U.S. Patent No. 5,008,903 (the "'903 Patent") that arises under the United

States patent laws (35 U.S.C. §§ 101, et seq.). The Court has subject matter jurisdiction over this

action pursuant to the Declaratory Judgment Act (28 U.S.C. §§ 2201 and 2202) and 28 U.S.C. §§

1331 and 1338.

4.      This Court has general and specific personal jurisdiction over Rembrandt because Rembrandt transacts business within this judicial district, and has purposefully availed itself of the laws and protection of the courts in Delaware in filing a prior patent infringement action involving the '903 Patent in the United States District Court for the District of Delaware (C.A. No. 06-635-GMS).  This action seeks a declaration that CoxCom has not infringed any valid claims of the '903 Patent.

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) and 1400(b).

## BACKGROUND

6.      CoxCom is a cable service provider that offers various cable services to subscribers, including Cox® Cable, advanced digital video programming services under the Cox® Digital Cable brand, and local and long-distance telephone services under the Cox® Digital Telephone brand.  CoxCom also offers high speed Internet access under the Cox® High Speed Internet brand.

7.      Rembrandt is a company that invests in patents, but does not practice them. Instead, it acquires rights to patents and sues entities it believes infringe upon those patents.

8.      Upon information and belief, Rembrandt maintains or is associated with a website at http://www.rembrandtfund.com.  Exhibit A is a true and correct copy of excerpts from its website.  According to its website, Rembrandt "shoulders the legal, financial, and business risks associated with pursuing patent pirates and provides the capital and expertise required to litigate complex patent infringements."  *Id.*  To pursue such patent infringement litigation, Rembrandt maintains a "staff of in-house professionals and outside consultants" that "includes scientists, inventors, financial analysts, lawyers, and researchers who are expert at identifying the validity

- 2 -

and market value of patents and Intellectual Property (IP), and securing revenue for these inventors and companies as well as Rembrandt's investors." *Id.* Rembrandt claims to have raised $150 million "to acquire patents and litigate patent infringement." *Id.*

9.      In short, Rembrandt's business is to initiate lawsuits to enforce patent rights. Rembrandt is engaged in the enforcement of patents that it has acquired in a number of different industries.   For example, in February 2006, Rembrandt initiated a patent suit against Sharp Corporation and Sharp Electronics Corporation in an action entitled *Rembrandt Technologies, L.P. v. Sharp Corporation and Sharp Electronics Corporation*, 2:06-CV-00047-TJW (E.D. Tex.).   An apparent affiliate of Rembrandt, Rembrandt Vision Technologies, L.P., has also initiated a patent suit against Bausch & Lomb Incorporated and Ciba Vision Corporation, in an action entitled *Rembrandt Vision Technologies, L.P. v. Bausch & Lomb Incorporated and Ciba Vision Corporation*, Case No. 2:05-CV-00491-TJW (E.D. Tex.).

## REMBRANDT'S ENFORCEMENT CAMPAIGN AGAINST COXCOM AND OTHER CABLE SERVICE PROVIDERS

10.      Rembrandt has expanded its enforcement efforts to target members of the cable industry, including CoxCom and its affiliates.

11.      On June 1, 2006, Rembrandt filed a complaint in the United States District Court for the Eastern District of Texas, entitled *Rembrandt Technologies, L.P. v. Charter Communications, Inc., Charter Communications Operating, LLC, Cox Communications, Inc., CoxCom, Inc., Cox Enterprises, Inc., Cablevision Systems Corporation and CSC Holdings, Inc.*,[1] Case No. 2:06-CV-223 ("Texas Action").   A true and correct copy of the complaint filed in the Texas Action is attached as Exhibit B.   The Texas Action alleges that defendants, including CoxCom, infringe multiple patents by operating digital cable systems in which they provide

- 3 -

cable television, high speed internet, and Voice over IP (VoIP) services to their subscribers. On October 16, 2006, Rembrandt dismissed Cablevision Systems Corporation and its affiliate CSC Holdings, Inc. without prejudice from the Texas Action.

12.    On September 13, 2006, Rembrandt filed suit against Time Warner, in a case entitled *Rembrandt Technologies, L.P. v. Time Warner Cable, Inc.*, Case No. 2:06-CV-369 ("Time Warner Action"). A true and correct copy of the Time Warner complaint is attached hereto as Exhibit C. In the Time Warner Action, Rembrandt asserts infringement of several U.S. patents, including the '903 Patent. Rembrandt claims that Time Warner infringed "the '903 Patent by providing high speed cable modem internet products and services to subscribers." *Id.* A true and correct copy of the '903 Patent is attached hereto as Exhibit D.

13.    Rembrandt has also pursued its business of enforcing patent rights through litigation in Delaware. On October 13, 2006, Rembrandt filed a patent infringement action against Cablevision Systems Corporation, et al., that is entitled *Rembrandt Technologies, L.P. v. Cablevision Systems Corporation and CSC Holdings, Inc.*, Case No. 1:06-CV-00635-GMS ("Cablevision Action"). In the Cablevision Action, Rembrandt asserts a variety of patents, including the '903 patent. The present action relates to the Cablevision Action under D. Del. LR 3.1(b) because it at least involves the same patent.

14.    Rembrandt filed the Cablevision Action in this Court. In addition to asserting against Cablevision the patents at issue in the Texas Action, Rembrandt also asserts that Cablevision has infringed the '903 Patent by providing high speed internet service to its subscribers. A true and correct copy of the complaint is attached hereto as Exhibit E.

## THE CABLE INDUSTRY

15.     The cable industry in which CoxCom operates is highly competitive and involves a number of companies that offer the same sorts of services that CoxCom offers its subscribers. However, because of the expense of research and development of the equipment necessary to provide a robust, fully-functional cable system, standards have been developed that apply to various cable services, including the provision of high speed internet access.

16.     Cable Television Laboratories, Inc. ("CableLabs") is a nonprofit research and development consortium that helps develop and integrate new cable telecommunications technologies.  Exhibit F is a true and correct copy of excerpts from the CableLabs' website. CableLabs supported the development of cable modems via promulgation of a standard known as the Data Over Cable Service Interface Specification ("DOCSIS®") standards.  CableLabs' DOCSIS® specification "defines interface requirements for cable modems involved in high speed data distribution over cable television system networks," including internet access.  *Id.* Further information regarding CableLabs and DOCSIS® may be found on the CableLabs Web site at www.cablelabs.com.     CableLabs and cable companies like CoxCom require interoperability among DOCSIS® cable modems and other equipment.

17.     There are a limited number of vendors capable of supporting and providing cable modems and other equipment for building the architecture necessary to offer new cable services like high speed internet.  Cable companies like CoxCom, Cablevision or Time Warner Cable, Inc. ("Time Warner"), often utilize the same vendors because the cable modems and other equipment offered by such vendors are DOCSIS®-compliant.

- 5 -

## DECLARATORY JUDGMENT COUNT

## (NONINFRINGEMENT, INVALIDITY AND/OR UNENFORCEABILITY OF THE '903 PATENT)

18.    CoxCom restates and realleges the allegations set forth in paragraphs 1 through 17 above and incorporates them by reference.

19.    By virtue of Rembrandt's actions against CoxCom and its affiliates, as well as Rembrandt's initiation of lawsuits against Cablevision and Time Warner asserting provision of high speed internet services infringes the '903 Patent, CoxCom is under a real and immediate apprehension of a lawsuit by Rembrandt alleging infringement of the '903 Patent in view of CoxCom's business of providing high speed internet services.

20.    Upon information and belief, CoxCom, however, has not directly infringed, contributed to the infringement of, or actively induced the infringement of any claim of the '903 Patent, nor has it otherwise committed any acts of infringement of any rights of Rembrandt.

21.    Upon information and belief, the claims of the '903 Patent are invalid under 35 U.S.C. §§ 102, 103 and/or 112.

22.    Upon information and belief, any attempt by Rembrandt to enforce the '903 Patent would be barred by waiver, laches, estoppel or acquiescence and, therefore, the '903 Patent is unenforceable.

## PRAYER FOR RELIEF

WHEREFORE, CoxCom prays for the following:

1.    A judgment and declaration that CoxCom has not infringed and does not infringe in any manner any claim of the '903 Patent, directly, contributorily or by inducement, and has not otherwise infringed or violated any rights of Rembrandt.

2.    A judgment that each claim in the '903 Patent is invalid and unenforceable.

3. An injunction against Rembrandt and its affiliates, subsidiaries, assigns, employees, agents or anyone acting in privity or concert with Rembrandt from charging infringement or instituting any legal action for infringement of the '903 Patent against CoxCom or anyone acting in privity with CoxCom, including the divisions, successors, assigns, agents, suppliers, manufacturers, contractors and customers of CoxCom.

4. A judgment and declaration that this is an exceptional case within the meaning of 35 U.S.C. § 285, entitling CoxCom to an award of its reasonable attorneys' fees, expenses and costs in this action.

5. A judgment for such other and further relief in law or in equity as this Court deems just or proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

Rodger D. Smith II (#3778)
Leslie A. Polizoti (#4299)
Chase Manhattan Centre
1201 North Market Street, P.O. Box 1347
Wilmington, DE 19899-1347
rsmith@mnat.com
(302) 658-9200
     *Attorneys for Plaintiff CoxCom, Inc.*

OF COUNSEL:

Mitchell G. Stockwell
KILPATRICK STOCKTON LLP
1100 Peachtree Street, N.E., Suite 2800
Atlanta, GA 30309
mstockwell@kilpatrickstockton.com
(404) 815-6500

Dated: November 30, 2006

- 7 -

# EXHIBIT 3A

# United States Patent [19]

## Betts et al.

| | |
|---|---|
| [11] | **Patent Number:** 5,008,903 |
| [45] | **Date of Patent:** Apr. 16, 1991 |

[54] **ADAPTIVE TRANSMIT PRE-EMPHASIS FOR DIGITAL MODEM COMPUTED FROM NOISE SPECTRUM**

[75] Inventors: William L. Betts, St. Petersburg; James J. DesRosiers, Tampa, both of Fla.

[73] Assignee: A.T. & T. Paradyne, Largo, Fla.

[21] Appl. No.: 357,056

[22] Filed: May 25, 1989

[51] Int. Cl.⁵ ............................................. H04L 7/00
[52] U.S. Cl. ....................................... 375/60; 375/14
[58] Field of Search .................... 375/7, 8, 12, 13, 14, 375/15, 60, 109; 333/18, 28 R; 364/724; 371/64, 34; 455/24

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,593,142 | 7/1971 | Freeny | 375/43 |
| 4,053,837 | 10/1977 | Ryan et al. | 375/15 |
| 4,433,425 | 2/1984 | de Jaeger | 375/13 |
| 4,483,009 | 11/1984 | Honda et al. | 375/14 |
| 4,489,416 | 12/1984 | Stuart | 375/13 |
| 4,550,415 | 10/1985 | Debus, Jr. et al. | 375/14 |
| 4,797,898 | 1/1989 | Martinez | 375/12 |

*Primary Examiner*—Douglas W. Olms
*Assistant Examiner*—Stephen Chin
*Attorney, Agent, or Firm*—Kane, Dalsimer, Sullivan, Kurucz, Levy, Eisele & Richard

[57] **ABSTRACT**

An apparatus and method calculates pre-emphasis coefficients for a transmitting modem based upon the noise spectrum as it is received at the receiving modem. A noise spectrum analysis circuit calculates a difference between the best-fit transmitted data and the actually received data. This difference is used to compute a discrete Fourier transform of the noise spectrum, which is transmitted back to the transmitting modem on the secondary channel. This data is used to calculate filter coefficients for the transmitting modem.

**21 Claims, 4 Drawing Sheets**



Case 2:07-cv-00404-CMSE Document 745-5 Filed 06/28/2007 Page 3 of 24



FIG. 1a     FIG. 1b     FIG. 1c

FIG. 2a     FIG. 2b     FIG. 2c

FIG. 3a     FIG. 3b     FIG. 3c



*FIG. 4*



FIG. 5



FIG. 6

5,008,903

## ADAPTIVE TRANSMIT PRE-EMPHASIS FOR DIGITAL MODEM COMPUTED FROM NOISE SPECTRUM

### BACKGROUND OF INVENTION

1. Field of Invention

This invention relates to an apparatus for determining a frequency-dependent signal-to-noise ratio in a communications network so as to allow proper equalization in a transmit pre-emphasis mode.

2. Description of the Prior Art

It is well-known in the prior art that a transmitter in a communications network, particularly a multipoint network, should emphasize or amplify certain frequencies so as to compensate for frequency-dependent losses in the communications process. For example, with the use of a telephone line as a communications line, losses are more pronounced at higher frequencies. These losses are typically modelled as a constant negative slope above a given break frequency on a decibels versus frequency plot.

When noise is injected into a communications line subsequent to the high-frequency roll-off of the communications line and the signal rolls off above a break frequency while the noise signal remains constant (thereby resulting in a signal-to-noise ratio which progressively decreases above the break frequency), prior art methods of frequency-dependent analysis of total energy received is adequate as an equalization technique. These methods include fixed pre-emphasis wherein a fixed frequency-dependent boost is included in the communication apparatus, or adaptive pre-emphasis wherein the required frequency-dependent boost is calculated on-line during a periodic training sequence.

However, when noise is injected into a communications line prior to the high frequency roll-off of the communications line and the noise rolls off in parallel to the roll-off of the signals (resulting in a constant signal-to-noise ratio as a function of frequency), prior art methods of frequency-dependent analysis of total energy received is inadequate as an equalization technique.

This inadequacy is due to the fact that a positive gain is applied to higher frequency portions of the total signal. However, in order to keep the total signal energy constant as is required by telephone and other communications line applications, this positive gain in the upper frequency spectrum must be compensated for by a negative gain in the lower frequency spectrum thereby reducing the signal-to-noise ratio in the lower frequencies and resulting in a degradation in performance. This principle is illustrated in more detail by the several drawings of FIGS. 1, 2 and 3.

FIG. 1a illustrates the received transmitter signal and the received noise signal being "flat" across the entire band. The signal model for this spectrum is shown in FIG. 1b wherein the communications line includes no roll-off or other frequency-dependent characteristics and noise is added between the transmitter and the receiver. Such a system requires no frequency-dependent pre-emphasis as is shown by the ideal flat pre-emphasis of FIG. 1c.

FIG. 2a illustrates the received transmitter signal rolling off above a break frequency $w_o$ while the received noise spectrum is "flat" across the entire band. The signal included for this spectrum is shown in FIG.

2b wherein the transmitter signal passes through a channel or communications line thereby being rolled-off before having frequency-independent noise added thereto. The ideal pre-emphasis, whether manually set or periodically calculated on-line, is illustrated in FIG. 2c wherein an increasing gain is applied above the frequency $w_o$. This frequency-dependent pre-emphasis flattens the transmitter signal as received without affecting the noise signal, thereby increasing the signal-to-noise ratio at the frequencies above $w_o$ and improving overall system performance. A slight negative gain may be applied in the lower frequencies so as to keep the total incoming energy constant. This ideal pre-emphasis is accurately calculated by prior art methods.

FIG. 3a illustrates the received transmitter signal and the received noise both rolling off in parallel above break frequency $w_o$. The signal model for this spectrum is shown in FIG. 3c wherein the noise is added to the transmitter signal at the transmitter end and both the transmitter signal and the noise are passed through the channels or communication line thereby having substantially identical attenuation characteristics applied thereto. Therefore, the signal-to-noise ratio remains constant throughout the entire band as is illustrated by the constant vertical distance between the received transmitter signal and the noise. As the signal-to-noise ratio is constant, the ideal signal pre-emphasis is flat or shown in FIG. 3c (or 1c). However, prior art methods of pre-emphasis, either manual or automated, would look to the frequency-dependent energy spectrum of the entire received signal (received transmitter signal plus received noise) and calculate a pre-emphasis similar to that shown in FIG. 2c. This would result in a lowering of the transmitter signal power and the signal-to-noise ratio at frequencies below break frequency $w_o$ and an overall degradation in system performance.

### OBJECTS AND SUMMARY OF THE INVENTION

It is therefore the object of this invention to provide a method and apparatus for automated transmit pre-emphasis calculation which properly accounts for frequency-dependent signal-to-noise ratios.

This apparatus and method uses a noise spectrum generator circuit to calculate a frequency-dependent noise spectrum. This spectrum is transmitted from the receiver to the transmitter (or from the master to the remote in a multipoint system) via the secondary channel. The transmitter uses this information to compute the new pre-emphasis coefficients from its own transmitted spectrum as seen by the receiver and uses the result on its subsequent transmission.

Thus, this and other objects are effectively achieved.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. 1a, 1b and 1c are illustrative of a communications system with no frequency-dependent attenuation or roll-off.

FIGS. 2a, 2b and 2c are illustrative of a communications system with noise injected subsequent to frequency-dependent attenuation or roll-off.

FIGS. 3a, 3b and 3c are illustrative of a communications system with noise injected prior to frequency-dependent attenuation or roll-off.

FIG. 4 is a schematic of the noise spectrum generator circuit of the present invention.

3

FIG. 5 is a schematic of the transmitter and receiver of the present invention.

FIG. 6 is a schematic of the nine-tap filter of the pre-filter of FIG. 5.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring now to the drawings in detail wherein like numerals indicate like elements throughout the several views, noise spectrum generator circuit 50 is illustrated in FIG. 4. As will be described herein, noise spectrum generator circuit 50 is incorporated into the circuitry of the modem receiver circuit 12 of FIG. 5.

Noise spectrum generator circuit 50 includes analog-to-digital converters 52, 53 and sinusoidal mixers 54, 55 for demodulation. The demodulated signal from mixers 54, 55 is equalized by linear equalizers 56, 57. Linear equalizers 56, 57 are transversal filters which are from the prior art and are not to be confused with the equalization used for pre-emphasis in the transmitter circuitry. The resulting signals are phase corrected by phase corrector 60 which results in an x-y signal representative of the complex plane to slicer 62. Slicer 62 includes the constellation or eye pattern data which is used in the quadrature amplitude modulation scheme of the signal received by analog-to-digital convertors 52, 53. Slicer 62 outputs the constellation point which is closest to the input of slicer 62. Therefore, the actual received point is input to slicer 62 and the presumed actual transmitted point is output from slicer 62. Comparator 64 subtracts the actual received point from the actual transmitted point so as to calculate an error signal which is representative of the noise signal at the given frequency. This error or noise signal is inversely related to the distance between the signal line and the noise line of FIGS, 1a, 2a and 3a at the given frequency.

The resulting error signal is phase corrected by inverse phase corrector 66. The output of inverse phase corrector 66 is used to update the characteristics of linear equalizers 56, 57 and as an input to complex DFT (discrete Fourier transform) block 68. Complex DFT block 68 converts the phase corrected noise signals in the time domain (i.e. successive values corresponding to successive frequencies) into the noise spectrum in the frequency domain.

FIG. 5 discloses the entire modem transmitter circuit 10 and modem receiver circuit 12 of the present invention. Modem transmitter circuit 10 includes a conventional modem transmitter 14 which outputs digital signals to be transmitted to pre-filter 16. Pre-filter 16 pre-emphasizes the digital signals prior to their conversion to analog signals. Pre-filter 16, as will be described herein, includes nine-tap filter 70 as shown in FIG. 7. The output of the pre-filter 16 is converted to analog format by digital-to-analog converter 18 for transmission across communications line 20, which may be a telephone line, to modem receiver circuit 12.

Analog-to-digital converter 22 (which corresponds to analog-to-digital converters 42, 43 of FIG. 4) converts the analog signal from communications line 20 into digital format for input into noise spectrum analysis block 24. The remainder of the noise spectrum generator circuit of FIG. 4 is included in noise spectrum analysis block 24 from which a frequency domain plot of the noise signal ($P'_i$, i=1,5) is output, said frequency domain plot being derived by discrete Fourier transform techniques as previously described.

4

Secondary channel transmitter 38 transmits communications network control parameters, including the spectrum ($P_i$, i=1,5) from block 24, on a sideband of the primary channel at a low transmission rate through line 42 via digital-to-analog converter 40 to analog-to-digital converter 44 of modem transmitter circuitry 10.

Modem transmitter circuitry 10 includes analog-to-digital converter 44 and secondary channel receiver 46 which receives the spectrum sent from secondary channel transmitter 38 through line 42. Secondary channel receiver 46 transmits the spectrum ($P'_i$, i=1,5) data to comparator 28. In order to account for existing pre-emphasis, the frequency domain plot of the noise signal has subtracted from it the previous frequency domain plot as stored in shift register 26. This subtraction is performed by comparator 28. The reference spectrum outputs from comparator 28 is multiplied by one half by multiplier 30. This division is done as the current state-of-the-art is to have the transmitter provide by pre-emphasis one half of the signal compensation required while the receiver provides the other half. The portion provided by the receiver of, course, is done by apparatus separate from the invention as herein described. This division by two is optional and not crucial to the invention. The reference spectrum may be divided by other values, or not divided at all, in other embodiments of the invention.

Shift register 26 includes a power-up line which initializes the contents of shift register 26 with values representative of a flat spectrum as stored in block 29.

The output of multiplier 30 is input to compute block 48 which calculates and determines the pre-filter coefficients ($C_i$, i=0,4) for pre-filter 16 as will be described hereinafter.

Pre-filter 16 includes nine-tap filter 70 as shown in FIG. 6. Nine-tap filter 70 receives its input from the output from modem transmitter 14. The input is transmitted through a series of 9 delay blocks 71-79, the outputs of each of these delay blocks is sent through multipliers 81-89. Multipliers 81-89 receive their second multiplicands ($C_0$–$C_4$) from compute block 48 and send their respective products to adder 90. The output of adder 90 is the output of pre-filter 16.

Compute block 48 includes a power-up line which initializes the pre-filter coefficients ($C_i$, i=0,4) for a flat spectrum for the first transmission of the transmitting circuit 10. Subsequent initialization could be provided by the previously calculated $C_i$, i=0,4 stored in non-volatile memory.

The functional description of this invention is as follows.

The transmitting modem 10 sends QAM modulated data signals to the receiving modem 12.

The noise spectrum generator circuit 50, including the complex DFT block 68, calculates a frequency spectrum ($P_i$, i=1,5) of the noise at 5 frequencies—709, 1145, 1800, 2455 and 2891 Hertz. These frequencies are chosen from a 22 point discrete Fourier transform calculation so as to span the usable frequency of a telephone line. The spectrum is transmitted back to the transmitting modem 10 over the secondary channel. The previous frequency spectrum is subtracted from the new frequency spectrum, and the result is divided in half. This result is stored as the "previous value" for the next calculation.

The frequency spectrum ($P_i$, i=1,4) of the noise expressed in a logarithm scale are converted to a linear scale ($F_i$, i=0,4) in compute block 48.

5,008,903

| 5 | 6 |

The linear scale frequency spectrum is converted to filter coefficients through the following transformation:

$$C_0 = (F_0 - 2F_1 + 2F_2 - 2F_3 + F_4)/8$$
$$C_1 = (F_0 - 2F_1 + 2F_3 - F_4)/8$$
$$C_2 = (F_0 - 2F_2 + F_4)/8$$
$$C_3 = (F_0 + 2F_1 + 2F_3 - F_4)/8$$
$$C_4 = (F_0 + 2F_1 + 2F_2 + 2F_3 + F_4)/8$$

$C_i$, i=0,4, is then transformed by computer block 48 into $C'_i$, i=0,4 in order to adjust the pre-emphasis coefficients to be appropriate for the resonators of the resonating filters. These resonators are located at 0, 600, 1200 and 2400 Hertz. An iterative calculation is done to adjust the pre-emphasis coefficients, $C'_i$, i=0,4 (i.e. scalars) into appropriate filter coefficients, $C_i$, i=0,4.

Finally, these filter coefficients, $C_i$, i=0,4, are adjusted via an AGC circuit in compute block 48, so as to assure a constant power output from transmitting modem 10.

These appropriate filter coefficients $C_i$, i=0,4 are transmitted to pre-filter 16. However, pre-filter 16 implements these coefficients only whenever data is not being transmitted through pre-filter 16, such as just before a remote modem responds to a poll. This implementation precludes changing the transmission characteristics in the middle of a transmission.

Obviously, many modifications and variations of the invention are possible in light of the above description. It is therefore to be understood that within the scope of the appended claims, the invention may be practiced other than as specifically described.

What is claimed is:

1. An apparatus for calculating pre-emphasis coefficients for a transmitting modem in a communications system, including:

first transmitting means in the transmitting modem, including adjusting means responsive to the pre-emphasis coefficients for adjusting frequency-dependent characteristics of an output of said first transmitting means;

receiving means for receiving said output from said first transmitting means;

generating means for generating parameters responsive to a noise spectrum of said output including means for calculating said noise spectrum of said output;

second transmitting means for transmitting said parameters to the transmitting modem, and

computing means for computing the pre-emphasis coefficients from said parameters.

2. The apparatus of claim 1 wherein said adjusting means includes a filter with several taps.

3. The apparatus of claim 2 wherein said filter includes at least nine taps.

4. The apparatus of claim 1 wherein said generating means includes a noise spectrum generator circuit.

5. The apparatus of claim 4 wherein said noise spectrum generator circuit includes:

determining means for determining best-fit transmitted data points from said output of said first transmitting means as received by said receiving means;

comparing means for determining a difference between said best-fit transmitted data points and said output as received by said receiving means thereby calculating said noise spectrum of said output.

6. An apparatus for calculating pre-emphasis coefficients for a transmitting modem in a communications systems, including:

first transmitting means in the transmitting modem, including adjusting means responsive to the pre-emphasis coefficients for adjusting frequency-dependent characteristics of an output of said first transmitting means;

receiving means for receiving said output from said first transmitting means;

generating means, including a noise spectrum generator circuit, for generating parameters responsive to a noise spectrum of said output;

second transmitting means for transmitting said parameters to the transmitting modem; and

computing means for computing the pre-emphasis coefficients from said parameters;

wherein said noise spectrum generator circuit includes determining means for determining best-fit transmitted data points from said output of said first transmitting means as received by said receiving means; and comparing means for determining a difference between said best-fit transmitted data points and said output as received by said receiving means;

wherein said receiving means includes analog-to-digital conversion means and demodulating means which generates a complex signal; and wherein said noise spectrum generator circuit includes a phase corrector responsive to said complex signal; a slicer which determines, from said complex signal, best-fit transmitted data points from said first transmitting means; subtracting means for determining a difference between said best-fit transmitted data points and said complex signal; an inverse phase corrector responsive to said difference; and a complex discrete Fourier transform block responsive to said inverse phase corrector.

7. The apparatus of claim 6 wherein said phase corrector is responsive to equalization means and wherein said equalization means is responsive to said inverse phase corrector.

8. An apparatus for calculating pre-emphasis coefficients for a transmitting modem in a communications systems, including:

first transmitting means in the transmitting modem, including adjusting means responsive to the pre-emphasis coefficients for adjusting frequency-dependent characteristics of an output of said first transmitting means;

receiving means for receiving said output from said first transmitting means;

generating means, including a noise spectrum generator circuit, for generating parameters responsive to a noise spectrum of said output;

second transmitting means for transmitting said parameters to the transmitting modem; and

computing means for computing the pre-emphasis coefficients from said parameters;

wherein said noise spectrum generator circuit includes determining means for determining best-fit transmitted data points from said output of said first transmitting means as received by said receiving means; and comparing means for determining a difference between said best-fit transmitted data points and said output as received by said receiving means; and

5,008,903

7

wherein said determining means includes eye pattern data.

9. An apparatus for calculating pre-emphasis coefficients for a transmitting modem in a communications systems, including:

first transmitting means in the transmitting modem, including adjusting means responsive to the pre-emphasis coefficients for adjusting frequency-dependent characteristics of an output of said first transmitting means;

receiving means for receiving said output from said first transmitting means;

generating means, including a noise spectrum generator circuit, for generating parameters responsive to a noise spectrum of said output;

second transmitting means for transmitting said parameters to the transmitting modem; and

computing means for computing the pre-emphasis coefficients from said parameters;

wherein said noise spectrum generator circuit includes determining best-fit transmitted data points from said output of said first transmitting means as received by said receiving means; and comparing means for determining a difference between said best-fit transmitted data points and said output as received by said receiving means; and

wherein said generating means includes discrete Fourier transform means responsive to said difference, thereby calculating a frequency domain representation of said noise spectrum of said output.

10. The apparatus of claim 8 wherein said generating means further includes discrete Fourier transform means responsive to said difference, thereby calculating a frequency domain representation and storing the values of the frequency domain representation of a noise spectrum of said output.

11. The apparatus of claim 10, wherein said computing means includes subtracting means for subtracting previously stored values from said frequency domain representation thereby calculating second differences.

8

12. The apparatus of claim 11 wherein said computing means further includes dividing means for dividing said second differences.

13. The apparatus of claim 12 wherein said dividing means divides by two.

14. The apparatus of claim 11 wherein said second differences replace said previously stored values.

15. The apparatus of claim 1 wherein said second transmitting means transmits over a secondary channel.

16. The apparatus of claim 15 wherein said secondary channel is a sideband of a channel of said first transmitting means.

17. The apparatus of claim 16 wherein said receiving means and said second transmitting means are incorporated into a single circuit.

18. The apparatus of claim 1 wherein said computing means converts said parameters from logarithmic to linear scale.

19. The apparatus of claim 1 wherein said computing means adjusts said parameters iteratively to adjust for resonator frequencies of said first transmitting means.

20. The apparatus of claim 1 wherein said computing means adjusts said parameters to assure a constant power output of said first transmitting means.

21. A method for calculating pre-emphasis coefficients for a transmitting modem in a communications systems, including the steps of:

transmitting from the transmitting modem;

adjusting frequency characteristics of output from said transmitting step responsive to the pre-emphasis coefficients;

receiving said output from said first transmitting means;

calculating a noise spectrum of said output;

generating parameters responsive to said noise spectrum of said output;

sending said parameters to the transmitting modem; and

computing the pre-emphasis coefficients from said parameters.

*    *    *    *    *

# EXHIBIT 3B

US005710761A

# United States Patent [19]

## Scott

[11] **Patent Number:** 5,710,761

[45] **Date of Patent:** Jan. 20, 1998

[54] **ERROR CONTROL NEGOTIATION BASED ON MODULATION**

[75] Inventor: **Robert Earl Scott**, Indian Rocks Beach, Fla.

[73] Assignee: **Paradyne Corporation**, Largo, Fla.

[21] Appl. No.: **458,948**

[22] Filed: **May 31, 1995**

[51] Int. Cl.$^6$ ............................................. **H04L 1/00**

[52] U.S. Cl. ....................... **370/252; 375/222; 379/93.08**

[58] Field of Search ............................... 370/252, 465, 370/466, 467, 469; 375/222; 379/93

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,715,044 | 12/1987 | Gartner | 375/8 |
| 5,384,780 | 1/1995 | Lomp et al. | 375/222 |
| 5,430,793 | 7/1995 | Ueltzen et al. | 375/222 |
| 5,481,696 | 1/1996 | Lomp et al. | 395/500 |
| 5,550,881 | 8/1996 | Sridhar et al. | 375/222 |
| 5,636,037 | 6/1997 | Saitoh | 375/222 |

*Primary Examiner*—Melvin Marcelo
*Attorney, Agent, or Firm*—Thomas, Kayden, Horstemeyer & Risley

[57] **ABSTRACT**

A modem dynamically selects the type of error-control negotiation sequence as a function of a negotiated parameter of the physical layer. In one embodiment of the invention, a modem selects between error-control negotiation sequences as a function of the type of modulation negotiated in the physical layer. In particular, the modem has at least two type of error-control negotiation sequences to select from: "LAPM or Disconnect," and "LAPM, MNP or Buffer." When the modem negotiates a V.32 or higher modulation, the modem uses the "LAPM or Disconnect" error control negotiation sequence. However, when the modem negotiates a V.22 bis or lower modulation, the modem uses the "LAPM, MNP or Buffer" error control sequence.

**16 Claims, 1 Drawing Sheet**



*FIG. 1*



*FIG. 2*



5,710,761

1

# ERROR CONTROL NEGOTIATION BASED ON MODULATION

## BACKGROUND OF THE INVENTION

The present invention relates to data communications equipment, e.g., modems, and, more particularly, to the error control negotiation phase of establishing a data connection.

In establishing a data connection between two modems, the modems perform a "handshaking" sequence to negotiate various parameters about the data connection, e.g., the type of modulation (which relates to line speed), and the type of error control protocol. The type of modulation is representative of the "physical" layer of a data connection, while the type of error control protocol is representative of the "link" layer of the data connection. The negotiation of the physical layer is always negotiated before the link layer.

The types of error control protocols used today are: "Link Access Protocol Modem" (LAPM), "Microcom Networking Protocol" (MNP), or "Buffer" (which in reality is no error control). Typically, in negotiating the type of error control protocol a modem tries each type of error control protocol in turn. In particular, the modem uses a negotiation sequence defined herein as "LAPM, MNP, or Buffer." In this negotiation sequence, the modem attempts to connect with the far-end modem for several seconds, e.g., 2 seconds, using an "LAPM" protocol like International Telecommunication Union (ITU) standard V.42. If the far-end modem does not appropriately respond, the modem then tries to connect with the far-end modem for several seconds, e.g., 6 seconds, using the "MNP" protocol. If this too is unsuccessful, the modem then falls back to a non-error control mode, i.e., the "Buffer" mode of operation. This type of negotiation sequence typically allows a modem to connect to the widest range of industry-available modems.

Unfortunately with higher modulation speeds available, like those in ITU standards V.34 and, to a lesser degree, V.32bis, the above error control negotiation sequence can present a problem. In particular, as noted above, the negotiation of the line speed (modulation) occurs before the negotiation of the type of error control. In order to determine the appropriate line speed, a modem uses a technique called "line probing." Unfortunately, the accuracy of current line probing techniques is not perfect. As a result, a modem may erroneously connect at too high a line speed. In other words, even though the line speed was successfully negotiated, the error rate at that line speed is high. This affects the time it takes to perform the subsequent error control negotiation. In particular, with an increase in the error rate, the LAPM type of error control may not be negotiated within the 2 seconds, mentioned above. Further, in severe cases, the time delay in negotiating the error control protocol will be so long that neither LAPM nor MNP is negotiated, causing the modem to fallback to buffer mode. The latter presents a problem, since users typically want V.42 error control and V.42bis data compression for their data calls, however in buffer mode neither V.42 error control nor V.42bis data compression are available.

One way to solve the above-mentioned problem is to have a different negotiation sequence for error control negotiation—"LAPM or Disconnect" for example. With this negotiation setting, the modem tries for an extended length of time, e.g., 30 seconds, to negotiate a LAPM data connection. Even if the modem has trouble at the start of the call, LAPM may still be negotiated because of the longer time delay. However, this negotiation sequence presents a problem when connecting to modems that do not support

LAPM, i.e., MNP-only or non-error-control modems. In order to connect to MNP-only or non-error-control modems, the user must switch the modem back to using the "LAPM, MNP, or Buffer" error control negotiation sequence, described above. Typically, the user switches between error control negotiation sequences via an respective AT command. This is not user-friendly. In today's marketplace, the configuration of the modem itself, e.g., what type of error control negotiation sequence to use, should be transparent to the user.

## SUMMARY OF THE INVENTION

However, I have realized a solution that solves all of the above problems and is user-friendly. I have observed that almost every high-speed modem (V.34, V.32bis, V.32) has a LAPM mode, and that the LAPM mode is enabled. Further, only the low-speed modems (V.22bis or below) are MNP-only or non-error control. And, finally, the modulation (physical layer) is always negotiated before the error control protocol (link layer). Therefore, and in accordance with the invention, a modem dynamically selects the type of link layer negotiation sequence as a function of a negotiated parameter of the physical layer.

In one embodiment of the invention, a modem selects between error control negotiation sequences as a function of the type of modulation negotiated in the physical layer. In particular, the modem has at least two type of error control negotiation sequences to select from: "LAPM or Disconnect," and "LAPM, MNP or Buffer." When the modem negotiates a V.32 or higher modulation, the modem uses the "LAPM or Disconnect" error control negotiation sequence. However, when the modem negotiates a V.22bis or lower modulation, the modem uses the "LAPM, MNP or Buffer" error control sequence.

In another embodiment of the invention, a modem uses the data rate negotiated at the physical layer, rather than the modulation, to select the type of error control sequence. For example, if the modem connects at 2400 bits per second (bps) or below, the modem uses the "LAPM, MNP or Buffer" error control sequence. However, if the modem connects at a rate higher than 2400 bps, the modem uses the "LAPM or Disconnect" error control negotiation sequence. It should be noted that even though V.34 supports 2400 bps, I have observed that this data rate is unlikely to be used, i.e., a data rate of 2400 bps or less can be used to infer there is no high-speed modem in the data connection.

The above-described inventive concept provides a number of advantages. The user does not have to administer the modem to select a particular type of error control negotiation sequence via an AT command or other type of strap setting. Further, a modem incorporating the inventive concept still maintains compatibility with a large part of the currently installed-base of modems. Finally, this approach allows a high-speed modem to connect at the highest feasible rate and still negotiate the use of the LAPM protocol.

## BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 is a block diagram of a data communications equipment embodying the principles of the invention; and

FIG. 2 is a flow diagram of an illustrative method embodying the principles of the invention for use in the modem of FIG. 1.

## DETAILED DESCRIPTION

FIG. 1 shows an illustrative high-level block diagram of a modem embodying the principles of the invention. As

5,710,761

3

shown, modem 100 couples to a communications channel (not shown) via line 133, which is, e.g., a local loop that couples modem 100 to a local central office (not shown). Modem 100 is also coupled to respective data terminal equipment (DTE) 10 via line 11. Other than the inventive concept, the components of modem 100 are well-known and will not be described in detail. Modem 100 includes DTE interface 105, microprocessor-based central processing unit (CPU) 110, memory 120 and digital signal processing circuitry (DSP) 130. Since FIG. 1 is a high-level block diagram, other parts of modem 100 not important to the inventive concept are assumed to be included within these representative components. For example, DSP 130 is representative of not only a digital signal processing chip, but also includes the "data access arrangement" (DAA) circuitry that couples any transmitted and received data signals to, and from, line 133. Further, although shown as single lines in FIG. 1, lines 11, 106, 111, 109, and 133, are representative of a plurality of signals as known in the art to interconnect the various components. For example, line 11 is representative of any one of a number of ways for coupling data communications equipment to data terminal equipment, e.g., a serial interface like that specified in Electronic Industry Association (EIA) standard RS-232.

As known in the art, CPU 110 provides a controlling function for modem 100, e.g., CPU 110 controls, via line 109, DSP 130 for establishing, maintaining, and disconnecting, from a data connection to a far-end modem (not shown), via line 109. In performing this controlling function, CPU 110 operates on, or executes, program data stored in memory 120 via line 111, which is representative of control, address, and data signals (not shown).

In accordance with the inventive concept, modem 100 dynamically selects the type of error control negotiation sequence as a function of the type of physical layer negotiated. Turning now to FIG. 2, an illustrative method embodying the principles of the invention will be described. The steps shown in FIG. 2 are illustratively stored in memory 120 as program data as represented by blocks 305, block 310, block 315, etc., of FIG. 1, respectively. For the purposes of this description, it is assumed that modem 100 has already initiated a data call to a far-end modem (not shown) and a handshaking sequence has begun. As known in the art, CPU 110 first negotiates with the far-end modem the physical layer of the data connection, as shown in step 305. (It should be realized that since this is a negotiation process, whether modem 100 is the originating, or answering, modem is irrelevant to the inventive concept). During the physical layer negotiation, modem 100 negotiates the type of modulation, e.g., V.22, V.22bis, V.32, V.32bis, and V.34 industry standards. After negotiation of the physical layer, CPU 110 evaluates a negotiated parameter of the physical layer in step 310. In particular, CPU 110 compares a value of the negotiated parameter to a predefined value. If the value of the negotiated parameter is greater than or equal to the predefined value, CPU 110 uses an "LAPM or Disconnect" error control negotiation sequence in step 315 as part of the link layer negotiation. The software instructions for executing the "LAPM or Disconnect" error control negotiation sequence are illustratively stored in memory 120 at location 121. With this negotiation setting, modem 100 tries for an extended length of time to negotiate a LAPM link layer on the data connection. If a LAPM link layer cannot be negotiated, modem 100 disconnects.

On the other hand, if the value of the negotiated parameter is less than the predefined value, CPU 110 uses an "LAPM, MNP or Buffer" error control negotiation sequence in step

4

320 as part of the link layer negotiation. The software instructions for executing the "LAPM, MNP, or Buffer" error control negotiation sequence are illustratively stored in memory 120 at location 122. As described earlier, in this negotiation sequence modem 100 attempts to connect with the far-end modem for several seconds using an "LAPM" protocol like International Telecommunication Union (ITU) standard V.42. If the far-end modem does not appropriately respond, modem 100 then tries to connect with the far-end modem for several seconds using the "MNP" protocol. If this too is unsuccessful, modem 100 then falls back to a non-error control mode, i.e., the "Buffer" mode of operation.

In one embodiment of the invention, the negotiated parameter from the physical layer is the type of modulation negotiated in the physical layer. In particular, when modem 100 negotiates a V.32 or higher modulation, modem 100 performs step 315, described above. However, when modem 100 negotiates a V.22bis or lower modulation, modem 100 performs step 320, described above.

In another embodiment of the invention, the negotiated parameter from the physical layer is the negotiated data rate. For example, if modem connects below 4800 bps, modem 100 performs step 320, described above. However, when modem 100 connects at a rate equal to or higher than 4800 bps, modem 100 performs step 315, described above. It should be noted that even though high-speed modulations, like V.34, support rates below 4800, I have observed that these data rates are unlikely to be used. As a result, a data rate less than 4800 bps can be used to infer there is no high-speed modem in the data connection.

The above-described inventive concept provides a number of advantages. The user does not have to administer the modem to select a particular type of error control negotiation sequence for use during the link layer negotiation. Further, a modem incorporating the inventive concept still maintains compatibility with a large part of the currently installed-base of modems. Finally, this approach allows a high-speed modem to connect at the highest feasible rate and still negotiate the use of the LAPM protocol.

The foregoing merely illustrates the principles of the invention and it will thus be appreciated that those skilled in the art will be able to devise numerous alternative arrangements which, although not explicitly described herein, embody the principles of the invention and are within its spirit and scope.

For example, although the invention is illustrated herein as being implemented with discrete functional building blocks, e.g. a memory, CPU, etc., the functions of any one or more of those building blocks can be carried out using one or more appropriate integrated circuits, e.g., a microprocessor that includes memory.

In addition, although described in the context of a modem external to the data terminal equipment, the inventive concept applies to any other forms of coupling a modem to data terminal equipment, e.g., a modem that is internal to a personal computer or a modem that is part of a mobile phone transceiver. Finally, the selection of a link layer negotiation sequence can be a function of other data rates, types of modulations, and/or other parameters of the physical layer.

What is claimed:

1. A method for use in data communications equipment, the method comprising the steps of:

negotiating a physical layer of a data connection with a far-end data communications equipment to determine a set of parameters for the physical layer of the data connection with the far-end data communications equipment; and

5,710,761

| 5 | 6 |

selecting one of a number of error control negotiation sequences as a function of a value of at least one parameter from the set of parameters for the physical layer.

2. The method of claim 1, further including the step of negotiating error control of the data connection with the far-end data communications equipment in accordance with the selected one of the number of error control negotiation sequences.

3. The method of claim 1, wherein the at least one parameter is the type of modulation negotiated with the far-end data communications equipment.

4. The method of claim 3, wherein the number of error control negotiation sequences include a Link Access Protocol Modem, Microcom Networking Protocol, or Buffer sequence and a Link Access Protocol Modem or Disconnect sequence.

5. The method of claim 4, wherein the Link Access Protocol Modem, Microcom Networking Protocol, or Buffer sequence is selected when the type of modulation negotiated is less than V.32, and wherein the Link Access Protocol Modem or Disconnect sequence is selected when the type of modulation negotiated is greater than or equal to V.32.

6. The method of claim 1, wherein the at least one parameter is the data rate negotiated with the far-end data communications equipment.

7. The method of claim 6, wherein the number of error control negotiation sequences include a Link Access Protocol Modem, Microcom Networking Protocol, or Buffer sequence and a Link Access Protocol Modem or Disconnect sequence.

8. The method of claim 7, wherein the Link Access Protocol Modem, Microcom Networking Protocol, or Buffer sequence is selected when the data rate is less than 4800 bits per second, and wherein the Link Access Protocol Modem or Disconnect sequence is selected the data rate is greater than or equal to 4800 bits per second.

9. Data communications apparatus comprising:

a memory that stores a number of error control negotiation sequences; and

processor circuitry that negotiates a physical layer of a data connection with a far-end data communications equipment to determine a set of parameters for the physical layer of the data connection with the far-end data communications equipment, and then selects from memory one of a number of error control negotiation sequences as a function of a value of at least one parameter from the set of parameters for the physical layer.

10. The apparatus of claim 9, wherein the processor negotiates error control of the data connection with the far-end data communications equipment in accordance with the selected one of the number of error control negotiation sequences.

11. The apparatus of claim 9, wherein the at least one parameter is the type of modulation negotiated with the far-end data communications equipment.

12. The apparatus of claim 11, wherein the number of error control negotiation sequences include a Link Access Protocol Modem, Microcom Networking Protocol, or Buffer sequence and a Link Access Protocol Modem or Disconnect sequence.

13. The apparatus of claim 12, wherein the processor selects the Link Access Protocol Modem, Microcom Networking Protocol, or Buffer sequence when the type of modulation negotiated is less than V.32, and wherein the processor selects the Link Access Protocol Modem or Disconnect sequence when the type of modulation negotiated is greater than or equal to V.32.

14. The apparatus of claim 9, wherein the at least one parameter is data rate negotiated with the far-end data communications equipment.

15. The apparatus of claim 9, wherein the number of error control negotiation sequences include a Link Access Protocol Modem, Microcom Networking Protocol, or Buffer sequence and a Link Access Protocol Modem or Disconnect sequence.

16. The apparatus of claim 15, wherein the processor selects the Link Access Protocol Modem, Microcom Networking Protocol, or Buffer sequence when the data rate is less than 4800 bits per second, and wherein the processor selects the Link Access Protocol Modem or Disconnect sequence when the data rate is greater than or equal to 4800 bits per second.

* * * * *

## UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.   :  5,710,761
DATED        :  January 20, 1998
INVENTOR(S) :  Scott

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Title page of the patent, second column, six lines under the heading "ABSTRACT", change "type" to --types--.
Column 2, line 27, after "at least two" change "type" to --types--.
Column 4, line 22, change "4800" (in bold) to --4800-- (in regular font).
Column 4, line 49, after "can be" delete "carded" and insert therefor --carried--.

Signed and Sealed this

Twenty-sixth Day of May, 1998

Attest:

*Bruce Lehman*

**BRUCE LEHMAN**

*Attesting Officer*        *Commissioner of Patents and Trademarks*

# EXHIBIT 3C



US005778234A

# United States Patent [19]

Hecht et al.

[11] **Patent Number:** 5,778,234

[45] **Date of Patent:** Jul. 7, 1998

[54] **METHOD FOR DOWNLOADING PROGRAMS**

[75] Inventors: **Gideon Hecht**, Seminole; **Kurt Ervin Holmquist**, Largo; **Donald C. Snoll**, Clearwater, all of Fla.

[73] Assignee: **Paradyne Corporation**, Largo, Fla.

[21] Appl. No.: **899,834**

[22] Filed: **Jul. 24, 1997**

**Related U.S. Application Data**

[62] Division of Ser. No. 880,257, May 8, 1992.

[51] Int. Cl.$^6$ ............................................. G06F 9/44
[52] U.S. Cl. ..................................... 395/712; 395/652
[58] Field of Search ........................... 395/712, 651, 395/652

[56] **References Cited**

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,430,704 | 2/1984 | Page et al. | 364/200 |
| 4,459,662 | 7/1984 | Skelton et al. | 364/200 |
| 4,626,986 | 12/1986 | Mori | 364/200 |
| 4,663,707 | 5/1987 | Dawson | 364/200 |
| 4,720,812 | 1/1988 | Kao et al. | 364/900 |
| 4,724,521 | 2/1988 | Carron et al. | 364/200 |
| 4,954,941 | 9/1990 | Redman | 364/200 |
| 5,053,990 | 10/1991 | Kriefels et al. | 364/900 |
| 5,136,711 | 8/1992 | Hugard et al. | 395/700 |
| 5,210,854 | 5/1993 | Beaverton et al. | 395/500 |
| 5,257,380 | 10/1993 | Lang | 395/700 |

| | | | |
|---|---|---|---|
| 5,280,627 | 1/1994 | Flaherty et al. | 395/700 |
| 5,355,498 | 10/1994 | Provino et al. | 395/700 |
| 5,361,365 | 11/1994 | Hirano et al. | 395/775 |
| 5,367,686 | 11/1994 | Fisher et al. | 395/700 |
| 5,367,688 | 11/1994 | Croll | 395/700 |

## FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| A0205692 | 6/1985 | European Pat. Off. | G06F 9/44 |
| 0500973A1 | 2/1991 | European Pat. Off. | G06F 9/445 |
| 0524719A2 | 5/1992 | European Pat. Off. | G06F 9/44 |
| 2227584 | 8/1990 | United Kingdom | G06F 12/12 |

## OTHER PUBLICATIONS

*Electronic Engineering*, vol. 64, No. 783, "SGS-Thomson Block Erase Flash in 16 Bit RISC Controller", Mar. 1992, Woolrich, London GB, p. 83.
*IBM Technical Disclosure Bulletin*, vol. 34, No. 3, Aug. 1991, Armonk, NY, US pp. 286–289.

*Primary Examiner*—Emanuel Todd Voeltz
*Assistant Examiner*—Kakali Chaki
*Attorney, Agent, or Firm*—Thomas, Kayden, Horstemeyer & Risley LLP

[57] **ABSTRACT**

A modified version of the operating communication program of a stored program controlled apparatus is downloaded by first downloading a segment of the new package of programs which contains the essential portion of the new programs. Control of the apparatus is then transferred to the new program segment. Thereafter, utilizing the downloaded essential portion of the new package of programs, the remainder of the new package of programs is downloaded.

**8 Claims, 1 Drawing Sheet**



FIG. 1



FIG. 2



FIG. 3



5,778,234

| 1 | 2 |

## METHOD FOR DOWNLOADING PROGRAMS

This application is a division of U.S. patent application having Ser. No. 07/880,257 of Hecht,et al., filed May 8,1992.

### BACKGROUND OF THE INVENTION

This invention relates to stored program controlled apparatus and, in particular, to apparatus with a capability for remote updating of its entire set of programs.

Stored program controlled apparatus can conveniently be divided into two types; one where the stored programs are completely unalterable under normal operating circumstances, and the other where the stored programs are alterable, at least at times, during normal operation. In apparatus of the first type, the program is often executed automatically and the user does not even know that the controlled apparatus is "stored program controlled". This is typically the case in equipment that is designed for people who are not knowledgeable in computers and for whom the equipment is just a tool of the trade. "Point of sale" terminals, such as check-out terminals at a supermarket, are a good example. Modems are another example. People who use this equipment desire fail-safe operation and they do not want to be bothered with loading programs, fixing program bugs, installing updated versions of software, etc.

One approach to programming such equipment is to imprint the program into read-only-memory integrated circuits and physically install the circuits into the equipment. The problem with this approach is that updated versions of the program require the creation of new sets of read-only memories and new installations.

When a communication link is present, "downloading" the programs to the equipment from a remote processor, through the communication link, forms another approach for programming the equipment. It has been known in the art for some time that it is feasible to download limited types of control information from a remote processor. It is also known to download entire machine language application programs. Often such equipment does not include writable non-volatile store, such as a hard disk, so the programs are stored in battery protected read/write memories.

This is an unattractive solution because it leaves a substantial portion of program memory to be at risk. To mitigate this problem, U.S. Pat. No. 4,724,521, suggests storing within read-only memories of the local equipment a number of general purpose routines which comprise instructions to be executed by the central processing unit to accomplish a particular program task. These, in effect, form a set of macro-instructions. The downloaded machine language program utilizes these macro-instructions to the extent possible, and thereby achieves flexibility without the need to download substantial amounts of program code.

In all of the known approaches, however, there is a program portion in the local equipment that is resident in a read-only memory, and its contents is not changed. That resident portion contains "boot-up" segments and program segments that are necessary to maintain the communication between the remote processor and the local equipment (so that the process of downloading the programs can continue). This set of programs is the "essential programs" (EP) set. This set of programs should, of course, be a non-volatile store because there is always a possibility of power loss.

The fact that the EP set is needed to maintain communications presents a problem when the EP set itself needs to be modified or updated. Indeed, that is often the case with modems, where essentially the sole function of the modem software is to support communication.

### SUMMARY OF THE INVENTION

The problem of downloading a modified version of the operating communication program, and the problem of effectively updating the entire set of programs in a stored program controlled apparatus, such as a modem, is solved with a downloadable start address specification means and, optionally, with an EEPROM memory. The start address specification means stores information that is downloaded through the communication link, and that information is used in defining the address from where the communication link programs are initiated.

In accordance with the method of this invention, downloading comprises what may be considered two communication segments. In the first segment the essential portion of the new package (EP set) of programs is downloaded to some chosen location in the local apparatus and the downloadable start address specification means is loaded with the appropriate new start address. Utilizing the most recently downloaded EP set of the new communication package, the second segment downloads the remainder of the new package.

### BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 presents a block diagram of an arrangement for carrying out this invention;

FIG. 2 is a flow diagram of a downloading process in accordance with this invention; and

FIG. 3 is a flow diagram of an augmented downloading process in accordance with this invention.

### DETAILED DESCRIPTION

A modem's primary function is to enable communications between a customer's digital equipment and a remote apparatus over a transmission medium. In a modem with a stored programmed controlled architecture this communication is effected with a set of programs, which includes call establishment programs, link layer protocols with flow control and error recovery functions, and programs that handle and store the communicated data, as well as the modulation and demodulation programs used by the modem. These programs occupy a significant portion of the modem's program memory. In accordance with this invention, all programs—including the EP set of programs that carry out the elemental communications—are downloadable. That is, the apparatus employing the principles of this invention does not need to have a non-volatile "boot-up" read-only-memory. All programs (including the boot-up programs) can be stored in a single memory arrangement which, for some applications, can consist of just two memory devices.

FIG. 1 depicts one structure that, in conformance with the principles of this invention, enables the downloading of programs to the modem's program memory. FIG. 1 includes a processor element 10 with a port for receiving signals from, and sending signals to, line 12. Processor 10 is also responsive to line 11 data from program memory 20, and it supplies address and data to memory 20 via bus 13 and bus 14, respectively. In a conventional processor structure, bus 14 is connected to an address port of memory 20. In FIG. 1, address modifier 30 is interposed between processor 10 and program memory 20, with bus 15 supplying the address information to memory 20. Modifier 30 is responsive to

5,778,234

3

register 40, which is loaded with bus 13 data when the register is enabled by bus 16. Modifier 30 is a modulo M adder, where M is the size of memory 20. A typical stored program controlled modem also includes a read/write data memory, means for interfacing with the transmission medium, means for interfacing with the local digital equipment, and perhaps other data and control ports. For purposes of this invention, however, these other elements are irrelevant, so they are not included in the drawing.

It should be understood that line 12 in the FIG. 1 architecture effectively offers a "remote execution" capability to processor 10, in that the programs which are executed by processor 10 are affected by data supplied by line 12. For example, data supplied by line 12 can effect branching to programs that are normally dormant. One such normally dormant program is a program that downloads information to the program memory. It should also be understood, and noted, that although this invention is described in connection with modems, its principles are applicable to all stored program apparatus. In particular, the principles of this invention are applicable to all situations where it is desirable to download an entire set of new programs, including the EP set. For example, this invention is useful in PCs, "point of sale" terminals, etc.

The operation of the FIG. 1 apparatus is quite simple. The processes carried out by the FIG. 1 apparatus are effected by executing a sequence of instructions that the processor receives from program memory 20 via bus 11. In turn, processor 10 determines which instructions are delivered to it by controlling the addresses applied to memory 20 (typically by controlling a "program counter" within processor 10, which is not shown in the FIG.). The primary difference between a conventional microprocessor arrangement and the FIG. 1 arrangement is that the addresses supplied on bus 14 are not the actual addresses that are applied to program memory 20, because of the interposed circuit 30. One might call these addresses "virtual addresses", which are translated into the real addresses by the additive constant applied by register 40 to modifier circuit 30.

The exact structure and organization of the programs executed by the FIG. 1 arrangement is not really relevant to this invention, but it is to be understood that a protocol exists for sending information out on line 12 and for receiving information from line 12. This protocol provides a mechanism for intelligent communication with processor 10, which includes, for example, knowing when the received data is commands or data, and whether to store the received data in memory 20 or elsewhere.

The programs that can be executed by the FIG. 1 arrangement reside throughout memory 20, but the set of programs that is essential to the maintenance of communication with line 12 (the EP set) may, advantageously, occupy a contiguous segment of memory 20 addresses in the range 0 to N. Within that range of addresses there is a subroutine for installing a new EP set

In accordance with the principles of this invention, the entire set of programs contained in memory 20 can be over-written with a new set of programs (in a process initiated by the apparatus itself or by the party connected to the apparatus via line 12) by following the procedure outlined in FIG. 2. In step 50 of FIG. 2, a command is received on line 12 to branch to the subroutine in the EP set that installs new EP sets (that command may simply be a data word that is installed in a particular read/write memory location). After supplying the branch instruction, the new EP

4

set of programs are downloaded via line 12. Optionally, an offset address that is the starting address of the new EP set (the address corresponding to 0 in the existing EP set) is also downloaded. Alternatively, the offset address may be predefined, in which case it does not need to be supplied by line 12. In any event, the offset address is greater than N and less than M−N. It may be noted that N must be less than M/2, because two EP sets must temporarily coexist in memory 20.

After the new EP set is installed in memory locations X through X+N, where X is the offset address (X=M/2, for example), memory locations that serve as software-defined registers in the new EP set are populated with data that is found in the corresponding software-defined addresses in the active EP set. Thereafter, according to step 51, register 40 is loaded with the offset address.

The immediate effect of loading the offset address into register 40 is to transfer control to the newly installed EP set. That means that the program in the new EP set to which control is transferred, must be at a predetermined logic point so that the communication can continue seamlessly. This minor requirement can be easily accommodated by proper planning of the new EP set. Once operation proceeds under control of the new EP set of programs, according to FIG. 2, step 52 conditions processor 10 to account for the offset present in register 40 and loads the remainder of programs destined for memory 20 in addresses higher than X+N (modulo M).

It is obviously important to protect the information loaded into memory 20 from loss. At the very least, that means that memory 20 must be non-volatile. Memory 20 must also be relatively fast because it directly affects the processing speed that can be attained with the FIG. 1 arrangement. Currently, we use an electrically bulk erasable, programmable, read-only memory (FLASH EEPROM) to form memory 20. This memory must be erased in bulk before new information can be written in it. To install a new EP in such a memory, it is recalled that the EP set must occupy less than half of memory 20, and that makes it convenient to construct memory 20 from at least two distinct chips (distinct in the sense of being able to erase one and not the other). Each segment of the downloading process begins with a bulk erasure of one of the memory 20 halves.

To summarize the downloading process of this invention,

1. Bulk erase that half of memory 20 which does NOT contain the EP set of programs;

2. download a new EP set of programs to the erased half of memory 20;

3. download the offset address to pass control to the new EP set of programs;

4. bulk erase the other half of memory 20;

5. download the remainder of programs into memory 20.

If register 40 is to contain the offset address for a substantial time after downloading is accomplished, then its contents must be protected in a manner not unlike that of memory 20. Of course, register 40 can manufactured together with memory 20 and be an EEPROM. However, that is not absolutely necessary, and manufacturing costs could benefit if register 40 were constructed as part of the read/write memory or as part of processor 10.

Register 40 may be a volatile memory if the downloading process is carried out as depicted in FIG. 3. Specifically, by including a copy subroutine in the EP set of programs, the downloading process can be modified to the following (assuming the EP set is in the first half of memory 20):

1. Bulk erase the second half of memory 20;

5,778,234

**5**

2. download a new EP set of programs to the second half of memory 20;

4. download the offset address to pass control to the new EP set of programs;

5. bulk erase the first half of memory 20;

6. copy the contents of the second half of memory 20 into the first half of memory 20;

7. reset the offset address to 0; and

8. download the remainder of programs into memory 20. Admittedly, during the copy sequence (which may also be a "move" sequence) the arrangement is vulnerable to power failures. Since the time of copying or moving is very small, this is a very unlikely event. Still, to protect against this unlikely event, the power source can be designed to have sufficient reserve to complete the copy operation, or to protect the starting address. A capacitor at the output of the power supply may supply the necessary power reserve.

In the arrangement described above where memory 20 consists of two FLASH EEPROM chips, register 40 needs to have only one bit of memory, and modifier circuit 30 can be merely an Exclusive OR gate which, with the aid of the one bit memory of register 40, selects the bank of memory that is active.

We claim:

1. A method for installing a new set of communication programs $P_{new}$ into a stored program controlled apparatus that includes a communication port and a memory by transmitting said set of programs $P_{new}$ to said apparatus via said port, with the aid of a set of communications programs $P_{old}$ already resident in said memory, where said set of programs $P_{old}$ contains a subset of programs $EP_{old}$ that occupy less than half of the memory and said set of programs $P_{new}$ also contains a subset of programs $EP_{new}$ that, when installed, occupy less than half of the memory, comprising the steps of:

installing the $EP_{new}$ programs in a first area of said memory that contains programs other than the $EP_{old}$ programs, thereby overwriting at least a portion of one program in said $P_{old}$ set of programs;

altering operation of said apparatus to execute the $EP_{new}$ programs instead of the $EP_{old}$ programs; and

installing the remaining programs of said $P_{new}$ set of programs in a second area of said memory, said second area constituting memory locations not occupied by the $EP_{new}$ programs.

2. The method of claim 1 further comprising

a step of moving, interposed between said step of altering operation of the apparatus and said step of installing the remaining programs, that installs said $EP_{new}$ programs into memory locations starting at a location that corresponds to a starting location of the $EP_{old}$ programs, and

a second step of altering operation of said apparatus to execute the $EP_{new}$ programs in the installed locations by said step of moving.

**6**

wherein said installing the remaining programs of said $P_{new}$ set of programs stores the programs in memory locations not occupied with the $EP_{new}$ programs installed by said step of moving.

3. The method of claim 1, further comprising the steps of:

erasing said first area of said memory, said erasing step to be performed prior to said step of installing the $EP_{new}$ programs into said first area of said memory; and

erasing said second area of said memory, said erasing step to be performed after said step of altering operation of the apparatus and prior to said step of installing the remaining programs of said $P_{new}$ set of programs.

4. The method of claim 1, wherein said step of altering operation of said apparatus to execute said $EP_{new}$ programs is accomplished by installing an offset address to pass control of said apparatus to said $EP_{new}$ programs.

5. A method for installing a new set of communication programs $P_{new}$ into a stored program controlled apparatus that includes a communication port and a memory by transmitting said set of programs $P_{new}$ to said apparatus via said port, with the aid of a set of communications programs $P_{old}$ already resident in said memory, where said set of programs $P_{old}$ contains a subset of programs $EP_{old}$ that occupy less than half of the memory and said set of programs $P_{new}$ also contains a subset of programs $EP_{new}$ that, when installed, occupy less than half of the memory, comprising the steps of:

installing the $EP_{new}$ programs in a first area of said memory that contains programs other than the $EP_{old}$ programs, thereby overwriting at least a portion of one program in said $P_{old}$ set of programs;

altering operation of said apparatus to execute the $EP_{new}$ programs instead of the $EP_{old}$ programs;

moving the $EP_{new}$ programs from said first area of memory to a second area of said memory; and

installing the remaining programs of said $P_{new}$ set of programs in said first area of memory.

6. The method of claim 5, further comprising the step of:

erasing said first area of said memory, said erasing step to be performed prior to said step of installing the $EP_{new}$ programs into said first area of said memory.

7. The method of claim 5, wherein said moving step further comprises the steps of:

copying the $EP_{new}$ programs from said first area of memory to said second area of memory; and

erasing said first area of memory.

8. The method of claim 5, wherein said step of altering operation of said apparatus to execute said $EP_{new}$ programs is accomplished by installing an offset address to pass control of said apparatus to said $EP_{new}$ programs.

* * * * *

## UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    :  5,778,234
DATED         :  July 7, 1998
INVENTOR(S)   :  Hecht, *et al.*

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In column 4, line 45, delete "that".

In column 5, line 48, insert ":" after "comprising".

In column 6, line 1, insert "step of" after the first appearance of "said" and before "installing".

Signed and Sealed this

Seventeenth Day of November, 1998

Attest:

*Bruce Lehman*

**BRUCE LEHMAN**

*Attesting Officer*            *Commissioner of Patents and Trademarks*

# EXHIBIT 3D

US006131159A

# United States Patent [19]

## Hecht et al.

[11] **Patent Number:** 6,131,159

[45] **Date of Patent:** Oct. 10, 2000

[54] **SYSTEM FOR DOWNLOADING PROGRAMS**

[75] Inventors: **Gideon Hecht**, Seminole; **Kurt Ervin Holmquist**, Largo; **Donald C. Snoll**, Clearwater, all of Fla.

[73] Assignee: **Paradyne Corporation**, Largo, Fla.

[21] Appl. No.: **07/880,257**

[22] Filed: **May 8, 1992**

[51] Int. Cl.[7] ...................................... G06F 9/445

[52] U.S. Cl. .......................... 713/1; 713/100; 711/1

[58] Field of Search ...................... 395/700, 651, 395/652, 653, 712; 364/DIG. 1, DIG. 2; 713/1, 2, 100; 711/114, 1, 145, 202–206; 710/23, 104

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,430,704 | 2/1984 | Page et al. | 395/700 |
| 4,459,662 | 7/1984 | Skelton et al. | 364/200 |
| 4,626,986 | 12/1986 | Mori | 395/700 |
| 4,654,783 | 3/1987 | Veres et al. | 713/2 |
| 4,663,707 | 5/1987 | Dawson . | |
| 4,720,812 | 1/1988 | Kao et al. | 364/900 |
| 4,724,521 | 2/1988 | Carron et al. | 395/700 |
| 5,053,990 | 10/1991 | Kreifels et al. | 364/900 |
| 5,126,808 | 6/1992 | Montalvo et al. | 357/23.5 |
| 5,136,711 | 8/1992 | Hugard et al. | 395/652 |
| 5,142,623 | 8/1992 | Staab et al. | 709/200 |
| 5,210,854 | 5/1993 | Beaverton et al. | 395/500 |
| 5,257,380 | 10/1993 | Lang | 395/700 |
| 5,268,928 | 12/1993 | Herh et al. | 375/222 |
| 5,280,627 | 1/1994 | Flaherty et al. | 395/700 |
| 5,297,258 | 3/1994 | Hale et al. | 711/114 |
| 5,321,840 | 6/1994 | Ahlin et al. | 395/712 |
| 5,355,498 | 10/1994 | Provino et al. | 395/700 |
| 5,361,365 | 11/1994 | Hirano et al. | 395/775 |
| 5,367,686 | 11/1994 | Fisher et al. | 395/700 |
| 5,367,688 | 11/1994 | Croll | 395/700 |
| 5,572,572 | 11/1996 | Kawan et al. | 379/90.01 |
| 5,579,522 | 11/1996 | Christeson et al. | 713/2 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2015305 | 12/1990 | Canada | G06F 12/14 |
| 0 205 692 | 6/1985 | European Pat. Off. | G06F 9/44 |
| 0 500 973 A1 | 2/1991 | European Pat. Off. | G06F 9/445 |
| 0 524 719 A2 | 5/1992 | European Pat. Off. | G06F 9/44 |
| 2 227 584 | 8/1990 | United Kingdom | G06F 12/12 |

### OTHER PUBLICATIONS

Electronic Engineering, vol. 64, No. 783, "SGS–Thomson Block Erase Flash in 16 Bit RISC Controller", Mar. 1992, Woolrich, London, GB, p. 83.

IBM Technical Disclosure Bulletin, vol. 34, No. 3, Aug. 1991, Armonk, NY, US, pp. 286–289.

*Primary Examiner*—Thomas C. Lee
*Assistant Examiner*—Rijue Mai
*Attorney, Agent, or Firm*—Thomas, Kayden, Horstemeyer & Risley LLP

[57] **ABSTRACT**

A modified version of the operating communication program of a stored program controlled apparatus is installed with the aid of a downloadable start address specification means, optionally realized with an EEPROM memory. The start address specification means stores information that is downloaded through a communication port in the apparatus, and that information is used in defining the address from where the communication programs are initiated. In accordance with the method of this invention, downloading of the entire new set of programs is effected by first downloading a segment of the essential portion of the new package of programs. Control is then transferred to the new segment by downloading appropriate information into the start address specification means. Thereafter, utilizing the downloaded essential portion of the new package of programs, the remainder of the new package is downloaded.

**21 Claims, 1 Drawing Sheet**



*FIG. 1*



*FIG. 2*



*FIG. 3*



6,131,159

# 1

## SYSTEM FOR DOWNLOADING PROGRAMS

### BACKGROUND OF THE INVENTION

This invention relates to stored program controlled apparatus and, in particular, to apparatus with a capability for remote updating of its entire set of programs.

Stored program controlled apparatus can conveniently be divided into two types; one where the stored programs are completely unalterable under normal operating circumstances, and the other where the stored programs are alterable, at least at times, during normal operation. In apparatus of the first type, the program is often executed automatically and the user does not even know that the controlled apparatus is "stored program controlled". This is typically the case in equipment that is designed for people who are not knowledgeable in computers and for whom the equipment is just a tool of the trade. "Point of sale" terminals, such as check-out terminals at a supermarket, are a good example. Modems are another example. People who use this equipment desire fail-safe operation and they do not want to be bothered with loading programs, fixing program bugs, installing updated versions of software, etc.

One approach to programming such equipment is to imprint the program into read-only-memory integrated circuits and physically install the circuits into the equipment. The problem with this approach is that updated versions of the program require the creation of new sets of read-only memories and new installations.

When a communication link is present, "downloading" the programs to the equipment from a remote processor, through the communication link, forms another approach for programming the equipment. It has been known in the art for some time that it is feasible to download limited types of control information from a remote processor. It is also known to download entire machine language application programs. Often such equipment does not include writable non-volatile store, such as a hard disk, so the programs are stored in battery protected read/write memories. This is an unattractive solution because it leaves a substantial portion of program memory to be at risk. To mitigate this problem, U.S. Pat. No. 4,724,521, suggests storing within read-only memories of the local equipment a number of general purpose routines which comprise instructions to be executed by the central processing unit to accomplish a particular program task. These, in effect, form a set of macro-instructions. The downloaded machine language program utilizes these macro-instructions to the extent possible, and thereby achieves flexibility without the need to download substantial amounts of program code.

In all of the known approaches, however, there is a program portion in the local equipment that is resident in a read-only memory, and its contents are not changed. That resident portion contains "boot-up" segments and program segments that are necessary to maintain the communication between the remote processor and the local equipment (so that the process of downloading the programs can continue). This set of programs is the "essential programs" (EP) set. This set of programs should, of course, be a non-volatile store because there is always a possibility of power loss.

The fact that the EP set is needed to maintain communications presents a problem when the EP set itself needs to be modified or updated. Indeed, that is often the case with modems, where essentially the sole function of the modem software is to support communication.

### SUMMARY OF THE INVENTION

The problem of downloading a modified version of the operating communication program, and the problem of

# 2

effectively updating the entire set of programs in a stored program controlled apparatus, such as a modem, is solved with a downloadable start address specification means and, optionally, with an EEPROM memory. The start address specification means stores information that is downloaded through the communication link, and that information is used in defining the address from where the communication link programs are initiated.

In accordance with the method of this invention, downloading comprises what may be considered two communication segments. In the first segment the essential portion of the new package (EP set) of programs is downloaded to some chosen location in the local apparatus and the downloadable start address specification means is loaded with the appropriate new start address. Utilizing the most recently downloaded EP set of the new communication package, the second segment downloads the remainder of the new package.

### BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 presents a block diagram of an arrangement for carrying out this invention;

FIG. 2 is a flow diagram of a downloading process in accordance with this invention; and

FIG. 3 is a flow diagram of an augmented downloading process in accordance with this invention.

### DETAILED DESCRIPTION

A modem's primary function is to enable communications between a customer's digital equipment and a remote apparatus over a transmission medium. In a modem with a stored programmed controlled architecture this communication is effected with a set of programs, which includes call establishment programs, link layer protocols with flow control and error recovery functions, and programs that handle and store the communicated data, as well as the modulation and demodulation programs used by the modem. These programs occupy a significant portion of the modem's program memory. In accordance with this invention, all programs—including the EP set of programs that carry out the elemental communications—are downloadable. That is, the apparatus employing the principles of this invention does not need to have a non-volatile "boot-up" read-only-memory. All programs (including the boot-up programs) can be stored in a single memory arrangement which, for some applications, can consist of just two memory blocks.

FIG. 1 depicts one structure that, in conformance with the principles of this invention, enables the downloading of programs to the modem's program memory. FIG. 1 includes a processor element 10 with a port for receiving signals from, and sending signals to, line 12. Processor 10 is also responsive to line 11 data from program memory 20, and it supplies address and data to memory 20 via bus 13 and bus 14, respectively. In a conventional processor structure, bus 14 is connected to an address port of memory 20. In FIG. 1, address modifier 30 is interposed between processor 10 and program memory 20, with bus 13 supplying the address information to memory 20. Modifier 30 is responsive to register 40, which is loaded with bus 13 data when the register is enabled by bus 16. Modifier 30 is a modulo M adder, where M is the size of memory 20. A typical stored program controlled modem also includes a read/write data memory, means for interfacing with the transmission medium, means for interfacing with the local digital equipment, and perhaps other data and control ports. For purposes of this invention, however, these other elements are irrelevant, so they are not included in the drawing.

6,131,159

It should be understood that line 12 in the FIG. 1 architecture effectively offers a "remote execution" capability to processor 10, in that the programs which are executed by processor 10 are affected by data supplied by line 12. For example, data supplied by line 12 can effect branching to programs that are normally dormant. One such normally dormant program is a program that downloads information to the program memory. It should also be understood, and noted, that although this invention is described in connection with modems, its principles are applicable to all stored program apparatus. In particular, the principles of this invention are applicable to all situations where it is desirable to download an entire set of new programs, including the EP set. For example, this invention is useful in PCs, "point of sale" terminals, etc.

The operation of the FIG. 1 apparatus is quite simple. The processes carried out by the FIG. 1 apparatus are effected by executing a sequence of instructions that the processor receives from program memory 20 via bus 11. In turn, processor 10 determines which instructions are delivered to it by controlling the addresses applied to memory 20 (typically by controlling a "program counter" within processor 10, which is not shown in the FIG.). The primary difference between a conventional microprocessor arrangement and the FIG. 1 arrangement is that the addresses supplied on bus 14 are not the actual addresses that are applied to program memory 20, because of the interposed circuit 30. One might call these addresses "virtual addresses", which are translated into the real addresses by the additive constant applied by register 40 to modifier circuit 30.

The exact structure and organization of the programs executed by the FIG. 1 arrangement is not really relevant to this invention, but it is to be understood that a protocol exists for sending information out on line 12 and for receiving information from line 12. This protocol provides a mechanism for intelligent communication with processor 10, which includes, for example, knowing when the received data is commands or data, and whether to store the received data in memory 20 or elsewhere.

The programs that can be executed by the FIG. 1 arrangement reside throughout memory 20, but the set of programs that is essential to the maintenance of communication with line 12 (the EP set) may, advantageously, occupy a contiguous segment of memory 20 addresses in the range 0 to N. Within that range of addresses there is a subroutine for installing a new EP set.

In accordance with the principles of this invention, the entire set of programs contained in memory 20 can be over-written with a new set of programs (in a process initiated by the apparatus itself or by the party connected to the apparatus via line 12) by following the procedure outlined in FIG. 2. In step 50 of FIG. 2, a command is received on line 12 to branch to the subroutine in the EP set that installs new EP sets (that command may simply be a data word that is installed in a particular read/write memory location). After supplying the branch instruction, the new EP set of programs are downloaded via line 12. Optionally, an offset address that is the starting address of the new EP set (the address corresponding to 0 in the existing EP set) is also downloaded. Alternatively, the offset address may be predefined, in which case it does not need to be supplied by line 12. In any event, the offset address is greater than N and less than M−N. It may be noted that N must be less than M/2, because two EP sets must temporarily coexist in memory 20.

After the new EP set is installed in memory locations X through X+N, where X is the offset address (X=M/2, for example), memory locations that serve as software-defined registers in the new EP set are populated with data that is

found in the corresponding software-defined addresses in the active EP set. Thereafter, according to step 51, register 40 is loaded with the offset address.

The immediate effect of loading the offset address into register 40 is to transfer control to the newly installed EP set. That means that the program in the new EP set to which control is transferred, must be at a predetermined logic point so that the communication can continue seamlessly. This minor requirement can be easily accommodated by proper planning of the new EP set. Once operation proceeds under control of the new EP set of programs, according to FIG. 2, step 52 conditions processor 10 to account for the offset present in register 40 and loads the remainder of programs destined for memory 20 in addresses higher than X+N (modulo M).

It is obviously important to protect the information loaded into memory 20 from loss. At the very least, that means that memory 20 must be non-volatile. Currently, we use an electrically bulk erasable, programmable, read-only memory (FLASH EEPROM) to form memory 20. This memory must be erased in bulk before new information can be written in it. To install a new EP in such a memory, it is recalled that the EP set must occupy less than half of memory 20, and that makes it convenient to construct memory 20 from at least two distinct erasable memory blocks (distinct in the sense of being able to erase one and not the other). Each segment of the downloading process begins with a bulk erasure of one of the memory 20 halves.

To summarize the downloading process of this invention,

1. Bulk erase the that half of memory 20 which does NOT contain the EP set of programs;
2. download a new EP set of programs to the erased half of memory 20;
3. download the offset address to pass control to the new EP set of programs;
4. bulk erase the other half of memory 20;
5. download the remainder of programs into memory 20.

If register 40 is to contain the offset address for a substantial time after downloading is accomplished, then its contents must be protected in a manner not unlike that of memory 20. Of course, register 40 can manufactured together with memory 20 and be an EEPROM. However, that is not absolutely necessary, and manufacturing costs could benefit if register 40 were constructed as part of the read/write memory or as part of processor 40.

Register 40 may be a volatile memory if the downloading process is carried out as depicted in FIG. 3. Specifically, by including a copy subroutine in the EP set of programs, the downloading process can be modified to the following (assuming the EP set is in the first half of memory 20):

1. Bulk erase the second half of memory 20;
2. download a new EP set of programs to the second half of memory 20;
4. download the offset address to pass control to the new EP set of programs;
5. bulk erase the first half of memory 20;
6. copy the contents of the second half of memory 20 into the first half of memory 20;
7. reset the offset address to 0; and
8. download the remainder of programs into memory 20.

Admittedly, during the copy sequence (which may also be a "move" sequence) the arrangement is vulnerable to power failures. Since the time of copying or moving is very small, this is a very unlikely event. Still, to protect against this unlikely event, the power source can be designed to have sufficient reserve to complete the copy operation, or to protect the starting address. A capacitor at the output of the power supply may supply the necessary power reserve.

6,131,159

**5**

In the arrangement described above where memory **20** consists of two FLASH EEPROM chips, register **40** needs to have only one bit of memory, and modifier circuit **30** can be merely an Exclusive OR gate which, with the aid of the one bit memory of register **40**, selects the bank of memory that is active.

What is claimed is:

1. A system comprising:

(a) a processor;

(b) a memory, and a set of programs stored in said memory that are executed when the system needs to be initialized, said memory being of a type which may be completely updated in its entirety but which is not volatile, said memory being the only program memory in said system; and

(c) alterable storage means for holding a displacement multi-bit memory address that is used to point to the starting address accessed by the processor when initializing.

2. The system of claim **1** wherein said memory is an EEPROM memory.

3. The system of claim **1** wherein said memory consists of 2-FLASH EEPROM devices.

4. The system of claim **1** wherein said alterable storage means is an EEPROM memory.

5. The system of claim **1** further comprising translation means interposed between said alterable storage means and said memory, wherein said alterable storage means holds an address that translates between addresses directed to the memory via said translation means and addresses actually applied to the memory by said translation means.

6. A system comprising:

(a) a processor;

(b) a memory coupled to said processor, said memory being the only program memory in the system, said memory being completely updatable in its entirety but non-volatile, there being a set of programs stored in said memory that are executed when the system needs to be initialized; and

(c) alterable memory means for storing a multi-bit memory address that controls the starting address accessed by the processor when initializing.

7. The system of claim **6** further comprising means for receiving a trigger signal at a telecommunications input port of the system to begin execution of said programs.

8. A system comprising:

(a) a processor;

(b) a memory and a communications port coupled to said processor, said communications port being adapted to communicate with devices which are external to said system, said memory being completely updatable in its entirety but non-volatile;

(c) a program module in said memory that, when activated by said processor, effects communication with said port; and

(d) operationally alterable means for setting the starting address of said program, which address is supplied to said system via said communication port.

9. The system of claim **8** wherein:

(a) said memory contains a first set of programs and a second set of programs;

(b) said memory is at least twice the size of the size of the first set of programs; and

**6**

(c) said operationally alterable means sets the starting position of the program executed by said processor in connection with communication with said port at a second specified location that is M removed from the first location, M being half the size of said memory.

10. A system comprising:

(a) a processor;

(b) a communication port coupled to said processor, said communication port being adapted to communicate with devices which are external to said system;

(c) a memory coupled to said processor, said memory being non-volatile and capable of being completely updated in its entirety, said memory containing programs, including a set of programs that are executed when the system needs to be initialized and a program for controlling communication through said communication port; and

(d) means for activating said program for controlling communication and receiving information through said communication port to modify the programs in said memory, said information including the program for controlling communication through said communication port and a command that is executed by said processor effectively when it is received.

11. The system of claim **10** wherein the communication port is a telecommunication port.

12. The system of claim **10** wherein the communication port is a telecommunication port and the programs execute the functions of a modem.

13. The system of claim **10** where the communication port receives commands to be executed by the processor and data to be stored in the memory.

14. The system of claim **10** wherein said means for receiving includes means for altering the program according to the information obtained by the means for receiving.

15. The system of claim **10** wherein said means for receiving modifies the programs by altering a portion of the memory contents pursuant to data received via said communication port.

16. The system of claim **10** wherein said means for receiving modifies the programs by replacing them with program data received via said communication port.

17. The system of claim **10** where the means for altering alters all of the programs in the system in a single communication session with said communication port.

18. A system comprising:

(a) a processor;

(b) a memory coupled to said processor, said memory being of a type, which is completely updatable in its entirety but non-volatile;

(c) a set of program means stored in said memory that are activated when said system needs to be updated wit a new set of programs, and

(d) alterable storage means for holding an offset memory address that is used to point to a starting address accessed by said processor when initializing.

19. The system of claim **18** wherein said memory is an EEPROM memory.

20. The system of claim **18** wherein said memory consists of 2 FLASH EEPROM devices.

21. The system of claim **18** wherein said alterable storage means is an EEPROM memory.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.   : 6,131,159
DATED        : October 10, 2000
INVENTOR(S)  : Hecht, et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 4, line 40, insert "be" between "can" and "manufactured".

Column 6, line 49, delete "," after "type".

Column 6, line 52, change "wit" to --with--.

Signed and Sealed this

Twenty-fourth Day of April, 2001

*Nicholas P. Godici*

Attest:

**NICHOLAS P. GODICI**

*Attesting Officer*   *Acting Director of the United States Patent and Trademark Office*

# EXHIBIT 3E

US006950444B1

## (12) United States Patent
Holmquist et al.

(10) Patent No.: **US 6,950,444 B1**
(45) Date of Patent: **Sep. 27, 2005**

(54) **SYSTEM AND METHOD FOR A ROBUST PREAMBLE AND TRANSMISSION DELIMITING IN A SWITCHED-CARRIER TRANSCEIVER**

(75) Inventors: **Kurt Holmquist**, Largo, FL (US); **Joseph Chapman**, Seminole, FL (US)

(73) Assignee: **Paradyne Corporation**, Largo, FL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 812 days.

(21) Appl. No.: **09/637,185**

(22) Filed: **Aug. 11, 2000**

### Related U.S. Application Data

(60) Provisional application No. 60/150,436, filed on Aug. 24, 1999.

(51) Int. Cl.$^7$ ............................................. **H04L 12/56**
(52) U.S. Cl. ...................................... 370/476; 370/477
(58) Field of Search .............................. 370/476, 471, 370/472, 474, 477, 389

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,278,689 A | * | 1/1994 | Gitlin et al. ................. 359/137 |
| 5,305,384 A | * | 4/1994 | Ashby et al. ................. 380/29 |
| 5,535,199 A | | 7/1996 | Amri et al. |

| | | | |
|---|---|---|---|
| 5,822,373 A | * | 10/1998 | Addy .......................... 375/259 |
| 6,252,865 B1 | | 6/2001 | Walton et al. ................ 370/335 |
| 6,353,635 B1 | * | 3/2002 | Montague et al. ...... 375/240.26 |
| 6,651,210 B1 | * | 11/2003 | Trott et al. ................. 714/758 |

* cited by examiner

*Primary Examiner*—Kenneth Vanderpuye
(74) *Attorney, Agent, or Firm*—Thomas, Kayden, Horstemeyer & Risley LLP

(57) **ABSTRACT**

A method and system for robust delimiting of transmitted messages in switched-carrier operation in which a preamble precedes each communication message with the preamble comprising symbols transmitted at a rate lower than that of the following data. The lower rate symbols of the preamble significantly increase the probability that the decoder will decode the preamble symbols error free. Communication line control information can be included in the robust preamble, thereby ensuring that line control information is reliably transferred over the communication channel. The first symbol of the preamble can be transmitted at the lower symbol rate and at an increased power level, thereby clearly and reliably delimiting the beginning of a transmission. The end of the communication message can be reliably delimited by sending the first symbol containing only bits from a next cell of information at a lower symbol rate and including an extra bit in that symbol. The extra bit can be set to indicate to a receiver whether the last cell of information has just begun.

**55 Claims, 10 Drawing Sheets**





FIG. 1



FIG. 2A

FIG. 2B



FIG. 3A



FIG. 3B



FIG. 4A



FIG. 4B





FIG. 7



FIG. 8



FIG. 9

US 6,950,444 B1

# SYSTEM AND METHOD FOR A ROBUST PREAMBLE AND TRANSMISSION DELIMITING IN A SWITCHED-CARRIER TRANSCEIVER

## CROSS-REFERENCE TO RELATED APPLICATIONS

This document claims priority to, and the benefit of, the filing date of Provisional Application Ser. No. 60/150,436 entitled "A TECHNIQUE FOR ROBUST SIGNAL DELIMITING AND ENCODING OF CRITICAL LINK CONTROL SIGNALS APPLIED TO TRANSMISSION OF ATM CELLS OVER A DSL USING ADAPTIVE TIME DOMAIN DUPLEX (ATDD)," filed on Aug. 24, 1999, which is hereby incorporated by reference.

## TECHNICAL FIELD

The present invention relates generally to communications systems, and more particularly, to a system and method for a robust preamble and transmission delimiting in a switched-carrier transceiver.

## BACKGROUND OF THE INVENTION

Data communication typically occurs as the transfer of information from one communication device to another. This is typically accomplished by the use of a modem located at each communication endpoint. In the past, the term modem denoted a piece of communication apparatus that performed a modulation and demodulation function, hence the term "modem". Today, the term modem is typically used to denote any piece of communication apparatus that enables the transfer of data and voice information from one location to another. For example, modem communication systems use many different technologies to perform the transfer of information from one location to another. Digital subscriber line (DSL) technology is one vehicle for such transfer of information. DSL technology uses the widely available subscriber loop, the copper wire pair that extends from a telephone company central office to a residential location, over which communication services, including the exchange of voice and data, may be provisioned. DSL devices can be referred to as modems, or, more accurately, transceivers, which connect the telephone company central office to the user, or remote location typically, referred to as the customer premises. DSL communication devices utilize different types of modulation schemes and achieve widely varying communication rates. However, even the slowest DSL communications devices achieve data rates far in excess of conventional point-to-point modems.

DSL transceivers can be used to provision a variety of communication services using, for example, asynchronous transfer mode (ATM). ATM defines a communication protocol in which 53 octet (byte) cells are used to carry information over the DSL communication channel. The first five octets of the ATM cell are typically used for overhead and the remaining 48 octets are used to carry payload data. When using a switched-carrier transmission methodology, a control transceiver may be connected via the DSL to one or more remote transceivers. In such a communication scheme, the transmission is commonly referred to as "half-duplex," which is defined as two way electronic communication that takes place in only one direction at a time. With only a single remote transceiver on a line, switched-carrier transmission may instead be employed in full-duplex mode (i.e., allowing transmission in both directions simultaneously). In this case, full-duplex operation is typically enabled by employing

either echo cancellation or frequency division multiplexing. Hybrid techniques are possible such as one in which there are multiple remote transceivers and communication takes place between the control transceiver and only one remote transceiver in full-duplex fashion. As it relates to the present invention, the common characteristic of these communication techniques is the use of a switched-carrier modulation in which transmitters are deliberately silent for some interval between signal transmissions. For simplicity, the following discussions assume the simplest case of using switch carrier modulation with a half-duplex (also sometimes referred to as "time domain duplex") line usage discipline.

Before the transmission of ATM cells, a preamble containing channel, transmission, address and administrative information may be transmitted by the transceiver. The application of this preamble is sometimes referred to as "framing" the data to be transmitted. Due to the switched-carrier nature of the transmission, silence precedes this preamble and it is of course important for all symbols in this preamble to be received error free. It is also desirable to have the ability to precisely delimit the beginning and end of a transmission to within one transmitted symbol interval. Robustly delimiting the beginning of a message enables a receiving transceiver to reliably begin immediately decoding the message at the correct symbol. Likewise, robustly delimiting the end of a message enables a receiving transceiver to reliably decode the entire message through the final symbol and then stopping so as to prevent data loss and to prevent the inclusion of any false data. Furthermore, by communicating the end of message indicator to a receiving transceiver prior to the actual end of the message, line turnaround time (i.e., idle time on the line between transmissions) can be reduced, thereby increasing the effective use of the available line bandwidth.

Because the most efficient signal constellation encoding cannot allocate signal space to silence, it is impractical to reliably discriminate silence from a signal when analyzing only a single symbol encoding an arbitrary data value.

To improve message delimiting, existing techniques use special marker symbols whose symbol indices are greater than those used to encode data. At N bits per symbol (bps) data is encoded using symbol indices 0 through $2^N-1$. The special symbols use indices $2^N$ and above. While these special marker symbols are useful for marking the beginning and end of a transmission, their placement at the outer edges of a constellation raises the peak signal, thus increasing the peak to average ratio (PAR) across all data rates by as much as 4 dB. Unfortunately, discrimination of special symbols has the same error threshold as does decoding of data.

Thus, it would be desirable to have a robust manner in which to detect the beginning and end of a transmission so that line bandwidth can be most efficiently allocated. Furthermore, it would be desirable to robustly transmit a message preamble including control information thereby greatly improving the probability that the preamble is received error free.

## SUMMARY OF THE INVENTION

The present invention provides an improved system and method for robustly delimiting a message transmission in switched-carrier communication systems. The invention provides a method and system for transmission of a message preamble in which transmission of the preamble is more robust than the data. In this manner, the beginning and end of a transmission can be robustly delimited and channel control information can be reliably conveyed to a receiving transceiver.

US 6,950,444 B1

3

The system of the present invention uses a novel header application, which enables the transport of ATM, or any other data, efficiently and economically over a communications channel, such as a DSL communications channel.

Briefly described, in architecture, the system for robust transmission delimiting comprises a communication message including a preamble including a plurality of bits representing communication link control information, and an encoder configured to encode the preamble bits into a plurality of symbol indices. The symbol indices are encoded at a lower bit per symbol rate relative to the maximum rate capable of being supported over a communication channel.

In another aspect, the invention is a system for delimiting the end of a transmission. The system takes a communication message segmented into a plurality of fixed size units, each fixed size unit including a plurality of bits, and includes an encoder configured to encode the plurality of bits into a plurality of symbol indices at a first data rate. The encoder is also configured to encode the first symbol index containing only bits from each fixed size unit at a data rate lower than that of the first data rate.

The present invention can also be viewed as a method for robust transmission delimiting comprising the steps of applying a preamble to a communication message, the preamble including a plurality of bits representing communication link control information, and encoding the preamble bits into a plurality of symbol indices. The symbol indices are encoded at a lower bit per symbol rate relative to the maximum rate capable of being transmitted over a communication channel.

In another aspect, the invention is a method for delimiting the end of a transmission comprising the steps of segmenting a communication message into a plurality of fixed size units, each unit including a plurality of bits, encoding a plurality of the bits in the cells into a plurality of symbol indices, the symbol indices being encoded at a first rate, and encoding the first symbol index containing only bits from each fixed size unit at a rate lower than that of the first rate.

BRIEF DESCRIPTION OF THE DRAWINGS

The invention can be better understood with reference to the following drawings. The components in the drawings are not necessarily to scale, emphasis instead being placed upon clearly illustrating the principles of the present invention. Moreover, in the drawings, like reference numerals designate corresponding parts throughout the several views.

FIG. 1 is a schematic view illustrating a switched-carrier half-duplex communication environment, in which DSL transceivers containing the present invention reside;

FIB 2A is an illustration of the time-domain duplex communication methodology employed by the DSL transceivers of FIG. 1;

FIG. 2B is a schematic view illustrating, in further detail, a communication message of FIG. 2A;

FIG. 3A is a schematic view illustrating the bit to symbol relationship of the communication message of FIG. 2B;

FIG. 3B is a schematic view illustrating, in further detail, the preamble of FIG. 3A;

FIG. 4A is a graphical illustration representing a two (2) bit per symbol signal space constellation and the increased energy symbol of FIG. 3B;

FIG. 4B is a graphical illustration showing an exemplar grouping of constellation points representing different bit per symbol rates in accordance with an aspect of the invention;

4

FIG. 5 is a schematic view illustrating the communication message of FIG. 3A and a technique for scrambling that further improves reliable transmission of the message preamble;

FIG. 6 is a schematic view illustrating the communication message of FIG. 3A and the reduced line turn around delay made possible by an aspect of the invention;

FIG. 7 is a block diagram illustrating the control DSL transceiver of FIG. 1;

FIG. 8 is a block diagram illustrating the encoder of FIG. 7; and

FIG. 9 is a block diagram illustrating the decoder of FIG. 7.

DETAILED DESCRIPTION OF THE INVENTION

Although, described with particular reference to the transmission of ATM cells over a DSL communication channel, the system and method for a robust preamble and transmission delimiting can be implemented to transmit all forms of data in any switched-carrier transmission system in which it is desirable to send a robust preamble and to robustly delimit the beginning and end of each communication message.

Furthermore, the system and method for a robust preamble and transmission delimiting can be implemented in software, hardware, or a combination thereof. In a preferred embodiment(s), selected portions of the system and method for a robust preamble and transmission delimiting are implemented in hardware and software. The hardware portion of the invention can be implemented using specialized hardware logic. The software portion can be stored in a memory and be executed by a suitable instruction execution system (microprocessor). The hardware implementation of the system and method for a robust preamble and transmission delimiting can include any or a combination of the following technologies, which are all well known in the art: an discrete logic circuit(s) having logic gates for implementing logic functions upon data signals, an application specific integrated circuit having appropriate logic gates, a programmable gate array(s) (PGA), a field programmable gate array (FPGA), etc

Furthermore, the robust preamble and transmission delimiting software, which comprises an ordered listing of executable instructions for implementing logical functions, can be embodied in any computer-readable medium. Moreover, use by or in connection with an instruction execution system, apparatus, or device, such as a computer-based system, processor-containing system, or other system that can fetch the instructions from the instruction execution system, apparatus, or device and execute the instructions.

In the context of this document, a "computer-readable medium" can be any means that can contain, store, communicate, propagate, or transport the program for use by or in connection with the instruction execution system, apparatus, or device. The computer readable medium can be, for example but not limited to, an electronic, magnetic, optical, electromagnetic, infrared, or semiconductor system, apparatus, device, or propagation medium. More specific examples (a non-exhaustive list) of the computer-readable medium would include the following: a electrical connection (electronic) having one or more wires, a portable computer diskette (magnetic), a random access memory (RAM), a read-only memory (ROM), an erasable programmable read-only memory (EPROM or Flash memory) (magnetic), an optical fiber (optical), and a portable compact disc read-only memory (CDROM) (optical). Note that the computer-

US 6,950,444 B1

5
6

readable medium could even be paper or another suitable medium upon which the program is printed. As the program can be electronically captured, via for instance optical scanning of the paper or other medium, then compiled, interpreted or otherwise processed in a suitable manner if necessary, and then stored in a computer memory.

Turning now to the drawings, FIG. 1 is a schematic view illustrating a switched-carrier half-duplex communication environment 1, in which DSL transceivers containing the present invention reside. Although the invention will be described below in a half-duplex communication environment, the DSL transceivers containing the invention may be used in a switched-carrier full-duplex environment as well. In such a case, full-duplex operation may be enabled using technologies such as echo cancellation or frequency division multiplexing. Communication environment 11, includes central office 12 connected via communication channel 16 to customer premises 21. Communication channel 16 can be any physical medium over which communications signals can be exchanged, and in the preferred embodiment, is the copper wire pair that extends from a telephone company central office to an end-user location, such as a home or office. Central office 12 includes DSL transceiver 100 connected to communication channel 16. DSL transceiver 100 processes data via connection 14. DSL transceiver 100 exchanges data via connection 14 with any data terminal equipment (DTE), such as a computer or data terminal.

Customer premises 21 includes one or more DSL transceivers 150 connected via internal infrastructure wiring 18 to communication channel 16. The infrastructure wiring 18 can be, for example but not limited to, the telephone wiring within a private residence or within an office. DSL transceivers 150 can be connected to a variety of telecommunication devices located at customer premises 21. For example, DSL transceiver 150 connects via connection 22 to a personal computer 26. Although additional DSL transceivers can be located at customer premises 21, an exemplar one of which is indicated using reference numeral 155, the aspects of the invention to be discussed below are also applicable if only one DSL transceiver 150 is located at customer premises 21. In the example given in FIG. 1, DSL transceiver 155 connects to computer 28 via connection 29.

The DSL transceiver 100 located at central office 12 is considered a "control device" and the DSL transceiver 150 located at customer premises 21 is considered a "remote device." This is so because the control DSL transceiver 100 controls the communication sessions by periodically polling each remote DSL transceiver 150 to determine whether the remote device has information to transmit. Regardless of the number of DSL transceivers located at customer premises 21, the method of communication between DSL transceiver 100 located at central office 12 and DSL transceiver 150 located at customer premises 21 is half-duplex in nature, sometimes referred to as adaptive time-domain duplex, or data driven half-duplex, unless the above-mentioned technologies such as echo cancellation or frequency division multiplexing allow full-duplex operation between the control transceiver 100 and one remote transceiver 150. This means that during any time period only one DSL transceiver may transmit at any time. In the situation in which there are multiple DSL transceivers located at customer premises 21, the DSL transceiver 100 located at central office 12 periodically polls each DSL transceiver located at customer premises 21 at an appropriate time to determine whether any of the remotely located DSL transceivers have any information to transmit to central office 12. If only one DSL

transceiver 150 is located at customer premises 21, the communication method may be half-duplex in nature or conventional full-duplex techniques may be used (e.g., using either frequency division multiplexing or echo cancellation).

FIG. 2A is a schematic view illustrating the time-domain duplex communication methodology between a control DSL transceiver 100 and a remote DSL transceiver 150. When a control DSL transceiver 100 desires to send a message to a remote DSL transceiver 150 the control DSL transceiver 100 sends a communication message 31 including a preamble and any information that is to be transmitted. There are times when the communication message may include only a preamble. After the transmission of communication message 31, the remote DSL transceiver to which communication message 31 is addressed (in this example remote DSL transceiver 150) responds with communication message 32. After the remote DSL transceiver 150 completes the transmission of communication message 32, the control DSL transceiver 100 is now free to send another communication message 34 to either the same remote DSL transceiver 150 or, if present, a different remote DSL transceiver, such as DSL transceiver 155 (remote "n") of FIG. 1. As illustrated in FIG. 2A, remote DSL transceiver "n" responds with communication message 36. In this manner, the communication methodology between control DSL transceiver 100 and all remote DSL transceivers 150, 155. . . n, is switched-carrier and time-domain duplexed.

FIG. 2B is a schematic view illustrating, in further detail, the communication message 31 of FIG. 2A. Communication message 31 begins with preamble 40 followed by optional administrative header 42. In accordance with an aspect of the invention, all communication messages, regardless of the content, begin with preamble 40. Administrative header 42 is optional and can be used to send information that is neither part of the preamble 40 or of any data to follow. For example, the administrative header 42 could convey a description of noise level conditions at one end so the other end may opt to increase or reduce the power level of its transmission as necessary. Likewise, the administrative header 42 sent by a remote transceiver could contain information regarding the amount of payload information that the remote transceiver is ready to transmit and its relative priorities so that the control transceiver could alter the amount of time that this remote transceiver is given to transmit its data (relative to any other transceivers connected to the line). When the payload data comprises ATM cells, the control transceiver could use messages conveyed by the administrative header 42 to direct remote devices to activate or deactivate various ATM virtual circuits.

If data is included in communication message 31, one or more ATM cells follow the optional administrative header 42. Although illustrated using three ATM cells, 44, 45 and 46, there are situations in which no ATM cells, or for that matter, no information of any kind, follows preamble 40. In the case in which information does follow preamble 40, and for purposes of illustration only, ATM cells 44, 45 and 46 are each standard 53 octet ATM cells. For example, ATM cell 44 includes 5 octet ATM header 47 and 48 octets of ATM data 48. ATM cells 45 and 46 are identical in structure to ATM cell 44. ATM cells 44, 45 and 46 adhere to the conventional ATM cell structure as defined in standardized ATM literature. It should be noted that optional administrative header 42 does not follow the standard ATM cell format and that administrative header 42 can be any number of octets in length. As known to those having ordinary skill in the art, an octet comprises 8 bits of information. Although described with particular reference to the transportation of ATM cells

US 6,950,444 B1

7

over a DSL communication channel, the principles of the invention are applicable to all fixed length communication messages.

FIG. 3A is a schematic view illustrating the bit to symbol relationship of the communication message 31 of FIG. 2B. In accordance with an aspect of the invention, preamble 40 is placed at the beginning of every transmission (i.e., each communication message 31). Preamble 40 is followed by optional administrative header 42, which is then followed, if there is data to transmit, by one or more 53 octet ATM cell 44 and 45. Although illustrated using only two ATM cells, any number of ATM cells may follow preamble 40 and, if included, optional administrative header 42. The ATM cells are a stream of data information represented as a series of bits that are placed into each ATM cell.

The preamble 40 is also a series of bits, which are encoded into a number of communication symbols. Symbols are the representation of the bits to be transmitted, and are represented as signal points in a signal space constellation (to be described below with respect to FIGS. 4A and 4B). In accordance with one aspect of the invention, each of the bits in preamble 40 are encoded into symbols, an exemplar one of which is illustrated using reference numeral 55, at the lowest available bit rate that can be transmitted over the communication channel 16. For purposes of illustration only, the symbols that encode the bits in the preamble 40 shown in FIG. 3A are encoded at a rate of two (2) bits per symbol. However, any number of bits per symbol lower than that of the normally transmitted data rate can be used so long as the symbol rate allows a receiving device to more reliably decode those symbols. For example, if the normal data rate is five (5) bits per symbol, then a symbol rate of two (2) bits per symbol has a significantly (approximately 9 dB) higher noise margin than the five (5) bit per symbol data rate, thereby allowing the symbols that are encoded at the lower rate of two (2) bits per symbol to be very robustly and reliably decoded by a receiving device. In this manner, the preamble 40, which is sent at the beginning of every communication message 31, can be made sufficiently robust so that the chance that it will always be received error free is greatly increased. Although very robust, there are still situations in which the symbols into which the preamble bits are encoded can be corrupted. However, in accordance with another aspect of the invention, because the preamble 40 is sent at the beginning of every communication message 31, even if the preamble 40 is corrupted, only data following that preamble may be affected, i.e., lost due to corruption, if certain bits of the preamble are corrupted.

In accordance with another aspect of the invention, the first symbol 55 representing the first bits in the preamble 40 can be sent using an increased power level, thereby clearly and robustly delimiting the beginning of the communication message 31. The effect of this increased power level symbol 55 will be explained in greater detail below with respect to FIGS. 4A and 4B.

Still referring to FIG. 3A, if an administrative header 42 is present in communication message 31, then the bits that are contained in administrative header 42 will be encoded at a symbol rate of "N" bits per symbol, where N is the normal data rate. The normal data rate can be any data rate, for example, but not limited to, a value between 2 and 12 (inclusive) bits per symbol. For purposes of illustration, and for simplicity of explanation, the normal symbol rate can be five bits per symbol. This is represented by the group of symbols 56 into which all the bits of administrative header 42 and a portion of the bits of header 47 of ATM cell 44 are encoded.

8

In accordance with another aspect of the invention, the first symbol used to encode bits from a particular cell that contains bits only from that cell will be encoded at a data rate lower than that of the standard data rate used for all other bits of each cell. For example, symbol 57 is the first symbol that contains bits only from ATM cell 44. The last symbol 65 of symbol group 56 contains bits from both administrative header 42 and ATM cell 44. Likewise, symbol 60 is the first symbol containing only bits from ATM cell 45. In accordance with this aspect of the invention, the symbols 57 and 60 will be encoded at a data rate that is two (2) bits per symbol lower than that of the preceding symbols (represented by N−2 where N is the number of bits per symbol used for encoding all other bits of the administrative header and ATM cells.) In this manner, because of the fixed length 53 octet ATM cells, by simple bit counting, the receiver will always know the first symbol encoding bits from a cell that contains only bits from this cell, and therefore has the special encoding described herein. These N−2 bits of the cell data are grouped for transmission and an additional bit (bit 54 for cell 44 or bit 61 for cell 45) is added for a total of N−1 bits encoded into symbol 57 or 60, respectively. This group of N−1 bits, represented by symbol 57 or 60, is encoded into a symbol and scaled for transmission with the scaling normally applied when encoding at N−1 bits per symbol. The extra bit 54 or 61 indicates whether or not the cell just started (ATM cell 44 or 45, respectively) is the last cell of the transmission. The extra bit 61 in symbol 60 is set to logic one to indicate that ATM cell 45 is the last cell of the transmission so that the receiver will know at the beginning of the receipt of ATM cell 45 that ATM cell 45 is the last cell in the transmission. For the same reason, bit 54 in symbol 57 set to zero so that the receiver will know that at least one more cell follows cell 44.

If N=2, then no bits are taken from the cell to encode the next symbol (since N−2=0). Since N−1=1, the next symbol contains just one bit, which is the last cell indicator. This effectively inserts an entire extra symbol in each cell. Nevertheless, the same encoding/decoding logic for this special symbol applies for any value of N≧2.

Once the receiver knows that a particular cell is the last cell in the message, by simple counting it can readily identify the symbol that contains the last bits of the last cell. This is represented in FIG. 3A as symbol 51 or optionally symbol 53. Since the number of bits remaining to be transmitted in the last symbol (M) can be less than N, a modified encoding technique is preferable for this symbol. One option is to add one or more padding bits (P) 52 so that M+P=N. Another option is to encode the last group of bits at M bits per symbol as represented by symbol 53. This has the advantage of increased robustness for the transmission of these bits.

For simplicity, the following discussion does not address this second technique. Having recognized the last symbol of the transmission, the receiver does not attempt to demodulate and decode the signal on the line following this symbol since the transmitting station must now be sending silence.

It should be noted that although described as being encoded at N−1 bits per symbol, the symbols 57 and 60 containing the additional last cell indicator bit can be encoded at any symbol rate lower than that of the standard transmission rate (N bits per symbol). For example, if N is five (5), the specially encoded symbols could also be encoded at N−2 or three (3) bits per symbol so that they contain two (2) bits of cell data plus the last cell indicator bit. In this manner, the receiver can clearly and reliably decode the symbol 60, thereby providing a robust and reliable end of message delimiter.

9                                                                          10

In accordance with this aspect of the invention, and to be described in further detail with respect to FIG. 3B, it is also desirable to have the ability to indicate that a message contains only an administrative header 42. In order to accomplish this, the first symbol containing data from the administrative header 42 can also be encoded using the higher noise margin N−1 bit per symbol encoding technique described above. For example, the first N−2 bits of the administrative header 42 can be combined with a last cell bit (such as bit 61 of symbol 60) and be encoded at the N−1 bit per symbol rate. This can provide the extra bit to indicate whether or not one or more ATM cells follow administrative header 42. An alternative technique is to simply include a bit in the preamble 40 that indicates whether an administrative header 40 follows the preamble. For simplicity, it has been assumed that this alternative technique is used with respect to FIG. 3A and in the following discussion.

Because each ATM cell is the smallest unit of a payload of ATM cells, and because all ATM cells have the same length, the first symbol of each cell that carries only bits of that cell can readily be identified. Because these bits are transmitted using the specially encoded symbol carrying two fewer bits than normal (as described above), the length of each cell is effectively increased by two bits. In some cases this can result in one extra symbol being needed to transmit the cell. In other cases an additional cell is not needed because the spare bits are available anyway (and would have ended up as the padding bits (P) 52 in FIG. 3A). Because the cells may be transmitted contiguously as a bit stream, the addition of one extra symbol may provide sufficient extra bits to cover the opening symbol of multiple following cells. For example, at eight (8) bits per symbol, in one (1) extra symbol is needed to cover the end of frame signaling overhead to transmit up to four (4) cells.

FIG. 3B is a schematic view illustrating, in further detail, the exemplar preamble 40 of FIG. 3A. The bit stream of preamble 40 comprises four (4) bits 62 that include information regarding the transmit rate (in bits per symbol) used to encode data following preamble 40 (the data comprising the optional administrative header and optional ATM cells), four (4) bits 63 that include information regarding the rate (also in bits per symbol) that the receiver is capable of receiving, two (2) bits 64 that identify the address of a remote DSL transceiver if the control DSL transceiver is transmitting (if a remote DSL transceiver is transmitting, then these two (2) bits 64 can represent the address of that remote DSL transceiver) and two (2) bits 66, which can be used to communicate the format of the message to follow. For example, the two (2) bits 66 can be used to advise a receiving device whether an administrative header 42 follows the preamble 40, whether ATM cells follow the preamble, whether both follow or whether only the preamble is being transmitted. The four (4) bits provided by symbols 55 and 67 and by symbols 68 and 69 can each encode as many as sixteen data encoding rates.

As mentioned above, the preamble 40 is sent at the beginning of each transmission. The twelve (12) bits that comprise the preamble 40 are encoded into symbols 55, 67, 68, 69, 70 and 71 in accordance with that described above. In accordance with an aspect of the invention, all of the symbols in preamble, 40 are encoded at a low bit per symbol rate. In this example, all of the symbols are encoded at a rate of two (2) bits per symbol, however, any other low bit per symbol rate can be used with similar results. The low bit per symbol rate ensures a high signal-to-noise ratio for these symbols, thereby significantly decreasing the probability that these preamble symbols will be corrupted by noise on the communication channel. The payload data (administrative header and ATM cells) would typically be encoded at N bits per symbol only if transmission at this N bit per symbol rate has an acceptably low rate of errors (based on line length, signal strength, noise, distortion and other impairments that may be present). Otherwise, data transmission efficiency would suffer. Therefore, encoding the preamble at less than N bits per symbol allows a corresponding improvement in the reliability of transmitting this information such that it is highly unlikely to be corrupted. Since very few bits are needed to convey the information carried in the preamble, a very low rate can be used without seriously reducing the overall transmission efficiency.

In accordance with another aspect of the invention, the first symbol 55 is encoded at a rate of two (2) bits per symbol and has its energy increased to a point at which noise on the communication channel is unlikely to cause a receiver to erroneously interpret the first symbol 55 as silence. Likewise the increased energy makes it unlikely that noise on the communication channel will cause the receiver to erroneously interpret an interval of the silence that precedes each message as the starting symbol of a message. It has been found that an energy increase of 3dB is sufficient. This aspect of the invention will be described in greater detail below with respect to FIGS. 4A and 4B. In this manner, the beginning of each transmission can be clearly and robustly delimited. The remainder of the symbols 67, 68, 69, 70 and 71 that represent the bits in preamble 40 are all encoded at two (2) bits per symbol, but do not have their energy increased.

The four (4) transmit rate bits 62 inform a receiving DSL transceiver of the transmit rate of the information to follow the preamble 40. Sending this information in every message has significant benefits. It provides the transmitting transceiver the option of changing the encoding rate for the payload from one message to the next. Messages containing information that has been determined to be of high priority can be transmitted using a lower number of bits per symbol to improve the chances of its being received without errors. If the communications system intermittently has a reduced throughput demand, the transceivers may instantly reduce their data rates to improve robustness without adversely affecting real throughput. Finally, if a severe noise condition (such as an impulse caused by plain old telephone service (POTS) ringing signals on a subscriber line 16) happens to corrupt one or both of the symbols 55 and 67 that encode the transmit rate, only the payload data in this message will be improperly decoded. The receiver's memory of a corrupted rate value lasts only until the next transmission begins. This allows the transmit rate to potentially be changed for every message while at the same time avoiding the complexities of providing fail-safe communication of the rate, such as through use of an automatic repeat request (ARQ) protocol, that would be needed if the rate is sent only when it is changed.

The receive rate bits 63 allow the transmitting device to communicate to the receiving device the maximum receive rate at which the transmitting device can receive. Inherently included in these receive rate bits 63 are commands that instruct the opposite device to either increase or decrease its transmit rate. This allows the responding transceiver to instantly modify the rate it uses for its next transmission to accommodate changes in the signal quality that have been detected at the opposite end of the line.

In accordance with an aspect of the invention, the address bits 64 need only be used when the control DSL transceiver

11

100 is communicating with a plurality of remote DSL transceivers in what is commonly referred to as "multi-point" mode. When communicating in "multi-point" mode the address bits 64 include either the address of the remote DSL transceiver 150 that is to transmit next (if the transmission is sent by the control DSL transceiver 100) or the address of the responding remote DSL transceiver 150 (if the transmission is sent by the remote DSL transceiver 150). Sending these bits 64 at the lower bit rate of the preamble reduces the likelihood of a remote transceiver 150 not responding or of the incorrect remote transceiver 150 responding to a message from the control transceiver 100. Frequent occurrence of either of these two types of errors could adversely affect the overall data transmission efficiency of the line.

The format bits 66 indicate whether the optional administrative header 42 is being sent, whether one or more ATM cells are being sent, or whether both or neither are being sent. As described previously, the receiver uses this information in conjunction with the transmit rate from bits 62 to identify the special symbols at the start of each ATM cell and to determine the symbol that is the last in the message. Robust transmission of this information at the start of each message allows the transmitter to dynamically modify the message format as needed from one message to the next. Should one of the format bits be corrupted by an abnormally severe noise event, the "damage" is restricted to the current message only. To operate reliably, the receiver could have a "back up" method of recognizing the end of a message such as through detecting loss of signal energy for an extended duration.

FIG. 4A is a graphical illustration representing a two (2) bit per symbol signal space constellation and the increased energy symbol of FIG. 3B. The constellation points labeled "c" represent the points in a standard 2 bit per symbol constellation. For each constellation point "c" transmitted, the effect of noise can make the point appear to a receiver to have been moved with respect to where it was when it was transmitted. The dashed circle 76 surrounding constellation point 79 represents the space within which noise may move the point and still have the point reliably decoded by the receiver. The point 79 appears in a different place at the decoder due to noise induced in the communications channel 16. Each of the points "c" have a space about which they can move and still be reliably decoded by the receiver.

The circle 77 encloses the area surrounding the origin of the in-phase-(horizontal) and quadrature (vertical) axes of FIG. 4A about which an interval of silence (no constellation point) can be moved by the same additive noise that can affect signal points. This additive noise could cause the silence to be interpreted by the decoder as one of the constellation points in a two (2) bit per symbol constellation due to the overlap of the decoding discrimination threshold circles 76 and 77. As shown, the circle 76 and the circle 77 have sufficient overlap in region 73 so that silence can easily be interpreted as one of the signal points "c". Conversely, one of the signal points "c" could also be interpreted by the decoder as silence.

For efficient operation, it is desirable that the beginning and end of each transmission be robustly and precisely identified (to within one (1) symbol interval). The beginning and end of each transmission are preceded and followed by silence on the line. Because the most efficient constellation encoding cannot allocate signal space to silence, it is impractical to reliably discriminate silence from signal when analyzing only a single symbol. In other words, it would be undesirable for silence that occurs before a message or after

12

a message to be interpreted as a constellation point "c", and it would be undesirable for a constellation point "c" to be interpreted as silence. As mentioned above, this is possible due to the effect of noise altering the position of the constellation signal points "c" or the position of silence.

In accordance with an aspect of the invention, the first symbol (symbol 55 of FIG. 3B) in the preamble 40 is transmitted with increased energy, thereby increasing the probability that it will be reliably detected by the decoder of the receiving device. In this manner, the beginning of each transmission is clearly and robustly delimited. The signal point "b" in FIG. 4A is an exemplar one of four (4) two (2) bit per symbol constellation points that are transmitted at an increased energy level. While other increases may provide useful, a 3 dB increase is typically sufficient and does not increase the ratio of peak power to average power (PAR) of the transmitted signal. As illustrated, the signal point "b" is enclosed by dotted circle 78, within which the point "b" may move due to noise on the communication channel 16 and still be reliably decoded by the receiver. As shown, there is no overlap between circle 78 and circle 77. Accordingly, by boosting the energy of the first symbol (symbol 55 of FIG. 3B) transmitted in a communication message (31 of FIG. 3A), there is a significantly higher probability that the boosted symbol will be reliably decoded and not be mistaken for silence. Nor will silence be mistaken for this boosted energy first symbol. Preferably, the receiver places the threshold to discriminate signal from noise at one unit from the origin as shown by circle 77 in FIG. 4A.

FIG. 4B is a graphical illustration showing an exemplar grouping of constellation points representing different bit per symbol rates in accordance with an aspect of the invention. For example purposes only, assuming that normal data is encoded at five (5) bits per symbol, the black constellation points, an exemplar of one of which is illustrated using reference numeral 81, represent data encoded at five (5) bits per symbol. In accordance with an aspect of the invention, all the symbols in the preamble 40 are encoded at a rate of two (2) bits per symbol and are illustrated by the four (4) constellation points labeled "c" in FIG. 4B. These two (2) bit per symbol constellation points provide a higher signal-to-noise ratio (high margin) than do the normal data encoded at five (5) bits per symbol. This increased margin increases the probability that the receiver will reliably decode all the symbols in the preamble.

In accordance with another aspect of the invention, the four constellation points labeled "b" in FIG. 4B represent the first symbol (symbol 55 of FIGS. 3A and 3B), which energy is boosted by 3 dB. In this manner, the constellation points "b" representing the boosted symbol 55 of FIG. 3A and 3B will robustly and reliably communicate the beginning of a transmission. Circle 82 represents the maximum signal level of any symbols as the number of bits per symbol becomes arbitrarily large, but the average power of the transmitted signal is the same as it is for either the five (5) bits per symbol (81) or the two (2) bits per symbol (points "c") constellations shown. Therefore, as illustrated by circle 82, the instantaneous power required by the boosted symbol points "b" is not any higher than that used to send the normal data at any bits per symbol value. In this manner, the boosted symbol represented by constellation points "b" can be used to reliably indicate the start of a message without requiring a higher transmit level capability than that needed for normal data transmission. The non-boosted two (2) bit per symbol constellation points indicated as "c" (having a significantly higher signal-to-noise ratio than that of the normal five (5) bit per symbol data) are used to transmit all symbols of the preamble after the first symbol.

FIG. 5 is a schematic view illustrating the communication message 31 of FIG. 3A and another aspect of the invention. Typically, it is desirable to scramble all the data bits in a communications message using a self-synchronizing scrambler so that all points in the signal constellation can be used. Unfortunately, the self-synchronizing capability of the scrambler carries the inherent disadvantage of error propagation and extension. A single bit in error in the received data stream is typically transformed by the self-synchronizing descrambling process into at least 3 erroneous bits that are separated by several bits that are not in error.

Typically, in switched-carrier operation, the scrambler setting (state) at the end of one transmission is preserved and used to begin scrambling the next message. (This enables full randomization of the encoding process so as to make full use of the available channel bandwidth.) Similarly, in a receiving device, when descrambling, the state of the descrambler that exists at the end of the previously received message is used to begin the descrambling process for the next received message. This means that the last state of the scrambler saved after scrambling the data portion of the message would then be used to begin scrambling the preamble bits of the next message.

Unfortunately, using this technique with the robust preamble 40 of the invention can lead to error propagation from the data portion of the communication message to the preamble 40. Allowing errors, which are more likely due to the larger number of bits per symbol, in the payload data to corrupt the data in the preamble due to the inherent error extension of the descrambling process significantly reduces the robustness of the preamble 40. In accordance with another aspect of the invention, a first scrambler can be used to scramble the information contained in the preamble 40 and a second scrambler can be used to scramble the data (i.e., the information in the ATM cells 44, 45, etc.)

As shown in FIG. 5, line 87 indicates that a first scrambler is used to scramble the preamble 40 of communication message 31 and also used to scramble the preamble of communication message 86. Similarly, line 88 indicates that a second scrambler is used to scramble the data portion of communication message 31 and the data portion of communication message 86. The message to message randomizing desirable for full usage of the available channel bandwidth can be maintained if the setting of the preamble scrambler (to be described with respect to FIG. 8) at the end of one preamble is used to begin the scrambling of the preamble of the next communication message 86. Because errors in the preamble are considered unlikely to occur, and because the bits received at the end of a previous preamble define the descrambler state used to descramble the next preamble, error extension from one message preamble into the preamble is also much less likely than in the single scrambler case.

An alternative to this that avoids the use of two scramblers is to save the state of the preamble scrambler after scrambling the preamble as the state to use to begin scrambling of the next preamble. This cab be done instead of the conventional approach of using the state of the scrambler at the end of the message. This technique can also prevent errors at the end of one message from corrupting the preamble of the next transmission.

FIG. 6 is a schematic view illustrating the communication message 31 and the reduced line turn around delay made possible by an aspect of the invention. In time-domain duplex operation any periods during which no transceiver is transmitting represent loss of available bandwidth. To make most efficient usage of a communication line, it is desirable to minimize these periods. Some intervals of silence necessarily occur between transmissions because the transition from silence to the first symbol of the preamble is the manner in which the beginning of the next transmission is delimited. The process by which a transceiver makes the transition from receiving to transmitting is referred to as "line turn-around" and the time required may determine the minimum amount of silence that can occur between messages. Various aspects of the design and implementation of a time-domain duplex transceiver may result in increased delays in the line turn-around process. For example, transmitter filters and receiver equalizers have inherent delays. The analog-to-digital and digital-to-analog conversion process as well as the process of transferring digital samples between the signal processor and converters may have some inherent delays. If the signal processing is implemented in firmware there may be delays between the arrival of received signal samples and the time the processing can be performed. All of these factors may extend the line turn-around time to the point that transmission efficiency is significantly reduced.

As described above with respect to FIG. 3A, communication message 31 includes a specially encoded symbol 60 transmitted at a lower bit per symbol rate than that of the normal data encoding rate. The symbol encodes an additional bit 61 that indicates whether or not the ATM cell is the last cell in the communication message 31. If it is indicated to the receiver at the beginning of the last ATM cell 46 that the ATM cell 46 is the last cell in the communication message, (instead of waiting to the end of the ATM cell 46) line turn around delay can be reduced. As illustrated, if a receiving device must wait until the end of the last message to learn that the message is complete, there will be a delay "d" between the time that the communication message 31 is received and the time at which the transmission of communication message 91a can begin. By having advance notification that the communication message is about to be complete, a remote DSL transceiver 150 can begin transmission of the next message before reception of the current message has been completed. By knowing the delay contributed by the factors such as those mentioned previously, the transceiver can begin the transmission process, indicated by communication message 91b, as soon as possible, so as to reduce delay "d" as much as possible, potentially reducing it to the minimum value needed for the receiver to reliably detect the transition from silence to signal at the beginning of the next message.

FIG. 7 is a block diagram illustrating the control DSL transceiver 100 of FIG. 1. Although, described with respect to control DSL transceiver 100, the following description is equally applicable to a remote DSL transceiver 150. Control DSL transceiver 100 includes microprocessor 101, memory 102, transmitter 115 and receiver 120 in communication via logical interface 108. A bi-directional stream of ATM cells from a DTE is communicated via line 14 to the control DSL transceiver 100. Memory 102 includes end of transmission delimiting software 106 and robust preamble software 104. This software resides in memory 102 and executes in microprocessor 101 in order to achieve and perform the benefits of the present invention. Transmitter 115 communicates with line interface 109 via connection 112 in order to gain access to communication channel 16. Information received on communication channel 16 is processed by line interface 109 and sent via connection 111 to receiver 120.

Transmitter 115 includes, among other elements that are known to those having ordinary skill in the art, encoder 200 and modulator 117. Similarly, receiver 120 includes, among

US 6,950,444 B1

15

other elements that have been omitted for clarity, decoder 300 and demodulator 118.

FIG. 8 is a block diagram illustrating the encoder 200 of FIG. 7. The transmit sequencer 236 commands the multiplexer 214 via connection 242 to select the first two (2) bits of the four (4) bits (62 of FIG. 3B) that define the current transmit rate from transmit rate element 206, via connection 212. This symbol is then forwarded to preamble scrambler 217, via connection 216 for scrambling, and is then forwarded via connection 218 to two (2) bit per symbol preamble encoder 219. This encoded symbol is then forwarded via connection 226 to gain increase element 227 where its energy is increased by approximately 3 dB and is then sent via connection 228 to multiplexer 224 and over connection 254 to modulator 117.

The next two (2) bits of the transmit rate (62 of FIG. 3B) are then scrambled and encoded in the same way. Next, the transmit sequencer 236 commands the multiplexer 214 via connection 242 to select the four (4) bits representing the requested received rate from receive rate element 204, which bits are forwarded to multiplexer 214 via connection 211. These four (4) bits are then forwarded to preamble scrambler 217 where they are scrambled, and then forwarded via connection 218 to two (2) bit per symbol preamble encoder 219 where they are encoded into a pair of symbols. These encoded symbols, are forwarded directly via connection 226 to multiplexer 224 and then forwarded via connection 254 to modulator 117.

If there are multiple remote DSL transceivers 150 and 155, then the transmit sequencer 236 commands the multiplexer 214 via connection 242 to select the two (2) bits representing the remote address from remote address element 202, which bits are then forwarded via connection 209 to multiplexer 214. These two (2) bits are then forwarded via connection 216 to preamble scrambler 217, which scrambles the bits and forwards them via connection 218 to the two (2) bit per symbol preamble encoder 219. The two (2) bit per symbol preamble encoder 219 encodes the bits and transfers the encoded symbol via connection 226 through multiplexer 224 and then via connection 254 to modulator 117.

Transmit sequencer 236 senses if an administrative header 42 and/or ATM cells 44, 45, 46 are available for transmission via connections 232 and 234, respectively, and uses this information to prepare the message format indicator which is loaded by the transmit sequencer 236 via connection 207. The transmit sequencer 236 commands the multiplexer 214 via connection 242 to select the two (2) bits representing the message format from element 201, which bits are then forwarded via connection 208 to multiplexer 214. These two (2) bits are then forwarded via connection 216 to preamble scrambler 217, which scrambles the bits and forwards them via connection 218 to the two (2) bit per symbol preamble encoder 219. The two (2) bit per symbol preamble encoder 219 encodes the bits and transfers the encoded symbol via connection 226 through multiplexer 224 and then via connection 254 to modulator 117.

Next, transmission of either the administrative header 42 or the ATM cell payload begins by transmit sequencer 236 sending a command via connection 235 to multiplexer 241 to select either the administrative header 42 via element 229 or payload data via element 231. These bits are supplied through multiplexer 241 via connections 239 and 238 and are then forwarded via connection 244 to payload scrambler 246. Payload scrambler 246 scrambles the bits and forwards them via connection 248 to N bit per symbol data encoder 249 and N−1 bit per symbol data encoder 251. As mentioned

16

above with respect to FIG. 5, payload scrambler 246 may use as its initial state either the state that exists at the end of scrambling the preamble (supplied via connection 247) or the state that exists after completion of scrambling the payload portion of the previous message. As mentioned above with respect to FIG. 3A, all the data bits are encoded at an N bit per symbol data rate by data encoder 249 and forwarded via connection 257 to multiplexer 224 until the first symbol containing only bits from a new ATM cell is detected. This symbol is encoded at a rate of N−1 bits per symbol by N−1 bit per symbol data encoder 251 and forwarded via connection 256 to multiplexer 224. The index for this symbol as delivered to payload scrambler 246 is formed by selecting the first N−2 bits of the first octet of the cell and adding an additional bit (i.e., bit 54 or bit 61 of FIG. 3A) representing the state of the last cell signal 237 as selected via multiplexer 241. When instructed by transmit sequencer 236 via connection 252, the multiplexer 224 selects the symbols from either N bit per symbol data encoder 249 or from N−1 bit per symbol data encoder 251 and forwards these symbols via connection 254 to modulator 117.

Transmit sequencer 236 uses the payload bits per symbol value N received via connection 212 to determine the number of symbols to encode for each cell and to determine which symbol is to be encoded at the N−1 bits per symbol rate and contain the last cell indicator bit. After completing transmission of the message, transmit sequencer 236 commands multiplexer 224 via connection 252 to select silence 221 via connection 222 as the input to the modulator 117.

FIG. 9 is a block diagram illustrating the decoder 300 of FIG. 7. A received transmission stream is received in demodulator 118, where it is demodulated in accordance with techniques known those having ordinary skill in the art. The first symbol is forwarded via connection 301 to gain reduction element 302. Gain reduction element 302 reduces the gain of the first symbol and supplies that reduced energy symbol via connection 304 to multiplexer 306. Receive sequencer 328 sends a signal to multiplexer 306 via connection 354 instructing multiplexer 306 to select that reduced gain symbol and transfer it via connection 307 to two (2) bit per symbol preamble decoder 308. The decoded bits from the first symbol are then sent via connection 309 to preamble descrambler 311. Preamble descrambler 311 descrambles the first bits in the transmission and forwards them via connection 312 to the multiplexer 314. When instructed by receive sequencer 328 via connection 332, the multiplexer 314 forwards these bits via connection 324 to transmit rate element 236.

The following preamble symbols are all forwarded via connection 301 directly to multiplexer 306, which forwards these symbols via connection 307 for decoding by two (2) bit per symbol preamble decoder 308. The decoded bits are forwarded via connection 309 to preamble descrambler 311 as mentioned above. These bits are then forwarded in order via connections 324, 321, 318 and 316 to transmit rate element 326, receive rate element 322, remote address element 319 and message format element 317, respectively.

Next, the administrative header symbols and ATM cell data symbols that have been encoded at N bits per symbol are forwarded via connection 301 to N bit per symbol data decoder 337 and the ATM cell data symbols that have been encoded at N−1 bits per symbol are forwarded via connection 301 to N−1 bit per symbol data decoder 339. These symbols are decoded and the decoded bits are transferred via connections 338 and 341 to multiplexer 342. Similarly, as mentioned above with respect to FIG. 8, receive sequencer

17

328 insures that the symbols encoded at the rate of N−1 bits per symbol are forwarded via connection 301 to N−1 bit per symbol data decoder 339, which forwards the decoded bits via connection 341 to multiplexer 342. As shown, the value of N, which is the bits per symbol value used for the N bits per symbol, or N−1 bit per symbol decoding is controlled by the just received transmit rate bits that have been stored in transmit rate element 326.

At the appropriate time, receive sequencer 328 commands the multiplexer 342 via connection 347 to forward the bits via connection 344 to payload descrambler 336. In accordance with an aspect of the invention, the preamble descrambler 311 operates only on the preamble bits and the payload descrambler 336 operates only on the payload bits. As mentioned above with respect to FIG. 5, the payload descrambler may use as its initial state either the state of the preamble descrambler at the end of descrambling the preamble as supplied via connection 334 or the state of the payload descrambler at the end of descrambling the payload bits of the previous message. The descrambled payload bits are then forwarded via connection 346 to multiplexer 349. When ordered by receive sequencer 328 via connection 331, the multiplexer 349 forwards the administrative header bits via connection 351 and the payload data bits via connection 352. These bits are then forwarded via logical interface 108 to microprocessor 101 for processing (FIG. 7). Receive sequencer 328 determines the presence or absence of the administrative header and ATM cells via the just received message format bits that have been stored in element 317 and provided to receive sequencer 328 via connection 327. When the bits for each symbol containing the last message bit are available at multiplexer 349, receive sequencer 328 directs the N−2 bits of payload data to the payload data element 356 via connection 352 and receives the last cell bit via connection 329. Receive sequencer 328 uses the current bits per symbol value for payload data received via connection 324 to determine the beginning and end of each cell. Based on the message format and the value of the last cell indicator bit, receive sequencer 328 determines when the last symbol of the message has been decoded and instructs demodulator 118 (FIG. 7) to stop delivering demodulated symbols.

In an alternative embodiment, the special encoding of the last cell as described above in FIG. 3A can be omitted and an "eye pattern closure test" can be used to detect the end of the message. In such a situation where it is acceptable to lose the advanced notification of the end of the transmission, beneficial alternative uses for the special encoding of the first bits of each cell are possible. For example, this special encoding as described above with respect to FIG. 3A wherein N−2 bits are encoded for the first full bytes of each cell, can be used to indicate whether or not the ATM cell header (e.g., ATM header 47 of FIG. 2B) is present. This can be useful in the situation in which a string of ATM cells have exactly the same header. This can happen, for example, for ATM adaptation layer 5 (AAL5) cells that carry data from a single protocol data unit (PDU) if no other cells have been interleaved. The single extra bit (bit 61 of FIG. 3A) provided by the encoding described above with respect to FIG. 3A, can be used to indicate whether or not the following cell contains a header. If the bit 61 indicates that there is no header, the receiver copies the last header received ahead of the payload octets of this next cell before forwarding it to the ATM layer. Advantageously, this reduces the approximate 10 percent overhead imposed by the five (5) octet header (47 of FIG. 2B).

It should be emphasized that the above-described embodiments of the present invention, particularly any "preferred"

18

embodiments, are merely possible examples of implementations, merely set forth for a clear understanding of the principles of the invention. Many variations and modifications may be made to the above-described embodiment(s) of the invention without departing substantially from the spirit and principles of the invention. For example, the robust preamble and transmission delimiting system and method are applicable to all switched-carrier transmission methodologies in which it is desirable to reliably convey channel establishment information and reliably delimit the beginning and end of each communication message. All such modifications and variations are intended to be included herein within the scope of the present invention.

Therefore, having thus described the invention, at least the following is claimed:

1. A system for robust transmission delimiting, comprising:

a communication message including a preamble, the preamble operating to frame the message and to delimit the message from silence, the preamble including a plurality of bits representing communication link control information; and

an encoder configured to encode the preamble bits into a plurality of symbol indices, the symbol indices encoded at a lower bit per symbol rate relative to the maximum rate capable of being supported over a communication channel.

2. A system for robust transmission delimiting, comprising:

a communication message including a preamble, the preamble including a plurality of bits representing communication link control information; and

an encoder configured to encode the preamble bits into a plurality of symbol indices, the symbol indices encoded at a lower bit per symbol rate relative to the maximum rate capable of being supported over a communication channel,

wherein the preamble includes information that defines a rate at which data following the preamble has been encoded for transmission.

3. The system as defined in claim 2, further comprising a gain boost element configured to increase the energy of the first symbol index to reliably indicate the beginning of the communication message.

4. The system as defined in claim 2, wherein the preamble includes information defining a maximum rate at which a first transceiver that is sending the preamble is able to receive transmissions from a second transceiver that is receiving the preamble.

5. The system as defined in claim 2, wherein the preamble indicates whether a data portion follows the preamble and, if so, the format and type of data that follows the preamble.

6. The system as defined in claim 2, wherein the preamble indicates whether administrative information follows the preamble.

7. The system as defined in claim 5, further comprising:

a first scrambler configured to scramble the preamble; and

a second scrambler configured to scramble the data,

wherein a state of the scrambler used to scramble the bits that comprise the preamble is the state that existed when scrambling of a previous preamble was completed.

8. The system as defined in claim 5, wherein the data portion of the communication message comprises fixed size units, the fixed size units comprising a plurality of bits and

US 6,950,444 B1

19

wherein the bits are encoded into symbol indices such that, for each of the fixed size units, one symbol index is encoded differently from the other symbols.

**9.** The system as defined in claim **8**, wherein the differently encoded symbol index further comprises an extra bit that indicates whether the fixed size unit from which the other bits of the differently encoded symbol indices are obtained is the last one transmitted in a message.

**10.** The system as defined in claim **8**, wherein the differently encoded symbol index is encoded at a data rate lower than that of the other symbols carrying message data.

**11.** A system for delimiting the end of a transmission, comprising:

a communication message segmented into a plurality of fixed size units, each fixed size unit including a plurality of bits; and

an encoder configured to encode the plurality of bits into a plurality of symbol indices at a first data rate, the encoder also configured to encode at a second rate when producing the first symbol index in the plurality of symbol indices that contains only bits from each fixed size unit, where the second rate is lower than the first rate.

**12.** A method for robust transmission delimiting, the method comprising the steps of:

applying a preamble to a communication message, the preamble operating to frame the message and to delimit the message from silence, the preamble including a plurality of bits representing communication link control information; and

encoding the preamble bits into a plurality of symbol indices, the symbol indices encoded at a lower bit per symbol rate relative to the maximum rate capable of being transmitted over a communication channel.

**13.** A method for robust transmission delimiting, the method comprising the steps of:

applying a preamble to a communication message, the preamble including a plurality of bits representing communication link control information;

encoding the preamble bits into a plurality of symbol indices, the symbol indices encoded at a lower bit per symbol rate relative to the maximum rate capable of being transmitted over a communication channel; and

including information in the preamble defining a rate at which data following the preamble has been encoded for transmission.

**14.** The method as defined in claim **13**, further comprising the step of increasing the energy of the first symbol index to reliably indicate the beginning of the communication message.

**15.** The method as defined in claim **13**, further comprising the step of including information in the preamble defining a maximum rate at which a transceiver that is sending the preamble is able to receive transmissions from a transceiver that is receiving the preamble.

**16.** The method as defined in claim **13**, further comprising the step of using the preamble to indicate whether a data portion follows the preamble and, if so, the format and type of data that follows the preamble.

**17.** The method as defined in claim **13**, further comprising the step of using the preamble to indicate whether administrative information follows the preamble.

**18.** The method as defined in claim **16**, further comprising the steps of:

scrambling the preamble using a first scrambler;

scrambling the data using a second scrambler; and

20

scrambling the bits in the preamble using the state of the scrambler that existed when scrambling of the previous preamble was complete.

**19.** The method as defined in claim **16**, wherein the data portion of the communication message comprises fixed size units, the fixed size units comprising a plurality of bits, and wherein the bits that comprise each of the fixed size units are encoded into symbol indices such that for each of the fixed size units, one symbol index is encoded differently from the other symbols.

**20.** The method as defined in claim **19**, further comprising the step of including in said differently encoded symbol index an extra bit that indicates whether the fixed size unit from which the other bits of said differently encoded symbol indices are obtained is the last one transmitted in a message.

**21.** The method as defined in claim **19**, further comprising the step of encoding the differently encoded symbol index at a data rate lower than that of the other symbols carrying message data.

**22.** A method for delimiting the end of a transmission, the method comprising the steps of:

segmenting a communication message into a plurality of units, each unit including a plurality of bits and having a fixed size;

encoding a plurality of the bits in the plurality of units into a plurality of symbol indices, the symbol indices being encoded at a first rate; and

encoding one symbol index of the plurality of symbol indices at a rate lower than the first rate, the one symbol index containing bits from only one of the plurality of units.

**23.** A system for robust transmission delimiting, comprising:

means for applying a preamble to a communication message, the preamble operating to frame the message and to delimit the message from silence, the preamble including a plurality of bits representing communication link control information; and

means for encoding the preamble bits into a plurality of symbol indices, the symbol indices encoded at a lower bit per symbol rate relative to the maximum rate capable of being transmitted over a communication channel.

**24.** The system as defined in claim **23**, further comprising means for increasing the energy of the first symbol index to reliably indicate the beginning of the communication message.

**25.** A system for robust transmission delimiting, comprising:

means for applying a preamble to a communication message, the preamble including a plurality of bits representing communication link control information;

means for encoding the preamble bits into a plurality of symbol indices, the symbol indices encoded at a lower bit per symbol rate relative to the maximum rate capable of being transmitted over a communication channel; and

means for including information in the preamble defining a rate at which data following the preamble has been encoded for transmission.

**26.** The system as defined in claim **25**, further comprising means for including information in the preamble defining a maximum rate at which a transceiver that is sending the preamble is able to receive transmissions from a transceiver that is receiving the preamble.

**27.** The system as defined in claim **25**, further comprising means for using the preamble to indicate whether a data

21

portion follows the preamble and, if so, the format and type of data that follows the preamble.

**28.** The system as defined in claim 25, further comprising means for using the preamble to indicate whether administrative information follows the preamble.

**29.** The system as defined in claim 27, further comprising:

means for scrambling the preamble using a first scrambler;

means for scrambling the data using a second scrambler; and

means for scrambling the bits in the preamble using the state of the scrambler that existed when scrambling of the previous preamble was complete.

**30.** The system as defined in claim 27, wherein the data portion of the communication message comprises fixed size units, the fixed size units comprising a plurality of bits; and

means for encoding the bits that comprise each of the fixed size units into symbol indices such that for each of the fixed size units, one symbol index is encoded differently from the other symbols.

**31.** The system as defined in claim 30, further comprising means for including in said differently encoded symbol index an extra bit that indicates whether the fixed size unit from which the other bits of said differently encoded symbol indices are obtained is the last one transmitted in a message.

**32.** The system as defined in claim 30, further comprising means for encoding the differently encoded symbol index at a data rate lower than that of the other symbols carrying message data.

**33.** A system for delimiting the end of a transmission, comprising:

means for segmenting a communication message into a plurality of fixed size units, each unit including a plurality of bits;

means for encoding a plurality of the bits in the units into a plurality of symbol indices, the symbol indices being encoded at a first rate; and

means for encoding at a second rate when producing the first symbol index in the plurality of symbol indices that contains only bits from each fixed size unit, where the second rate is lower than the first rate.

**34.** A computer readable medium having a program for robust transmission delimiting, the program comprising logic for performing the steps of:

applying a preamble to a communication message, the preamble operating to frame the message and to delimit the message from silence, the preamble including a plurality of bits representing communication link control information; and

encoding the preamble bits into a plurality of symbol indices, the symbol indices encoded at a lower bit per symbol rate relative to the maximum rate capable of being transmitted over a communication channel.

**35.** The program as defined in claim 34, further comprising logic for performing the step of increasing the energy of the first symbol index to reliably indicate the beginning of the communication message.

**36.** A computer readable medium having a program for robust transmission delimiting, the program comprising logic for performing the steps of:

applying a preamble to a communication message, the preamble including a plurality of bits representing communication link control information;

encoding the preamble bits into a plurality of symbol indices, the symbol indices encoded at a lower bit per

22

symbol rate relative to the maximum rate capable of being transmitted over a communication channel; and

including information in the preamble defining a rate at which data following the preamble has been encoded for transmission.

**37.** The program as defined in claim 36, further comprising logic for performing the step of including information in the preamble defining a maximum rate at which a transceiver that is sending the preamble is able to receive transmissions from a transceiver that is receiving the preamble.

**38.** The program as defined in claim 36, further comprising logic for performing the step of using the preamble to indicate whether a data portion follows the preamble and, if so, the format and type of data that follows the preamble.

**39.** The program as defined in claim 36, further comprising logic for performing the step of using the preamble to indicate whether administrative information follows the preamble.

**40.** The program as defined in claim 38, further comprising logic for performing the steps of:

scrambling the preamble using a first scrambler;

scrambling the data using a second scrambler; and

scrambling the bits in the preamble using the state of the scrambler that existed when scrambling of the previous preamble was complete.

**41.** The program as defined in claim 38, wherein the data portion of the communication message comprises fixed size units, the fixed size units comprising a plurality of bits; and

wherein the bits that comprise each of the fixed size units are encoded into symbol indices such that for each of the fixed size units, one symbol index is encoded differently from the other symbols.

**42.** The program as defined in claim 41, further comprising logic for performing the step of including in said differently encoded symbol index an extra bit that indicates whether the fixed size unit from which the other bits of said differently encoded symbol indices are obtained is the last one transmitted in a message.

**43.** The program as defined in claim 41, further comprising logic for performing the step of encoding the differently encoded symbol index at a data rate lower than that of the other symbols carrying message data.

**44.** A computer readable medium having a program for delimiting the end of a transmission, the program comprising logic to perform the steps of:

segmenting a communication message into a plurality of fixed size units, each unit including a plurality of bits;

encoding a plurality of the bits in the fixed sized units into a plurality of symbol indices, the symbol indices being encoded at a first rate; and

encoding at a second rate when producing the first symbol index in the plurality of symbol indices that contains only bits from each fixed size unit, where the second rate is lower than the first rate.

**45.** A method for delimiting the end of a transmission, the method comprising the steps of:

segmenting a communication message into a plurality of fixed size units, each unit including a plurality of bits;

encoding the first N bits in a unit into a first symbol index, the first symbol index being encoded at a first rate, N being less than the fixed size; and

encoding the remaining bits in the plurality of units into a plurality of symbol indices at a rate greater than the first rate.

US 6,950,444 B1

23 24

**46**. The system as defined in claim **11**, further comprising a gain boost element configured to increase the energy of the first symbol index to reliably indicate the beginning of the communication message.

**47**. The system as defined in claim **11**, wherein the preamble indicates whether a data portion follows the preamble and, if so, the format and type of data that follows the preamble.

**48**. The method as defined in claim **22**, further comprising the step of increasing the energy of the first symbol index to reliably indicate the beginning of the communication message.

**49**. The method as defined in claim **22**, further comprising the step of using the preamble to indicate whether a data portion follows the preamble and, if so, the format and type of data that follows the preamble.

**50**. The system as defined in claims **33**, further comprising means for increasing the energy of the first symbol index to reliably indicate the beginning of the communication message.

**51**. The system as defined in claim **33**, further comprising means for using the preamble to indicate whether a data portion follows the preamble and, if so, the format and type of data that follows the preamble.

**52**. The program as defined in claim **44**, further comprising logic for performing the step of increasing the energy of the first symbol index to reliably indicate the beginning of the communication message.

**53**. The program as defined in claim **44**, further comprising logic for performing the step of using the preamble to indicate whether a data portion follows the preamble and, if so, the format and type of data that follows the preamble.

**54**. The method as defined in claim **45**, further comprising the step of increasing the energy of the first symbol index to reliably indicate the beginning of the communication message.

**55**. The method as defined in claim **45**, further comprising the step of using the preamble to indicate whether a data portion follows the preamble and, if so, the format and type of data that follows the preamble.

* * * * *

# EXHIBIT 4

Copyright © 2006 Rembrandt IP Management, LLC

**R**

**R E M B R A N D T**
*Drawn to Invention*

➡ **About**

**The Acquisition Process**

**The Rembrandt Story**

**Meet our People**

**FAQs**

**Famous Patent Infringement Cases**

**Working with Rembrandt**

------------------------

## About

**Rembrandt**
*Drawn to Invention*

Rembrandt delivers value for an inventor's invention. The company shoulders the legal, financial, and business risks associated with pursuing patent pirates and provides the capital and expertise required to litigate complex patent infringements.

Rembrandt acquires promising patents from inventors and innovative companies that can't defend their patents against infringement because of the cost of litigation or the threat of business or legal retaliation.

The firm's staff of in-house professionals and outside consultants includes scientists, inventors, financial analysts, lawyers, and researchers who are expert at identifying the validity and market value of patents and Intellectual Property (IP), and securing revenue for these inventors and companies as well as Rembrandt's investors.

Rembrandt invests its capital to acquire patents and pursue infringement. The company distinguishes itself through the quality of patents it acquires and the ability to pursue patent infringement, regardless of the size or sophistication of the infringer. The company has raised $150 million to acquire patents and litigate patent infringement.

Rembrandt's financial resources, deep expertise, and commitment to innovation provide inventors and companies the ability to level the patent playing field and see value from their inspiration, ideas and IP.



# EXHIBIT 5A

2

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

06 JUN -1  PM 4: 48

TX EASTERN-MARSHALL

BY_____

REMBRANDT TECHNOLOGIES, LP

Plaintiff,

v

CHARTER COMMUNICATIONS, INC.,
CHARTER COMMUNICATIONS
OPERATING, LLC, COX
COMMUNICATIONS, INC., COXCOM,
INC., COX ENTERPRISES, INC., CSC
HOLDINGS, INC., and CABLEVISION
SYSTEMS CORPORATION,

Defendants.

Case No. __2-06CV-223 L__

**JURY TRIAL DEMANDED**

## COMPLAINT FOR PATENT INFRINGEMENT

For its complaint plaintiff Rembrandt Technologies, LP ("Rembrandt"), by and through the undersigned attorneys, alleges as follows:

### THE PARTIES

1.    Plaintiff Rembrandt is a limited partnership organized under the laws of the state of New Jersey with its principal place of business at 401 City Avenue, Suite 815, Bala Cynwyd, PA 19004.

2.    Defendant Charter Communications, Inc. is a corporation organized under the laws of the state of Delaware with its principal place of business at 12405 Powerscourt Dr., Ste. 100, St. Louis, MO 63131.

3.    Defendant Charter Communications Operating, LLC is a corporation organized under the laws of the state of Delaware with its principal place of business at 12405 Powerscourt Dr., Ste. 100, St. Louis, MO 63131.

4.    Defendant Cox Communications, Inc. is a corporation organized under the laws of the state of Georgia with its principal place of business at 1400 Lake Hearn Dr., Atlanta, GA 30319

5.    Defendant Cox Enterprises, Inc. is a corporation organized under the laws of the state of Georgia with its principal place of business at 6205 Peachtree Dunwoody Road NE, Atlanta, GA 30328.

6.    Defendant Coxcom, Inc. is a corporation organized under the laws of the state of Delaware with its principal place of business at 1400 Lake Hearn Dr., Atlanta, GA 30319.

7.    Defendant CSC Holdings, Inc. is a corporation organized under the laws of the state of Delaware with its principal place of business at 1111 Stewart Ave., Bethpage, NY 11714.

8.    Defendant Cablevision Systems Corporation is a corporation organized under the laws of the state of Delaware with its principal place of business at 1111 Stewart Ave., Bethpage, NY 11714.

## JURISDICTION AND VENUE

9.    This is an action for patent infringement, arising under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq.*

2

10.    Subject matter jurisdiction is proper in this Court under 28 U.S.C. §§ 1331 and 1338(a).

11.    Because the Defendants have committed acts of patent infringement in this district, or are otherwise present or doing business in this district, this Court has personal jurisdiction over the Defendants.

12    Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b), (c), and 1400(b).

## COUNT I – INFRINGEMENT OF U.S. PATENT NO. 5,243,627

13.    Rembrandt realleges and incorporates herein by reference the allegations stated in paragraphs 1-12 of this Complaint.

14.    Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 5,243,627, entitled "Signal Point Interleaving Technique" ("the '627 patent.").

15.    The '627 patent was duly and legally issued by the United States Patent and Trademark Office on September 7, 1993.

16.    Defendants are operators of cable television systems throughout the United States.

17.    Defendants have directly or indirectly infringed, and are continuing to directly or indirectly infringe, the '627 patent by practicing or causing others to practice (by inducement and contributorily) the inventions claimed in the '627 patent, in this district or otherwise within the United States. For example, Defendants have infringed and continue to infringe the '627 patent

3

by their receipt and retransmission over their cable television systems of digital terrestrial

broadcast signals that comply with the ATSC Digital Television Standard.

18      Upon information and belief, Defendants will continue to infringe the '627 patent

unless enjoined by this Court.  Upon information and belief, such infringement has been, and

will continue to be, willful, making this an exceptional case and entitling Rembrandt to increased

damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

## COUNT II – INFRINGEMENT OF U.S. PATENT NO. 5,852,631

19.     Rembrandt realleges and incorporates herein by reference the allegations stated in

paragraphs 1-18 of this Complaint.

20.     Rembrandt is the owner of all right, title and interest, including the right to sue,

enforce and recover damages for all infringements, in U.S. Patent No. 5,852,631, entitled

"System and Method for Establishing Link Layer Parameters Based on Physical Layer

Modulation" ("the '631 patent.")

21.     The '631 patent was duly and legally issued by the United States Patent and

Trademark Office on December 22, 1998.

22.     Defendants are operators of cable systems and providers of Internet service

throughout the United States

23.     Defendants have directly or indirectly infringed, and are continuing to directly or

indirectly infringe, the '631 patent by practicing or causing others to practice (by inducement and

contributorily) the inventions claimed in the '631 patent, in this district or otherwise within the

4

United States. For example, Defendants have infringed and continue to infringe the '631 patent by providing high speed internet service to subscribers.

24.    Upon information and belief, Defendants will continue to infringe the '631 patent unless enjoined by this Court. Upon information and belief, such infringement has been, and will continue to be, willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

## COUNT III – INFRINGEMENT OF U.S. PATENT NO. 5,719,858

25.    Rembrandt realleges and incorporates herein by reference the allegations stated in paragraphs 1-24 of this Complaint.

26.    Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 5,719,858, entitled "Time-Division Multiple-Access Method for Packet Transmission on Shared Synchronous Serial Busses" ("the '858 patent.").

27.    The '858 patent was duly and legally issued by the United States Patent and Trademark Office on February 17, 1998.

28.    Defendants are operators of cable systems and providers of Internet service throughout the United States.

29.    Defendants have directly or indirectly infringed, and are continuing to directly or indirectly infringe, the '858 patent by practicing or causing others to practice (by inducement and contributorily) the inventions claimed in the '858 patent, in this district or otherwise within the United States. For example, Defendants have infringed and continue to infringe the '858 patent

by their provision of high speed internet services, including such services as Voice over IP (VoIP), to subscribers.

30. Upon information and belief, Defendants will continue to infringe the '858 patent unless enjoined by this Court. Upon information and belief, such infringement has been, and will continue to be, willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

## COUNT IV – INFRINGEMENT OF U.S. PATENT NO. 4,937,819

31. Rembrandt realleges and incorporates herein by reference the allegations stated in paragraphs 1-30 of this Complaint.

32. Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 4,937,819, entitled "Time Orthogonal Multiple Virtual DCE for Use in Analog and Digital Networks" ("the '819 patent.").

33. The '819 patent was duly and legally issued by the United States Patent and Trademark Office on June 26, 1990.

34. Defendants are operators of cable systems and providers of Internet service throughout the United States.

35. Defendants have directly or indirectly infringed, and are continuing to directly or indirectly infringe, the '819 patent by practicing or causing others to practice (by inducement and contributorily) the inventions claimed in the '819 patent, in this district or otherwise within the United States. For example, Defendants have infringed and continue to infringe the '819 patent

by their provision of high speed internet services, such as Voice over IP (VoIP) services, to cable television subscribers.

36.   Upon information and belief, Defendants will continue to infringe the '819 patent unless enjoined by this Court. Upon information and belief, such infringement has been, and will continue to be, willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

## **PRAYER FOR RELIEF**

WHEREFORE, Rembrandt prays that it have judgment against Defendants for the following:

(1)   A decree that the Defendants have infringed the patents-in-suit;

(2)   A permanent injunction enjoining and restraining each Defendant and its agents, servants, employees, affiliates, divisions, and subsidiaries, and those in association with them, from making, using, offering to sell, selling, and importing into the United States any product, or using, offering to sell, or selling any service, which falls within the scope of any claim of the patents-in-suit;

(3)   An award of damages;

(4)   An award of increased damages pursuant to 35 U.S.C. § 284;

(5)   An award of all costs of this action, including attorneys' fees and interest; and

(6)   Such other and further relief, at law or in equity, to which Rembrandt is justly entitled.

## **JURY DEMAND**

Rembrandt hereby demands a jury trial on all issues appropriately triable by a jury.

Dated: June 1, 2006                    Respectfully submitted,


                                       By: *[signature]* Robert M. Parker by per. Mark Gass f.

                                       Robert M. Parker
                                       State Bar #15498000
                                       Robert C. Bunt
                                       State Bar #00787165
                                       PARKER & BUNT P.C.
                                       100 E. Ferguson, Suite 1114
                                       Tyler, Texas 75702
                                       Tel: 903-533-9288
                                       Fax: 903-533-9687


OF COUNSEL:

Frank E. Scherkenbach
Lawrence K. Kolodney
FISH & RICHARDSON, P.C.
225 Franklin Street
Boston, Massachusetts 02110
Tel: 617-542-5070
Fax: 617-542-8906

Alan D. Albright
State Bar # 00973650
FISH & RICHARDSON, P.C.
One Congress Plaza
4th Floor
111 Congress Avenue
Austin, Texas 78701
Tel: 512-391-4930
Fax: 512-391-6837

Timothy Devlin
FISH & RICHARDSON, P.C.
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, Delaware 19899
Tel: 302-652-5070
Fax: 302-652-0607

Franklin Jones, Jr.
State Bar #00000055
JONES & JONES, INC., P.C.
201 West Houston Street, Drawer 1249
Marshall, Texas 75671-1249
Tel: 903-938-4395
Fax: 903-938-3360

Attorneys for Plaintiff
REMBRANDT TECHNOLOGIES, LP

# EXHIBIT 5B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

FILED CLERK
U.S. DISTRICT COURT

2006 JUN -1 PM 4: 43

TEXAS EASTERN

BY_____

|  |  |
|---|---|
| REMBRANDT TECHNOLOGIES, LP | |
| Plaintiff, | Case No. 2:06cv224 |
| v. | **JURY TRIAL REQUESTED** |
| TIME WARNER CABLE INC., | |
| Defendant. | |

**COMPLAINT**

Rembrandt Technologies, LP ("Rembrandt") files this complaint for infringement of
United States Patent Nos. 5,243,627; 5,852,631; 5,719,858; and 4,937,819 under 35 U.S.C. §
271, and in support thereof would respectfully show the Court the following:

**THE PARTIES**

1.      Plaintiff Rembrandt is a limited partnership organized under the laws of the state
of New Jersey with its principal place of business at 401 City Avenue, Suite 815, Bala Cynwyd,
PA 19004.

2.      Defendant Time Warner Cable Inc. ("TWC") is a corporation organized under the
laws of the state of Delaware with its principal place of business at 7910 Crescent Executive
Drive, Suite 56, Charlotte, North Carolina 28217.  TWC's registered agent for service of process
in Texas is CT Corporation System, 350 North St. Paul Street, Dallas, Texas 75201.  TWC
regularly conducts and transacts business in Texas and within this judicial district itself (both as
Time Warner Cable and/or Road Runner) and through one or more subsidiaries, affiliates,
partners, or other related parties, and as set forth in Paragraphs 6-29 below, has committed, and

continues to commit tortious acts of patent infringement within and outside of Texas and within this judicial district.

**JURISDICTION AND VENUE**

3.  This is an action for patent infringement, arising under the patent laws of the United States, Tile 35, United States Code. This Court has exclusive subject matter jurisdiction over this case for patent infringement under 28 U.S.C. §§ 1331 and 1338(a).

4.  This Court has personal jurisdiction over Defendant TWC. TWC has conducted and does conduct business with the State of Texas. TWC, directly or through subsidiaries or intermediaries, offers for sale, sells, advertises, and markets products and services that infringe the patents-in-suit as described more specifically below. Therefore, because TWC has committed acts of patent infringement in this district, or is otherwise present or doing business in this district, this Court has personal jurisdiction over TWC.

5.  Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b), (c), and 1400(b).

**COUNT I – INFRINGEMENT OF U.S. PATENT NO. 5,243,627**

6.  Rembrandt refers to and incorporates herein the allegations of Paragraphs 1-5 above.

7.  Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 5,243,627, entitled "Signal Point Interleaving Technique" ("the '627 patent.")

8.    The '627 patent was duly and legally issued by the United States Patent and Trademark Office on September 7, 1993, after full and fair examination.

9.    Defendant TWC is the operator of cable television systems throughout the United States.

10.    Defendant has directly or indirectly infringed, and is continuing to directly or indirectly infringe, the '627 patent by practicing or causing others to practice (by inducement and contributorily) the inventions claimed in the '627 patent, in this district or otherwise within the United States. For example, Defendant has infringed and continues to infringe the '627 patent by their receipt and retransmission over their cable television systems of digital terrestrial broadcast signals that comply with the ATSC Digital Television Standard.

11.    Upon information and belief, Defendant will continue to infringe the '627 patent unless enjoined by this Court. Upon information and belief, such infringement has been, and will continue to be, willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

**COUNT II – INFRINGEMENT OF U.S. PATENT NO. 5,852,631**

12.    Rembrandt refers to and incorporates herein the allegations of Paragraphs 1-11 above.

13.    Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 5,852,631, entitled "System and Method for Establishing Link Layer Parameters Based on Physical Layer Modulation" ("the '631 patent.")

3

14.     The '631 patent was duly and legally issued by the United States Patent and Trademark Office on December 22, 1998, after full and fair examination.

15.     Defendant TWC is the operator of cable systems and provider of Internet service throughout the United States.

16.     Defendant has directly or indirectly infringed, and is continuing to directly or indirectly infringe, the '631 patent by practicing or causing others to practice (by inducement and contributorily) the inventions claimed in the '631 patent, in this district or otherwise within the United States.  For example, Defendant has infringed and continues to infringe the '631 patent by providing high speed internet service to subscribers.

17.     Upon information and belief, Defendant will continue to infringe the '631 patent unless enjoined by this Court.  Upon information and belief, such infringement has been, and will continue to be, willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

## COUNT III – INFRINGEMENT OF U.S. PATENT NO. 5,719,858

18.     Rembrandt refers to and incorporates herein the allegations of Paragraphs 1-17 above.

19.     Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 5,719,858, entitled "Time-Division Multiple-Access Method for Packet Transmission on Shared Synchronous Serial Busses" ("the '858 patent.")

4

20.   The '858 patent was duly and legally issued by the United States Patent and Trademark Office on February 17, 1998, after full and fair examination.

21.   Defendant TWC is the operator of cable systems and provider of Internet service throughout the United States.

22.   Defendant has directly or indirectly infringed, and is continuing to directly or indirectly infringe, the '858 patent by practicing or causing others to practice (by inducement and contributorily) the inventions claimed in the '858 patent, in this district or otherwise within the United States.  For example, Defendant has infringed and continues to infringe the '858 patent by its provision of high speed internet services, including such services as Voice over IP (VoIP) to subscribers.

23.   Upon information and belief, Defendant will continue to infringe the '858 patent unless enjoined by this Court.  Upon information and belief, such infringement has been, and will continue to be, willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

## COUNT IV – INFRINGEMENT OF U.S. PATENT NO. 4,937,819

24.   Rembrandt refers to and incorporates herein the allegations of Paragraphs 1-23 above.

25.   Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 4,937,819, entitled "Time Orthogonal Multiple Virtual DCE for Use in Analog and Digital Networks" ("the '819 patent.")

26.     The '819 patent was duly and legally issued by the United States Patent and Trademark Office on June 26, 1990, after full and fair examination.

27.     Defendant TWC is the operator of cable systems and provider of Internet service throughout the United States.

28.     Defendant is directly or indirectly infringed, and is continuing to directly or indirectly infringe, the '819 patent by practicing or causing others to practice (by inducement and contributorily) the inventions claimed in the '819 patent, in this district or otherwise within the United States.  For example, Defendant has infringed and continues to infringe the '819 patent by its provision of high speed internet services, such as Voice over IP (VoIP) services, to cable television subscribers.

29.     Upon information and belief, Defendant will continue to infringe the '819 patent unless enjoined by this Court.  Upon information and belief, such infringement has been, and will continue to be, willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

## PRAYER FOR RELIEF

WHEREFORE, Rembrandt prays that it have judgment against Defendant TWC for the following:

(1)     An order that TWC has infringed the patents-in-suit;

(2)     A permanent injunction enjoining and restraining TWC and its agents, servants, employees, affiliates, divisions, and subsidiaries, and those in association therewith, from making, using, offering to sell, selling, and importing into the United States any product, or using, offering to sell, or selling any service, which falls within the scope of any claim of the patents-in-suit;

6

(3)   An award of damages;

(4)   An award of increased damages pursuant to 35 U.S.C. § 284;

(5)   An award of all costs of this action, including attorneys' fees and interest; and

(6)   Such other and further relief, at law or in equity, to which Rembrandt is justly

entitled.


**JURY DEMAND**

Rembrandt hereby demands a jury trial on all issues appropriately triable by a jury.

DATED:  June 1, 2006                          Respectfully submitted,

                                             _Robert M. Parker_   by permission
                                             Camille Slu__
                                             Robert M. Parker
                                             State Bar No. 15498000
                                             Robert Christopher Bunt
                                             State Bar No.  00787165
                                             **PARKER & BUNT, P.C.**
                                             100 E. Ferguson, Suite 1114
                                             Tyler, Texas 75702
                                             903/531-3535
                                             903/533-9687 - Facsimile
                                             E-mail: cbunt@cox-internet.com
                                             E-mail: rmparker@cox-internet.com


                                             **ATTORNEYS FOR PLAINTIFF**
                                             **REMBRANDT TECHNOLOGIES, LP**

# EXHIBIT 5C

FILED-CLERK
U S DISTRICT COURT

06 SEP 13 PM 4: 17

TX EASTERN-MARSHALL

BY_____

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

|  |  |
|---|---|
| REMBRANDT TECHNOLOGIES, LP | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v | ) |
| | ) |
| TIME WARNER CABLE INC., | ) |
| | ) |
| Defendant. | ) |

Case No  2-06CV-369

**JURY TRIAL REQUESTED**

## COMPLAINT

Plaintiff Rembrandt Technologies, LP ("Rembrandt") files this complaint for infringement of United States Patent Nos. 5,008,903; 5,710,761; 5,778,234; 6,131,159 and 6,950,444 under 35 U.S.C § 271, and in support thereof would respectfully show the Court the following:

## THE PARTIES

1.    Plaintiff Rembrandt is a limited partnership organized under the laws of the state of New Jersey with its principal place of business at 401 City Avenue, Suite 815, Bala Cynwyd, PA 19004 and offices at 214 W Fanin, Marshall, TX 75670.

2    Defendant Time Warner Cable Inc ("TWC") is a corporation organized under the laws of the state of Delaware with its principal place of business at 7910 Crescent Executive Drive, Suite 56, Charlotte, North Carolina 28217. TWC's registered agent for service of process in Texas is CT Corporation System, 350 North St. Paul Street, Dallas, Texas 75201. TWC is a national provider of cable television and internet products and services, and regularly conducts and transacts business in Texas and within this judicial district itself (both as Time Warner Cable and/or Road Runner).

1

## JURISDICTION AND VENUE

3      This is an action for patent infringement, arising under the patent laws of the
United States, 35 U.S.C. § 1, et seq.  This Court has exclusive subject matter jurisdiction over
this action under 28 U.S.C. §§1331 and 1338(a).

4.      This Court has personal jurisdiction over Defendant TWC  TWC has conducted
and does conduct business with the State of Texas  TWC, directly or through subsidiaries or
intermediaries, offers for sale, sells, advertises, and markets products and services that infringe
the patents-in-suit as described more specifically below. Therefore, because TWC has committed
acts of patent infringement in this district, or is otherwise present or doing business in this
district, this Court has personal jurisdiction over TWC.

5      Venue is proper in this judicial district under 28 U.S.C. §§1391(b), (c), and
1400(b).

## COUNT I: INFRINGEMENT OF U.S. PATENT NO. 5,008,903

6.      Rembrandt refers to and incorporates herein the allegations of Paragraphs 1-5
above

7.      Rembrandt is the owner of all right, title and interest, including the right to sue,
enforce and recover damages for all infringements, in U.S. Patent No. 5,008,903, entitled
"Adaptive Transmit Pre-Emphasis for Digital Modem Computed from Noise Spectrum" ("the
'903 patent").  A true copy of the '903 patent is attached as Exhibit A

8      The '903 patent was duly and legally issued by the United States Patent and
Trademark Office on April 16, 1991, after full and fair examination.

9      Defendant has directly or indirectly infringed, and is continuing to directly or
indirectly infringe, the '903 patent by practicing or causing others to practice, by inducement and

contributorily, the inventions claimed in the '903 patent, in this district or otherwise within the United States. For example, Defendant has infringed and continues to infringe the '903 patent by providing high-speed cable modem internet products and services to subscribers.

10.    Upon information and belief, Defendant will continue to infringe the '903 patent unless enjoined by this Court. Upon information and belief, such infringement has been, and will continue to be, willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

## COUNT II: INFRINGEMENT OF U.S. PATENT NO. 5,710,761

11.    Rembrandt refers to and incorporates herein the allegations of Paragraphs 1-5 above.

12.    Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 5,710,761, entitled "Error Control Negotiation Based on Modulation" ("the '761 patent"). A true copy of the '761 patent is attached as Exhibit B.

13.    The '761 patent was duly and legally issued by the United States Patent and Trademark Office on January 20, 1998, after full and fair examination.

14.    Defendant has directly or indirectly infringed, and is continuing to directly or indirectly infringe, the '761 patent by practicing or causing others to practice, by inducement and contributorily, the inventions claimed in the '761 patent, in this district or otherwise within the United States. For example, Defendant has infringed and continues to infringe the '761 patent by providing high-speed cable modem internet products and services to subscribers.

15.    Upon information and belief, Defendant will continue to infringe the '761 patent unless enjoined by this Court. Upon information and belief, such infringement has been, and will

3

continue to be, willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

### COUNT III: INFRINGEMENT OF U.S. PATENT NO. 5,778,234

16.    Rembrandt refers to and incorporates herein the allegations of Paragraphs 1-5 above.

17.    Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 5,778,234, entitled "Method for Downloading Programs" ("the '234 patent."). A true copy of the '234 patent is attached as Exhibit C.

18.    The '234 patent was duly and legally issued by the United States Patent and Trademark Office on July 7, 1998, after full and fair examination.

19.    Defendant has directly or indirectly infringed, and is continuing to directly or indirectly infringe, the '234 patent by practicing or causing others to practice, by inducement and contributorily, the inventions claimed in the '234 patent, in this district or otherwise within the United States. For example, Defendant has infringed and continues to infringe the '234 patent by providing high-speed cable modem internet products and services to subscribers.

20    Upon information and belief, Defendant will continue to infringe the '234 patent unless enjoined by this Court. Upon information and belief, such infringement has been, and will continue to be, willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285

### COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 6,131,159

21.    Rembrandt refers to and incorporates herein the allegations of Paragraphs 1-5 above.

4

22. Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 6,131,159, entitled "System for Downloading Programs" ("the '159 patent."). A true copy of the '159 patent is attached as Exhibit D.

23. The '159 patent was duly and legally issued by the United States Patent and Trademark Office on October 10, 2000, after full and fair examination.

24. Defendant has directly or indirectly infringed, and is continuing to directly or indirectly infringe, the '159 patent by practicing or causing others to practice, by inducement and contributorily, the inventions claimed in the '159 patent, in this district or otherwise within the United States. For example, Defendant has infringed and continues to infringe the '159 patent by providing high-speed cable modem internet products and services to subscribers.

25. Upon information and belief, Defendant will continue to infringe the '159 patent unless enjoined by this Court. Upon information and belief, such infringement has been, and will continue to be, willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

## COUNT V: INFRINGEMENT OF U.S. PATENT NO. 6,950,444

26. Rembrandt refers to and incorporates herein the allegations of Paragraphs 1-5 above.

27. Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 6,950,444, entitled "System and Method for a Robust Preamble and Transmission Delimiting in a Switched-Carrier Transceiver" ("the '444 patent") A true copy of the '444 patent is attached as Exhibit E.

5

28. The '444 patent was duly and legally issued by the United States Patent and Trademark Office on September 27, 2005, after full and fair examination.

29. Defendant has directly or indirectly infringed, and is continuing to directly or indirectly infringe, the '444 patent by practicing or causing others to practice, by inducement and contributorily, the inventions claimed in the '444 patent, in this district or otherwise within the United States. For example, Defendant has infringed and continues to infringe the '444 patent by providing high-speed cable modem internet products and services to subscribers.

30. Upon information and belief, Defendant will continue to infringe the '444 patent unless enjoined by this Court. Upon information and belief, such infringement has been, and will continue to be, willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

**PRAYER FOR RELIEF**

WHEREFORE, Rembrandt prays that it have judgment against Defendant TWC for the following:

(1) An order that TWC has infringed the patents-in-suit;

(2) A permanent injunction enjoining and restraining TWC and its agents, servants, employees, affiliates, divisions, and subsidiaries, and those in association therewith, from making, using, offering to sell, selling, and importing into the United States any product, or using, offering to sell, or selling any service, which falls within the scope of any claim of the patents-in-suit;

(3) An award of damages;

(4) An award of increased damages pursuant to 35 U.S.C. § 284;

(5) An award of all costs of this action, including attorneys' fees and interest; and

(6)   Such other and further relief, at law or in equity, to which Rembrandt is justly

entitled

## JURY DEMAND

Rembrandt hereby demands a jury trial on all issues appropriately triable by a jury.

Dated: September 13, 2006.

SUSMAN GODFREY L.L.P.

By: _____

Max L. Tribble, Jr
State Bar No. 20213950
Tibor L. Nagy
State Bar 24041562
Email: mtribble@susmangodfrey.com
Email: tnagy@susmangodfrey.com
Susman Godfrey L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

OF COUNSEL:

Edgar Sargent
WA State Bar No. 28283
Email: esargent@susmangodfrey.com
Susman Godfrey L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Telephone: (206) 516-3880
Facsimile: (206) 516-3883

Brooke A.M. Taylor
WA State Bar No. 33190
Email: btaylor@susmangodfrey.com
Susman Godfrey L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Telephone: (206) 516-3880
Facsimile: (206) 516-3883

# EXHIBIT 6

Driving Directions from Bala-cynwyd, PA to Wilmington, DE



# MAPQUEST®

## forget the directions.
## just **follow your nose.**

stay with us and we'll make you a
**complimentary** hot breakfast.



Hampton
We Love Having You Here.®

stay with us

**Notes:**

**Start:**  Bala-cynwyd, PA US
**End:**  Wilmington, DE US

## Directions

| | | Total Est. Distance: 31.41 miles |
|---|---|---|
| **Total Est. Time:** 46 minutes | | |

| | Directions | Distance |
|---|---|---|
| START | **1:** Start out going SOUTHEAST on CYNWYD RD toward CONCORD CIR. | 0.2 miles |
| | **2:** Turn RIGHT onto N HIGHLAND AVE. | <0.1 miles |
| | **3:** Turn LEFT onto BRYN MAWR AVE. | 0.3 miles |
| | **4:** Turn RIGHT onto W CITY AVE / US-1 / CITY LINE AVE. Continue to follow US-1. | 3.9 miles |
| | **5:** Turn SLIGHT RIGHT onto WEST CHESTER PIKE / PA-3 W. | 2.5 miles |
| 476 | **6:** Merge onto I-476 S toward CHESTER. | 8.6 miles |
| 95 | **7:** Merge onto I-95 S toward CHESTER (Crossing into DELAWARE). | 14.7 miles |
| 7A EXIT | **8:** Take EXIT 7A toward SR-52 S / DELAWARE AVE.. | 0.1 miles |

**9:** Stay STRAIGHT to go onto W 11TH ST.

0.5 miles

**10:** Turn RIGHT onto N KING ST / US-13 BR S.

<0.1 miles

**11:** End at **Wilmington, DE US**

**Total Est. Time:** 46 minutes     **Total Est. Distance:** 31.41 miles

Tylenol GoTabs. Fast pain relief for people on the go.

**Start:**
Bala-cynwyd, PA US

**End:**
Wilmington, DE US



© 2006 MapQuest, Inc.; © 2006 Tele Atlas





All rights reserved. Use Subject to License/Copyright
These directions are informational only. No representation is made or warranty given as to their content, road conditions or route usability or expeditiousness. User assumes all risk of use. MapQuest and its suppliers assume no responsibility for any loss or delay resulting from such use.

# EXHIBIT 7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

REMBRANDT TECHNOLOGIES, LP

      Plaintiff,

    v.

CABLEVISION SYSTEMS CORPORATION,
and CSC HOLDINGS, INC.

      Defendants.

Case No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT FOR PATENT INFRINGEMENT

For its complaint plaintiff Rembrandt Technologies, LP ("Rembrandt"), by and through the undersigned attorneys, alleges as follows:

### THE PARTIES

1.    Plaintiff Rembrandt is a limited partnership organized under the laws of the state of New Jersey with its principal place of business at 401 City Avenue, Suite 815, Bala Cynwyd, PA 19004.

2.    Defendant Cablevision Systems Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business at 1111 Stewart Avenue, Bethpage, NY 11714.

3.    Defendant CSC Holdings, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 1111 Stewart Avenue, Bethpage, NY 11714

### JURISDICTION AND VENUE

4.    This is an action for patent infringement, arising under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq.*

5.    Subject matter jurisdiction is proper in this Court under 28 U.S C. §§ 1331 and 1338(a).

6.    Because Defendants are incorporated in this district, this Court has personal jurisdiction over Defendants.

7.    Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b), (c), and 1400(b).

## COUNT I – INFRINGEMENT OF U.S. PATENT NO. 5,243,627

8.    Rembrandt realleges and incorporates herein by reference the allegations stated in paragraphs 1-7 of this Complaint.

9.    Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 5,243,627, entitled "Signal Point Interleaving Technique" ("the '627 patent.") (Exhibit A).

10.   The '627 patent was duly and legally issued by the United States Patent and Trademark Office on September 7, 1993.

11.   Defendants are operators of cable television systems throughout the United States.

12.   Defendants have directly or indirectly infringed, and are continuing to directly or indirectly infringe, the '627 patent by practicing or causing others to practice (by inducement and/or contributorily) the inventions claimed in the '627 patent, in this district or otherwise within the United States.  For example, Defendants have infringed and continue to infringe the '627 patent by their receipt and retransmission over their cable television systems of digital terrestrial broadcast signals that comply with the ATSC Digital Television Standard.

13.   Upon information and belief, Defendants will continue to infringe the '627 patent unless enjoined by this Court.  Upon information and belief, such infringement has been, and

will continue to be, willful, making this an exceptional case and entitling Rembrandt to increased

damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

## COUNT II – INFRINGEMENT OF U.S. PATENT NO. 5,852,631

14. Rembrandt realleges and incorporates herein by reference the allegations stated in

paragraphs 1-13 of this Complaint.

15. Rembrandt is the owner of all right, title and interest, including the right to sue,

enforce and recover damages for all infringements, in U.S. Patent No. 5,852,631, entitled

"System and Method for Establishing Link Layer Parameters Based on Physical Layer

Modulation" ("the '631 patent.") (Exhibit B).

16. The '631 patent was duly and legally issued by the United States Patent and

Trademark Office on December 22, 1998.

17. Defendants are operators of cable systems and providers of Internet service

throughout the United States.

18. Defendants have directly or indirectly infringed, and are continuing to directly or

indirectly infringe, the '631 patent by practicing or causing others to practice (by inducement

and/or contributorily) the inventions claimed in the '631 patent, in this district or otherwise

within the United States. For example, Defendants have infringed and continue to infringe the

'631 patent by providing high speed internet service to subscribers.

19. Upon information and belief, Defendants will continue to infringe the '631 patent

unless enjoined by this Court. Upon information and belief, such infringement has been, and

will continue to be, willful, making this an exceptional case and entitling Rembrandt to increased

damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

3

## COUNT III – INFRINGEMENT OF U.S. PATENT NO. 5,719,858

20.     Rembrandt realleges and incorporates herein by reference the allegations stated in paragraphs 1-19 of this Complaint.

21.     Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 5,719,858, entitled "Time-Division Multiple-Access Method for Packet Transmission on Shared Synchronous Serial Buses" ("the '858 patent.") (Exhibit C).

22.     The '858 patent was duly and legally issued by the United States Patent and Trademark Office on February 17, 1998.

23.     Defendants are operators of cable systems and providers of Internet service throughout the United States.

24.     Defendants have directly or indirectly infringed, and are continuing to directly or indirectly infringe, the '858 patent by practicing or causing others to practice (by inducement and/or contributorily) the inventions claimed in the '858 patent, in this district or otherwise within the United States.  For example, Defendants have infringed and continue to infringe the '858 patent by their provision of high speed internet services, including such services as Voice over IP (VoIP), to subscribers.

25.     Upon information and belief, Defendants will continue to infringe the '858 patent unless enjoined by this Court.  Upon information and belief, such infringement has been, and will continue to be, willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S. C. §§ 284 and 285.

4

## COUNT IV – INFRINGEMENT OF U.S. PATENT NO. 4,937,819

26.     Rembrandt realleges and incorporates herein by reference the allegations stated in paragraphs 1-25 of this Complaint.

27.     Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 4,937,819, entitled "Time Orthogonal Multiple Virtual DCE for Use in Analog and Digital Networks" ("the '819 patent.") (Exhibit D).

28.     The '819 patent was duly and legally issued by the United States Patent and Trademark Office on June 26, 1990.

29.     Defendants are operators of cable systems and providers of Internet service throughout the United States.

30.     Defendants have directly or indirectly infringed, and are continuing to directly or indirectly infringe, the '819 patent by practicing or causing others to practice (by inducement and/or contributorily) the inventions claimed in the '819 patent, in this district or otherwise within the United States.  For example, Defendants have infringed and continue to infringe the '819 patent by their provision of high speed internet services, such as Voice over IP (VoIP) services, to cable television subscribers.

31.     Upon information and belief, Defendants will continue to infringe the '819 patent unless enjoined by this Court.  Upon information and belief, such infringement has been, and will continue to be, willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

5

## COUNT V – INFRINGEMENT OF U.S. PATENT NO. 5,008,903

32.     Rembrandt realleges and incorporates herein by reference the allegations stated in paragraphs 1-31 of this Complaint.

33.     Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 5,008,903, entitled "Adaptive Transmit Pre-Emphasis For Digital Modem Computed From Noise Spectrum" ("the '903 patent.") (Exhibit E).

34.     The '903 patent was duly and legally issued by the United States Patent and Trademark Office on April 16, 1991.

35.     Defendants are operators of cable systems and providers of Internet service throughout the United States.

36.     Defendants have directly or indirectly infringed, and are continuing to directly or indirectly infringe, the '903 patent by practicing or causing others to practice (by inducement and/or contributorily) the inventions claimed in the '903 patent, in this district or otherwise within the United States.  For example, Defendants have infringed and continue to infringe the '903 patent by providing high speed internet service to subscribers.

37.     Upon information and belief, Defendants will continue to infringe the '903 patent unless enjoined by this Court.  Upon information and belief, such infringement has been, and will continue to be, willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

## PRAYER FOR RELIEF

WHEREFORE, Rembrandt prays that it have judgment against Defendants for the following:

(1)     A decree that the Defendants have infringed the patents-in-suit;

6

(2)     A permanent injunction enjoining and restraining Defendants and their agents, servants, employees, affiliates, divisions, and subsidiaries, and those in association with them, from making, using, offering to sell, selling, and importing into the United States any product, or using, offering to sell, or selling any service, which falls within the scope of any claim of the patents-in-suit;

(3)     An award of damages;

(4)     An award of increased damages pursuant to 35 U.S.C. § 284;

(5)     An award of all costs of this action, including attorneys' fees and interest; and

(6)     Such other and further relief, at law or in equity, to which Rembrandt is justly entitled.

## JURY DEMAND

Rembrandt hereby demands a jury trial on all issues appropriately triable by a jury.


WOMBLE CARLYLE SANDRIDGE & RICE, PLLC

  /s/ Kevin M. Baird
George Pazuniak (# 478)
Gerard M. O'Rourke (# 3265)
Kevin M. Baird (# 4219)
James M. Lennon (#4570)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Tel:  (302) 252-4320
Fax:  (302) 661-7722

*Counsel for Plaintiff Rembrandt Technologies, LP*

Dated:  October 13, 2006

# EXHIBIT 8A

.    .

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| REMBRANDT TECHNOLOGIES, LP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. _____ |
| | ) | |
| CBS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT FOR PATENT INFRINGEMENT
## AND DEMAND FOR JURY TRIAL

Rembrandt Technologies, LP ("Rembrandt"), for its complaint against CBS

Corporation ("CBS" or "Defendant"), alleges as follows:

## PARTIES

1.    Rembrandt is a limited partnership organized under the laws of the State

of New Jersey, having its principal place of business at 401 City Avenue, Suite 815, Bala

Cynwyd, PA 19004.

2.    CBS is a corporation organized under the laws of the State of Delaware,

having its principal place of business at 51 West 52nd Street, 35th Floor, New York, NY 10019.

## JURISDICTION AND VENUE

3.    This is an action arising under the patent laws of the United States, Title

35, United States Code. This Court has subject matter jurisdiction over this case under 28 U.S.C.

§§ 1331 and 1338(a).

.

4.       This Court has personal jurisdiction over CBS.  Defendant is incorporated

in the State of Delaware, and has conducted and does conduct business within the State of

Delaware.  Defendant, directly or through subsidiaries or intermediaries, offers for sale, sells,

advertises, and markets products and services that infringe the patent-in-suit, as described more

specifically below.  Therefore, because Defendant has committed acts of patent infringement in

this district, or is otherwise present or doing business in this district, this Court has personal

jurisdiction over Defendant.

5.       Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b), (c),

and 1400(b).

### INFRINGEMENT OF U.S. PATENT NO. 5,243,627

6.       Rembrandt realleges and incorporates herein by reference the allegations

stated in paragraphs 1-5 of this Complaint.

7.       United States Patent No. 5,243,627 entitled "Signal Point Interleaving

Technique" ("the '627 patent") was duly and legally issued by the United States Patent &

Trademark Office on September 7, 1993.  A copy of the '627 patent is annexed hereto as Exhibit

A.

8.       Rembrandt is the owner of all right, title and interest in the '627 patent,

with the right to sue, enforce and recover damages for infringement.

9.       CBS operates television systems and provides television services

throughout the United States.

2

10.    Defendant has directly or indirectly infringed the '627 patent, and is continuing to do so, by practicing the inventions claimed therein, and/or by inducing or contributing to the practice by others of the inventions claimed therein, in this judicial district. For example, Defendant has infringed, and continues to infringe, the '627 patent by its transmission, or receipt and retransmission, over its television systems, of digital terrestrial broadcast signals that comply with the ATSC Digital Television Standard.

11.    Rembrandt has been damaged by Defendant's infringement and will suffer additional and irreparable damage unless this Court enjoins Defendant from continuing its infringement under 35 U.S.C. § 283.

12.    Upon information and belief, such infringement has been, and will continue to be, willful and deliberate, entitling Rembrandt to increased damages under 35 U.S.C. § 284 and making this an exceptional case entitling Rembrandt to an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

## PRAYER FOR RELIEF

WHEREFORE, Rembrandt respectfully requests the following relief:

(1)    the entry of judgment in favor of Rembrandt, and against Defendant, that Defendant has infringed the '627 patent;

(2)    a permanent injunction enjoining and restraining Defendant and its officers, agents, servants, employees, affiliates, divisions, units and subsidiaries, and those in association therewith, from further acts of infringement of the '627 patent;

(3)    an award of damages;

(4)    an award of increased damages pursuant to 35 U.S.C. § 284;

(5)     an award of all costs and expenses of this action, including reasonable attorneys' fees, pre-judgment interest, and post-judgment interest; and

(6)     such other and further relief, at law and in equity, as the Court deems just and proper.

## JURY DEMAND

Rembrandt hereby respectfully requests a jury trial on all issues so triable.


ASHBY & GEDDES


Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Plaintiff*

*Of Counsel:*

John F. Sweeney
Joseph A. DeGirolamo
Michael O. Cummings
MORGAN & FINNEGAN, LLP
3 World Financial Center
New York, NY 10281-2101
Telephone: (212) 415-8700
jsweeney@morganfinnegan.com
jdegirolamo@ morganfinnegan.com
mcummings@morganfinnegan.com

Dated:  December 1, 2006
175613.1

4

# EXHIBIT 8B

.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| REMBRANDT TECHNOLOGIES, LP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     C.A. No. _____ |
| | ) |
| ABC, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

## COMPLAINT FOR PATENT INFRINGEMENT
## AND DEMAND FOR JURY TRIAL

Rembrandt Technologies, LP ("Rembrandt"), for its complaint against ABC, Inc. ("ABC" or "Defendant""), alleges as follows:

## PARTIES

1. Rembrandt is a limited partnership organized under the laws of the State of New Jersey, having its principal place of business at 401 City Avenue, Suite 815, Bala Cynwyd, PA 19004.

2. ABC is a corporation organized under the laws of the State of New York, having its principal place of business at 77 W. 66th Street, New York, NY 10023-6201.

## JURISDICTION AND VENUE

3. This is an action arising under the patent laws of the United States, Title 35, United States Code. This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1338(a).

4.      This Court has personal jurisdiction over ABC. Defendant has conducted and does conduct business within the State of Delaware. Defendant, directly or through subsidiaries or intermediaries, offers for sale, sells, advertises, and markets products and services that infringe the patent-in-suit, as described more specifically below. Therefore, because Defendant has committed acts of patent infringement in this district, or is otherwise present or doing business in this district, this Court has personal jurisdiction over Defendant.

5.      Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b), (c), and 1400(b).

## INFRINGEMENT OF U.S. PATENT NO. 5,243,627

6.      Rembrandt realleges and incorporates herein by reference the allegations stated in paragraphs 1-5 of this Complaint.

7.      United States Patent No. 5,243,627 entitled "Signal Point Interleaving Technique" ("the '627 patent") was duly and legally issued by the United States Patent & Trademark Office on September 7, 1993. A copy of the '627 patent is annexed hereto as Exhibit A.

8.      Rembrandt is the owner of all right, title and interest in the '627 patent, with the right to sue, enforce and recover damages for infringement.

9.      ABC operates television systems and provides television services throughout the United States.

10.      Defendant has directly or indirectly infringed the '627 patent, and is continuing to do so, by practicing the inventions claimed therein, and/or by inducing or

2

contributing to the practice by others of the inventions claimed therein, in this judicial district. For example, Defendant has infringed, and continues to infringe, the '627 patent by its transmission, or receipt and retransmission, over its television systems, of digital terrestrial broadcast signals that comply with the ATSC Digital Television Standard.

11.     Rembrandt has been damaged by Defendant's infringement and will suffer additional and irreparable damage unless this Court enjoins Defendant from continuing its infringement under 35 U.S.C. § 283.

12.     Upon information and belief, such infringement has been, and will continue to be, willful and deliberate, entitling Rembrandt to increased damages under 35 U.S.C. § 284 and making this an exceptional case entitling Rembrandt to an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

## PRAYER FOR RELIEF

WHEREFORE, Rembrandt respectfully requests the following relief:

(1)     the entry of judgment in favor of Rembrandt, and against Defendant, that Defendant has infringed the '627 patent;

(2)     a permanent injunction enjoining and restraining Defendant and its officers, agents, servants, employees, affiliates, divisions, units and subsidiaries, and those in association therewith, from further acts of infringement of the '627 patent;

(3)     an award of damages;

(4)     an award of increased damages pursuant to 35 U.S.C. § 284;

(5)     an award of all costs and expenses of this action, including reasonable attorneys' fees, pre-judgment interest, and post-judgment interest; and

(6)     such other and further relief, at law and in equity, as the Court deems just and proper.

## JURY DEMAND

Rembrandt hereby respectfully requests a jury trial on all issues so triable.

ASHBY & GEDDES

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Plaintiff*

*Of Counsel:*

John F. Sweeney
Joseph A. DeGirolamo
Michael O. Cummings
MORGAN & FINNEGAN, LLP
3 World Financial Center
New York, NY 10281-2101
Telephone: (212) 415-8700
Fax: (212) 415-8701
jsweeney@morganfinnegan.com
jdegirolamo@ morganfinnegan.com
mcummings@morganfinnegan.com

Dated:  December 1, 2006
175612.1

4

# EXHIBIT 8C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| REMBRANDT TECHNOLOGIES, LP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No. _____ |
| | ) | |
| NBC UNIVERSAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT FOR PATENT INFRINGEMENT
## AND DEMAND FOR JURY TRIAL

Rembrandt Technologies, LP ("Rembrandt"), for its complaint against NBC Universal, Inc. ("NBC" or "Defendant"), alleges as follows:

## PARTIES

1. Rembrandt is a limited partnership organized under the laws of the State of New Jersey, having its principal place of business at 401 City Avenue, Suite 815, Bala Cynwyd, PA 19004.

2. NBC is a corporation organized under the laws of the State of Delaware, having its principal place of business at 30 Rockefeller Plaza, New York, NY 10019.

## JURISDICTION AND VENUE

3. This is an action arising under the patent laws of the United States, Title 35, United States Code. This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1338(a).

4.     This Court has personal jurisdiction over NBC. Defendant is incorporated in the State of Delaware, and has conducted and does conduct business within the State of Delaware. Defendant, directly or through subsidiaries or intermediaries, offers for sale, sells, advertises, and markets products and services that infringe the patent-in-suit, as described more specifically below. Therefore, because Defendant has committed acts of patent infringement in this district, or is otherwise present or doing business in this district, this Court has personal jurisdiction over Defendant.

5.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b), (c), and 1400(b).

## INFRINGEMENT OF U.S. PATENT NO. 5,243,627

6.     Rembrandt realleges and incorporates herein by reference the allegations stated in paragraphs 1-5 of this Complaint.

7.     United States Patent No. 5,243,627 entitled "Signal Point Interleaving Technique" ("the '627 patent") was duly and legally issued by the United States Patent & Trademark Office on September 7, 1993. A copy of the '627 patent is annexed hereto as Exhibit A.

8.     Rembrandt is the owner of all right, title and interest in the '627 patent, with the right to sue, enforce and recover damages for infringement.

9.     NBC operates television systems and provides television services throughout the United States.

2

10.     Defendant has directly or indirectly infringed the '627 patent, and is continuing to do so, by practicing the inventions claimed therein, and/or by inducing or contributing to the practice by others of the inventions claimed therein, in this judicial district. For example, Defendant has infringed, and continues to infringe, the '627 patent by its transmission, or receipt and retransmission, over its television systems, of digital terrestrial broadcast signals that comply with the ATSC Digital Television Standard.

11.     Rembrandt has been damaged by Defendant's infringement and will suffer additional and irreparable damage unless this Court enjoins Defendant from continuing its infringement under 35 U.S.C. § 283.

12.     Upon information and belief, such infringement has been, and will continue to be, willful and deliberate, entitling Rembrandt to increased damages under 35 U.S.C. § 284 and making this an exceptional case entitling Rembrandt to an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

## PRAYER FOR RELIEF

WHEREFORE, Rembrandt respectfully requests the following relief:

(1)     the entry of judgment in favor of Rembrandt, and against Defendant, that Defendant has infringed the '627 patent;

(2)     a permanent injunction enjoining and restraining Defendant and its officers, agents, servants, employees, affiliates, divisions, units and subsidiaries, and those in association therewith, from further acts of infringement of the '627 patent;

(3)     an award of damages;

3

(4)     an award of increased damages pursuant to 35 U.S.C. § 284;

(5)     an award of all costs and expenses of this action, including reasonable

attorneys' fees, pre-judgment interest, and post-judgment interest; and

(6)     such other and further relief, at law and in equity, as the Court deems just

and proper.

## JURY DEMAND

Rembrandt hereby respectfully requests a jury trial on all issues so triable.


ASHBY & GEDDES


_____
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Of Counsel:*                                              *Attorneys for Plaintiff*

John F. Sweeney
Joseph A. DeGirolamo
Michael O. Cummings
MORGAN & FINNEGAN, LLP
3 World Financial Center
New York, NY 10281-2101
Telephone: (212) 415-8700
jsweeney@morganfinnegan.com
jdegirolamo@morganfinnegan.com
mcummings@morganfinnegan.com

Dated:  December 1, 2006
175611.1

4

# EXHIBIT 8D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| REMBRANDT TECHNOLOGIES, LP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. _____ |
| | ) | |
| FOX ENTERTAINMENT GROUP, INC., and | ) | |
| FOX BROADCASTING COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR PATENT INFRINGEMENT
## AND DEMAND FOR JURY TRIAL

Rembrandt Technologies, LP ("Rembrandt"), for its complaint against Fox

Entertainment Group, Inc. ("Fox Entertainment") and Fox Broadcasting Company ("Fox

Broadcasting") (sometimes jointly referred to herein as "FOX" or "Defendants"), alleges as

follows:

## PARTIES

1.     Rembrandt is a limited partnership organized under the laws of the State

of New Jersey, having its principal place of business at 401 City Avenue, Suite 815, Bala

Cynwyd, PA 19004.

2.     Fox Entertainment is a corporation organized under the laws of the State

of Delaware, having its principal place of business at 10201 W. Pico Blvd, Los Angeles, CA

90035-2606.

3.      Fox Broadcasting is a subsidiary of Fox Entertainment and is a corporation organized under the laws of the State of Delaware, having its principal place of business at 10201 W. Pico Blvd, Los Angeles, CA 90035-2606.

## JURISDICTION AND VENUE

4.      This is an action arising under the patent laws of the United States, Title 35, United States Code.  This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1338(a).

5.      This Court has personal jurisdiction over FOX.  Defendants are incorporated in the State of Delaware, and have conducted and do conduct business within the State of Delaware.  Defendants, directly or through subsidiaries or intermediaries, offer for sale, sell, advertise, and market products and services that infringe the patent-in-suit, as described more specifically below.  Therefore, because Defendants have committed acts of patent infringement in this district, or are otherwise present or doing business in this district, this Court has personal jurisdiction over Defendants.

6.      Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b), (c), and 1400(b).

## INFRINGEMENT OF U.S. PATENT NO. 5,243,627

7.      Rembrandt realleges and incorporates herein by reference the allegations stated in paragraphs 1-6 of this Complaint.

2

8. United States Patent No. 5,243,627 entitled "Signal Point Interleaving Technique" ("the '627 patent") was duly and legally issued by the United States Patent & Trademark Office on September 7, 1993. A copy of the '627 patent is annexed hereto as Exhibit A.

9. Rembrandt is the owner of all right, title and interest in the '627 patent, with the right to sue, enforce and recover damages for infringement.

10. FOX operates television systems and provides television services throughout the United States.

11. Defendants have directly or indirectly infringed the '627 patent, and are continuing to do so, by practicing the inventions claimed therein, and/or by inducing or contributing to the practice by others of the inventions claimed therein, in this judicial district. For example, Defendants have infringed, and continue to infringe, the '627 patent by their transmission, or receipt and retransmission, over their television systems, of digital terrestrial broadcast signals that comply with the ATSC Digital Television Standard.

12. Rembrandt has been damaged by Defendants' infringement and will suffer additional and irreparable damage unless this Court enjoins Defendants from continuing their infringement under 35 U.S.C. § 283.

13. Upon information and belief, such infringement has been, and will continue to be, willful and deliberate, entitling Rembrandt to increased damages under 35 U.S.C. § 284 and making this an exceptional case entitling Rembrandt to an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

3

## PRAYER FOR RELIEF

WHEREFORE, Rembrandt respectfully requests the following relief:

(1)     the entry of judgment in favor of Rembrandt, and against Defendants, that

Defendants have infringed the '627 patent;

(2)     a permanent injunction enjoining and restraining Defendants and their

officers, agents, servants, employees, affiliates, divisions, units and subsidiaries, and those in

association therewith, from further acts of infringement of the '627 patent;

(3)     an award of damages;

(4)     an award of increased damages pursuant to 35 U.S.C. § 284;

(5)     an award of all costs and expenses of this action, including reasonable

attorneys' fees, pre-judgment interest, and post-judgment interest; and

(6)     such other and further relief, at law and in equity, as the Court deems just

and proper.

## JURY DEMAND

Rembrandt hereby respectfully requests a jury trial on all issues so triable.

ASHBY & GEDDES

_____

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Plaintiff*

4

*Of Counsel:*

John F. Sweeney
Joseph A. DeGirolamo
Michael O. Cummings
MORGAN & FINNEGAN, LLP
3 World Financial Center
New York, NY 10281-2101
Telephone: (212) 415-8700
Fax: (212) 415-8701
jsweeney@morganfinnegan.com
jdegirolamo@morganfinnegan.com
mcummings@morganfinnegan.com

Dated: December 1, 2006
175610.1

# EXHIBIT 9

 **United States Patent and Trademark Office** 

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Assignments on the Web > Patent Query

## Patent Assignment Abstract of Title

*NOTE:Results display only for issued patents and published applications.
For pending or abandoned applications please consult USPTO staff.*

**Total Assignments: 9**
**Patent #:** 5008903   **Issue Dt:** 04/16/1991   **Application #:** 07357056   **Filing Dt:** 05/25/1989
**Inventors:** WILLIAM L. BETTS, JAMES J. DES ROSIERS
   **Title:** ADAPTIVE TRANSMIT PRE-EMPHASIS FOR DIGITAL MODEM COMPUTED FROM NOISE
SPECTRUM
**Assignment: 1**
   **Reel/Frame:** 005123/0495   **Recorded:** 06/28/1989   **Pages:** 1
   **Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST.
   **Assignors:** BETTS, WILLIAM L.   **Exec Dt:** 06/23/1989
              DES ROSIERS, JAMES J.   **Exec Dt:** 06/23/1989
   **Assignee:** A.T.&T. PARADYNE, 8545 126TH AVE., N., P.O. BOX 2826 LARGO FL 34649-2826 A
CORP. OF NJ
**Correspondent:** JOSEPH C. SULLIVAN
              KANE, DALSIMER, SULLIVAN, KURUCZ,
              LEVY, EISELE & RICHARD
              711 THIRD AVE.
              NEW YORK, NY 10017
**Assignment: 2**
   **Reel/Frame:** 008167/0408   **Recorded:** 10/10/1996   **Pages:** 24
   **Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
   **Assignor:** LUCENT TECHNOLOGIES, INC.   **Exec Dt:** 07/31/1996
   **Assignee:** PARADYNE CORPORATION (FORMERLY KNOWN AS AT&T PARADYNE CORPORATION)
              8545 126TH AVENUE NORTH
              LARGO, FLORIDA 33773
**Correspondent:** COOLEY GODWARD CASTRO HUDDLESON & TATUM
              CRAIG P. OPPERMAN
              FIVE PALO ALTO SQUARE
              3000 EL CAMINO REAL
              PALO ALTO, CALIFORNIA 94306
**Assignment: 3**
   **Reel/Frame:** 008261/0384   **Recorded:** 12/11/1996   **Pages:** 14
   **Conveyance:** SECURITY AGREEMENT
   **Assignor:** PARADYNE CORPORATION   **Exec Dt:** 07/31/1996
   **Assignee:** BANKAMERICA BUSINESS CREDIT, INC.
              2 NORTH LAKE AVENUE
              SUITE 200

PASADENA, CALIFORNIA 91101

**Correspondent:** MORRISON & FOERSTER LLP
GARY E. CANN
345 CALIFORNIA STREET
SAN FRANCISCO, CA 94104-2675

**Assignment: 4**
**Reel/Frame:** 008366/0665          **Recorded:** 02/13/1997          **Pages:** 5
**Conveyance:** CHANGE OF NAME (SEE DOCUMENT FOR DETAILS).
**Assignor:** AT& T PARADYNE CORP          **Exec Dt:** 08/05/1996
**Assignee:** PARADYNE CORPORATION
8545 126 AVENUE NORTH
LARGO, FLORIDA 33773
**Correspondent:** THOMAS, KAYDEN, HORSTEMEYER &
RISLEY, L.L.P.
SCOTT A. HORSTEMEYER
100 GALLERIA PARKWAY, SUITE 1500
ATLANTA, GA 30339

**Assignment: 5**
**Reel/Frame:** 012211/0350          **Recorded:** 10/16/2001          **Pages:** 40
**Conveyance:** SECURITY AGREEMENT
**Assignor:** PARADYNE CORPORATION          **Exec Dt:** 07/16/2001
**Assignee:** FOOTHILL CAPITAL CORPORATION
SUITE 3000W
2450 COLORADO AVE.
SANTA MONICA, CALIFORNIA 90404
**Correspondent:** BROBECK, PHLEGER & HARRISON LLP
DENISE HINDS
550 SO. HOPE ST.
LOS ANGELES, CA 90071

**Assignment: 6**
**Reel/Frame:** 017706/0479          **Recorded:** 06/02/2006          **Pages:** 4
**Conveyance:** RELEASE BY SECURED PARTY (SEE DOCUMENT FOR DETAILS).
**Assignors:** BANK OF AMERICA, N.A.          **Exec Dt:** 07/22/2004
BANKAMERICA BUSINESS CREDIT, INC.          **Exec Dt:** 07/22/2004
**Assignee:** PARADYNE CORPORATION
8545 126TH AVENUE NORTH
LARGO, FLORIDA 33773
**Correspondent:** SCOTT A. HORSTEMEYER
100 GALLERIA PARKWAY
SUITE 1750
ATLANTA, GA 30339

**Assignment: 7**
**Reel/Frame:** 017706/0483          **Recorded:** 06/02/2006          **Pages:** 5
**Conveyance:** RELEASE BY SECURED PARTY (SEE DOCUMENT FOR DETAILS).
**Assignor:** WELLS FARGO FOOTHILL, INC., F/K/A FOOTHILL          **Exec Dt:** 12/16/2004
CAPITAL CORPORATION

**Assignee:** PARADYNE CORPORATION
8545 126TH AVENUE NORTH
LARGO, FLORIDA 33773
**Correspondent:** SCOTT A. HORSTEMEYER
100 GALLERIA PARKWAY
SUITE 1750
ATLANTA, GA 30339

**Assignment: 8**
**Reel/Frame:** 018015/0826          **Recorded:** 07/31/2006          **Pages:** 9
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignors:** ZHONE TECHNOLOGIES, INC.          **Exec Dt:** 06/09/2006
PARADYNE CORPORATION          **Exec Dt:** 06/09/2006
**Assignee:** REMBRANDT IP MANAGEMENT, LLC
401 CITY AVENUE
BALA CYNWYD, PENNSYLVANIA 19004
**Correspondent:** SCOTT A. HORSTEMEYER
100 GALLERIA PARKWAY
SUITE 1750
ATLANTA, GA 30339

**Assignment: 9**
**Reel/Frame:** 018160/0082          **Recorded:** 08/23/2006          **Pages:** 10
**Conveyance:** CORRECTIVE ASSIGNMENT TO CORRECT THE ASSIGNEE PREVIOUSLY RECORDED ON REEL 018015 FRAME 0826. ASSIGNOR(S) HEREBY CONFIRMS THE CORRECTIVE ASSIGNMENT TO CORRECT THE ASSIGNEE FROM REMBRANDT IP MANAGEMENT, LLC TO REMBRANDT COMMUNICATIONS, LP.
**Assignors:** ZHONE TECHNOLOGIES, INC.          **Exec Dt:** 08/09/2006
PARADYNE CORPORATION          **Exec Dt:** 08/09/2006
REMBRANDT IP MANAGEMENT, LLC          **Exec Dt:** 08/09/2006
**Assignee:** REMBRANDT COMMUNICATIONS, LP
401 CITY AVENUE
BALA CYNWYD, PENNSYLVANIA 19004
**Correspondent:** SCOTT A. HORSTEMEYER
100 GALLERIA PARKWAY
SUITE 1750
ATLANTA, GA 30339

Search Results as of: 01/23/2007 05:47 PM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350.
Web interface last modified: July 26, 2006 v.1.10

| .HOME | INDEX| SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT



## United States Patent and Trademark Office



## Assignments on the Web > Patent Query

# Patent Assignment Abstract of Title

**NOTE:Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff.**

**Total Assignments: 9**
**Patent #:** 6131159  **Issue Dt:** 10/10/2000  **Application #:** 07880257  **Filing Dt:** 05/08/1992
**Inventors:** GIDEON HECHT, KURT E. HOLMQUIST, DONALD C. SNOLL
**Title:** APPARATUS AND METHOD FOR DOWNLOADING PROGRAMS

**Assignment: 1**
**Reel/Frame:** 006131/0089  **Recorded:** 05/08/1992  **Pages:** 6
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST.
**Assignors:** HECHT, GIDEON  **Exec Dt:** 04/21/1992
HOLMQUIST, KURT E.  **Exec Dt:** 04/21/1992
SNOLL, DONALD C.  **Exec Dt:** 05/01/1992
**Assignee:** AMERICAN TELEPHONE AND TELEGRAPH COMPANY A CORPORATION OF NEW YORK
550 MADISON AVENUE, NEW YORK, NY 10022-3201
**Correspondent:** P.V.D. WILDE
AT&T BELL LABORATORIES
600 MOUNTAIN AVENUE
P.O. BOX 636
MURRAY HILL, NJ 07974-0636

**Assignment: 2**
**Reel/Frame:** 007527/0274  **Recorded:** 06/07/1995  **Pages:** 36
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignor:** AMERICAN TELELPHONE AND TELEGRAPH COMPANY  **Exec Dt:** 04/20/1994
**Assignee:** AT&T CORP.
32 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10013
**Correspondent:** MR. S. H. DWORETSKY
AT&T BELL LABORATORIES
600 MOUNTAIN AVENUE
3C-512, P.O. BOX 636
MURRAY HILL, NJ 07974-0636

**Assignment: 3**
**Reel/Frame:** 007528/0038  **Recorded:** 06/07/1995  **Pages:** 39
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignor:** AT&T CORP.  **Exec Dt:** 05/23/1995
**Assignee:** AT&T IPM CORP.
2333 PONCE DE LEON BOULEVARD
CORAL GABLES, FLORIDA 33134

**Correspondent:** MR. S.H. DWORETSKY
AT&T BELL LABORATORIES
600 MOUNTAIN AVENUE - 3C-512
P.O. BOX 636
MURRAY HILL, NJ 07974-0636

**Assignment: 4**
**Reel/Frame:** 008765/0361          **Recorded:** 10/20/1997          **Pages:** 8
**Conveyance:** BILL OF SALE, CONVEYANCE, ASSIGNMENT AND TRANSFER OF ASSETS
**Assignor:** AT&T IPM CORP.                      **Exec Dt:** 08/25/1995
**Assignee:** AT&T CORP.
P.O. BOX 636
600 MOUNTAIN AVENUE
MURRAY HILL, NEW JERSEY 07974
**Correspondent:** THOMAS, KAYDEN, HORSTEMEYER & RISLEY LLP
SCOTT A. HORSTEMEYER
100 GALLERIA PARKWAY, SUITE 1500
ATLANTA, GEORGIA 30339

**Assignment: 5**
**Reel/Frame:** 008178/0161          **Recorded:** 11/12/1996          **Pages:** 81
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignor:** AT&T CORP.                          **Exec Dt:** 03/29/1996
**Assignee:** LUCENT TECHNOLOGIES INC.
600 MOUNTAIN AVENUE - P.O. BOX 636
MURRAY HILL, NEW JERSEY 07974
**Correspondent:** BRUCE S. SCHNEIDER
DOCKET ADMINISTRATOR - ROOM 3C-512
600 MOUNTAIN AVENUE
P.O. BOX 636
AMURRAY HILL, NEW JERSEY 07974-0636

**Assignment: 6**
**Reel/Frame:** 008173/0152          **Recorded:** 10/10/1996          **Pages:** 3
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignor:** LUCENT TECHNOLOGIES, INC.          **Exec Dt:** 07/31/1996
**Assignee:** PARADYNE CORPORATION (FORMERLY KNOWN AS AT&T PARADYNE CORPORATION)
8545 126TH AVENUE N.
LARGO, FLORIDA 33773
**Correspondent:** COOLEY GODWARD CASTRO HUDDLESON & TATUM
CRAIG P. OPPERMAN
FIVE PALO ALTO SQUARE
3000 EL CAMINO REAL
PALO ALTO, CA 94306

**Assignment: 7**
**Reel/Frame:** 012211/0350          **Recorded:** 10/16/2001          **Pages:** 40
**Conveyance:** SECURITY AGREEMENT
**Assignor:** PARADYNE CORPORATION              **Exec Dt:** 07/16/2001
**Assignee:** FOOTHILL CAPITAL CORPORATION

SUITE 3000W
2450 COLORADO AVE.
SANTA MONICA, CALIFORNIA 90404
**Correspondent:** BROBECK, PHLEGER & HARRISON LLP
DENISE HINDS
550 SO. HOPE ST.
LOS ANGELES, CA 90071

**Assignment: 8**
**Reel/Frame:** 015972/0276      **Recorded:** 03/30/2005                    **Pages:** 27
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignor:** PARADYNE CORPORATION                **Exec Dt:** 12/09/2004
**Assignee:** REMBRANDT TECHNOLOGIES LP
401 CITY AVENUE
BALA CYNWYD, PENNSYLVANIA
**Correspondent:** FISH & RICHARDSON P.C.
TIMOTHY DEVLIN
1425 K STREET, N.W.
11TH FLOOR
WASHINGTON, DC 20005-3500

**Assignment: 9**
**Reel/Frame:** 015503/0087      **Recorded:** 12/20/2004                    **Pages:** 3
**Conveyance:** AGREEMENT REGARDING RELEASE OF SECURITY INTERESTS
**Assignor:** WELLS FARGO FOOTHILL, INC., FORMERLY KNOWN      **Exec Dt:** 12/20/2004
AS FOOTHILL CAPITAL CORPORATION
**Assignee:** PARADYNE CORPORATION
8545 126TH AVENUE NORTH
LARGO, FLORIDA 33773
**Correspondent:** THOMAS, KAYDEN, HORSTEMEYER & RISLEY LLP
SCOTT A. HORSTEMEYER
100 GALLERIA PARKWAY, SUITE 1750
ATLANTA, GA 30339-5948

Search Results as of: 01/23/2007 05:49 PM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350.
Web interface last modified: July 26, 2006 v.1.10

| .HOME | INDEX| SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

 **United States Patent and Trademark Office**

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help



## Assignments on the Web > Patent Query

# Patent Assignment Abstract of Title

*NOTE: Results display only for issued patents and published applications.*
*For pending or abandoned applications please consult USPTO staff.*

**Total Assignments: 3**
**Patent #:** 5778234    **Issue Dt:** 07/07/1998    **Application #:** 08899834    **Filing Dt:** 07/24/1997
**Inventors:** GIDEON HECHT, KURT ERVIN HOLMQUIST, DONALD C. SNOLL
**Title:** METHOD FOR DOWNLOADING PROGRAMS
**Assignment: 1**
       **Reel/Frame:** 012211/0350       **Recorded:** 10/16/2001                 **Pages:** 40
       **Conveyance:** SECURITY AGREEMENT
       **Assignor:** PARADYNE CORPORATION                         **Exec Dt:** 07/16/2001
       **Assignee:** FOOTHILL CAPITAL CORPORATION
                  SUITE 3000W
                  2450 COLORADO AVE.
                  SANTA MONICA, CALIFORNIA 90404
   **Correspondent:** BROBECK, PHLEGER & HARRISON LLP
                  DENISE HINDS
                  550 SO. HOPE ST.
                  LOS ANGELES, CA 90071
**Assignment: 2**
       **Reel/Frame:** 015972/0276       **Recorded:** 03/30/2005                 **Pages:** 27
       **Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
       **Assignor:** PARADYNE CORPORATION                         **Exec Dt:** 12/09/2004
       **Assignee:** REMBRANDT TECHNOLOGIES LP
                  401 CITY AVENUE
                  BALA CYNWYD, PENNSYLVANIA
   **Correspondent:** FISH & RICHARDSON P.C.
                  TIMOTHY DEVLIN
                  1425 K STREET, N.W.
                  11TH FLOOR
                  WASHINGTON, DC 20005-3500
**Assignment: 3**
       **Reel/Frame:** 015503/0087       **Recorded:** 12/20/2004                 **Pages:** 3
       **Conveyance:** AGREEMENT REGARDING RELEASE OF SECURITY INTERESTS
       **Assignor:** WELLS FARGO FOOTHILL, INC., FORMELY KNOWN        **Exec Dt:** 12/20/2004
                  AS FOOTHILL CAPITAL CORPORATION
       **Assignee:** PARADYNE CORPORATION
                  8545 126TH AVENUE NORTH
                  LARGO, FLORIDA 33773

**Correspondent:** THOMAS, KAYDEN, HORSTEMEYER & RISLEY LLP

SCOTT A. HORSTEMEYER

100 GALLERIA PARKWAY, SUITE 1750

ATLANTA, GA 30339-5948

If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350.
Web interface last modified: July 26, 2006 v.1.10

| .HOME | INDEX| SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

Case 2:07-cv-00404-GMSCE Document 245212 Filed 06/28/2007 Page 100 of 144
Page 1 of 2
USPTO Assignments on the Web

 **United States Patent and Trademark Office** 

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Assignments on the Web > Patent Query

# Patent Assignment Abstract of Title

*NOTE:Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff.*

**Total Assignments: 5**
**Patent #:** 6950444    **Issue Dt:** 09/27/2005    **Application #:** 09637185    **Filing Dt:** 08/11/2000
**Inventors:** Kurt Holmquist, Joseph Chapman
    **Title:** SYSTEM AND METHOD FOR A ROBUST PREAMBLE AND TRANSMISSION DELIMITING IN A SWITCHED-CARRIER TRANSCEIVER
**Assignment: 1**
    **Reel/Frame:** 011119/0993    **Recorded:** 08/11/2000    **Pages:** 5
    **Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
    **Assignors:** HOLMQUIST, KURT    **Exec Dt:** 08/10/2000
        CHAPMAN, JOSEPH    **Exec Dt:** 08/10/2000
    **Assignee:** PARADYNE CORPORATION
        8545 126 AVENUE NORTH
        LARGO, FLORIDA 33773
    **Correspondent:** THOMAS, KAYDEN, HORSTEMEYER ET AL
        SCOTT A. HORSTEMEYER
        100 GALLERIA PARKWAY
        SUITE 1750
        ATLANTA, GA 30339
**Assignment: 2**
    **Reel/Frame:** 012211/0350    **Recorded:** 10/16/2001    **Pages:** 40
    **Conveyance:** SECURITY AGREEMENT
    **Assignor:** PARADYNE CORPORATION    **Exec Dt:** 07/16/2001
    **Assignee:** FOOTHILL CAPITAL CORPORATION
        SUITE 3000W
        2450 COLORADO AVE.
        SANTA MONICA, CALIFORNIA 90404
    **Correspondent:** BROBECK, PHLEGER & HARRISON LLP
        DENISE HINDS
        550 SO. HOPE ST.
        LOS ANGELES, CA 90071
**Assignment: 3**
    **Reel/Frame:** 017706/0483    **Recorded:** 06/02/2006    **Pages:** 5
    **Conveyance:** RELEASE BY SECURED PARTY (SEE DOCUMENT FOR DETAILS).
    **Assignor:** WELLS FARGO FOOTHILL, INC., F/K/A FOOTHILL    **Exec Dt:** 12/16/2004
        CAPITAL CORPORATION
    **Assignee:** PARADYNE CORPORATION

Case 2:07-cv-00404-DMC-CE Document 45-12 Filed 06/28/2007 Page 11 of 14
USPTO Assignments on the Web
Page 2 of 2

8545 126TH AVENUE NORTH
LARGO, FLORIDA 33773
**Correspondent:** SCOTT A. HORSTEMEYER
100 GALLERIA PARKWAY
SUITE 1750
ATLANTA, GA 30339

## Assignment: 4

| | | | | |
|---|---|---|---|---|
| **Reel/Frame:** | 018015/0826 | **Recorded:** 07/31/2006 | | **Pages:** 9 |

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignors:** ZHONE TECHNOLOGIES, INC.      **Exec Dt:** 06/09/2006
PARADYNE CORPORATION      **Exec Dt:** 06/09/2006

**Assignee:** REMBRANDT IP MANAGEMENT, LLC
401 CITY AVENUE
BALA CYNWYD, PENNSYLVANIA 19004

**Correspondent:** SCOTT A. HORSTEMEYER
100 GALLERIA PARKWAY
SUITE 1750
ATLANTA, GA 30339

## Assignment: 5

| | | | | |
|---|---|---|---|---|
| **Reel/Frame:** | 018160/0082 | **Recorded:** 08/23/2006 | | **Pages:** 10 |

**Conveyance:** CORRECTIVE ASSIGNMENT TO CORRECT THE ASSIGNEE PREVIOUSLY RECORDED ON REEL 018015 FRAME 0826. ASSIGNOR(S) HEREBY CONFIRMS THE CORRECTIVE ASSIGNMENT TO CORRECT THE ASSIGNEE FROM REMBRANDT IP MANAGEMENT, LLC TO REMBRANDT COMMUNICATIONS, LP.

**Assignors:** ZHONE TECHNOLOGIES, INC.      **Exec Dt:** 08/09/2006
PARADYNE CORPORATION      **Exec Dt:** 08/09/2006
REMBRANDT IP MANAGEMENT, LLC      **Exec Dt:** 08/09/2006

**Assignee:** REMBRANDT COMMUNICATIONS, LP
401 CITY AVENUE
BALA CYNWYD, PENNSYLVANIA 19004

**Correspondent:** SCOTT A. HORSTEMEYER
100 GALLERIA PARKWAY
SUITE 1750
ATLANTA, GA 30339

Search Results as of: 01/23/2007 05:49 PM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350.
Web interface last modified: July 26, 2006 v.1.10

| .HOME | INDEX| SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT



**United States Patent and Trademark Office**

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help



## Assignments on the Web > Patent Query

# Patent Assignment Abstract of Title

*NOTE: Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff.*

**Total Assignments: 9**
**Patent #:** 5710761    **Issue Dt:** 01/20/1998    **Application #:** 08458048    **Filing Dt:** 05/31/1995
**Inventor:** ROBERT E. SCOTT
**Title:** ERROR CONTROL NEGOTIATION BASED ON MODULATION
**Assignment: 1**
**Reel/Frame:** 007691/0057    **Recorded:** 05/31/1995    **Pages:** 3
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignor:** SCOTT, ROBERT EARL    **Exec Dt:** 05/30/1995
**Assignee:** AT&T IPM CORP.
2333 PONCE DE LEON BOULEVARD
CORAL GABLES, FLORIDA 33134
**Correspondent:** MR. S. H. DWORETSKY, AT&T BELL
LABORATORIES, 600 MOUNTAIN AVENUE
P.O. BOX 636
MURRAY HILL, NJ 07974-0636
**Assignment: 2**
**Reel/Frame:** 008465/0069    **Recorded:** 01/21/1997    **Pages:** 8
**Conveyance:** BILL OF SALE, CONVEYANCE, ASSIGNMENT AND TRANSFER OF ASSETS
**Assignor:** AT&T IPM CORP.    **Exec Dt:** 08/24/1995
**Assignee:** AT&T CORP.
P.O. BOX 636
600 MOUNTAIN AVENUE
MURRAY HILL, NEW JERSEY 07974
**Correspondent:** THOMAS, KAYDEN, HORSTEMEYER & RISLEY
SCOTT A. HORSTEMEYER
100 GALLERIA PARKWAY, SUITE 1500
ATLANTA, GA 30339
**Assignment: 3**
**Reel/Frame:** 007922/0859    **Recorded:** 04/04/1996    **Pages:** 3
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignor:** SCOTT, ROBERT EARL    **Exec Dt:** 03/21/1996
**Assignee:** AT&T PARADYNE
8545 126TH AVENUE, N.
LARGO, FLORIDA 34649
**Correspondent:** LUCENT TECHNOLOGIES
MR. R. D. SLUSKY

600 MOUNTAIN AVENUE
P.O. BOX 636
MURRAY HILL, NJ 07974-0636

**Assignment: 4**
 **Reel/Frame:** 009935/0779          **Recorded:** 05/10/1999          **Pages:** 63
 **Conveyance:** PATENT ASSIGNMENT
 **Assignor:** AT&T CORP.                              **Exec Dt:** 03/29/1996
 **Assignee:** LUCENT TECHNOLOGIES, INC.
ROOM 3B-505
600 MOUNTAIN AVENUE
MURRAY HILL, NEW JERSEY 07974
 **Correspondent:** THOMAS, KAYDEN, HORSTEMEYER & RISLEY LLP
SCOTT A. HORSTEMEYER
100 GALLERIA PARKWAY
SUITE 1500
ATLANTA, GA 30339

**Assignment: 5**
 **Reel/Frame:** 008173/0042          **Recorded:** 10/10/1996          **Pages:** 3
 **Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
 **Assignor:** LUCENT TECHNOLOGIES, INC.                **Exec Dt:** 07/31/1996
 **Assignee:** PARADYNE CORPORATION
8545 126TH AVENUE N.
(FORMERLY KNOWN AS AT&T PARADYNE CORPORATION)
LARGO, FLORIDA 33773
 **Correspondent:** COOLEY GODWARD CASTRO ET AL.
CRAIG P. OPPERMAN
FIVE PALO ALTO SQUARE
3000 EL CAMINO REAL
PALO ALTO, CA 94306

**Assignment: 6**
 **Reel/Frame:** 008427/0502          **Recorded:** 01/21/1997          **Pages:** 5
 **Conveyance:** CHANGE OF NAME (SEE DOCUMENT FOR DETAILS).
 **Assignor:** AT&T PARADYNE CORP.                      **Exec Dt:** 08/05/1996
 **Assignee:** PARADYNE CORPORATION
8545 126 AVENUE NORTH
LARGO, FLORIDA 33773
 **Correspondent:** THOMAS, KAYDEN, HORSTEMEYER ET AL.
SCOTT A. HORSTEMEYER
100 GALLERIA PARKWAY
SUITE 1500
ATLANTA, GA 30339

**Assignment: 7**
 **Reel/Frame:** 012211/0350          **Recorded:** 10/16/2001          **Pages:** 40
 **Conveyance:** SECURITY AGREEMENT
 **Assignor:** PARADYNE CORPORATION                      **Exec Dt:** 07/16/2001
 **Assignee:** FOOTHILL CAPITAL CORPORATION

SUITE 3000W
2450 COLORADO AVE.
SANTA MONICA, CALIFORNIA 90404

**Correspondent:** BROBECK, PHLEGER & HARRISON LLP
DENISE HINDS
550 SO. HOPE ST.
LOS ANGELES, CA 90071

## Assignment: 8

**Reel/Frame:** 015972/0276           **Recorded:** 03/30/2005           **Pages:** 27

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignor:** PARADYNE CORPORATION                  **Exec Dt:** 12/09/2004

**Assignee:** REMBRANDT TECHNOLOGIES LP
401 CITY AVENUE
BALA CYNWYD, PENNSYLVANIA

**Correspondent:** FISH & RICHARDSON P.C.
TIMOTHY DEVLIN
1425 K STREET, N.W.
11TH FLOOR
WASHINGTON, DC 20005-3500

## Assignment: 9

**Reel/Frame:** 015503/0087           **Recorded:** 12/20/2004           **Pages:** 3

**Conveyance:** AGREEMENT REGARDING RELEASE OF SECURITY INTERESTS

**Assignor:** WELLS FARGO FOOTHILL, INC., FORMELY KNOWN     **Exec Dt:** 12/20/2004
AS FOOTHILL CAPITAL CORPORATION

**Assignee:** PARADYNE CORPORATION
8545 126TH AVENUE NORTH
LARGO, FLORIDA 33773

**Correspondent:** THOMAS, KAYDEN, HORSTEMEYER & RISLEY LLP
SCOTT A. HORSTEMEYER
100 GALLERIA PARKWAY, SUITE 1750
ATLANTA, GA 30339-5948

Search Results as of: 01/23/2007 05:48 PM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350.
Web interface last modified: July 26, 2006 v.1.10

| .HOME | INDEX| SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

# EXHIBIT 10A

## Table C-3.
## U.S. District Courts—Civil Cases Commenced, by Nature of Suit and District, During the 12-Month Period Ending June 30, 2005

| Circuit and District | Total Civil Cases | Total U.S. Civil | Contract | Real Property | Tort Actions | Civil Rights | Motions to Vacate Sentence | Habeas Corpus General | Death Penalty | Prison Civil Rights | Prison Condition | Mandamus and Other | Forfeitures and Penalties | Labor Suits | Social Security | All Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL | 282,758 | 54,502 | 3,692 | 2,223 | 2,090 | 2,742 | 11,318 | 6,183 | 9 | 1,922 | 277 | 620 | 2,214 | 500 | 16,066 | 5,546 |
| DC | 2,630 | 1,458 | 38 | 8 | 47 | 307 | 69 | 226 | – | 203 | 16 | 12 | 17 | 7 | 40 | 468 |
| 1ST | 6,549 | 1,497 | 39 | 116 | 102 | 93 | 333 | 92 | – | 41 | 2 | 24 | 90 | 33 | 346 | 185 |
| ME | 485 | 165 | 29 | 8 | 6 | 9 | 35 | 2 | 1 | 1 | 2 | – | 10 | – | 77 | 16 |
| MA | 3,179 | 598 | 19 | 1 | 43 | 45 | 111 | 67 | – | 23 | 2 | 19 | 25 | 25 | 98 | 113 |
| NH | 486 | 125 | 3 | – | 6 | 4 | 25 | 5 | – | 1 | – | – | 24 | – | 38 | 22 |
| RI | 829 | 129 | 2 | 11 | 11 | 30 | 32 | 5 | – | 2 | – | 1 | 10 | 1 | 50 | 12 |
| PR | 1,570 | 480 | 13 | 99 | 42 | 5 | 130 | 15 | – | 14 | 1 | 3 | 21 | 7 | 83 | 22 |
| 2ND | 24,204 | 4,035 | 336 | 166 | 240 | 201 | 565 | 618 | 2 | 53 | 16 | 66 | 223 | 37 | 1,014 | 508 |
| CT | 2,305 | 340 | 7 | 3 | 19 | 34 | 42 | 101 | – | 4 | – | 2 | 25 | 5 | 45 | 54 |
| NY,N | 1,622 | 434 | 10 | 21 | 31 | 12 | 65 | – | – | – | 1 | – | 36 | 5 | 265 | 18 |
| NY,E | 6,398 | 1,429 | 279 | 13 | 105 | 64 | 148 | 216 | – | 19 | – | 37 | 47 | 6 | 278 | 216 |
| NY,S | 11,734 | 1,161 | 22 | 6 | 63 | 65 | 266 | 213 | 2 | 25 | 5 | 26 | 43 | 17 | 218 | 190 |
| NY,W | 1,739 | 518 | 11 | 77 | 15 | 22 | 28 | 87 | – | 4 | 1 | – | 55 | 7 | 195 | 19 |
| VT | 408 | 153 | 7 | 55 | 7 | 4 | 16 | – | – | 14 | 10 | 1 | 17 | 1 | 23 | 11 |
| 3RD | 34,371 | 4,239 | 59 | 221 | 170 | 201 | 492 | 1,141 | 1 | 180 | 12 | 29 | 78 | 50 | 1,275 | 330 |
| DE | 1,302 | 97 | 6 | 1 | 6 | 15 | 23 | – | – | 1 | – | – | 29 | 22 | 26 | 13 |
| NJ | 6,863 | 1,384 | 26 | 4 | 60 | 69 | 137 | 540 | – | 24 | 1 | 16 | 4 | 29 | 314 | 123 |
| PA,E | 20,088 | 1,024 | 12 | 19 | 41 | 63 | 200 | 110 | – | 3 | 1 | 10 | 7 | 5 | 459 | 96 |
| PA,M | 2,862 | 946 | 5 | 103 | 6 | 65 | 229 | 423 | – | 6 | 6 | 1 | 34 | 3 | 123 | 52 |
| PA,W | 2,883 | 720 | 6 | 76 | 35 | 31 | 80 | 49 | 1 | 2 | 5 | 2 | 1 | – | 353 | 55 |
| VI | 383 | 68 | 4 | 16 | 16 | 7 | 50 | 19 | – | 1 | – | – | – | 3 | – | 23 |
| 4TH | 39,018 | 5,175 | 105 | 305 | 194 | 243 | 1,626 | 438 | 1 | 72 | 19 | 95 | 247 | 31 | 1,526 | 273 |
| MD | 3,961 | 872 | 23 | 3 | 47 | 68 | 209 | 6 | – | 10 | 5 | 70 | 88 | 6 | 258 | 93 |
| NC,E | 1,510 | 660 | 34 | 2 | 15 | 69 | 149 | 164 | 1 | 7 | 1 | 15 | 40 | 33 | 169 | 22 |
| NC,M | 1,203 | 464 | 6 | 3 | 10 | 28 | 259 | 14 | – | 1 | 1 | 1 | 45 | 6 | 89 | 16 |
| NC,W | 1,113 | 291 | – | 7 | 4 | 19 | 143 | 2 | – | 8 | 5 | 1 | 16 | 3 | 73 | 21 |
| SC | 23,249 | 947 | 14 | 282 | 41 | 12 | 229 | 61 | – | 17 | 6 | 4 | 13 | – | 247 | 32 |
| VA,E | 4,512 | 690 | 15 | 1 | 54 | 10 | 260 | 81 | – | 2 | 6 | 3 | 20 | 6 | 89 | 66 |
| VA,W | 1,404 | 506 | 3 | 2 | 10 | 17 | 148 | 37 | – | 5 | 5 | 1 | 16 | 4 | 266 | 9 |
| WV,N | 649 | 297 | 4 | 3 | 6 | 13 | 93 | 36 | – | 1 | 1 | 1 | 9 | 4 | 102 | 7 |
| WV,S | 1,417 | 448 | 4 | 3 | 7 | 7 | 136 | 37 | – | 1 | 1 | – | 9 | 3 | 233 | 7 |

Case 2:07-cv-00404-GMS-CE   Document 274-13   Filed 06/28/2007   Page 33 of 100

# Table C-3. (June 30, 2005—Continued)

| Circuit and District | Total Private Civil Cases | Private Cases | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Contract | Real Property | FELA* | Marine Personal Injury | Motor Vehicle Personal Injury | Other Personal Injury | Other Tort Actions | Civil Rights | Habeas Corpus General | Death Penalty | Prisoner Petitions Conditions and Civil Rights | Mandamus and Other | Copyright, Patent, Trademark | Labor Suits | All Other |
| TOTAL | 228,256 | 24,898 | 2,318 | 691 | 1,703 | 4,169 | 43,783 | 22,837 | 33,982 | 19,219 | 214 | 23,100 | 736 | 11,784 | 18,143 | 20,679 |
| DC | 1,172 | 135 | 27 | - | 1 | 25 | 147 | 28 | 325 | 23 | - | 88 | 1 | 65 | 142 | 165 |
| 1ST | 5,052 | 853 | 106 | 38 | 59 | 99 | 763 | 105 | 1,005 | 215 | 2 | 195 | 18 | 347 | 497 | 750 |
| ME | 320 | 63 | 14 | - | 2 | 13 | 42 | 6 | 81 | 15 | - | 34 | - | 13 | 13 | 32 |
| MA | 2,581 | 427 | 22 | 37 | 39 | 258 | 473 | 75 | 473 | 150 | 2 | 86 | 17 | 195 | 273 | 486 |
| NH | 361 | 56 | 7 | 1 | 6 | 41 | 28 | 9 | 62 | 32 | - | 45 | - | 34 | 29 | 73 |
| RI | 700 | 209 | 5 | - | 6 | 6 | 270 | 9 | 107 | 7 | - | 5 | 1 | 37 | 75 | 73 |
| PR | 1,090 | 98 | 66 | - | 11 | 34 | 165 | 9 | 282 | 7 | - | 25 | - | 68 | 107 | 107 |
| 2ND | 20,169 | 2,698 | 108 | 158 | 117 | 564 | 3,288 | 356 | 3,483 | 1,250 | 1 | 1,348 | 29 | 1,423 | 2,229 | 3,211 |
| CT | 1,965 | 404 | 14 | 22 | 12 | 35 | 116 | 42 | 485 | 53 | 1 | 167 | 3 | 113 | 197 | 401 |
| NY-N | 1,186 | 107 | 7 | 10 | 10 | 89 | 89 | 19 | 241 | 175 | - | 256 | 3 | 47 | 84 | 120 |
| NY-E | 4,969 | 436 | 31 | 25 | 27 | 274 | 622 | 78 | 959 | 376 | - | 86 | 17 | 313 | 785 | 927 |
| NY-S | 10,573 | 1,630 | 40 | 68 | 39 | 209 | 2,238 | 194 | 1,505 | 517 | - | 583 | 13 | 890 | 1,031 | 1,620 |
| NY-W | 1,221 | 83 | 68 | 11 | 13 | 26 | 173 | 16 | 272 | 489 | - | 227 | 13 | 47 | 107 | 101 |
| VT | 255 | 38 | 4 | - | 16 | 16 | 50 | 7 | 31 | 10 | - | 19 | - | 13 | 25 | 42 |
| 3RD | 30,132 | 2,407 | 461 | 158 | 70 | 564 | 14,119 | 298 | 3,345 | 1,288 | 29 | 1,549 | 24 | 1,607 | 1,540 | 2,693 |
| DE | 1,205 | 80 | 3 | 3 | 8 | 15 | 22 | 20 | 122 | 67 | - | 153 | 3 | 176 | 94 | 504 |
| NJ | 5,489 | 874 | 14 | 16 | 14 | 174 | 669 | 109 | 932 | 180 | - | 399 | 6 | 34 | 739 | 1,017 |
| PA-E | 19,064 | 916 | 31 | 117 | 31 | 235 | 13,211 | 108 | 1,328 | 376 | 14 | 435 | 9 | 381 | 788 | 790 |
| PA-M | 1,906 | 239 | 28 | 13 | 15 | 94 | 106 | 26 | 298 | 517 | - | 435 | 3 | 953 | 388 | 105 |
| PA-W | 2,163 | 267 | 19 | 11 | 13 | 31 | 110 | 28 | 641 | 261 | 1 | 300 | 5 | 20 | 94 | 187 |
| VI | 295 | 31 | 4 | - | 3 | 15 | 61 | 7 | 24 | 238 | - | 256 | 3 | 74 | 283 | 90 |
| 4TH | 33,843 | 2,111 | 115 | 19 | 56 | 421 | 2,129 | 19,586 | 2,010 | 1,391 | 19 | 2,431 | 245 | 625 | 1,245 | 1,440 |
| MD | 3,089 | 576 | 28 | 8 | 8 | 119 | 264 | 61 | 520 | 120 | - | 396 | 182 | 87 | 226 | 488 |
| NC-E | 850 | 112 | 14 | 14 | 9 | 6 | 77 | 18 | 169 | 97 | 3 | 149 | - | 54 | 51 | 766 |
| NC-M | 739 | 93 | 6 | 1 | 1 | 22 | 48 | 18 | 169 | 114 | 1 | 114 | - | 77 | 48 | 1,017 |
| NC-W | 822 | 147 | 5 | - | 7 | 7 | 55 | 15 | 154 | 114 | 2 | 78 | - | 76 | 65 | 790 |
| SC | 22,302 | 466 | 6 | 4 | 7 | 115 | 59 | 19,170 | 144 | 55 | 1 | 78 | - | 76 | 375 | 167 |
| VA-E | 3,822 | 381 | 9 | 9 | 11 | 115 | 292 | 88 | 466 | 247 | 4 | 786 | 49 | 183 | 316 | 179 |
| VA-W | 883 | 89 | 21 | - | 9 | 55 | 1,127 | 97 | 338 | 468 | 4 | 489 | 10 | 14 | 316 | 342 |
| WV-N | 352 | 100 | 12 | 1 | 4 | 55 | 58 | 29 | 138 | 40 | 2 | 316 | - | 7 | 48 | 49 |
| WV-S | 969 | 147 | 10 | 3 | 9 | 27 | 155 | 213 | 91 | 111 | - | 74 | 4 | 79 | 79 | 39 |

## Table C-3. (June 30, 2005—Continued)

| Circuit and District | Total Civil Cases | U.S. Cases | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Total U.S. Civil | Contract | Real Property Actions | Tort Actions | Civil Rights | Prisoner Petitions | | | | | Mandamus and Other | Forfeitures and Penalties | Labor Suits | Social Security | All Other |
| | | | | | | | Motions to Vacate Sentence | Habeas Corpus General | Death Penalty | Prison Civil Rights | Prison Condition | | | | | |
| **5TH** | 31,030 | 6,406 | 989 | 59 | 212 | 291 | 1,812 | 846 | 3 | 108 | 17 | 26 | 208 | 52 | 1,270 | 513 |
| LA,E | 4,162 | 328 | 20 | 4 | 28 | 25 | 63 | 48 | - | 2 | - | 2 | 7 | - | 94 | 57 |
| LA,M | 1,447 | 85 | 4 | 4 | 28 | 24 | 24 | 1 | - | 7 | - | 2 | 11 | - | 27 | 10 |
| LA,W | 2,550 | 773 | 15 | 5 | 26 | 26 | 108 | 228 | - | 7 | 6 | 2 | 21 | 1 | 301 | 24 |
| MS,N | 1,289 | 81 | 7 | 12 | 22 | 26 | 16 | 33 | - | 6 | - | - | 5 | 5 | 29 | 8 |
| MS,S | 2,728 | 245 | 6 | 22 | 18 | 18 | 56 | 165 | - | 9 | 3 | 1 | 22 | 5 | 40 | 17 |
| TX,N | 4,921 | 1,050 | 12 | 4 | 18 | 58 | 290 | 165 | - | 23 | - | 8 | 28 | 17 | 275 | 143 |
| TX,E | 3,010 | 607 | 11 | 4 | 18 | 12 | 121 | 6 | 2 | 52 | - | - | 18 | 7 | 160 | 45 |
| TX,S | 7,265 | 2,131 | 859 | 3 | 38 | 83 | 586 | 139 | - | 7 | 11 | 8 | 63 | 15 | 164 | 162 |
| TX,W | 3,658 | 1,106 | 38 | 1 | 59 | 60 | 548 | 65 | - | 12 | - | 1 | 66 | 5 | 180 | 87 |
| **6TH** | 27,691 | 5,162 | 553 | 296 | 139 | 195 | 813 | 293 | - | 71 | 18 | 12 | 181 | 77 | 2,094 | 420 |
| KY,E | 2,342 | 1,261 | 6 | 131 | 10 | 11 | 60 | 157 | - | 55 | 12 | 4 | 7 | - | 781 | 29 |
| KY,W | 1,410 | 325 | 6 | 94 | 11 | 5 | 42 | 2 | - | 7 | - | - | 11 | 1 | 121 | 21 |
| MI,E | 5,872 | 1,228 | 484 | 17 | 34 | 51 | 159 | 13 | - | - | 6 | 5 | 21 | 5 | 266 | 133 |
| MI,W | 1,612 | 302 | 12 | 3 | 3 | 9 | 105 | 14 | - | 3 | - | - | 42 | 6 | 84 | 22 |
| OH,N | 9,223 | 547 | 13 | 21 | 24 | 17 | 76 | 45 | - | 4 | - | 1 | 18 | 10 | 221 | 70 |
| OH,S | 2,729 | 524 | 16 | 24 | 29 | 31 | 66 | 12 | - | 5 | - | 1 | 40 | 21 | 203 | 51 |
| TN,E | 1,625 | 400 | 8 | - | 13 | 16 | 147 | - | - | 4 | - | - | 9 | 11 | 188 | 23 |
| TN,M | 1,419 | 278 | 8 | 11 | 9 | 16 | 65 | 3 | - | 2 | - | 1 | 23 | 2 | 99 | 41 |
| TN,W | 1,459 | 297 | 9 | 11 | 10 | 21 | 89 | 47 | - | 3 | - | 1 | 23 | 5 | 61 | 29 |
| **7TH** | 17,797 | 3,143 | 341 | 289 | 133 | 159 | 741 | 285 | - | 26 | 10 | 15 | 160 | 44 | 573 | 357 |
| IL,N | 8,182 | 1,184 | 281 | 21 | 63 | 105 | 202 | 39 | - | 8 | 3 | 12 | 37 | 24 | 128 | 259 |
| IL,C | 1,162 | 239 | 7 | 21 | 5 | 7 | 88 | 15 | - | 3 | 3 | 1 | 18 | 1 | 48 | 8 |
| IL,S | 1,295 | 330 | 8 | 57 | 6 | 6 | 89 | 82 | - | 2 | 1 | - | 31 | 5 | 22 | 22 |
| IN,N | 1,923 | 505 | 8 | 50 | 21 | 9 | 105 | 12 | - | 4 | 3 | 1 | 31 | 6 | 92 | 71 |
| IN,S | 2,929 | 505 | 8 | 138 | 16 | 13 | 96 | 1 | - | 4 | - | - | 9 | 6 | 179 | 20 |
| WI,E | 1,349 | 246 | 19 | 6 | 18 | 11 | 79 | 6 | - | 10 | - | - | 23 | 2 | 61 | 23 |
| WI,W | 957 | 317 | 9 | 11 | 10 | 9 | 72 | 140 | - | 12 | - | 1 | 12 | 1 | 25 | 16 |
| **8TH** | 16,475 | 3,935 | 63 | 300 | 114 | 152 | 855 | 295 | - | 43 | 25 | 22 | 119 | 24 | 1,673 | 250 |
| AR,E | 3,797 | 705 | 6 | 116 | 6 | 23 | 49 | 132 | - | 8 | 20 | 7 | 7 | 7 | 318 | 10 |
| AR,W | 932 | 371 | 1 | 16 | 3 | 7 | 26 | 2 | - | 1 | - | 1 | 11 | - | 297 | 4 |
| IA,N | 691 | 289 | 3 | 11 | 11 | 8 | 89 | 4 | - | 7 | - | 1 | 21 | 1 | 111 | 12 |
| IA,S | 995 | 309 | 4 | 39 | 9 | 20 | 118 | 4 | - | 4 | - | 1 | 5 | 5 | 109 | 10 |
| MN | 3,447 | 347 | 13 | 10 | 23 | 7 | 78 | 7 | - | 4 | 4 | 2 | 12 | 6 | 74 | 53 |
| MO,E | 2,441 | 516 | 9 | 4 | 19 | 48 | 155 | 48 | - | 9 | - | 6 | 22 | 3 | 189 | 40 |
| MO,W | 2,483 | 849 | 9 | 3 | 16 | 27 | 163 | 57 | - | 6 | 4 | 6 | 11 | 4 | 471 | 71 |
| NE | 1,053 | 283 | 5 | 38 | 8 | 11 | 90 | 6 | - | 10 | - | 1 | 19 | 4 | 49 | 23 |
| ND | 280 | 127 | 3 | 59 | 6 | 6 | 80 | 13 | - | 1 | - | - | 2 | 1 | 17 | 9 |
| SD | 416 | 169 | 13 | 4 | 17 | 6 | 45 | 18 | - | 1 | - | 5 | 5 | 2 | 38 | 7 |

34

## Table C-3. (June 30, 2005—Continued)

| Circuit and District | Total Private Civil Cases | Private Cases | | | | | | | | Prisoner Petitions | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Contract | Real Property | FELA* | Marine Personal Injury | Motor Vehicle Personal Injury | Other Personal Injury | Other Tort Actions | Civil Rights | Habeas Corpus General | Death Penalty | Conditions and Civil Rights | Mandamus and Other | Copyright, Patent, Trademark | Labor Suits | All Other |
| **5TH** | **24,624** | **3,590** | **230** | **59** | **809** | **723** | **4,220** | **423** | **3,013** | **3,462** | **56** | **3,386** | **95** | **1,362** | **1,535** | **1,679** |
| LA,E | 3,844 | 342 | 36 | 4 | 414 | 153 | 1,358 | 21 | 364 | 333 | 6 | 209 | 3 | 86 | 111 | 204 |
| LA,M | 1,362 | 103 | 8 | 3 | 6 | 30 | 202 | 11 | 314 | 82 | – | 218 | 2 | 23 | 470 | 67 |
| LA,W | 1,985 | 204 | 28 | 2 | 123 | 354 | 354 | 38 | 205 | 205 | 1 | 140 | 3 | 11 | 83 | 93 |
| MS,N | 1,777 | 238 | 6 | 4 | 1 | 103 | 266 | 36 | 219 | 135 | 1 | 231 | – | 28 | 30 | 46 |
| MS,S | 1,208 | 648 | 47 | 2 | 11 | 45 | 610 | 27 | 164 | 207 | 7 | 333 | 1 | 77 | 67 | 139 |
| TX,N | 2,483 | 552 | 31 | 3 | 30 | 104 | 246 | 57 | 225 | 207 | 11 | 333 | 23 | 238 | 242 | 384 |
| TX,E | 3,871 | 552 | 31 | 3 | 30 | 104 | 610 | 59 | 549 | 829 | 8 | 672 | 24 | 238 | 242 | 384 |
| TX,E | 2,403 | 225 | 20 | 12 | 156 | 30 | 344 | 22 | 242 | 491 | 11 | 487 | 38 | 146 | 94 | 110 |
| TX,S | 5,134 | 912 | 29 | 30 | 237 | 61 | 638 | 87 | 621 | 787 | 15 | 577 | 10 | 341 | 322 | 467 |
| TX,W | 2,552 | 266 | 23 | 2 | 2 | 41 | 202 | 31 | 463 | 393 | 4 | 316 | 11 | 486 | 106 | 206 |
| **6TH** | **22,529** | **2,289** | **213** | **75** | **84** | **446** | **7,624** | **304** | **3,448** | **1,573** | **21** | **1,597** | **28** | **739** | **2,216** | **1,872** |
| KY,E | 1,061 | 188 | 7 | 2 | 1 | 75 | 183 | 23 | 173 | 69 | – | 120 | 28 | 26 | 65 | 147 |
| KY,W | 1,085 | 209 | 5 | 8 | 2 | 75 | 120 | 21 | 175 | 82 | – | 140 | 9 | 49 | 112 | 64 |
| MI,E | 4,644 | 555 | 64 | 15 | 3 | 57 | 815 | 84 | 825 | 579 | 5 | 281 | 9 | 204 | 670 | 84 |
| MI,W | 1,310 | 131 | 11 | 19 | 1 | 20 | 35 | 18 | 161 | 202 | 4 | 418 | 4 | 103 | 103 | 146 |
| OH,N | 8,676 | 434 | 71 | 7 | 12 | 60 | 5,874 | 58 | 569 | 255 | 5 | 102 | 7 | 636 | 636 | 458 |
| OH,S | 2,205 | 327 | 17 | 12 | 9 | 31 | 193 | 35 | 570 | 142 | 6 | 75 | 7 | 155 | 329 | 304 |
| TN,E | 2,070 | 325 | 17 | 10 | 7 | 82 | 170 | 20 | 287 | 65 | 1 | 151 | 1 | 155 | 105 | 104 |
| TN,M | 1,225 | 184 | 8 | 1 | 1 | 37 | 99 | 21 | 310 | 72 | 3 | 154 | 1 | 36 | 105 | 102 |
| TN,W | 1,141 | 122 | 14 | 1 | 3 | 37 | 170 | 24 | 203 | 72 | 3 | 154 | 1 | 102 | 138 | 102 |
| | 1,162 | 140 | 16 | 1 | 7 | 34 | 135 | 24 | 378 | 103 | 6 | 156 | 3 | 35 | 58 | 66 |
| **7TH** | **14,654** | **1,733** | **570** | **106** | **38** | **254** | **838** | **255** | **3,345** | **1,237** | **3** | **1,534** | **10** | **778** | **2,218** | **1,735** |
| IL,N | 6,998 | 931 | 513 | 45 | 38 | 78 | 336 | 144 | 1,526 | 197 | 3 | 273 | 5 | 438 | 1,439 | 1,068 |
| IL,C | 923 | 73 | 13 | 2 | 1 | 12 | 31 | 11 | 236 | 92 | – | 187 | – | 52 | 136 | 77 |
| IL,S | 965 | 89 | 9 | 19 | 7 | 27 | 28 | 28 | 132 | 54 | – | 192 | 2 | 52 | 118 | 126 |
| IN,N | 1,803 | 145 | 14 | 14 | 11 | 52 | 80 | 17 | 410 | 262 | 4 | 192 | 2 | 45 | 160 | 126 |
| IN,S | 2,424 | 265 | 11 | 23 | 3 | 38 | 154 | 40 | 646 | 307 | 2 | 272 | 1 | 100 | 208 | 237 |
| WI,E | 1,101 | 123 | 7 | 3 | 1 | 58 | 80 | 17 | 295 | 373 | 2 | 135 | – | 77 | 114 | 109 |
| WI,W | 640 | 98 | 3 | – | – | 11 | 46 | 10 | 100 | 163 | 2 | 168 | 2 | 56 | 43 | 34 |
| **8TH** | **12,540** | **1,313** | **51** | **23** | **13** | **250** | **3,934** | **291** | **2,200** | **849** | **6** | **1,530** | **81** | **566** | **855** | **578** |
| AR,E | 3,092 | 106 | 3 | 3 | 3 | 35 | 1,915 | 9 | 371 | 122 | 1 | 342 | 50 | 26 | 71 | 39 |
| AR,W | 561 | 94 | 4 | 4 | 2 | 20 | 71 | 17 | 142 | 15 | 3 | 112 | 2 | 11 | 35 | 35 |
| IA,N | 392 | 56 | 2 | 1 | 3 | 12 | 7 | 6 | 81 | 37 | – | 112 | – | 28 | 33 | 20 |
| IA,S | 666 | 75 | 6 | 6 | 2 | 6 | 4 | 13 | 165 | 51 | – | 159 | – | 77 | 39 | 46 |
| MN | 3,100 | 314 | 10 | 4 | 4 | 16 | 1,250 | 182 | 427 | 176 | 1 | 101 | 3 | 187 | 309 | 121 |
| MO,E | 1,895 | 231 | 12 | 4 | 4 | 87 | 323 | 26 | 395 | 156 | 1 | 116 | 1 | 116 | 192 | 114 |
| MO,W | 1,634 | 197 | 7 | 2 | 4 | 55 | 170 | 23 | 343 | 156 | 1 | 315 | 23 | 69 | 120 | 65 |
| NE | 770 | 180 | 7 | 7 | 1 | 55 | 69 | 9 | 203 | 42 | – | 134 | 1 | 39 | 39 | 65 |
| ND | 153 | 30 | 2 | 1 | – | 12 | 61 | 5 | 28 | 10 | 1 | 134 | – | 11 | 8 | 21 |
| SD | 257 | 50 | 1 | – | – | 9 | 35 | 10 | 45 | 44 | 6 | 41 | – | 8 | 9 | 13 |

35

## Table C-3. (June 30, 2005—Continued)

Columns under "U.S. Cases" span Total U.S. Civil through All Other. Columns under "Prisoner Petitions" span Motions to Vacate Sentence through Mandamus and Other.

| Circuit and District | Total Civil Cases | Total U.S. Civil | Contract | Real Property | Tort Actions | Civil Rights | Motions to Vacate Sentence | Habeas Corpus General | Death Penalty | Prison Civil Rights | Prison Condition | Mandamus and Other | Forfeitures and Penalties | Labor Suits | Social Security | All Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **9TH** | 43,530 | 10,332 | 619 | 155 | 452 | 535 | 1,866 | 837 | 1 | 138 | 6 | 200 | 490 | 85 | 3,439 | 1,509 |
| AK | 4,558 | 1,085 | 10 | - | 19 | 11 | 46 | - | - | 1 | - | 2 | 3 | 11 | 23 | 19 |
| AZ | 5,709 | 1,086 | 21 | - | 47 | 53 | 464 | 153 | - | 11 | - | 4 | 73 | 4 | 154 | 91 |
| CA.N | 4,487 | 841 | 82 | 28 | 59 | 81 | 66 | 66 | - | 15 | 2 | - | 28 | 1 | 169 | 231 |
| CA.E | 2,828 | 1,008 | 18 | 15 | 25 | 48 | 152 | 85 | - | 36 | - | 6 | 30 | 3 | 511 | 94 |
| CA.C | 13,802 | 3,435 | 382 | 37 | 106 | 119 | 342 | 332 | 1 | 41 | 1 | 162 | 156 | 32 | 1,317 | 594 |
| CA.S | - | 785 | 22 | 7 | 50 | 65 | 187 | 10 | - | 6 | 1 | 3 | 70 | 3 | 251 | 81 |
| HI | 771 | 198 | 16 | 8 | 11 | 27 | 62 | 3 | - | 3 | - | - | 2 | 2 | 89 | 31 |
| ID | 605 | 165 | 7 | 15 | 5 | 5 | 37 | 5 | - | 7 | - | 1 | 11 | 2 | 9 | 34 |
| MT | 672 | 226 | 5 | 1 | 18 | 33 | 77 | 3 | - | 7 | 1 | - | 2 | 4 | 39 | 25 |
| NV | 2,533 | 442 | 9 | 12 | 24 | 12 | 123 | 28 | - | 5 | 1 | 6 | 42 | 8 | 48 | 127 |
| OR | 2,681 | 877 | 11 | 13 | 13 | 32 | 123 | 30 | - | 5 | - | 9 | 24 | 4 | 28 | 85 |
| WA.E | 852 | 378 | 17 | 7 | 30 | 40 | 87 | 119 | - | 1 | - | 8 | 8 | 7 | 127 | 13 |
| WA.W | 3,566 | 722 | 1 | 12 | 43 | 6 | 86 | 3 | - | - | - | - | 12 | 2 | 527 | 83 |
| GUAM | 64 | 21 | 17 | - | 3 | 3 | 14 | - | - | - | - | - | 28 | 1 | 147 | - |
| NMI | 39 | 12 | 1 | - | - | - | - | - | - | - | - | - | - | 1 | - | - |
| **10TH** | 10,856 | 2,893 | 58 | 217 | 131 | 132 | 685 | 141 | - | 14 | 81 | 9 | 143 | 21 | 964 | 297 |
| CO | 2,661 | 489 | 17 | 8 | 24 | 35 | 64 | 49 | - | 2 | 13 | 9 | 21 | 4 | 152 | 95 |
| KS | 1,799 | 548 | 3 | 34 | 13 | 18 | 130 | - | - | 1 | 68 | - | 18 | 4 | 144 | 25 |
| NM | 1,472 | 493 | 6 | 5 | 48 | 25 | 167 | 86 | - | 2 | - | - | 56 | 6 | 132 | 48 |
| OK.N | 837 | 207 | 3 | 13 | 4 | 4 | 42 | 1 | - | - | - | 1 | 7 | 6 | 113 | 18 |
| OK.E | 586 | 211 | 9 | 10 | 4 | 2 | 25 | 1 | - | 1 | - | - | 5 | 5 | 147 | 18 |
| OK.W | 1,816 | 467 | 5 | 133 | 16 | 28 | 55 | 2 | - | 3 | - | - | 5 | 5 | 184 | 5 |
| UT | 1,313 | 364 | 12 | 13 | 16 | 3 | 138 | 2 | - | - | - | 2 | 10 | 6 | 54 | 29 |
| WY | 372 | 114 | 3 | 1 | 2 | 3 | 64 | - | - | 1 | - | - | 8 | - | 85 | 23 |
| **11TH** | 28,607 | 6,227 | 492 | 91 | 156 | 233 | 1,461 | 971 | - | 73 | 55 | 110 | 288 | 39 | 1,862 | 436 |
| AL.N | 3,765 | 555 | 6 | 1 | 8 | 37 | 60 | 59 | - | 8 | 3 | - | 15 | 4 | 338 | 16 |
| AL.M | 1,263 | 225 | 6 | 1 | 9 | 17 | 59 | 4 | - | 3 | - | - | 14 | 2 | 119 | 25 |
| AL.S | 834 | 175 | - | 1 | 6 | 9 | 63 | - | - | - | - | 1 | - | 1 | 85 | 8 |
| FL.N | 1,836 | 587 | 4 | - | 15 | 9 | 125 | 264 | - | 16 | 16 | 1 | 5 | 7 | 119 | 12 |
| FL.M | 7,141 | 1,766 | 35 | 20 | 50 | 41 | 402 | 350 | - | 17 | 32 | 56 | 29 | 21 | 613 | 114 |
| FL.S | 7,056 | 1,640 | 389 | 49 | 71 | 71 | 442 | 191 | - | 30 | 2 | 9 | 87 | 19 | 141 | 187 |
| GA.N | 4,368 | 735 | 35 | 39 | 23 | 44 | 158 | 69 | - | 14 | 2 | 42 | 72 | 6 | 205 | 55 |
| GA.M | 1,145 | 295 | 8 | 8 | 9 | 10 | 65 | 5 | - | - | - | - | 18 | 1 | 158 | 21 |
| GA.S | 1,199 | 249 | 7 | - | 4 | 11 | 87 | 29 | - | 4 | - | - | 18 | 1 | 74 | 14 |

36

## Table C-3. (June 30, 2005—Continued)

| Circuit and District | Total Private Civil Cases | Contract | Real Property | FELA* | Marine Personal Injury | Motor Vehicle Personal Injury | Other Personal Injury | Other Tort Actions | Civil Rights | Habeas Corpus General | Death Penalty | Conditions and Civil Rights | Mandamus and Other | Copyright, Patent, Trademark | Labor Suits | All Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9TH | 33,198 | 3,727 | 210 | 41 | 258 | 209 | 3,526 | 440 | 4,512 | 884 | 11 | 5,355 | 104 | 2,863 | 2,339 | 4,073 |
| AK | 245 | 79 | 12 | 2 | 8 | 1 | 24 | 2 | 36 | 29 | — | 16 | 5 | 6 | 19 | 21 |
| AZ | 3,472 | 332 | 12 | 1 | 26 | 26 | 137 | 31 | 506 | 255 | 2 | 1,535 | 9 | 157 | 122 | 349 |
| CA,N | 4,868 | 498 | 26 | 5 | 41 | 14 | 229 | 82 | 746 | 693 | 5 | 749 | 8 | 464 | 521 | 787 |
| CA,E | 3,479 | 222 | 23 | 7 | 28 | 48 | 112 | 26 | 635 | 814 | 1 | 1,049 | 3 | 72 | 104 | 307 |
| CA,C | 10,367 | 1,233 | 39 | 8 | 17 | 25 | 1,895 | 139 | 1,339 | 1,493 | 10 | 614 | 28 | 1,415 | 792 | 1,343 |
| CA,S | 2,043 | 222 | 19 | 8 | 17 | 32 | 90 | 29 | 132 | 283 | — | 263 | 3 | 156 | 63 | 248 |
| HI | 573 | 91 | 19 | 8 | 41 | 10 | 34 | 24 | 75 | 23 | — | 28 | 28 | 36 | 59 | 76 |
| ID | 446 | 59 | 7 | — | — | 15 | 55 | 10 | 53 | 47 | — | 86 | 9 | 9 | 17 | 37 |
| MT | 446 | 92 | 2 | 1 | 41 | 11 | 55 | 5 | 60 | 60 | — | 82 | 2 | 28 | 58 | 37 |
| NV | 2,091 | 297 | 18 | 3 | 20 | 15 | 166 | 28 | 412 | 263 | 1 | 310 | 2 | 137 | 128 | 308 |
| OR | 1,804 | 209 | 18 | 1 | 8 | 20 | 112 | 20 | 445 | 329 | 1 | 328 | 2 | 99 | 143 | 185 |
| WA,E | 474 | 45 | 7 | — | 8 | 26 | 34 | 4 | 100 | 58 | — | 106 | 45 | 17 | 24 | 63 |
| WA,W | 2,846 | 297 | 25 | 8 | 135 | 15 | 550 | 41 | 402 | 152 | 1 | 344 | 1 | 287 | 310 | 280 |
| GUAM | 23 | 3 | 1 | — | — | — | — | 1 | — | — | — | 1 | — | — | 1 | 7 |
| NMI | 27 | — | 1 | — | — | 4 | 3 | 1 | 3 | — | — | — | — | — | 1 | — |
| 10TH | 7,963 | 1,249 | 86 | 21 | 6 | 231 | 741 | 145 | 2,007 | 884 | — | 930 | 21 | 422 | 433 | 776 |
| CO | 2,172 | 353 | 18 | 5 | 6 | 44 | 127 | 31 | 455 | 242 | 2 | 361 | 8 | 139 | 118 | 267 |
| KS | 1,251 | 182 | 5 | 2 | — | 48 | 114 | 28 | 304 | 113 | — | 185 | — | 69 | 73 | 110 |
| NM | 979 | 138 | 17 | 4 | — | 31 | 127 | 22 | 405 | 53 | — | 52 | 8 | 20 | 34 | 77 |
| OK,N | 630 | 127 | 6 | 2 | — | 13 | 46 | 10 | 160 | 73 | 1 | 30 | 2 | 25 | 76 | 64 |
| OK,E | 375 | 52 | 5 | 3 | — | 8 | 39 | 5 | 95 | 60 | — | 58 | 6 | 42 | 58 | 64 |
| OK,W | 1,349 | 183 | 14 | — | — | 32 | 147 | 24 | 316 | 279 | 4 | 141 | 5 | 49 | 59 | 103 |
| UT | 949 | 173 | 23 | 2 | — | 13 | 90 | 23 | 226 | 32 | — | 75 | 9 | 121 | 49 | 122 |
| WY | 258 | 41 | 4 | 4 | — | 26 | 51 | 3 | 46 | 32 | 1 | 18 | — | 4 | 12 | 15 |
| 11TH | 22,380 | 2,893 | 144 | 20 | 192 | 360 | 2,454 | 606 | 4,269 | 2,555 | 45 | 3,177 | 80 | 987 | 2,894 | 1,707 |
| AL,N | 3,210 | 327 | 6 | — | 6 | 61 | 993 | 83 | 685 | 236 | 11 | 413 | 7 | 44 | 239 | 105 |
| AL,M | 1,038 | 126 | 6 | — | — | 40 | 81 | 24 | 247 | 81 | 1 | 312 | 7 | 22 | 34 | 48 |
| AL,S | 659 | 152 | 5 | — | 15 | 21 | 81 | 46 | 113 | 49 | — | 80 | 1 | 16 | 34 | 30 |
| FL,N | 1,249 | 98 | 7 | — | — | 40 | 66 | 11 | 261 | 411 | 6 | 258 | 1 | 16 | 39 | 30 |
| FL,M | 5,375 | 681 | 25 | 12 | 30 | 52 | 418 | 78 | 977 | 735 | 22 | 620 | 34 | 264 | 924 | 455 |
| FL,S | 5,416 | 835 | 28 | — | 131 | 28 | 417 | 78 | 842 | 368 | 1 | 371 | 15 | 311 | 1,398 | 592 |
| GA,N | 3,633 | 519 | 51 | 8 | 3 | 52 | 270 | 212 | 657 | 264 | — | 619 | 20 | 246 | 152 | 328 |
| GA,M | 950 | 78 | 8 | 3 | — | 32 | 65 | 9 | 194 | 107 | 1 | 235 | — | 40 | 36 | 56 |
| GA,S | 950 | 77 | 8 | 2 | 2 | 32 | 61 | 17 | 93 | 204 | 1 | 259 | 1 | 15 | 38 | 51 |

*FELA = FEDERAL EMPLOYERS LIABILITY ACT.

# EXHIBIT 10B

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

|  |  | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | Numerical Standing | |
|---|---|---|---|---|---|---|---|---|---|
| **DELAWARE** | | 2005 | 2004 | 2003 | 2002 | 2001 | 2000 | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | Filings* | 1,190 | 1,797 | 1,362 | 2,028 | 1,004 | 1,303 | | |
| | Terminations | 1,448 | 1,516 | 1,507 | 1,478 | 1,020 | 955 | | |
| | Pending | 1,853 | 2,085 | 1,836 | 1,999 | 1,477 | 1,502 | | |
| | % Change in Total Filings — Over Last Year | | -33.8 | | | | | 91 | 6 |
| | % Change in Total Filings — Over Earlier Years | | | -12.6 | -41.3 | 18.5 | -8.7 | 70 | 5 |
| | Number of Judgeships | 4 | 4 | 4 | 4 | 4 | 4 | | |
| | Vacant Judgeship Months** | .0 | .0 | 1.9 | 3.1 | .0 | .0 | | |
| ACTIONS PER JUDGESHIP | FILINGS — Total | 298 | 449 | 340 | 507 | 251 | 326 | 81 | 5 |
| | FILINGS — Civil | 264 | 414 | 306 | 462 | 233 | 307 | 70 | 5 |
| | FILINGS — Criminal Felony | 28 | 29 | 25 | 38 | 18 | 19 | 91 | 6 |
| | FILINGS — Supervised Release Hearings** | 6 | 6 | 9 | 7 | - | - | 88 | 4 |
| | Pending Cases | 463 | 521 | 459 | 500 | 369 | 376 | 26 | 3 |
| | Weighted Filings** | 422 | 534 | 424 | 516 | 379 | 389 | 59 | 4 |
| | Terminations | 362 | 379 | 377 | 370 | 255 | 239 | 71 | 4 |
| | Trials Completed | 20 | 19 | 23 | 18 | 16 | 19 | 44 | 2 |
| MEDIAN TIMES (months) | From Filing to Disposition — Criminal Felony | 9.4 | 9.1 | 8.3 | 9.8 | 8.0 | 6.6 | 58 | 1 |
| | From Filing to Disposition — Civil** | 10.9 | 14.0 | 11.2 | 8.2 | 12.6 | 10.9 | 68 | 5 |
| | From Filing to Trial** (Civil Only) | 23.5 | 26.0 | 24.0 | 22.5 | 21.0 | 24.0 | 47 | 2 |
| OTHER | Civil Cases Over 3 Years Old** — Number | 156 | 65 | 66 | 99 | 77 | 70 | | |
| | Civil Cases Over 3 Years Old** — Percentage | 9.1 | 3.4 | 3.9 | 5.4 | 5.5 | 4.9 | 77 | 5 |
| | Average Number of Felony Defendants Filed Per Case | 1.2 | 1.2 | 1.3 | 1.1 | 1.3 | 1.2 | | |
| | Jurors — Avg. Present for Jury Selection | 39.82 | 38.50 | 34.98 | 33.84 | 32.68 | 35.75 | | |
| | Jurors — Percent Not Selected or Challenged | 22.8 | 20.9 | 24.0 | 24.4 | 19.9 | 28.5 | | |

| 2005 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 1055 | 28 | 5 | 252 | 7 | 3 | 36 | 92 | 50 | 149 | 149 | 63 | 221 |
| Criminal* | 110 | 1 | 27 | 16 | 23 | 20 | 6 | ** | 5 | 4 | - | 6 | 2 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See "Explanation of Selected Terms."

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | Numerical Standing | |
|---|---|---|---|---|---|---|---|---|---|
| **TEXAS EASTERN** | | 2005 | 2004 | 2003 | 2002 | 2001 | 2000 | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | Filings* | 3,583 | 3,860 | 4,072 | 3,610 | 3,452 | 3,604 | U.S. | Circuit |
| | Terminations | 3,538 | 4,243 | 3,487 | 4,458 | 4,819 | 4,568 | | |
| | Pending | 3,035 | 2,983 | 3,358 | 2,825 | 3,706 | 5,076 | | |
| | % Change in Total Filings — Over Last Year | | -7.2 | | | | | 67 | 6 |
| | % Change in Total Filings — Over Earlier Years | | | -12.0 | -.8 | 3.8 | -.6 | 53 | 6 |
| | Number of Judgeships | 8 | 8 | 8 | 7 | 7 | 7 | | |
| | Vacant Judgeship Months** | .0 | 9.1 | 4.2 | 19.3 | 10.0 | .0 | | |
| ACTIONS PER JUDGESHIP | FILINGS — Total | 448 | 483 | 509 | 515 | 493 | 515 | 45 | 7 |
| | FILINGS — Civil | 376 | 411 | 431 | 444 | 427 | 447 | 36 | 7 |
| | FILINGS — Criminal Felony | 72 | 71 | 77 | 70 | 66 | 68 | 45 | 3 |
| | FILINGS — Supervised Release Hearings** | 0 | 1 | 1 | 1 | 1 | - | - | - |
| | Pending Cases | 379 | 373 | 420 | 404 | 529 | 725 | 53 | 8 |
| | Weighted Filings** | 511 | 518 | 529 | 492 | 492 | 503 | 31 | 5 |
| | Terminations | 442 | 530 | 436 | 637 | 688 | 653 | 49 | 6 |
| | Trials Completed | 21 | 21 | 26 | 22 | 22 | 28 | 38 | 6 |
| MEDIAN TIMES (months) | From Filing to Disposition — Criminal Felony | 8.3 | 8.4 | 7.5 | 8.9 | 8.0 | 6.9 | 42 | 6 |
| | From Filing to Disposition — Civil** | 10.3 | 6.5 | 10.9 | 15.0 | 30.9 | 24.3 | 55 | 5 |
| | From Filing to Trial** (Civil Only) | 15.9 | 15.4 | 17.0 | 14.0 | 15.9 | 15.7 | 8 | 2 |
| OTHER | Civil Cases Over 3 Years Old** — Number | 64 | 47 | 41 | 58 | 881 | 1,878 | | |
| | Civil Cases Over 3 Years Old** — Percentage | 2.6 | 1.9 | 1.4 | 2.4 | 26.1 | 39.6 | 13 | 4 |
| | Average Number of Felony Defendants Filed Per Case | 1.7 | 1.7 | 1.7 | 1.4 | 1.7 | 1.6 | | |
| | Jurors — Avg. Present for Jury Selection | 34.27 | 33.92 | 32.49 | 32.40 | 32.25 | 35.12 | | |
| | Jurors — Percent Not Selected or Challenged | 30.2 | 32.5 | 33.5 | 33.3 | 35.6 | 35.2 | | |

| 2005 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 3004 | 146 | 311 | 1346 | 35 | 23 | 95 | 242 | 227 | 193 | 260 | 9 | 117 |
| Criminal* | 569 | 4 | 127 | 68 | 204 | 49 | 28 | 23 | 14 | 18 | 5 | 4 | 25 |

\*  Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See "Explanation of Selected Terms."

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| REMBRANDT TECHNOLOGIES, L.P. | |
| Plaintiff, | |
| v. | CASE NO. 2:06-CV-507 [LED] |
| CHARTER COMMUNICATIONS, INC., CHARTER COMMUNICATIONS OPERATING, LLC, and COXCOM, INC., | |
| Defendants. | |

## **ORDER DISMISSING DEFENDANT COXCOM, INC. FOR LACK OF PERSONAL JURISDICTION**

It is hereby ORDERED AND ADJUDGED that Defendant CoxCom, Inc. be dismissed with/without prejudice from this action due to this Court's lack of personal jurisdiction over CoxCom.

US2000 9720059.5 C8490-331049

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| REMBRANDT TECHNOLOGIES, L.P. | |
| Plaintiff, | |
| v. | CASE NO. 2:06-CV-507 [LED] |
| CHARTER COMMUNICATIONS, INC., CHARTER COMMUNICATIONS OPERATING, LLC, and COXCOM, INC., | |
| Defendants. | |

## <u>ORDER DISMISSING DEFENDANT COXCOM, INC. FOR LACK OF SUBJECT MATTER JURISDICTION</u>

It is hereby ORDERED AND ADJUDGED that Defendant CoxCom, Inc. be dismissed with/without prejudice from this action due to this Court's lack of subject matter jurisdiction over the action against CoxCom, Inc.

19

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

REMBRANDT TECHNOLOGIES, L.P.

        Plaintiff,

v.

CHARTER COMMUNICATIONS, INC.,
CHARTER COMMUNICATIONS
OPERATING, LLC, and COXCOM, INC.,

        Defendants.

CASE NO. 2:06-CV-507 [LED]

## ORDER TRANSFERRING THE ACTION AGAINST DEFENDANT COXCOM, INC. TO THE DISTRICT OF DELAWARE

It is hereby ORDERED AND ADJUDGED that the action against Defendant CoxCom, Inc. be transferred to the District of Delaware, where CoxCom, Inc. v. Rembrandt Technologies, L.P., Case No. 06-721, is currently pending.

20